K3HsWEIc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.

5                           20 CR 188 (JSR)

6                                   Telephone Conference
    RUBEN WEIGAND,
7
            Defendant.
8
    ------------------------------x
9
                                    New York, N.Y.
10                                  March 17, 2020
                                    3:30 p.m.
11

12  Before:

13                  HON. JED S. RAKOFF,

14                                  District Judge

15
                        APPEARANCES
16
    GEOFFREY S. BERMAN
17      United States Attorney for the
        Southern District of New York
18  CHRISTOPHER DiMASE
    TARA LaMORTE
19  NICHOLAS FOLLY
        Assistant United States Attorneys
20
    MICHAEL H. ARTAN
21      Attorney for Defendant

22  ALSO PRESENT:
    LA AUSA Solomon Kim
23

24

25

K3HsWEIc

| | |
|---|---|
| 1 | (In chambers) |
| 2 | THE COURT:  This is Judge Rakoff. |
| 3 | I'm going to put you on the speakerphone. |
| 4 | We have a court reporter here. |
| 5 | Will the parties please state your names for the |
| 6 | record. |
| 7 | MR. DIMASE:  Good morning, your Honor. |
| 8 | For the government, Christopher DiMase. |
| 9 | I'm also joined by AUSA Nicholas Folly and AUSA Tara |
| 10 | La Morte. |
| 11 | Also, the court, if the court would permit, we have |
| 12 | the AUSA from Los Angeles who handled the hearings last week, |
| 13 | Solomon Kim. |
| 14 | He is also on the line to address any questions that |
| 15 | may arise because we were not able to get the transcripts in |
| 16 | advance of today's proceeding. |
| 17 | THE COURT:  All right. |
| 18 | For the defense. |
| 19 | MR. ARTAN:  Good afternoon, your Honor. |
| 20 | Michael Artan for Mr. Weigand. |
| 21 | I have a question for the court before we proceed. |
| 22 | I think someone said yesterday I should not use a |
| 23 | speaker, but my client's fiance is present in my office, and |
| 24 | I'm inquiring whether I could stay on the speaker or not. |
| 25 | I certainly would accede to whatever the court |

K3HsWEIc

1   desires.

2              THE COURT:  Well, you could stay on the speaker.

3              Here is the difficulty.

4              Just keep this in mind.

5              When you're on the speakerphone and I try to interrupt

6   you for a question or something like that, you can't hear me.

7              That's the trouble with speakerphones.

8              So if you will just be sure that when you're speaking

9   on the speakerphone, you pause every minute or so to make sure

10  that I don't have some question for you, then it's fine.

11             MR. ARTAN:  Thank you, your Honor.

12             If it poses a difficulty, I know you'll let me know,

13  and I appreciate the courtesy.

14             I believe there is someone on from pretrial services

15  as well.

16             MS. DEFEO:  Courtney DeFeo, C-o-u-r-t-n-e-y D-e F-e-o.

17             THE COURT:  Thank you.

18             All right.

19             Just to set the table here, this bail hearing

20  originates from a call I received yesterday where I was

21  informed by counsel for both sides that the defendant had been

22  arrested in California, that he had been taken before a

23  magistrate judge who, after receiving the pretrial services

24  report there, which I have a copy of, initially set bail

25  conditions that would authorize the defendant's release.

K3HsWEIc

1          However, he stayed that order at the request of the

2     U.S. Attorney's office in New York, who wanted to appeal that

3     determination to me.

4          Independent of that, I think, as I understood it at

5     least as of yesterday, one of the bail conditions, namely the

6     posting of a substantial bond by a third party, had not been

7     met.

8          We considered whether it was possible to get the

9     defendant here today, but aside from all the obvious problems,

10     the coronavirus problems would have made it just impossible.

11          We are going ahead without the presence of the

12     defendant, but let me ask defense counsel, you indicated

13     yesterday that you might have an opportunity to speak with him

14     before our telephone conference today.

15          I don't know if you did that or not?

16          MR. ARTAN:  Your Honor, after we were on the phone, I

17     went to go see my client, and he has agreed to waive his

18     presence for today's hearing.

19          THE COURT:  All right.

20          Excellent.

21          OK.

22          Let me hear first from the government and then from

23     defense counsel and then from anyone else who wants to be

24     heard.

25          MR. DIMASE:  Judge, just one point of clarification.

K3HsWEIc

1            You mentioned having a pretrial services report from

2    California.

3            Based on my conversations with AUSA Kim, I believe

4    there may be two reports.

5            I just want to make sure that you have those.

6            LAW CLERK:  I just gave you the updated one.

7            I can print out the original one.

8            THE COURT:  I've only read the updated one.

9            I'm told there was an earlier one, but I'll take a

10   look if you want.

11           I don't see any reason to take a look at it.

12           This was the updated.

13           the one I read was the later report.

14           MR. DIMASE:  Understood.

15           OK.

16           I take it, maybe the AUSA can clarify this, that the

17   updated report contains all the information that was contained

18   in the original report?

19           THE COURT:  Well, you know, with apologies to anyone

20   who cares, I assume counsel is going to tell me every relevant

21   fact that I need to know right now.

22           MR. DIMASE:  Fair enough.

23           I don't mind doing that, your Honor.

24           I want to make sure that you had all the appropriate

25   information.

K3HsWEIc

1          With that, typically the government is appealing the

2     decision before the magistrate judge who sets bail conditions,

3     and I shared those with the court yesterday, but in sum, those

4     conditions include a $500,000 bond to be fully secured by

5     equity and real estate owned by a particular person; GPS

6     location monitoring; surrender the defendant's passport; and

7     travel restricted to the Los Angeles area and to the Southern

8     District of New York.

9          We don't believe that those conditions, or frankly any

10    set of conditions, can reasonably assure Mr. Weigand's

11    attendance in court and we are, therefore, seeking detention.

12         I would note at the outset that there was a particular

13    person identified as the surety in the CDCA proceedings.

14         We have been notified by that person, who was prepared

15    at the time to secure the bond with equity and real estate that

16    he owned, that he is no longer prepared to service --

17         THE COURT:  No, I don't think that is especially

18    relevant.

19         I indicated that as much yesterday when defense

20    counsel wanted to have this hearing later, because he wanted to

21    see if he could find someone else who was suitable.

22         If the present conditions are suitable to the court

23    but someone else has to be found, obviously the guy won't be

24    released until someone else is found.

25         But I don't think that is the heart of the matter.

K3HsWEIc

1          I thought the government was of the view that no set

2     of conditions could assure the risk of flight, assure against

3     the risk of flight, even if the bond was $10 million or two

4     cents.

5          MR. DIMASE:  That is our argument, your Honor.

6          THE COURT:  Well, I would like to hear that argument

7     then and enough of these preliminaries.

8          MR. DIMASE:  So, your Honor, first of all, as you have

9     seen in the pretrial services report, after reviewing the

10    information, they recommend detention.

11         The reason for that are many of the same reasons the

12    government seeks detention.

13         First of all, the defendant is a German citizen.

14         He has no citizenship or other status here in the

15    United States.

16         That is particularly problematic because, as the court

17    may be aware, Germany will not extradite its citizens to the

18    United States for prosecution on criminal charges.

19         To the extent that the defendant is able to leave the

20    United States and return to Germany, he cannot be brought back

21    to be prosecuted on the charge in the indictment.

22         Moreover, he has no ties to the United States.

23         He has no family here in the United States, no

24    property that the government is aware of, no employment here,

25    quite infrequent travel here.

K3HsWEIc

1          In point of fact, on this trip -- I'll just go back to

2     how this arrest developed -- Mr. Weigand was flying from

3     Zurich, Switzerland, to San Jose, Costa Rica, and he had a

4     stopover at Los Angeles International Airport in California.

5          And it was at the Los Angeles airport he was arrested

6     by agents on the arrest warrant associated with the indictment.

7          Even on this trip, Mr. Weigand was not intending to

8     stay or spend any significant time.

9          In fact, I believe his flight was scheduled to leave

10    five hours after -- his flight out to Costa Rica was scheduled

11    to leave five hours after his flight from Zurich arrived.

12         In sum, defendant is a foreign citizen to a country

13    that won't extradite.

14         Has no ties really here to the United States.

15         Secondly, it is clear from the allegations in the

16    indictment that this is somebody who is connected to a criminal

17    network with access to substantial financial resources.

18         As the court is no doubt aware from reading the

19    indictment, the charged scheme is a bank fraud scheme involving

20    the processing of over $100 million using phony corporations

21    and offshore bank accounts.

22         In fact, I'll get to this a little later when I

23    discuss the penalties that the defendant faces, but that is

24    likely a significant underestimate of the actual amount of

25    money handled by this organization, because it only accounts

K3HsWEIc

1    for one of the significant credit card companies that was

2    involved in the scheme.

3            We have not obtained records from the other of the two

4    largest credit card players.

5            It could easily be twice that amount, if not more.

6            So I think it also bears note that the government is

7    aware that at least one player in the scheme was earning as

8    much as 8.5 percent of the transactions.

9            So we're talking about, first of all, a very large

10   figure in terms of the money that was flowing through accounts

11   that the defendant and his coconspirators controlled, and then

12   fees that are a substantial portion of that amount of money.

13           So we're talking about a group of people that have

14   access, I think it is fair to say, to substantial resources,

15   many of which may be offshore.

16           Turning to the evidence against this defendant, the

17   evidence is strong.

18           The government has detailed text message conversations

19   involving the defendant in which he and his coconspirators

20   discussed this scheme that is charged in the indictment, which

21   I'll call the miscoding scheme for lack of a better word.

22           We also have anticipated testimony from a

23   coconspirator witness, among other things, placing the

24   defendant in one or more meetings related to the criminal

25   scheme.

K3HsWEIc

1          We have developed evidence that the defendant and his

2     coconspirators used encrypted services, encrypted chat

3     messages, such as Telegram, and e-mail, such as ProtonMail, to

4     avoid law enforcement detection, and also used anonymous e-mail

5     addresses, nicknames, and unsigned e-mails, among other things,

6     to avoid law enforcement detection.

7          So this case is strong against the defendant.

8          turning to the charge, the charge is serious.

9          This is a charge that carries a 30-year statutory

10    maximum.

11         It is a scheme, as I noted before, that involves at

12    least $100 million, but likely much more than that.

13         The guidelines, I understand, were discussed at some

14    length in the California proceedings, I think, at a minimum, it

15    is fair to say somewhere in the ballpark of 70 to 87 months,

16    and I can tell the court how I'm arriving at that.

17         I think there is an argument that the entire $100

18    million, the government is aware of today, could constitute

19    loss under the guidelines.

20         Under that scenario, the range is much higher, at 135

21    to 168 months, based on $100 million loss.

22         But even if it were to take a more conservative

23    approach and really base the loss on gain, because the loss is

24    not easily calculable under the guidelines, I think using the

25    8.5 percent number as a proxy for the amount earned here, that

K3HsWEIc

is in the ballpark of eight and a half million, that gets you

to an offense level of 27 and a resulting guidelines range of

70 to 87 months.

          So that is a substantial sentence, especially in a

white collar case, and it could be much higher than that.

          The bottom line is, between the strength of the

evidence against the defendant and the seriousness of the

charge, along with the consequences it carries, there are

strong defenses for this defendant who has no ties here, who is

a German citizen, and were he to return to Germany, could avoid

ever being prosecuted here in the United States, flee back to

that country or elsewhere in the world.

          There is one other point I want to bring to the

court's attention in connection with this bail proceeding,

which is the post-arrest statement made by Mr. Weigand, which

I think goes a little bit to his likelihood of complying with

bail conditions in terms of, you know, his basically coming to

terms with the charges against him and his willingness to be

honest with law enforcement.

          So he told the agents during his post-arrest statement

that he did not have any involvement with a company that is

listed in the indictment as the marijuana -- I'm not sure, I'm

forgetting the precise definition -- the company to which

Mr. Weigand's coconspirators provided the services.

          Mr. Weigand denied any involvement with that company,

K3HsWEIc

1    but the evidence shows that he was heavily involved in the

2    scheme and that he knew full well that he and his coconspirator

3    handling marijuana transaction proceeds through that company,

4    including text messages, chat messages, and other evidence of

5    that nature where Mr. Weigand is discussing the scheme.

6         In addition, Mr. Weigand was questioned about an

7    e-mail address that the government has connected both to him

8    and to the scheme.

9         Again, he, when questioned about that e-mail address,

10   he denied being connected to it or using it and, in fact, the

11   evidence shows that not only was that his e-mail address, but

12   that he was using it in furtherance of the charged scheme.

13        So to add to everything else, this is a person who

14   has, in the context of a post-arrest statement, when agents

15   spoke to him after his arrest at the airport, lied and denied

16   any involvement in the charged offense.

17        So for all those reasons, your Honor, I think

18   primarily based on the lack of any ties here, the German

19   citizenship, the extradition problem, combined with the

20   strength of the evidence, the seriousness of the charge, and

21   the financial resources that Mr. Weigand has to flee, we

22   believe he presents a very, very serious risk of flight that

23   cannot be mitigated with any set of bail conditions at all, and

24   that he should be, therefore, detained.

25        THE COURT:  All right.

K3HsWEIc

1          Let me hear from defense counsel.

2          MR. ARTAN:  Thank you, your Honor.

3          To begin, just to get one point out of the way, the

4    defense would like to emphasize the fact that there is no risk

5    to the community because the indictment in paragraph six

6    acknowledges that whatever has been alleged stopped in 2019.

7          So I would just like to put that little point to rest

8    before getting to the issue of flight risk.

9          The government and defense has a hugely different

10   point of view with respect to the loss amount in this case, and

11   I think it is important to talk about what the alleged scheme

12   is and, of course, my client is not acceding to any

13   involvement, but the alleged scheme is basically marijuana

14   dispensaries here in California and Oregon, which are legal

15   operations according to state law.

16         And I, of course, acknowledge the fact that state law

17   and federal law are at odds in that regard, but in the state of

18   California and the state of Oregon, the dispensaries were

19   operating legally.

20         There was a company Eaze, which is not named in the

21   indictment, but that is what is being discussed here was the

22   subject of civil litigation last year, was sort of an Uber,

23   if you will, type company which was delivering marijuana to

24   customers in California and Oregon.

25         The customers, up until last year, were using credit

K3HsWEIc

1    cards to pay for the marijuana deliveries.

2            The company Eaze, which I believe is the company that

3    Mr. DiMase was talking about --

4            MR. DIMASE:  That's correct.

5            MR. ARTAN:  -- was then processing --

6            I'm sorry?

7            MR. DIMASE:  I just said that that was correct.

8            MR. ARTAN:  That company --

9            Could you repeat that, please?

10           MR. DIMASE:  I'm sorry.

11           I just was saying --

12           MR. ARTAN:  In any event --

13           MR. DIMASE:  -- you're correct, that is the company,

14   Eaze, that we were discussing.

15           MR. ARTAN:  OK.

16           So Eaze then was dealing with e-commerce facilities to

17   process the credit cards.

18           The credit cards would be processed, and full payment

19   was made to the dispensaries.

20           So when the government is talking about a loss, there

21   was no loss to anyone.

22           The financial institutions were all made fully whole,

23   the purchasers of the marijuana basically paid for their

24   marijuana, and the dispensaries received their money.

25           To suggest that there is a $100 million loss in this

K3HsWEIc

1    case is completely at odds with what the structure alleged by

2    the government constituted.

3           The fact is that the government's case is based on a

4    technical interpretation of Section 1344(2), which talks about

5    getting money under some false pretense, but the fact is there

6    a no loss and no intended loss in this case.

7           So the defense would like to emphasize the fact that

8    although there might be some technical argument of a bank

9    fraud -- again, I am not conceding that -- but if there is a

10   technical argument as to bank fraud, we have a case where there

11   is no loss and no intended loss.

12          If you had a no-loss bank fraud case, which is our

13   view of what this is, and it is also the way the indictment is

14   laid out.

15          You're not talking about 70 to 87 months, you're

16   talking about a sentence of less than a year.

17          I would also like to emphasize the fact that

18   throughout this indictment, it does not say anywhere what

19   Mr. Weigand is accused of doing.

20          Throughout the indictment, it says he and his

21   conspirators, he and his conspirators did X, Y, and Z.

22          There is not a single instance in the indictment which

23   identifies what conduct he is supposedly to have done.

24          This is of great concern because the government speaks

25   in broad terms about a criminal network and so on, and the fact

K3HsWEIc

```
1    is that his involvement, alleged involvement, could have been

2    as small as making an introduction and he could be tied up in

3    this situation, and the Court has no way of knowing what it is

4    he is supposed to have done.

5           My client has been in the e-commerce industry for a

6    good number of years.

7           In fact, I won't say the entire period of e-commerce,

8    but for an extended time.

9           He is deeply respected in Europe.

10          He is a very successful e-commerce consultant.

11          It is a legitimate company, it is a series of

12   legitimate companies, and I would emphasize the fact that he

13   has no criminal record.

14          He has no history of any criminal conduct.

15          The e-commerce world is complicated, your Honor, and

16   the fact is that you have, even under any circumstance, when

17   you're talking about e-commerce, these same types of accounts

18   and same types of setups would be used whether they were

19   selling marijuana or selling widgets or selling on eBay.

20          The fact is that that is consistent with how

21   e-commerce exists and operates.

22          I think there is a temptation to get too far -- at

23   least to get caught up in the idea that all this money was

24   going through the accounts, but it all came back to where it

25   was supposed to go.
```

K3HsWEIc

1          Additionally, your Honor, I would like to point out
2     that insofar as the post-arrest statements, I talked to my
3     client about them.
4          He was asked if he had involvement with Eaze and he
5     does not have involvement with Eaze.
6          Eaze, even if you believe the government's view of
7     what happened, Eaze would have been way down the road and it
8     would have been a situation where if my client was involved, he
9     would have been involved with parties other than Eaze.
10          Insofar as this e-mail address is concerned, he still
11     denies that it is his e-mail.
12          He wasn't asked if he ever used it, he was asked if it
13     was his e-mail.
14          I would suggest to the court that someone who is a
15     successful European businessman -- and I haven't heard any
16     doubt about that -- would actually put himself in a position of
17     hiding out in Germany the rest of his life over what would
18     appear, from the defense perspective, of being a no-loss bank
19     fraud case.
20          As to ties here in Los Angeles, my client has ties
21     here.
22          He has friends here that he's known for a long time.
23          One person was willing to be a surety, and as I told
24     the court yesterday and as Mr. DiMase has reiterated today, he
25     has chosen not to continue in that circumstance.

K3HsWEIc

1          But the fact is my client does have ties here, he is

2     able to live here or in New York, where he also has friends,

3     and the picture as a total is important for the court to

4     understand.

5          He is a successful businessman with an unidentified

6     role in a no-loss bank fraud case, your Honor.

7          I think understanding that, the magistrate judge

8     appropriately granted a bond of $500,000 secured by property,

9     my client has already provided -- the passport was already

10    turned over to pretrial services here in Los Angeles, the FBI

11    had it and gave it to the pretrial services office, and so that

12    has already occurred, and the Court also required location

13    monitoring, GPS monitoring.

14         The defense would suggest that, taken in combination,

15    the factors and terms and conditions of bond set forth by the

16    magistrate judge here in Los Angeles more than adequately

17    assure the government of Mr. Weigand's appearance in court and

18    that the magistrate judge made an appropriate decision.

19         Insofar as the pretrial services' recommendation is

20    concerned, the pretrial services' original recommendation, your

21    Honor, was that my client be released on a $100,000 unsecured

22    bond with $50,000 cash deposit.

23         That was the report issued last Tuesday.

24         On Friday, when the court actually made its finding,

25    the pretrial services agency recommended detention based on the

K3HsWEIc

1  government's statement to them that there was $100 million

2  loss.

3            I would suggest to the court that the pretrial

4  services' original position should also be recognized, because

5  this is not a $100 million loss case and there was no loss and

6  no intended loss.

7            Obviously, if the court has any questions -- I'm

8  sorry.

9            THE COURT:  No, but let me hear --

10           MR. ARTAN:  I forgot to add one thing to your Honor.

11           I apologize.

12           The government has mentioned encrypted messages and so

13  on.

14           And the fact is, your Honor, that almost every

15  industry I'm aware of that involves either the transmission of

16  financial information or involves the transmission of

17  confidential communication, even medical records and legal

18  communication involves encrypted messaging.

19           Virtually every big law firm I deal with and whatever

20  healthcare providers I represent, everything is encrypted.

21           So to suggest that the fact of the messages being

22  encrypted is nefarious, I think is a bit misleading.

23           Thank you for that, your Honor.

24           THE COURT:  Thank you.

25           Let me hear briefly from the government in rebuttal.

K3HsWEIc

1          MR. DIMASE:  Thank you, your Honor.

2          For one thing, I think very little was said about U.S.

3     ties.

4          It is very unclear to me, other than "friends," that

5     Mr. Weigand has any real ties to the U.S. or any specifics on

6     that.

7          Nor were the issues of the inability to extradite him

8     from Germany or his profits really addressed, but let me

9     address the two things that were brought up at some length;

10    one, the evidence and what Mr. Weigand's scheme was, and two,

11    the loss issue.

12          On his role, I think Mr. Artan said something like

13    this was, at best, a technical violation.

14          The scheme involved regular lies to banks in order to

15    force them or permit them to transactions they would never have

16    transacted otherwise.

17          The scheme is complex, but actually it is not, as

18    Mr. Artan suggests, complicated.

19          Mr. Weigand and his coconspirators were responsible --

20    and Mr. Weigand, in particular, was responsible for helping

21    create fake companies that looked like real merchants and then

22    submitting application packs, they are called, which contained

23    all the information about the fake merchant, what they do, what

24    their line of business is, their expected revenue, things of

25    that nature to a bank, and then setting up an account in the

K3HsWEIc

1    name of that fake merchant so that the credit card companies

2    will think that customers, when they are buying marijuana, are

3    actually buying, let's just say, golf balls.

4              So golfballs.com is a merchant.

5              Mr. Weigand is involved in putting together

6    application packs and submitting them to banks with fake

7    companies listed in them in order to allow these transactions

8    to be processed.

9              Visa, Mastercard, U.S. banks, none of them would

10   handle this traffic otherwise.

11             So it is not a complicated scheme and it is not a

12   technical bank fraud violation.

13             It is a series of regular lies to banks to get them to

14   move money that they absolutely would not otherwise.

15             Mr. Weigand's involvement included submitting

16   application packs.

17             He also had direct relationships with so-called

18   acquiring banks, the banks where the merchants had their

19   accounts to receive these funds, to help this company, Eaze,

20   process that marijuana traffic and move the money through the

21   financial system.

22             There is evidence that he attended a meeting in

23   California with coconspirators to map out how they would

24   operate this scheme, and it is clear from the electronic

25   messages that he knew that this was marijuana traffic going

K3HsWEIc

through e-merchants and the banks, that he knew the real

customer was Eaze, and that the companies were phony, and even

discussed the submission of these application packs to banks to

facilitate the scheme.

        Let me turn now to loss.

        With respect to loss, there is a loss here.

        Whether it is $100 million, which is the government's

position, or not, one way or the other, there was exposure to

banks and credit card companies to legal risk and reputational

harm, at a minimum.

        As I said, the banks and credit card companies simply

would not have processed this money.

        It isn't really fair to say the money went all where

it was supposed to go.

        Large chunks of this money went to the criminal actors

responsible for facilitating the lies to banks.

        At the end of the day, the dispensaries got paid,

that's true, but a big percentage was lopped off to facilitate

these lies to make sure the transactions went through.

        So even if it is not 100 million -- as I already said

100 million really underestimates the amount, it is only from

one of the major credit card companies -- the guidelines

direct, under application note Section 2B1.1, application note

3(b), that the court says that the gain resulted from the

offense, as an alternate measure of loss, only if there is a

K3HsWEIc

loss that recently cannot be determined.

          As I said, there was clearly a loss here.

          Whether it is 100 million or some other amount, that
is difficult to calculate.

          For that reason, at a minimum, the court would
calculate the gain, which is a substantial percentage of this
100 million or much more that passed through these phony
merchant accounts.

          So the government just does not agree at all with this
theory that there is simply no loss in this case and that the
guidelines are as low as Mr. Artan suggests.

          THE COURT:  All right.

          Unless anyone else has anything to say, I'm prepared
to rule.

          MR. ALEINIKOFF:  If the court would indulge a brief
rebuttal, I would appreciate that.

          THE COURT:  Absolutely.

          MR. ARTAN:  Insofar as Mr. Weigand's role is
concerned, we hardly dispute the way it's been expressed by the
government.

          Again, the indictment itself is incredibly vague and
these broad statements, I think, should be limited in terms of
the emphasis the court adopts.

          Insofar as the ties are concerned, your Honor, there
is no question that my client doesn't have family here.

K3HsWEIc

1          He is not a resident here.

2          This isn't a standard situation of ties, but the fact

3    is that he is an extremely successful businessperson, and

4    people who are in his position certainly don't want to be

5    restricted to one country for the rest of their lives with the

6    idea that a defensible case is out there.

7          I don't want to belabor the loss situation too much,

8    your Honor.

9          But when the government says that the banks would not

10   have done this without the miscoding, the fact is, your Honor,

11   the banks made substantial money on every one of these credit

12   card transactions.

13         The banks made money.

14         So to suggest that there was a loss to the bank is

15   simply fanciful.

16         Every credit card transaction involved a bank fee

17   where they made money.

18         Now, the fact that they might not have done it doesn't

19   alter the fact that the banks got -- if the volume is what the

20   government says, the banks made millions and millions of

21   dollars even though they were "defrauded."

22         It is an odd-ball situation, your Honor.

23         And if federal law was consistent with California

24   Oregon law, I guess we would be in a different posture right

25   now, but this is where we are, and I would suggest to the court

K3HsWEIc

1    that the magistrate judge in California was correct in his

2    ruling.

3              THE COURT:  All right.

4              Thank you very much.

5              I think the very fine presentation by both sides in

6    one respect seems to me to be a little misfocused, and that is

7    by the emphasis on loss or no loss and the concomitant emphasis

8    on how that affects the guidelines.

9              To begin with, loss is not an element of this crime.

10             The essence of bank fraud, like the mail fraud statute

11   for which it is derived which goes back to 1872, is that you

12   lied to someone from whom you were seeking to get money or

13   property or the like.

14             You put them at risk because if they had known the

15   truth, they might or might not have gone along with what you

16   were proposing.

17             But under federal law, and really under the common law

18   of England as well, you had to tell them the truth.

19             The gist of the indictment, as I read it, is that the

20   grand jury determined that there was probable cause to believe

21   that this defendant and his confederates repeatedly lied to the

22   banks in substantial transactions and multiple transactions and

23   thereby put them, at a minimum, at the risk of entering into a

24   transaction that they believed was different from what it

25   actually was.

K3HsWEIc

1          That is the heart of federal fraud statutes.

2          I have, in numerous written decisions as well as oral

3    statements made at sentencing, pointed out how misguided the

4    guidelines are in their inornate attention to loss when it is

5    not even an element of the crime.

6          To be frank, I think the guidelines in this respect

7    are totally irrational, and whether it is $100 million or no

8    loss is not irrelevant, but it is not, in my view, central to

9    the inquiry.

10          I have sentenced people to well below the guidelines

11    when the guidelines were simply a figure based largely on loss,

12    and I've sentenced people to above the guidelines when I

13    thought that other factors showed that they were substantial

14    crooks.

15          While I appreciate all the arguments from both sides

16    on the loss issue and the concomitant guideline issue, I think

17    it is somewhat besides the point, or at least not totally

18    besides the point, but not central to the inquiry.

19          What I think is central to the inquiry is, first, the

20    seeming strength of the government's case.

21          Now, I say seeming because I always hold open, in any

22    bail situation, reconsidering the matter if I find reason to

23    believe that the government has materially overstated the

24    strength of its case.

25          But given the nature of the transactions here and the

K3HsWEIc

nature of the charge, it sounds like a strong case, well

supported.

        The most important factor, though, as I'm sure both

counsel recognize, is the utter lack of ties that this

defendant has with the United States of any meaningful sort,

coupled with the extradition bar from Germany, coupled with the

obvious motive to flee that anyone would have who knew that

they were facing a serious felony charge, regardless of what

the sentence might turn out to be if convicted.

        I was a little surprised to hear defense counsel say

that, Oh, no respected businessman would want to spend his time

cooped up in a country that couldn't extradite him.

        One thinks of Marc Rich, who spent, what, 30 years in

Switzerland because Switzerland wouldn't extradite him, even

though he was an American citizen with substantial ties to the

United States.

        One thinks more recently of Mr. Goshen and his flight

after all sorts of representations were made to the Japanese

authorities to get him released on bail.

        But every case is different, and I don't mean to tar

this defendant with those cases.

        My point is that this defendant has an obvious motive

to flee, has the wherewithal to flee, has a particularly strong

reason to flee in light of the no extradition situation, and

that coupled with all the other comments I've made convinces me

K3HsWEIc

1    that no set of conditions could reasonably assure that he is

2    not a substantial flight risk.

3           So I overrule the magistrate judge and Mr. Weigand

4    will be detained.

5           Now, we need to arrange to get him to New York.

6           We need to arrange for an arraignment, if he wishes

7    New York counsel, of course we need to get him an opportunity

8    to retain New York counsel.

9           Although I will be frank to say that I so far have

10   been very impressed by his California counsel, but that's the

11   defendant's decision to make.

12          On the other hand, we have the vicissitudes attendant

13   on the coronavirus situation.

14          My suggestion is that we put this down for arraignment

15   on April 28.

16          That is almost, what, five, six weeks from now.

17          That's much longer than I would do, but for the

18   coronavirus, I recognize that that presents substantial

19   problems.

20          I'm willing to do an earlier arraignment if defendant

21   wants, but assuming that he wants the time to retain counsel

22   and have counsel get up to speed and so forth, we would have

23   the arraignment in my court at 2:00 p.m. on April 28.

24          Is there anything counsel wants to raise with the

25   Court?

K3HsWEIc

            MR. ARTAN:  Your Honor, if, in fact, I can't say for
sure I might stay on the case, but we may also be getting
counsel in New York.

            If, in fact, we were in a position to be arraigned
early and Mr. Weigand was obviously in your district, could we
advance the date, giving notice to the court, would that be
agreeable?

            THE COURT:  Absolutely.

            I'm here.

            Our court has not shut down, and all you need to do is
jointly call the court with your adversary and I'm usually
prepared to do an arraignment on 24-hour notice.

            MR. ARTAN:  Thank you, your Honor.

            THE COURT:  All right.

            Anything else?

            MR. DIMASE:  Judge, just two quick points on the
timing of everything.

            At the moment, Mr. Weigand has an identity hearing
scheduled in California for, I believe, next Tuesday or
Wednesday.

            We would like to know whether it is on this call or
shortly thereafter whether he intends to continue to pursue
that hearing or not.

            I think that may affect the timing of his removal to
New York.

K3HsWEIc

 1              THE COURT:  I'm not going to ask defense counsel to

 2      add to that on this call because he would need to consult with

 3      his client further given today's result.

 4              I assume he will let you know promptly and well before

 5      the day of the hearing.

 6              MR. DIMASE:  Very good.

 7              I think what will need to happen is there will need to

 8      be a further proceeding in California where, in light of this

 9      court's detention order, that court orders Mr. Weigand removed

10      here to New York.

11              Perhaps the identity hearing can be adjudicated one

12      way or the other, also that is by consent or with adversarial

13      proceeding, and then following that hearing, assuming the

14      government succeeds, he would be ordered removed to New York.

15              THE COURT:  Right.

16              MR. DIMASE:  The second issue --

17              MR. ARTAN:  May I butt in here?

18              MR. DIMASE:  Sure.

19              MR. ARTAN:  The court already set, the magistrate

20      court set Tuesday afternoon, March 24, for the identity hearing

21      and asked that we notify the government by Friday as to whether

22      we would be contesting identity so that the government could

23      avoid having a witness flown out.

24              So the matter is already on calendar for March 24.

25              THE COURT:  That's fine.

K3HsWEIc

1           MR. ARTAN:  I'm not sure that --

2           THE COURT:  That schedule is fine.

3           You'll let the government know by Friday, and if the

4    answer is you want the hearing, the hearing will be held on

5    March 24.

6           That is fully consistent with the arraignment date

7    that I just set.

8           It still gives you plenty of time.

9           MR. DIMASE:  I'm not asking the court to order this,

10   but to the extent that the counsel can provide a little bit

11   more notice on Friday, there are some pretty severe

12   restrictions in place for agent travel, which would require

13   some approvals to get the agents flown back to LA.

14          If there is any way you could let us know sooner than

15   Friday, we would greatly appreciate that.

16          MR. ARTAN:  I'll do my best.

17          I'm going to try to see my client tomorrow and let you

18   know.

19          MR. DIMASE:  Thank you.

20          The only other thing I would say, your Honor, is just

21   obviously the coronavirus presents somewhat of an unknown.

22          I did hear from the marshals today that there were

23   some delays in getting people produced from other districts.

24          I don't think that the court's schedule is

25   unreasonable.

K3HsWEIc

1          It still gives a significant amount of time to get the

2   defendant here, but I will let the court now if we foresee any

3   issues with that timeline in light of the unique events

4   unfolding right now.

5          THE COURT:  That's fine, although it was precisely

6   because of that that I picked a date so far in the future.

7          My normal practice is to arraign a defendant the day

8   after he or she is indicted, not to give six weeks from the

9   time of a bail hearing.

10          Do your best, and obviously none of us can predict

11   exactly what will happen, so if there is a problem, of course

12   my practice, which the government I'm sure knows, but just for

13   defense counsel's benefit, don't ever send me a letter without

14   prior permission of the court.

15          If you have any kind of application whatsoever, just

16   get your adversary and call me and I will make myself available

17   and that way we can resolve any disputes very expeditiously.

18          I will, pursuant to Section 3161 of Title 18, exclude

19   all time between now and April 28, finding that such time is

20   necessary for the identification hearing, for the

21   transportation of the defendant, and also because, particularly

22   given the coronavirus, the best interest of justice in

23   excluding such time substantially outweighs the interest of the

24   public and the defendant in a speedy trial.

25          Anything else we need to take up?

K3HsWEIc

1              MR. DIMASE:  Nothing from the government, your Honor.

2         Thank you.

3              MR. ARTAN:  Nothing from the defense.

4         Thank you.

5              THE COURT:  Thanks very much.

6         Bye-bye.

7         (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25