

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 23, 2020

**BY ECF / EMAIL**

Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
New York, New York 10007

Re:   *United States v. Ruben Weigand*, S3 20 Cr. 188 (JSR)

Dear Judge Rakoff:

The Government submits this letter in response to the defendant's April 21, 2020 motion, which seeks reconsideration of the Court's March 17, 2020 Order detaining Ruben Weigand pending trial in this case.   (*See* Dkt. No. 26, the "Reconsideration Mot.").   For the reasons described below, the defendant has failed to raise any new arguments that warrant overturning the Court's prior detention order.   As the Court has previously found, Weigand, who is a German citizen and cannot be extradited from Germany to the United States, "has an obvious motive to flee, has the wherewithal to flee, has a particularly strong reason to flee in light of the no extradition situation" and therefore "no set of conditions could reasonably assure that he is not a substantial flight risk."   (March 17, 2020 Bail Hearing Transcript ("Tr.," attached hereto as Exhibit A) at 27-28).   The Court should accordingly deny the defendant's Reconsideration Motion and order that the defendant remain detained pending trial in this case.

A.      **The Charges**

On or about March 9, 2020, a grand jury empaneled in the Southern District of New York returned a superseding indictment, S3 20 Cr. 188 (JSR) (the "Indictment"), charging Ruben Weigand and Hamid Akhavan, a/k/a "Ray Akhavan" ("Akhavan"), with conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349, from in or around 2016, through at least in or around 2019.   (Dkt No. 16).

As set forth in greater detail in the Indictment, Weigand and Akhavan, working with others, including principals from one of the leading on-demand marijuana delivery companies in the United States (the "Online Marijuana Marketplace Company"), planned and executed a scheme to

Honorable Jed S. Rakoff
April 23, 2020

deceive United States banks and other financial institutions into processing over one hundred million dollars in credit and debit card payments for the purchase and delivery of marijuana products (the "Transaction Laundering Scheme"). Because many United States banks are unwilling to process payments involving the purchase of marijuana, Weigand, Akhavan, and others used fraudulent methods so that the Online Marijuana Marketplace Company could avoid these restrictions and receive tens of millions of dollars from its customers, primarily located in California and Oregon, who purchased marijuana products through the company. (Indictment ¶ 1).[1] Some of the banks and other financial institutions victimized by this criminal activity are located in the Southern District of New York.

As further set forth in the Indictment, the Online Marijuana Marketplace Company operated a technology platform that enabled customers to place online orders for various marijuana products offered by different dispensaries listed on the Online Marijuana Marketplace Company's website and mobile application (collectively, the "Applications"). As a result of the Transaction Laundering Scheme, at various times between 2016 and 2019, the Online Marijuana Marketplace Company was able to offer its customers the ability to pay for purchases of marijuana products with credit and debit cards. (Id. ¶ 4). Once a customer placed an order, a delivery driver arranged by the dispensary would deliver the order to the customer shortly thereafter. Once the delivery was complete, the Online Marijuana Marketplace Company would generate and transmit via email a receipt for the purchase. (Id. ¶ 5). The fact that the transaction involved the purchase of marijuana, however, was concealed from the bank or financial institution responsible for approving the payment—that is, the cardholder's issuing bank—which otherwise would have declined the transaction. (Id. ¶¶ 2, 8-9).

To effectuate the Transaction Laundering Scheme, Weigand, Akhavan, and several of the principals of the Online Marijuana Marketplace Company, including principals at the company, arranged for the money received from the Online Marijuana Marketplace Company's customers to be disguised as payments to over a dozen phony online merchants and other non-marijuana businesses (the "Phony Merchants"), including transactions that appeared to be for stenographic services, music stores/pianos, and cosmetic stores.[2] Weigand, Akhavan, and others, worked with

---

[1] In the defendant's Reconsideration Motion, he notes that marijuana is legal under state law in several states, including California and Oregon. (Reconsideration Mot. at 4). This is entirely beside the point. Marijuana is a Schedule I Controlled Substance under the Controlled Substances Act, and the possession, distribution, and use of marijuana is unlawful under federal statutes, including Title 21, United States Code Sections 841 and 844. Accordingly, as noted above, many United States banks are unwilling to process payments involving the purchase of marijuana. As a result, the co-conspirators in the Transaction Laundering Scheme, including Weigand, went to great lengths to hide the true nature of the transactions they were processing from banks and financial institutions and disguised those transactions as lawful payments for other goods.

[2] A list of several of the website names associated with the Phony Merchants appears in paragraph 13 of the Indictment. Additional website names associated with the Phony Merchants included organikals.store, greendenvale, mentaldossier.com, indus-distr.com, osteofiles.com, goodgreenbazaar.com, medical-stf.com, and medical-dsr.com. The Phony Merchants involved in the scheme also included Lorry Ltd., Linebeck, Hot Robots, International Standard, and New

Honorable Jed S. Rakoff
April 23, 2020

other co-conspirators to create at least a dozen Phony Merchants.   The Phony Merchants typically maintained web pages suggesting that they were involved in selling legitimate goods, such as carbonated drinks, face cream, dog products, and diving gear.

To accomplish this deceptive scheme, the Online Marijuana Marketplace Company relied on third party payment processors (the "Payment Processors") who worked with Weigand, Akhavan, and other co-conspirators to create phony offshore corporations and websites (i.e., the Phony Merchants) and open offshore merchant bank accounts.   One of Weigand's responsibilities was to submit fraudulent applications on behalf of the Phony Merchants to these offshore banks in order to open merchant bank accounts for the Phony Merchants.   Weigand, Akhavan and other members of the conspiracy then used the Phony Merchants' offshore bank accounts to disguise payments made to the Online Marijuana Marketplace Company for the purchase of marijuana products, thereby deceiving United States banks about the true nature of the financial transactions they were processing.   Working together, Weigand, Akhavan, other Payment Processors, and principals of the Online Marijuana Marketplace Company, deceived United States banks and financial institutions—including federally insured institutions—into processing tens of millions of dollars in marijuana purchases made through the Online Marijuana Marketplace Company.   (*Id.* ¶ 2; see also *Id.* ¶¶ 8, 12-14).   The Transaction Laundering Scheme generated more than approximately $100 million in credit and debit card transactions.   (*Id.* ¶ 14).   Based on evidence obtained to date, it appears that the Online Marijuana Marketplace Company stopped processing credit card transactions in approximately mid-2019.[3]

As mentioned above, Weigand's primary role in the Transaction Laundering Scheme was to manage an international network of bank accounts used by the Phony Merchants to process payments on behalf of the Online Marijuana Marketplace Company.   For example, in one encrypted group chat message, Akhavan states to employees at the Online Marijuana Marketplace Company that "Ruben [Weigand] ha[s] . . . agreed to be actively involved with helping us out. [Unnamed co-conspirator] is handling all reporting and reconciliation.   And Ruben [Weigand] is interfacing with the banks."   In this role, Weigand was responsible for, among things, finding

---

Opal Ltd.

[3] Among other sources of information in this investigation, some of which are discussed below, is a cooperating witness ("CW-1") with whom Akhavan contracted to receive services to implement the Transaction Laundering Scheme.   According to CW-1—and as corroborated by other evidence—among other roles CW-1 played in the charged conspiracy, CW-1 assisted Weigand, Akhavan, and other co-conspirators in the creation and development of the Phony Merchants and phony merchant websites and the preparation of associated fraudulent merchant applications, agreements, and related documents to submit to banks and financial institutions. Based in part on his involvement in the bank frank scheme charged in the Indictment, CW-1 has pleaded guilty to conspiring to commit bank fraud, conspiring to commit money laundering, and Hobbs Act extortion offenses pursuant to a cooperation agreement with the United States Attorney's Office for the Southern District of New York.   In connection with CW-1's assistance, CW-1 has provided information and records to law enforcement, and hopes to receive leniency at sentencing.   Information provided by CW-1 has been corroborated, in part, by recordings, electronic communications, and other records.

Honorable Jed S. Rakoff
April 23, 2020

European banks to process the Online Marijuana Marketplace Company's marijuana transactions, and reviewing and then submitting fraudulent application packages for the Phony Merchants to his contacts at these overseas banks.

During one of Weigand's most recent trips to the United States in March 2018, Weigand met in Calabasas, California, with co-conspirators in the Transaction Laundering Scheme and discussed, among other things, operational details regarding how the Transaction Laundering Scheme would work. Specifically, among other things, attendees at the meeting discussed that the underlying transactions that were going to be processed through the Phony Merchants were for the Online Marijuana Marketplace Company. Furthermore, the attendees at the meeting discussed the details of how the payment processing would work, including the use of Phony Merchants with overseas bank accounts.

**B.    The Defendant**

Weigand is a German citizen and resides in Luxemburg. Weigand has no family in the United States, no property or assets in the United States, and no permanent legal status in the United States. The defendant travels to the United States infrequently—when the defendant was arrested at LAX on March 9, 2020, the defendant was only in the United States on a layover in transit from Zurich, Switzerland, to San Jose, Costa Rica. The defendant appears to have significant personal wealth, owning a home in Luxemburg that is purportedly worth in excess of $ 3 million. (Reconsideration Mot. at 3).

According to the defendant, he has resided in Luxemburg with his girlfriend of ten years. Before that, Weigand resided in Molsberg, Germany, where he was born and raised. Weigand's parents and his siblings all reside in Germany. He has no close family in the United States.

**C.    Procedural History**

As noted above, Weigand was arrested on March 9, 2020, at Los Angeles International Airport. Weigand was presented in the Central District of California ("CDCA") the following day, on or about March 10, 2020. A bail hearing was held in front of Magistrate Judge Patrick J. Walsh in CDCA on or about March 13, 2020, who ordered the defendant released on a set of bail conditions. Judge Walsh also ordered that Weigand remain detained until his conditions were satisfied.

The Government appealed Judge Walsh's bail decision to Your Honor and a telephonic bail review hearing was held on or about March 17, 2020 (the "March 17 Bail Argument"). At the conclusion of the March 17 Bail Argument, the Court overruled the magistrate judge and ordered that Weigand remain detained. In so ruling, the Court explained:

> this defendant has an obvious motive to flee, has the wherewithal to flee, has a particularly strong reason to flee in light of the no extradition situation, and that coupled with all the other comments I've made convinces me that no set of conditions could reasonably assure that he is not a substantial flight risk. So I overrule the magistrate judge and Mr. Weigand will be detained.

Honorable Jed S. Rakoff
April 23, 2020

Tr. 27-28.

The defendant has remained incarcerated at the Santa Ana Jail in California since his arrest. At the request of the defendant, the defendant has remained at the Santa Ana Jail and has not been transferred to a detention facility in New York.

**D.      COVID-19 Conditions and Protocols at Santa Ana Jail**

As noted above, Weigand is currently incarcerated at the Santa Ana Jail in California. Based on information provided by the Santa Ana Jail yesterday, there are currently no COVID-19 cases at the Santa Ana Jail, including both inmates and staff.   Furthermore, no inmates have exhibited flu like symptoms or other COVID-19 related symptoms.   The Santa Ana Jail is also taking a number of precautionary measures, including the following:

- Public visits are suspended;
- All professional staff are subject to a medical screening before they are allowed inside the Jail;
- Professional non-contact visitors will be offered disinfect[ant] products to clean their visitation phones;
- All staff are having their temperature read by medical staff when they exit and return to the Jail;
- All inmate programs are suspended;
- Medical has added a supplemental COVID-19 questionnaire for all new intakes;
- Cleaning crews are systematically cleaning the Jail throughout the day;
- Portable handwashing stations are available;
- Daily briefings with medical staff;
- Inmates have been given four free ten-minutes phone call to contact their family or attorney;
- Educational posters have been placed throughout the facility;
- All new inmate intakes will be on a medical isolation for a minimum of seven days;
- Information videos related to hygiene, social distancing, and COVID-19 updates will be played via Jail's TV network system for every inmate group, once a week;
- All inmates over the age of 60 are housed together in their own special unit; and
- The Jail will not accept new inmates who have recently been in other countries.

**E.      Applicable Law**

Title 18, United States Code, Section 3142(e) provides that if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the officer shall order the defendant detained pending trial.  18 U.S.C. § 3142(e).  In seeking detention, the Government bears the burden of establishing risk of flight by a preponderance of the evidence or dangerousness by clear and convincing evidence.  *Id.* § 3142(f).  The Government is not bound by the rules of evidence in discharging its burden, *see id.*, and may proceed by proffer, *see, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).  In considering the defendant's application for bail, the Court must consider (1) the nature and

Honorable Jed S. Rakoff
April 23, 2020

circumstances of the offenses charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.   18 U.S.C. § 3142(g).

**F.**   **Discussion**

As described above, and during the March 17 Bail Argument, Weigand is a wealthy German citizen, with no current (or even recent) ties to the United States, no property or other assets in the United States, the means to flee, the incentive to flee, and close ties to foreign individuals, including his family.   Weigand presents a severe risk of flight.   As both Pretrial Services recommended and Your Honor already found, Weigand should be detained.   Nothing in his Reconsideration Motion, including his proposed bail package, or his arguments about COVID-19, change Weigand's risk of flight, or the appropriateness of the Court's detention order.

      a.   Weigand Has No Meaningful Ties to the United States and Extraordinarily Strong Ties Elsewhere

Weigand has no meaningful ties to the United States of any kind, and he does not assert otherwise in his Reconsideration Motion.   He does not live in the United States.   He has no family in the United States.   He has no property in the United States.   He has no other assets in the United States.   He is not a citizen and has no lawful resident status.   Weigand lives in Luxemburg and does not travel frequently to the United States.   Weigand's family is also from Germany.

The letters enclosed as Exhibits C through E to his Reconsideration Motion, two of which were provided by Weigand's potential co-signers, are in accord.   The letter from Mirko Huellemann indicates that Mr. Huellamann resides in Germany.   The letter from Markus Fuchs indicates that Mr. Fuchs met Weigand through a mutual friend in Munich, Germany, where Mr. Fuchs is from.   These letters demonstrate that Weigand has very close, long-standing ties to other jurisdictions, including those from which, as discussed below, extradition is not possible.   Although Weigand is a resident of Luxemburg, he is a German citizen, and appears to have deep ties to other German citizens/residents as set forth in above-referenced letters.

      b.   Weigand Has A Powerful Incentive to Flee

Weigand also has an extremely powerful incentive to flee.   He is facing a serious bank fraud conspiracy charge, alleging that Weigand and his co-conspirators were involved in the unlawful processing of over $100 million.   This charge carries a statutory maximum sentence of 30 years in prison.   And the evidence of Weigand's guilt is very strong.   Among other evidence, the Government's case consists of:

- The anticipated testimony of CW-1, explaining how the Transaction Laundering Scheme worked, and the role of the co-conspirators, including Weigand.   That testimony would include, as noted above, testimony that Weigand attended a meeting in Calabasas, California, during which Weigand, Akhavan, CW-1, and other co-conspirators discussed how the Transaction Laundering Scheme was intended to operate.   There are pictures of Weigand and other co-conspirators at this meeting.   Emails also show that Weigand met with Akhavan and

Honorable Jed S. Rakoff
April 23, 2020

> representatives from the Online Marijuana Marketplace Company during that same trip.   In addition, Weigand's travel records show that he was in California during the time that these meetings took place.

- Numerous encrypted chat messages and encrypted emails in which Weigand, Akhavan, principals at the Online Marijuana Marketplace Company, and other co-conspirators communicate about the daily operation of the Transaction Laundering Scheme.   These messages and emails make explicit reference to the use of Phony Merchants to process transactions that Weigand and other co-conspirators knew were on behalf of the Online Marijuana Marketplace Company.   As an example, in one set of emails, a co-conspirator sent an email to an email address used by Weigand, attaching a set of fraudulent merchant application packages for Phony Merchants, including merchants named "International Standard Ltd" and "Hot Robots Ltd."   In the application package for International Standard Ltd, the merchant lists its website as "goodegreenbazaar.com," and purports that its business is the "production and sale of sheet music."   This evidence goes to the core of the bank fraud conspiracy—it shows that Weigand and his co-conspirators were disguising the Online Marijuana Marketplace Company's transactions through the use of Phony Merchants and offshore bank accounts.[4]

- A recording of Weigand's post-arrest statement, after he waived his *Miranda* rights, in which Weigand made a number of false statements to law enforcement, including an unequivocal statement that he had "no involvement" with the Online Marijuana Marketplace Company and that his knowledge about the Company was limited to what he had read on a billboard and on the Company's website.   Weigand also denied using an encrypted email address that was used to communicate about the Transaction Laundering Scheme.   Other evidence, including signatures to emails from that email address, and testimony from CW-1, demonstrates that Weigand in fact used that email address in furtherance of the Transaction Laundering Scheme.

- Financial records and other evidence showing that Akavan, Weigand, and offshore banks used to open bank accounts for the Phony Merchants, were collectively paid outsized fees to process the marijuana transactions on behalf of the Online

---

[4] Notably, many of these communications took place through encrypted communication platforms that prevents third parties—including law enforcement—from being able to access the cryptographic keys needed to decrypt the conversation.   This means that law enforcement agents are unable to intercept or "wiretap" communications that are sent through these encrypted communication platforms, and, furthermore, are unable to view the content of such communications through the use of search warrants that are served on the service providers. Individuals who are engaged in criminal activity therefore frequently use end-to-end encrypted communication services such as those used by Weigand, Akhavan, and other co-conspirators, in an effort to evade detection by law enforcement (e.g., by preventing law enforcement agents from collecting incriminating evidence through methods such as wiretaps and search warrants). During these same chats and emails, co-conspirators in the Transaction Laundering Scheme also frequently used anonymous email addresses, nicknames, and unsigned emails, in a further effort to avoid law enforcement detection.

Honorable Jed S. Rakoff
April 23, 2020

Marijuana Marketplace Company.   In some cases, those fees exceeded ten percent for the processing of such transactions.[5]

Given the weight of the evidence and the potential length of a sentence in this case, any individual would be highly incentivized to flee; with Weigand's utter lack of ties to the United States and his especially strong ties abroad, that incentive is even stronger.

c.   Weigand Has the Means To Flee and To Frustrate Any Potential Extradition

Weigand also has both the means to flee and the ability, once gone, to frustrate any potential extradition.   As noted in his Reconsideration Motion, Weigand is extremely wealthy.   He owns a $3 million home, which he can purportedly borrow against to receive a loan for at least $1 million in cash.   It is also clear from the proposed bail package that Weigand has wealthy friends who are willing to provide him with money.   Not only does Weigand have the means to flee, but because Germany does not extradite its own citizens, he is also able to fully obstruct extradition back to the United States if he successfully flees to Germany.

Weigand's offer to sign a so-called "waiver of any rights he has to challenge extradition from Germany and Luxembourg" (Reconsideration Mot. 3) provides no additional assurance whatsoever.   Numerous courts have recognized that such purported waivers are unenforceable and effectively meaningless.   *See, e.g.*, *United States v. Morrison*, No. 16-MR-118, 2016 WL 7421924, at *4 (W.D.N.Y. Dec. 23, 2016); *United States v. Kazeem*, No. 15 Cr. 172, 2015 WL 4645357, at *3 (D. Or. Aug. 3, 2015); *United States v. Young*, Nos. 12 Cr. 502, 12 Cr. 645, 2013 WL 12131300, at *7 (D. Utah Aug. 27, 2013); *United States v. Cohen*, No. C 10-00547, 2010 WL 5387757, at *9 n.11 (N.D. Cal. Dec. 20, 2010); *United States v. Bohn*, 330 F. Supp. 2d 960, 961 (W.D. Tenn. 2004); *United States v. Stroh*, No. 396 Cr. 139, 2000 WL 1832956, at *5 (D. Conn. Nov. 3, 2000); *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985).   For very good reason: Any defendant who signs such a purported waiver and then flees will assuredly contest the validity and/or voluntariness of the waiver, and will get to do so in the jurisdiction of his choosing (i.e., the one to which he chose to flee).   The Department of Justice's Office of International Affairs is unaware of any country anywhere in the world that would consider an anticipatory extradition waiver binding.

The inclusion of sureties who are collectively pledging $1,000,000 as part of the proposed bail package also fails to provide any real assurance that Weigand will not flee.   Given Weigand's substantial financial resources, those who are supporting him have little reason to fear that they would suffer significant financial harm if Weigand were to flee.   That is because Weigand appears to have both the means to flee *and* the means to make whole his co-signors should he flee.

Finally, the inclusion of Weigand's $3 million home as security in his bail package does very little to address his risk of flight.   The Government is informed by the U.S. Marshals that property abroad is exceedingly difficult for the U.S. government to seize and thus the proposed additional security does not meaningfully change the assessment of the defendant's risk of flight.

---

[5] Typical transaction fees for comparable credit card transactions are in the range of 1-3%.

Honorable Jed S. Rakoff
April 23, 2020

      d.  <u>The COVID-19 Pandemic Does Not Justify Weigand's Release At This Time</u>

      Weigand also argues that he should be released as a result of the COVID-19 pandemic and his alleged vulnerability based on sleep apnea.   However, as described above, the Santa Ana Jail has demonstrated that it is equipped to address the current public health crisis.   Furthermore, the defendant has provided limited support for his claim that his health condition renders him especially vulnerable to COVID-19.

      As noted above, the Santa Ana Jail has a number of measures in place to protect the health and safety of its inmates and staff.   As of yesterday, there were no cases of COVID-19 among the staff and inmates at the Santa Ana Jail.   Further, no inmates have exhibited flu like symptoms or COVID-19 related symptoms.   Given the length of time that COVID-19 has been present in California, the measures in place at the Santa Ana Jail appear to be working.

      Weigand's medical documentation is also an insufficient basis to demonstrate that he is at high-risk for COVID-19.   In particular, the records are approximately two years old, which suggests that either Weigand's condition has improved, such that he did not need any follow up, or that his condition was not so severe to begin with.   Notably, according to the Pre Trial Services Report, Weigand did not report this condition to Pretrial Services when he was asked about his health.   Instead, he reported that he was "in good physical health."   Finally, even according to the letter from his doctor included in Weigand's Reconsideration Motion, the doctor acknowledges that "it is too early in the pandemic . . . to know exactly how much higher the risk for a sleep apnea / upper airway resistance syndrome patients is to have a sever course of infection." (Reconsideration Mot. Ex. B).   Although the letter goes on to note that in general anyone with a compromised immune system is at significant risk to become severely ill when infected, Weigand has provided no indication as to whether he *presently* has such a weakened immune system.

      Finally, that bail has been granted in certain other cases is not a basis to grant bail here— any more than that bail has been denied in certain other cases is a basis to deny bail.   Weigand cites to other cases, such as *United States v. Lopez*, 19 cr. 323 (Mar. 26, 2020), in support of his claim that the pandemic justifies his release on bail.   *Lopez* did not involve a non-citizen with no ties to the United States; who has substantial ties to country from which extradition is impossible (Germany); and who has the financial means to flee.[6]   *Lopez* is therefore irrelevant to the Court's analysis here.[7]

---

[6] Among other things, the defendant in Lopez lived in the United States and had a family here.

[7] The defendant's additional argument that he should be released under 18 U.S.C. § 3142(i) is misplaced.   While Weigand's release would certainly make it more convenient for him and his counsel to prepare his defense, his release is not "necessary" for the preparation of his defense under 18 U.S.C. § 3142(i).   If that were the case, Section 3142(i) would seemingly compel the release of all defendants who are currently detained pending trial.   Furthermore, unlike in *United States v. Stephens*, No. 15-CR-95 (AJN) (S.D.N.Y. Mar. 19, 2020) (ECF Doc. No. 2798), which is cited by the defense, where the defendant had proffered specific, unrebutted facts demonstrating that the precautions taken by the BOP were impeding his ability to prepare for a hearing scheduled just *one week* in the future, the case here presents no similar circumstances.

Honorable Jed S. Rakoff
April 23, 2020

## <u>CONCLUSION</u>

For the foregoing reasons, no condition or combination of conditions can reasonably assure Weigand's appearance in Court.  As Your Honor has already found, Weigand should therefore remain detained.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:     _____/s/_____

Christopher J. DiMase / Nicholas Folly/
Tara LaMorte
Assistant United States Attorneys
(212) 637-2433 / (212) 637-1060/
(212) 335-104

# **EXHIBIT A**

K3HsWEIc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.

5                              20 CR 188 (JSR)

6                                        Telephone Conference
    RUBEN WEIGAND,
7
              Defendant.
8
    ------------------------------x
9
                                       New York, N.Y.
10                                     March 17, 2020
                                       3:30 p.m.
11

12  Before:

13                      HON. JED S. RAKOFF,

14                                     District Judge

15
                         APPEARANCES
16
    GEOFFREY S. BERMAN
17       United States Attorney for the
         Southern District of New York
18  CHRISTOPHER DiMASE
    TARA LaMORTE
19  NICHOLAS FOLLY
         Assistant United States Attorneys
20
    MICHAEL H. ARTAN
21       Attorney for Defendant

22  ALSO PRESENT:
    LA AUSA Solomon Kim
23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

K3HsWEIc

1              (In chambers)

2              THE COURT:  This is Judge Rakoff.

3              I'm going to put you on the speakerphone.

4              We have a court reporter here.

5              Will the parties please state your names for the

6     record.

7              MR. DIMASE:  Good morning, your Honor.

8              For the government, Christopher DiMase.

9              I'm also joined by AUSA Nicholas Folly and AUSA Tara

10    La Morte.

11             Also, the court, if the court would permit, we have

12    the AUSA from Los Angeles who handled the hearings last week,

13    Solomon Kim.

14             He is also on the line to address any questions that

15    may arise because we were not able to get the transcripts in

16    advance of today's proceeding.

17             THE COURT:  All right.

18             For the defense.

19             MR. ARTAN:  Good afternoon, your Honor.

20             Michael Artan for Mr. Weigand.

21             I have a question for the court before we proceed.

22             I think someone said yesterday I should not use a

23    speaker, but my client's fiance is present in my office, and

24    I'm inquiring whether I could stay on the speaker or not.

25             I certainly would accede to whatever the court

K3HsWEIc

1    desires.

2              THE COURT:  Well, you could stay on the speaker.

3              Here is the difficulty.

4              Just keep this in mind.

5              When you're on the speakerphone and I try to interrupt

6    you for a question or something like that, you can't hear me.

7              That's the trouble with speakerphones.

8              So if you will just be sure that when you're speaking

9    on the speakerphone, you pause every minute or so to make sure

10   that I don't have some question for you, then it's fine.

11             MR. ARTAN:  Thank you, your Honor.

12             If it poses a difficulty, I know you'll let me know,

13   and I appreciate the courtesy.

14             I believe there is someone on from pretrial services

15   as well.

16             MS. DEFEO:  Courtney DeFeo, C-o-u-r-t-n-e-y D-e F-e-o.

17             THE COURT:  Thank you.

18             All right.

19             Just to set the table here, this bail hearing

20   originates from a call I received yesterday where I was

21   informed by counsel for both sides that the defendant had been

22   arrested in California, that he had been taken before a

23   magistrate judge who, after receiving the pretrial services

24   report there, which I have a copy of, initially set bail

25   conditions that would authorize the defendant's release.

K3HsWEIc

1          However, he stayed that order at the request of the

2     U.S. Attorney's office in New York, who wanted to appeal that

3     determination to me.

4          Independent of that, I think, as I understood it at

5     least as of yesterday, one of the bail conditions, namely the

6     posting of a substantial bond by a third party, had not been

7     met.

8          We considered whether it was possible to get the

9     defendant here today, but aside from all the obvious problems,

10    the coronavirus problems would have made it just impossible.

11         We are going ahead without the presence of the

12    defendant, but let me ask defense counsel, you indicated

13    yesterday that you might have an opportunity to speak with him

14    before our telephone conference today.

15         I don't know if you did that or not?

16         MR. ARTAN:  Your Honor, after we were on the phone, I

17    went to go see my client, and he has agreed to waive his

18    presence for today's hearing.

19         THE COURT:  All right.

20         Excellent.

21         OK.

22         Let me hear first from the government and then from

23    defense counsel and then from anyone else who wants to be

24    heard.

25         MR. DIMASE:  Judge, just one point of clarification.

K3HsWEIc

1          You mentioned having a pretrial services report from

2   California.

3          Based on my conversations with AUSA Kim, I believe

4   there may be two reports.

5          I just want to make sure that you have those.

6          LAW CLERK:  I just gave you the updated one.

7          I can print out the original one.

8          THE COURT:  I've only read the updated one.

9          I'm told there was an earlier one, but I'll take a

10   look if you want.

11          I don't see any reason to take a look at it.

12          This was the updated.

13          the one I read was the later report.

14          MR. DIMASE:  Understood.

15          OK.

16          I take it, maybe the AUSA can clarify this, that the

17   updated report contains all the information that was contained

18   in the original report?

19          THE COURT:  Well, you know, with apologies to anyone

20   who cares, I assume counsel is going to tell me every relevant

21   fact that I need to know right now.

22          MR. DIMASE:  Fair enough.

23          I don't mind doing that, your Honor.

24          I want to make sure that you had all the appropriate

25   information.

K3HsWEIc

1          With that, typically the government is appealing the

2     decision before the magistrate judge who sets bail conditions,

3     and I shared those with the court yesterday, but in sum, those

4     conditions include a $500,000 bond to be fully secured by

5     equity and real estate owned by a particular person; GPS

6     location monitoring; surrender the defendant's passport; and

7     travel restricted to the Los Angeles area and to the Southern

8     District of New York.

9          We don't believe that those conditions, or frankly any

10    set of conditions, can reasonably assure Mr. Weigand's

11    attendance in court and we are, therefore, seeking detention.

12         I would note at the outset that there was a particular

13    person identified as the surety in the CDCA proceedings.

14         We have been notified by that person, who was prepared

15    at the time to secure the bond with equity and real estate that

16    he owned, that he is no longer prepared to service --

17         THE COURT:  No, I don't think that is especially

18    relevant.

19         I indicated that as much yesterday when defense

20    counsel wanted to have this hearing later, because he wanted to

21    see if he could find someone else who was suitable.

22         If the present conditions are suitable to the court

23    but someone else has to be found, obviously the guy won't be

24    released until someone else is found.

25         But I don't think that is the heart of the matter.

K3HsWEIc

1          I thought the government was of the view that no set

2    of conditions could assure the risk of flight, assure against

3    the risk of flight, even if the bond was $10 million or two

4    cents.

5          MR. DIMASE:  That is our argument, your Honor.

6          THE COURT:  Well, I would like to hear that argument

7    then and enough of these preliminaries.

8          MR. DIMASE:  So, your Honor, first of all, as you have

9    seen in the pretrial services report, after reviewing the

10   information, they recommend detention.

11         The reason for that are many of the same reasons the

12   government seeks detention.

13         First of all, the defendant is a German citizen.

14         He has no citizenship or other status here in the

15   United States.

16         That is particularly problematic because, as the court

17   may be aware, Germany will not extradite its citizens to the

18   United States for prosecution on criminal charges.

19         To the extent that the defendant is able to leave the

20   United States and return to Germany, he cannot be brought back

21   to be prosecuted on the charge in the indictment.

22         Moreover, he has no ties to the United States.

23         He has no family here in the United States, no

24   property that the government is aware of, no employment here,

25   quite infrequent travel here.

8

K3HsWEIc

1          In point of fact, on this trip -- I'll just go back to

2     how this arrest developed -- Mr. Weigand was flying from

3     Zurich, Switzerland, to San Jose, Costa Rica, and he had a

4     stopover at Los Angeles International Airport in California.

5          And it was at the Los Angeles airport he was arrested

6     by agents on the arrest warrant associated with the indictment.

7          Even on this trip, Mr. Weigand was not intending to

8     stay or spend any significant time.

9          In fact, I believe his flight was scheduled to leave

10    five hours after -- his flight out to Costa Rica was scheduled

11    to leave five hours after his flight from Zurich arrived.

12         In sum, defendant is a foreign citizen to a country

13    that won't extradite.

14         Has no ties really here to the United States.

15         Secondly, it is clear from the allegations in the

16    indictment that this is somebody who is connected to a criminal

17    network with access to substantial financial resources.

18         As the court is no doubt aware from reading the

19    indictment, the charged scheme is a bank fraud scheme involving

20    the processing of over $100 million using phony corporations

21    and offshore bank accounts.

22         In fact, I'll get to this a little later when I

23    discuss the penalties that the defendant faces, but that is

24    likely a significant underestimate of the actual amount of

25    money handled by this organization, because it only accounts

K3HsWEIc

1    for one of the significant credit card companies that was

2    involved in the scheme.

3            We have not obtained records from the other of the two

4    largest credit card players.

5            It could easily be twice that amount, if not more.

6            So I think it also bears note that the government is

7    aware that at least one player in the scheme was earning as

8    much as 8.5 percent of the transactions.

9            So we're talking about, first of all, a very large

10   figure in terms of the money that was flowing through accounts

11   that the defendant and his coconspirators controlled, and then

12   fees that are a substantial portion of that amount of money.

13           So we're talking about a group of people that have

14   access, I think it is fair to say, to substantial resources,

15   many of which may be offshore.

16           Turning to the evidence against this defendant, the

17   evidence is strong.

18           The government has detailed text message conversations

19   involving the defendant in which he and his coconspirators

20   discussed this scheme that is charged in the indictment, which

21   I'll call the miscoding scheme for lack of a better word.

22           We also have anticipated testimony from a

23   coconspirator witness, among other things, placing the

24   defendant in one or more meetings related to the criminal

25   scheme.

K3HsWEIc

1          We have developed evidence that the defendant and his

2     coconspirators used encrypted services, encrypted chat

3     messages, such as Telegram, and e-mail, such as ProtonMail, to

4     avoid law enforcement detection, and also used anonymous e-mail

5     addresses, nicknames, and unsigned e-mails, among other things,

6     to avoid law enforcement detection.

7          So this case is strong against the defendant.

8               turning to the charge, the charge is serious.

9          This is a charge that carries a 30-year statutory

10    maximum.

11         It is a scheme, as I noted before, that involves at

12    least $100 million, but likely much more than that.

13         The guidelines, I understand, were discussed at some

14    length in the California proceedings, I think, at a minimum, it

15    is fair to say somewhere in the ballpark of 70 to 87 months,

16    and I can tell the court how I'm arriving at that.

17         I think there is an argument that the entire $100

18    million, the government is aware of today, could constitute

19    loss under the guidelines.

20         Under that scenario, the range is much higher, at 135

21    to 168 months, based on $100 million loss.

22         But even if it were to take a more conservative

23    approach and really base the loss on gain, because the loss is

24    not easily calculable under the guidelines, I think using the

25    8.5 percent number as a proxy for the amount earned here, that

K3HsWEIc

1     is in the ballpark of eight and a half million, that gets you

2     to an offense level of 27 and a resulting guidelines range of

3     70 to 87 months.

4            So that is a substantial sentence, especially in a

5     white collar case, and it could be much higher than that.

6            The bottom line is, between the strength of the

7     evidence against the defendant and the seriousness of the

8     charge, along with the consequences it carries, there are

9     strong defenses for this defendant who has no ties here, who is

10    a German citizen, and were he to return to Germany, could avoid

11    ever being prosecuted here in the United States, flee back to

12    that country or elsewhere in the world.

13           There is one other point I want to bring to the

14    court's attention in connection with this bail proceeding,

15    which is the post-arrest statement made by Mr. Weigand, which

16    I think goes a little bit to his likelihood of complying with

17    bail conditions in terms of, you know, his basically coming to

18    terms with the charges against him and his willingness to be

19    honest with law enforcement.

20           So he told the agents during his post-arrest statement

21    that he did not have any involvement with a company that is

22    listed in the indictment as the marijuana -- I'm not sure, I'm

23    forgetting the precise definition -- the company to which

24    Mr. Weigand's coconspirators provided the services.

25           Mr. Weigand denied any involvement with that company,

K3HsWEIc

but the evidence shows that he was heavily involved in the

scheme and that he knew full well that he and his coconspirator

handling marijuana transaction proceeds through that company,

including text messages, chat messages, and other evidence of

that nature where Mr. Weigand is discussing the scheme.

In addition, Mr. Weigand was questioned about an

e-mail address that the government has connected both to him

and to the scheme.

Again, he, when questioned about that e-mail address,

he denied being connected to it or using it and, in fact, the

evidence shows that not only was that his e-mail address, but

that he was using it in furtherance of the charged scheme.

So to add to everything else, this is a person who

has, in the context of a post-arrest statement, when agents

spoke to him after his arrest at the airport, lied and denied

any involvement in the charged offense.

So for all those reasons, your Honor, I think

primarily based on the lack of any ties here, the German

citizenship, the extradition problem, combined with the

strength of the evidence, the seriousness of the charge, and

the financial resources that Mr. Weigand has to flee, we

believe he presents a very, very serious risk of flight that

cannot be mitigated with any set of bail conditions at all, and

that he should be, therefore, detained.

THE COURT:  All right.

K3HsWEIc

1           Let me hear from defense counsel.

2           MR. ARTAN:  Thank you, your Honor.

3           To begin, just to get one point out of the way, the

4    defense would like to emphasize the fact that there is no risk

5    to the community because the indictment in paragraph six

6    acknowledges that whatever has been alleged stopped in 2019.

7           So I would just like to put that little point to rest

8    before getting to the issue of flight risk.

9           The government and defense has a hugely different

10   point of view with respect to the loss amount in this case, and

11   I think it is important to talk about what the alleged scheme

12   is and, of course, my client is not acceding to any

13   involvement, but the alleged scheme is basically marijuana

14   dispensaries here in California and Oregon, which are legal

15   operations according to state law.

16          And I, of course, acknowledge the fact that state law

17   and federal law are at odds in that regard, but in the state of

18   California and the state of Oregon, the dispensaries were

19   operating legally.

20          There was a company Eaze, which is not named in the

21   indictment, but that is what is being discussed here was the

22   subject of civil litigation last year, was sort of an Uber,

23   if you will, type company which was delivering marijuana to

24   customers in California and Oregon.

25          The customers, up until last year, were using credit

K3HsWEIc

1      cards to pay for the marijuana deliveries.

2              The company Eaze, which I believe is the company that

3      Mr. DiMase was talking about --

4              MR. DIMASE:  That's correct.

5              MR. ARTAN:  -- was then processing --

6              I'm sorry?

7              MR. DIMASE:  I just said that that was correct.

8              MR. ARTAN:  That company --

9              Could you repeat that, please?

10             MR. DIMASE:  I'm sorry.

11             I just was saying --

12             MR. ARTAN:  In any event --

13             MR. DIMASE:  -- you're correct, that is the company,

14     Eaze, that we were discussing.

15             MR. ARTAN:  OK.

16             So Eaze then was dealing with e-commerce facilities to

17     process the credit cards.

18             The credit cards would be processed, and full payment

19     was made to the dispensaries.

20             So when the government is talking about a loss, there

21     was no loss to anyone.

22             The financial institutions were all made fully whole,

23     the purchasers of the marijuana basically paid for their

24     marijuana, and the dispensaries received their money.

25             To suggest that there is a $100 million loss in this

K3HsWEIc

1   case is completely at odds with what the structure alleged by

2   the government constituted.

3        The fact is that the government's case is based on a

4   technical interpretation of Section 1344(2), which talks about

5   getting money under some false pretense, but the fact is there

6   a no loss and no intended loss in this case.

7        So the defense would like to emphasize the fact that

8   although there might be some technical argument of a bank

9   fraud -- again, I am not conceding that -- but if there is a

10  technical argument as to bank fraud, we have a case where there

11  is no loss and no intended loss.

12       If you had a no-loss bank fraud case, which is our

13  view of what this is, and it is also the way the indictment is

14  laid out.

15       You're not talking about 70 to 87 months, you're

16  talking about a sentence of less than a year.

17       I would also like to emphasize the fact that

18  throughout this indictment, it does not say anywhere what

19  Mr. Weigand is accused of doing.

20       Throughout the indictment, it says he and his

21  conspirators, he and his conspirators did X, Y, and Z.

22       There is not a single instance in the indictment which

23  identifies what conduct he is supposedly to have done.

24       This is of great concern because the government speaks

25  in broad terms about a criminal network and so on, and the fact

K3HsWEIc

1   is that his involvement, alleged involvement, could have been

2   as small as making an introduction and he could be tied up in

3   this situation, and the Court has no way of knowing what it is

4   he is supposed to have done.

5           My client has been in the e-commerce industry for a

6   good number of years.

7           In fact, I won't say the entire period of e-commerce,

8   but for an extended time.

9           He is deeply respected in Europe.

10          He is a very successful e-commerce consultant.

11          It is a legitimate company, it is a series of

12   legitimate companies, and I would emphasize the fact that he

13   has no criminal record.

14          He has no history of any criminal conduct.

15          The e-commerce world is complicated, your Honor, and

16   the fact is that you have, even under any circumstance, when

17   you're talking about e-commerce, these same types of accounts

18   and same types of setups would be used whether they were

19   selling marijuana or selling widgets or selling on eBay.

20          The fact is that that is consistent with how

21   e-commerce exists and operates.

22          I think there is a temptation to get too far -- at

23   least to get caught up in the idea that all this money was

24   going through the accounts, but it all came back to where it

25   was supposed to go.

K3HsWEIc

1          Additionally, your Honor, I would like to point out
2     that insofar as the post-arrest statements, I talked to my
3     client about them.

4          He was asked if he had involvement with Eaze and he
5     does not have involvement with Eaze.

6          Eaze, even if you believe the government's view of
7     what happened, Eaze would have been way down the road and it
8     would have been a situation where if my client was involved, he
9     would have been involved with parties other than Eaze.

10         Insofar as this e-mail address is concerned, he still
11    denies that it is his e-mail.

12         He wasn't asked if he ever used it, he was asked if it
13    was his e-mail.

14         I would suggest to the court that someone who is a
15    successful European businessman -- and I haven't heard any
16    doubt about that -- would actually put himself in a position of
17    hiding out in Germany the rest of his life over what would
18    appear, from the defense perspective, of being a no-loss bank
19    fraud case.

20         As to ties here in Los Angeles, my client has ties
21    here.

22         He has friends here that he's known for a long time.

23         One person was willing to be a surety, and as I told
24    the court yesterday and as Mr. DiMase has reiterated today, he
25    has chosen not to continue in that circumstance.

1    But the fact is my client does have ties here, he is

2    able to live here or in New York, where he also has friends,

3    and the picture as a total is important for the court to

4    understand.

5    He is a successful businessman with an unidentified

6    role in a no-loss bank fraud case, your Honor.

7    I think understanding that, the magistrate judge

8    appropriately granted a bond of $500,000 secured by property,

9    my client has already provided -- the passport was already

10   turned over to pretrial services here in Los Angeles, the FBI

11   had it and gave it to the pretrial services office, and so that

12   has already occurred, and the Court also required location

13   monitoring, GPS monitoring.

14   The defense would suggest that, taken in combination,

15   the factors and terms and conditions of bond set forth by the

16   magistrate judge here in Los Angeles more than adequately

17   assure the government of Mr. Weigand's appearance in court and

18   that the magistrate judge made an appropriate decision.

19   Insofar as the pretrial services' recommendation is

20   concerned, the pretrial services' original recommendation, your

21   Honor, was that my client be released on a $100,000 unsecured

22   bond with $50,000 cash deposit.

23   That was the report issued last Tuesday.

24   On Friday, when the court actually made its finding,

25   the pretrial services agency recommended detention based on the

K3HsWEIc

1    government's statement to them that there was $100 million

2    loss.

3            I would suggest to the court that the pretrial

4    services' original position should also be recognized, because

5    this is not a $100 million loss case and there was no loss and

6    no intended loss.

7            Obviously, if the court has any questions -- I'm

8    sorry.

9            THE COURT:  No, but let me hear --

10           MR. ARTAN:  I forgot to add one thing to your Honor.

11           I apologize.

12           The government has mentioned encrypted messages and so

13   on.

14           And the fact is, your Honor, that almost every

15   industry I'm aware of that involves either the transmission of

16   financial information or involves the transmission of

17   confidential communication, even medical records and legal

18   communication involves encrypted messaging.

19           Virtually every big law firm I deal with and whatever

20   healthcare providers I represent, everything is encrypted.

21           So to suggest that the fact of the messages being

22   encrypted is nefarious, I think is a bit misleading.

23           Thank you for that, your Honor.

24           THE COURT:  Thank you.

25           Let me hear briefly from the government in rebuttal.

K3HsWEIc

1              MR. DIMASE:  Thank you, your Honor.

2              For one thing, I think very little was said about U.S.

3    ties.

4              It is very unclear to me, other than "friends," that

5    Mr. Weigand has any real ties to the U.S. or any specifics on

6    that.

7              Nor were the issues of the inability to extradite him

8    from Germany or his profits really addressed, but let me

9    address the two things that were brought up at some length;

10   one, the evidence and what Mr. Weigand's scheme was, and two,

11   the loss issue.

12             On his role, I think Mr. Artan said something like

13   this was, at best, a technical violation.

14             The scheme involved regular lies to banks in order to

15   force them or permit them to transactions they would never have

16   transacted otherwise.

17             The scheme is complex, but actually it is not, as

18   Mr. Artan suggests, complicated.

19             Mr. Weigand and his coconspirators were responsible --

20   and Mr. Weigand, in particular, was responsible for helping

21   create fake companies that looked like real merchants and then

22   submitting application packs, they are called, which contained

23   all the information about the fake merchant, what they do, what

24   their line of business is, their expected revenue, things of

25   that nature to a bank, and then setting up an account in the

K3HsWEIc

1    name of that fake merchant so that the credit card companies

2    will think that customers, when they are buying marijuana, are

3    actually buying, let's just say, golf balls.

4              So golfballs.com is a merchant.

5              Mr. Weigand is involved in putting together

6    application packs and submitting them to banks with fake

7    companies listed in them in order to allow these transactions

8    to be processed.

9              Visa, Mastercard, U.S. banks, none of them would

10   handle this traffic otherwise.

11             So it is not a complicated scheme and it is not a

12   technical bank fraud violation.

13             It is a series of regular lies to banks to get them to

14   move money that they absolutely would not otherwise.

15             Mr. Weigand's involvement included submitting

16   application packs.

17             He also had direct relationships with so-called

18   acquiring banks, the banks where the merchants had their

19   accounts to receive these funds, to help this company, Eaze,

20   process that marijuana traffic and move the money through the

21   financial system.

22             There is evidence that he attended a meeting in

23   California with coconspirators to map out how they would

24   operate this scheme, and it is clear from the electronic

25   messages that he knew that this was marijuana traffic going

K3HsWEIc

1    through e-merchants and the banks, that he knew the real

2    customer was Eaze, and that the companies were phony, and even

3    discussed the submission of these application packs to banks to

4    facilitate the scheme.

5            Let me turn now to loss.

6            With respect to loss, there is a loss here.

7            Whether it is $100 million, which is the government's

8    position, or not, one way or the other, there was exposure to

9    banks and credit card companies to legal risk and reputational

10   harm, at a minimum.

11           As I said, the banks and credit card companies simply

12   would not have processed this money.

13           It isn't really fair to say the money went all where

14   it was supposed to go.

15           Large chunks of this money went to the criminal actors

16   responsible for facilitating the lies to banks.

17           At the end of the day, the dispensaries got paid,

18   that's true, but a big percentage was lopped off to facilitate

19   these lies to make sure the transactions went through.

20           So even if it is not 100 million -- as I already said

21   100 million really underestimates the amount, it is only from

22   one of the major credit card companies -- the guidelines

23   direct, under application note Section 2B1.1, application note

24   3(b), that the court says that the gain resulted from the

25   offense, as an alternate measure of loss, only if there is a

1     loss that recently cannot be determined.

2              As I said, there was clearly a loss here.

3              Whether it is 100 million or some other amount, that

4     is difficult to calculate.

5              For that reason, at a minimum, the court would

6     calculate the gain, which is a substantial percentage of this

7     100 million or much more that passed through these phony

8     merchant accounts.

9              So the government just does not agree at all with this

10    theory that there is simply no loss in this case and that the

11    guidelines are as low as Mr. Artan suggests.

12             THE COURT:  All right.

13             Unless anyone else has anything to say, I'm prepared

14    to rule.

15             MR. ALEINIKOFF:  If the court would indulge a brief

16    rebuttal, I would appreciate that.

17             THE COURT:  Absolutely.

18             MR. ARTAN:  Insofar as Mr. Weigand's role is

19    concerned, we hardly dispute the way it's been expressed by the

20    government.

21             Again, the indictment itself is incredibly vague and

22    these broad statements, I think, should be limited in terms of

23    the emphasis the court adopts.

24             Insofar as the ties are concerned, your Honor, there

25    is no question that my client doesn't have family here.

1           He is not a resident here.

2           This isn't a standard situation of ties, but the fact

3   is that he is an extremely successful businessperson, and

4   people who are in his position certainly don't want to be

5   restricted to one country for the rest of their lives with the

6   idea that a defensible case is out there.

7           I don't want to belabor the loss situation too much,

8   your Honor.

9           But when the government says that the banks would not

10  have done this without the miscoding, the fact is, your Honor,

11  the banks made substantial money on every one of these credit

12  card transactions.

13          The banks made money.

14          So to suggest that there was a loss to the bank is

15  simply fanciful.

16          Every credit card transaction involved a bank fee

17  where they made money.

18          Now, the fact that they might not have done it doesn't

19  alter the fact that the banks got -- if the volume is what the

20  government says, the banks made millions and millions of

21  dollars even though they were "defrauded."

22          It is an odd-ball situation, your Honor.

23          And if federal law was consistent with California

24  Oregon law, I guess we would be in a different posture right

25  now, but this is where we are, and I would suggest to the court

K3HsWEIc

1   that the magistrate judge in California was correct in his

2   ruling.

3          THE COURT:  All right.

4          Thank you very much.

5          I think the very fine presentation by both sides in

6   one respect seems to me to be a little misfocused, and that is

7   by the emphasis on loss or no loss and the concomitant emphasis

8   on how that affects the guidelines.

9          To begin with, loss is not an element of this crime.

10         The essence of bank fraud, like the mail fraud statute

11  for which it is derived which goes back to 1872, is that you

12  lied to someone from whom you were seeking to get money or

13  property or the like.

14         You put them at risk because if they had known the

15  truth, they might or might not have gone along with what you

16  were proposing.

17         But under federal law, and really under the common law

18  of England as well, you had to tell them the truth.

19         The gist of the indictment, as I read it, is that the

20  grand jury determined that there was probable cause to believe

21  that this defendant and his confederates repeatedly lied to the

22  banks in substantial transactions and multiple transactions and

23  thereby put them, at a minimum, at the risk of entering into a

24  transaction that they believed was different from what it

25  actually was.

K3HsWEIc

1          That is the heart of federal fraud statutes.

2          I have, in numerous written decisions as well as oral

3   statements made at sentencing, pointed out how misguided the

4   guidelines are in their inornate attention to loss when it is

5   not even an element of the crime.

6          To be frank, I think the guidelines in this respect

7   are totally irrational, and whether it is $100 million or no

8   loss is not irrelevant, but it is not, in my view, central to

9   the inquiry.

10         I have sentenced people to well below the guidelines

11  when the guidelines were simply a figure based largely on loss,

12  and I've sentenced people to above the guidelines when I

13  thought that other factors showed that they were substantial

14  crooks.

15         While I appreciate all the arguments from both sides

16  on the loss issue and the concomitant guideline issue, I think

17  it is somewhat besides the point, or at least not totally

18  besides the point, but not central to the inquiry.

19         What I think is central to the inquiry is, first, the

20  seeming strength of the government's case.

21         Now, I say seeming because I always hold open, in any

22  bail situation, reconsidering the matter if I find reason to

23  believe that the government has materially overstated the

24  strength of its case.

25         But given the nature of the transactions here and the

K3HsWEIc

1    nature of the charge, it sounds like a strong case, well

2    supported.

3              The most important factor, though, as I'm sure both

4    counsel recognize, is the utter lack of ties that this

5    defendant has with the United States of any meaningful sort,

6    coupled with the extradition bar from Germany, coupled with the

7    obvious motive to flee that anyone would have who knew that

8    they were facing a serious felony charge, regardless of what

9    the sentence might turn out to be if convicted.

10             I was a little surprised to hear defense counsel say

11   that, Oh, no respected businessman would want to spend his time

12   cooped up in a country that couldn't extradite him.

13             One thinks of Marc Rich, who spent, what, 30 years in

14   Switzerland because Switzerland wouldn't extradite him, even

15   though he was an American citizen with substantial ties to the

16   United States.

17             One thinks more recently of Mr. Goshen and his flight

18   after all sorts of representations were made to the Japanese

19   authorities to get him released on bail.

20             But every case is different, and I don't mean to tar

21   this defendant with those cases.

22             My point is that this defendant has an obvious motive

23   to flee, has the wherewithal to flee, has a particularly strong

24   reason to flee in light of the no extradition situation, and

25   that coupled with all the other comments I've made convinces me

K3HsWEIc

1    that no set of conditions could reasonably assure that he is

2    not a substantial flight risk.

3              So I overrule the magistrate judge and Mr. Weigand

4    will be detained.

5              Now, we need to arrange to get him to New York.

6              We need to arrange for an arraignment, if he wishes

7    New York counsel, of course we need to get him an opportunity

8    to retain New York counsel.

9              Although I will be frank to say that I so far have

10   been very impressed by his California counsel, but that's the

11   defendant's decision to make.

12             On the other hand, we have the vicissitudes attendant

13   on the coronavirus situation.

14             My suggestion is that we put this down for arraignment

15   on April 28.

16             That is almost, what, five, six weeks from now.

17             That's much longer than I would do, but for the

18   coronavirus, I recognize that that presents substantial

19   problems.

20             I'm willing to do an earlier arraignment if defendant

21   wants, but assuming that he wants the time to retain counsel

22   and have counsel get up to speed and so forth, we would have

23   the arraignment in my court at 2:00 p.m. on April 28.

24             Is there anything counsel wants to raise with the

25   Court?

K3HsWEIc

1              MR. ARTAN:  Your Honor, if, in fact, I can't say for

2      sure I might stay on the case, but we may also be getting

3      counsel in New York.

4              If, in fact, we were in a position to be arraigned

5      early and Mr. Weigand was obviously in your district, could we

6      advance the date, giving notice to the court, would that be

7      agreeable?

8              THE COURT:  Absolutely.

9              I'm here.

10             Our court has not shut down, and all you need to do is

11     jointly call the court with your adversary and I'm usually

12     prepared to do an arraignment on 24-hour notice.

13             MR. ARTAN:  Thank you, your Honor.

14             THE COURT:  All right.

15             Anything else?

16             MR. DIMASE:  Judge, just two quick points on the

17     timing of everything.

18             At the moment, Mr. Weigand has an identity hearing

19     scheduled in California for, I believe, next Tuesday or

20     Wednesday.

21             We would like to know whether it is on this call or

22     shortly thereafter whether he intends to continue to pursue

23     that hearing or not.

24             I think that may affect the timing of his removal to

25     New York.

K3HsWEIc

1          THE COURT:  I'm not going to ask defense counsel to

2     add to that on this call because he would need to consult with

3     his client further given today's result.

4          I assume he will let you know promptly and well before

5     the day of the hearing.

6          MR. DIMASE:  Very good.

7          I think what will need to happen is there will need to

8     be a further proceeding in California where, in light of this

9     court's detention order, that court orders Mr. Weigand removed

10    here to New York.

11         Perhaps the identity hearing can be adjudicated one

12    way or the other, also that is by consent or with adversarial

13    proceeding, and then following that hearing, assuming the

14    government succeeds, he would be ordered removed to New York.

15         THE COURT:  Right.

16         MR. DIMASE:  The second issue --

17         MR. ARTAN:  May I butt in here?

18         MR. DIMASE:  Sure.

19         MR. ARTAN:  The court already set, the magistrate

20    court set Tuesday afternoon, March 24, for the identity hearing

21    and asked that we notify the government by Friday as to whether

22    we would be contesting identity so that the government could

23    avoid having a witness flown out.

24         So the matter is already on calendar for March 24.

25         THE COURT:  That's fine.

K3HsWEIc

1           MR. ARTAN:  I'm not sure that --

2           THE COURT:  That schedule is fine.

3           You'll let the government know by Friday, and if the

4    answer is you want the hearing, the hearing will be held on

5    March 24.

6           That is fully consistent with the arraignment date

7    that I just set.

8           It still gives you plenty of time.

9           MR. DIMASE:  I'm not asking the court to order this,

10   but to the extent that the counsel can provide a little bit

11   more notice on Friday, there are some pretty severe

12   restrictions in place for agent travel, which would require

13   some approvals to get the agents flown back to LA.

14          If there is any way you could let us know sooner than

15   Friday, we would greatly appreciate that.

16          MR. ARTAN:  I'll do my best.

17          I'm going to try to see my client tomorrow and let you

18   know.

19          MR. DIMASE:  Thank you.

20          The only other thing I would say, your Honor, is just

21   obviously the coronavirus presents somewhat of an unknown.

22          I did hear from the marshals today that there were

23   some delays in getting people produced from other districts.

24          I don't think that the court's schedule is

25   unreasonable.

K3HsWEIc

1      It still gives a significant amount of time to get the

2   defendant here, but I will let the court now if we foresee any

3   issues with that timeline in light of the unique events

4   unfolding right now.

5      THE COURT:  That's fine, although it was precisely

6   because of that that I picked a date so far in the future.

7      My normal practice is to arraign a defendant the day

8   after he or she is indicted, not to give six weeks from the

9   time of a bail hearing.

10      Do your best, and obviously none of us can predict

11   exactly what will happen, so if there is a problem, of course

12   my practice, which the government I'm sure knows, but just for

13   defense counsel's benefit, don't ever send me a letter without

14   prior permission of the court.

15      If you have any kind of application whatsoever, just

16   get your adversary and call me and I will make myself available

17   and that way we can resolve any disputes very expeditiously.

18      I will, pursuant to Section 3161 of Title 18, exclude

19   all time between now and April 28, finding that such time is

20   necessary for the identification hearing, for the

21   transportation of the defendant, and also because, particularly

22   given the coronavirus, the best interest of justice in

23   excluding such time substantially outweighs the interest of the

24   public and the defendant in a speedy trial.

25      Anything else we need to take up?

K3HsWEIc

1          MR. DIMASE:  Nothing from the government, your Honor.

2     Thank you.

3          MR. ARTAN:  Nothing from the defense.

4     Thank you.

5          THE COURT:  Thanks very much.

6     Bye-bye.

7     (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25