**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

HAMID AKHAVAN and RUBEN WEIGAND,

                Defendants

Case No. 20-cr-188 (JSR)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RUBEN WEIGAND'S**
**MOTION TO DISMISS THE INDICTMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

BACKGROUND ..................................................................................................................... 4

ARGUMENT ........................................................................................................................... 6

I.    The Bank Fraud Statute Requires Proof That The Defendant Intended To Both Deceive The Victim And To Cheat The Victim Out Of Property By Material Misrepresentations. ....................................................................................................... 7

    A.    The Dismissal Of An Indictment For Failure To State An Offense ..................... 7

    B.    *Kelly v. United States* ........................................................................................ 8

    C.    Wire Fraud Precedents Are Applicable To The Bank Fraud Statute ................. 10

    D.    Materiality Is Essential ..................................................................................... 11

II.    The Indictment Does Not Allege A Scheme With The Objective To "Cheat" Or Deprive The U.S. Issuing Banks Of Property. ............................................................... 11

    A.    The Indictment Does Not Allege A Scheme To Obtain Money From Or Inflict Economic Harm On U.S. Issuing Banks. ................................................. 12

    B.    U.S. Issuing Banks' Intangible Right To Approve Credit Card Transactions Based On Correct Merchant Codes Is Not A Qualifying Property Right Under *Kelly*. ............................................................................. 15

III.    If Anything, The Indictment Alleges A Scheme That Had Only An Incidental and Immaterial Effect On The U.S. Issuing Banks. ............................................................ 17

CONCLUSION ...................................................................................................................... 19

# TABLE OF AUTHORITIES

**CASES**

*Dowling v. United States*,
473 U.S. 207 (1985)................................................................8

*Kelly v. United States*,
140 S. Ct. 1565 (2020) ................................................. *passim*

*Loughrin v. United States*,
573 U.S. 351 (2014)................................................................7

*Neder v. United States*
527 U.S. 1 (1999)..................................................................10

*Russell v. United States*,
369 U.S. 749 (1962)................................................................8

*United States v. Ayewoh*,
627 F.3d 914 (1st Cir. 2010)....................................................5

*United States v. Banyan*,
933 F.3d 548 (6th Cir. 2019) .................................................12

*United States v. Bouchard*,
828 F.3d 116 (2d Cir. 2016)....................................................7

*United States v. DiMarzo*,
No. 93-cr-247, 1993 WL 426936 (S.D.N.Y. Oct. 21, 1993) .................................................19

*United States v. Finazzo*,
850 F.3d 94 (2d Cir. 2017)....................................................14

*United States v. George*,
223 F. Supp. 2d 159 (S.D.N.Y. 2016)......................................8

*United States v. Goldberg*,
756 F.2d 949 (2d Cir. 1985)....................................................8

*United States v. Lebedev*,
932 F.3d 40 (2d Cir. 2019)....................................................17

*United States v. Mercado*,
No. S1-02-cr-675, 2003 WL 21756084 (S.D.N.Y. July 30, 2003).........................................19

*United States v. Mermelstein*,
487 F. Supp. 2d 242 (E.D.N.Y. 2007) .....................................8

*United States v. Miller*,
   953 F.3d 1095 (9th Cir. 2020) ...................................................................... *passim*

*United States v. Murphy*,
   836 F.2d 248 (6th Cir. 1988) ...................................................................16

*United States v. Nejad*,
   No. 18–CR–224 (AJN), 2020 WL 883500 (S.D.N.Y. Feb. 24, 2020) ....................................12

*United States v. Puerta*,
   607 F. App'x 635 (9th Cir. 2015) ...............................................................14

*United States v. Ragosta*,
   970 F.2d 1085 (2d Cir. 1992) .....................................................................10

*United States v. Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970) .................................................................3, 12

*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007) ............................................................11, 14, 18

*United States v. Sadler*,
   750 F.3d 585 (6th Cir. 2014) ...................................................................16

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007) ................................................................11, 18

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987) ..........................................................3, 12, 14, 16

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992) .......................................................................5

*United States v. Tana*,
   618 F. Supp. 1393 (S.D.N.Y. 1985) ...............................................................8

**STATUTES**

18 U.S.C. § 666.................................................................................................9

18 U.S.C. § 1343..............................................................................................9

18 U.S.C. § 1344........................................................................................1, 7, 12

## PRELIMINARY STATEMENT

The Indictment in this case should be dismissed because the facts alleged by the Government cannot support the charge of conspiracy to commit bank fraud.  In fact, they conclusively refute it.  On March 31, 2020, the defendants were charged in superseding indictment S3 20 Cr. 188 (the "Indictment") with a single count of conspiracy to commit bank fraud for allegedly participating in a scheme to "disguise" debit and credit card transactions for the purchase of marijuana as transactions for other, "legitimate goods."  Indictment at ¶¶ 2, 13.  The Indictment does not allege that, in connection with the scheme, the defendants sought to cheat any U.S. financial institutions.  Indeed, on the Indictment's own telling, it was not an object of the alleged scheme that the defendants obtain "moneys, funds, credits, assets, securities, or other property," 18 U.S.C. § 1344, from any U.S. financial institutions.  On the contrary, the object of the alleged scheme was to secure approval of transactions that debit and credit cardholders wished to engage in, and from which the alleged victims—"some" unspecified issuing banks in the United States ("U.S. Issuing Banks")—received significant fees.[1]

Those banks had already made the decision to extend credit or provide debit card services to the cardholders, and there is no allegation that the U.S. Issuing Banks suffered any loss from the transactions, or faced any economic risk whatsoever.  In fact, quite the opposite: they benefited from the transactions.  And there is no allegation that Weigand ever interacted with the U.S. Issuing

---

[1] Although the Indictment refers generally to "United States Banks" and "financial institutions," it is clear from the allegations in the Indictment that the federally-insured financial institutions alleged to be the victims in this case are domestic banks that (unlike other domestic banks) opted not to process transactions related to marijuana.  The Indictment also refers to "acquiring" banks, which held accounts for merchants in which the proceeds of credit and debit card transactions were deposited.  Indictment at ¶ 11(b).  The Indictment, as well as other representations by the Government, indicate that the merchant acquiring banks engaged by the defendants in the alleged scheme were "offshore," foreign banks.  *See* Indictment at ¶¶ 2, 13; *see also* Gov. Bail Opposition at 3–4.

1

Banks at all, let alone that he did so in a fraudulent manner.  The Foreign Acquiring Banks referenced in the Indictment are not within the scope of the bank fraud statute and, in any event,

████████████████████████████████████████████████████████████████████

███████████████████████████████.  To the extent that those Foreign Acquiring Banks were obtaining money from the U.S. Issuing Banks, that was an incidental byproduct of defendants' alleged scheme to secure approval of credit and debit cardholders' transactions.  It was not the object of the alleged conspiracy.  As a result, on the facts alleged in the Indictment, there was no scheme to obtain "moneys . . . or other property" from U.S. financial institutions.  Thus, as a matter of law, there could be no bank fraud.

That conclusion is all the more obvious in light of the Supreme Court's recent decision in *Kelly v. United States*, 140 S. Ct. 1565 (2020).  On May 7, 2020, in a landmark decision narrowing the scope of the federal criminal fraud statutes, the Supreme Court expressed concern with the "ballooning of federal power" and the "sweeping expansion of federal criminal jurisdiction," and held that the federal fraud statutes require the Government to prove that the "object" of a fraud scheme is to obtain money or tangible property from the victim.  *Id.* at 1568, 1574 (holding that a scheme focused on the intangible right to control traffic on the George Washington Bridge toll plaza was not within the ambit of the federal fraud statutes charged in that case) (citation omitted).  The Court explained that a scheme aimed at denying the alleged victim the right to exercise "allocation, exclusion, and control" over its property does not qualify under the fraud statutes.  *Id.* at 1572.  And it held that a conviction under the fraud statutes cannot rest on an "incidental" deprivation of property—in *Kelly*, the incremental cost associated with employing additional toll workers needed to carry out the scheme—that was not the object of the alleged scheme.  *Id.* at 1573–74.

2

Approximately one month earlier, the U.S. Court of Appeals for the Ninth Circuit (with Your Honor sitting by designation and authoring the opinion) presaged the reasoning in *Kelly* by holding that "to be guilty of wire fraud, a defendant must act with the intent not only to . . . utilize . . . forms of deception, but also to deprive a victim of money or property by means of those deceptions. In other words, a defendant must intend to deceive *and* cheat." *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020) (emphasis in original).  To support that holding, *Miller* relied on longstanding precedents from the Second Circuit, which established that "contemplated harm" is an element of "fraudulent intent" and that the Government has the "burden of showing that some actual harm or injury [to the victim's money or property] was contemplated by the schemer."  *Id.* at 1102 (quoting *United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987), and *United States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970)).

The Indictment in this case fails to meet the standard set forth in *Kelly* (and *Miller*) and therefore fails to state an offense because, at most, it alleges a scheme to deceive but not to cheat a U.S. bank of any property.  Despite a detailed description of credit card payment processing, nowhere does the Indictment allege that any U.S. Issuing Bank suffered economic harm or even faced any incremental economic risk as a result of unwittingly processing marijuana transactions. There is no allegation that Weigand communicated in any way with a U.S. financial institution, let alone an allegation that he made materially false statements to any such institution.

The Indictment's allegation that marijuana transactions were "miscoded" by the defendants and co-conspirators to secure the approval of U.S. Issuing Banks does not meet *Kelly*'s requirements.  In fact, the right to approve or decline a transaction based on accurate information— a decision the Indictment does not allege had any bearing on any U.S. Issuing Banks' economic position—is the exercise of precisely the type of intangible right of "allocation, exclusion, and

3

control" that does not qualify as a property interest under *Kelly*.  140 S. Ct. at 1572.  Notably, the Indictment does not allege that any particular U.S. Issuing bank, in fact, did or would have declined a transaction based on its associated merchant code.  On the face of the Indictment, the alleged scheme is outside the ambit of the federal bank fraud statute.  The Indictment should be dismissed.

## BACKGROUND

On March 31, 2020, the Government filed the Indictment against Weigand and his co-defendant Hamid Akhavan alleging a conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349.  The Indictment alleges that from in or about 2016 until 2019, the defendants and their co-conspirators "engaged in a scheme to deceive United States banks and other financial institutions into processing in excess of one hundred million dollars in credit and debit card payments for the purchase and delivery of marijuana products."  Indictment at ¶ 1.

The alleged bank fraud conspiracy involved a California-based purveyor of marijuana, referred to in the Indictment as the "Online Marijuana Marketplace Company," which offered on-demand marijuana delivery services to customers through a mobile application.  *Id*. at ¶ 3.  The Indictment alleges that "[a]t various points" from 2016 through 2019, one of the payment methods offered by the Online Marijuana Marketplace Company was debit and credit cards.  *Id*. at ¶ 4.  However, according to the Indictment, during that time period, "most banks in the United States were unwilling to process credit and debit card transactions involving marijuana" and would not "extend credit (i.e., approve) transactions" for "the sale of marijuana."  *Id*. at ¶¶ 10(d), 12.[2]  While implicitly acknowledging that other banks in the United States were willing to do so, the

---

[2] As explained below, the Indictment wholly fails to specify *which* banks were unwilling to do so, and it wholly fails to identify any specific transactions that would not have been approved in the absence of the alleged schemes.  These defects alone are a basis to dismiss the Indictment for lack of specificity.  And the voluminous discovery the government has produced does nothing to answer these fundamental questions.

Indictment does not so much as assert that any particular bank did or would have refused to approve any transaction.

The Indictment alleges that the defendants and their co-conspirators "used several strategies to trick United States issuing banks into authorizing marijuana transactions for the Online Marijuana Marketplace Company." *Id.* at ¶ 12. Principally, the Indictment alleges that the defendants created more than a dozen companies (the alleged "Phony Merchants") "involved in selling legitimate goods, such as carbonated drinks, face cream, dog products, and diving gear." *Id.* at ¶ 13  They used those companies to open "offshore bank accounts with [offshore][3] merchant acquiring banks and to initiate credit card charges for marijuana purchases made through the Online Marijuana Marketplace Company." *Id.* at ¶ 12. The Indictment also alleges that defendants "used merchant codes for other products" and "directed others to apply" those incorrect merchant codes "in order to get around the[ ] rules" of "Credit Card Companies," such as Visa and MasterCard, that "do not support marijuana transactions" and "do not have marijuana merchant codes." *Id.* at ¶¶ 9, 14. Put simply, the Indictment alleges that the defendants engaged in a scheme to "miscode," or use inaccurate merchant category codes. *Id.* at ¶ 9. Notably, however, the Indictment does *not* allege that any banks' approval and processing requirements turned on the specific codes provided to them.

---

[3] The Indictment describes the merchant acquiring banks at issue as "offshore acquiring banks." Indictment at ¶ 13. Offshore banks that are not federally insured are outside the purview of the bank fraud statute. *See United States v. Ayewoh*, 627 F.3d 914, 917 (1st Cir. 2010) ("[U]nder § 1344, the defrauded financial institution's federally-insured status is a jurisdictional prerequisite as well as a substantive element of the crime, and as such must be proven by the prosecution beyond a reasonable doubt.") (internal citations and quotations removed); *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992) (With respect to the bank fraud statute, "[i]t was Congress' intent that a federally insured or chartered bank must be the actual or intended victim of the scheme.").

By taking these measures, the defendants were allegedly able to "disguise payments made to the Online Marijuana Marketplace Company for the purchase of marijuana products," to "deceive United States banks about the true nature of the financial transactions they were processing," and thereby "facilitate the approval and processing of marijuana transactions" by U.S. Issuing Banks, the alleged victims of the scheme. *Id.* at ¶¶ 2, 9, 13.

## ARGUMENT

The Indictment should be dismissed for two independent but related reasons. *First*, the Indictment simply does not describe a cognizable theory of bank fraud. On the Indictment's own telling, the object of the alleged scheme was not to obtain money or property from any U.S. financial institution. Instead, it was to facilitate transactions with cardholders who willingly initiated those transactions and were not deceived in any way. Because the U.S. Issuing Banks had already underwritten the credit offered to the cardholders, and because there is no allegation that the U.S. Issuing Banks lost money on any of the relevant transactions, the inescapable conclusion is that the U.S. Issuing Banks were not cheated out of any money or property. On the contrary, they necessarily *made* significant amounts of money on the transactions through their collection of fees. Thus, the Indictment itself forecloses any argument that the alleged miscoding was *material* or posed any economic harm to those banks. And the Supreme Court's decision in *Kelly* squarely forecloses any theory that a conviction could rest on the notion that defendants deprived the U.S. Issuing Banks of "allocation, exclusion, and control" over their property.

*Second*, to the extent that any money or property was allegedly obtained from the U.S. Issuing Banks, those funds were obtained by the Foreign Acquiring Banks, not the defendants. The object of the alleged scheme was *not* to cheat the U.S. Issuing Banks out of money by defrauding them. It was to facilitate the transactions with the cardholders, and the defendants allegedly accomplished that objective through honest interactions with the Foreign Acquiring

Banks.  Thus, to the extent the Indictment alleges an indirect flow of money between those Foreign Acquiring Banks and the U.S. Issuing Banks, those transactions were an incidental result of defendants' alleged scheme, not its primary object.  That is plainly insufficient under *Kelly*.[4]

**I.     The Bank Fraud Statute Requires Proof That The Defendant Intended To Both Deceive The Victim And To Cheat The Victim Out Of Property By Material Misrepresentations.**

Bank fraud has two separate subsections, which create two separate offenses that the Indictment generically alleges.  *See* 18 U.S.C. § 1344; *Loughrin v. United States*, 573 U.S. 351, 355–56 (2014); Indictment ¶¶ 15–16.  Under Section 1344 bank fraud can be based on either (1) a scheme to defraud a financial institution or (2) a scheme to obtain money from a financial institution by false pretenses or representations.  18 U.S.C. § 1344(1)–(2).  But regardless of which subsection supposedly applies, the Indictment's flaws are fatal.  Under either subsection, the Indictment must (a) state an offense with sufficient specificity, (b) allege that the defendants *intended* to obtain the banks' property as anything more than a mere incidental byproduct of some scheme, and (c) show that the defendants made material misrepresentations to those banks.  *See Loughrin*, 573 U.S. at 355–56, 363; *United States v. Bouchard*, 828 F.3d 116, 124, 126 (2d Cir. 2016).  At each step, the Indictment fails.

A.     The Dismissal Of An Indictment For Failure To State An Offense

Under Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, a motion to dismiss an indictment may be brought if it identifies "a defect in the indictment or information," including the "failure to state an offense."  Because federal crimes are "solely creatures of statute," an indictment must be dismissed if it fails to allege a crime within "the reach of a federal criminal

---

[4] In addition to the arguments presented in support of his motion, Weigand incorporates by reference all arguments presented in co-defendant Akhavan's brief.

statute." *Dowling v. United States*, 473 U.S. 207, 213 (1985); *see also United States v. George*, 223 F. Supp. 3d 159, 161 (S.D.N.Y. 2016) (granting motion to dismiss indictment for failure to state an offense because defendant had not committed a "qualifying prior sex offense" within the meaning of the Sex Offender Registration and Notification Act); *United States v. Tana*, 618 F. Supp. 1393, 1394–95 (S.D.N.Y. 1985) (granting motion to dismiss indictment because the property the defendant allegedly stole did not constitute a "thing of value of the United States" within the meaning of 18 U.S.C. § 641).

In evaluating a motion to dismiss, a court "accept[s] as true all of the allegations of the indictment." *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). Even then, however, the indictment must sufficiently "inform the accused of the *specific* offense . . . with which he is charged." *Russell v. United States*, 369 U.S. 749, 765 (1962) (citation omitted). And an indictment is not sufficiently specific unless it provides the defendant "with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Mermelstein*, 487 F. Supp. 2d 242, 249 (E.D.N.Y. 2007) (quotations omitted) (citing *United States v. Walsh*, 194 F. 3d 37, 44 (2d Cir. 1999) and *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

B.    *Kelly v. United States*

The Supreme Court's recent decision in *Kelly* is directly applicable here. The defendants in *Kelly* were public officials with ties to the Port Authority and New Jersey's then-Governor Chris Christie. 140 S. Ct. at 1569. Their objective was to punish the Mayor of Fort Lee for failing to back Christie's reelection bid. *Id*. In order to create gridlock and exact political retribution, the defendants devised a scheme to reallocate the three toll lanes on the George Washington Bridge toll plaza that were reserved for traffic from Fort Lee. *Id*. at 1569–1570. As a result of the lane realignment, two of the dedicated Fort Lee lanes were eliminated and massive traffic congestion ensued. *Id*. at 1570. To cover up their scheme, the defendants lied about their motives:  they

8

asserted that the lane change was part of a traffic study intended to gauge the impact of lane closures in the future. And, to give their pretext more credibility, the defendants directed Port Authority engineers to collect traffic data that was never used. They also hired extra toll collectors to facilitate the desired lane change at the agency's expense. *Id*. at 1569–1571.

The defendants were convicted of federal wire fraud under 18 U.S.C. § 1343, fraud on a federally funded program or entity (the Port Authority) under 18 U.S.C. § 666(a)(1)(A), and conspiracy to commit each of those crimes. *Id.* at 1568. The Government did not dispute that both of the federal fraud statutes required *property* fraud: the wire fraud statute proscribes deceptive "schemes to deprive [the victim of] money or property" and the federal-program fraud statute similarly bars "obtain[ing] by fraud" the "property" of a federally funded program or entity. *Id.* at 1571 (citations omitted). Rather, the Government argued that the scheme in *Kelly* involved property fraud in two distinct ways. First, the defendants commandeered property by taking "control" of the physical lanes on the toll plaza. Second, they diverted the Port Authority's labor force by using the agency's traffic engineers and toll collectors to effectuate the scheme, in turn depriving the agency of the benefit of wage labor for which it had paid. *Kelly*, 140 S. Ct. at 1572.

The Supreme Court rejected both of the Government's theories. The Court held that a conviction under the federal fraud statutes requires the Government to prove not only that the defendants had "engaged in deception, but [also] that an 'object of their fraud was property.'" *Id*. at 1571 (quoting *Cleveland v. United States*, 531 U.S. 12, 26 (2000)). The Court found that, although the defendants had usurped the Port Authority's "'intangible rights of allocation, exclusion, and control'—its prerogatives over who should get a benefit and who should not," those intangible rights did "not create a property interest." *Id.* at 1572 (citation omitted). Similarly, although the defendants had diverted the Port Authority's wage labor, that redirected labor was

not an "object of the fraud," but rather an "incidental byproduct" of the scheme.  Indeed, the Court expressly held that "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme."  *Id.* at 1573 (citation omitted).

    C.    <u>Wire Fraud Precedents Are Applicable To The Bank Fraud Statute</u>

Because the bank fraud statute was modeled on the wire fraud statute and contains the same operative language, the holding in *Kelly* extends to the federal bank fraud statute.  In *Neder v. United States*, the Supreme Court explained that the statutes contain the same core language: "[T]he mail fraud and wire fraud statutes . . . both prohibit, in pertinent part, 'any scheme or artifice to defraud' or to obtain money or property 'by means of false or fraudulent pretenses, representations, or promises.'" 527 U.S. 1, 20–21 (1999) (quoting 18 U.S.C. §§ 1341, 1343). Likewise, "[t]he bank fraud statute, which was modeled on the mail and wire fraud statutes, similarly prohibits any 'scheme or artifice to defraud a financial institution' or to obtain any property of a financial institution 'by false or fraudulent pretenses, representations, or promises.'" *Id.* (holding that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes") (quoting 18 U.S.C. § 1344).  And *Kelly*'s application of the wire fraud statute turned on this shared statutory language.  140 S. Ct. at 1571 ("The federal wire fraud statute makes it a crime to effect . . . 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'") (citation omitted).

In light of their shared lineage and language, courts have frequently interpreted the bank fraud and wire fraud statutes identically, relying on cases concerning one statute to decide cases concerning the other.  *See, e.g.*, *Miller*, 953 F.3d at 1098–1099, 1102–1103 (relying on a bank fraud case when holding that the wire fraud statute requires the Government to prove that the defendant intended to "deceive *and* cheat," as opposed to "deceive *or* cheat" the victim) (emphasis in original); *see also United States v. Ragosta*, 970 F.2d 1085, 1090 n.2 (2d Cir. 1992) ("According

10

to its legislative history, the bank fraud statute was modeled after the mail and wire fraud statutes . . . . Therefore, precedents arising under those statutes can be helpful to inform our interpretation of . . . amorphous phrases.") (internal quotations and citations omitted).

       D.    Materiality Is Essential

The Government must also establish that the defendant's false statements were *material* to the victim.  *See United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007).  In other words, the alleged false statements must have been more than merely *relevant*; they must have had "probative weight."  *Id.* at 234.  And it is not enough to claim that the scheme caused the banks "to enter into transactions they would otherwise avoid."  *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007).  "[T]o be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction."  *Rigas*, 490 F.3d at 231 (quoting *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)).

## II.    The Indictment Does Not Allege A Scheme With The Objective To "Cheat" Or Deprive The U.S. Issuing Banks Of Property.

As the Supreme Court made clear in *Kelly*, the federal fraud statutes require not only an intent to deceive, but also that "the deceit . . . have . . . the 'object' of obtaining the [victim's] money or property."[5]  140 S. Ct. at 1572.  Here, the Indictment fails to allege that the object of the scheme was to obtain money from, or to inflict any economic harm on, the U.S. Issuing Banks.  On the contrary, if executed as alleged, the scheme would have generated substantial fees for U.S. Issuing Banks.  Far from showing that defendants' alleged false statements were material, the Indictment appears to allege that any statements made to U.S. financial institutions were limited

---

[5] On March 17, 2020, before denying Weigand's initial bail application, this Court acknowledged that "[t]he essence of bank fraud, like the mail fraud statute f[rom] which it is derived which goes back to 1872, is that *you lied to someone from whom you were seeking to get money or property or the like*."  Tr. at 25:10-13 (emphasis added).

to certain merchant codes and descriptors—which were plainly *not* material to any decisions that had any bearing on any U.S. Issuing Banks' financial position.  And again, the Indictment does not even allege that Weigand had any dealings whatsoever with the U.S. Issuing Banks, but instead only with foreign entities.  As a result, the Indictment fails as a matter of law.

A.    <u>The Indictment Does Not Allege A Scheme To Obtain Money From Or Inflict Economic Harm On U.S. Issuing Banks.</u>

The Indictment does not allege that the charged scheme put U.S. Issuing Banks at risk of economic harm, nor does the Indictment allege that the defendants intended to inflict such harm. As explained above, the bank fraud statute, like the other fraud statutes on which it is modeled, requires proof that a defendant intended to deprive the victims of money or property.  "[T]he government can[not] escape the burden of showing that some actual harm or injury [to the victim's money or property] was contemplated by the schemer."  *Miller*, 953 F.3d at 1102 (internal citation omitted); *see also United States v. Banyan*, 933 F.3d 548, 554 (6th Cir. 2019) (bank fraud "requires the government to prove the defendant's 'intent to obtain bank property'") (citation omitted); *United States v. Nejad*, No. 18–CR–224 (AJN), 2020 WL 883500, at *2 (S.D.N.Y. Feb. 24, 2020) ("[I]f the Government intends to prove bank fraud under § 1344(1) . . . it must prove that [the defendant]" knew that his conduct "was likely to cause [banks] tangible economic harm.").  In other words, as the Second Circuit has long held, the mere intent to deceive is insufficient.  Instead, the Government must, "at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims."  *Starr*, 816 F.2d at 98 (emphasis in original); *see also Regent Off. Supply Co.*, 421 F.2d at 1181 (holding that "the purpose of the scheme must be to injure") (citation and internal quotations omitted).

The Indictment in this case alleges no intent to deprive U.S. financial institutions of money or property.  Instead, it alleges a deceptive scheme to secure "the approval and processing of

marijuana transactions," without any allegation of a tangible economic harm to U.S. Issuing Banks. Indictment at ¶ 13. Indeed, the only individuals or entities who would have parted with their money or property were the *cardholders*, who had already been approved and extended credit by U.S. Issuing Banks when their cards were issued. *See* Indictment at ¶¶ 2, 5 (referring to "money received from the Online Marijuana Marketplace Company's customers" and describing how those marijuana purchases were made). Moreover, to the extent debit cards were used, the cardholders used the existing funds in their accounts without an extension of credit by U.S. Issuing Banks. There was certainly no deception of those cardholders; they willingly participated in—and, in fact, initiated—the transactions and thus likewise wanted them to be approved and processed. As the Indictment alleges, those credit and debit cardholders used their money to buy marijuana knowingly, voluntarily, and with complete information—in states where it was lawful under state law to do so. *Id.* And the Indictment does not allege that the scheme somehow precluded the U.S. Issuing Banks from collecting the funds from the cardholders—let alone that any such harm was the object of the alleged conspiracy.

In fact, the U.S. Issuing Banks would have enjoyed significant economic *gain* as a result of the alleged scheme. If the scheme occurred as the Indictment alleges, the U.S. Issuing Banks made substantial fees from the transactions. The Indictment acknowledges that U.S. Issuing Banks receive a fee from credit card companies for every transaction they approve. *See id.* at ¶ 11(c) ("In the settlement stage, the Credit Card Companies use their Payment Networks to forward each transaction to the appropriate issuing bank, which ordinarily will transfer funds for the approved transaction, less a fee."). Therefore, if U.S. Issuing Banks had processed "in excess of one hundred million dollars in credit and debit card payments," as alleged, they would have earned millions in fees, without any increased economic risk, let alone any economic harm. *See id.* at ¶ 1. The

Government did not even attempt to rebut that fact at Weigand's bail hearings on March 17 and April 24, 2020.[6]  In *Starr*, the Second Circuit held that a defendant could not be convicted of mail and wire fraud convictions where there was evidence of "an intent to deceive and to induce the customers to enter into the transaction" but "no evidence of tangible injury . . . from which the jury could infer an intent to defraud."  816 F.2d at 98, 101.  So too here.

If anything, the Indictment confirms that the alleged misstatements were *immaterial* to the allegedly victimized banks.  Although the Indictment alleges that some of the banks would have preferred not to process transactions involving marijuana (Indictment ¶¶ 1, 12), it fails to allege how defendants' misrepresentations were "of some independent value" or bore "on the ultimate value of the transaction."  *Rigas*, 490 F.3d at 231.  The Second Circuit has made clear that merely *preferring* to avoid a transaction is not enough for materiality; instead, "the fraudulent scheme must implicate tangible economic harm."  *United States v. Finazzo*, 850 F.3d 94, 111 & n.18 (2d Cir. 2017).  If nothing else, to the extent the Indictment rests on the banks' policies or concerns about particular transactions, it wholly fails to meet the requirements of specificity by failing to allege anything about those policies or even to identify a single specific transaction that the banks would not have processed.  *Cf. Rigas*, 490 F.3d at 234–35 (examining bank policies for materiality purposes); *United States v. Puerta*, 607 F. App'x 635, 636 (9th Cir. 2015) (requiring sufficient evidence that specific misrepresentations caused a bank to part with its money).

---

[6] At the March 17, 2020 bail hearing, Weigand argued: "[T]o suggest that there was a loss to the bank is simply fanciful.  Every credit card transaction involved a bank fee where they made money." Tr. at 24:14–17.  And, "if the volume is what the government says, the banks made millions and millions of dollars . . . ." *Id*. at 24:19–21.  On April 24, 2020, Weigand reiterated that the Government had failed to allege that "any bank—U.S. or foreign—lost a nickel in this supposed bank fraud scheme."  Tr. at 3:21–24.

Moreover, the Indictment does not allege that the defendants themselves sought to obtain any money from U.S. Issuing Banks.  Rather, if the scheme was carried out as alleged, any funds transferred as a result of approved transactions would have been distributed from the U.S. Issuing Banks to third parties other than the defendants, including merchant banks, payment processors, and merchants.  Indictment at ¶ 11(d).  To the extent that the defendants can be alleged to have obtained money or property from any financial institutions, they were the Foreign Acquiring Banks, which are not within the purview of the bank fraud statute.

An alleged scheme with the effect of *earning* U.S. Issuing Banks money, rather than *depriving* them of money or property, simply cannot satisfy the essential elements of the bank fraud statute.  *See Kelly*, 140 S. Ct. at 1571.  The Indictment must therefore be dismissed.

    B.    <u>U.S. Issuing Banks' Intangible Right To Approve Credit Card Transactions Based On Correct Merchant Codes Is Not A Qualifying Property Right Under *Kelly*.</u>

Nor can the Indictment survive on the notion that the U.S. Issuing Banks were deprived of an intangible right to approve credit card transactions based on correct merchant codes or descriptors.  In *Kelly*, the Supreme Court squarely held that the intangible right of "allocation, exclusion, and control" does "not create a property interest" and, accordingly, that the deprivation of this intangible right does not qualify as the deprivation of a property interest under the fraud statutes.  *Id.* at 1572.  Yet, that is all that the Indictment alleges here.

The scheme in *Kelly* and the scheme alleged in the Indictment mirror each other in critical respects.  Although the Government in *Kelly* asserted that the defendants had tried to "commandeer[ ] part of the Bridge itself—to take control of its physical lanes," the Court held that the Government's argument resolved to a claim that the defendants had usurped the rights of "allocation, exclusion, and control" by "deciding that drivers from Fort Lee should get two fewer lanes while drivers from nearby highways should get two more."  *Id.* at 1572–73.  The Court held

that was insufficient to satisfy the fraud statutes.  And it made no difference that the defendants in *Kelly* "did so by resorting to lies" about their motives.  *Id.*

So too here.  The Indictment's theory is that Weigand, Akhavan, and their co-conspirators allegedly deprived "some" unnamed U.S. Issuing Banks of their intangible right to approve or decline transactions based on accurate information and correct merchant codes.  In both schemes, the efforts of the defendants were allegedly directed at an entity's right of "allocation, exclusion, and control" *over* property, not the property itself:  in *Kelly*, the Port Authority's right to control the use of its lanes; in this case, U.S. Issuing Banks' prerogative to determine which transactions to approve.  *See also* Brief for Defendants-Appellants, *United States v. Gatto* et al., Nos. 19-783(L), 19-786(CON), 19-788(CON), ECF No. 160, at 3 (2d Cir. May 22, 2020) ("There is no meaningful distinction between the right to control the property at issue in *Kelly*—the bridge lanes—and the right to control the property at issue here—scholarships.").[7]

Even before *Kelly*, circuit courts throughout the country recognized that the federal fraud statutes were "'limited in scope to the protection of *property rights*" and that the deprivation of intangible rights, including "the ethereal right to accurate information" could not support convictions.  *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014); *see also United States v. Murphy*, 836 F.2d 248, 253–54 (6th Cir. 1988) (holding that the state's "right to accurate information" in connection with issuance of state bingo permits could not support a mail fraud conviction); *see also Starr*, 816 F.2d at 100 (finding that the intended "harm" to victims was, at

---

[7] The defendants in *United States v. Gatto et al.* were convicted of wire fraud in 2018 for making payments to prospective college recruits to steer them towards certain universities in violation of the rules of the National Collegiate Athletic Association (NCAA), in turn allegedly depriving universities of the benefit of their scholarship money.  On appeal, the U.S. Court of Appeals for the Second Circuit heard oral argument on March 13, 2020 but, recognizing the potential impact of *Kelly*, directed the parties to provide supplemental briefing addressing the Supreme Court's decision.  As of this filing, the appeal is still pending in the Second Circuit.

most, "metaphysical," and "[in]sufficient to infer fraudulent intent"); *Miller*, 953 F.3d at 1101. And *Kelly* plainly abrogated any prior decisions holding that such an intangible right—whether the "right to control" property or the "right to accurate information" in connection with the distribution of property—may support a conviction under the federal fraud statutes. *See, e.g.*, *United States v. Lebedev*, 932 F.3d 40, 48–49 (2d Cir. 2019) (affirming a wire fraud conviction based on the theory that the defendant had "deprived . . . financial institutions of the right to control their assets by misrepresenting potentially valuable economic information," including the identity of underlying transactions). Because *Kelly* is the Supreme Court's most recent decision on the topic, it applies over any prior, inconsistent appellate decisions and compels dismissal here. And, at the very least, a case like *Lebedev* cannot be extended beyond its egregious facts, which involved disguising Bitcoin transactions that were "both unlawful and carried a higher risk of fraudulent transactions" within a scheme that was plainly designed so that the defendant could "*obtain funds*" from the victim banks. *Id.* at 49 (emphasis added). Here, by contrast, the Indictment does not allege that the transactions posed any material risk to the U.S. Issuing Banks, that any U.S. Issuing Bank would not have approved them if the merchant codes had been different, or that the scheme was aimed at depriving those U.S. Issuing Banks of any money or property.

## III.   If Anything, The Indictment Alleges A Scheme That Had Only An Incidental and Immaterial Effect On The U.S. Issuing Banks.

The defendants' roles were unconnected to any U.S. bank, and the defendants did not obtain funds from the U.S. Issuing Banks. On the contrary, the Indictment's allegations set forth an offshore scheme to obtain funds from *foreign* financial institutions that are beyond the reach of the federal bank fraud statute. In particular, the Indictment alleges that the defendants and their co-conspirators:

- "[C]reate[d] phony **offshore corporations and websites** (i.e., the Phony Merchants) and **open[ed] offshore merchant bank accounts**." Indictment at ¶ 2 (emphasis added)

17

- "[U]sed [the Phony Merchants] to open **offshore bank accounts with merchant acquiring banks** . . . ." *Id.* at ¶ 12 (emphasis added)

- "[C]reate[d] the Phony Merchants — including phony online merchants purportedly selling dog products, dive gear, carbonated drinks, green tea, and face creams — and establish[ed] Visa and MasterCard merchant processing accounts with one or more **offshore acquiring banks**." *Id.* at ¶ 13 (emphasis added)

While reciting all of these actions directed at *foreign* banks that are beyond the scope of the bank fraud statute, the Indictment fails to allege a single misrepresentation that the defendants made to a U.S. Issuing Bank.  In fact, the Indictment does not even allege that the defendants ever communicated with any U.S. Issuing Bank.  Rather, the Government has maintained that the defendants were responsible for sending "application packages" and credentials for the Phony Merchants only to *offshore* banks and payment processors.  Gov. Bail Opposition at 3–4.

Nor can the Indictment rely on the fact that the Foreign Acquiring Banks received funds from the U.S. Issuing Banks to satisfy the bank fraud statute.  Again, there is no allegation that those transactions resulted in any economic loss or material risk to the U.S. Issuing Banks; in fact, they would have resulted in major economic gain for those banks.  *See Rigas*, 490 F.3d at 231.  At most, the Indictment alleges that "some" unspecified banks would have preferred to avoid marijuana-related transactions.  But that is not enough.  *See Shellef*, 507 F.3d at 108–09 ("[T]he indictment states only that [defendant's] misrepresentation induced [the victim] to enter into a transaction it would otherwise have avoided.  Because it does not assert that [defendant's] misrepresentation had relevance to the object of the contract, we do not think it is legally sufficient.") (internal citation and quotations omitted).  And, even then, the Indictment fails to allege which banks had which policies that prohibited these transactions—let alone which transactions were supposedly wrongly induced.  Indeed, this Indictment comes nowhere close to pleading allegations similar to other Indictments that the courts have found sufficient under the

bank fraud statute.  *See, e.g.*, *United States v. Mercado*, No. S1-02-cr-675, 2003 WL 21756084, at *2 (S.D.N.Y. July 30, 2003) (looking at deposit dates and amounts); *United States v. DiMarzo*, No. 93-cr-247, 1993 WL 426936, at *2 (S.D.N.Y. Oct. 21, 1993) (looking at dates, banks, and transactions).  In all events, those transactions were not an "object of the fraud," but rather an "incidental byproduct" of the alleged scheme.  *Kelly*, 140 S. Ct. at 1573.  And, in *Kelly*, the Supreme Court squarely held that "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme."  *Id.* at 1573.  As a result, the Indictment must be dismissed.

## CONCLUSION

The Indictment alleges a scheme that did not result in or intend any economic harm to any U.S. financial institution.  Indeed, the scheme alleged in the Indictment resulted in U.S. banks obtaining significant fees.  The object of the alleged scheme was not for the defendants to obtain money or property from U.S. Issuing Banks.  The scheme therefore falls outside the reach of the federal bank fraud statute.  For all the foregoing reasons, and because the Indictment perpetuates the "ballooning of federal power" and the "sweeping expansion of federal criminal jurisdiction" the *Kelly* Court warned against, Weigand respectfully requests the dismissal of the Indictment with prejudice.

Dated:  New York, New York
        June 26, 2020

Respectfully submitted,

DECHERT LLP

By: */s/ Andrew J. Levander*

Andrew J. Levander
Michael J. Gilbert
Shriram Harid
Steven Pellechi
Three Bryant Park
1095 Avenue of the Americas

New York, New York 10036-6797
Andrew.levander@dechert.com
Michael.gilbert@dechert.com
Shriram.harid@dechert.com
Steven.pellechi@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional
Corporation
1 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90071
Michaelartan@yahoo.com

*Attorneys for Defendant*
*Ruben Weigand*