UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     v.

Hamid Akhavan,
     a/k/a "Ray Akhavan,"

-and-

Ruben Weigand,

         Defendants.

**S3 20 Cr. 188 (JSR)**

**Government's Memorandum of Law in Opposition to
Defendants' Pretrial Motions**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Christopher J. DiMase,
Nicholas Folly,
Tara La Morte
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ........................................................................................................ 1

ARGUMENT............................................................................................................. 5

I.    The Defendants' Motions to Dismiss Should Be Denied ..................................... 5

   A.   Applicable Law .......................................................................................... 5

     1.   Standard for Motions to Dismiss ............................................................ 5

     2.   The Bank Fraud Statute ........................................................................ 7

   B.   Discussion ................................................................................................. 8

     1.   The Indictment Is Plainly Sufficient...................................................... 9

     2.   The Indictment Alleges Materially False Pretenses, Representations, and Promises in Connection with the Scheme to Defraud .......................................... 12

     3.   The Indictment Alleges a Scheme to Obtain Money or Property from a U.S. Bank . 17

     4.   The Scheme Involved Risk of Tangible Economic Harm .......................................... 19

     5.   There is No Basis to Dismiss the Indictment Pursuant to the Rohrabacher-Farr Amendment ................................................................................. 23

II.   The Defendants' Motions to Compel Should Be Denied............................................. 26

   A.   Background ................................................................................................. 26

B. The Defendants' Motion For Rule 16 Material Should Be Denied .............................. 29

    1. Federal Rule of Criminal Procedure 16(a)(1)(E) ....................................................... 29

    2. Requests for Bank and Credit Card Company Policies Regarding Marijuana

    Transactions ..................................................................................................................... 31

    3. Request for Contracts and Rules Governing Assignment of Merchant Category Codes

    33

    4. Requests for Transaction Analyses Linking Banks With Relevant Policies to

    Particular Non-Medical Transactions .................................................................................. 35

    5. Request for Memoranda of Interviews or Meetings in this Matter ............................ 36

    6. Requests for Other Categories of Materials ............................................................... 37

C. The Defendants' Motion for Purported *Brady* Material Should Be Denied .................. 41

    1. Law Applicable to *Brady* Requests .......................................................................... 41

    2. An Order Compelling the Production of *Brady* Material Is Unnecessary.................. 43

D. The Defendants' Motion for Identification of Trial Witnesses 50 Days In Advance of

Trial Should Be Denied ......................................................................................................... 44

E. The Defendants' Motion for Identification of Potential Trial Exhibits 50 Days In

Advance of Trial Should Be Denied ...................................................................................... 45

F. The Defendants' Request for Disclosure of *Giglio* and Jencks Act Material 50 Days In

Advance of Trial Should Be Denied ...................................................................................... 46

III. Weigand's Motion to Suppress Should Be Denied ...................................................... 50

  A. Factual Background ......................................................................................................... 50

B.   Applicable Law ................................................................................................. 51

   1.   Probable Cause ...................................................................................... 51

   2.   Particularity and Overbreadth................................................................ 53

   3.   Good Faith ............................................................................................. 56

C.   Discussion ......................................................................................................... 57

   1.   The Search Warrant Plainly Establishes Probable Cause......................... 57

   2.   The Search Warrant Did Not Lack Particularity and Was Not Overbroad ............... 60

   3.   Law Enforcement Officers Relied on the Search Warrant in Good Faith.................. 66

CONCLUSION......................................................................................................... 70

# TABLE OF AUTHORITIES

**Federal Cases**

*Andresen v. Maryland*, 427 U.S. 463 (1976) .............................................................................. 62

*Boyce Motor Lines v. United States,* 342 U.S. 337 (1952) ........................................................... 6

*Brady* v. *Maryland*, 373 U.S. 83 (1963) ..................................................................................... 42

*Davis v. United States*, 564 U.S. 229 (2011) ............................................................................... 66

*Director of Revenue of Mo. v. CoBank, ACB*, 531 U.S. 316 (2001) ........................................... 25

*United States v. Falso*, 544 F.3d 110 (2d Cir. 2008) ................................................................. 61

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................................................. 47

*Groh v. Ramirez*, 540 U.S. 551 (2004) ......................................................................... 54, 61, 64

*Hamling v. United States*, 418 U.S. 87 (1974)........................................................................ 5, 6

*Herring v. United States*, 555 U.S. 135 (2009 ............................................................................ 66

*Illinois v. Gates*, 462 U.S. 213 (1983) ............................................................................... passim

*In re Fed. Grand Jury Proceedings*, 760 F.2d 436 (2d Cir. 1985) ............................................. 40

*In re United States*, 834 F.2d 283 (2d Cir. 1987) ....................................................................... 47

*In re Warrant for xxxxxxx@gmail.com*, 33 F. Supp. 3d 386 (S.D.N.Y. 2014)........................... 62

*Jones v. United States*, 526 U.S. 227 (1999) ................................................................................ 5

*Kelly v. United States*, __S. Ct.__, No. 18-1059, 2020 WL 2200833 (May 7, 2020) ................. 21

*Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979) .................................................................... 67

*Loughrin v. United States*, 573 U.S. 351 (2014).................................................................. passim

*Neder v. United States*, 527 U.S. 1 (1999).................................................................................. 12

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) ............................................................................. 42

*Shaw v. United States*, 137 S. Ct. 462 (2016) .................................................................. 7, 18, 20

*Spinelli v. United States*, 393 U.S. 410, 419 (1969) .................................................. 57

*Texas v. Brown*, 460 U.S. 730 (1983) ..................................................................... 51

*United States ex rel. Lucas v. Regan*, 503 F.2d 1 (2d Cir. 1974).............................. 47

*United States* v. *Agurs*, 427 U.S. 97 (1976).............................................................. 42

*United States v. Akers*, 215 F.3d 1089 (10th Cir. 2000) .......................................... 20

*United States v. Alfonso*, 143 F.3d 772 (2d Cir.1998) ............................................... 6

*United States v. Ali*, 68 F.3d 1468 (2d Cir.1995)...................................................... 13

*United States v. Armstrong*, 517 U.S. 456 (1996) .................................................... 30

*United States v. Bianco*, 998 F.2d 1112 (2d Cir. 1993) ............................................ 54

*United States v. Binday*, 804 F.3d 558 (2d Cir. 2015) .............................................. 21

*United States v. Bonventre*, 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013).... 44

*United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016)............................................. 8

*United States v. Burnett*, 10 F.3d 74 (2d Cir. 1993) ................................................. 14

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019) ............................................. 20

*United States v. Calk*, 19 Cr. 366 (LGS), 2020 WL 3577903 (S.D.N.Y. July 1, 2020) ............... 41

*United States v. Canter*, 338 F. Supp. 2d 460 (S.D.N.Y. 2004) ................................ 48

*United States v. Carton*, 17 Cr. 680 (CM) (S.D.N.Y. July 10, 2018)......................... 49

*United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007)............................. 46

*United States v. Clark*, 638 F.3d 89 (2d Cir. 2011) ........................................... passim

*United States v. Cole*, 19 Cr. 869 (ER) ................................................................... 49

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001)....................................... 37, 42, 47

*United States v. Dames*, 380 F. Supp. 2d 270 (S.D.N.Y. 2005) ................................ 50

*United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164 (S.D.N.Y. Mar. 11, 2009)...... 48

*United States v. Dayan*, 2005 WL 757250 (S.D.N.Y. 2005) ........................................................ 14

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ......................................................... 25

*United States v. Defreitas*, No. 07 Cr. 543, 2011 WL 317964 (E.D.N.Y. Jan. 31, 2011) ........... 30

*United States v. DiNome*, 86 F.3d 277 (2d Cir. 1996) ............................................................... 21

*United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011) ............................................... 54

*United States v. Evanchik*, 413 F.2d 950 (2d Cir. 1969) ........................................................... 42

*United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) ................................................................ 22

*United States v. Freedman*, No. 18-CR-217 (KMW), 2019 WL 2590747 (S.D.N.Y. June 25, 2019) ........................................................................................................................................ 44, 46

*United States v. Gallo*, 98 Cr. 338, 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) ............................ 43

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) ................................................. 53, 55, 61, 62

*United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) ................................................................ 62

*United States v. Gaskin*, 364 F.3d 438 (2d Cir. 2004) ................................................................ 52

*United States v. George*, 975 F.2d 72 (2d Cir. 1992) ...................................................... 53, 54, 69

*United States v. Ghailani*, 687 F. Supp. 2d 365 (S.D.N.Y. 2010) ............................................. 37

*United States v. Giffen*, 379 F. Supp. 2d 337 (S.D.N.Y. 2004) ................................................. 46

*United States v. Gotti*, 42 F. Supp. 2d 252, 274 (S.D.N.Y. 1999) (Parker, J.) ........................... 54

*United States v. Grant*, No. 04 CR 207 (BSJ), 2004 WL 1171258 (S.D.N.Y. May 25, 2004) .... 39

*United States v. Green*, No. 04 CR. 424 (RWS), 2004 WL 2985361 (S.D.N.Y Dec. 23, 2004).. 48

*United States v. Greyling*, No. 00 Cr. 631 (RCC), 2002 WL 424655 (S.D.N.Y. Mar. 18, 2002) 49

*United States v. Grubbs*, 547 U.S. 90 (2006) .............................................................................. 68

*United States v. Jackstadt*, 617 F.2d 12 (2d Cir. 1980) ............................................................. 52

*United States v. Jacobson*, 4 F. Supp. 3d 515 (E.D.N.Y. 2014) ................................................ 55

*United States v. Jacques Dessange, Inc.*, 2000 WL 280050 (S.D.N.Y. 2000) .............................. 50

*United States v. Juliano*, 99 Cr. 1197, 2000 WL 640644 (S.D.N.Y. May 18, 2000). ................. 44

*United States v. King*, 10 Cr. 122 (JGK), 2011 WL 1630676 (S.D.N.Y. Apr. 27, 2011)............. 49

*United States v. Klein*, 476 F.3d 111 (2d Cir. 2007).................................................................... 13

*United States v. Laljie*, 184 F.3d 180 (2d Cir. 1999) ................................................................... 23

*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002) .............................................................. 6

*United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) ......................................................... passim

*United States v. Leon*, 468 U.S. 897, 914 (1984)................................................................. passim

*United States v. Levine*, 249 F. Supp. 3d 732 (S.D.N.Y. 2017).................................................. 45

*United States v. Levis*, 488 Fed. App'x 481 (2d Cir. 2012)........................................................ 22

*United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *8 (S.D.N.Y. Feb. 25, 2013)

(Crotty, J.)................................................................................................................................. 55

*United States v. Litvak*, No. 13-CR-19 (JCH), 2013 WL 5740891 (D. Conn. Oct. 21, 2013) ..... 13

*United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y 2004)............................................. 55

*United States v. Maniktala*, 934 F. 2d 25 (2d Cir. 1991)....................................................... 30, 42

*United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016) .......................................................... 24

*United States v. Mendlowitz*, 17 Cr. 248 (VSB), 2019 WL 1017533, at *9 (S.D.N.Y. Mar. 2, 2019)........................................................................................................................................ 55

*United States v. Meregildo*, 920 F. Supp. 2d 434 (S.D.N.Y. 2013)............................................. 42

*United States v. Miller*, 70 F.3d 1353 (D.C. Cir. 1995)............................................................... 14

*United States v. Moore*, 968 F.2d 216 (2d Cir. 1992).................................................................. 56

*United States v. Morgan*, 690 F. Supp. 2d 274 (S.D.N.Y. 2010) ................................................ 48

*United States v. Morgenstern*, 933 F.2d 1108 (2d Cir. 1991)...................................................... 14

*United States v. Nejad*, 436 F. Supp. 3d 707, 729 (S.D.N.Y. 2020) ............................................. 65

*United States v. Nejad*, No. 18-CR-224 (AJN), 2019 WL 6702361 (S.D.N.Y. Dec. 6, 2019).... 15, 19, 20

*United States v. Nejad*, No. 18-CR-224 (AJN), 2020 WL 883500 (S.D.N.Y. Feb. 24, 2020) ....... 8

*United States v. Nixon*, 418 U.S. 683 (1974) .............................................................................. 48

*United States v. Percevault*, 490 F.2d 126 (2d Cir. 1974) ............................................................ 37

*United States v. Perez*, 940 F. Supp. 540 (S.D.N.Y. 1996) ........................................................ 43

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) ...................................................................... 5

*United States v. Pisarski*, No. 17-10428, 2020 WL 3886486 (9th Cir. July 10, 2020) ............... 24

*United States v. Post*, No. 08 Cr. 243 (KMK), 2013 WL 2934229 (S.D.N.Y. June 3, 2013) .... 5, 9

*United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958) ...................................................... 40

*United States v. Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) ............................................. 16, 37

*United States v. Riley*, 906 F.2d 841 (2d Cir. 1990) ............................................................ passim

*United States v. Rivera,* 16 Cr. 175 (LGS), 2017 WL 1843302 (S.D.N.Y. May 8, 2017) .......... 43

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) ............................................................ 47

*United States v. Rosenthal*, 91 Cr. 412 (LLS) 1991 WL 267767 (S.D.N.Y. Dec. 3, 1991) ......... 45

*United States* v. *Rossomando*, 144 F.3d 197 (2d Cir. 1998) ....................................................... 21

*United States v. Rowe*, 56 F.2d 747 (2d Cir. 1932) .................................................................... 18

*United States v. Roy*, 783 F.3d 418 (2d Cir. 2015) ..................................................................... 10

*United States v. Rudaj*, 2006 WL 1876664 (S.D.N.Y. 2006) ...................................................... 12

*United States v. Ruggiero*, 472 F.2d 599 (2d Cir. 1973) ............................................................. 42

*United States v. Ruiz*, 702 F. Supp. 1066 (S.D.N.Y. 1989) ........................................................ 47

*United States v. Saipov*, No. 17 Cr. 722 (VSB), 2019 WL 3024598, at *4-5 (S.D.N.Y. July 19, 2020).......................................................................................................................... 58

*United States v. Salemo*, 499 F. App'x 110 (2d Cir. 2012) ........................................ 12

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991)............................................. 16

*United States v. Scott*, 17 Cr. 630 (ER)....................................................................... 45

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) .................................................. 15

*United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015)... 6

*United States v. Sledziejowski*, 16-cr-101, 2018 WL 2288962 (N.D. Tex. May 18, 2018).......... 39

*United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) ........................................... 52

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir.1992) ............................... 7, 10, 17

*United States v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) ..................................... 29

*United States v. Stevens*, 985 F.2d 1175 (2d Cir. 1993) .............................................. 30

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ............................................ 6, 7

*United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) 5, 9

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990).................................................. 40

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001).............................. 49, 50

*United States v. Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 58 (D. Conn. 2002) ...................... 65

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017)......................................... passim

*United States v. Underwood*, No. 04 CR. 424 (RWS), 2005 WL 927012 (S.D.N.Y. Apr. 21, 2005)........................................................................................................................ 48, 49

*United States v. Urena*, 989 F. Supp. 2d 253 (S.D.N.Y. 2013) ................................... 30

*United States v. Vilar*, 530 F. Supp. 2d 516 (S.D.N.Y. 2008) ..................................... 44

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ........................................................... 6

*United States v. Wagner*, 989 F.2d 69 (2d Cir. 1993)..................................................... 52

*United States v. Watts*, 934 F. Supp. 2d 451 (E.D.N.Y. 2013)..................................... 22

*United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017) .......................... 63, 65, 66

*United States v. Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015) ......................................... 63

*United States v. Winters,* 06 Cr. 54 (SWK), 2006 WL 2789864 (S.D.N.Y. Sep. 27, 2006)......... 39

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008)............................................... 6, 7

*United States v. Young*, 745 F.2d 733 (2d Cir. 1984) ................................................... 53

*United States v. Young*, 952 F.2d 1252 (10th Cir. 1991) ............................................. 14

*United States v. Yu*, 97 Cr. 102 (SJ), 1998 WL 57079 (E.D.N.Y. Feb. 5, 1998)......... 43

*United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) .......................... 65

*United States v. Zarrab*, 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ............ 15, 17, 22, 23

*Walczyk v. Rio*, 496 F.3d 139 (2d Cir. 2007).............................................................. 52

*Washington v. Recuenco*, 548 U.S. 212 (2006) ........................................................... 13

*Weatherford v. Bursey*, 429 U.S. 545 (1977)............................................................... 42


**Federal Statutes**

18 U.S.C. § 1344................................................................................................. 7, 8

18 U.S.C. § 3500................................................................................................... 47

Consolidated Appropriations Act of 2020, Pub. L. No. 116-93, 133 Stat. 2317 (2019) ............. 23

**Federal Rules**

Fed. R. Crim. P. 16 ...................................................................................... passim

Fed. R. Crim. P. 7 ................................................................................................. 5

## PRELIMINARY STATEMENT

The Government respectfully submits this omnibus memorandum of law in opposition to five separate motions filed by defendants Hamid Akhavan, a/k/a "Ray Akhavan," and Ruben Weigand to: (1) dismiss the indictment; (2) compel certain discovery; and (3) suppress evidence obtained pursuant to a search warrant for several electronic devices that were seized from Weigand at the time of his arrest. For the reasons stated below, all of the defendants' motions are without merit and should be denied.

## BACKGROUND

On or about March 9, 2020, a grand jury empaneled in the Southern District of New York returned a superseding indictment, S3 20 Cr. 188 (JSR) (the "Indictment"), charging Ruben Weigand and Hamid Akhavan, a/k/a "Ray Akhavan" ("Akhavan"), with one count of violating Title 18, United States Code, Section 1349 (conspiracy to commit bank fraud), from in or around 2016, through at least in or around 2019.

Over its 16 pages, the Indictment sets forth extensive allegations supporting the sole count of bank fraud conspiracy. In particular, the Indictment provides substantial detail regarding, among other things: (a) the operation of the Online Marijuana Marketplace Company that employed the defendants' services (Ind. ¶¶ 3-6); (b) how credit card and debit card transactions are ordinarily processed, and the various entities involved in the processing of such transactions (*Id.* ¶¶ 7-11); and (c) the scheme employed by the defendants to cause Issuing Banks to process marijuana transactions for the Online Marijuana Marketplace Company, which those Issuing Banks otherwise would not have processed (*Id.* ¶¶ 1-2, 12-14). The Indictment concludes with statutory allegations, which track the language of the bank fraud statute, and adds that "AKHAVAN and WEIGAND participated in a scheme to deceive financial institutions and

other financial intermediaries – including federally insured banks – into processing and authorizing payments to and from marijuana sale and delivery businesses and their customers in the United States by disguising the transactions to create the false appearance that they were unrelated to the purchase of marijuana, and thereby obtain money of, or under the custody and control, of those financial institutions and intermediaries." (*Id.* ¶¶ 15-16).[1]

Contrary to the assertion of the defendants in their respective motions to dismiss that the defendants' scheme relied solely on miscoding of merchant category codes, or "MCCs" (*see* Akhavan MTD at 4, Weigand MTD at 5), the Indictment describes a wide ranging and multi-tiered scheme to deceive the Issuing Banks and thereby cause those banks to process marijuana transactions and issue payments that they would not have otherwise approved. That scheme is summarized in the opening paragraphs of the Indictment, which state in relevant part:

> From at least in or about 2016, up to and including in or about 2019, HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, principals at one of the leading on demand marijuana delivery companies in the United States (the "Online Marijuana Marketplace Company"), and other co-conspirators, engaged in a scheme to deceive United States banks and other financial institutions into processing in excess of one hundred million dollars in credit and debit card payments for the purchase and delivery of marijuana products (the "Transaction Laundering Scheme"). Because many United States banks are unwilling to process payments involving the purchase of marijuana, the Online Marijuana Marketplace Company used fraudulent methods to avoid these restrictions and to receive in excess of one hundred million dollars from customers located in California and Oregon who purchased marijuana through the Online Marijuana Marketplace Company.
>
> \* \* \* \* \*
>
> Working together, AKHAVAN, WEIGAND, other Payment Processors, and principals of the Online Marijuana Marketplace Company deceived United States banks and financial institutions – including federally insured institutions – into processing in excess

---

[1] Because the charged scheme was designed to conceal that the transactions in question involved marijuana, medical or otherwise, it is irrelevant "which transactions specifically involved medical marijuana." (Akhavan MTD at 3 n.4).

of one hundred million dollars in marijuana purchases made through the Online Marijuana Marketplace Company.

(Ind. ¶¶ 1-2).

As alleged in the Indictment, in connection with each credit card and debit card transaction, "the bank issuing the credit or debit card to the customer ("issuing bank") receives the transaction information from the [payment] Processor and responds by approving or declining the transaction." (*Id.* at ¶ 10(d)). Following the approval of a transaction, in the so-called "settlement stage," the issuing bank "transfer[s] funds for the approved transaction" to the acquiring bank. (*Id.* at 11(c)). The issuing bank later uses "the information it has received from each transaction to prepare monthly cardholder statements, which are distributed to cardholders. These statements typically identify each credit or debit card purchase made by the cardholder, the amount of the purchase, and the name associated with the merchant." (*Id.* at 11(e)). In describing the role of the Issuing Banks in the scheme, the Indictment therefore makes clear that transfers of payment for credit card transactions are made from the Issuing Banks' own funds, as an extension of credit to the cardholder. The Indictment also makes clear that "[i]ssuing banks in the United States generally will not extend credit (i.e., approve) transactions that involve unlawful activity under federal law, such as the sale of marijuana." (*Id.*).

The Indictment goes on to detail how the Transaction Laundering Scheme operated to deceive the Issuing Banks, and makes clear that the scheme involved deceptive conduct extending far beyond MCC miscoding. As set forth in the Indictment, "the primary method used by Akhavan, Weigand, and other co-conspirators, involved the creation and use of the Phony Merchants. These fraudulent companies were used to open offshore bank accounts with merchant acquiring banks and to initiate credit card charges for marijuana purchases made through the Online Marijuana Marketplace Company." (*Id.* ¶ 12). Akhavan and Weigand

"worked with other co-conspirators to create the Phony Merchants – including phony online merchants purportedly selling dog products, dive gear, carbonated drinks, green tea, and face creams – and establish Visa and MasterCard merchant processing accounts with one or more offshore acquiring banks."  (*Id.* ¶ 13).  They then "arranged for more than a dozen Phony Merchants to be used by the Online Marijuana Marketplace Company."  (*Id.*).

To facilitate the charged scheme, webpages were created and deployed to lend legitimacy to the Phony Merchants.  As the Indictment explains: "The Phony Merchants . . . typically had web pages suggesting that they were involved in selling legitimate goods, such as carbonated drinks, face cream, dog products, and diving gear.  Yet . . . these companies were actually being used to facilitate the approval and processing of marijuana transactions."  (*Id.*).  The Indictment further alleges that many of the Phony Merchants purported to have the same physical address, and despite being based outside of the United States, claimed to maintain U.S.-based customer service numbers.  (*Id.*)

The Indictment alleges that over $100 million in marijuana credit and debit card transactions were processed using the Phony Merchants.  (*Id.* ¶ 14).  "Some of the merchant websites listed for those transactions include: greenteacha.com, medical-stf.com, organikals.store, and soniclogistix.com."  (*Id.*).  Moreover, none of the Phony Merchant website names "listed for those transactions referred to the Online Marijuana Marketplace Company or to marijuana."  (*Id.*).  According to the Indictment, "AKHAVAN, and others, also worked with and directed others to apply incorrect MCCs to the Online Marijuana Marketplace Company marijuana transactions in order to disguise the nature of those transactions and create the false appearance that the transactions were completely unrelated to marijuana."  (*Id.*).  Indeed, as the

Indictment details, "[s]ome of the MCCs/categories listed for the transactions . . . included stenographic services, music stores/pianos, and cosmetic stores." (*Id.*).

## ARGUMENT

## I.     The Defendants' Motions to Dismiss Should Be Denied

The defendants move to dismiss the Indictment on the grounds that it is insufficiently specific, fails to state an offense, and violates a stand-alone provision in an appropriations bill related to medical marijuana known as the Rohrabacher-Farr Amendment.  Their arguments are entirely without merit.  The Indictment is sufficiently specific, properly pleads a bank fraud conspiracy offense, and, even assuming that the appropriate remedy for a violation of the appropriations provision is dismissal of the Indictment—which it is not—clearly falls outside of the ambit of that provision.  Accordingly, the defendants' motions to dismiss should be denied in their entirety.

### A.  Applicable Law

#### 1.  Standard for Motions to Dismiss

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Jones v. United States*, 526 U.S. 227, 232 (1999); *Hamling v. United States*, 418 U.S. 87, 117 (1974); Fed. R. Crim. P. 7(c)).  "A defendant faces a 'high standard' in seeking to dismiss an indictment." *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *6 (S.D.N.Y. Dec. 3, 2013) (quoting *United States v. Post*, No. 08 Cr. 243 (KMK), 2013 WL 2934229, at *5 (S.D.N.Y. June 3, 2013)).

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense

charged.'" *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Rule 7(c) (alterations omitted)). To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted). Although there are circumstances in which greater specificity is required to pass muster under Rule 7(c) and the constitutional provisions it implicates, that heightened standard is limited to "very rare cases," such as those involving refusal to answer questions before Congress, in which "specification of how a particular element of criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Stringer*, 730 F.3d at 124 (quoting *Hamling*, 418 U.S. at 117); *Yannotti*, 541 F.3d at 127.

"[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998). Accordingly, "[i]n reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true." *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *2 (S.D.N.Y. Oct. 20, 2015) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952)). Indeed, "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotation marks omitted).

Even in cases involving very bare-bones charges, courts will not dismiss the indictment absent a showing of prejudice. *Stringer*, 730 F.3d at 124. Where a defendant has been given sufficient notice of the charges against him by means of, for example, discovery materials or a bill of particulars, prejudice will not have been shown, and the indictment should stand. *See, e.g.*, *id.* at 124-25; *Yannotti*, 541 F.3d at 127; *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir.1992).

### 2. The Bank Fraud Statute

The bank fraud statute, Title 18, United States Code, Section 1344, has two prongs under which a defendant may commit the crime of bank fraud. The first prong, Section 1344(1), makes it a crime to execute[ ], or attempt[ ] to execute, a scheme or artifice . . . to defraud a financial institution." 18 U.S.C. § 1344(1). Section 1344(1) requires the Government to prove that a defendant engaged in a deceptive course of conduct with "knowledge that [the defendant] would likely harm the bank's property interest," *Shaw v. United States*, 137 S. Ct. 462, 468 (2016), including deprivation of the bank's right to use the property, *Id.* at 467. Accordingly, "a scheme fraudulently to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a 'financial institution' [under Section 1344(1)], at least where . . . the defendant knew that the bank held the deposits, the funds obtained came from the deposit account, and the defendant misled the bank in order to obtain those funds." *Id.* at 466. Moreover, "while insisting upon 'a scheme to defraud,' [Section 1344(1)] demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Id.* at 467.

The second prong, Section 1344(2), makes it a crime to "execute[ ], or attempt[ ] to execute, a scheme or artifice . . . to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of

false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2). Section 1344(2) requires the Government to prove "that the defendant intend[ed] to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution" through false or fraudulent pretenses. *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016). Section 1344(2) does not require a showing that "a defendant intended to defraud a federally insured bank or other financial institution." *Loughrin v. United States*, 573 U.S. 351, 355, 356-57 (2014) ("nothing in the [Section 1344(2)] clause . . . demands that a defendant have a specific intent to deceive a bank"). Rather, the Government may prove a violation of 1344(2) by establishing that the defendant "acquire[d] (or attempt[ed] to acquire) bank property 'by means of' [a] misrepresentation." *Id.* at 362-63. In other words, the Government need only prove that "the defendant's false statement [was] the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control." *Id.* at 363. Thus, unlike Section 1344(1), Section 1344(2) does not require proof that the defendant "intended to cause harm to the victim banks—or to anyone else, for that matter." *United States v. Nejad*, No. 18-CR-224 (AJN), 2020 WL 883500, at *3 (S.D.N.Y. Feb. 24, 2020) (citing *Loughrin*, 573 U.S. at 355-57; *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019)). Nor does Section 1344(2) require proof that the "defendant's scheme created a risk of financial loss to the bank." *Loughrin*, 573 U.S. at 366 n.9.

## B. Discussion

The defendants' arguments to dismiss the Indictment are meritless. They contend that the sole count of bank fraud conspiracy is deficient in that: (1) it is insufficiently specific (Akhavan MTD at 7-13); (2) it fails to state an offense because it does not allege (a) a scheme to obtain money from or otherwise inflict harm on U.S. Issuing Banks (Akhavan MTD at 15-19; Weigand

MTD at 11-17), or (b) material misrepresentations to U.S. Issuing Banks in furtherance of that scheme (Akhavan MTD at 19-22; Weigand MTD at 14, 17-19); and (3) it "defies the Rohrabacher-Farr Amendment" (Akhavan MTD at 22-25).

The defendants' arguments are based on a fundamental misconstruction of the conduct charged in the Indictment and also of the law, conflating the elements of the two separate prongs of bank fraud. The Indictment, which tracks the relevant statutory language, alleges the timeframe of the offense, and provides significant detail regarding the charged scheme, is plainly sufficient. Assuming more were required, which it is not, the allegations set forth in the Indictment easily allege a scheme to obtain property under the custody or control of a bank through false pretenses and representations under Section 1344(2). The core claim in the defendants' motions—that the Indictment fails to allege a scheme to defraud a bank and thereby harm a bank's property interest under Section 1344(1)—is likewise baseless. The Indictment clearly alleges facts showing that the Issuing Banks maintained a property interest in the funds they used to settle credit and debit card transactions for their cardholders, and that the Banks issued such payments as a direct result of the deceptive scheme outlined in the Indictment.

### 1. The Indictment Is Plainly Sufficient

The defendants fall far short of establishing any pleading deficiency here, let alone meet the "high standard" they face in seeking to dismiss the Indictment. *See Thompson*, 2013 WL 6246489, at \*6 (quoting *Post*, 2013 WL 2934229, at \*5). The Indictment properly alleges that Akhavan and Weigand conspired together and with others to commit bank fraud.

The Indictment specifies the time period of the conspiracy as between in or about 2016 and at least in or about 2019. (Ind. ¶ 15). It goes on to allege that the object of that conspiracy was "to execute, a scheme and artifice to defraud a financial institution, the deposits of which

were then federally insured, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises." (*Id.* ¶ 16). These allegations track the language of Title 18, United States Code, Sections 1344 and 1349. Moreover, the Indictment describes the alleged bank fraud scheme in considerable detail over many pages, explaining how Akhavan, Weigand, and others deceived financial institutions into processing and authorizing marijuana transactions by "disguising the transactions to create the false appearance that they were unrelated to the purchase of marijuana." (*Id.*).[2] As this Court already concluded in its May 20, 2020 Order deciding the defendants' motions for bills of particulars (the "May 20 Order"), "[t]he indictment's description of the Transaction Laundering Scheme . . . is sufficiently clear for the defendants to understand the crime with which the Government accuses them . . . thus placing the defendants on notice and allowing them to prepare a defense." (May 20 Order, Dkt. No. 40, at 6). Because the Indictment tracks the language of the relevant statute and provides more than adequate notice regarding that nature of the charged offense, the defendants' motions to dismiss should be denied. *See Stavroulakis*, 952 F.2d at 693 ("We have often stated that an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." (internal citation and quotation omitted)).

Similarly, while the defendants may desire additional factual detail regarding the charged offense, their arguments that the Indictment should be dismissed for lack of specificity are meritless. The defendants' assertion that the Indictment must identify particular victim banks

---

[2] The Government is under no obligation to allege and prove overt acts for a conspiracy charged under Title 18, United States Code, Section 1349. *See United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) ("We agree with these courts and conclude that a conspiracy conviction under § 1349 does not require proof of an overt act.").

and transactions involved in the charged scheme and the specific actions that the defendants

performed in furtherance of the scheme (Akhavan MTD at 9-10, 11-12; Weigand MTD at 4 n.2,

14) is unsupported by the law and was squarely rejected by this Court in the May 20 Order,

denying requests for a bill of particulars for that very sort of information on that ground that it

represented "mere evidentiary detail." (*See* May 20 Order, Dkt. No. 40, at 5, 6).[3]  The

defendants' claim that the Indictment must allege particulars regarding policies maintained by

U.S. Issuing Banks, (Akhavan MTD at 9-10; Weigand MTD at 14), is also unsupported by any

precedent and should be rejected for the same reasons articulated in the May 20 Order.  Any such

bank policies also represent "mere evidentiary detail," particularly in light of the Indictment's

clear and unambiguous allegation that U.S. Issuing Banks were deceived into processing

marijuana transactions that they would otherwise not have processed.  In short, because the

Indictment is sufficient under longstanding federal precedent, the defendants' motions to dismiss

for lack of specificity should be denied.

Ultimately, the defendants' motions raise *factual* issues that cannot be adjudicated on a

motion to dismiss, but rather must be resolved through a trial.  In particular, they claim that there

was not a scheme to obtain money from, or otherwise inflict harm on, U.S. Issuing Banks

(Akhavan MTD at 11, 15-19; Weigand MTD at 11-17), nor were there material

misrepresentations made to U.S. Issuing Banks in furtherance of that scheme (Akhavan MTD at

---

[3]  As the Court observed in the May 20 Order: "Not only does the indictment allege a scheme for
which the existence of an actual victim is not required, but also the indictment is already quite
clear that the goal of the charged conspiracy was not to defraud any bank in particular.  Rather,
the design of the Transaction Laundering Scheme was to enable the customers of the Online
Marijuana Marketplace Company to purchase marijuana through credit and debit card
transactions, regardless of the particular banks involved."  (May 20 Order, Dkt. No. 40, at 5-6).
In any event, by letter dated June 22, 2020, the Government provided the defendants with a non-
exhaustive list of U.S.-based issuing banks associated with individuals who made MasterCard
and Visa credit card purchases from the Online Marijuana Marketplace Company in the course
of the charged bank fraud scheme.

19-22; Weigand MTD at 14, 17-19).  These are issues of fact.  *See Neder v. United States*, 527

U.S. 1, 8 (1999); *United States v. Rudaj*, 2006 WL 1876664, at *7 (S.D.N.Y. 2006); *cf. United*

*States v. Salemo*, 499 F. App'x 110, 112 (2d Cir. 2012).  As such, these issues are appropriately

decided not by the Court as a matter of law based on contentions in a brief, but rather by the jury

based on the evidence presented at trial.  As the evidence at trial will prove beyond a reasonable

doubt, none of the defendants' contentions have any merit.

## 2. The Indictment Alleges Materially False Pretenses, Representations, and Promises in Connection with the Scheme to Defraud

This court should reject the defendants' argument that the Indictment does not allege

materially false statements in connection with the alleged scheme to defraud U.S. banks.  The

defendants and their co-conspirators orchestrated the processing of over $100 million of

marijuana-related credit card transactions by U.S. Issuing Banks.  Because these banks would not

have processed those transactions had they known their true purpose—*i.e.*, to pay for marijuana,

the sale of which remains illegal under federal law—the charged scheme to intentionally obscure

the true nature of the transactions undoubtedly involved material falsehoods.  As the Indictment

clearly alleges, Akhavan, Weigand, and others worked with third-party payment processors and

offshore acquiring banks to create a series of "Phony Merchants," complete with seemingly-

legitimate websites advertising non-marijuana-related goods and services, and to open bank

accounts in these Merchants' names.  (Ind. ¶¶ 12-13).  The members of the conspiracy then

arranged to have false MCCs applied to the credit and debit card purchases from the Online

Marijuana Marketplace Company in order to create the appearance that these transactions were

not for the purchase of marijuana.  (*Id.* ¶ 14)).  Akhavan, Weigand, and their co-conspirators

thereby conspired to defraud numerous U.S. financial institutions and to obtain funds under the control of such institutions through false pretenses, representations, and promises.

The defendants nonetheless contend that the Indictment fails to allege material misrepresentations in furtherance of the scheme. (Akhavan MTD at 19-22; Weigand MTD at 14, 17-19). They also point to the fact that the Indictment contains no specific allegation that either defendant communicated directly with a U.S. Issuing Bank, let alone lied directly to such a bank. (Weigand MTD at 3). These arguments miss the mark entirely.

First, the Indictment alleges a conspiracy, and particularly alleges the involvement of others in the charged scheme to defraud U.S. Issuing Banks. Thus, the Indictment need not allege that either of the defendants themselves was specifically involved in communicating any particular misrepresentation to the U.S. Issuing Banks, or any other person or entity.[4]

Second, the question of materiality is one for the jury and not a matter to be decided on a motion to dismiss an indictment. *See, e.g.*, *United States v. Litvak*, No. 13-CR-19 (JCH), 2013 WL 5740891, at *5 (D. Conn. Oct. 21, 2013) (because "materiality is a classic question reserved for the jury," defendant's "challenges to the Indictment on this ground are not appropriate for this Motion to Dismiss"); *United States v. Ali*, 68 F.3d 1468, 1474 (2d Cir.1995) ("the element of materiality under § 1001 must be determined by the jury and not the court"); *Washington v. Recuenco*, 548 U.S. 212, 219 (2006) ("materiality is an element of the mail fraud, wire fraud, and bank fraud statutes, and thus must be submitted to the jury to support conviction of those crimes"); *United States v. Klein*, 476 F.3d 111, 113 (2d Cir. 2007) (finding an indictment's bank fraud counts sufficient even though they did not specifically allege that the fraudulent act was

---

[4] Notably, in order to prove a violation of bank fraud under 18 U.S.C. § 1344(2), the Government need not prove that misrepresentations were made to an FDIC insured bank, or for that matter, any financial institution. *Loughrin,* 573 U.S. at 355, 356-57.

"material," since materiality is an element of the offense that can be inferred from the use of the word "fraud" itself in the indictment and the statute does not use the word "material").

Third, even assuming an allegation of a material misrepresentation is required, the Indictment clearly alleges that, as part of the charged conspiracy, the marijuana transactions in question were presented to the U.S. Issuing Banks in a misleading manner to trick those banks into processing the transactions when they otherwise would not have done so. Similar to the misrepresentations in *Lebedev*, the series of misrepresentations alleged in the Indictment were designed to hide the true nature of those transactions and were thus both material and sufficient to plead a conspiracy to violate the bank fraud statute. *See, e.g., Lebedev*, 932 F.3d at 49 (upholding convictions under Section 1344(2) and for wire fraud where scheme involved the disguise of the underlying nature of certain credit card transactions (including through the use of front companies) from banks and credit card companies)); *United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (holding that a "deceptive course of conduct" engaged in by the defendant "amounted to a false representation" under the second prong of the bank fraud statute); *United States v. Burnett*, 10 F.3d 74, 78 (2d Cir. 1993) (when a defendant knowingly cashes a check for purposes of falsely boosting the balance in a bank account so that he can later withdraw the artificially inflated balance, the defendant has made a misrepresentation under the first prong of the bank fraud statute); *United States v. Dayan*, 2005 WL 757250, at *3 (S.D.N.Y. 2005) (denying Rule 29 motion in check-kiting case where defendant claimed that the Government had failed to prove a misrepresentation); *United States v. Miller*, 70 F.3d 1353, 1355 (D.C. Cir. 1995) (material misrepresentation "[e]ach time Miller inserted Rolark's card into an ATM and entered her personal four-digit code"); *United States v. Young*, 952 F.2d 1252, 1257 (10th Cir. 1991) (implicit misrepresentation of defendant's authority to negotiate checks

submitted for payment).  Indeed, recent cases in this District have held that allegations of broad schemes to defraud U.S. banks involving misleading transactional information and the use of international shell companies are sufficient to properly allege misrepresentations in furtherance of a bank fraud conspiracy offense.  *See United States v. Nejad*, No. 18-CR-224 (AJN), 2019 WL 6702361, at *14 (S.D.N.Y. Dec. 6, 2019) ("Indictment alleges [a misrepresentation in] that the wire transfer orders themselves impliedly misrepresented that the beneficiaries of the fund transfers were Turkish and Swiss—and, importantly, not Iranian—entities"); *United States v. Zarrab*, 2016 WL 6820737, at *13 (S.D.N.Y. Oct. 17, 2016) (finding that the indictment alleged "false and misleading statements through the use of multiple layered entities and by stripping material information from wire transfer instructions" to conceal Iranian beneficiaries and thereby influence the decision-making of U.S. banks).

Weigand's reliance on *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), is misplaced.  (Weigand MTD at 11, 18).  Notably, *Shellef* was a *wire fraud* case, and turned on whether the alleged scheme to defraud was legally sufficient under Section 1343.  *Shellef* therefore has no relevance as to bank fraud charges under Section 1344(2), a statutory provision that does not require a scheme to defraud.  *Loughrin v. United States*, 573 U.S. 351, at 355, 356-57.  If *Shellef* has any relevance here, it would only be as to the allegations of bank fraud under Section 1344(1), which, as noted above, does require "a scheme or artifice . . . to defraud a financial institution."  Nonetheless, even assuming *arguendo* that the holding in *Shellef* is relevant to bank fraud charges under Section 1344(1), the allegations here differ in kind from those in *Shellef*, which focused on a single misrepresentation, i.e., that the defendant would not distribute a particular product domestically.  *Shellef*, 507 F.3d at 107-09.  Here, much like the allegations in *Lebedev*, the Indictment alleges that each and every transaction that was presented

to the Issuing Banks was *entirely* fraudulent, that is, the transactions were based on Phony

Merchants, who were purporting to sell products that they were not in fact selling, and who were

utilizing bogus webpages to give the appearance of legitimacy to the Phony Merchants, as well

as incorrect MCCs to further disguise the nature of the transactions. *See Lebedev*, 932 F.3d at

48-49 (upholding conviction under Section 1343 where scheme involved the disguise of the

underlying nature of certain transactions from banks and credit card companies, including

misrepresentations about who the underlying merchant was). Furthermore, the Indictment states

that the defendants disguised payments for marijuana products "to deceive United States banks

about the true nature of the financial transactions they were processing," i.e. the unlawful nature

of the transactions.[5] (Ind. ¶ 2). The concealment of such information regarding the illegal nature

of the transactions and the completely fraudulent nature of the transactions presented to the

Issuing Banks surely implicates an "essential element of the bargain" with the Issuing

Banks. *United States v. Schwartz*, 924 F.2d 410, 420-21 (2d Cir. 1991) (indictment alleged

"misrepresentations that went to an essential element of the bargain" where the indictment

asserted that as part of a consummated contract of sale with a counterparty, defendant falsely

promised not to *illegally* distribute night vision goggles to restricted nations). Thus, the

allegations in the Indictment are more than sufficient to survive a motion to dismiss.

Accordingly, the Court should reject the defendants' arguments and find that—while not

necessary to properly plead a bank fraud conspiracy offense—the Indictment alleges material

misrepresentations.

---

[5] For the same reasons, contrary to Weigand's contention (Weigand MTD at 11, 14, 18), the misrepresentations alleged in the Indictment easily meet the threshold of having "some independent value" or otherwise bearing on "the ultimate value of the transaction." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007).

### 3. The Indictment Alleges a Scheme to Obtain Money or Property from a U.S. Bank

The Court should also reject the defendants' argument that the Indictment fails to allege a scheme to obtain money or property from a U.S. bank. (Weigand MTD at 12-17). The Indictment specifically alleges that the defendants conspired to execute "a scheme and artifice to defraud a financial institution, the deposits of which were then federally insured, in violation of the first prong of Section 1344, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution" (Ind. ¶ 16), which would violate the second prong of Section 1344. Because the Indictment tracks the language of the relevant statutes, the defendants' arguments cannot succeed. *See Zarrab*, 2016 WL 6820737, at *11; *see also Stavroulakis*, 952 F.2d at 693 ("We have often stated that an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.") (internal citation and quotation omitted).

Even if the Court were to consider them, the defendants' arguments have no merit. As described above, the Indictment alleges that the U.S. Issuing Banks transferred payments for credit and debit card transactions as a result of the charged scheme. (Ind. ¶¶ 10-11). There is simply no question that the Indictment properly alleges that the defendants and their co-conspirators intended to "obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution," as required by Section 1344(2), which does not require a scheme to defraud the bank itself. *Loughrin*, 573 U.S. at 355; *see also Lebedev*, 932 F.3d at 49 (evidence sufficient for Section 1344(2) conviction where defendant engaged in scheme with intent to obtain funds under [financial] institutions' custody and control; "namely, funds in the customers' accounts" and credit card advances on behalf of customers). The

Indictment also properly alleges a scheme to "defraud a financial institution" under Section 1344(1). Indeed, particularly with respect to credit card transactions, the Indictment alleges that the U.S. Issuing Banks used their *own* funds to extend credit for cardholder purchases, on the false pretense that those purchases were for lawful merchandise and not marijuana products. Thus, the allegations make clear that the charged scheme "deprived the [Issuing Banks] of certain property rights."[6] *Shaw*, 137 S. Ct. at 466.

Nor is it relevant that U.S. Issuing Banks may not have suffered economic loss—or may have even earned income—by virtue of processing the fraudulent transactions alleged in the Indictment.[7] (Akhavan MTD at 8; Weigand MTD at 18). The first prong of the bank fraud statute, Section 1344(1), "while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Shaw*, 137 S. Ct. at 467. That is because, as *Shaw* observed, "'a man is none the less cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'" *Id.* (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)). Likewise, the second prong of the bank fraud statute, Section 1344(2), requires no proof that the "defendant's scheme created a risk of financial loss to the bank." *Loughrin*, 573 U.S. at 366 n.9.

Nor is the bank customer's willingness to part with his or her money relevant to the inquiry of whether the defendants' improperly obtained funds under the custody or control of the

---

[6] Indeed, even the allegation that Issuing Banks processed debit card transactions—generally funded using the moneys contained in customer bank accounts—as a result of the charged scheme is sufficient to establish a deprivation to the Issuing Banks' property interests, given that "a scheme fraudulently to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a 'financial institution'…." *Shaw*, 137 S. Ct. at 466.

[7] In *Zarrab*, the Court explicitly rejected arguments paralleling those made by the defendants here (Weigand MTD at 15; Akhavan MTD at 2), that the Indictment failed to properly allege a bank fraud scheme because the U.S. banks in that case stood to benefit financially from processing the fraudulent transactions at issue (for example, by earning fees for processing wire transfers). *See* 2016 WL 6820737, at *14.

bank or otherwise impaired the bank's property interest.  (*See* Weigand MTD at 13; Akhavan

MTD at 18).  Indeed, in *Lebedev*, the Second Circuit upheld convictions under Section 1344(2)

and for wire fraud involving misrepresentations to a bank regarding unregistered Bitcoin

transactions, even though the bank's customers willingly purchased Bitcoin.[8]  932 F.3d at 49.

Notwithstanding the customer's knowing involvement in the transactions, the *Lebedev* court

found that the scheme was one to "obtain funds under [the banks'] custody and control," namely,

"funds in the customers' accounts."  *Id.*; *see also Nejad*, 2019 WL 6702361, at *14 (finding that

indictment properly alleged a scheme to obtain bank property under both Sections 1344(1) and

1344(2), where the bank customer willingly transferred its own funds through a U.S. bank as part

of the scheme).

 Finally, that "the Indictment does not allege that the defendants themselves sought to

obtain any money from U.S. Issuing Banks," (Weigand MTD at 15), is beside the point.  Again,

the Indictment charges a conspiracy; the defendants' alleged involvement as co-conspirators in a

scheme to defraud banks to cause those banks to transfer to others money under the banks'

control is clearly sufficient.

 Accordingly, the Court should reject the defendants' arguments and find that the

Indictment properly alleges a scheme to obtain money or property from a bank.

### 4.  The Scheme Involved Risk of Tangible Economic Harm

 The defendants further claim that they lacked the intent to expose the U.S. banks to

tangible economic or other harm.  (Akhavan MTD at 16-19; Weigand MTD at 12-14).  This

argument is meritless for several reasons.  As an initial matter, contrary to the defendants'

---

[8]  Notably, Akhavan's contention that the transactions at issue "could be perfectly legitimate had all participants been fully informed," (Akhavan MTD at 18), is directly refuted by the clear allegation in the Indictment that banks would not have processed the marijuana-related transactions had they not been deceived.

argument, harm to a person or entity, whether a federally-insured bank or otherwise, is not an element of the second prong of the bank fraud statute, Section 1344(2). Under *Loughrin*, all that is required under Section 1344(2) is that the defendant "acquire (or attempt to acquire) bank property 'by means of' [a] misrepresentation. 573 U.S. at 362-63. "Section 1344(2)'s 'by means of' language is satisfied when . . . the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control." *Id.* at 363. *Lebedev*, 932 F.3d at 49; *but see United States v. Calderon*, 944 F.3d 72, 91-92 (2d Cir. 2019) (declining to decide post-*Loughrin* whether the bank fraud statute requires a finding that the defendant contemplated harm or injury to the victim). Even with respect to Section 1344(1), the defendants' assertion that intentional causation of harm to the U.S. Issuing Banks is somehow required under that provision is entirely wrong. As noted above, the Supreme Court has expressly held that *intent* to cause tangible economic loss is not a required element of bank fraud. *See Shaw*, 137 S. Ct. at 466-67. Instead, the first prong of the bank fraud statute, Section 1344(1), "'demands neither a showing of ultimate financial loss nor a showing of *intent* to cause financial loss,' but rather requires simply '*knowledge* that [the defendant] would likely harm the bank's property interest.'" *Nejad*, 2019 WL 6702361, at *14 (emphasis added, brackets in original) (quoting *Shaw*, 137 S. Ct. at 467-68). Moreover, where the indictment "tracks the language of the statute and clearly sets forth all the elements of the crime of bank fraud," there is no requirement that the indictment allege that the defendant "put a federally insured bank" at "potential risk of loss." *United States v. Akers*, 215 F.3d 1089, 1101 (10th Cir. 2000).

In any event, harm to a U.S. bank is easily established in this case. The charged scheme robbed the U.S. Issuing Banks of critical information with respect to the transactions at issue, and thus, the concrete harm contemplated by the defendants was to deny the victim banks "the

right to control [their] assets by depriving [them] of information necessary to make discretionary economic decisions." *United States* v. *Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) (in mail fraud case, holding that defendant who deliberately supplied false information to obtain a bank loan "intended to inflict a genuine harm upon the bank—*i.e.*, to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant"); *United States v. Binday*, 804 F.3d 558, 574 (2d Cir. 2015) (finding sufficient for insurance fraud charge proof that defendants "exposed the insurers to an unbargained-for economic loss" based on the features of the insurance policies the defendants obtained based on their fraud); *United States v. DiNome*, 86 F.3d 277, 283-84 (2d Cir. 1996) (affirming wire fraud conviction where fraudulent intent was proven by showing that withheld information substantially diminished value of the mortgage transaction).

The defendants' reliance on the Supreme Court's recent decision in *Kelly v. United States*, __S. Ct.__, No. 18-1059, 2020 WL 2200833 (May 7, 2020), in an effort to undermine the banks' right to control funds in their custody is entirely misplaced. Unlike in *Kelly*, and as described in detail in the Indictment, the scheme to defraud charged here involved an effort to obtain *money* under the custody or control of banks, and not merely "an exercise of regulatory power." *Id.* at *2. As this Court concluded in the May 20 Order:

> [In *Kelly*], the Supreme Court held that the federal fraud statutes only prohibit deceptive schemes to deprive a victim of money or property, and that the improper use of regulatory power in that case did not constitute such a deprivation. *See id.* at *4-7. Here, in contrast, the goal of the alleged fraud was clearly to obtain money from the victim banks, i.e., to induce them to make payments that they would not otherwise have made to the Phony Merchant bank accounts controlled by the defendants. (Ind. ¶ 14).

(May 20 Order, Dkt. No. 40, at 7-8). Simply put, *Kelly*, is inapposite here.

Instead, this case is controlled by the Second Circuit's decision in *Lebedev*, where it held that a fraud charge "under a right-to-control theory can be predicated on a showing that the defendant, through the 'withholding or inaccurate reporting of information that could impact on economic decisions,' deprived 'some person or entity . . . of potentially valuable economic information.'" *Lebedev*, 932 F.3d at 48 (quoting *United States v. Finazzo*, 850 F.3d 94, 108 (2d Cir. 2017)). Here, the Indictment alleges that the scheme deprived the U.S. Issuing Banks of information regarding the illegal nature of the transactions at issue, namely, that they involved marijuana sales in violation of federal law. (*See* Ind. ¶¶ 10(d), 12). This information would have been economically valuable to the U.S. Issuing Banks because it lured them—by disguising the illegal transactions as legitimate through the Phony Merchants—into processing and approving those transactions, thereby causing the Issuing Banks to relinquish funds that they otherwise would have kept. This is plainly on all fours with *Lebedev*, where the Second Circuit upheld a wire fraud conviction under the right to control theory where the charged scheme—like that alleged in the instant Indictment—involved disguising transactions "through front entities . . . so the institutions processing those [credit card] transactions would be more likely to process and approve them." *Lebedev*, 932 F.3d at 49; *see also Zarrab*, 2016 WL 6820737, at *14 ("where . . . it is alleged that a defendant intentionally withholds or falsifies material information . . . the defendant will have already exposed the bank to immediate harm by denying the bank the right to control its assets by depriving the bank of the information necessary to make discretionary economic decisions") (internal quotations and brackets omitted) (citing *United States v. Watts*, 934 F. Supp. 2d 451, 471 (E.D.N.Y. 2013); *United States v. Levis*, 488 Fed. App'x 481, 486 (2d Cir. 2012); *United States v. Chandler*, 98 F.3d 711, 716 (2d Cir. 1996)). Accordingly, the

Indictment adequately alleges a scheme to defraud under a right to control theory. *Lebedev*, 932 F.3d at 49; *Zarrab*, 2016 WL 6820737, at *13-14).

Finally, the defendants' argument that the Indictment fails to state an offense because it fails to allege that the transactions in fact resulted in any "economic harm or material risk" to the U.S. Issuing Banks (Weigand MTD at 18; Akhavan MTD at 18), is of no moment. This argument has no bearing on the sufficiency of the allegations in the Indictment, but rather raises an issue of fact to be resolved at trial. *See United States v. Laljie*, 184 F.3d 180, 191 (2d Cir. 1999) (examining the potential for loss created by each alleged misrepresentation on a case-by-case basis, after trial).

### 5. There is No Basis to Dismiss the Indictment Pursuant to the Rohrabacher-Farr Amendment

Akhavan's additional basis to dismiss the Indictment—that it "defies the Rohrabacher-Farr Amendment"—is frivolous. The Rohrabacher-Farr Amendment (the "Amendment") provides that "[n]one of the funds made available . . . to the Department of Justice may be used, with respect to [certain enumerated] States . . . to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated Appropriations Act of 2020, Pub. L. No. 116-93, § 531, 133 Stat 2317 (2019).

The Amendment has no application whatsoever to the bank fraud conspiracy offense alleged in the Indictment. That offense involves a scheme to deceive U.S. banks into processing marijuana transactions they would not otherwise process, by falsely representing the transactions to involve other goods and services. No business, whether fully legal or subject to divergent state and federal criminal law, has license to violate federal bank fraud statutes. Moreover, the

Department of Justice's administration of the federal bank fraud statute does not "prevent" the States from "implementing their own laws" authorizing medical marijuana, in violation of the Amendment, as it is obviously possible for medical marijuana businesses legal under state law to operate without engaging in bank fraud. Taken to its logical conclusion, Akhavan's position would suggest that any federal crime committed by a marijuana business legal under state law could not be prosecuted by the Department of Justice. That is not the law.

The bank fraud crime alleged here stands in stark contrast to the "federal marijuana offenses" involving "infractions of the Controlled Substances Act" at issue in *United States v. McIntosh*, 833 F.3d 1163, 1168-69 (9th Cir. 2016), relied upon by Akhavan. (*See* Akhavan MTD at 23). *McIntosh* held that the Amendment "prohibits DOJ from spending funds from relevant appropriations acts for the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws." 833 F.3d at 1177. Accordingly, *McIntosh* concluded that "individuals who do not strictly comply with all state-law conditions regarding the use, distribution, possession, and cultivation of medical marijuana have engaged in conduct that is unauthorized, and prosecuting such individuals does not violate [the Amendment]." *Id.* at 1178. The Ninth Circuit's recent decision in *United States v. Pisarski* further supports *McIntosh's* limited interpretation of the Amendment. *See* No. 17-10428, 2020 WL 3886486, at *4 (9th Cir. July 10, 2020) ("defendants may seek to enjoin the expenditure of DOJ funds *only* if they 'strictly comply with all state-law conditions regarding the use, distribution, possession, and cultivation of medical marijuana'") (emphasis in original) (quoting *McIntosh*, 833 F.3d at 1178)). The *Pitarski* court also made clear that defendants "bear the burden of proof" in demonstrating such strict compliance. 2020 WL 3886486, at *4. Neither

*McIntosh* nor any other authority supports the proposition that a criminal scheme to defraud a federally insured bank falls within the ambit of the Amendment.[9]

Finally, as the Indictment makes clear, neither Akhavan nor Weigand were even employed by a medical marijuana business legal under state law. Rather, as the Indictment alleges, Akhavan and Weigand, together with others, helped the Online Marijuana Marketplace Company to disguise marijuana sales as non-marijuana transactions, to trick U.S. banks into processing such transactions in violation of federal law.[10] Their connection to the marijuana business, in other words, was limited to helping conduct the bank fraud charged in the Indictment. The Amendment plainly does not protect bank fraudsters from prosecution merely because they offer their services to a marijuana business.

---

[9] Moreover, neither the Supreme Court nor any court in the Second Circuit has held that the Amendment creates any right on behalf of criminal defendants charged with offenses involving the distribution of marijuana, medical or otherwise. The plain text of the Amendment—a stand-alone provision in an appropriations bill—prohibits the Attorney General from expending allocated funds to interfere with several states' implementation of their medical marijuana laws; it does not prohibit the criminal prosecution of individuals who violate the federal Controlled Substances Act, let alone unrelated federal criminal statutes. If the Amendment was meant to amend any of the federal criminal statutes, or to interfere with the Attorney General's core function, it would have done so directly. *See Director of Revenue of Mo. v. CoBank, ACB*, 531 U.S. 316, 323 (2001) ("[I]t would be surprising indeed," if Congress had effected a "radical" change in the law "sub silentio" via "technical and conforming amendments"). In addition, as the Second Circuit has made clear, "[t]he dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (internal quotations omitted) (denying motion to dismiss indictment based on alleged violation of consular-notification provision of Vienna Convention on Consular Relations). Thus, "[m]otions to dismiss indictments are disfavored." *United States v. Finazzo*, No. 10-CR-457 RRM, 2011 WL 3794076, at *2 (E.D.N.Y. Aug. 24, 2011). Akhavan cites no case in this Circuit, nor is the Government aware of any, supporting dismissal of the Indictment—an "extraordinary remedy reserved for extremely limited circumstances implicating fundamental rights"—based upon a purported violation of the Amendment (or an appropriations provision) which by its plain text does not alter federal criminal law, let alone provide for a private right of action on behalf of criminal defendants.

[10] Akhavan mistakenly contends that he owned the Online Marijuana Marketplace Company. (*See* Akhavan MTD at 3-4). In fact, as the Indictment makes clear, neither Akhavan nor Weigand had any direct role in the Online Marijuana Marketplace Company.

In short, the conduct alleged in the Indictment is far afield from any legal protection offered by the Amendment.

## II.      The Defendants' Motions to Compel Should Be Denied

Both defendants next ask this Court to compel the Government to (1) make disclosures of various categories of documents pursuant to Federal Rule of Criminal Procedure 16; (2) make disclosures of purported *Brady* materials; and (3) produce a witness list, trial exhibits, and *Giglio* and Jencks Act materials 50 days in advance of trial.[11]  These requests are meritless and should be rejected.

The Government has complied, and will continue to comply, with its Rule 16 and *Brady* obligations.  Indeed, the defendants demand materials that Rule 16 expressly excludes from production, and otherwise fail either to cite any authority supporting their demands or to make the requisite showing required to justify production.  With respect to the defendants' requests for purported *Brady* materials, the Government is fully cognizant of its *Brady* obligations, has already made disclosures beyond those obligations in an abundance of caution, and will continue to do so in accordance with the law and the Court's Individual Rules.  Finally, the defendants have not justified their demands for production of a trial witness list, potential exhibits, and Jencks Act and *Giglio* materials 50 days in advance of trial.

### A.  Background

The production of Rule 16 discovery began in early April 2020, approximately a month before the defendants were arraigned by this Court.  The Government has fully complied with its discovery obligations, and to date has produced a substantial volume of material, including

---

[11]  Akhavan's motion explicitly seeks a witness list, exhibits, *Giglio*, and Jencks Act materials 50 days before trial, while Weigand simply joins in "all applicable arguments" made by Akhavan. (Weigand MTC at 10).

roughly 43,000 pages of documents and several terabytes of data containing extractions of several electronic devices and search warrant returns.  Categorically, as part of its Rule 16 discovery productions, the Government has provided the following (among other things):

*(1)  Electronic Communications and Related Data*

- email and chat message communications between the defendants and others in connection with the charged scheme;

- call and text detail records for a phone used by Akhavan;

- subscriber and other non-content records for online accounts used by Akhavan and Weigand;

- Pen register information;

*(2)  Search Warrant Information and Returns*

- search warrant materials related to searches conducted on devices belonging to the defendants seized by the Government;

- the results of forensic analyses performed on electronic devices seized from defendant Weigand incident to his arrest;

- search warrant and Section 2703(d) returns related to an email account used by defendant Akhavan;

*(3)  Defendants' Statements and Related Materials*

- materials related to the arrest of each of the defendants, including handwritten notes and reports reflecting post-arrest statements, advice of rights forms, photographs, receipts, and recordings;

- a report of prior statements made by defendant Akhavan to Government officials;

*(4)  Criminal History Records*

- criminal history records for defendant Akhavan;

*(5) Records Relating to CW-1*

- recordings of meetings and telephone calls between the defendants and a cooperating witness ("CW-1");

- a full forensic analysis of a cell phone used by CW-1 to communicate with the defendants and others about the charged scheme;

- documents and records provided by CW-1 related to the operation of the charged scheme, including photographs of the defendants attending one or more meetings related to the scheme;

- a record of CW-1's travel history into and out of the United States;

*(6) Third Party Records*

- All records provided to the Government from the Online Marijuana Marketplace Company related to the charged scheme, in response to a Grand Jury Subpoena;

- records from a marijuana dispensary connected to the charged scheme;

- bank records from banks that issued credit cards used by customers to make purchases from the Online Marijuana Marketplace Company;

- financial records from Visa and MasterCard associated with purchases made from the Online Marijuana Marketplace Company under Phony Merchant names;

- records and communications from an employee of Akhavan related to the scheme;

*(7) Other Records*

- screenshots of fake websites associated with various Phony Merchants.

Of course, the Government is continuing to produce materials pursuant to Rule 16 as they come within its possession, custody, or control. In addition, beyond these materials, the

Government has provided the defendants with further particularized information and disclosures. First, in response to the Court's Order of May 20, 2020, which almost entirely denied defendants' request for a bill a particulars, the Government produced particulars listing the names of defendants' co-conspirators in connection with the Indictment.[12]  Second, on or about June 22, 2020, the Government provided the defendants with a letter containing three categories of information: (a) a list of U.S.-based Issuing Banks associated with individuals who made purchases from the Online Marijuana Marketplace Company in connection with the charged scheme; (b) information concerning the approximate percentage of transactions involving purported medical marijuana during the course of the charged scheme, obtained from attorneys representing the Online Marijuana Marketplace Company; and (c) certain other information received from attorneys representing the Online Marijuana Marketplace Company (who, in turn, obtained it based on the attorneys' interviews of several employees of the Company), relating to statements attributed to defendant Akhavan during a meeting concerning the scheme that occurred in Calabasas, California in or about March 2018.  Each of these categories of information is further discussed in connection with the responses to defendants' specific arguments below.

### B.  The Defendants' Motion For Rule 16 Material Should Be Denied

#### 1.  Federal Rule of Criminal Procedure 16(a)(1)(E)

Rule 16 of the Federal Rules of Criminal Procedure "created only a narrow right of pretrial discovery from the government."  *United States v. Stein*, 488 F. Supp. 2d 350, 365 (S.D.N.Y. 2007).  In particular, the Rule requires the Government to permit the defendant to inspect and copy documents and objects within the Government's possession, custody, or control

---

[12]  The Government later supplemented that list to include an inadvertently-omitted co-conspirator.

if the items are material to preparing the defense, if the Government intends to use them in its case-in-chief at trial, or if the items were obtained from or belong to the defendant.  Fed. R. Crim. P. 16(a)(1)(E).  An item is "'material to preparing the defense'" under Rule 16 "'if it could be used to counter the Government's case or bolster a defense.'"  *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017), *overruled on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180-81 (2d Cir. 1993).  "'Defense' means 'the defendant's response to the Government's case in chief,' encompassing only items 'which refute the Government's arguments that the defendant committed the crime charged.'"  *United States v. Armstrong*, 517 U.S. 456, 462 (1996) (interpreting predecessor to Fed. R. Crim. P. 16(a)(1)(E)); *accord United States v. Defreitas*, No. 07 Cr. 543, 2011 WL 317964, at *9 (E.D.N.Y. Jan. 31, 2011), *aff'd sub nom. United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013), and *aff'd sub nom. United States v. Ibrahim*, 529 F. App'x 59 (2d Cir. 2013).

Under these standards, the question is whether the evidence will enable a defendant "'significantly to alter the quantum of proof in his favor.'"  *United States v. Urena*, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013) (quoting *United States v. Maniktala*, 934 F. 2d 25, 28 (2d Cir. 1991)).[13]  A defendant seeking an order compelling Rule 16 discovery "must make a *prima facie* showing of materiality, and must offer more than the conclusory allegation that the requested evidence is material."  *Id.* (internal citations and quotations omitted).

Rule 16(a)(2) explicitly excludes from this discovery attorney and agent notes and reports, and witness statements.  *See* Fed. R. Crim. P. 16(a)(2) ("Except as permitted by Rule 16(a)(1)(A)-(D), (F) and (G), this rule does not authorize the discovery or inspection of reports,

---

[13]  The Government notes that defendant Akhavan's characterization of the governing Rule 16 standards, including discussion of what qualifies as material, rests entirely on authority outside the Second Circuit.  (*See* Akhavan MTC at 11-12).

memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.  Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500").

2. **Requests for Bank and Credit Card Company Policies Regarding Marijuana Transactions**

Relying on Rule 16(a)(1)(E), the defendants seek bank and credit card policies "against marijuana transactions" and related information, claiming that such policies and related information are necessary to understand the charge and are material to the Government's case. (Akhavan MTC at 4-5, 12; Weigand MTC at 2, 5-6, 8).  In connection with this argument, the defendants note that on or about June 22, 2020, the Government voluntarily provided them with a non-exhaustive list of U.S. Issuing Banks associated with individuals who made MasterCard and Visa credit card purchases from the Online Marijuana Marketplace Company in the course of the charged scheme.

Characterizing the Government's charge as a "Rube-Goldberg-like design" (Akhavan MTC at 12)—a characterization the Government does not accept—the defendants complain that more is required, claiming that the Government's Issuing Bank list raises a bevy of questions regarding the banks' role in the transactions, *i.e.*, whether they were "just associated with people" who made the purchases; the dates of the transactions; the banks' respective policies; whether the transactions involved medical marijuana; whether the banks would have processed them with different MCC codes, etc.  The defendants also complain that the list is "non-exhaustive."  (Akhavan MTC at 13; *see* Weigand MTC at 5-6, 8).

The defendants are wrong. The Government's list is what the Court understood the Government would be providing to the defendants when the Court rejected the defendants' requests for a bill of particulars on these very same issues. As the Court explained then,

> Not only does the indictment allege a scheme for which the existence of an actual victim is not required, but also the indictment is already quite clear that the goal of the charged conspiracy was not to defraud any bank in particular. Rather, the design of the Transaction Laundering Scheme was to enable the customers of the Online Marijuana Marketplace Company to purchase marijuana through credit and debit transactions, regardless of the particular banks involved.

(May 20 Order at 5-6 & n.1). In response to Akhavan's claim that the identity of Issuing Banks was necessary to assess venue, the Court observed that the Government had agreed to provide a list of victim banks. (*Id.* at n.1).[14]

As such, the defendants have not established that the policies and related information they seek are "material" within the meaning of Rule 16. Indeed, as explained further below, some of the information sought relating to the Issuing Banks, such as whether the transactions at issue involved medical marijuana, is irrelevant to the charge. Similarly irrelevant are the policies of the Credit Card Companies as they pertain to marijuana processing—rather, as the defendants take great pains to note repeatedly in their motion papers, the Indictment has not identified the Credit Card Companies as targets of the defendants' bank fraud scheme.

In any event, the Government represents that it has produced all "documents and objects" within the meaning of Rule 16(a)(1)(E) in its possession, custody, and control that bear on these issues. Indeed, the discovery materials produced to date answer many of the questions the

---

[14] The Government notes, however, that the June 22 Issuing Bank list includes *all* Issuing Banks that it is currently aware of that processed MasterCard and Visa transactions through the Online Marijuana Marketplace Company within the charged timeframe, not simply those banks located in the Southern District of New York.

defendants claim are raised by the Government's Issuing Bank list, including, for example, the dates of transactions and the role of the Issuing Banks. To the extent that the Government comes into possession of additional documents or objects reflecting Issuing Bank and/or Credit Card Company policies pertaining to marijuana transactions and related information, the Government will produce them.[15]

Finally, the Government notes that is in possession of certain information concerning such policies and related information in the form of internal notes and reports prepared by Government agents and attorneys in connection with interviews of bank and credit card company personnel. Pursuant to Rule 16(a)(2), and as discussed further below, the Government is not required to and does not intend to produce such notes as Rule 16 discovery. Rather, the Government will produce such notes, or portions thereof, as required consistent with its obligations under *Brady*, *Giglio*, and the Jencks Act.

### 3. Request for Contracts and Rules Governing Assignment of Merchant Category Codes

Second, the defendants assert that the Government's theory of fraud "depends upon the MCCs, which are *the* alleged vehicle for the fraudulent misrepresentations that made the entire scheme work." (Akhavan MTC at 13; *see* Weigand MTC 2, 8). From that incorrect characterization, the defendants leap to the conclusion that Rule 16 mandates that the Government produce all documents relevant to the Indictment's allegations regarding MCCs, including, specifically, contracts and rules governing MCC assignments.

As an initial matter, as discussed herein, the defendants are wrong to focus exclusively on the MCCs as the linchpin of the Government's theory, which appears to reflect their effort to

---

[15] Of course, the defendants have the ability to subpoena such policies themselves pursuant to Rule 17.

establish materiality under Rule 16, and not an accurate reading of the Indictment.  Rather, as the Indictment describes in detail, the gravamen of the defendants' scheme to defraud Issuing Banks entailed the creation and use of completely fictitious merchants, complete with phone websites and phony accoutrements, to facilitate the ability of customers of the Online Marijuana Marketplace Company to purchase marijuana products through credit and debit cards issued by their respective Issuing Banks.  Indeed, the Indictment alleges the creation and use of the Phony Merchants as the "primary method" used by the defendants and co-conspirators to effectuate their unlawful scheme.  (Ind. ¶ 12; *see also id.* ¶ 13).  To be sure, the defendants also employed certain MCC codes to promote this scheme.  As the Indictment explains, the defendants used false MCC codes indicating innocuous goods and services as a way to disguise the nature of the transactions and create the false appearance that the transactions were completely unrelated to marijuana, including MCC categories reflecting stenographic services, music stores/pianos, and cosmetic stores.  (*Id.* ¶ 14).  In view of these allegations, contracts and rules from banks and/or other entities reflecting the particulars of how those codes are typically assigned and who assigns them are not material.  Rather, the point—as alleged in the Indictment—is that Akhavan and others directed others to apply incorrect MCC codes (however generated) to transactions conducted through the Online Marijuana Marketplace Company.  (*Id.* ¶ 14).

Accordingly, the defendants have not established that they are entitled under Rule 16 to contracts and rules governing the assignment of MCC codes.  In any event, at present, the Government has produced all documents or objects in its possession, custody, or control regarding the use of MCC codes in connection with the charged scheme, including electronic communications on this issue that bear on the defendants' intent, and will produce contracts and policies governing the assignment of such codes if the Government comes within possession of

documents and objects containing that information.  Again, to the extent that such information is reflected in internal Government documents made by Government personnel in connection with this case, or in witness statements, it is not subject to Rule 16 discovery and the Government will produce such material in accordance with its obligations under *Brady*, *Giglio*, and the Jencks Act.  *See* Rule 16(a)(2).

**4.    Requests for Transaction Analyses Linking Banks With Relevant Policies to Particular Non-Medical Transactions**

Next, Akhavan demands any internal Government analyses showing "a bank, with an ascertainable policy, processing a given transaction at a given time and location, on a credit or debit card, based on an MCC assigned by a particular merchant bank and so forth."  (Akhavan MTC at 13).  He argues that such analysis is material under Rule 16 and thus must be disclosed, as he claims it is otherwise "impossible to investigate the materiality or causal significance of the MCCs," which is "[t]he alleged mechanism for the scheme."  (*Id.*).

Akhavan's argument fails for several reasons.  First, it rests on the faulty premise that the Indictment alleges the MCCs as the "mechanism" for the fraud, but as discussed above, this is simply an erroneous reading of the Indictment.  Second, as this Court previously observed in ruling on the defendants' motions for a bill of particulars, the Indictment alleges a bank fraud conspiracy scheme "for which the existence of an actual victim is not required." (May 20 Order at 5).  In other words, to prove its case, the Government does not need to prove the completion of actual credit and debit transactions through specific Issuing Banks deceived in connection with the use of Phony Merchant accounts.  Accordingly, Akhavan's claim that "it is impossible to prepare a defense with respect to whether an MCC was intended to induce a bank to take actions it otherwise would not have" without the information sought (Akhavan MTC at 14) is

unpersuasive and should be rejected. While it would be undoubtedly *useful* for the defendants to have internal Government analyses, it is not "material" to preparing their defense.

Akhavan next asserts that the "lack of transaction-level evidence makes it impossible for the Government to establish that it is not running afoul of the Rohrabacher-Farr Amendment's prohibition on interfering with state medical marijuana laws." (Akhavan MTC at 14; *see also* Weigand MTC at 6). As discussed fully *supra*, however, the defense's reliance on the Rohrabacher-Farr Amendment avails him nothing, as no aspect of this federal bank fraud prosecution can credibly be said to interfere with any state's implementation of laws that authorize the "distribution, possession, or cultivation of medical marijuana." [16]

Finally, the Government notes that to the extent it generates any transactional analyses that it intends to use in its case-in-chief, it will produce such analyses pursuant to Rule 16 or, if warranted, as an expert disclosure. Otherwise, any internal analyses created by the Government are not subject to Rule 16 disclosure pursuant to Rule 16(a)(2).

### 5. Request for Memoranda of Interviews or Meetings in this Matter

In an apparent end run around the Jencks Act, Akhavan seeks "any interview memoranda or notes generated in the course of the Government's investigation," claiming—without any elaboration or discussion—that such materials will "aid" in the preparation of his defense. Relying on Rule 16(a)(1)(E), he surmises that the "materiality of the information should be clear" from his Motion. (Akhavan MTC at 21; *see also* Weigand MTC at 10 (seeking production

---

[16] Akhavan claims that the Government's representation—based on information provided by attorneys for the Online Marijuana Marketplace Company—that 99% of the transactions after 2018 were for recreational marijuana "is not remotely plausible." (Akhavan MTC at 6; *see also id.* at 15). He provides no support for that assumption. To the extent the Government learns that its figures are not accurate, it will provide that information to the defendants. However, for the reasons discussed above, whether the transactions at issue involved medical or recreational marijuana is simply irrelevant.

of "all information concerning the attorney proffer described in [the Government's] June 22 letter")).

The assertion that Rule 16 requires disclosures of non-*Brady* information that is "material to preparing the defense," contained in documents, such as witness statements, that are expressly excluded from Rule 16, *see* Rule 16(a)(2), is frivolous, and the defendants fail to provide any authority in support of it. To the contrary, all controlling authority and the well-established practices in this District are inconsistent with the defendants' request. *See, e.g.*, *United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001) (production of non-exculpatory Jencks Act statements cannot be ordered prior to witness testimony); *United States v. Percevault*, 490 F.2d 126, 131 (2d Cir. 1974) (Section 3500 "is the exclusive vehicle for disclosure of statements made by government witnesses."); *United States v. Ghailani*, 687 F. Supp. 2d 365, 369 (S.D.N.Y. 2010) (denying defendant's motion to compel the production of a memorandum made by the government, explaining that the memorandum is protected against disclosure under Rule 16(a)(2) "regardless of its materiality"); *United States v. Rigas*, 258 F. Supp. 2d 299, 307 (S.D.N.Y. 2003) (denying defendants' motion for an order directing the government to disclose, among other things, memoranda written by firms the Government engaged to investigate the defendants).

Any other outcome would fatally undermine 18 U.S.C. § 3500, which specifically indicates that witness statements are not discoverable at this stage (except as required under *Brady*, of course). The Government will make disclosures of internal memoranda and notes, or portions thereof, in accordance with its obligations under *Brady*, *Giglio*, and the Jencks Act.

### 6. Requests for Other Categories of Materials

As discussed below, the Court need not order the Government to produce documents and other items collected during searches and seizures, or documents received from third parties, as

the Government is complying with its Rule 16 obligations as to those categories of materials. As to the defendants' request for production of the Government's taint protocols and Akhavan's request for grand jury testimony, they are legally and factually unfounded, and should be rejected.

***Documents and Other Items Collected During Searches and Seizures***. With respect to Akhavan, the Government has produced to him all emails and other data obtained pursuant to two email search warrants and a Section 2703(d) Order obtained by another U.S. Attorney's Office in connection with a separate investigation. The Government also seized two of Akhavan's cellular telephones pursuant to a search and seizure warrant, and is working on obtaining a forensic analysis of those devices. Once that occurs, the Government will produce the entirety of the forensic analysis to Akhavan, conduct a responsiveness review of the forensic images, and produce materials determined to be responsive to the warrant to both Akhavan and Weigand.

With respect to Weigand, the Government has produced to him the entirety of a forensic analysis performed on several devices seized from him incident to arrest, which was conducted pursuant to a search and seizure warrant. The Government is currently undertaking a responsiveness review of that data, has already produced certain materials determined to be responsive to the warrant to both defendants, and will continue to do so as it continues its review.

Finally, the Government has produced the entirety of a forensic analysis of CW-1's cellular telephone to both defendants, as well as other electronic communications obtained from CW-1, consistent with the obligations imposed by Rule 16.

***Documents Produced by Third Parties***. The Government has produced documents gathered from third parties consistent with the obligations imposed by Rule 16, including

multiple productions containing a substantial volume of documents obtained from the Online Marijuana Marketplace Company. Akhavan's speculation that the Government possesses additional Rule 16 materials in the form of third party records is unfounded. (Akhavan MTC at 17). As the Government comes into possession of additional third party records that are discoverable under Rule 16, it will continue to process and produce them to the defendants.

*Taint Protocols.* The defendants demand that the Court order the Government "to provide an explanation of the protocols it has implemented" to ensure that the prosecution team is not exposed to privileged materials that may reside on electronic devices and accounts seized by the Government. (Akhavan MTC at 17; Weigand MTC at 8-9). Tellingly, the defendants cite no authority supporting this demand, and unsurprisingly, the Government has failed to locate any in its search within this Circuit.[17] Neither Rule 16 nor any other authority supports—let alone requires—the Government to disclose its taint protocols to the defendants.[18] Accordingly, this demand should be rejected.

Of course, the Government prosecution team is attuned to avoiding exposure to privileged information. Notwithstanding their demands for taint protocols, neither defendant had volunteered a list of attorneys with whom he asserts he has an attorney-client relationship to filter the seized data for potentially privileged communications. As a result, on or about July 9,

---

[17] The Government has identified one case outside this Circuit addressing a defendant's motion to compel the Government to produce "the methods and results of its taint process." *See United States v. Sledziejowski*, 16-cr-101, 2018 WL 2288962, at *9 (N.D. Tex. May 18, 2018). The court rejected the defendant's request, noting the absence of any authority supporting the demand.

[18] The Government has identified two cases in this district involving Government requests to use "privilege teams" in responding to defense motions for *in camera* or special master review of certain materials, but nothing remotely suggesting that the Government's taint protocols are subject to production under Rule 16. *See United States v. Winters,* 06 Cr. 54 (SWK), 2006 WL 2789864 (S.D.N.Y. Sep. 27, 2006); *United States v. Grant*, No. 04 CR 207 (BSJ), 2004 WL 1171258 (S.D.N.Y. May 25, 2004).

2020, the Government emailed both sets of defense counsel separately, requesting identification of any attorneys with whom their clients assert an attorney-client relationship and with whom there may be communications within the seized data, so that the Government could properly segregate potentially privileged materials to the extent they have not already been segregated. On July 12, 2020, counsel for Weigand responded with a list of attorney names, and the Government will take action to ensure that the prosecution team is screened from reviewing privileged communications that may be contained on his devices.[19]

**Transcripts of Grand Jury Testimony.** Akhavan next seeks the disclosure of grand jury testimony and records. (Akhavan MTC at 18). This request can be easily dispensed with. To pierce the secrecy protections afforded grand jury testimony under Federal Rule of Criminal Procedure 6(e), a defendant must demonstrate a "particularized need" for disclosure, *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683 (1958); *In re Fed. Grand Jury Proceedings*, 760 F.2d 436, 439 (2d Cir. 1985), and in this Circuit, courts have long held that "[a] review of grand jury minutes is rarely permitted without specific allegations of government misconduct." *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990), *abrogated on other grounds as recognized by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010).

Here, Akhavan has not and cannot meet this heavy burden. Indeed, Akhavan does nothing more than vaguely claim that it is "impossible to tell from the Indictment on what offense the grand jury actually indicted the Defendant, leaving the Government free to fill in the details of the purported bad conduct as it sees fit." (Akhavan MTC at 18). That assertion is plainly belied by the 16-page speaking Indictment, as recognized by the Court in largely denying

---

[19] Counsel for Akhavan responded on July 11, 2020, that they have identified potentially privileged materials within the seized email communications, and are continuing to review. However, counsel has not yet provided the Government with a list of identified law firms and lawyers.

the defendants' request for a bill of particulars. Again, Akhavan provides no authority in support of this request, and there is no attempt to link this bald allegation to the governing standards. To the contrary, speculation regarding what evidence the Government may or may not have presented to the grand jury is insufficient to meet his burden to overcome the presumption of regularity. *United States v. Calk*, 19 Cr. 366 (LGS), 2020 WL 3577903, at *3 (S.D.N.Y. July 1, 2020). Akhavan's characterization of the Indictment is simply wrong, and affords no basis for disturbing the presumption of secrecy and closure protecting grand jury testimony.

***Federal Rule of Criminal Procedure 16(a)(1)(A)-(C).*** The Government has produced and will continue to produce to each defendant (1) the substance of all oral statements made by that defendant in response to Government interrogation, *see* Rule 16(a)(1)(A); (2) all relevant written and recorded statements of that defendant that it knows exists in its possession, custody, or control, *see* Rule 16(a)(1)(B); and (3) any criminal history records of the defendant that it knows exists within its possession, custody, and control, *see* Rule 16(a)(1)(D). Accordingly, an order compelling the Government to produce such materials is unnecessary and the defendants' requests for these materials should be denied as moot.

### C. The Defendants' Motion for Purported *Brady* Material Should Be Denied

Defendants seek "confirmation" that the Government has produced or will produce material in categories they claim qualify as exculpatory. (Akhavan MTC at 22-23; *see also* Weigand MTC at 9-10). As discussed below, the Government recognizes its obligations under *Brady*, and as such, consistent with longstanding precedent in this Circuit, the Court should deny the defendants' request for an order compelling the production of *Brady* material. The defendants have failed to provide any basis supporting entry of such an order.

#### 1. Law Applicable to *Brady* Requests

"The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *Coppa*, 267 F.3d at 139 (quoting *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963)). However, the purpose of the *Brady* rule "is not to provide the defendant with complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory information known to the government but unknown to him." *United States v. Ruggiero*, 472 F.2d 599 (2d Cir. 1973). As the Second Circuit has explained, "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *see also United States v. Polowichak*, 783 F.2d 410, 414 (4th Cir. 1986) ("*Brady* did not create a criminal right analogous to discovery in a civil case."); *United States v. Evanchik*, 413 F.2d 950, 953 (2d Cir. 1969) ("Neither [*Brady*] nor any other case requires the government to afford a criminal defendant a general right of discovery.").

Accordingly, the defense does not have a "constitutional right to conduct his own search of the [Government's] files to argue relevance." *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987). "Unlike Rule 16 and the Jencks Act . . . *Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation . . . ." *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (internal quotation marks omitted); *see also United States v. Meregildo*, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013) ("*Brady* is not a rule of discovery--it is a remedial rule." (citing *Coppa*, 267 F.3d at 140)). It is the prosecution team's duty to evaluate whether exculpatory information exists within its holdings. *See United States* v. *Agurs*, 427 U.S. 97, 109 (1976) ( "If everything that might influence a jury must be disclosed, the only way a prosecutor

could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice. . . . [T]he Constitution surely does not demand that much.").

### 2. An Order Compelling the Production of *Brady* Material Is Unnecessary

The Government has repeatedly acknowledged its *Brady* obligations to the defendants and its intent to abide by them, and reiterates that representation here.  Courts in this Circuit routinely deny specific requests for *Brady* material where, as here, the Government has made a good-faith representation to the court and the defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*.[20]  *See, e.g.*, *United States v. Rivera,* 16 Cr. 175 (LGS), 2017 WL 1843302, at *2 (S.D.N.Y. May 8, 2017) (denying defendants' motions to disclose *Brady* material after "the Government represented that it does not have any [*Brady* material], is not aware of any, and will 'promptly' produce any of which it becomes aware"); *United States v. Gallo*, 98 Cr. 338, 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of purported *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"); *United States v. Yu*, 97 Cr. 102 (SJ), 1998 WL 57079, at *4–*5 (E.D.N.Y. Feb. 5, 1998) (denying defense request that Government provide early disclosure of *Brady* material because Government acknowledged its continuing obligation to provide exculpatory material upon its discovery and assured that it would comply with that obligation); *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

---

[20]  Indeed, in an abundance of caution, the Government disclosed portions of internal notes reflecting information received by attorneys from the Online Marijuana Marketplace Company. That information involved certain statements attributed to defendant Akhavan in connection with a meeting concerning that scheme that occurred in Calabasas, California, in or about March 2018.

The defendants otherwise cite no authority supporting their request for an order compelling the Government to confirm *ex ante* that it will disclose certain specified categories of materials that they deem exculpatory, in the event the Government comes into possession of such materials. As noted above, it is the prosecution team that is tasked with making *Brady* determinations in the first instance, and because the defendants have made no particularized showing that materials exist requiring disclosure, the Government need do no more than acknowledge its obligations. *United States v. Juliano*, 99 Cr. 1197, 2000 WL 640644, at *2 (S.D.N.Y. May 18, 2000).

### D. The Defendants' Motion for Identification of Trial Witnesses 50 Days In Advance of Trial Should Be Denied

The Court should deny the defendants' motion for a deadline 50 days prior to trial for disclosure of the Government's witness list. The Government is unaware of any case of comparable complexity and scope in which such an early deadline has been set for witness-related disclosures. Even in *United States v. Bonventre*, which involved the largest Ponzi scheme in U.S. history, five defendants, charges spanning decades, and a six-month trial, the Government was ordered to disclose its witness list, Jencks Act material, and *Giglio* material only 45 days before trial. *See* 10 Cr. 228 (LTS), 2013 WL 2303726, at *7-8 (S.D.N.Y. May 28, 2013). Indeed, the authorities cited by defendants in support of this demand involve far more complex schemes with large pools of potential witnesses and voluminous exhibits. *See, e.g., United States v. Freedman*, No. 18-CR-217 (KMW), 2019 WL 2590747 (S.D.N.Y. June 25, 2019) (rejecting request to order witness list 30 days in advance of trial, instead acknowledging Government's representation that it would disclose list three weeks in advance); *United States v. Vilar*, 530 F. Supp. 2d 516, 638–39 (S.D.N.Y. 2008) (ordering disclosure of witness list 60 days

before trial; Government's evidence encompassed 19 years' worth of wrongdoing and documents); *United States v. Rosenthal*, 91 Cr. 412 (LLS) 1991 WL 267767 (S.D.N.Y. Dec. 3, 1991) (requiring production of witness list 30 days before trial as documentary evidence was voluminous, witness pool was large, and Government anticipated needing a month to present its evidence).[21]

In this case, the Government anticipates needing approximately two weeks to present its case. While the Government alleges that the charged conspiracy took place over the course of a three-year period, it is not unduly complex and the volume of discovery produced accords with cases of similar of similar scope. Accordingly, the Government proposes to provide a witness list 15 days in advance of trial, which accords with other cases involving charges associated with international financial schemes. *See, e.g.*, *United States v. Scott*, 17 Cr. 630 (ER), July 16, 2019 Pretrial Conference Tr., Dkt. No. 104, at 12-13 (in complex international money laundering case involving the laundering of hundreds of millions of dollars derived from a multi-billion dollar fraud scheme, ordering disclosing of exhibit and witness lists two weeks in advance of trial).

### E. The Defendants' Motion for Identification of Potential Trial Exhibits 50 Days In Advance of Trial Should Be Denied

The defendants seek potential trial exhibits 50 days before trial, but provide no basis to justify such an early identification of potential trial exhibits. (Akhavan MTC at 20-21).

When district courts have ordered an early production of trial exhibits, they have generally ordered production shortly before the trial date to "ensure an efficient presentation at

---

[21] The defendants cite *United States v. Levine*, 249 F. Supp. 3d 732, 733 n.1 (S.D.N.Y. 2017), a complicated tax shelter case involving eight counts of tax and wire fraud, in support of their request for a witness list and potential trial exhibits 50 days in advance of trial. (Akhavan MTC at 20). However, the opinion simply notes in a footnote the fact that the Government was ordered to provide witness and exhibit lists 50 days in advance of trial; no explanation is provided for that timeframe.

trial." *Id.* For instance, in *United States v. Giffen*, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004), a

case involving the production of over one million pages of documents, the court ordered the

Government to identify its trial exhibits 30 days before trial, while also explaining that the

Government "may supplement its exhibit list at any time, including during trial, in good faith."

*Id.* Other cases have adopted similar timelines for early disclosure of trial exhibits when the case

has unusually complex or voluminous discovery. *See Freedman*, 2019 WL 2590747 (in light of

complexity of case and large volume of discovery, ordering production of preliminary exhibit list

30 days prior to trial, rejecting defendants' request for production 90 days prior to trial); *United*

*States v. Chalmers*, 474 F. Supp. 2d 555, 573 (S.D.N.Y. 2007) (requiring disclosure of

preliminary trial exhibit list 30 days before trial); *United States v. Lino*, 00 Cr. 632 (WHP), 2001

WL 8356 at *20 (S.D.N.Y. Jan. 2, 2001) (15 days before trial).

In this case, the Government respectfully submits that its exhibit list should be furnished

at the same time as its witness list, *i.e.* 15 days before trial, and the defense's exhibit list should

be due to the Government one week before trial. This timeline is more than sufficient to "ensure

an efficient presentation at trial." *Giffen*, 379 F. Supp. 2d at 344.

**F. The Defendants' Request for Disclosure of *Giglio* and Jencks Act Material 50 Days**
   **In Advance of Trial Should Be Denied**

Finally, while acknowledging that the Jencks Act prevents the Court from ordering early

disclosure of Jencks material (Akhavan MTC at 24), the defendants nonetheless request that the

Court encourage the Government to produce Jencks and *Giglio* material 50 days prior to trial,

based upon the assumption that the Government has a substantial number of witnesses and the

conclusory assertion that a genuine risk exists that delays will be occasioned otherwise. (*Id.*).

The Court should deny this request. As a preliminary matter, the defendants are correct that the Government is under no obligation under the Jencks Act, 18 U.S.C. § 3500 *et seq*., to produce prior statements of its witnesses until after each has testified on direct examination. The Jencks Act provides in pertinent part:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500. Courts in this Circuit have consistently held that the district court lacks the power to mandate early production of Jencks material. *See, e.g., Coppa*, 267 F.3d at 145 (the "Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements."); *United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3 n.1 (2d Cir. 1974); *In re United States*, 834 F.2d 283, 287 (2d Cir. 1987). Indeed, courts in this District have routinely found that providing this information as little as one day in advance of a witness's testimony is sufficient to avoid unnecessary delay. E.*g., United States v. Ruiz*, 702 F. Supp. 1066, 1069-70 (S.D.N.Y. 1989) (approving Government agreement to provide impeachment material along with 3500 material on day before witness testifies), *aff'd*, 894 F.2d 501 (2d Cir. 1990).

The Government recognizes that *Giglio v. United States*, 405 U.S. 150 (1972), requires disclosure of any materials that might be used to impeach key witnesses "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).[22] In *Coppa*, 267 F.3d at 142, the Second Circuit noted that "we have never interpreted due process of law as requiring more than

---

[22] The Government understands and will comply with the Court's Individual Rule requiring production of *Giglio* material 4 weeks in advance of trial.

that *Brady* [and *Giglio*] material must be disclosed in time for its effective use at trial," and courts have therefore held that "the Government is not required to produce *Giglio* material until it produces '3500 material' pursuant to the Jencks Act, so long as the Government provides the Giglio material in time for its effective use at trial." *United States v. Morgan*, 690 F. Supp. 2d 274, 286 & n.61 (S.D.N.Y. 2010) (collecting cases); *see also United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009) ("The Second Circuit has held that a request for immediate or early disclosure [of *Giglio* material] has no basis in the law. Impeachment material ordinarily need not be disclosed until the witness is called to testify at trial.") (internal citations omitted).

In this District, the time which is considered to allow for effective use of the material is typically measured in days or, at most, weeks, before trial. *See United States v. Underwood*, No. 04 CR. 424 (RWS), 2005 WL 927012, at *3 (S.D.N.Y. Apr. 21, 2005) (to allow defense sufficient time to make effective use of exculpatory material, Government ordered to produce *Giglio* material two business days before trial); *United States v. Green*, No. 04 CR. 424 (RWS), 2004 WL 2985361, at *3 (S.D.N.Y Dec. 23, 2004) (noting "the widely accepted practice in this district of producing impeachment material when [the Government] provides prior statements of a witness pursuant to 18 U.S.C. § 3500," and ordering production of *Giglio* material by 5:00 p.m. on the Friday before trial unless materials are voluminous); *United States v. Canter*, 338 F. Supp. 2d 460, 462 (S.D.N.Y. 2004) ("It has been the practice of this Court and of other courts in this district to require that the Government produce these materials a few days before the start of trial, usually on the Friday before a trial scheduled to start on a Monday."); *United States v.*

*Greyling*, No. 00 Cr. 631 (RCC), 2002 WL 424655, at *2 (S.D.N.Y. Mar. 18, 2002) (production of *Giglio* material by the Wednesday before the week in which a witness will testify is appropriate); *United States v. Trippe*, 171 F. Supp. 2d 230, 238 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material, that is, at least one day before the Government witness is called to testify.").

The Government is unaware of any case of comparable complexity and scope in which such an early deadline has been set for witness-related disclosures. Fifty days before trial is far earlier than is common in many cases in this District, *see, e.g., United States v. Underwood*, 2005 WL 927012 (S.D.N.Y. 2005) (noting "the widely accepted practice in this district of producing . . . prior statements of a witness pursuant to 18 U.S.C. § 3500 . . . [on] the Friday before the trial is scheduled to begin"). Indeed, even in complex white-collar cases in this District that involve far more complicated facts patterns than this case, the Government often provides 3500 material two weeks prior to trial, and, if the defendants agree to reasonable stipulations, four weeks before trial. *See, e.g., United States v. Cole*, 19 Cr. 869 (ER), Dkt. Entry No. 23 (S.D.N.Y Feb. 18, 2020) (contemplating 3500 material four weeks before trial in complex accounting fraud case); *United States v. Carton*, 17 Cr. 680 (CM), Dkt. Entry 66 (S.D.N.Y. July 10, 2018) (3500 material one month before securities fraud trial).

In this case, the Government intends to disclose all *Giglio* material well in advance of the subject witnesses' testimony, in accordance with the Court's Individual Rules, four weeks prior to trial.[23] The defendants' demands for yet earlier disclosure is based on conclusory assertions

_____

[23] *See, e.g., United States v. King*, No. 10 Cr. 122 (JGK), 2011 WL 1630676, at *7 (S.D.N.Y. Apr. 27, 2011) (noting, and approving over defense objection, Government's agreement to produce *Giglio* material at same time as Jencks Act disclosures); *United States v. Earls*, No. 03 CR. 0364, 2004 WL 350725, at *8 (S.D.N.Y. Feb. 25, 2004) (in denying motion for early *Giglio*

and is unfounded. *See, e.g., United States v. Dames*, 380 F. Supp. 2d 270, 272-73 (S.D.N.Y. 2005) (denying motion for early *Giglio* disclosure); *United States v. Jacques Dessange, Inc.*, 2000 WL 280050, at *9 (S.D.N.Y. 2000) (same).

Accordingly, the defendant's motion for the early production of *Giglio* and Jencks Act material should be denied. Under the circumstances, the Government intends to provide Jencks Act material 15 days prior to trial, and any *Giglio* material four weeks before trial. We also request that the defense be ordered to make reciprocal disclosures one week before trial.

## III. Weigand's Motion to Suppress Should Be Denied

### A. Factual Background

On or about April 14, 2020, the Government obtained a search warrant (the "Search Warrant") authorizing the search and seizure of three electronic devices belonging to Weigand: (1) a black/dark grey OnePlus cell phone; (2) a silver MacBook Pro Model A1502 bearing serial number C02RP1LJFVH8; and (3) a black/dark grey Apple iPhone (collectively, the "Subject Devices"). The Subject Devices were seized from Weigand on or about March 9, 2020, at the time he was arrested at Los Angeles International Airport in California. In connection with the Search Warrant application, the Government submitted an affidavit that was sworn to by Special Agent Matthew Mahaffey of the Federal Bureau of Investigation (the "Mahaffey Affidavit"). (*See* Dkt. No. 70-1, Exhibit A).

The Search Warrant authorized the Government to review electronically stored information ("ESI") "contained on the Subject Devices for evidence, fruits, and instrumentalities

---

disclosure, noting "there is no general right of pre-trial discovery because such material ripens into evidentiary material for purposes of impeachment only if and when the witness testifies at trial") (citations, alteration, and quotation marks omitted); *Trippe*, 171 F. Supp. 2d at 238 ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material[.]").

of bank fraud, and money laundering, in violation of Title 18, United States Code, Sections 1344 (bank fraud), 1349 (conspiracy to commit bank fraud), 1956 (money laundering), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 1956(h) (conspiracy to commit money laundering) (the "Subject Offenses")" and set forth an itemized list of the particularized evidence to be seized. (*See* Dkt. No. 70-2, Exhibit B). This list included, among other things, communications constituting crimes, or with co-conspirators; evidence of the relationship between suspects, co-conspirators, and/or victims involved in the Subject Offenses; and evidence concerning financial transactions by or between the co-conspirators and/or victims of the Subject Offenses. (*Id.*). Several of the items on the list, including those noted above, were limited to the period of 2016 to 2019. (*Id.*). The particularized list of items to be seized also included evidence concerning the identity or location of the owner or user of the Subject Devices; subscriber information pertaining to the Subject Devices; evidence concerning the location of other evidence of the Subject Offenses; password or other information needed to access a user's electronic device(s) or other online accounts that may contain evidence of the Subject Offenses; and non-content transactional information of activity of the Subject Devices, such as log files.

## B. Applicable Law

### 1. Probable Cause

Probable cause is a "flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983), which requires a case-by-case analysis of the totality of the circumstances, *see Illinois v. Gates*, 462 U.S. 213, 230 (1983). In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that

contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

Moreover, the training and experience of law enforcement agents bear significantly on probable

cause determinations. *Id*. at 232. Inferences drawn by law enforcement agents based on facts

known to them, the totality of the circumstances, and their training and experience may all

support a probable cause finding. *Id.* at 231-32; *see also United States v. Gaskin*, 364 F.3d 438,

457 (2d Cir. 2004) ("[C]ourts recognize that experience and training may allow a law

enforcement officer to discern probable cause from facts and circumstances where a layman

might not.").

Where a search has been conducted pursuant to a court-authorized warrant, "great

deference" is due to a magistrate judge's probable cause determination. *United States v. Leon*,

468 U.S. 897, 914 (1984) (internal quotation marks omitted); *see also Walczyk v. Rio*, 496 F.3d

139, 157 (2d Cir. 2007) ("[A] reviewing court must accord considerable deference to the

probable cause determination of the issuing magistrate."). "A magistrate's finding of probable

cause is itself a substantial factor tending to uphold the validity of the warrant." *United States v.

Jackstadt*, 617 F.2d 12, 13 (2d Cir. 1980) (per curiam). In close cases, where the existence of

probable cause is in doubt, resolution "should be largely determined by the preference to be

accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (internal

quotation marks omitted).

Moreover, "a court reviewing a challenged warrant—whether at the district or appellate

level—must accord considerable deference to the probable cause determination of the issuing

magistrate." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (internal quotation marks

omitted); *see also United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) ("A reviewing court

must accord substantial deference to the finding of an issuing officer that probable cause exists . .

. . The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause.") (citations omitted).

## 2. Particularity and Overbreadth

The particularity requirement of the Fourth Amendment "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990). The requirement seeks to ensure that the warrant enables "the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992). "[C]ourts may tolerate some ambiguity in the warrant so long as 'law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured [sic] that all those facts were included in the warrant.'" *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (quoting *United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984)).

"To be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017), *overruled on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018). It must (i) "'identify the specific offense for which the police have established probable cause,'" (ii) "'describe the place to be searched,'" and (iii) "'specify the items to be seized by their relation to designated crimes.'" *Id.* (quoting *Galpin*, 720 F.3d at 445). "The Fourth Amendment does not require a perfect description of the data to be searched and seized." *Id.* at 100. Indeed, "[s]earch warrants covering digital data may contain 'some ambiguity. . . .'" *Id.* (quoting *Galpin*, 720 F.3d at 446). In fact, "[w]here, as here, complex financial crimes are alleged, a warrant properly provides

more flexibility to the searching agents," *United States v. Dupree*, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011), and "it may be appropriate to use more generic terms to describe what is to be seized," *United States v. Gotti*, 42 F. Supp. 2d 252, 274 (S.D.N.Y. 1999) (Parker, J.). "[A] search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100. When a search warrant limits the scope of the search to evidence of particular federal crimes, and gives an "illustrative list of seizable items," the search warrant is sufficiently particular. *Riley*, 906 F.2d at 844-45.

The crime or crimes under investigation generally should be apparent from the face of the warrant; a warrant cannot, for example, call for seizure of all "records," or all evidence "relating to the commission of a crime," without further particularization. *United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993) (warrant permitting seizure of all "papers," "records," and other items, without any "more particular limiting language" or tethering "to particular crimes," was insufficiently particularized), *overruled on other grounds by Groh v. Ramirez*, 540 U.S. 551 (2004); *United States v. George,* 975 F.2d 72, 76 (2d Cir. 1992). However, a warrant for seizure of "all evidence" of a given crime or crimes is sufficiently particular if it offers a list of illustrative items. *See Riley*, 906 F.2d at 844-45 (warrant containing list of illustrative items to seize was sufficiently particular notwithstanding provision allowing, as well, seizure of "other items that constitute evidence of the offenses" identified). The requirement is satisfied if the warrant, including the attachments it incorporates, "enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *George*, 975 F.2d at 75 (citations omitted); *see also Groh*, 540 U.S. at 557-59.

A warrant may leave some matters to the discretion of the executing officer. "Once a category of seizable papers has been adequately described, with the description delineated in part

by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *Riley*, 906 F.3d at 845.

The probable cause and particularity requirements intersect in the doctrine of overbreadth. As to each category of evidence identified for seizure in the warrant, there must exist probable cause to believe it is relevant to the investigation at issue. *See Galpin*, 720 F.3d at 448 (warrant was overbroad where it allowed seizure of items related to crimes as to which no probable cause showing had been offered or made); *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y 2004) (Briccetti, J.) ("the overbreadth inquiry asks whether the warrant authorized the search and seizure of items as to which there was no probable cause") (internal quotation marks omitted). Naturally, the broader the crime or crimes under investigation, the broader the categories of documents and records that may properly be seized. *See, e.g.*, *United States v. Mendlowitz*, 17 Cr. 248 (VSB), 2019 WL 1017533, at *9 (S.D.N.Y. Mar. 2, 2019) (Broderick, J.) (in complex fraud case, warrant "authorizing seizure of any and all evidence of specific crimes including but not limited to illustrative categories of documents and records" was proper); *United States v. Jacobson*, 4 F. Supp. 3d 515, 522 (E.D.N.Y. 2014) (breadth of warrant, which contained no timeframe limitation, was justified because "the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity"); *United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *8 (S.D.N.Y. Feb. 25, 2013) (Crotty, J.) (in pump-and-dump case, broad warrant with no timeframe limitation was justified by breadth and complexity of fraud described in underlying affidavit).

### 3. Good Faith

The logic of the "good faith exception" is straightforward: "the nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Leon*, 468 U.S. at 922. Indeed, "[t]he animating principle of the exclusionary rule is deterrence of police misconduct, but the extent to which the rule is so justified varies with the culpability of the law enforcement conduct." *Clark*, 638 F.3d at 99 (internal quotation marks omitted). For that reason, evidence seized pursuant to a judicially authorized warrant should remain admissible, "even if the warrant lacks probable cause or is technically deficient," where the agents executing the warrant "relied upon it in objective good faith." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (internal quotation marks omitted).

Although the Government bears the burden to "demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant," the Second Circuit has observed that "in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." *Clark*, 638 F.3d at 100 (internal quotation marks omitted). Thus, there are only four circumstances in which the good faith exception does not apply, which are to be viewed "against [a] presumption of reasonableness." *Id.* These include: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Moore*, 968 F.2d at 222 (citing *Leon*, 468 U.S. at 923). As the Supreme Court has observed, however, "[r]easonable minds frequently may differ on the question whether a particular affidavit established probable cause, and we have

thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." *Leon*, 468 U.S. at 914 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. *Id.* at 921.

## C. Discussion

### 1. The Search Warrant Plainly Establishes Probable Cause

The Search Warrant was supported by a comprehensive agent affidavit, replete with details of Weigand's involvement in the Transaction Laundering Scheme, including his relationship and extensive communications through electronic devices with his co-conspirators. At the outset, the Mahaffey Affidavit incorporated the Indictment charging Weigand and Akhavan with one count of violating Title 18, United States Code, Section 1349 (conspiracy to commit bank fraud), from in or around 2016, through at least in or around 2019. (Mahaffey Affidavit ¶ 8). The Mahaffey Affidavit also set forth Weigand's role in the Transaction Laundering Scheme, explaining, among other things, that one of his responsibilities was to submit bank applications on behalf of the Phony Merchants to offshore banks in order to open merchant bank accounts for the Phony Merchants. (*Id.* ¶ 12). The Mahaffey Affidavit also explained that Weigand attended a meeting on or about January 17, 2018, with other co-conspirators in the Transaction Laundering Scheme, including Akhavan, during which they discussed, among other things, the fact that the underlying transactions that were going to be processed through the Phony Merchants were in fact for the Online Marijuana Marketplace Company, and details of how the payment processing would work, including the use of Phony Merchants with overseas bank accounts. (*Id.* ¶¶ 19(b)-(c)). The Mahaffey Affidavit included a

photograph of Weigand at that meeting. (*Id.* ¶ 19(a)). The Mahaffey Affidavit also explained

that Weigand frequently communicated with other co-conspirators through encrypted

communications, including through the use of a messaging application for cell phones, tablets,

and computers, through which users can send and receive end-to-end encrypted messages.[24] (*Id.*

¶ 16). The Mahaffey Affidavit provided numerous examples of such communications. (*Id.* ¶¶

16-18).

Nonetheless, Weigand claims that the abundant allegations in the Mahaffey Affidavit fail

to establish probable cause because they do not establish that "the devices had any connection to

the alleged criminal conduct." (Weigand Suppression Mem. at 10).[25] The defendant is wrong on

the facts and the law. Contrary to Weigand's claim that the Mahaffey Affidavit is deficient for

not "includ[ing] any assertion that Weigand actually used the Devices in connection with the

[Subject Offenses]," what the law actually requires is that the affidavit establish that "there is a

fair probability that contraband or evidence of a crime will be found in a particular place."

*Illinois v. Gates*, 462 U.S. at 238; *see also, e.g.*, *United States v. Saipov*, No. 17 Cr. 722 (VSB),

2019 WL 3024598, at *4-5 (S.D.N.Y. July 19, 2020) (Broderick, J.) (finding probable cause for

a search warrant for the contents of the defendant's cell phone without any showing that the

device itself was used in connection with the crime). Taken as a totality—as they must be—the

circumstances established in the Mahaffey Affidavit provide ample probable cause to believe

---

[24] As Special Agent Mahaffey explained in his affidavit, end-to-end encryption is a system of communication where only the communicating users can read the messages. End-to-end encryption prevents third parties—including law enforcement—from being able to access the cryptographic keys needed to decrypt the conversation. This means that law enforcement agents are unable to intercept or "wiretap" communications that are sent through end-to-end encryption, and, furthermore, are unable to view the content of such communications through the use of search warrants that are served on the service providers.

[25] "Weigand Suppression Mem." refers to Weigand's memorandum of law in support of his motion to suppress. (*See* Dkt. No. 69).

that contraband and/or evidence of the Subject Offenses would be found on the Subject Devices. *Gates*, 462 U.S. at 238. Indeed, as noted above, the Mahaffey Affidavit detailed how Weigand and other co-conspirators routinely communicated through electronic devices, including cell phones and computers (such as the Subject Devices) to send and receive communications in furtherance of the Transaction Laundering Scheme. (*See, e.g.*, Mahaffey Affidavit ¶¶ 16-18).

Weigand also claims that the Mahaffey Affidavit failed to establish probable cause because there was a "considerable passage of time between the communications cited in the Affidavit and the issuance of the warrant." (Weigand Suppression Mem. at 11). However, as set forth in the Mahaffey Affidavit, based on Special Agent Mahaffey's training and experience,

> Computer files or remnants of such files can be recovered months or even years after they have been created or saved on electronic devices such as the Subject Devices. Even when such files have been deleted, they can often be recovered, depending on how the hard drive has subsequently been used, months or years later with forensics tools. Thus, the ability to retrieve information from the Subject Devices depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and computer habits.

(Mahaffey Affidavit ¶ 23). Furthermore, the Indictment, which was incorporated into the Mahaffey Affidavit, also charged Weigand and Akhavan with participating in the bank fraud scheme through at least 2019, and the Mahaffey Affidavit also noted that relevant encrypted communications were sent as recently as May 2019. (Mahaffey Affidavit ¶ 20). Based on this information, Magistrate Judge Parker rightly determined that there was probable cause that evidence of Weigand's and his co-conspirators' criminal activity would be found on the Subject Devices.

Finally, Weigand claims that the Mahaffey Affidavit failed to establish probable cause because it included "vague, general assertions" in paragraph 22 regarding the use of electronic devices by co-conspirators engaged in fraud and money laundering offenses. (Weigand

Suppression Mem. at 11). Weigand is wrong. Special Agent Mahaffey's statements in that paragraph are hardly vague or general. For example, Special Agent Mahaffey explains that individuals engaged in crimes such as the Subject Offenses store records, such as logs of the very kind of chats and email communications that are described throughout his affidavit, on electronic devices such as the Subject Devices. (Mahaffey Affidavit ¶ 22). Special Agent Mahaffey also explains that those individuals store other records, including contact information of co-conspirators, such as telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; photographs of co-conspirators; location evidence revealing the user's location at relevant times; and/or records related to financial transactions involving criminal proceeds, including records pertaining to entities, bank accounts, and individuals involved in such transactions. (*Id.*). Special Agent Mahaffey also explains some of the reasons why individuals such as Weigand often store such records. (*Id.*). As noted above, the training and experience of law enforcement agents bears significantly on probable cause determinations, *Illinois v. Gates*, 462 U.S. at 232, and Magistrate Judge Parker properly relied on Special Agent Mahaffey's training and experience in finding probable cause here.

## 2. The Search Warrant Did Not Lack Particularity and Was Not Overbroad

Weigand also contends that the Search Warrant violated the Fourth Amendment's overbreadth[26] requirements, primarily because (1) the Search Warrant authorized the Government to search "all data contained on the devices;" and (2) the Search Warrant "provided no meaningful guidelines as to what data fell within the purview of the warrant." (Weigand Suppression Mem. at 14-15). Weigand's arguments are without merit.

---

[26] Because some of Weigand's overbreadth arguments are more properly understood as particularity arguments, the Government has addressed the Search Warrant's compliance with both the overbreadth and particularity requirements of the Fourth Amendment.

As noted above, a warrant satisfies the Fourth Amendment's overbreadth requirement if each category of evidence identified for seizure in the warrant is supported by probable cause to believe it is relevant to the investigation at issue. *See Galpin*, 720 F.3d at 448. Here, the breadth of the Search Warrant was supported by ample probable cause outlined in the Mahaffey Affidavit, which detailed Weigand's involvement in Transaction Laundering Scheme, and his frequent use of encrypted communications to communicate with co-conspirators in furtherance of the scheme, including through the use of a messaging application for cell phones, tablets, and computers, and an encrypted email service. (Mahaffey Affidavit ¶ 16). Furthermore, the Search Warrant clearly set forth a particularized list of items authorized to be seized, thereby enabling the executing officers to ascertain and identify with reasonable certainty those items authorized to be seized. *See Groh v. Ramirez*, 540 U.S. 551, 557-59 (2004). Accordingly, the issuing judge properly determined that the Search Warrant's description of the information to be seized—an itemized list of particularized evidence that constituted evidence, fruits, and instrumentalities of the Subject Offenses, was fully supported by the substantial probable cause upon which it was based. That determination is entitled to great deference. *Falso*, 544 F.3d at 117.

Nevertheless, Weigand argues that the Search Warrant improperly permitted the Government to conduct searches of all of the data contained on the Subject Devices. (Weigand Mot. at 14). The Second Circuit rejected this very argument in *United States v. Ulbricht*, reasoning that:

> Since a search of a computer is akin to a search of a residence, searches of computers may sometimes need to be as broad as searches of residences pursuant to warrants. Similarly, traditional searches for paper records, like searches for electronic records, have always entailed the exposure of records that are not the object of the search to at least superficial examination in order to identify and seize those records that are. And in many cases, the volume of

> records properly subject to seizure because of their evidentiary value may be vast.

858 F.3d 71, 102 (2d Cir. 2017). Accordingly, "courts have long recognized the practical need for law enforcement to exercise dominion over documents not within the scope of the warrant in order to determine whether they fall within the warrant." *In re Warrant for xxxxxx@gmail.com*, 33 F. Supp. 3d 386, 392 (S.D.N.Y. 2014) (Gorenstein, J.). As the Supreme Court observed in *Andresen v. Maryland*, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." 427 U.S. 463, 482 n. 11. "[A]lowing some latitude in this regard simply recognizes that few people keep documents of their criminal transactions in a folder marked 'drug records.'" *United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990). While it is true that there is "a heightened sensitivity to the particularity requirement in the context of digital searches," *Galpin*, 720 F.3d at 447, there is a concurrent sensitivity to the need to apply the principle highlighted in *Andresen* and *Riley* to searches of electronic evidence. While "remain[ing] sensitive to the difficulties associated with preserving a criminal defendant's privacy while searching through his electronic data," the "invasion of a criminal defendant's privacy is inevitable, however, in almost any warranted search because 'in searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.'" *Ulbricht*, 858 F.3d at 103 (quoting *United States v. Ganias*, 824 F.3d 199, 211 (2d Cir. 2016)). Accordingly, the Search Warrant was not overbroad (or lacking in particularity) simply because it authorized

the search of the entirety of the Subject Devices to identify the particular evidence outlined in the Search Warrant.[27]

Weigand also argues that the Search Warrant "provided no meaningful guidelines as to what data fell within the purview of the warrant." (Weigand Suppression Mem. at 15). Contrary to Weigand's claim, the Search Warrant: (1) articulated the specific offenses for which probable cause had been established, *i.e.*, Title 18, United States Code, Sections 1344, 1349, 1956, 1957, and 1956(h); (2) provided adequate guidance as to the places to be searched, including a detailed description of the Subject Devices (along with photos of each of them); and (3) contained a list of specified items, including categories of materials and illustrative lists, and their relation to the designated offenses. *See Ulbricht*, 858 F.3d at 99 (internal quotation marks omitted). This is exactly what the law requires. In determining whether a search warrant provides adequate guidance, courts construe the language of a warrant in light of the entire warrant. *Riley*, 906 F.2d at 844 ("In upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items."). Here, the Search Warrant contained a detailed list of evidence, fruits, and instrumentalities to be seized, including nine separate categories of materials. Given this level of detail and guidance, the Search Warrant was sufficiently particular.[28] *See id.* at 845 (when a search warrant limits the

---

[27] Contrary to Weigand's claim that the Government's production of documents from Weigand's laptop on May 12, 2020, were comprised of materials the Government had deemed responsive to the Search Warrant, the materials produced to Weigand on that date were <u>not</u> so limited—rather, the forensic analyses were comprised of <u>all</u> of the materials that the Government was able to extract from the seized devices, and which the Government produced to him pursuant to Rule 16. The materials contained in that production therefore lend no support to Weigand's argument that the "excessive sweep of the Government's collection and production confirms that the intrusive warrant was unconstitutionally overbroad." (Weigand Suppression Mem. at 2).

[28] For this same reason, the defendant's reliance on *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017) (Nathan, J.), and *United States v. Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015) is misplaced. Unlike the Search Warrant here, which contained a tailored list of nine specific categories of evidence and included clear timeframes, the warrants in *Wey* authorized a physical

scope of the search to evidence of particular federal crimes, and gives an "illustrative list of seizable items," the search warrant is sufficiently particular).  As such, the Search Warrant enabled the executing agents to ascertain and identify with reasonable certainty the items that the magistrate judge had authorized the agents to seize.  *See Groh v. Ramirez*, 540 U.S. 551 (2004).

Finally, Weigand contends that the Search Warrant was overbroad because certain provisions of the Search Warrant lacked temporal restrictions.  (Weigand Suppression Mem. at 5-6).  Weigand's argument lacks merit.  First, several categories of the search warrant *did* contain temporal restrictions, including the categories pertaining to evidence concerning the identity, or location of, and communications with, suspects, co-conspirators, and/or victims of the Subject Offenses (such as those contained in an illustrative list in Category 2 of the Search Warrant); evidence of the Subject Offenses (such as those contained in an illustrative list in Category 3 of the Search Warrant); evidence of the relationships between suspects, co-conspirators, and/or victims involved in the Subject Offenses; and evidence concerning financial transactions conducted by or between the co-conspirators and/or victims of the Subject Offenses (such as those contained in an illustrative list in Category 5 of the Search Warrant).

Nonetheless, Weigand contends that the Search Warrant was overbroad because the remaining categories of evidence to be seized listed in the Search Warrant did not contain temporal restrictions.  Weigand's argument is unavailing and finds no support in the cases he

---

search of the defendants' offices and apartment for "essentially all documents pertaining to [the defendants and their operations] unlimited by relevance to criminal conduct or by timeframe." *Wey*, 256 F. Supp. 3d at 394.  Similarly, in *Winn* "[t]he warrant authorized the seizure of 'any or all files' contained on the cell phone and its memory card that 'constitute[d] evidence of the offense of [Public Indecency 720 ILCS 5/11–30],' including, but not limited to, the calendar, phonebook, contacts, SMS messages, MMS messages, emails, pictures, videos, images, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, any system files, and any delated data. *Winn*, 79 F. Supp. 3d at 919.

cites.  First, the lack of any specified date ranges or other temporal restrictions alone does not render a warrant overbroad or insufficiently particular.  *See, e.g.*, *United States v. Nejad*, 436 F. Supp. 3d 707, 729 (S.D.N.Y. 2020) (Nathan, J.) (observing that "courts in this Circuit have recognized that '[t]he complexity and duration of alleged criminal activities' may 'render a time frame less significant.'") (citations omitted); *United States v. Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 58 (D. Conn. 2002) (noting that "[a] temporal limitation in a warrant is not an absolute necessity, but is only one indicia of particularity.").  Moreover, the main two cases the defendant cites involved warrants that were insufficiently particular because they failed to identify any specific crime for which evidence was sought.  In *United States v. Wey*, for example, the warrants "fail[ed] to set forth the crimes under investigation [and] neither cite[d] criminal statutes nor in any way describe[d] any suspected criminal conduct."  256 F. Supp. 3d 355, 384 (S.D.N.Y. 2017).  In *United States v. Zemlyansky*, the warrant at issue "[did] not direct the searching officers to seize evidence related to, or concerning, any particular crime or type of crime."  945 F. Supp. 2d 438, 456 (S.D.N.Y. 2013) (emphasis omitted).  Accordingly, in each case, the fatal flaw with the challenged warrants was the "failure to identify the specific offense for which the police have established probable cause."  *Ulbricht*, 858 F.3d at 99.  Here, the Search Warrant suffers no such flaw.

Finally, the remaining categories of evidence to be seized listed in the Search Warrant that did not have temporal restrictions were categorically distinct from those that did.  For example, Categories 1, 8, and 9, pertained to evidence concerning the ownership and use of the Subject Devices, and Categories 6 and 7 pertained to evidence concerning *other* locations where potentially relevant evidence might be found and to passwords or other information needed to access a user's electronic devices or other online accounts that may contain evidence of the

Subject Offenses.  Unlike the other categories noted above, it makes sense for these categories not to include a timeframe, because even if responsive evidence was created outside of the timeframe of the charged conspiracy (i.e., 2016-2019), it would still be relevant to proving the Subject Offenses for which the Mahaffey Affidavit set forth probable cause.[29]

### 3.  Law Enforcement Officers Relied on the Search Warrant in Good Faith

Weigand also argues that the Search Warrant is not subject to the good faith exception because the Mahaffey Affidavit (1) "was so lacking in indicia of probable cause" for the search of the Devices that "reliance upon it [was] unreasonable;" and (2) "authorized a limitless search of all the data on the Devices, and authorized the seizure of expansive categories of data with no meaningful restrictions, guidelines, or connection to the Subject Offenses," and was therefore "'so facially deficient that reliance upon it [was] unreasonable.'" (Weigand Suppression Mem. at 18 (quoting *Wey*, 256 F. Supp. 3d at 395)).  The foregoing discussion has addressed and refuted the premises underlying each of these conclusory assertions, but, even assuming, arguendo, that any has merit, it is well established that a deficient warrant does not "automatically dictate the suppression of all physical evidence seized." *Clark*, 638 F.3d at 99.  Indeed, the Second Circuit has counseled that "suppression is 'our last resort, not our first impulse' in dealing with violations of the Fourth Amendment." *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 140 (2009)).  As a result, the Supreme Court has long recognized that "the exclusionary rule does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." *Davis v. United States*, 564 U.S. 229 (2011) (quoting *Leon*, 468 U.S.at 922).  Here,

---

[29]  Weigand also argues that the Search Warrant was overbroad because the Mahaffey Affidavit failed to set forth any evidence that Weigand was involved in the scheme prior to January 2018. As noted above, however, the Indictment charges Weigand with participating in the scheme from 2016 through 2019.  The Mahaffey Affidavit therefore set forth sufficient probable cause for Magistrate Judge Parker to authorize the seizure of data prior to 2018.

even accepting the defendant's arguments as true, there is no basis to conclude that a "reasonably well trained officer would have known that the search was illegal despite the [issuing court's] authorization." *Leon*, 468 U.S. at 922 n.23.

The good faith exception applies in this case. The starting point for this analysis is the indisputable fact that the searches were conducted pursuant to a judicially authorized warrant. Next, none of the triggers for exclusion under *Leon* supports relief here. First, as discussed above, the defendant has made absolutely no showing that Special Agent Mahaffey deliberately or recklessly misled the issuing court. Second, the issuance of the Search Warrant here was far from a situation in which the issuing judge "wholly abandoned" her judicial role—a concern that is "animat[ed by] . . . a common precept: that someone independent of the police and prosecution must determine probable cause." *Clark*, 638 F.3d at 101. As the Second Circuit has explained, such abandonment must be "wholesale rather than partial" and "in the manner condemned in *Lo-Ji Sales*"— a case in which the Supreme Court held that the judge "had 'allowed himself to become a member, if not the leader, of the search party which was essentially a police operation.'" *Id.* at 100-01 (quoting *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979)). Specifically, a judge abandons the "neutral and detached function" required when he ceases to "act as a judicial officer" and "assume[s] the role of an adjunct law enforcement officer." *Id.* at 101 (internal quotation marks omitted).

The issuing judge here was an independent arbiter with no prior involvement in the investigation who considered a detailed affidavit (which incorporated an indictment charging the defendant from whom the devices had been seized) outlining in detail a sophisticated multinational criminal scheme. In light of the facts presented in the affidavit, the Magistrate Judge's determination that probable cause existed, even if incorrect, was far from an instance of

a judge serving as a mere "rubber stamp." *See id.* ("[A]bandonment of judicial neutrality and detachment properly cannot be inferred from the fact that the magistrate committed legal error in his assessment of probable cause . . . .  [A] 'rubber stamp' cannot be established 'merely on the basis of the substantial inadequacy of the probable cause showing in the affidavit.'" (internal quotation marks and citation omitted)).

The third exception to the good faith rule, where a warrant "application is so lacking in indicia of probable cause as to render reliance upon it unreasonable," is also absent here.  *See id.* at 102 (noting that use of the good faith exception is barred "when affidavits are bare bones, i.e., totally devoid of factual circumstances to support conclusory allegations").  Rather, the Mahaffey Affidavit contained ample probable cause supporting the search that was authorized.  At a bare minimum, it contained *indicia* of probable cause, including that (1) Weigand and Akhavan had already been indicted at the time, for their alleged participation in the Transaction Laundering Scheme (*see* Mahaffey Affidavit ¶ 8); and (2) that the co-conspirators in that scheme, including Weigand and Akhavan, frequently used phones and other electronic devices to effectuate the scheme (*see* Mahaffey Affidavit ¶ 16).  Those facts alone provided an objectively reasonable basis for the executing officers to rely on the Search Warrant and to presume that it was valid.

Finally, the Search Warrant itself was not facially deficient, and certainly not so facially deficient that the executing officers could not have reasonably presumed the warrant to be valid. A warrant is facially defective either (1) when it "omits or misstates information specifically required to be contained therein, i.e., 'the place to be searched, and the persons or things to be seized,'" *id.* at 102 (quoting U.S. Const. amend. IV); *see also United States v. Grubbs*, 547 U.S. 90, 97 (2006) ("The [Fourth] Amendment specifies only two matters that must be particularly

described in the warrant: [(i)] the place to be searched and [(ii)] the persons or things to be seized." (internal quotation marks omitted)), or (2) where the warrant includes a "catch-all" description of evidence to be seized that generally "relates to the commission of a crime" without any limiting description as to the type of crime, thereby amounting to a "general warrant." *United States v. George*, 975 F.2d 72, 74, 77-78 (2d Cir. 1992). Only such glaring deficiencies may preclude reasonable reliance on a warrant by the executing officers. In contrast, the Search Warrant here (1) specified the items to be searched (i.e., the Subject Devices); and (2) plainly stated the things to be seized by setting forth an itemized list of particularized evidence constituting evidence, fruits, and instrumentalities of the Subject Offenses. (*See* Dkt. No. 70-2, Exhibit B, at 4-5).

For all the foregoing reasons, the Court should deny Weigand's motion to suppress evidence obtained pursuant to the Search Warrant.

## <u>CONCLUSION</u>

For all of the reasons stated herein, the defendants' motions to dismiss the indictment, compel certain discovery, and suppress evidence are without merit and should be denied in their entirety.