**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

                 Plaintiff,

         v.

HAMID AKHAVAN and RUBEN WEIGAND,

                Defendants

---

Case No. 20-cr-188 (JSR)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RUBEN**
<u>**WEIGAND'S PRE-TRIAL MOTIONS**</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT .......................................................................................................................... 2

      I.      WEIGAND'S MOTION TO DISMISS SHOULD BE GRANTED ..................... 2

            A.     The Government's Reading Of The Bank Fraud Statute Would Impermissibly Permit The Prosecution Of Victimless Conduct................ 2

            B.     *Kelly* Conclusively Refutes The Government's Theory Of Harm............ 6

      II.     WEIGAND'S MOTION TO SUPPRESS SHOULD BE GRANTED................. 8

            A.     The Government's Theory Of Probable Cause Is Legally Flawed........... 8

            B.     There Is No Other Basis To Support The Government's Sweeping Search...................................................................................................... 11

            C.     The Good Faith Exception Does Not Apply............................................ 14

      III.    WEIGAND'S MOTION TO COMPEL SHOULD BE GRANTED................... 15

CONCLUSION..................................................................................................................... 17

## TABLE OF AUTHORITIES

**CASES**

*Davis v. United States*,
   564 U.S. 229 (2011)............................................................................................................14

*In re 650 Fifth Ave. and Related Properties*,
   934 F.3d 147 (2d Cir. 2019).............................................................................................14

*Kelly v. United States*,
   140 S. Ct. 1565 (2020).............................................................................................. *passim*

*Loughrin v. United States*,
   573 U.S. 351 (2014)..............................................................................................................4

*Maryland v. Garrison*,
   480 U.S. 79 (1987)..............................................................................................................13

*Neder v. United States*,
   527 U.S. 1 (1999)..................................................................................................................8

*Pasquantino v. United States*,
   544 U.S. 349 (2005)..............................................................................................................6

*Shaw v. United States*,
   137 S. Ct. 462 (2016)............................................................................................................4

*United States v. Calderon*,
   944 F. 3d 72 (2d Cir. 2019).................................................................................................5

*United States v. Finazzo*,
   850 F.3d 94 (2d Cir. 2017)..................................................................................................7

*United States v. Galpin*,
   720 F.3d 436 (2d Cir. 2013)..............................................................................................13

*United States v. George*,
   975 F.2d 72 (2d Cir. 1992)................................................................................................14

*United States v. Guzman*,
   No. S5 97 CR 786 (SAS), 1998 WL 61850 (S.D.N.Y. Feb. 13, 1998) .................................10

*United States v. Hernandez*,
   No. 09 CR 625(HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) ..........................................13

*United States v. Leary*,
   846 F.2d 592 (10th Cir. 1988) ...........................................................................................15

*United States v. Lebedev,*
    932 F.3d 40 (2d Cir. 2019)..................................................................5, 7

*United States v. Miller,*
    953 F.3d 1095 (9th Cir. 2020) .............................................................3, 5

*United States v. Moran,*
    349 F. Supp. 2d 425 (N.D.N.Y. 2005)....................................................15

*United States v. Nejad,*
    436 F. Supp. 3d 707 (S.D.N.Y. 2020)....................................................13

*United States v. Regent Office Supply Co.,*
    421 F. 2d 1174 (2d Cir. 1970)...............................................................2

*United States v. Reilly,*
    76 F.3d 1273(2d Cir. 1996)...................................................................14

*United States v. Rigas,*
    490 F.3d 208 (2d Cir. 2007)..................................................................8

*United States v. Rosario,*
    918 F. Supp. 524 (D.R.I. 1996)..............................................................10

*United States v. Rossomondo,*
    144 F.3d 197 (2d Cir. 1998)..................................................................6

*United States v. Rutherford,*
    71 F. Supp. 3d 386 (S.D.N.Y. 2014)......................................................14

*United States v. Sadler,*
    750 F.3d 585 (6th Cir. 2014) ................................................................7

*United States v. Saipov,*
    No. 17 Cr. 722 (VSB), 2019 WL 3024598 (S.D.N.Y. July 19, 2020)......................9

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007)...................................................................8

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987)................................................................2, 6, 7

*United States v. Triumph Capital Grp., Inc.,*
    211 F.R.D. 31 (D. Conn. 2002)..............................................................13

*United States v. Ulbricht,*
    858 F.3d 71 (2d Cir. 2017)...................................................................11

*United States v. Winn*,
    79 F. Supp. 3d 904 (S.D. Ill. 2015) ....................................................................................15

**STATUTES**

18 U.S.C. § 1341 ...........................................................................................................................2

18 U.S.C. § 1343 ...........................................................................................................................2

18 U.S.C. § 1344 ...........................................................................................................................2

## PRELIMINARY STATEMENT

The Government's Opposition to Weigand's Motion to Dismiss the Indictment advances a novel and legally impermissible reading of the bank fraud statute that would allow for the prosecution of conduct without *either* the intent to harm *or* the risk of harm to a U.S. bank or other covered victim. This insupportable position runs counter to longstanding precedent requiring fraudulent intent under the bank fraud statute. None of the cases the Government cites have disturbed this bedrock principle. And none of the conduct alleged in the Indictment satisfies these essential requirements.

Further, recent developments—in particular the Supreme Court's decision in *Kelly v. United States*—have confirmed that the Government's theory of harm is invalid. It is not enough for the Government to allege the deprivation of an intangible right of control: in this case, U.S. Issuing Banks' prerogative to determine which transactions to approve and which ones to decline. Under *Kelly*, the Government must allege an intent to cheat a victim out of money or property, which the Indictment does not. Because of this fundamental defect in the Indictment, along with the Indictment's failure to allege that any information allegedly conveyed to the U.S. Issuing Banks was material, dismissal of the Indictment is required.

The Government's Opposition to Weigand's Motion to Suppress is similarly unsound. There, the Government's apparent position is that, once it has probable cause to believe a person has, at some time, committed any crime that involved electronic communication, there is necessarily probable cause to search *any* electronic device associated with that person at *any* time without limitation. It does not matter if there is no evidence that the device to be searched was used in or had any connection to the alleged criminal activity. Nor does it matter that the criminal activity ended months or years before the search. And the Government's view is that it has the

right to search the **entire** contents of the device, without any effort to focus on the relevant time period or to avoid rummaging through materials plainly marked as personal or unrelated to the alleged crime.  The Government's position is entirely incompatible with the protections of the Fourth Amendment and must be rejected.

Finally, Weigand's motion to compel discovery made a particularized request for *Brady* material that the Government does not address.  Further, the Government's stated position on the materiality of bank and Credit Card Company rules and policies on the processing of marijuana sales is indefensible, given the centrality of that information to the allegations in the Indictment.

## ARGUMENT

## I.    WEIGAND'S MOTION TO DISMISS SHOULD BE GRANTED

### A.    The Government's Reading Of The Bank Fraud Statute Would Impermissibly Permit The Prosecution Of Victimless Conduct

The Government's untenable theory of bank fraud requires *neither* the intent to harm *nor* the risk of harm to support a conviction.  Opp. at 20.  But that novel theory of victimless bank fraud finds no support in the statute and is refuted by binding precedent, including the Supreme Court's recent decision in *Kelly v. United States*.

Under longstanding Second Circuit precedent regarding the mail and wire fraud statutes, on which the bank fraud statute is modeled, "fraudulent intent" is an essential feature of a "scheme or artifice to defraud"—which is operative language common to the mail, wire, and bank fraud statutes.  *See* 18 U.S.C. §§ 1341, 1343, 1344.  The Government "must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims" and "[o]nly a showing of intended harm will satisfy the element of fraudulent intent."  *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987); *see also United States v. Regent Office Supply Co.*, 421 F. 2d 1174, 1180 (2d Cir. 1970) (recognizing that "the critical element in a 'scheme to defraud' is 'fraudulent intent'"

2

and noting that "the government can[not] escape the burden of showing that some actual harm or injury was contemplated by the schemer") (citation omitted).  Recently, relying on the Supreme Court's decision in *Shaw v. United States*—on which the Government relies in its Opposition—the Ninth Circuit (with Your Honor sitting by designation and authoring the opinion) reiterated that "'fraudulent intent'" under the federal fraud statutes "requires the intent to deceive *and* cheat—in other words, to deprive the victim of money or property by means of deception." *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (emphasis in original).  The Indictment fails to allege that the defendants intended to cheat U.S. Issuing Banks or anyone else of money or property, as opposed to merely securing their approval for transactions.  Indictment at ¶¶ 1, 2.

To paper over the Indictment's failure to allege either an intent to harm or the risk of harm, the Government oscillates between § 1344(1) and § 1344(2).  But neither subsection of the statute permits the government to pursue victimless crimes.  The Government contends that "Section 1344(2) . . . does not require a scheme to defraud the bank itself" and that "Section 1344(1) . . . demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss."  Opp. at 17, 18, 20.  However, these observations miss the fundamental point that ***both*** prongs of the bank fraud statute require the intent to harm ***someone***—a federally insured financial institution, a third-party custodian of bank funds, or a bank depositor.  None of the cases the Government cites—most notably *Loughrin*, *Shaw*, or *Lebedev*—establish the contrary.  The Government has failed to identify a single precedent in which a defendant was convicted of bank fraud without the intent to harm either a financial institution or an individual, and without raising the risk of harm to that entity or individual.

Indeed, the Government fundamentally misreads those cases.  For example, the Government cites *Loughrin* and claims that "the second prong of the bank fraud statute, Section

1344(2), requires no proof that [a] defendant's scheme created a risk of financial loss to *[a] bank*," while ignoring that *Loughrin* involved a scheme to harm a non-bank ***custodian*** of bank property. Opp. at 18 (emphasis added and quotation marks omitted).  In *Loughrin*, the defendant presented forged checks to a third-party retailer (Target), purchased merchandise with those checks, and then promptly returned the merchandise for cash.  Even though the defendant in *Loughrin* may have lacked the specific intent to deceive the banks on which his forged checks were drawn, he most certainly intended to deceive "a non-bank custodian [Target] into giving up bank property that it h[eld]." *Loughrin v. United States*, 573 U.S. 351, 353-57 (2014).  Thus, *Loughrin* only establishes that the second prong of the statute distinctively proscribes schemes to deprive "non-bank custodian[s] into giving up bank property," even if the defendant lacked the "specific intent to deceive a bank."  *Id.* 573 U.S. at 357.  Here, by contrast, there is no allegation that any individual or entity—and most certainly not the debit and credit cardholders who knowingly purchased marijuana—were cheated out of their own money or property, or bank property in their custody.

Shaw is likewise off-point.  That case involved a defendant who intended to cheat "a bank depositor" instead of a bank.  *Shaw v. United States*, 137 S. Ct. 462, 465 (2016), *cert denied*, 139 S. Ct. 350 (2018).  In *Shaw*, the defendant obtained a bank depositor's banking credentials by stealth, transferred funds out of the depositor's account to other accounts controlled by the defendant, and pocketed those funds.  *Id.* at 466.  The defendant's intent to cheat the bank depositor was undeniable, and the aspects of *Shaw* the Government cites concern the requisite *mens rea* with respect ***to the bank*** under § 1344(1).  *See* Opp. at 7.  But *Shaw* does not support a reading of the bank fraud statute under which a defendant may be convicted when he intends ***no*** harm to either a bank or its customers, as is the case here.

4

Nor does *Lebedev* aid the government's cause.  As explained in Weigand's motion to dismiss the Indictment, *Lebedev* involved a scheme that was "both unlawful and carried a higher risk of fraudulent transactions"—and in which the defendants intended to "*obtain funds*" from the victim banks.  *United States v. Lebedev*, 932 F.3d 40, 48-49 (2d Cir. 2019), *cert denied*, 140 S. Ct. 1224 (2020).  That is a drastic departure from the current Indictment, which contains no allegations of any risk to the U.S. Issuing Banks, and no allegation that the defendants intended to deprive those Banks of money or property.  Most significantly, unlike the illegal Bitcoin transactions at issue in *Lebedev*, the marijuana transactions in this case were legal under state law, as the Indictment acknowledges.  Indictment at 10(d) n.2.

Indeed, the Government's effort to ascribe sweeping weight to *Lebedev* is foreclosed by the Second Circuit's decision in *Calderon* and the Supreme Court's recent ruling in *Kelly*.  In *Calderon*, the Second Circuit left undisturbed the longstanding principle that bank fraud requires "fraudulent intent" to cheat a bank, its customers, or third-party custodians of bank property out of their money or property.  *See United States v. Calderon*, 944 F. 3d 72, 92 (2d Cir. 2019) (declining to overturn "the Second Circuit's preexisting interpretation of the bank fraud statute" requiring that the defendant "contemplated harm or injury to the victim").  Then, in *Kelly*, the Supreme Court left no doubt that the "property fraud" required by the federal fraud statutes compels the Government to prove that the "***object*** of the[ ] fraud was money or property," and that money or property was not merely the "incidental byproduct of the scheme."  *Kelly v. United States*, 140 S. Ct. 1565, 1565, 1574 (2020).  This holding reinforces prior Second Circuit and other circuit court case law that a defendant must intend to "deceive *and* cheat . . . to deprive the victim of money or property" in order to be convicted of federal fraud.  *Miller*, 953 F.3d at 1103 (emphasis

in original); *Starr*, 816 F.2d at 98 (holding that deception, without "contemplat[ing] an actual injury to the alleged victims of the fraud," is insufficient to support a conviction).

Contrary to the Government's assertions, no aspect of the Supreme Court's decision in *Kelly* limits its holding to the regulatory domain or the "exercise of regulatory power."  Opp. at 21.  If anything, the opposite is true: if mere incidental effects on property are enough for fraud, then it would not have mattered that the *Kelly* defendants worked for the government—their acts would have deprived the government of at least some money or property, establishing fraud.  *But see Kelly*, 140 S. Ct. at 1573 (rejecting this notion).  Thus, *Kelly*'s guidance on the application of the federal fraud statutes applies with equal force here, outside the regulatory context.  *See id.* (citing *Pasquantino v. United States*, 544 U.S. 349, 355 (2005) (involving a scheme to traffic liquor across the Canadian border to avoid taxes)).  Because the Indictment alleges a scheme whose object was to facilitate the approval and "processing" of transactions—not to obtain money or property through fraud—*Kelly* compels the dismissal of the Indictment.

### B.    *Kelly* Conclusively Refutes The Government's Theory Of Harm

The Supreme Court's *Kelly* decision squarely forecloses the Government's theory here. The Government asserts here that "the concrete harm contemplated by the defendants was to deny the victim banks the right to control [their] assets by depriving [them] of information necessary to make discretionary economic decisions."  Opp. at 21 (quoting *United States v. Rossomondo*, 144 F.3d 197, 201 n.5 (2d Cir. 1998)).  But this theory of harm is hardly "concrete," and it entails the deprivation of precisely the "intangible right[ ] of allocation, exclusion, and control" that *Kelly* held does not qualify as a property interest.  140 S. Ct. at 1572.  As in *Kelly*, the Indictment focuses on the U.S. Issuing Banks' prerogative over "who should get a benefit and who should not."  *Id.*

In fact, the Government's Opposition here explicitly acknowledges that it is relying on the sort of "right to control" theory that *Kelly* foreclosed.  Relying on *Lebedev*, a pre-*Kelly* Second

Circuit decision, the Government contends that "the Indictment adequately alleges a scheme to defraud under a ***right to control*** theory." Opp. at 22–23 (emphasis added). Under *Kelly*, that theory of harm is outmoded and legally unavailable. Indeed, the Second Circuit's reasoning relied on the notion that "a wire fraud charge under [that] theory can be predicated on a showing that the defendant, through the 'withholding or inaccurate reporting of information that could impact on economic decisions,' deprived 'some person or entity . . . of potentially valuable economic information." *United States v. Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019), *cert denied*, 140 S. Ct. 1224 (2020) (quoting *United States v. Finazzo*, 850 F.3d 94, 108 (2d Cir. 2017)).

But a core teaching of *Kelly* is that "[e]conomic information" does not qualify as money or property under the fraud statutes. 140 S. Ct. at 1571. As Weigand noted in his motion to dismiss, a number of other circuits had similarly held, pre-*Kelly*, that "the ethereal right to accurate information" could not support fraud convictions. *See, e.g.*, *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014); *see also Starr*, 816 F.2d at 100 (finding that "metaphysical" harm was "[in]sufficient to infer fraudulent intent"); *see* Weigand MTD at 16–17. Because of *Kelly*, it is all the more clear that "economic information" that affects an entity's "intangible right . . . [of] control" does not qualify as a property interest, even if it could have an "impact on economic decisions." *Kelly*, 140 S. Ct. at 1572. In all events, here, there is no allegation in the Indictment that the merchant category codes, descriptors, and other merchant information relayed to U.S. Issuing Banks had any bearing on the banks' economic position: The U.S. Issuing Banks had already underwritten the credit offered to cardholders (and, as to debit card holders, the funds belonged to the card holder), and the Indictment does not allege that they incurred any incremental economic risk as a result of the inaccurate information they received. *See* Weigand MTD at 6.

Accordingly, even if *Lebedev*'s right-to-control theory were not abrogated by *Kelly*, it would not apply here.

Finally, the Indictment wholly fails to allege that any misrepresentations were *material* to the U.S. Issuing Banks.  The Government tries to sidestep this element of bank fraud by weakly gesturing towards a broader conspiracy and hiding behind inapposite cases.  But it does not explain (nor could it) how the alleged transactions were of "some independent value" or otherwise bore "on the ultimate value of the transaction"—when the Indictment itself alleges that U.S. Issuing Banks only *preferred* to not process transactions involving marijuana.  *See United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007); *see also* Indictment at ¶ 12.  Instead, the Government simply asserts that *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), is inapposite as involving wire fraud, while completely ignoring that the standard for materiality is the **same** for both wire and bank fraud.  *See Neder v. United States*, 527 U.S. 1, 20–21 (1999).  At bottom, the Indictment plainly alleges only that "some" unspecified bank "enter[ed] into a transaction it would otherwise have avoided," which is legally insufficient to establish materiality.  *Shellef*, 507 F.3d at 108–09; *see* Weigand MTD at 14.

Because the Indictment and the Government rely on a now-abrogated theory of harm of U.S. Issuing Banks' "right to control," and legally insufficient allegations of materiality, the Indictment should be dismissed.

## II.     WEIGAND'S MOTION TO SUPPRESS SHOULD BE GRANTED

### A.     The Government's Theory Of Probable Cause Is Legally Flawed

The Government does not cite a single case in which a court has upheld the search of electronic devices in the absence of any evidence that the particular devices had some connection with criminal activity or were seized from a defendant at or about the time he was committing a crime.  That is because the Government's sweeping theory has no legal support.

The Government cites *United States v. Saipov* for the proposition that the Court "f[ound] probable cause for a search warrant for the contents of [a] defendant's cell phone without any showing that the device itself was used in connection with the crime."  Opp. at 58 (citing *United States v. Saipov*, No. 17 Cr. 722 (VSB), 2019 WL 3024598, at 4-5 (S.D.N.Y. July 19, 2020)).  But that case is completely inapposite:  It involved the 2017 terrorist attack in lower Manhattan where the defendant drove a flatbed truck onto a pedestrian pathway, killing eight people.  *Saipov*, 2019 WL 3024598, at 1.  The two cell phones subject to search were found in the flatbed truck immediately after the attack took place—"[t]he logical inference, then, is that Saipov decided to keep the Cell Phones close to him while he committed the charged crimes."  *Id*. at 4.  One of the cell phones was ringing when it was recovered by law enforcement just minutes after the attack— "supporting the reasonable inference and possibility that a co-conspirator may have been trying to reach Saipov in connection with the crimes he had just committed."  *Id*.  Weigand's devices, by contrast, were seized ***months after*** the alleged scheme ended and ***years after*** the electronic communications described in the Affidavit took place.  *Saipov* simply does not support the Government's contention that it need not establish some link between the Devices and the alleged crime.

Devoid of any support in precedent, the Government advances a theory that would eviscerate the Fourth Amendment's fundamental protections.  Because there was no factual nexus between the alleged crime and the Devices, the Government relies on the Agent's general observation that people who commit crimes (***and those who do not***) store information on electronic devices.  And it seeks to transform that obvious observation of modern life into law enforcement expertise that could support a probable cause finding.  But that effort is foreclosed by the law and common sense.  Courts have repeatedly found that no probable cause exists where an affidavit

relies on an agent's opinion or experience without any other "factual nexus" linking the crime to the property to be searched. *See*, *e.g.*, *United States v. Guzman*, No. S5 97 CR 786 (SAS), 1998 WL 61850, at *4 (S.D.N.Y. Feb. 13, 1998) ("Permitting 'a search warrant based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect.'") (quoting *United States v. Rosario*, 918 F. Supp. 524, 531 (D.R.I. 1996)); *see also* Motion to Suppress at 12 (citing cases demonstrating that an affidavit must provide evidence connecting the alleged crime with the place to be searched). Nor could such generalized truisms support such a sweeping and intrusive search.

While acknowledging that the communications recounted in the Affidavit were from 2018 and that the alleged scheme had ended in 2019, the Government argues, without citing any supporting case law, that the staleness of the evidence is remedied by the Affidavit's general assertion that "Computer files or remnants of such files can be recovered months or even years after they have been created or saved on electronic devices." Opp. at 59. Here, too, the Agent's truism cannot exempt electronic devices from the staleness analysis entirely. The Government cites no support for this remarkable proposition.

Moreover, the Government claims that Weigand and his co-conspirators used encrypted messaging services to evade detection. *See* Affidavit at ¶ 16 ("individuals who are engaged in criminal activity frequently use end-to-end encryption communications services . . . in an effort to evade detection by law enforcement (e.g., by preventing law enforcement agents from collecting incriminating evidence through methods such as wiretaps and search warrants)"); *see also* March 17, 2020 Bail Hearing, Tr. at 10:1-4 ("We have developed evidence that [Weigand] and his coconspirators used encrypted services, encrypted chat messages . . . to avoid law enforcement

10

detection[.]").  But, if Weigand allegedly went to such lengths to prevent access to his electronic communications, there was no basis to believe that he would have had these communications stored on his devices, two years later, after the alleged scheme had ended, while traveling to a vacation in Costa Rica.

### B.       There Is No Other Basis To Support The Government's Sweeping Search

The Government does not dispute that the Warrant permitted a search of ***all*** the data on the Devices.  *See* Opp. at 62–63 (arguing that "[t]he Search Warrant was not overbroad (or lacking in particularity) simply because it authorized the search of the entirety of the Subject Devices[.]"). To support their argument that a limitless search is somehow proper under Fourth Amendment jurisprudence, the Government relies on *United States v. Ulbricht*.  *See* Opp. at 61 (citing *United States v. Ulbricht*, 858 F.3d 71, 82 (2d Cir. 2017), *cert denied*, 138 S. Ct. 2708 (2018)).

*Ulbricht*, however, was nothing like this case.  In *Ulbricht*, the defendant was charged with drug trafficking and other crimes related to his creation and operation of a massive criminal online marketplace (nominally, the "Silk Road") using the username "Dread Pirate[s] Roberts."  *See Ulbricht*, 858 F.3d at 82.  Through the use of undercover agents posing as Silk Road administrators, law enforcement was able to arrest the defendant while he was ***in the act of*** administering Silk Road as "Dread Pirate Roberts."  *Id*. at 87.  The defendant was arrested in a San Francisco public library, ***with his laptop open***, while he was logged into Silk Road as "Dread Pirate[s] Roberts." *Id*. at 86.  In upholding a broad search warrant of the defendant's laptop, the *Ulbricht* court acknowledged that the case was "unusual," given that the "crimes under investigation were committed largely through computers" and thus the "nature of [the defendant's] crimes" had a "symbiotic connection to his digital devices."  *Id*. at 103–104.  The *Ulbricht* court analogized the facts to cases where criminal activity pervades an entire business and thus "broad language used in warrants" is appropriate.  *Id*. at 102.  And *Ulbricht* expressly recognized that it was not dealing

11

with the "more typical" case, which may involve "electronically-stored data associated with the alleged crimes" but "on a hard drive that largely contains non-criminal information." *Id*. at 103. Thus, given the unique nature of the defendant's Silk Road operations, the *Ulbricht* court warned that future cases, unlike the case before it, "may require [the court] to articulate special limitations on digital searches to effectuate the Fourth Amendment's particularity or reasonableness requirements." *Id*. at 104.

The Government's reliance on *Ulbricht* ignores those crucial limits on the Second Circuit's holding. Unlike *Ulbricht*, this is not a case where the alleged crime has a "symbiotic relationship" with the electronic devices seized, nor has the Government alleged that criminal activity "pervaded" all of Weigand's business ventures. Indeed, as discussed above, the Government has failed to establish any connection between the Devices and the scheme, let alone a "symbiotic" one, and the Government does not dispute that Weigand is "a successful businessman involved in many lawful ventures having nothing at all to do with the allegations in this case." Motion to Suppress at 2. Further, based on the evidence described in the Affidavit, the Government knew that Weigand, at most, had a limited role, for a limited time, in the alleged scheme.[1] *See* Affidavit at ¶¶ 17–18, 21.

At bottom, there was no support for the Government's sweeping, intrusive Warrant. The Government asserts that the "breadth of the [warrant] was supported by ample probable cause." Opp. at 61. However, as the Government acknowledges, the Fourth Amendment demands that

---

[1] The Government produced to Weigand an audio recording of the May 2019 phone call between a Government cooperator and Weigand, which was referenced in the Affidavit. *See* Affidavit at ¶ 21. On the phone call, when the cooperator inquires whether Weigand is still involved in the alleged scheme, Weigand explains that he is "not personally involved at all" and that "some guys" that he knows are "taking care of it." USAO_00041040 at timestamp 03:30, 06:30.

"*each category* of evidence identified for seizure in the warrant is supported by probable cause to believe it is relevant to the investigation at issue." *Id.* (citing *United States v. Galpin*, 720 F.3d 436, 448 (2d Cir. 2013)) (emphasis added). While the Affidavit provides examples of encrypted communications (albeit from two years prior to when the warrant was issued), the Affidavit does not purport to establish probable cause that evidence of the alleged scheme would be found in the vast categories of other, non-communication data the Warrant permitted the Government to seize. As explained in Weigand's motion to suppress, the categories of data the Warrant permitted the Government to search for and seize included many that were unconnected to the Subject Offenses or the relevant time period. *See* Motion to Suppress at 16. Thus, contrary to the requirements of the Fourth Amendment, the Warrant was not tailored to the type of data established in the Affidavit. *See Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the [Fourth Amendment] ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.").

Indeed, the Government cites a number of cases acknowledging that, although temporal limitations alone may not be determinative in all circumstances, they are an important factor courts should consider in determining whether a warrant was sufficiently particular. *See* Opp. at 65 (citing *United States v. Nejad*, 436 F. Supp. 3d 707, 729 (S.D.N.Y. 2020), and *United States v. Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 58 (D. Conn. 2002)). The key inquiry is whether the probable cause established in the Affidavit supports the time frame of the Warrant. *See United States v. Hernandez*, No. 09 CR 625(HB), 2010 WL 26544, at *9 (S.D.N.Y. Jan. 6, 2010) ("A failure to indicate a time frame could render a warrant constitutionally overbroad because it could 'allow[] the seizure of records dating back arbitrarily far' and untethered to the scope of the

affidavit which ostensibly provided probable cause.") (citation omitted).  Where, as here, the Affidavit provided no evidence that Weigand was involved in the alleged scheme prior to 2018, or even that the scheme existed prior to 2018, no probable cause existed to permit the Government to seize data from before 2018, let alone search through data dating back to 2008.

### C.       The Good Faith Exception Does Not Apply

Because the Affidavit did not even purport to connect the Devices to the alleged crime and provided a plainly impermissible unlimited search of the Devices' data, the good faith exception does not apply here.  *See* Opp. at 66.  As the Second Circuit has held, the good faith exception is not "a general hunting license," "a mantle of omnipotence," or "a magic lamp for police officers to rub whenever they find themselves in trouble."  *United States v. Reilly*, 76 F.3d 1271, 1273, 1280 (2d Cir. 1996) (finding good faith exception did not apply).

In order to avoid exclusion, the good faith exception "requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts."  *Id.* at 1271, 1273.  The Supreme Court has recognized that, "when the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment Rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."  *Davis v. United States*, 564 U.S. 229, 238 (2011) (citation omitted); *see also In re 650 Fifth Ave. and Related Properties*, 934 F.3d 147, 164 (2d Cir. 2019) (finding good faith exception did not apply where "[t]he Government drafted an exceptionally broad and facially defective warrant.").

Because the Affidavit failed to establish probable cause that the Devices were in any way connected to the alleged offense and the warrant permitted a limitless search of all the data on the Devices, the good faith exception does not apply.  *See United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992) (finding exclusionary rule did not apply where, even though warrant listed specific items to be seized, it also contained a catch-all provision); *see also United States v. Rutherford*, 71

F. Supp. 3d 386, 393-394 (S.D.N.Y. 2014) (finding exclusionary rule did not apply where warrant was issued upon, *inter alia*, officer's conclusory representation that firearms inside defendant's apartment were "unlawfully possessed"); *United States v. Moran*, 349 F. Supp. 2d 425, 482 (N.D.N.Y. 2005) (finding good faith exception did not apply where "no facts in the application connected the alleged criminal activity with the residence" subject to search).  It is clear from the face of the Warrant that the Warrant's illusory limitations—vast categories of every conceivable type of data on an electronic device, only some of which had to relate to the Subject Offenses (*i.e.*, broad federal fraud and conspiracy statutes)—did not, in reality, provide any limitation at all.  *See United States v. Leary*, 846 F.2d 592, 601 (10th Cir. 1988) (finding exclusionary rule did not apply where warrant permitted seizure of long list of business records that related to "'the purchase, sale and illegal exportation of materials in violation of the' federal export laws," because such limitations, in practice, "provide[d] no limitation at all").  *See United States v. Winn*, 79 F. Supp. 3d 904, 919 (S.D. Ill. 2015) (finding good faith exception did not apply where, although affidavit established probable cause with respect to some categories of data on cell phone, the warrant "authorized the seizure of virtually every piece of data that could conceivably be found on the phone.").

## III.   WEIGAND'S MOTION TO COMPEL SHOULD BE GRANTED

The Government's Opposition fails to address certain aspects of Weigand's motion to compel discovery.  Most significantly, with respect to its *Brady* obligations, the Government maintains that "it is the prosecution team that is tasked with making *Brady* determinations in the first instance, and because the defendants have made no particularized showing that materials exist requiring disclosure, the Government need do no more than acknowledge its obligations."  Opp. at 44.

15

To the contrary, Weigand has in fact made a particularized request for *Brady* material that the Government ignores. The Government's June 22 letter included a critical but incomplete account of exculpatory information from attorneys representing the Online Marijuana Marketplace Company. Weigand MTC, Ex. C. That attorney proffer included an account of various exculpatory statements by Defendant Akhavan "[d]uring a meeting that occurred in Calabasas, California, in or about March 2018," including alleged representations by Akhavan about, *inter alia*, his use of MCC codes "in connection with processing the Online Marijuana Marketplace Company's credit and debit transactions" and information concerning the practices of Visa and MasterCard. *Id.*

In his motion to compel, Weigand requested "the prompt production of all information concerning the attorney proffer described in [the Government's] June 22, letter," along with clarification as to whether Weigand was present at the meeting allegedly held in Calabasas, California in or about March 2018, and all other documents reflecting similar statements by Akhavan in the past. Weigand MTC at 10.

Weigand is a German citizen, resident of Luxembourg, and is not alleged to have any contact with financial or other institutions in the United States. Accordingly, statements by his co-defendant about the practices of U.S. financial institutions and other entities in the United States may constitute critical evidence about Weigand's understanding of such matters. Weigand MTC at 3.

Weigand hereby reiterates this particularized request for *Brady* material.

Further, Weigand and Akhavan both requested information about the rules and policies of merchant acquiring banks, issuing banks, payment processors, and Credit Card Companies on the processing of marijuana transactions and the appropriate use of MCC codes for marijuana sales.

16

*See* Weigand MTC at 8.  Although the Government represents that it has produced "all 'documents and objects' within the meaning of Rule 16(a)(1)(E) in its possession, custody, and control that bear on these issues" and commits to producing all such information if it "comes into possession of additional documents," (Opp. at 32–33, 34–35), it is striking that the Government has not produced—and has failed to state if the voluminous discovery contains—a single rule or policy adopted by a bank or Credit Card Company on the processing of marijuana transactions and the assignment of MCC codes for marijuana sales.

Contrary to the Government's assertions, such information is not only "material," but also critical to understanding whether the conduct alleged in the Indictment complied with accepted industry practice.  *See* Opp. at 32, 34.  It is also central to allegations in the Indictment that the defendants ran afoul of Credit Card Company "rules that prohibit their credit cards from being used for marijuana purchases" (Indictment at ¶ 8) and related bank policies (*see* Indictment at ¶ 12).

Accordingly, Weigand vigorously disputes the Government's characterization of the materiality of the requested discovery.

## CONCLUSION

For the foregoing reasons, Weigand's motions to dismiss the Indictment, suppress evidence, and compel discovery should be granted.

Dated:  New York, New York        Respectfully Submitted,
      July 20, 2020

DECHERT LLP

By: */s/ Andrew J. Levander*

Andrew J. Levander
Michael J. Gilbert
Shriram Harid
Steven P. Pellechi
Three Bryant Park

1095 Avenue of the Americas
New York, New York 10036-6797
Andrew.levander@dechert.com
Michael.gilbert@dechert.com
Shriram.harid@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional
Corporation
1 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90071
Michaelartan@yahoo.com

*Attorneys for Defendant*
*Ruben Weigand*