UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

v.

HAMID AKHAVAN,
        a/k/a "Ray Akhavan",

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CASE NO. 20 -CR-188

**REPLY IN SUPPORT OF MOTION TO DISMISS**

## DEFENDANT HAMID AKHAVAN'S REPLY IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

Ira P. Rothken
Jared Smith
Rothken Law Firm
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 92404250
Email: ira@techfirm.net
Email: jared@techfirm.net


Sara C. Clark
Quinn Emanuel Urquhart & Sullivan, LLP
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone:  (713) 221-7010
Email: saraclark@quinnemanuel.com

William A. Burck
Derek L. Shaffer
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemanuel.com


Christopher Tayback
Paul Slattery
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Email: christayback@quinnemanuel.com
Email: paulslattery@quinnemanuel.com


*Attorneys for Hamid Akhavan*

**Table of Contents**

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

    There Is No Such Thing As Bank Fraud Without A Victim................................2

    Absence Of Materiality....................................................................................4

    Absence Of Actual Or Intended Harm Or Loss................................................5

    The Indictment Attempts An End Run Around The Rohrbacher-Farr Amendment ...........7

    The Government Is Withholding Key Material That Should Be Discovered.....................8

CONCLUSION......................................................................................................10

## Table of Authorities

### <u>Cases</u>

*Cumis Ins. Soc., Inc. v. BJ's Wholesale Club, Inc.*, 918 NE 2d 36 (Mass. 2009) .......................... 3

*Loughrin v. United States*, 573 U.S. 351 (2014)................................................................. 4, 5, 6

*U.S. v. Steffen*, 687 F.3d 1104 (8th Cir. 2012).................................................................... 3

*United States v. Akers*, 215 F.3d 1089 (10th Cir. 2000) ...................................................... 2

*United States v. Binday*, 804 F.3d 558  (2d Cir. 2015)........................................................ 6

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019)  ...................................................... 5

*United States v. Dinome*, 86 F.3d 277 (2d Cir. 1996)......................................................... 6

*United States v. Lebedev,* 932 F.3d 40 (2d. Cir. 2019) ........................................................ 6

*United States v. Nejad*, 2020 WL 883500 (S.D.N.Y. Feb. 24, 2020) ............................................ 5

*United States v. Rossomando,* 144 F.3d 197 (2d Cir. 1998)................................................... 6

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ........................................................ 2

### <u>Statutes</u>

18 U.S.C. § 1344.......................................................................................................*passim*

Defendant Hamid Akhavan respectfully submits his Reply in Support of Motion to Dismiss the Superseding Indictment (ECF 16) charging him with Conspiracy to Commit Bank Fraud.

## INTRODUCTION

The Government's Omnibus Opposition (ECF 79) confirms how unprecedented and strained its theory of the crime is.  Not once does the Government come out and say that a U.S. bank faces any exposure or harm from processing any of the marijuana-related transactions at issue.  That omission is striking, especially considering the Government's recognition that at least *some* U.S. banks have been glad to process these credit-card transactions just as they would any other, without any adverse consequence or even the slightest rebuke from the Government.  That leaves this prosecution resting solely and entirely on the premise that Defendants violated Section 1344 whenever they induced a U.S. bank to deviate from a so-called bank "policy."  But that premise breaks from the moorings of Section 1344 and all decided cases applying it.  Were it now sanctioned, the federal crime of bank fraud would be distended in breathtaking fashion:  Anyone who allegedly makes *any* misrepresentation (or omission) in any transaction that *arguably* runs afoul of a given bank's policy or contracts would thus be exposed to criminal prosecution—even in the absence of legal or economic harm to the bank, its customers, or our financial system.  Unless Section 1344 properly extends so far, the Indictment in this case is defective as a matter of law and should be dismissed.

Assuming *arguendo* that the Government can bootstrap the alleged dictates of banks' policies into the criminal prohibition of Section 1344, as it attempts to do, its case necessarily hinges on the actual circumstances and contours of banks' individual policies.  Yet the Government is coming up blank on those policies.  Utterly blank.  It refuses to specify any bank, any policy, or any particular transaction that offended the same.  To the extent the Government is trying to make

1

a criminal case based on the individual policies of individual banks, it should, at a bare minimum, be producing those policies in order to inform and enable fair defense.

## ARGUMENT

In its Opposition, the Government argues that, because it has (1) alleged that *someone* made a misrepresentation that disguised violations of unidentified policies of *some* (unspecified) Issuing Banks, and (2) alleged conspiracy, it has sufficiently pleaded that these specific Defendants are criminally liable for bank fraud.  Opp. at 9, 23.  But such amorphous vagaries are not the stuff of a valid criminal indictment.[1]  If this case is nonetheless to proceed, the Government should at least have to come clean with concrete specifics in discovery.

### There Is No Such Thing As Bank Fraud Without A Victim

1.      To begin, the mere fact that a bank policy was allegedly bent or violated en route to a perfectly legitimate (and profitable) credit-card transaction on behalf of consenting, satisfied parties should never occasion a prosecution for federal bank fraud.  Tellingly, the Opposition does not identify any case in which the Government indicted for bank fraud without the Government identifying any victim—actual, potential or intended—of the supposed fraud.  Here, even crediting everything alleged in the Indictment, no bank ever faced any legal exposure or economic harm from the alleged fraud.  It should follow that any alleged misrepresentations about the precise

---

[1]     The Government repeatedly suggests (no less than five times) that the Indictment should be beyond reproach simply because it recites language from the statute.  *See* Opp. at 1, 9, 10, 17, 20.  But bare legal conclusions do not equate with substantive validity.  To be valid, an indictment must not only "track[] the language of the statute" but also "clearly set[] forth all the elements of the crime of bank fraud."  *United States v. Akers*, 215 F.3d 1089, 1101 (10th Cir. 2000); *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) ("An indictment is sufficient if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.") (internal citations and quotations omitted).

nature of the transactions—all of which were undisputedly lawful in the states where they occurred—should not qualify as material under Section 1344.

2.    More broadly, the Government cites no case sanctioning a bank-fraud prosecution akin to this one.  To the contrary, the Eighth Circuit has specifically warned of and rejected the expansiveness of such a theory, as derived from particulars of bank policies and contracts.  In *U.S. v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012), the court considered whether failure to disclose and get approval for sale of collateral, in violation of a credit agreement with a bank, could constitute a scheme to defraud.   It answered no and held that, "in order for a fraudulent disclosure to be actionable fraud (either criminal or civil) the duty to disclose must be independent of any duty imposed by the contract." *Id*. (citations and quotations omitted).  As the Eighth Circuit explained, "In the civil context, a fraud claim is permitted only if it arises from acts that are separate and distinct from the contract." *Id*.  "If the same rule did not apply in the criminal context, every breach of a bank loan agreement could give rise to criminal fraud prosecution." *Id*.[2]  The Government in this case is defying that rule and going even further than it tried (unsuccessfully) to go in *Steffen*:  Whereas sale of collateral is economically material to a bank, the Government here does not allege that the economics of these marijuana-related transactions are any different than the economics of sneaker-related transactions when it comes to chargebacks, underlying risk, profit margins, or otherwise.

---

[2]    *See also, Cumis Ins. Soc., Inc. v. BJ's Wholesale Club, Inc.*, 918 NE 2d 36 (Mass. 2009) (describing how the Visa and MasterCard networks and agreements work and holding that no claim for civil fraud can arise from breach of the merchant bank agreement and/or Mastercard and Visa Rules:  "failure to perform a contractual duty does not give rise to a tort claim for negligent misrepresentation.  . . . Plaintiffs who are unable to prevail on their contract claims may not repackage the same claims under tort law.")

3.      Were the Government's legal theory credited, there would be no sensible stopping point.  Any bank policy, no matter how incidental or idiosyncratic, could assume the force of federal criminal law.  If, for instance, a particular bank discriminates on the basis of race, religion, politics, geography, or (as allegedly here) the stigma it ascribes to particular type of transaction, then it is a federal crime to induce a bank to deviate from that policy in processing a successful, profitable, lawful transaction.  Likewise, any alleged deviation from loan terms, or a misstatement on a credit-card application, no matter how technical or trivial, could form the basis for a criminal prosecution on the theory that a bank would not otherwise have transacted—regardless whether the bank or anyone else was harmed, or even could have been harmed.  That is not the state of the law today, nor should the law be so expanded to accommodate this Indictment.

### Absence Of Materiality

4.      Especially telltale is the Indictment's failure to establish materiality.   Under *Loughrin*, Section 1342(2) "demands that the defendant's false statement ***is the mechanism*** naturally inducing a bank (or custodian) to part with its money."  *Loughrin v. United States*, 573 U.S. 351, 365 (2014) (emphasis added).   As such, the Indictment needs to establish that the Defendants conspired to obtain property under the Issuing Banks' control *by means of* certain misrepresentations.  But the Indictment does not come close to doing so.

5.      Certainly merchant-category codes ("MCC") do not supply the lynchpin for materiality, yet the Government effectively concedes that the MCCs are the only thing issuing banks actually review in approving a transaction.  (Indictment ¶ 9); (Mot. at 5).  To be sure, MCCs are a focus of the Indictment, but the Government does not deny that the niceties of those codes— which are themselves shifting, variable, and subject to divergent interpretations and uses—are in fact *incidental to these transactions and are in no way relied upon* by issuing banks.  MTD at 4-5 (noting that "the Credit Card Companies' merchant category code lists available online . . . reveal

4

that the codes designedly fall far short of capturing the entire range of possible commercial activity, that the codes frequently change, and that they differ between payment institutions and credit card networks"); Opp. at 34 (". . . the Indictment alleges the creation and use of the Phony Merchants as the "primary method" used by the defendants and co-conspirators to effectuate their unlawful scheme") . Nor does the Government explain how marijuana-related transactions *should* be coded *accurately* from the perspective of those banks that concededly welcome them, in the absence of any on-point code specific to cannabis products. MTD at 5; *see also* Indictment at ¶ 9 (noting the non-existence of MCCs for marijuana). Unable to identify anything that the Defendants (or, for that matter, any co-conspirator) did to deceive issuing banks relative to the transactions at issue, the Government waives its hands about how the transactions were allegedly presented "in a misleading manner." Opp. at 14, *see id*. at 12. The key point remains, however, that the only specifics set forth in the Indictment are divorced from anything that an issuing bank would review or care about—let lone rely upon—in processing a credit-card charge, and that the Indictment has not alleged any representation that led an issuing bank to process a transaction that it would otherwise decline.

### Absence Of Actual Or Intended Harm Or Loss

6.      Relatedly, the Indictment does not allege that the marijuana-related nature of the transactions was material to issuing banks in the sense that it ever placed them at risk. Recognizing its weakness on this point, the Government argues (Opp. at 19-20) that no harm or risk thereof is required for bank fraud. But that is quite wrong. For Section 1344(1), the Government concedes the provision at least requires "knowledge that [the defendant] would likely harm the bank's property interest". (Opp. at 20). With respect to Section 2, *Loughrin* itself involved intent to harm a retailer, and we have addressed the dicta in *United States v. Nejad*, 2020 WL 883500 (S.D.N.Y. Feb. 24, 2020). (Mot. at 18 n. 17). Notably, *United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019), makes

clear *Loughrin* does not stand for the proposition that no harm or risk of harm is required under 1344(2), and the numerous prosecutions under Section 2 since *Loughrin* all involve an intended victim or concrete risk of harm.  (*Id.* at 16-19).  To reiterate, dispensing with any requirement of actual or intended harm would open floodgates to prosecution of the most passing, trifling misstatements omissions when dealing with banks, based merely on an allegation a bank's policy or contract happens to call for additional or different information before a transaction proceeds.

7.      It is risible for the Government to claim (Opp. at 18) that Section 1344(1) is implicated merely because banks "used their *own* funds to extend credit for cardholder purchases." Not only did issuing banks not lose anything on the transactions at issue but they profited from them just as they would from any other.  No case holds or suggests that a bank suffers harm or risk of harm just by processing credit-card transactions for willing customers, subject to precisely the rates and profits that the bank itself desires.

8.      It is telling that the portion of the Opposition entitled "The Scheme Involved Risk of Tangible Economic Harm" (Opp. at 19) begins by trying to escape any requirement that the Government establish harm or risk of harm.  The cases the Government then cites, however, highlight the difference between this case and any genuine case of bank fraud.  *Rossomando* involved the defendant's withholding of information showing that he—when he received credit— posed a worse credit risk than he had pretended.  *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998).  *Binday* involved "expos[ing] the insurers to an unbargained-for economic loss" by misrepresenting the risks of an insurance policy.  *United States v. Binday*, 804 F.3d 558, 574 (2d Cir. 2015).  In *Dinome*, the information withheld substantially diminished the value of the mortgage transaction to the victim.  *United States v. Dinome*, 86 F.3d 277, 283-84 (2d Cir. 1996).  And *Lebedev* specifically observed how the misrepresentations hid a heightened risk of fraud attending the transactions.  *United States v. Lebedev*, 932 F.3d 40, 48–49 (2d. Cir. 2019).  Here, in contrast, there

has been no allegation by the Government—and still no contention by the Government—that banks are any worse off, or even any less profitable, when processing the marijuana-related transactions at issue as compared to any other.

9.      The closest the Government comes to suggesting any exposure for issuing banks is when it passingly refers (Opp. at 22) to what it terms "the illegal nature of the transactions" and the "illegal transactions," but that is far too slender a reed to support this Indictment.  The Government does not allege that any bank—including those banks that are concededly glad to process marijuana-related transactions consistent with their chosen policies—faces any risk of prosecution, investigation, voided transactions, or any other adverse consequence.  Nor does the Government explain how, consistent with the Rohrbacher-Farr Amendment and state laws legalizing marijuana, it could possibly find fault with banks that process such transactions on behalf of informed, consenting, law-abiding cardholders.

**The Indictment Attempts An End Run Around The Rohrbacher-Farr Amendment**

10.      According to the Government (Opp. at 2 n.1), the distinction between medical and non-medical marijuana "is irrelevant" to the Indictment.   That only confirms that the Government's oblique theory of the crime is serving to interfere with states medical-marijuana regimes while circumventing Congressional constraints on any such federal prosecution.  Indeed, considering that privacy laws *prohibit* any identification of particular drugs, including medical marijuana (MTD at 5, n. 7), it would be *impossible* for issuing banks to receive information sufficient to satisfy the Government; any medical-marijuana transaction would necessarily run smack into the Government's instant theory of bank fraud.  Notwithstanding its latest protestations, the Government evidently knows it has a problem in this regard.  On June 22, the Government made an unprompted disclosure informing Defendants that, in the span of a single day (January 1, 2018) during the time period, it maintains sales of marijuana shifted from 100%

medical to 99% recreational as reported on the relevant marketplace.[3]  Unless that disclosure was

wholly gratuitous, the Government knows it to be relevant and, what is more, exculpatory.

### The Government Is Withholding Key Material That Should Be Discovered

11.    The Government has refused to produce whatever information underlies the eye-

popping change in calculations it has disclosed—according to which all sales preceding January

1, 2018 were reported as involving medical marijuana, yet 99% thereafter were reported as

recreational.  There is every reason to believe that the Government's calculation will be revealed

to be fallacious once scrutinized.  Most medical purchases made by prescription-holders who

present their card to avoid tax and purchasing limits occur at dispensaries that *also sell recreational*

and are recorded there *without distinction*.  (MTC. at 15).  Without addressing that point or the

implausibility of its calculation, the Government rejoins simply that Mr. Akhavan "provides no

support" (Opp. at 36 n.16) for his criticism.  Of course, the Government thereby underlines why

Mr. Akhavan *needs discovery* into what is behind the Government's figures—figures that the

Government has *itself* disclosed as relevant and likely exculpatory.

12.    Finally, assuming *arguendo* that the theory of the Indictment is credited, this

prosecution rests, at its core and by its terms, on the bank policies that the Defendants allegedly

set out to violate.  The whole case will come down to what particular policies say and how they

were implemented within the constraints of the Visa and MasterCard networks, what Defendants

and others knew about those, and whether, why, and how particular banks processed particular

---

[3]    Ltr. Dated Jun. 22, 2020 from A. Strauss to M. Artlan, *et al*. (". . . the Government has learned from attorneys representing the Online Marijuana Marketplace Company that: (a) prior to approximately January 1, 2018, all sales of marijuana through the Online Marijuana Marketplace Company platform—including transactions processed as part of the Scheme—were purported medical marijuana sales; and (b) after approximately January 1, 2018, approximately 99% of Online Marijuana Marketplace Company marijuana transactions processed as part of the Scheme were recreational (i.e., non-medical) marijuana sales.").

transactions.  Without those private bank policies, the Government has no case.  And only once equipped with those private bank policies can Defendants understand the supposed case and properly prepare to defend themselves at trial.  But the Government has not identified or produced any of the policies that define its criminal case.  Not one.

According to the Government in its Opposition, "the defendants have not established that the [bank] policies and related information they seek are 'material' within the meaning of Rule 16."  To borrow from *The Princess Bride*,[4] however, we do not think that word means what the Government thinks it means.  For reasons that are already obvious and will not be belabored, the policies requested by Defendants are ***essential***.  Without the actual policies, there is no way to drill into questions of, *e.g.*, notice to the Defendants, reliance by a given bank, or how any of the thousands of transactions even connects to any supposed policy or fraud surrounding same.  By no means should it suffice for the Government to allude to notes from meetings with bank and credit-card-company personnel, which it "***does not intend to produce***," (Opp. at 33), or to point to a "non-exhaustive list of U.S.-based issuing banks associated with individuals who made MasterCard and Visa credit card purchases from the Online Marijuana Marketplace Company." (Opp. at p. 11, fn. 3).  The touchstone of the Government's case is actual bank policies that were allegedly violated, and the Government should not be permitted to hide those from the Defendants. If it has those policies, it should produce them.  If it does not, its case should be at an early end.

---

[4]    Video: *You keep using that word. I do not think it means what you think it means* (Youtube Sept. 14, 2009), https://www.youtube.com/watch?v=YIP6EwqMEoE.

**CONCLUSION**

For the foregoing reasons, and those set forth in the Defendants' prior Memoranda of Law in support of dismissal and discovery (ECF 72 & 74), the Indictment should be dismissed, or, alternatively, the requested discovery should be ordered.

July 20, 2020

ROTHKEN LAW FIRM

/s/ Ira Rothken
Ira Rothken
Jared Smith
3 Hamilton Landing
Suite 280
Novato, CA 94949
Telephone: (415) 92404250
Email: ira@techfirm.net
Email: jared@techfirm.net

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

/s/ William A. Burck
William A. Burck
Derek L. Shaffer
777 6th Street NW 11th floor
Washington, DC 20005
Telephone: (202) 538-8000
Fax: (202) 538-8100
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemauel.com

Christopher Tayback
Paul J. Slattery
865 S Figueroa Street 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
Email: christayback@quinnemanuel.com
Email: paulslattery@quinnemanuel.com

Sara C. Clark
711 Louisiana St., Ste. 500
Houston, Texas 77002
Telephone: (713) 221-7000
Fax: (713) 221-7100
Email: saraclark@quinnemanuel.com