

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**ANDREW J. LEVANDER**

andrew.levander@dechert.com
+1 212 698 3683 Direct
+1 212 698 0483 Fax

September 24, 2020

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v. Weigand & Akhavan*, 20 cr. 188 (JSR)

Dear Judge Rakoff:

On behalf of Ruben Weigand, a defendant in the above-captioned case, we write to request respectfully that the Court reconsider its decision to detain Mr. Weigand pending trial. *See* ECF No. 28. Pursuant to 18 U.S.C. § 3142(f)(2), changed circumstances that have "a material bearing" on the question of pre-trial release justify bail under the stringent conditions we propose.

This Court has confirmed a firm trial date of December 1, approximately nine weeks from the date of this submission. Mr. Weigand, who has been incarcerated at the Santa Ana City Jail in California since his arrest on March 9, has already faced substantial limits on his access to counsel and his ability to prepare a defense. A potential multi-week transfer to New York and a BOP-mandated two-week post-transfer quarantine will further deprive him of access to counsel.[1] In order to ensure that Mr. Weigand has an adequate opportunity to consult with counsel and prepare for trial in this complex case involving voluminous discovery[2]—while the coronavirus continues to impede access to counsel in the prisons—his release is essential.

Mr. Weigand has now been imprisoned for over six months. Even if he were convicted at trial, it is reasonable to conclude that he has already served a significant portion of his potential sentence, diminishing his incentive to flee.

---

[1] As explained below, it is possible Mr. Weigand will require additional surgery in the coming weeks, further limiting his time to prepare for trial.

[2] To date, the Government has produced nearly one terabyte of discovery consisting of over 427,000 documents.





In addition, Mr. Weigand's health has recently taken a turn for the worse. He was recently hospitalized and underwent surgery, compounding the risk he faces from exposure to COVID-19 in prison.[3]

**I. Access to Counsel and Preparing for Trial**

During the bail revocation hearing this Court held on September 3 related to Mr. Weigand's co-defendant, Ray Akhavan (who has been released subject to conditions since his arrest), Your Honor emphasized that "we now have a firm, fixed, final, and unmovable trial date of December 1." Tr. at 8:24–9:2. The Court added that "[Mr. Akhavan] needs to be able to consult with his counsel. He needs to be able to prepare for that white-collar trial," and encouraged Mr. Akhavan's counsel to make arrangements to ensure his presence in New York "well in advance of trial" and, in any event, not later than one month before trial. *Id.* at 9:3–4, 13:10–13, 24:2–7.

Mr. Weigand has been incarcerated at the Santa Ana City Jail in California, during which time his ability to consult with counsel has been extremely limited and hampered by restrictions at the facility. *See* Ex. A at 11–12. He has been forced to communicate with counsel without privacy, through a plexiglass window, and in noisy conditions that make it difficult to have an intelligible conversation. *See id.* He has also been denied access to a laptop that allows him to view the discovery in this case in a systematic way.[4]

Recent developments at the Santa Ana City Jail have dramatically derailed Mr. Weigand's efforts to prepare for trial. Certain of the inmates in Mr. Weigand's unit were exposed to the extremely potent substance fentanyl, prompting staff at the facility to seize inmates' personal belongings, including all of Mr. Weigand's notes, personal work product, and work product developed with counsel, reflecting months of effort and preparation. The facility will not be returning these materials to Mr. Weigand because of the risk of fentanyl exposure. These materials cannot be readily replicated in custodial circumstances in the time remaining before trial. The only means of

---

[3] We do not repeat here all the relevant background, as the Court is familiar with it from our prior submissions. For the Court's reference, we enclose as exhibits Mr. Weigand's bail reconsideration motion dated April 20, 2020 (ECF No. 26, Exhibit A) and his request to stay his transfer to New York dated August 18, 2020 (ECF No. 87-1, Exhibit B).

[4] As we noted in a prior submission, there have been serious concerns raised about the illegal recording by law enforcement of attorney-client privileged phone calls in Orange County facilities, making telephone consultation not only limited, but also highly problematic. *See* Ex. A at 11–12.





rectifying this significant setback is for defense counsel to have appropriate and continued access to Mr. Weigand in the few remaining weeks before trial.[5]

If he is not released, Mr. Weigand's impending transfer to New York will further impair his access to counsel. The BOP has acknowledged that transfers can be "a complex, multi-day, multi-institution process" and Mr. Weigand will be unable to consult his counsel during that potentially multi-week transfer period. *See* Ex. B at 2–3.

Once he is in New York, he will be subject to a BOP-mandated two-week quarantine at either the MCC or the MDC, during which he will have no access to counsel and, as we previously noted, will be confined to the Special Housing Unit in solitary confinement. *Id.* at 3–4. Following the quarantine period, his ability to consult with counsel will likely still be severely limited. After months of prohibiting in-person attorney visits, the MCC and MDC have only recently announced limited legal visitation.[6]

Pursuant to this Court's Opinion and Order dated August 31, the Government is scheduled to produce critical materials four weeks before trial, on November 3. *See* ECF No. 91. These include *Giglio* material, Jencks Act material, and proposed witness and exhibit lists. *Id*; *see also* ECF No. 95 at 44–45. Mr. Weigand's ability to prepare his defense will be severely compromised if he is detained during that intensive period of preparation.

## II. Flight Risk

An assessment of his sentencing exposure leads to the conclusion that Mr. Weigand has likely already served a significant portion of the sentence he would face if he is convicted at trial, diminishing his incentive to flee.

On the Government's version of the facts, Mr. Weigand, who has no criminal history, was not the mastermind of the alleged conspiracy, nor was he a principal of the "Online Marijuana Marketplace Company" referenced in the Indictment. *See, e.g.*, Indictment ¶ 1. Based on the discovery and the Government's statements, it is our understanding that Mr. Weigand allegedly had a limited role assisting in the process of opening merchant bank accounts in Europe for so-called "Phony Merchants." *See id.* ¶¶ 2, 12. Although the Indictment alleges a conspiracy from 2016 to 2019,

---

[5] Mr. Weigand had no involvement and was not deemed to have any involvement in the fentanyl issue.

[6] *See* Peter Brush, "Bail Hearing Yields News That MCC To Reopen For Atty Visits," Law 360 (Sept. 11, 2020), at https://www.law360.com/banking/articles/1309426/bail-hearing-yields-news-that-mcc-to-reopen-for-atty-visits.





Mr. Weigand's alleged involvement was limited to the period from approximately January 2018 to mid-2019.

The Government has not argued that any of the alleged victim-banks have suffered any actual or intended financial loss and has not disputed that the banks received significant fees for their role in the transactions at issue.[7] Under Guidelines Section 2B1.1(a)(1), Mr. Weigand's base offense level is 7, because the offense of conspiracy to commit bank fraud has "a statutory maximum term of imprisonment of 20 years or more." Under Section 2B1.1(b)(1), because the actual and intended loss amounts were below $6,500, no levels are added to the base offense level. At an offense level of 7 without any criminal history, Mr. Weigand's Guidelines range is 0 to 6 months' imprisonment.

Even if his Guidelines range is determined to be higher, this is a case in which a below-Guidelines sentence would be appropriate. Your Honor has repeatedly stated that sentencing in white-collar cases should not be based on a mechanical application of the loss amount. *See, e.g.*, March 17 Bail Hearing, Tr. at 26:2–7 ("I have, in numerous written decisions as well as oral statements made at sentencing, pointed out how misguided the Guidelines are in their inordinate attention to loss when it is not even an element of the crime. To be frank, I think the Guidelines in this respect are totally irrational . . . .").

Indeed, this Court has imposed significantly below-Guidelines sentences in many white-collar criminal cases, after considering the defendant's role and responsibility for the charged offense. *See, e.g.*, *United States v. Kaitz, et al.* 14-cr-845 (S.D.N.Y. 2015) (sentence for Z. Kaitz of 4 months and Guidelines range of 51 to 63 months); *United States v. Caspersen*, 16-cr-414 (S.D.N.Y. 2016) (sentence of 48 months and Guidelines range of 151 to 188 months); *United States v. Lumiere*, 16-cr-483 (S.D.N.Y. 2017) (sentence of 18 months and Guidelines range of 87 to 108 months); *United States v. Peter G. Johnson, et al.*, 17-cr-482 (S.D.N.Y. 2018) (sentence of 30 months and Guidelines range of 188 to 235 months).

---

[7] Although the Government argued at the March 17 bail hearing that gain may be used an alternative measure of loss, *see* Tr. at 10:22–11:3, the Guidelines expressly state that gain from an offense should be used as an alternative measure of loss "*only if* there is a loss but it reasonably cannot be determined." Guidelines Section 2B1.1, Comment 3(B) (emphasis added). In this case, the loss amount is zero and therefore not indeterminate. Therefore, any gain to the defendants may not be used as an alternative measure of loss.





**III. Mr. Weigand's Health**

Mr. Weigand continues to face serious health issues that have increased in severity since this Court's April 27 decision to deny Mr. Weigand's bail application. *See* ECF No. 28. These underlying health conditions leave him in great jeopardy if he were to contract COVID-19.

Since our most recent submission to the Court on August 18, Mr. Weigand was hospitalized, after reporting abdominal pain, severe exhaustion, dizziness, itchiness throughout his body, and discoloration of his urine. *See* Ex. B at 1, Ex. C. at 70. As the enclosed medical records show, Mr. Weigand was diagnosed with "obstructive jaundice and choledocholithiasis" (*i.e.*, the formation of gallstones). Ex. C at 33. In order "to prevent . . . future attacks that could potentially be life-threatening," Mr. Weigand underwent surgery to remove his gallbladder, including the gallstones, and had a stent inserted in his bile duct. *Id.* at 35–36, 42. He may require additional surgery, including the removal of his "biliary stent." *Id.* at 14. After he was discharged from the hospital on August 24, Mr. Weigand has continued to experience a range of challenging post-operative symptoms, including "bleeding" and "abdominal distention." *Id.* at 10.

As the enclosed letter from Mr. Weigand's primary physician Dr. Frey indicates, Mr. Weigand faces acute health risks and potentially "lethal complication[s]" as a result of his recent surgery and his underlying health issues. Ex. D. According to Dr. Frey, Mr. Weigand has shown "clear signs of liver and blood viscosity problems," placing him at "increas[ed] risk for stroke and heart attack." *Id.* The inflammation resulting from his recent surgery "also increases the risk of heart attack," as would contracting COVID-19. In Mr. Weigand's case, "[a]ny type of supplementary risk for Covid 19 infection should strongly be avoided. A lethal complication [such] as stroke or heart attack may occur due to a supplementary Covid 19 infection." *Id.* As Dr. Frey acknowledges, Mr. Weigand's underlying and previously documented respiratory condition—"obstructive sleep apnea syndrome"—and compromised immune system remain concerns and risk factors. *Id*; *see also* Ex. B at 1–2.

A second opinion from Dr. Peter Steifelhagen echoes these concerns, noting that Mr. Weigand's post-operative "healing process is not yet complete" and that the surgery, together with his underlying health issues and "weakened immune system," means the "risk of life-threatening complications would be much higher in the event of COVID 19 infection." Ex. E.

As previously noted, these health concerns are magnified by the risks of transfer to New York and by the unsafe conditions at the MCC and the MDC. *See* Ex. B at 2–5. The BOP has acknowledged that transfers between facilities carry the risk of exposure to other inmates who have not been tested. *Id*. at 2–3. And the MCC and the MDC remain unfit for an individual with Mr. Weigand's underlying health issues. *Id.* at 4–6. As of September 22, according to the BOP's official figures,





17 inmates and 44 staff members had tested positive for COVID-19 at the MDC, compared to 36 inmates and 47 staff at the MCC.[8]

Together with his low risk of flight, Mr. Weigand's health issues favor his release on bail. *See* Jed S. Rakoff, "Covid & the Courts," THE NEW YORK REVIEW OF BOOKS (May 28, 2020) ("The court could find, for example, that if the defendant is released there is still a 20 percent risk he will flee, but if he is detained there is now a 5 percent risk he will die, and that is a much greater evil.").

**IV. The Proposed Bail Package**

To alleviate this Court's concerns about risk of flight, we propose a very substantial bail package. The package consists of a $3 million personal recognizance bond, $470,000 in cash collateral provided by Mr. Weigand's close friends and family,[9] seven financially responsible co-signers who are prepared to sign the bond to the extent of $1.15 million, house arrest in New York in a rented apartment or hotel near defense counsel's New York office, strict pre-trial supervision with GPS monitoring, and transfer to New York under the supervision of his attorneys or a private security service. Mr. Weigand will also execute a waiver of his right to challenge extradition from both Germany and Luxembourg, where he has resided and established his business. As indicated in the enclosed letter of support from the German Consulate, Mr. Weigand's passport is in the possession of U.S. authorities and the German Missions in the United States will refuse to issue Mr. Weigand a new passport pending trial. *See* Ex. F. Mr. Weigand has also executed and delivered to the German Consulate a declaration confirming that he will not apply for a passport if he is released on bail, until U.S. authorities permit his return to Europe. Ex. G. Mr. Weigand is a German citizen only and has no travel document other than his German passport.

To the extent the Court deems it necessary, Janne Reisch—a member of the Bar in Rhode Island, Massachusetts, and Connecticut—remains willing to supervise Mr. Weigand at her home in Westerly, Rhode Island. She is also willing to surrender or post her law license as collateral to ensure Mr. Weigand's appearance at trial. *See* Ex. H. However, in light of the imminent trial date and Mr. Weigand's need to consult New York counsel to prepare, we respectfully request that Mr.

---

[8] *See* "09/22/2020 Report from the Bureau of Prisons regarding the Metropolitan Detention Center and Metropolitan Correctional Center," at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200922_060535.pdf.

[9] Letters of support from the German Consulate and from friends and family are enclosed, including letters from Moritz Lamp, Ute Rahmann-Fiedler, Renaud Kieffer, Bobby Thekkekara, Annabel Weigand, and Natalie Weigand. Ex. I.





Weigand remain in a rented apartment or hotel in New York pending trial, subject to the proposed bail conditions above.

**V. Conclusion**

For the foregoing reasons, we respectfully request that the Court grant Mr. Weigand's bail application.

Respectfully submitted,

*/s/ Andrew J. Levander*

Andrew J. Levander

CC (via ECF): AUSA Christopher J. DiMase
AUSA Nicholas S. Folly
AUSA Tara LaMorte