# EXHIBIT A:
## Bail Reconsideration Motion Dated April 20, 2020



Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
+1  212  698  3500  Main
+1  212  698  3599  Fax
www.dechert.com

**ANDREW J. LEVANDER**

andrew.levander@dechert.com
+1 212 698 3683  Direct
+1 212 698 0483  Fax

April 21, 2020

The Honorable Jed R. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:  *United States v. Weigand, et al.*, 20 cr. 188 (Bail Reconsideration Motion)

Dear Judge Rakoff:

On behalf of Ruben Weigand, a defendant in the above-captioned case, we write respectfully to request that the Court reconsider its March 17, 2020 order detaining Mr. Weigand pending trial.  Pursuant to 18 U.S.C. § 3142(f), changed circumstances that have "a material bearing" on the question of pre-trial release justify reopening Mr. Weigand's bail hearing.[1]

The exponential growth of COVID-19 and dire conditions that have developed in the prison system throughout the country since March 17 warrant reconsideration.  In 2018, Mr. Weigand was diagnosed with obstructive sleep apnea, a respiratory condition his doctor describes in the attached report as a "hypoventilation syndrome with corresponding oxygen depletion."  Ex. A. As his doctor states in the attached letter, "[s]leep apnea and resistance in [the] upper airway often cause a weakened immune system and Mr. Weigand presented corresponding severe symptoms."  Ex. B.  This places Mr. Weigand "at a significant risk [of] becom[ing] severely, possibly fatally, ill" if he is infected with the coronavirus.  *Id.*

In the last few weeks, many courts in this District, including this Court, have recognized the escalating impact of the virus on the prison system and released defendants on bail or refused to detain them, over the government's objection.  This Court recently denied the government's request to detain the defendant in *United States v. Lopez*, 19 cr. 323 (Mar. 23, 2020), stating

---

[1]      Under 18 U.S.C. § 3142(f), a bail "hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."



The Honorable Jed R. Rakoff
April 21, 2020
Page 2

that "the coronavirus situation does create, on its own, an exceptional circumstance possibility." Tr. at 8:10–11; 10:23–24. This Court found that it "creates a danger if [a defendant] is placed in a prison facility, regardless of where that facility is, while the virus is still increasing exponentially throughout the United States" and that "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want." *Id.* at 18:14–17; 18:25–19:2.[2]

As the Court is aware, the virus has significantly impacted attorney-client visits across the prison system. The fact that the pre-trial stage of this case is likely to be extended, given the suspension of jury trials, also militates in favor of pre-trial release.

Mr. Weigand is a successful businessman with a legitimate consulting company in the e-commerce space. He has no criminal history, and the government did not dispute that Mr. Weigand poses no danger to the community. *See* March 17 Bail Hearing, Tr. at 13:3–6. Indeed, the conduct at issue, according to the Indictment, ceased in 2019. Indictment at ¶ 1. The Indictment does not include any detail about what Mr. Weigand is alleged to have done in connection with the charged conspiracy, what his role is alleged to have been and what, if anything, he is alleged to have gained from his alleged participation. The discovery produced to date – most of which does not involve or reference Mr. Weigand – fails to elucidate whether he made any false statement to a U.S. financial institution. As noted in the Indictment itself, the underlying marijuana transactions were lawful under applicable state law. Indictment at ¶¶3, 10 n.2. The financial institutions that are the alleged victims received substantial fees in connection with the transactions at issue.

---

[2]     We understand that this Court recently denied motions for compassionate release in *United States v. Haney*, 19 cr. 541 (April 13, 2020) and *United States v. Pinto-Thomas, et al.*, 18 cr. 579 (April 13, 2020) and acknowledged certain steps the Federal Bureau of Prisons ("BOP") is taking to combat the spread of the virus. *See United States v. Haney*, 19 cr. 541, ECF No. 27 at 14–15 (April 13, 2020). We respectfully submit that Mr. Weigand's circumstances are distinguishable and weigh in favor of his release. The defendants in *Haney* and *Pinto-Thomas* had been convicted and sentenced. Mr. Weigand, of course, has not been convicted, continues to benefit from the presumption of innocence, and need not satisfy the stringent "extraordinary and compelling" standard applicable to compassionate release. *See Pinto-Thomas*, ECF No. 189 at 11; *see also* 18 U.S.C. § 3582(c)(1)(A). In addition, unlike the defendants in those cases, who had no diagnosed medical conditions or failed to present "strong evidence" of such an ongoing medical condition, *id.* at 7, Mr. Weigand has had a diagnosed and documented underlying medical condition since 2018.



The Honorable Jed R. Rakoff
April 21, 2020
Page 3

Recognizing the Court's concerns about risk of flight, we propose a very substantial bail package consisting of a $4 million personal recognizance bond, secured by Mr. Weigand's home in Luxembourg which is worth in excess of $3 million, with no liens,[3] $1,000,000 in cash provided by Mr. Weigand's close friends, three co-signers, strict pre-trial supervision with electronic/GPS monitoring, and a condition of house arrest (with permission to leave only for meetings with counsel or court appearances). Mr. Weigand would be confined to the home of Janne Reisch, Esq. in Westerly, Rhode Island. Ms. Reisch is a well-regarded family law and general practitioner and a member of the Bar in Rhode Island, Massachusetts, and Connecticut.[4] She is a close friend of Mr. Weigand's life partner of eleven years. Mr. Weigand will also execute a waiver of any rights he has to challenge extradition from Germany and Luxembourg (where he has lived since 2014 but is not a citizen).[5]

We respectfully submit that this considerable security, these stringent conditions, the nature of the case, and the extraordinary circumstances warrant granting bail to Mr. Weigand.

---

[3]  Since the process of posting his home in Luxembourg may be time-consuming and the government has expressed concerns about accepting foreign property as security, if the Court or the government prefers, Mr. Weigand will borrow against the house and post an additional $1 million in cash.

[4]  By agreeing to have Mr. Weigand subject to house arrest in her home, Ms. Reisch is placing her law license, livelihood, and well-earned reputation at risk. She is also prepared to sign the bond, placing her at additional financial risk up to $50,000. Two other co-signers, Mirko Huellemann and Markus Fuchs, both of whom have provided letters of support, attached as Exhibits C and D, are prepared to contribute $800,000 and $150,000, respectively, to the cash security. In addition to putting their cash collateral at risk, Mr. Huellemann will sign the bond to the full extent of $4 million and Mr. Fuchs to $75,000. Another friend, Benjamin Bayr, is prepared to contribute $50,000 in cash. A letter of support from Mr. Bayr is attached as Exhibit E.

[5]  Upon his release, we propose that he will either be escorted to Rhode Island by the Marshals or, if that is not feasible, that he be released to Pre-Trial Services in California, where a GPS tracking device can be activated. Ms. Reisch will travel to California and then accompany him, by plane or car, to Rhode Island, where the house arrest will be established. As a member of the Bar, she, of course, has an obligation to ensure that he complies with the Court's orders and can take no steps that would in any way assist him in avoiding this Court's orders.



## I.      BACKGROUND

<u>Procedural History</u>

On March 9, 2020, a grand jury indicted Mr. Weigand on a single count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349, alleging that Mr. Weigand and his co-conspirators "engaged in a scheme to deceive United States banks and other financial institutions into processing in excess of one hundred million dollars in credit and debit card payments for the purchase and delivery of marijuana products" in states in which the personal use of marijuana has been legalized, California and Oregon.  Indictment at ¶ 1.

During a layover at Los Angeles International Airport on March 9, Mr. Weigand was arrested by federal agents.  Mr. Weigand was presented in the Central District of California before Magistrate Judge Patrick J. Walsh, who ordered his release on bail.  His bail conditions included a $500,000 bond to be secured by equity and real estate; GPS location monitoring; the surrender of Mr. Weigand's passport and travel documents; and the restriction of his travel to the Los Angeles area and the Southern District of New York.  March 17 Bail Hearing, Tr. at 6:3–8.

The government appealed Magistrate Judge Walsh's decision to this Court.  After holding a telephonic bail review hearing on March 17, this Court determined that no condition or combination of conditions would reasonably assure Mr. Weigand's appearance, overruled the magistrate judge's bail decision, and ordered Mr. Weigand detained pending trial.  *Id.* at 27:22–28:4. Mr. Weigand is being detained at Santa Ana City Jail in Orange County, California. His arraignment, which the Court has ordered will be held telephonically, is scheduled for April 28, 2020.

<u>The Spread of COVID-19 and Prison Conditions</u>

As the Court recognized in its ruling in the *Lopez* case, since March 17, the COVID-19 pandemic has resulted in a rapidly escalating number of cases and deaths on a daily basis.  As of April 20, over 753,317 people across every state had tested positive for the virus.  More than 36,109 people have died in the United States.  Orange County, where Mr. Weigand is currently



The Honorable Jed R. Rakoff
April 21, 2020
Page 5

detained, has recorded over 1,600 confirmed cases and 32 deaths.[6]

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations" and "may also be less able to participate in proactive measures to keep themselves safe."[7]  These problematic prison conditions include forced interactions with correctional officers; inmates in close confines with multiple other inmates in shared cells or rooms, and the resulting impossibility of social distancing; limited access to soap, hand sanitizer, cleaning supplies and disinfectants; and delayed medical evaluation and treatment.[8] For these reasons, physicians have described prisons as "petri dishes for contagious respiratory illnesses" such as COVID-19.[9]

It has been reported that at least 10 inmates at the Santa Ana Central Jail, in close proximity to the facility in which Mr. Weigand is being detained, have contracted the virus, four of whom tested positive in early April.[10]  Additionally, two jail deputies at nearby facilities have also tested positive.[11]

---

[6]      "Coronavirus in the U.S.: Latest Map and Case Count," THE NEW YORK TIMES (April 20, 2020), at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[7]      "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

[8]      Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8):1047–1055 (Oct. 2007), at https://doi.org/10.1086/521910; Margo Schlanger and Sonja Starr, "Four Things Every Prison System Must Do Today," SLATE (Mar. 27, 2020), at https://slate.com/news-and-politics/2020/03/four-steps-prevent-coronavirus-prison-system-catastrophe.html.

[9]      "Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons," LOS ANGELES TIMES (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[10]      Tony Saavedra, "Full quarantine imposed at Orange County central jail after 4 more inmates contract virus," THE ORANGE COUNTY REGISTER (April 7, 2020), at https://www.ocregister.com/2020/04/07/full-quarantine-imposed-at-orange-county-central-jail-after-4-more-inmates-contract-coronavirus/.

[11]      *Id.*



The Honorable Jed R. Rakoff
April 21, 2020
Page 6

Mr. Weigand shares a windowless room with 14 other inmates at the Santa Ana City Jail.  Those other inmates are a transient population.  Moreover, almost every day, two or three of the other inmates leave the communal cell to clean the foyer where the general public enters and leaves the facility, exposing them to potentially infected individuals.  Hand sanitizer, disinfectant wipes, and other means of protecting against the virus are not readily available to inmates.

Prison conditions in Bureau of Prisons facilities in New York, too, are exceedingly challenging.  As this Court acknowledged in its recent decision in *United States v. Haney*, 19 cr. 541, ECF No. 27 at 1 (April 13, 2020), this "public health crisis and . . . national emergency . . . can best be reduced by the kind of social distancing not easily attained in an overcrowded federal prison facility."  Although this Court acknowledged that "the BOP has taken a number of steps to mitigate the spread of the virus," it was "ever mindful of the fact that conditions of confinement – sharing small cells, eating together, using same bathrooms and sinks, delays in medical evaluation and treatment, and rationed access to soap – make prisons more potentially conducive to the transmission of COVID-19 than elsewhere."  *Id.* at 14.  This Court added that early signs of containment and progress, including BOP data, "must be treated with great caution, as the BOP has so far only tested for COVID-19 those prisoners who seem to be sufficiently unhealthy as to be in need of possible hospitalization."  *Id.* at 16.

As of the end of March, the BOP had reported that at least five inmates at federal facilities had died due to COVID-19.[12]  The Federal Defenders and others have voiced concerns that the BOP official numbers significantly understate the number of cases and "obscure the magnitude of the crisis behind bars."[13]  There is a growing disparity between the numbers reported by the BOP and prison union officials.  Echoing the concerns this Court expressed in *Haney* about limited testing, the Federal Defenders have noted that inmates at the Metropolitan Correctional Center (MCC) and the Metropolitan Detention Center (MDC) in New York are being tested to

---

[12]     Melena Ryzik and Nancy Coleman, "As Tekashi69 Is Released, Inmates Fearing Coronavirus Ask, 'Why Not Me?'" THE NEW YORK TIMES (April 2, 2020), at https://www.nytimes.com/2020/04/02/arts/music/tekashi69-free-prison-coronavirus.html?action=click&module=Latest&pgtype=Homepage.

[13]     Noah Goldberg and Stephen Rex Brown, "Coronavirus pandemic rages at NYC's federal jails — and numbers back lawyers' and staffers' claims that management has a poor grip on the problem." NEW YORK DAILY NEWS (April 20, 2020), at https://www.nydailynews.com/coronavirus/ny-coronavirus-mdc-mcc-bop-20200420-t25khpqxkfdqfmpvixxvlvxqfm-story.html.



such a limited extent that the official BOP numbers are "sham numbers."[14]  In addition, staff and corrections officers at the MDC have reported to the press that the MDC has an inadequate number of healthcare providers and limited cleaning supplies and masks for staff, conditions "setting up an environment to spread th[e] disease."[15]  So far, due to coronavirus concerns, at least 38 inmates have been released from the MCC and 53 from the MDC.[16]

## II.    ARGUMENT

### A.    The Pandemic and the Defendant's Medical Condition Constitute Exceptional Circumstances Warranting Release on Conditions.

Courts in this district have found that the pandemic, by itself, has created "exceptional" circumstances that may justify a defendant's release, even absent underlying health conditions. *See* 18 U.S.C. § 3145(c) ("A person subject to detention pursuant to section 3143(a)(2) or (b)(2) . . . may be ordered released, under appropriate conditions . . . if it is clearly shown that there are *exceptional reasons* why such person's detention would not be appropriate.") (emphasis added).

In *United States v. Lopez*, 19 cr. 323 (Mar. 26, 2020), accounting for the spread of the virus and its potential impact on the defendant, this Court denied the government's request to detain a defendant who had violated the terms of his pre-trial release, even though he had no underlying health conditions and reported no symptoms.  March 23 Bail Hearing, Tr. at 9:11–17.  The Court found that the coronavirus had caused "the creation of . . . exceptional circumstances and all of its aspects" in the defendant's case.  *Id.* at 18:9–11.  The Court added that the virus "creates a danger if [a defendant] is placed in a prison facility, regardless of where that facility is, while the virus is still increasing exponentially throughout the United States" and observed that "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want."  *Id.* at 18:14–17; 18:25–19:2.  Similarly, in *United States v. Estime*, 19 cr. 711 (Mar. 27, 2020), even though the defendant had no underlying medical conditions, Magistrate Judge Paul E. Davison ordered his release because of the virus.  *See also United States v. Opuoru*, 16 cr. 148, ECF No. 449 (April 2, 2020) (releasing, on consent, defendant with no

---

[14]    *Id.*

[15]    *Id.*

[16]    *Id.*



underlying medical conditions because of the risk posed by COVID-19 and restrictions on his right to counsel).

Several courts in this district have recognized that the risks the virus poses are amplified when a defendant has underlying medical conditions. *See, e.g.*, *United States v. Perez*, 19 cr. 297, ECF No. 62 (Mar. 19, 2020) (ordering the release of a defendant over the government's objection because his lung disease and related health conditions placed him "at a substantially heightened risk of dangerous complications" if he contracted COVID-19); *United States v. Reinaldo Roman*, 19 cr. 116, ECF No. 155 (Mar. 27, 2020) (finding that "the combination of the COVID-19 pandemic" and the defendant's preexisting health conditions that "heighten[e]d his risk of complications from the virus" presented "exceptional reasons to justify his release pending sentencing"); *United States v. Brown*, 15 cr. 623, ECF No. 43 (April 8, 2020) (releasing, over government's objection, defendant with asthma).[17]

Although the risks posed by the virus independently justify his release, Mr. Weigand's diagnosed condition renders him even more vulnerable to the virus. *See* Ex. A (diagnosing "a hypoventilation syndrome with corresponding oxygen depletion."); Ex. B ("Sleep apnea and resistance in [the] upper airway often cause a weakened immune system and Mr. Weigand presented corresponding severe symptoms.").

## B.    Defendants In This District Have Been Released On Bail Due to the Pandemic Even When They Pose A Danger To The Community, Which Mr. Weigand Does Not.

As noted above, the government does not dispute that Mr. Weigand poses no danger to the community.

The spread of COVID-19 has resulted in the release in this district of defendants who have been charged with violent crime or pose an ongoing danger to the community.  In addition to this Court's decision in the *Lopez* case, in which the defendant had pled guilty to attempted Hobbs Act robbery and use of a firearm in relation to a drug trafficking crime, in *United States v. Hudson*, 19 cr. 496 (Mar. 19, 2020), Judge McMahon ordered the release over the government's

---

[17]    Courts in the Eastern District of New York have also taken this approach based on inmates' underlying medical conditions.  *See, e.g.*, *United States v. Jackson*, 18-CR-606 (JS) (April 13, 2020) (releasing, over the government's objection, a defendant with sleep apnea, asthma, obesity and hypertension in a drug conspiracy case in which she faces 360 to life career offender guidelines).



The Honorable Jed R. Rakoff
April 21, 2020
Page 9

objection of a defendant charged with narcotics conspiracy, loansharking, and extortion based on "compelling reasons related to the current health crisis." The defendant's bail application had been denied twice before because of the danger he posed to the community. *See also United States v. Santiago Ramos*, 20 cr. 04 (Mar. 19, 2020) (denying, due to the risk of the COVID virus, the government's request for revocation and detention, despite the government's allegations that the defendant had continued to commit felonious conduct and had violated his initial conditions of pre-trial release by seeking to defraud additional investors and communicating with witnesses and victims without counsel).

Because Mr. Weigand poses no danger to the community, he too should be released.

**C.      The Proposed Bail Package And Stringent Bail Conditions Will Assure Mr. Weigand's Appearance at Trial.**

We respectfully submit that the substantial bail package we propose will reasonably assure Mr. Weigand's appearance at trial.

Although the March 17 hearing focused on the fact that Mr. Weigand is a German citizen and Germany does not extradite its citizens, since 2014, Mr. Weigand has resided in and established his business in Luxembourg. His life partner lives and works there; and his primary residence, the home he is prepared to post as collateral, is there. Luxembourg has an extradition treaty with the United States and has extradited individuals to the United States. *See, e.g.*, *United States v. Garcia*, 37 F.3d 1359 (9th Cir. 1994) (describing the extradition from Luxembourg to the United States of a former DEA agent); *United States v. Jurado-Rodriguez*, 907 F. Supp. 568, 571 (E.D.N.Y. 1995) (detailing the extradition from Luxembourg to the United States of individuals indicted on drug and money laundering charges).[18]

---

[18]      Mr. Weigand would be subject to extradition to the United States from Luxembourg on the charges in the indictment. None of the conditions that may bar or result in the denial of extradition under the treaty appear to apply in Mr. Weigand's case: he is not a Luxembourg citizen; he has not been convicted or acquitted in Luxembourg on the charges in the indictment; and the charged offenses are not "fiscal offenses" for which extradition may be denied, including offenses relating to the "payment of taxes or customs duties" and "currency exchange laws." *Extradition Treaty with Luxembourg* (Oct. 1, 1996), Articles 2, 3, 4, 5, and 6.



The Honorable Jed R. Rakoff
April 21, 2020
Page 10

Mr. Weigand will execute a waiver of his right to challenge extradition from both Germany and Luxembourg. Courts in this district have credited a defendant's waiver of the right to challenge extradition. In *United States v. Bodner*, for example, the Court credited a Swiss national's written waiver of his right to challenge extradition. The court noted that, if the government's argument that "the Swiss government will not extradite Swiss nationals" were "taken to its logical conclusion, no Swiss national would ever be eligible for bail." 2004, WL 169790, at *2 (S.D.N.Y. 2004). Mr. Weigand will also surrender any and all travel documents and will make no new applications.

The enclosed letters of support, which speak to Mr. Weigand's good character and reputation for honesty, further underscore that Mr. Weigand is not a flight risk. Ex. C, D and E.

### D.     The Elongated Pre-Trial Schedule In This Case and Likelihood of a Delayed Trial Favor Pre-Trial Release on Conditions.

Because of the spread of the virus, the pre-trial stage of this case is likely to be significantly longer than otherwise, and Mr. Weigand's trial may be delayed for an extended period. All jury duty calls have been suspended in the Southern District of New York and, under the most recent standing order on courthouse operations, "the conduct of jury trials in this district . . . is suspended until further order of the court."[19]

This Court has also accounted for the virus in its scheduling order in this case. The government has been granted four weeks to complete the production of discovery, two weeks longer than this Court's usual practice, and Mr. Weigand's arraignment has been scheduled for April 28, a delay that is also a departure from the Court's usual practice. March 17 Bail Hearing, Tr. at 32:7–9 ("My normal practice is to arraign a defendant the day after he or she is indicted, not to give six weeks from the time of a bail hearing."). The scheduling of Mr. Weigand's trial may also be impacted by the trial schedule of his co-defendant's counsel, David Chesnoff. Mr. Chesnoff represents Robert Durst in a murder trial in Los Angeles. The trial, expected to last

---

[19]     Standing Orders, "Suspension of Jury Trials as a result of COVID-19 and the Limitation of Court Operations," 20 misc 197 (April 20, 2020), at https://nysd.uscourts.gov/sites/default/files/2020-04/STANDING%20ORDER_%20In%20re_%20CORONAVIRUS_COVID_19%20PANDEMIC_%20This%20Matter%20Relates%20To_%20Suspension%20of%20Jury%20Trials%20and%20Other%20Limitation%20of%20COurt%20Operations_Third%20Standing%20Ord.pdf.



The Honorable Jed R. Rakoff
April 21, 2020
Page 11

five months, started in March but was then postponed until at least May 26 due to the coronavirus.[20]

## E.        The Discovery Produced to Date

As noted above, the Indictment is bereft of any detail as to Mr. Weigand's conduct.  The substantial majority of the discovery produced to date does not refer to Mr. Weigand at all. Indeed, neither the Indictment nor the government[21] has provided any information about what Mr. Weigand allegedly received in connection with the charged fraud scheme, the victims of which suffered no financial harm (and, in fact, made millions of dollars).  Indeed, the production we received from the government yesterday included an affidavit, filed last week, to obtain a warrant to search Mr. Weigand's cell phones and laptop computer.  In the affidavit, there is no assertion about any compensation Mr. Weigand allegedly received and no reference to his submission of any false information to U.S. financial institutions.

## F.        In The Alternative, Mr. Weigand Should Be Released Under 18 U.S.C. § 3142(i) Because His Release Is Necessary For The Preparation Of His Defense.

18 U.S.C. § 3142(i) permits the "temporary release" of a defendant "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." The Bureau of Prisons has suspended all legal visits through at least May 18.[22]

Although Mr. Weigand is able to reach counsel by telephone from the Santa Ana City Jail, the phone available to him is next to the television in the communal cell and only accessible if no other inmate is using it.  There is no privacy and the noise level in the cell makes it difficult to have a methodical and intelligible conversation.  In addition, the public defender's office in

---

[20]        *See, e.g.*, Claudia Koerner and Drusilla Moorhouse, "The Robert Durst Murder Trial Is On Hold Because Of The Coronavirus Pandemic," BUZZFEED NEWS (Mar. 15, 2020), at https://www.buzzfeednews.com/article/claudiakoerner/robert-durst-murder-trial-coronavirus.

[21]        The government made an initial production on April 10 and a second production yesterday.

[22]        Federal Bureau of Prisons, "BOP Implementing Modified Operations," at https://www.bop.gov/coronavirus/covid19_status.jsp.



Orange County has recently alleged that attorney-client privileged calls in Orange County facilities were illegally recorded and provided to prosecutors.[23]   The reality is that Mr. Weigand's ability to consult with New York counsel is extremely limited, at best.

Courts in this district have recognized that the pandemic and suspension of legal visits have significantly impaired defendants' ability to meet with counsel and prepare their defenses. Indeed, in *United States v. Stephens*, Judge Nathan acknowledged that the BOP response and "the obstacles the current public health crisis pose[d] to the preparation of the Defendant's defense constitute[d] a compelling reason [for his temporary release] under 18 U.S.C. § 3142(i)" and ordered his release.  ECF No. 2798 at 5 (March 19, 2020).

In the Central District of California, too, in light of the virus, Judge James Selna recently ordered the 90-day temporary release of defendant Michael Avenatti, who has already been convicted of fraud and extortion in a separate prosecution in the Southern District of New York. *See United States v. Avenatti,* 19 cr. 373.  Judge Selna ordered his release from the MCC on a $1 million bond—subject to confinement at a friend's home, electronic monitoring, and other conditions—with the aim of allowing Avenatti to prepare for his upcoming embezzlement trial. *United States v. Avenatti*, 19 cr. 61, ECF No. 140 (April 10, 2020).

Mr. Weigand's incarceration and the health crisis have dramatically impeded his ability to consult with counsel and prepare his defense.  Given his detention in California and the prevailing BOP restrictions, his ability to consult his New York counsel and prepare his defense will continue to be compromised if he is not released.

Accordingly, 18 U.S.C. 3142(i) presents an alternative basis for Mr. Weigand's release.

---

[23]       Tony Saavedra, "DA asked to investigate Orange County's illegally recorded attorney-client phone calls," THE ORANGE COUNTY REGISTER (Mar. 12, 2020), at
https://www.ocregister.com/2020/03/12/da-asked-to-investigate-orange-countys-illegally-recorded-attorney-client-phone-calls/.



### III.     CONCLUSION

For the reasons above, we respectfully request that the Court reopen Mr. Weigand's bail hearing and grant his bail application.

Respectfully submitted,

*/s/ Andrew J. Levander*

Andrew J. Levander


CC (via ECF):  AUSA Christopher J. DiMase
                       AUSA Nicholas S. Folly
                       AUSA Tara LaMorte

# EXHIBIT B:
## Request to Stay Transfer to New York
## Dated August 18, 2020



Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
+1  212  698  3500  Main
+1  212  698  3599  Fax
www.dechert.com

**ANDREW J. LEVANDER**

andrew.levander@dechert.com
+1 212 698 3683  Direct
+1 212 698 0483  Fax

August 18, 2020

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:      *United States v. Weigand & Akhavan*, 20 cr. 188

Dear Judge Rakoff:

We represent Ruben Weigand, a defendant in the above-captioned case, who is detained pending trial in the Santa Ana City Jail in the Central District of California.  Your Honor has directed that the Order staying Mr. Weigand's removal to the Southern District of New York remain in effect until August 31, 2020.  ECF No. 84.  However, the Court indicated that it "is unlikely to grant further such extensions beyond August 31, 2020."  *Id.*  For the reasons set forth below, we respectfully request a further 30-day extension of the Order staying Mr. Weigand's removal to New York.  The Government takes no position on this application.

Mr. Weigand's health has recently taken an alarming turn for the worse.  On August 6, Mr. Weigand experienced severe stomach pain, which persisted for several days, after which his hands, neck, and other parts of his body developed a yellow hue.  He is also experiencing dizziness, itchiness throughout his body, severe exhaustion, and discoloration of his urine.  Mr. Weigand had his blood drawn on August 11 and was seen by a doctor, who suspects Mr. Weigand has liver disease.  He is awaiting results from blood tests.  Publicly available information from the Centers for Disease Control and Prevention indicates that individuals with liver disease are at a higher risk of contracting the coronavirus.[1]

As the Court will recall, Mr. Weigand was also diagnosed in 2018 with the respiratory condition known as "obstructive sleep apnea syndrome," a "significant hypoventilation syndrome with corresponding oxygen depletion."  ECF No. 26-2, Ex. A.  Mr. Weigand's diagnosed "[s]leep apnea and resistance in [his] upper airway often cause a weakened immune system and Mr. Weigand [has]

---

[1] Centers for Disease Control and Prevention, "What to Know About Liver Disease and COVID-19," May 5, 2020, at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html.



The Honorable Jed R. Rakoff
August 18, 2020
Page 2

presented corresponding severe symptoms." ECF No. 26-2, Ex. B. His doctor has stated that he is at risk of "becom[ing] severely, possibly fatally, ill [if] infected with the coronavirus." *Id.*

The process the Bureau of Prisons ("BOP") uses to transfer inmates poses extraordinary risks to Mr. Weigand, given his health issues. In addition, upon arriving in New York he would be required to quarantine for 14 days, which entails solitary confinement in the Special Housing Unit (the "SHU"). Finally, both the Metropolitan Correctional Center ("MCC") and the Metropolitan Detention Center ("MDC") are still not permitting in-person attorney visits and the conditions in those facilities remain dangerous for inmates with underlying health conditions.

## I.      The Risks of Transfer

On August 5, the BOP released its "Coronavirus (COVID-19) Phase Nine Action Plan" (BOP Action Plan), its most recent guidance on "the management of the pandemic" at its institutions.[2] The BOP Action Plan addresses the protocol for moving inmates between facilities and acknowledges that transfers can be "a complex, multi-day, multi-institution process" and that "[t]he risk of COVID-19 exposure and transmission increases as the complexity of the move increases."[3]

The Action Plan also contemplates the use of holdover sites or bus hubs to facilitate the transfer of inmates between distant facilities. However, the BOP acknowledges that it is often "not possible or verifiable" to determine if all transferred inmates "have been tested for COVID-19 prior to transport," especially if inmates from BOP facilities are commingled with those from non-BOP facilities, such as the Santa Ana City Jail, which may be "unavoidable."[4] Indeed, recent reports have exposed a dangerous lack of testing by the BOP and the U.S. Marshals Service before inmates are transferred from one facility to another. *See* Keegan Hamilton and Keri Blakinger, "'Con Air' Is Spreading COVID-19 All Over the Federal Prison System," THE MARSHALL PROJECT (Aug. 13, 2020) ("[F]ederal prisoners in Marshals custody are being shipped around the U.S. by plane, van, and bus with no way to know if they are carrying the virus, and exposing other prisoners, staff, and possibly the public along the way."), at https://bit.ly/3g7RtGx.

The conditions, sanitariness, and COVID-readiness of holdover sites have been documented to be "notoriously poor." Liliana Segura, "The Coronavirus Brought Federal Transfers to a Halt. Now People    Are    Stuck    in    Limbo,"    THE    INTERCEPT    (July    9,    2020),

---

[2] Federal Bureau of Prisons, "Coronavirus (COVID-19) Phase Nine Action Plan," at https://prisonology.com/wp-content/uploads/2020/08/COVID-19-Phase-9-COVID-Action-Plan.pdf.

[3] *Id.*

[4] *Id.*



The Honorable Jed R. Rakoff
August 18, 2020
Page 3

https://theintercept.com/2020/07/19/coronavirus-prison-transfers-bop/. The transfer process has been described as "destabilizing and opaque," with "no telling how long a transfer w[ill] take, or how many stops a person in custody w[ill] make along the way. The virus has managed to make it even worse." *Id.* Further, transferred inmates may also be exposed to high-risk holdover sites along the way, including facilities identified by the Attorney General as facing "serious problems," including FCI Danbury, FCI Elkton, and FCI Oakdale. *Id.*[5]

The risks to Mr. Weigand are acute because of his suspected liver disease, his documented respiratory conditions, and his compromised immune system, which place him at risk of "becom[ing] severely, possibly fatally, ill [if] infected with the coronavirus." ECF No. 26-2, Ex. B.

## II.  Post-Transfer Quarantine

Under BOP protocol, "[t]ransferred inmates will undergo the same process as a new intake," which includes "new intake quarantine at the final designated facility."[6] The wardens at the MCC and MDC have both stated that new arrivals, including transferred inmates, are "placed in quarantine for fourteen days as a precautionary measure."[7] At the MCC and the MDC, this protocol applies even to "[n]ew arrivals with a temperature of less than 100.4 degrees" and "[t]hose who are asymptomatic."[8]

In practice, this quarantine protocol has meant isolating inmates in the SHU. As Judge Ramos stated in an opinion issued last month, "[t]he SHU is normally used to house inmates being disciplined or who are being protected for some reason, and many [have] inmates expressed trepidation about being sent there for medical isolation, referring to it as 'the box.'" *Fernandez-Rodriguez v. Lincoln-Vitale*, No. 20 Civ. 3315, 2020 WL 36118941, at *6 (S.D.N.Y. July 2, 2020). "SHU cells contain a single concrete slab that functions as a bed, a concrete stool, and a

---

[5] *See also* Memorandum for Director of Bureau of Prisons, "Increasing Use of Home Confinement at Institutions Most Affected by COVID-19," April 3, 2020, at https://www.justice.gov/file/1266661/download.

[6] Federal Bureau of Prisons, "Coronavirus (COVID-19) Phase Nine Action Plan," at https://prisonology.com/wp-content/uploads/2020/08/COVID-19-Phase-9-COVID-Action-Plan.pdf.

[7] "08/11/2020 Report from the Bureau of Prisons regarding the Metropolitan Detention Center and Metropolitan Correctional Center," at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200811_025512.pdf.

[8] *Id.*



The Honorable Jed R. Rakoff
August 18, 2020
Page 4

combination sink and toilet" and the MCC warden has acknowledged that "the conditions for the inmates in the SHU are not as favorable as conditions in an ordinary cell." *Id.*[9]

### III.      Conditions at the MCC and the MDC

After transfer and quarantine, Mr. Weigand would be confined in the MCC or MDC pending trial. Both institutions have suspended in-person attorney visiting at this time.[10] The Santa Ana City Jail, where Mr. Weigand is currently detained, is not a BOP facility and he has access to counsel, although not without constraints on his ability to communicate freely and easily with counsel.

And, more generally, the conditions at the MCC and MDC for someone with medical conditions are dangerous and pose far more risk to Mr. Weigand than does the Santa Ana facility.

Inmates at the MCC initiated a class action in this Court alleging that the MCC warden and her staff were deliberately indifferent to "conditions that pose[d] an excessive risk to their health and safety" in violation of their rights under the Fifth and Eighth Amendments of the U.S. Constitution. Judge Ramos addressed their claims in a detailed opinion that documented the spread of the virus at the MCC and the failure on the part of "management of the MCC . . . to implement common-sense measures to stop the spread of the virus." *Fernandez-Rodriguez v. Lincoln-Vitale*, 2020 WL 36118941, at *1. Judge Ramos recognized that, following an outbreak at the facility "[i]n March and April, at least five percent of the MCC's inmates fell ill with COVID-19." *Id.* The Court found that "the MCC's response to the pandemic was ad-hoc and overlooked many gaps in its scheme to identify and isolate infected inmates . . . ." *Id.* at *2.

Indeed, management at the MCC admitted to a litany of failures of oversight, management, and safety. *Id.* at *20. These "material failings in the MCC's system for identifying infected inmates and ensuring their prompt isolation . . . especially . . . medically vulnerable inmates" prompted the Court to find last month that "the MCC's inmates faced a substantial risk to their health . . . ." *Id.* at *21. Further, the Court found "[t]he conditions facing the MCC [to be] worse" than those facing

---

[9] *See also* Chris Villani, "Ex-PIMCO CEO Rips Solitary Quarantine in Admissions Case," Law360 (Aug. 6, 2020) (describing solitary confinement in "a 77-square-foot prison cell for nearly 24 hours per day due to the COVID-19 pandemic"), at https://www.law360.com/articles/1299156/ex-pimco-ceo-rips-solitary-quarantine-in-admissions-case.

[10] "BOP Implementing Modified Operations," at
https://www.bop.gov/coronavirus/covid19_status.jsp#:~:text=MODIFIED%20OPERATIONS%3A%20BO
P%20is%20implementing,gathering%20and%20maximize%20social%20distancing.



comparable correctional facilities, including facilities identified by the Attorney General as those "most affected by COVID-19," including FCI Danbury, FCI Elkton, and FCI Oakdale. *Id.*[11]

These dangerous conditions and failures of management have not abated at the MCC. As Judge Ramos acknowledged, "[e]ven [in early July], after the peak of the outbreak at the MCC, a handful of inmates continue[d] to test positive for the disease." *Id.* at *1. Indeed, according to the MCC's own numbers, an additional 20 MCC inmates tested positive for COVID-19 between July 7, 2020 and August 11, 2020.[12] Because of the limited testing at the facility, those official figures in all likelihood understate the severity of the problem at the MCC.[13]

The MDC has not fared much better. Indeed, conditions at that institution also sparked litigation by inmates against the MDC warden on the ground that "MDC officials' response to the pandemic has been so deficient as to violate the Eighth Amendment." *Chunn v. Edge*, No. 20 civ. 1590, 2020 WL 3055669, at *1 (E.D.N.Y. June 9, 2020). Both courts in this District and the Eastern District of New York have recognized the risks posed by conditions at the MDC and granted applications for compassionate release on that basis. *See, e.g.*, *United States v. Kissi*, No. 13 cr. 51, 2020 WL 3723055, at *1 (E.D.N.Y. June 26, 2020) (granting motion for compassionate release based in part on "the medical risks presented by the conditions at the Metropolitan Detention Center"); *see also United States v. Lopez*, 16 cr. 317, 2020 WL 3100462, at *2 (S.D.N.Y. June 10, 2020) (recognizing that "the crowded nature of federal detention centers such as the MDC presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread.").

As of August 11, 2020, according to official BOP figures, 14 inmates and 44 staff members had tested positive at the MDC, compared to 29 inmates and 47 staff at the MCC.[14]

---

[11] *See also* Memorandum for Director of Bureau of Prisons, "Increasing Use of Home Confinement at Institutions Most Affected by COVID-19," April 3, 2020, at https://www.justice.gov/file/1266661/download.

[12] *See* "07/07/2020 Report from the Bureau of Prisons regarding the Metropolitan Detention Center and Metropolitan Correctional Center," at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200709_033921.pdf; "08/11/2020 Report from the Bureau of Prisons regarding the Metropolitan Detention Center and Metropolitan Correctional Center," at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200811_025512.pdf.

[13] Josh Gerstein, "U.S. prisons' virus-related release policies prompt confusion," POLITICO (April 12, 2020), at https://www.politico.com/news/2020/04/10/us-prisons-virus-related-release-policies-prompt-confusion-178691.

[14] *See* "08/11/2020 Report from the Bureau of Prisons regarding the Metropolitan Detention Center and Metropolitan Correctional Center," at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200811_025512.pdf.



The Honorable Jed R. Rakoff
August 18, 2020
Page 6

Accordingly, the unsafe conditions at the MCC and the MDC, Mr. Weigand's specific health concerns, and the likely limits on his access to counsel at those facilities favor extending his detention in California and postponing his transfer to New York.

**IV.    Conclusion**

For the reasons above, we respectfully request that the Court extend the stay of Mr. Weigand's removal to New York by an additional 30 days. We also respectfully reserve our right to make another bail application based in part on the concerns identified herein. In the event the Court declines to postpone Mr. Weigand's transfer to New York, we respectfully request that the Court recommend to the BOP that he be transferred by plane, not by bus.


Respectfully submitted,


*/s/ Andrew J. Levander*

Andrew J. Levander

CC (via ECF):   AUSA Christopher J. DiMase
                AUSA Nicholas S. Folly
                AUSA Tara LaMorte