# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - X
                                        :

UNITED STATES OF AMERICA       :

    - v. -                      :   **SEALED INDICTMENT**

                                        :

HAMID AKHAVAN,               :   S3 20 Cr. 188 (__)
    a/k/a "Ray Akhavan," and
RUBEN WEIGAND,              :

            Defendants.    :

- - - - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 3 1 2020

**COUNT ONE**
**(Conspiracy to Commit Bank Fraud)**

The Grand Jury charges:

OVERVIEW OF THE SCHEME

1. From at least in or about 2016, up to and including in or about 2019, HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, principals at one of the leading on-demand marijuana delivery companies in the United States (the "Online Marijuana Marketplace Company"), and other co-conspirators, engaged in a scheme to deceive United States banks and other financial institutions into processing in excess of one hundred million dollars in credit and debit card payments for the purchase and delivery of marijuana products (the "Transaction Laundering Scheme"). Because many United States banks are unwilling to process payments involving the purchase

of marijuana, the Online Marijuana Marketplace Company used fraudulent methods to avoid these restrictions and to receive in excess of one hundred million dollars from customers located in California and Oregon who purchased marijuana through the Online Marijuana Marketplace Company.

2. To effectuate the Transaction Laundering Scheme, HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, and several of the principals of the Online Marijuana Marketplace Company, arranged for the money received from the Online Marijuana Marketplace Company's customers to be disguised as payments to over a dozen phony online merchants and other non-marijuana businesses (the "Phony Merchants"), including transactions that appeared to be for stenographic services, music stores/pianos, and cosmetic stores. To accomplish this deceit, the Online Marijuana Marketplace Company relied on third party payment processors (the "Payment Processors") who worked with AKHAVAN, WEIGAND, and other co-conspirators to create phony offshore corporations and websites (i.e., the Phony Merchants) and open offshore merchant bank accounts. AKHAVAN, WEIGAND, and other members of the conspiracy used the Phony Merchants' offshore bank accounts to disguise payments made to the Online Marijuana Marketplace Company for the purchase of marijuana products and to deceive United States banks about the true nature of the financial transactions they were processing.

2

Working together, AKHAVAN, WEIGAND, other Payment Processors, and principals of the Online Marijuana Marketplace Company deceived United States banks and financial institutions—including federally insured institutions—into processing in excess of one hundred million dollars in marijuana purchases made through the Online Marijuana Marketplace Company.

## BACKGROUND ON THE ONLINE MARIJUANA MARKETPLACE COMPANY

3. At all times relevant to this Indictment, the Online Marijuana Marketplace Company was a California-based company that arranged for on-demand sale and delivery of marijuana products to customers located in California and Oregon. Through the Online Marijuana Marketplace Company's mobile application and website (collectively, the "Applications"), customers could order marijuana from different dispensaries listed on the Applications. Specifically, customers used the Applications to select the marijuana product(s) of their choice, and to receive delivery of their selection shortly thereafter. Although the Online Marijuana Marketplace Company operated the technology platform through which users purchase marijuana (i.e., the Applications), it was not the actual retailer of the marijuana. The actual retailers, referred to as "dispensaries," contracted with the Online Marijuana Marketplace Company to fulfill orders placed by customers through the Applications.

3

4. To request and receive a delivery of marijuana through the Applications, a user created an Online Marijuana Marketplace Company account through the company's website or mobile application. Once the customer selected his or her product(s) for purchase, the Application generated a check-out screen for the order where the customer could select a payment option. At various points from in or around 2016, through in or around 2019, one of the payment options offered by the Online Marijuana Marketplace Company for purchases of marijuana were credit cards and debit cards. For purchases with credit cards or debit cards, the Applications allowed customers to enter their card information and then complete the payment using that information.

5. Once a customer placed an order, a delivery driver would deliver the order to the customer shortly thereafter. Once the delivery was complete, the Online Marijuana Marketplace Company generated and transmitted via email a receipt for the purchase. When customers made purchases by credit cards or debit cards, those purchases would appear on the customers' card statements as though they were from merchants other than the Online Marijuana Marketplace Company (e.g., a merchant from whom the customer had not in fact purchased the marijuana).

6. The Online Marijuana Marketplace Company stopped accepting credit card payments in or around mid-2019.

4

BACKGROUND ON CREDIT AND DEBIT CARD PROCESSING

7.   Credit and debit card transactions are usually processed through payment networks (the "Payment Networks"), run by entities such as MasterCard or Visa (the "Credit Card Companies"), that provide authorization, clearing and settlement services for credit and debit card transactions.  Financial institutions, as members of these payment networks, can offer payment processing services directly to merchants, but more commonly partner with non-bank third parties — including payment processors, Independents Sales Organizations ("ISOs"), and Merchant Service Providers ("MSPs," collectively with ISOs and payment processors, the "Processors") — for such third parties to process payments on behalf of the sponsoring financial institutions.  These processors are typically required to be registered with the Payment Networks.

8.   Processors typically use Payment Networks set up by the Credit Card Companies.  The Credit Card Companies have rules that prohibit their credit cards from being used for marijuana purchases.  Violations of these rules can lead to penalties and ultimately to a merchant being terminated.  Debit cards that are issued by banks often fall under the same rules because the Processors typically use the Credit Card Companies' Payment Networks.

5

9. When purchases are made with a credit or debit card, merchant category codes ("MCCs") are assigned to each transaction that are specific to the category of product or service being purchased. Because the Credit Card Companies do not support marijuana transactions, they do not have marijuana merchant codes. As a result, in order to process a marijuana transaction through a Credit Card Company, a false merchant code — i.e., a merchant code associated with a different product or product category — would have to be used. HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, and their co-conspirators, used merchant codes for other products — typically referred to as "miscoding" — in order to get around these rules.

10. Online credit card and debit card payment transactions typically consist of two steps: (1) an authorization; followed by (2) clearing and settlement. Card authorization for online purchases generally works as follows:

a. A cardholder (i.e., the individual making the purchase online) initiates a transaction by entering a credit or debit card number, card expiration date, and other security features required by the merchant, such as the Card Verification Value ("CVV") number or the cardholder's zip code.

6

b.  The merchant uses its payment software or gateway[1] to transmit the cardholder's information and the details of the transaction, including the name and location of the merchant, the MCC, a description of the goods and services purchased (sometimes referred to as the "descriptor"), the amount of the transaction, and the transaction date, to its partner Processor (or directly to the merchant's bank, which is often referred to as the "acquiring bank").

c.  The Processor captures the transaction information and routes it through a Payment Network to the cardholder's "issuing bank," as defined below, to be approved or declined.

d.  The bank issuing the credit or debit card to the customer ("issuing bank") receives the transaction information from the Processor and responds by approving or declining the transaction. Issuing banks in the United States generally will not extend credit (i.e., approve) transactions that involve unlawful activity under federal law, such as the sale of marijuana.[2]

---

[1] A payment gateway is a technology used by merchants to accept debit or credit card purchases from customers. For online sales, this typically refers to the "checkout" portals used to enter credit card information or credentials.

[2] Although the personal use of marijuana has been legalized under state law in several states, including California and Oregon, marijuana is a Schedule I Controlled Substance under the

7

e. The issuing bank sends a response code back to the Processor, and that code reaches the merchant's payment gateway and is stored in a batch file pending settlement, which is described below.

f. If the merchant receives authorization, the issuing bank will place a hold for the amount of the purchase on the cardholder's account pending settlement.

g. Finally, the merchant typically provides the customer a receipt to complete the sale. This entire authorization process usually takes place within seconds.

h. In order to accept transactions on behalf of the Credit Card Companies, the acquiring bank must be a registered member of the Credit Card Companies.

11. Step two of the credit card and debit payment card process is clearing and settlement, which pertains to the recording of the movement of funds ("clearing"), and the actual flow of funds ("settlement"). Clearing and settlement generally works as follows:

a. During the clearing stage, the issuing bank posts to each cardholder's account the transaction information that it received from the merchant (or from the Processor after

---

Controlled Substances Act, and the possession, distribution, and use of marijuana is unlawful under federal statutes, including Title 21, United States Code Sections 841 and 844.

8

receiving it from the merchant), including the name of the merchant and the amount for each transaction. However, in the clearing stage, there is no exchange or transfer of funds.

  b. The acquiring bank then credits the merchant's account and submits the transaction to the respective Credit Card Company's Payment Network for settlement.

  c. In the settlement stage, the Credit Card Companies use their Payment Networks to forward each transaction to the appropriate issuing bank, which ordinarily will transfer funds for the approved transaction, less a fee.

  d. The Credit Card Companies typically use their Payment Networks to pay the acquiring bank (and sometimes the Processor) its respective percentages from the remaining funds, after which the Processor pays the merchant an amount equal to the cardholder purchases, minus a fee charged to merchants for processing the debit and credit card transactions (i.e., the "merchant discount rate").

  e. The final step is for the issuing bank to use the information it has received from each transaction to prepare monthly cardholder statements, which are distributed to cardholders. These statements typically identify each credit or debit card purchase made by the cardholder, the amount of the purchase, and the name associated with the merchant.

9

THE TRANSACTION LAUNDERING SCHEME

12. During the time period charged in this Indictment, because most banks in the United States were unwilling to process credit and debit card transactions involving marijuana, HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, and other members of the conspiracy, used several strategies to trick United States issuing banks into authorizing marijuana transactions for the Online Marijuana Marketplace Company. The primary method used by AKHAVAN, WEIGAND, and other co-conspirators, involved the creation and use of the Phony Merchants. These fraudulent companies were used to open offshore bank accounts with merchant acquiring banks and to initiate credit card charges for marijuana purchases made through the Online Marijuana Marketplace Company. Because of the high risk associated with processing transactions that involved unlawful activity (i.e., the sale of marijuana), employees at some of the acquiring banks charged high fees for the acquiring banks to process these transactions.

13. HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, worked with other co-conspirators to create the Phony Merchants — including phony online merchants purportedly selling dog products, dive gear, carbonated drinks, green tea, and face creams — and establish Visa and MasterCard merchant processing accounts with one or more offshore acquiring banks.

10

AKHAVAN, WEIGAND, and their co-conspirators arranged for more than a dozen Phony Merchants to be used by the Online Marijuana Marketplace Company. For example, some of the website names for the Phony Merchants included: absolutsoda.com; diverkingdom.com; fly2skyshop.com; goodegreenbazaar.com; greenteacha.com; happypuppybox.com; outdoormaxx.com; and soniclogistix.com. The Phony Merchants also typically had web pages suggesting that they were involved in selling legitimate goods, such as carbonated drinks, face cream, dog products, and diving gear. Yet, as noted above, these companies were actually being used to facilitate the approval and processing of marijuana transactions. Furthermore, the Phony Merchants were not based in the United States, and many of them had the same address listed as their company address. In addition, while these entities claimed to be based outside the United States, their customer service telephone numbers were American phone numbers.

14. Between at least in or about 2017 and at least in or about July 2019, more than approximately $100 million in credit and debit card transactions were processed for several of the Phony Merchants that were being used by HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, and other co-conspirators, to process marijuana purchases involving the Online Marijuana Marketplace Company. Some of the merchant websites listed for those transactions include: greenteacha.com,

11

medical-stf.com, organikals.store, and soniclogistix.com. AKHAVAN, and others, also worked with and directed others to apply incorrect MCCs to the Online Marijuana Marketplace Company marijuana transactions in order to disguise the nature of those transactions and create the false appearance that the transactions were completely unrelated to marijuana. Some of the MCCs/categories listed for the transactions listed above included stenographic services, music stores/pianos, and cosmetic stores. None of the merchant website names listed for those transactions referred to the Online Marijuana Marketplace Company or to marijuana.

## STATUTORY ALLEGATIONS

15. From at least in or about 2016, up to and including in or about 2019, in the Southern District of New York and elsewhere, HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

16. It was a part and object of the conspiracy that HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, and others known and unknown, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, the deposits of which were then

federally insured, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, AKHAVAN and WEIGAND participated in a scheme to deceive financial institutions and other financial intermediaries—including federally insured banks—into processing and authorizing payments to and from marijuana sale and delivery businesses and their customers in the United States by disguising the transactions to create the false appearance that they were unrelated to the purchase of marijuana, and thereby obtain money of, or under the custody and control, of those financial institutions and intermediaries.

(Title 18, United States Code, Section 1349.)

FORFEITURE ALLEGATION

17. As a result of committing the offense alleged in Count One of this Indictment, HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting, or derived from, proceeds obtained directly or indirectly, as a result of the commission of said offense, including but not limited to a sum of money in United States currency representing

13

the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

18. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable

property.

>       (Title 18, United States Code, Section 981;
>  Title 21, United States Code, Section 853; and
>   Title 28, United States Code, Section 2461.)


_____          _____
Foreperson                               GEOFFREY S. BERMAN
                                         United States Attorney
                                         Southern District of New York

15

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

HAMID AKHAVAN, a/k/a "Ray Akhavan," and
RUBEN WEIGAND,

Defendants.

SEALED INDICTMENT

S3 20 Cr. 188

(18 U.S.C. § 1349.)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

_____ 3/9/20
Foreperson.

3/9/2020  Filed Indictment under seal

USMJ Wang

MK