UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

HAMID AKHAVAN,
      a/k/a "Ray Akhavan," and

RUBEN WEIGAND,

    Defendants.

**S3 20 Cr. 188 (JSR)**

**Government's Memorandum of Law In Support of Circle Internet Financial LLC's**

**Motion to Quash**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Nicholas Folly,
Tara M. La Morte,
Emily Deininger,
Assistant United States Attorneys
   *Of Counsel*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................................. 2

   I. The Charged Scheme ................................................................................................ 2

   II. Circle's Motion to Quash the Subpoena .............................................................. 4

ARGUMENT .................................................................................................................... 5

   I. The Government Has Standing to Support Circle's Motion to Quash .................. 5

   II. The Defendants Have Not and Cannot Establish that the Information Sought from Circle Is Relevant to the Issue of Materiality ............................................................. 6

   III. Weigand's Remaining Arguments Are Meritless ............................................. 12

CONCLUSION ................................................................................................................ 14

i

The Government writes respectfully to join and support third-party Circle Internet Financial LLC's ("Circle") motion to quash the Rule 17(c) subpoena issued by defendant Ruben Weigand (the "Subpoena").

The Court should grant Circle's motion to quash the Subpoena because the information sought is not relevant to any element of the bank fraud conspiracy charge facing the defendants, and introduction of any evidence regarding Circle's operation would needlessly result in a confusing and distracting sideshow for the jury. In attempting to argue that Circle's operation has relevance to the charged scheme—which involves a broad array of lies to financial institutions and card networks perpetrated by Eaze, the defendants, and others through ordinary credit and debit transactions—the defendants[1] are forced to misstate the nature and scope of the Government's allegations and simply speculate about how Circle actually works. As a legal matter, the defendants also ignore Second Circuit precedent squarely rejecting their arguments concerning the relevance of the information sought. In particular, contrary to their claim that the Subpoena might yield relevant materiality evidence by showing that victim banks were derelict in detecting prohibited marijuana transactions, the Second Circuit has repeatedly held that such evidence has no bearing on the issue of materiality in a fraud prosecution. Accordingly, in addition to the reasons set forth by Circle in its motion to quash—including that its relationship with Eaze started well after the charged scheme ended—for these additional reasons the Court should grant Circle's motion.

---

1. [1] The Government addresses the defendants' respective arguments collectively in this memorandum.

**BACKGROUND**

**I. The Charged Scheme**

As the Court is well aware, the defendants are charged in one count with participating in conspiracy to commit bank fraud, from in or around 2016, through at least in or around 2019.

Contrary to the defendants' claims in their respective memoranda opposing Circle's motion to quash the Subpoena, that their scheme relied solely on miscoding of merchant category codes, or "MCCs" and fake descriptors, the Indictment describes a wide ranging and multi-tiered scheme to deceive the Issuing Banks and thereby cause those banks to process marijuana transactions and issue payments that they would not have otherwise approved.

As alleged in the Indictment, in connection with each credit card and debit card transaction, "the bank issuing the credit or debit card to the customer ("issuing bank") receives the transaction information from the [payment] Processor and responds by approving or declining the transaction." (*See* Indictment S3 20 Cr. 188 at ¶ 10(d)). Following the approval of a transaction, in the so-called "settlement stage," the issuing bank "transfer[s] funds for the approved transaction" to the acquiring bank. (*Id.* at 11(c)). The issuing bank later uses "the information it has received from each transaction to prepare monthly cardholder statements, which are distributed to cardholders. These statements typically identify each credit or debit card purchase made by the cardholder, the amount of the purchase, and the name associated with the merchant." (*Id.* at 11(e)). In describing the role of the Issuing Banks in the scheme, the Indictment therefore makes clear that transfers of payment for credit card transactions are made from the Issuing Banks' own funds, as an extension of credit to the cardholder. The Indictment also makes clear that "[i]ssuing banks

2

in the United States generally will not extend credit (i.e., approve) transactions that involve unlawful activity under federal law, such as the sale of marijuana." (*Id.*).

The Indictment goes on to detail how the Transaction Laundering Scheme operated to deceive the Issuing Banks, and makes clear that the scheme involved deceptive conduct extending far beyond MCC miscoding and fake descriptors.  As set forth in the Indictment, "the primary method used by Akhavan, Weigand, and other co-conspirators, involved the creation and use of the Phony Merchants.  These fraudulent companies were used to open offshore bank accounts with merchant acquiring banks and to initiate credit card charges for marijuana purchases made through the Online Marijuana Marketplace Company." (*Id.* ¶ 12).  Akhavan and Weigand "worked with other co-conspirators to create the Phony Merchants – including phony online merchants purportedly selling dog products, dive gear, carbonated drinks, green tea, and face creams – and establish Visa and MasterCard merchant processing accounts with one or more offshore acquiring banks." (*Id.* ¶ 13).  They then "arranged for more than a dozen Phony Merchants to be used by the Online Marijuana Marketplace Company." (*Id.*).

To facilitate the charged scheme, webpages were created and deployed to lend legitimacy to the Phony Merchants.  As the Indictment explains: "The Phony Merchants . . . typically had web pages suggesting that they were involved in selling legitimate goods, such as carbonated drinks, face cream, dog products, and diving gear.  Yet . . . these companies were actually being used to facilitate the approval and processing of marijuana transactions." (*Id.*).  The Indictment further alleges that many of the Phony Merchants purported to have the same physical address,

3

and despite being based outside of the United States, claimed to maintain U.S.-based customer service numbers. (*Id.*)

The Indictment alleges that over $100 million in marijuana credit and debit card transactions were processed using the Phony Merchants. (*Id.* ¶ 14). "Some of the merchant websites listed for those transactions include: greenteacha.com, medical-stf.com, organikals.store, and soniclogistix.com." (*Id.*). Moreover, none of the Phony Merchant website names "listed for those transactions referred to the Online Marijuana Marketplace Company or to marijuana." (*Id.*). According to the Indictment, "AKHAVAN, and others, also worked with and directed others to apply incorrect MCCs to the Online Marijuana Marketplace Company marijuana transactions in order to disguise the nature of those transactions and create the false appearance that the transactions were completely unrelated to marijuana." (*Id.*). Indeed, as the Indictment details, "[s]ome of the MCCs/categories listed for the transactions . . . included stenographic services, music stores/pianos, and cosmetic stores." (*Id.*).

## II.  Circle's Motion to Quash the Subpoena

As stated in the defendant Weigand's memoranda, on or about December 11, 2020, the Court granted Weigand's request for issuance of the Subpoena to Circle. (*See* Weigand Mem. at 5). On or about February 5, 2021, Circle moved to quash the subpoena. The Court granted the Government's request to file a submission addressing Circle's motion to quash and the defendants' respective oppositions.

4

**ARGUMENT**

**I.  The Government Has Standing to Support Circle's Motion to Quash**

The Government has independent standing to move to quash such subpoenas, *see, e.g.*, *United States v. Giampa*, No. 92 Cr. 437 (PKL), 1992 WL 296440, at *1-2 (S.D.N.Y. Oct. 7, 1992), and its views may in any event be considered, *see, e.g.*, *United States v. Weissman*, No. 01 Cr. 529 (BSJ), 2002 WL 31875410, at *1 n.1 (S.D.N.Y. Dec. 26, 2002).

"[C]ourts in this Circuit have generally agreed that a party may also demonstrate standing to challenge a Rule 17(c) subpoena directed to a non-party based on the movant's legitimate interests." *United States v. Bergstein*, 16 Cr. 746 (PKC), 2017 WL 6887596, at *2 (S.D.N.Y. Dec. 28, 2017), *aff'd*, 788 F. App'x 742 (2d Cir. 2019); *see, e.g.*, *United States v. Jackson*, No. 02 CR.756 (LMM), 2006 WL 1993251, at *1 (S.D.N.Y. July 14, 2006) (finding the Government had standing to move to quash subpoena served on BOP because its "legitimate interests are affected"). *See United States v. Nektalov*, S2 03 Cr. 828 (PKL), 2004 WL 1574721, at *1 (S.D.N.Y. July 14, 2004) (a "party whose legitimate interests are affected by a subpoena may move to quash that subpoena").  "Interests considered 'legitimate' in other cases in this District include preventing undue lengthening of the trial, preventing undue harassment of witnesses, and protecting a privilege or proprietary interest in the material."  *Id.* at 3 (citing *United States v. Giampa*, 1992 WL 296440, at *1-*2 (S.D.N.Y. Oct. 7, 1992) (internal citations omitted).  In addition, "the government's legitimate interests are affected . . . in that the subpoenas do require the application of the *Nixon* standards." *Jackson*, 2006 WL 1993251, at *2 (quashing subpoena to MCC).

Here, the Subpoena implicates the Government's legitimate interests.  In particular, the Subpoena risks unduly lengthening and complicating the trial. *See Netkalov*, 2004 WL 157421, at

5

*1.  The expansive requests of the Subpoena appear to be in service of a mini-trial on an issue that, for the reasons explained below and in Circle's memorandum, is not relevant and would require substantial additional testimony and witnesses.  Moreover, "the government's legitimate interests are affected . . . in that the [Subpoena] do[es] require the application of the *Nixon* standards." *Jackson*, 2006 WL 1993251, at *2.

In any event, as noted above, even if the Government lacks standing (and it does not), the Court may nevertheless consider the Government's views in ensuring that the Subpoena is for a proper purpose and complies with the requirements of Rule 17(c).  *Bergstein*, 2017 WL 6887596, at *3; *United States v. Weissman*, 01 Cr. 529 (BSJ), 2002 WL 31875410, at *1 n.1.

## II.  The Defendants Have Not and Cannot Establish that the Information Sought from Circle Is Relevant to the Issue of Materiality[2]

As set forth in their oppositions to Circle's motion to quash, as well as other pre-trial filings and disclosures, the defendants contend that the victim banks have not and cannot diligently police their policies prohibiting them from conducting business involving certain marijuana transactions. As a result, according to the defendants, victim banks in fact have processed marijuana transactions and accordingly their marijuana-prohibition policies are immaterial.  (*See* Akhavan Mem. at 1; Weigand Mem. at 1, 7).  They claim that the Subpoena might supply evidence as to these points, and as a result, should be enforced.  This is wrong on several levels.  Simply put, the susceptibility of a fraud victim to the fraud—whether due to negligence, carelessness, insufficient (or even no)

---

[2] The Government contends that the standard set forth in *United States v. Nixon*, 418 U.S. 683 (1974), applies in adjudicating Circle's motion to quash.  That said, whether analyzed under *Nixon* or *United States v. Tucker*, 249 F.R.D. 58 (S.D.N.Y. 2008), Circle's motion to quash should be granted because the material sought is not relevant to this case.

transaction monitoring systems, or some other factor—is wholly irrelevant to proving or defending against a bank fraud conspiracy charge, and serves no purpose other than to confuse and mislead the jury.[3]  Rather, in this case, the relevant question is what the victim banks actually do if they discover that they are processing prohibited marijuana transactions.  The information sought under the Subpoena is not going to help answer that question.  Indeed, the Government will show at trial that the victim banks do take action if they discover that they are conducting business involving prohibited marijuana transactions under their policies.

It is black-letter law that negligence or lack of diligence or reasonableness on the part of a target of a fraudulent scheme is no defense to a federal fraud charge.  *United States v. Frenkel*, 682 Fed. Appx. 20, 22 (2d Cir. 2017) (rejecting defendant's argument that district court erred in precluding him from arguing victim bank's negligence in failing to conduct sufficient diligence in connection with issuing loan because "a victim's negligence is not a defense under the federal fraud statutes" and argument is irreconcilable with Supreme Court's decision in *Neder*); *United States v. Kaufman*, 617 Fed. Appx. 50 (2d Cir. 2015) (in bank fraud and bank fraud conspiracy case, upholding instruction that victim negligence, carelessness, or gullibility is no defense); *United States v. Isola*, 548 Fed. Appx. 723, 724-725 (2d Cir. 2013) (district court properly excluded allegedly habitual negligence of financial institutions that were victims of fraud; evidence of a particular lender's unreasonableness irrelevant to materiality of false statements, which is an objective question); *see United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004)

---

[3] The Government intends to move *in limine* to preclude other categories of evidence for this reason.

(adopting rule that victim's lack of reasonableness or negligence is no defense to fraud); *see United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (confirming the same rule applies in prosecution for mail fraud).

This principle is reflected in standard jury charges given in other fraud cases. For example, in a mortgage fraud case, the jury was instructed: "[I]t does not matter whether any of the banks involved might have discovered the fraud had it probed further. If you find that a scheme or artifice existed, it is irrelevant whether you believe that any of the banks involved was careless, gullible, or even negligent." *United States v. Cherico*, No. 08 Cr. 786 (S.D.N.Y.) (CM), Oct. 31, 2011 Tr. at 1498:20-24.

Negligence is no defense to bank fraud because (1) actual reliance by the target of the fraud is not an element of the fraud statutes, and, relatedly, (2) materiality under these statutes is an objective rather than a subjective standard. *Neder v. United States*, 527 U.S. 1, 16, 24-25 (1999). As to the first point, the Supreme Court has explained that "[t]he common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes," because, "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted." *Id.* at 24-25 (citations omitted).

The Court in *Neder* confirmed that materiality was an element of the federal fraud statutes, but, consistent with Congress's focus on the "scheme" to defraud rather than the completed fraud, adopted a test that did not have the effect of smuggling reliance into the equation: "a false statement is material if it has a *natural tendency* to influence, or is capable of influencing, the decision of the

decisionmaking body to which it was addressed."  *Id.* at 16 (emphasis added; citation, alteration, and quotation marks omitted)); *see United States v. Irvin*, 682 F.3d 1254, 1267-68 (10th Cir. 2012) ("This definition, in referring to natural tendencies and capabilities, establishes materiality in the bank fraud context as an *objective* quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision").  More recently, as this Court has observed, "'[A] misrepresentation is material if it is capable of influencing the decisionmaker, *no matter what the victim decides to do.*'" *United States v. Allen*, No. 2015 WL 5022524, at * 2 (JSR) (S.D.N.Y. Aug. 18, 2015) (emphasis added) (quoting *United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir. 2013)); *see also Cherico*, Oct. 31, 2011 Tr. at 1498:1-14 ("We use the word material to distinguish between kinds of statements that matter and those that are of no real importance.  A material fact is one that you would expect to be of concern to a reasonable and prudent person who was relying on the statements made to him and the accuracy of the information being provided to him in making a decision.  It does not matter whether the [target] actually relied on the misrepresentation or omission.  It had to be capable of influencing the [target], and intended by the defendant to influence the [target], whether it influenced the [target] or not.").[4]

-------------------------

[4] For this reason, the defendants' argument that information sought by the Subpoena might reveal the "state of mind" of the issuing banks is meritless.  (*See* Weigand Mem. at 12 n.3).  Indeed, under this objective test, "a false statement can be material even if the decision maker actually knew or should have known that the statement was false."  *United States* v. *Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999), *cert. denied*, 530 U.S. 1261 (2000); *see Brogan* v. *United States*, 522 U.S. 398, 409-10 (1998) (Ginsburg, J., concurring) (stating that where, in context of false statement charge under 18 U.S.C. § 1001, agents already "had in hand the records indicating that [the defendant's] answer was false" before asking him questions about his conduct, that "[t]hus, when the interview ended, a federal offense had been completed—even though, for all we can tell, [defendant]'s unadorned denial misled no one"); *United States* v. *Irvin*, 682 F.3d 1254, 1267-68 (10th Cir. 2012)

9

Under this binding legal authority, the defendants cannot challenge the materiality of the victim banks' policies prohibiting certain marijuana transactions by showing that the victim banks were dilatory or lackadaisical in identifying prohibited marijuana transactions across their systems. These matters simply have no bearing on the question of materiality in a federal criminal fraud trial.  *See United States* v. *Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis: 'If a scheme to defraud has been or is intended to be devised, it makes no difference whether the person the schemer intended to defraud was gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts.'"  (citation omitted)).  Nor could they challenge materiality by showing that isolated employees failed to properly enforce such policies.  Rather, to challenge materiality in this case, the defendants would have to show that the Government's identified victim financial institutions, which had policies prohibiting them from authorizing certain marijuana transactions, *knew* that certain transactions they were processing were for marijuana and yet that knowledge has no capability to influence their business decisions.

Conspicuously absent from the defendants' papers is any effort to proffer that they could make such a showing, even with the evidence sought under the Subpoena.  First, and most

---

(affirming conviction for bank fraud even though record was "clear" that fraudulent financial information submitted for a loan had no impact on target bank's decision whether to issue the loan); *United States v. Pizano*, 421 F.3d 707, 721-22 (8th Cir. 2005) (explaining that although evidence of reliance by banks on misrepresentations in loan applications is probative of materiality, absence of reliance does not prove lack of materiality); *United States v. LeMaster*, 54 F.3d 1224, 1230-31 (6th Cir. 1995) ("A false statement can be material even if the agent to whom it is made knows that it is false." (citation omitted)); *United States* v. *Whitaker*, 848 F.2d 914, 916 (8th Cir. 1988).

importantly, even assuming that it is the victim banks that approve Circle transactions relating to the purchase of products from the Eaze platform, the defendants merely assume that those banks understood that they were approving prohibited transactions, *i.e.*, that they were knowingly authorizing prohibited marijuana transactions and continued to do so.  This assumption is flawed for several reasons.  First, it assumes that the victim banks understand what Eaze is.  Contrary to the defendants' arguments, it is not enough that the victim banks might have or should have been able to make this determination with sufficient diligence or with better monitoring systems because the name "Eaze" appears as a descriptor in their records and the company otherwise publicly advertises.  (*See Weigand* Mem. at 7).  Second, even assuming *arguendo* that the victim banks understand what Eaze is, the defendants would have to also show that the victim banks had actual knowledge that the transaction was a prohibited one, *i.e.* that it involved the sale of marijuana products, as opposed to legal CBD products (which Eaze sold and continues to sell, and which are not prohibited by the victim banks' policies), or any other lawful product that the company sells. Even assuming they could establish all of that, the defendants would then have to show that knowledge was objectively incapable of influencing the banks' actions.  As explained above, contrary to the defendants' argument, any purported failure by the banks to investigate these facts one way or the other is not relevant to whether they would have approved the transactions or taken some related action had they known the transactions were prohibited under their policies.  It simply does not matter what the victim banks should have or could have discovered if they probed.  What matters is whether having actual knowledge that they are engaging in prohibited transactions is capable, objectively, of influencing their business actions.

11

Relatedly, the defendants have not come close to showing that the way Circle operates is sufficiently similar to how ordinary credit and debit transactions are processed, such as to make evidence about Circle's post-scheme involvement with Eaze probative.  While the defendants point to the presence of MCC codes and descriptors, we also know from the defendants' proffer and Circle's submission that Circle transactions are cryptocurrency transactions that settle in U.S. dollars, and that they involve a two-step debit withdrawal and purchase process, each possibly involving MCC codes relating to financial institutions.  (*See* Weigand Mem. at 2, 4, 8; Affidavit of Jeremy Allaire dated Feb. 5, 2021, ¶¶ 3-5.)  (Of course, Circle's use of "financial institutions"-related MCC codes certainly obfuscates that the underlying transaction might involve the purchase of marijuana.  It is entirely unclear whether this two-step process—which appears to involve a debit withdrawal from a customer's account, the conversion of those funds to the stable cryptocurrency in a Circle "wallet," the purchase of a good or service using the cryptocurrency, and finally the settlement of the transaction in U.S. dollars—involves the same or sufficiently similar processing steps as those involved in a standard credit or debit transaction, which is what is at issue in this case yet involves none of these features.[5]  Substantial testimony on these issues would be required at trial.

## III.  Weigand's Remaining Arguments Are Meritless

Weigand's remaining arguments regarding the possible relevance of the material sought by the Subpoena are meritless.  While Weigand claims that the Subpoena should be enforced to

---

[5] For example, on information and belief, the list of banks noted on page 9 of Weigand's brief, which apparently have appeared on Eaze's website starting in 2020, *i.e.* after the charged scheme, pertain to ACH transfers, not credit or debit purchases.

supply impeachment evidence, there is literally no discussion (beyond a recitation of boilerplate law) as to why or how this evidence would be impeaching.  (*See* Weigand Mem. at 13-14).  This is not surprising; for the reasons explained above, there are gaping holes that would need to be filled before the anticipated evidence might have any impeaching value.[6]

Nor is showing that the "imprecision of MCCs" or that the use of offshore entities is not necessarily "nefarious," sufficient reasons to enforce the Subpoena.  (*Id.* at 7, 8).  The use of a "financial transaction" MCC code to facilitate a prohibited marijuana purchase using a Circle cryptocurrency account (assuming *arguendo* that that is what is happening here) is not evidence of imprecision, but rather potential evidence of fraud.[7]  Moreover, as Weigand admits in his brief, the defendants already have in their possession materials showing that Circle is affiliated with offshore financial institutions.  (*id.* at 7-8).

Finally, Weigand makes a curious "*modus operandi*" argument, which is entirely ambiguous and equally meritless.  Without elaboration, Weigand simply asserts that Eaze, the issuing banks, and the payment networks each have some undefined yet possibly relevant "*modus operandi*" and that the material sought will reveal whether it exists and something about it.  (*See* Weigand Mem. at 9).  Weigand then cites a number of cases, none of which are helpful here.  (*See*

---

[6] Indeed, it is for this reason that some courts, have concluded that material sought only for impeachment may not be obtained pursuant to Rule 17 subpoena.  *See Blakstad*, 2020 WL 5992347, at *11 ("Courts have consistently interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment." (quoting *United States v. Cherry*, 86 F. Supp. 547 553 (S.D.N.Y. 1995)).

[7] Of course "everybody is doing it" is not a defense to a fraud charge.  *See United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044, at *13 (S.D.N.Y. May 2, 2019).

*id.* at 10, citing *United States v. Serrano*, 640 Fed. App'x 95, 99 (2d Cir. 2016) (burglary

defendant's "M.O. [not] to be seen in the area"); *United States v. Rutkoske*, 506 F.3d 170, 177-78

(2d Cir. 2007) (not a *modus operandi* case, but simply stands for the proposition that post-scheme

evidence may be relevant); *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) (same);

*United States v. Rittweger*, 258 F. Supp. 2d 345, 347 n.2 (S.D.N.Y. 2003) (same).  If anything, this

argument underscores precisely why the Subpoena is a fishing expedition.

   In the end, evidence about Circle's operations is not relevant, and admission of testimony

and evidence regarding Circle would be a confusing and unnecessary sideshow.

## CONCLUSION

   For the foregoing reasons, the Court should grant Circle's motion to quash the Subpoena.

Dated: New York, New York
   February 11, 2021

          Respectfully submitted,

          AUDREY STRAUSS
          United States Attorney for the
          Southern District of New York


     By:  ___/s/_____
          Nicholas Folly
          Tara M. La Morte
          Emily Deininger
          Assistant United States Attorneys
          Tel.: 212-637- 5217/1041/2472