UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

HAMID AKHAVAN,
        a/k/a "Ray Akhavan,"

and

RUBEN WEIGAND,

          Defendants.

**S3 20 Cr. 188 (JSR)**


**Government's Motion *in Limine* To Preclude Defendants' Experts**


AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Nicholas Folly,
Tara M. La Morte,
Emily Deininger,
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

Background .......................................................................................................................... 1

I. Defendant Akhavan's Expert Disclosures ...................................................................... 1

II. Defendant Weigand's Expert Disclosures ..................................................................... 5

Argument ............................................................................................................................ 7

I. Law Governing Admissibility of Expert Testimony ....................................................... 7

II. The Court Should Preclude Defendants From Offering "Expert" Testimony on Matters the Jury Is Capable of Understanding Through Lay Witnesses ........................................... 10

III. The Court Should Preclude Expert Testimony on Irrelevant Matters ........................... 14

IV. The Court Should Preclude Certain Expert Testimony as Unreliable ............................ 22

V. The Court Should Preclude Weigand's Expert From Offering Testimony That Invades the Jury's Function ............................................................................................................ 26

VI. The Court Should Preclude Akhavan's Expert, John Vardaman, From Testifying About His Prospective Employment With the DOJ Frauds Section as well as From Revealing Privileged Government Information .......................................................................................... 27

Conclusion ........................................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Romano Enterprises*, 303 F.3d 256 (2d Cir. 2002) .................................................. 9

*Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705 (2d Cir. 1989)..................................... 8

*Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346 (S.D.N.Y. 2003) .................................. 23

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)........................................ 14

*General Electric Company v. Joiner*, 522 U.S. 136 (1997)........................................................ 9, 25

*Grand Cent. P'ship v. Cuomo*, 166 F.3d 473 (2d Cir. 1999)....................................................... 28

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ............................................................................... 9

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................. 9

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2004) .......................................................... 10

*LaSalle Bank Nat. Ass'n v. CIBC Inc.*, 08 Civ. 8426 (WHP), 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) .......................................................................................................................................... 9

*SEC v. Lipson*, 46 F. Supp. 2d 758 (N.D. Ill. 1998) .................................................................... 23

*United States v. Alameh*, 341 F.3d 167 (2d Cir. 2003) ............................................................... 21

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) .................................................................. 8

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)......................................................... 10

*United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991)............................................................. 8

*United States v. Collins*, 581 Fed. Appx. 59 (2d Cir. 2014) ...................................................... 13

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994).............................................................. 7, 27

*United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005).................................................................. 8

*United States v. Gatto*, --F.3d--, 2021 WL 137250 (2d Cir. Jan. 15, 2021) ............................... 16

*United States v. Jacques Dessange, Inc.*, No. 99 Cr. 1182 (DLC), 2000 WL 294849 (S.D.N.Y. Mar. 21, 2000) ........................................................................................................................... 26

*United States v. Lesniewski*, No. 11 Cr. 1091 (VM), 2013 WL 3776235 (S.D.N.Y. July 12, 2013) ....................................................................................................................................................... 26

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ............................................................... 9

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .................................................................... 8

*United States v. Mendlowitz*, No. 17 Cr. 248 (VSB) .................................................................. 13

*United States v. Newkirk*, No. 14-CR-534-02 (JSR), 2016 WL 1659149 (S.D.N.Y. Apr. 19, 2016) ....................................................................................................................................................... 17

*United States v. Newkirk*, No. 14 Cr. 534 (JSR), 2016 WL 1659149 (S.D.N.Y. Apr. 19, 2016), *aff'd*, 683 Fed. Appx. 95 (2d Cir. 2017) ................................................................................ 12, 13

*United States v. Sanchez*, 517 F.3d 651 (2d Cir. 2008) ............................................................. 21

*United States v. Sanders*, No. 12 Cr. 574 (LAK), 2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) 17

**Other Authorities**

Charles A. Wright & Victor J. Gold, Federal Practice and Procedure: Evidence § 6253 (1997)... 8

**Rules**

Fed. R. Evid. 602 ................................................................................................................. 8
Fed. R. Evid. 702 .......................................................................................................... 7, 22, 27

The Government submits this motion *in limine* to preclude the defendants' experts from testifying because they offer opinions that do not require specialized knowledge, that are not relevant, that are not reliable, and that would usurp the jury's function.

## Background

### I. Defendant Akhavan's Expert Disclosures

By letter dated November 3, 2020, Akhavan notified the Government that he intends to call three expert witnesses: (1) Jeff Rankin; (2) Monica MacGregor; and (3) John Vardaman. Akhavan's letter described the qualifications of these witnesses, summarized the testimony they are expected to offer, and provided a brief description of the bases for their opinions.  *See* Exhibit A.  Akhavan's letter also included the curriculum vitae for each of the witnesses.  *See id.*

*Jeff Rankin*.  According to Akhavan's disclosures, from 2007 through June 2020, Rankin served as a business executive at U.S. Bank, focusing on commercial cards for large market and public sector clients; prior to that, he worked at Visa Inc. and Bank of America.  Akhavan proposes that Rankin testify, in sum and substance, to the following:

1. The "roles, processes, and responsibilities of each of the players that make up the payment network," *i.e.*, the "merchant, the independent sales organization ("ISO"), payment services providers ("PSP"), the merchant/acquiring bank, the credit card network, and the issuing bank," as well as the "privity, and lack of privity, between each player.";

2. "Visa and MasterCard rules and regulations and how to apply them with respect to the subject areas below," which apparently include the onboarding of cannabis merchants, acquiring banks' onboarding of merchants; the selection and availability of MCCs, and various (and undefined e-commerce customs and practices;

3. The "evolution of the Visa and MasterCard rules, customs and practices as they relate to cannabis;"

1

4. The "roles, rules, customs and practices related to e-commerce, payment gateways, processors, debit cards, and credit cards";

5. The "various risk levels of consumer transactions and the indemnity, remedy, and risk allocation processes built into the credit card networks that favor issuing banks";

6. The "role and responsibilities of acquiring banks, and rules" they must follow in onboarding clients, and "the KYC process, including the merchant application process";

7. The "process of how an MCC is selected and by whom," specifically that the acquiring banks have the "sole responsibility and discretion" in selecting an MCC;

8. The "purpose, history, and evolution of MCCs," including that there was no "product level" MCC for cannabis during the relevant period, and "when there is no specific product-level MCC that applies," the acquiring bank has the discretion to select an MCC that fits, and that "MCCs are not made to identify products but general categories";

9. "[W]ithin the Visa/MasterCard network, a merchant bank has discretion to onboard a cannabis client"; and

10. The "lack of specificity of rules and practices regarding what content should appear on a merchant website and what information must be included in a merchant name" and that such information "is not for the benefit of the issuing banks" but rather to "reduce cardholder confusion" so as to minimize disputes and chargebacks.

Exhibit A at 1-3.

*Monica MacGregor.*   According to Akhavan's disclosure, MacGregor is currently a Managing Director in BRG's Global Investigations and Strategic Intelligence practice, and describes herself as an expert in "evaluating, designing, implementing and remediating" AML, sanctions, and anti-corruption compliance programs.  From 2015 to 2017 she served as a BSA

2

Officer at Oriental Bank, based in Puerto Rico, and prior to that worked in a number of consulting

roles.  Akhavan proposes that MacGregor testify, in sum and substance, to the following:

1. The "role and responsibility of issuing banks when it comes to cannabis transactions," including that the banks "take on the risk that their account holders may purchase cannabis";

2. That "issuing bank policies regarding transaction monitoring for cannabis purchases are to a large extent policies in paper, not actionable in practice" because "there is no specific transactional typology to easily identify cannabis transactions";

3. That there is a "lack of consumer notice by the issuing banks regarding use of their branded cards to purchase cannabis as compared to other comparable goods and services";

4. The limited information provided to issuing banks "through the Visa and MasterCard networks" and "the related responsibilities of the issuing and acquiring banks," including the data that issuing banks look to "as a matter of custom and practice" in determining whether to approve or reject transactions, and that "algorithms based on MCCs are not sufficient" to detect cannabis transactions;

5. That during the relevant period "there was no specific MCC code for cannabis"; and

6. "Due to the lack of sufficient information provided by the credit card companies, other investigative methods and due diligence procedures would be required to reliably detect cannabis transactions"

Exhibit A at 3-5.

*John Vardaman*.  According to Akhavan's disclosure, Vardaman is an expert on "banking

compliance, anti-money laundering ("AML")/bank secrecy act ("BSA") laws, and other financial

crimes."  He currently serves on the advisory board of a company and provides legal advice

concerning payment services in high-risk industries, and previously served as Chief Compliance

Officer for a regulatory technology company that "works with state-legal compliance companies

3

and financial institutions to ensure compliance with relevant laws and regulations." He has prior Government service, including serving as the Assistant Deputy Chief for Policy in DOJ's then-Asset Forfeiture and Money Laundering Section, where he purportedly "drafted the DOJ policy for cannabis banking, known as the Cole Memorandum," and "worked closely" with FinCEN "to draft the simultaneously issued FinCEN Guidance on BSA Expectations Regarding Marijuana Related Businesses."

Akhavan proposes that Vardman testify, in sum and substance, to the following:

1. "[A]bout" the issuance of the Cole Memorandum, "which laid out eight priorities for federal prosecutors in enforcing offenses related to cannabis," and issuance of the FinCEN guidance, "which clarifies how financial institutions can provide services to" Marijuana Related Businesses ("MRB");

2. Since issuance of the FinCEN guidance, it is "well known that numerous financial institutions are actively servicing" the marijuana industry, based on certain FinCEN issued reports and statistics, and that the guidance "has to be considered a qualified success" in allowing the cannabis industry to access the banking system and addressing the Cole Memorandum's policy goals;

3. That the 2018 recission of the Cole Memorandum "had no practical effect on DOJ enforcement practices with respect to cannabis banking," and that the memo "remains the de facto guidepost for federal prosecutors";

4. That the "federal government permits issuing and acquiring banks to enter the cannabis space," that the industry "is operating under the color of state law with the acquiescence of the federal government," and as a result, issuing banks "can permissively service an industry that remains illegal under federal law";

5. The lack of enforcement actions taken against banks since the issuance of the FinCEN guidance means that banks "can and do rely on the federal government's hands-off policies with respect to cannabis banking"' and

6. That "the government is on record saying banking MRBs is a permissible activity."

Exhibit A at 6-7.

4

## II.  Defendant Weigand's Expert Disclosures

By letter dated November 3, 2020, Weigand notified the Government that he intends to call Stephen Mott as an expert witness, and by letter dated December 21, 2020, notified the Government that he intends to call Donald Vilfer as an expert witness.  *See* Exhibits B, C. Weigand's letters described the qualifications of these witnesses, summarized the testimony they are expected to offer, and provided a brief description of the bases for their opinions.  *See* Exhibits B, C.  Weigand also provided the curriculum vitae for each of the witnesses.  *See id.*

*Stephen Mott*.  According to Weigand's disclosure, since 1998 Mott has served as the president of a consulting company for electronic payments transaction businesses.  He was a senior executive at MasterCard between 1995 and 1998, where he states that he created a new electronic security protocol to help member banks use the internet safely as a delivery channel for financial products.

Weigand proposes that Mott testify, in sum and substance, to the following:

1.  The "mechanics of credit and debit card transactions," including the "roles of the various participants in those transactions," "especially merchants, merchant acquiring banks, independent sales organizations ("ISOs"), payment service providers ("PSPs"), payment networks, issuing banks, payment gateways, third-party risk management specialists, and cardholders";

2.  The "concerns and operating parameters of issuing banks" including their "consideration of customer creditworthiness and "the factors that are material or immaterial to them when determining whether to approve or decline credit and debit transactions";

3.  "Steps that issuing banks may take in order to detect and root out fraud and other suspicious activity";

4.  Information about "non-secure e-commerce transactions" including interchange fees paid to issuing banks versus chargeback liability, "among other topics" relating to such transactions;

5

5. "Standards and protocols employed by Visa and MasterCard when determining membership in the United States and abroad";

6. "Visa and MasterCard's approach to international transactions"; and

7. The ways by which Visa and MasterCard "oversee and manage the integrity of the global payments system," including "the jurisdictional constraints imposed on non-U.S. acquiring banks by Visa and MasterCard."

Exhibit B.

_Donald Vilfer_.   According to Weigand's disclosure, since 2002 Vilfer, a former FBI Supervisory Special Agent, has provided electronic device forensic analysis services through his company, Digital Evidence Ventures.  Weigand proposes that Vilfer testify to the following topics:

- The "files located on" forensic copies of the three electronic devices seized by the Government from Weigand on the day of his arrest, including the "timing and manner of their creation, modification, and use"; and

- Weigand's "use of those devices during the period relevant to the Indictment."

Exhibit C at 3.  However, in describing the bases for Vilfer's testimony, Weigand relayed that Vilfer's testimony would be based on (as relevant here), "[a] USB drive that appears to be the source of [certain] materials" described in the Government's preliminary exhibit list, "and which may be the source of other materials the Government located on Mr. Weigand's laptop."  Exhibit C at 2. Weigand subsequently produced a copy of this drive (the "Weigand USB Drive") to the Government.

Following these disclosures, the Government and Weigand's counsel engaged in several communications regarding the scope of Vilfer's proposed testimony, including specific discussion of what opinions, if any, Vilfer intended to offer based on the Weigand USB Drive.  In an email

6

dated January 19, 2021, Weigand's counsel relayed that, like the Government's FBI/Investigative analyst, who would testify as to forensic searches and analyses of electronic devices that were seized from the defendant, Vilfer is likewise "not an 'expert witness' for whom additional disclosures are required under the Federal Rules, beyond those provided to the Government." *See* Exhibit D.  Counsel affirmed this to the Government on a phone call that took place on February 12, 2021.

As to the Weigand USB drive, counsel merely noted that "[n]otwithstanding our position on Mr. Vilfer's status as an 'expert witness'" under the rules, he "may rely on the USB drive mentioned in our supplemental disclosure to provide testimony on the source of certain materials located on Mr. Weigand's laptop." *Id.*   To date, Weigand's counsel has not committed as to whether or not they would seek to introduce the drive, and what opinions, expert or otherwise, they may offer based upon it.

## Argument

### I.  Law Governing Admissibility of Expert Testimony

Rule 702 of the Federal Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert witness may give testimony about that knowledge, in the form of an opinion or otherwise.  Fed. R. Evid. 702.  While expert witnesses are often uniquely situated to explain a "complicated morass of obscure terms and concepts" to the jury, *see United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994), expert testimony is properly excludable where "persons of common understanding are [ ] capable of comprehending the primary facts and drawing correct conclusions

from them" *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (internal quotation marks and citations omitted).

A fact witness may testify as to matters about which the witness has personal knowledge, so long as the testimony is otherwise admissible.  Fed. R. Evid. 602.  Fact testimony, even when offered by a person with specialized knowledge, is admissible if it is relevant, within the personal knowledge of the witness, and helpful, as opposed to testimony that is not probative and merely a waste of time.  *See* 29 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure: Evidence § 6253, at 117 (1997); *United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) (district court erred in allowing expert testimony "about matters that required no specialized knowledge"); *Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (vacating jury verdict where district court allowed expert to testify "about matters that were neither scientific nor in any way beyond the jury's ken").  An expert's opinions are inadmissible if they do not result "from a process of reasoning which can be mastered only by specialists in the field."  *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (citation and internal quotation marks omitted); *see also United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (the district court should not admit testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help").

Relatedly, trial courts should not admit "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994); *see also LaSalle Bank Nat. Ass'n v. CIBC Inc.*, 08 Civ. 8426 (WHP), 2012 WL

466785 (S.D.N.Y. Feb. 14, 2012) ("[A]n expert witness may not offer testimony which merely rehashes the testimony of percipient witnesses.").

Of course, expert testimony, like all evidence, is subject to Rule 401, and thus experts cannot testify as to matters that are irrelevant to the case. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702 [02], p. 702-181988.

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Amorgianos v. Romano Enterprises*, 303 F.3d 256, 267 (2d Cir. 2002). As the Supreme Court instructed in *General Electric Company v. Joiner*, 522 U.S. 136 (1997), "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at 146.

In addition, as relevant here, a district court must exclude expert testimony that will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (expert testimony that "expresses a legal conclusion" precluded). "Even if a jury were not misled into adopting a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury." *Id.* at 364. Thus, while an

9

expert "may opine on an issue of fact within the jury's province," the expert may not "give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

Finally, the Court must apply Rule 403 before admitting expert testimony. Applying this rule in the expert context, courts have recognized that the risk of undue prejudice and confusion is particularly high when experts are permitted to testify as to matters with little probative value. *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2004) ("[T]he Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."); *see also Daubert*, 509 U.S. at 595 (courts should "exercise[s] more control over experts than over lay witnesses" in conducting Rule 403 analysis).

## II.   The Court Should Preclude Defendants From Offering "Expert" Testimony on Matters the Jury Is Capable of Understanding Through Lay Witnesses

Defendants's proffered "experts" seek to testify to an array of facts that are within the ken of the average juror's understanding, including based on the anticipated testimony of lay witnesses with personal knowledge of the relevant facts. Specifically, and as described above, the defendants propose to have their respective experts testify regarding the following topics:

- The roles, processes, and responsibilities of the various players that comprise the credit/debit payment processing network (*see* Rankin Topics 1, 6; Mott Topic 1);[1]

---

[1] The numbering of these topics corresponds to the Government's lists contained in the background section of this memorandum.

10

- Rules, regulations, and protocols employed by Visa and MasterCard regarding cannabis, merchant onboarding, MCCs, information transmitted to issuing banks via the card networks; membership, international transactions, jurisdictional constraints on non-U.S. acquiring banks, and content of merchant websites and names (*see* Rankin Topics 2, 3, 7, 9, 10; MacGregor Topic 4; Mott Topics 5, 6, 7);

- Information surrounding MCCs, including the MCCs that are available and how they are selected for merchants (Rankin Topics 7, 8; MacGregor Topic 5);

- Various (and undefined) e-commerce "roles, rules, customs, and practices" (Rankin Topic 4; *see* Mott Topic 4);

- The ways in which Visa and MasterCard "oversee and manage the integrity of the global payments system" (*see* Mott Topic 7).

The Government's percipient witnesses will address these concepts. As reflected in the Government's witness list served upon the defendants, witnesses from several of the victim issuing banks, Visa, and MasterCard, as well as other witnesses, including two co-conspirators, will testify in this trial.[2] These witnesses will discuss the players, terms and processes of the credit and debit payment system and put them in context. Such testimony will cover pertinent Visa and MasterCard rules, regulations and policies, merchant onboarding, and policing of those policies. The jurors

---

[2] By letter dated November 3, 2020, the Government, provided the defense with a non-exhaustive list of topics it anticipates certain of these witnesses would address, and specifically stated that it "does not believe such notification is warranted because the expected testimony of the witnesses . . . would not constitute expert testimony" under the Rules, but was providing notice in an "abundance of caution."

will not and do not need an expert to explain or define these concepts.  Indeed, multiple aspects of these concepts are reflected in numerous conversations between the defendants, co-conspirators, and others.  There is nothing technical or confusing about the language they use, and there is no more of a need for an "expert" to explain how the payments system works than there is for an "expert" to "interpret" the co-conspirators' testimony and statements.[3]

The defendants' proposed experts present concerns similar to those that resulted in the preclusion of expert testimony in other recent cases.  For example, in *United States v. Newkirk*, No. 14 Cr. 534 (JSR), 2016 WL 1659149 (S.D.N.Y. Apr. 19, 2016), *aff'd*, 683 Fed. Appx. 95 (2d Cir. 2017) (summary order), the defendant sought to provide expert testimony to explain "the mechanics of mergers and acquisitions, the role of transactional attorneys, and the meaning of terms like 'restricted stock,' 'pledge agreement,' and 'priority of security interest.'"  *Id.* at *2.  This Court excluded the testimony, explaining that the expert has nothing "to contribute to a reasonable juror that can't be obtained from the fact witnesses. . . .  There are some terms that may not be familiar to the jury, but then they get explained by the fact witnesses in everyday language and indeed there doesn't seem to be much dispute about their meaning."  *Id.*  In affirming this Court's ruling, the Second Circuit explained that the district court "acted well within its discretion in concluding that other witnesses with financial backgrounds were competent to explain the transactions and related terminology presented by the case."  *Newkirk*, 683 Fed. Appx. 95, 96-97

---

[3] Tellingly, the defendants' respective witness list include witnesses from MasterCard, Visa, Wells Fargo, Bank of America, Citibank (all of which are on the Government's witness list, albeit in most cases by name), as well as other bank witnesses.

(2d Cir. 2017) (citing *United States v. Nouri*, 711 F.3d 129, 145 (2d Cir. 2013) (upholding preclusion of expert testimony on customary commissions by brokerage firms where cumulative of other evidence at trial); *United States v. Collins*, 581 Fed. Appx. 59, 60 (2d Cir. 2014) (summary order) (upholding exclusion of testimony by two lawyers on materiality of corporate agreement, and "the work of transactional lawyers" generally, where "fact witnesses proved sufficient" to explain defense to jury)).

Indeed, Judge Broderick excluded expert testimony on some of these precise topics in *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019). In that decision, the Court affirmed its prior order excluding the defendant's proposed expert testimony concerning general industry practices in the payment processing industry, ruling, as relevant here, that expert testimony was not needed for the jury to understand concepts surrounding the usage of credit cards, including fees, methods used by credit card processors with merchant customers, and the various players involved in credit card processing, including customers, merchants, merchant banks, issuing banks, payment processors, and the card networks. *Id.* at *5-*6. The Court observed, as a secondary matter, that the Government had put on percipient witnesses who addressed these topics, explaining that "[b]ecause many of these witnesses had prior experience working for credit card processors or had knowledge generally about the industry because of their work history, there was no need for expert testimony related to industry practice." *Id.* at *7. Accordingly, "even if such testimony were appropriately the subject for expert testimony," the defendant's expert's testimony would have been duplicative. *Id.*

So it is here.  Testimony surrounding the workings of the payment industry are not properly the subject of expert testimony and should be excluded as such.

## III.   The Court Should Preclude Expert Testimony on Irrelevant Matters

As noted above, Rules 401 and 403 of the Federal Rules of Evidence apply equally to expert testimony as to lay testimony.  As the Supreme Court observed, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993).

Beyond not being properly the subject of expert testimony, for the reasons explained below, a substantial portion of the proposed testimony is irrelevant to resolution of the issues presented in this case, and should be excluded.  Especially considering the lack of probative value, admission of this evidence will serve to unnecessarily cloud and confuse the issues before the jury.

### A.   Testimony Offered By Rankin, MacGregor, and Mott

*Victim Bank Diligence and Effective Enforcement of Marijuana Prohibition Policies.*  As noted in Government motion *in limine* III, the defendants seek to offer expert opinions regarding the ability of issuing banks to effectively enforce policies prohibiting them from conducting business involving illegal credit and debit marijuana transactions, as well as the nature of diligence that they would need to undertake to effectively enforce those policies.  Specifically, as set forth above, MacGregor intends to opine that "issuing bank policies regarding transaction monitoring for cannabis purchases are to a large extent policies in paper, not actionable in practice" (MacGregor Topic 2), that "due to lack of sufficient information provided by the credit

14

card companies, other . . . due diligence procedures would be required to reliably detect cannabis transactions" (MacGregor Topic 6), that "algorithms based on MCCs are not sufficient" to detect marijuana transactions (MacGregor Topic 4), and that issuing banks "take on the risk" that their cardholders will use their cards to purchase marijuana products (MacGregor Topic 1; *see also* MacGregor Topic 3). Rankin seeks to opine regarding "the risk allocation processes built into the credit card networks that favor issuing banks" (Rankin Topic 5),[4] and Mott intends to provide expert testimony regarding "steps issuing banks may take . . . to detect . . . fraud and other suspicious activity." (Mott Topic 3).

As discussed fully in motion *in limine* III, the binding precedent in this Circuit is clear: none of this is relevant. Accordingly, these expert opinions should be precluded. That it may be difficult for issuing banks to "reliably detect" the defendants' fraud has no relevance to whether or not the defendants concocted a scheme to commit bank fraud.

Equally irrelevant, prejudicial, and misleading are the defendants' experts' opinions concerning what level of due diligence issuing banks would have to undertake in order to effectively detect illegal and miscoded marijuana transactions. Such opinions are plainly calculated to invite the jury to make a negative assessment of the victim banks' diligence measures as compared with the expert's opinion of what those measures should or could be. This is, again, an attempt to cast victim banks as negligent or insufficiently diligent in rooting out the defendants' fraud. For all the reasons set forth in motion *in limine* III, these opinions are irrelevant to proving

---

[4] The scope of Rankin's opinion in this regard is not entirely clear.

15

or defending against a bank fraud conspiracy charge, and serve no purpose other than to confuse and mislead the jury.  In addition, to the extent these experts are attempting to opine as to what the victim banks actually can and cannot afford to do in terms of due diligence, they are plainly not qualified to do so, no basis for such opinions are anywhere within their expert notices, and obviously they cannot testify as to the mindset to the mindset of the victim banks.  Accordingly, the Court should preclude the defendants from offering these expert opinions.

*Issuing Bank Profits*. Defendants seek to admit expert testimony regarding and relatedly, "interchange fees paid to issuing banks versus chargeback liability for online transactions" (Mott Topic 4).  However, for the reasons explained fully in motion *in limine* I, that the victim banks may have avoided liability or benefitted through fees associated with the transactions processed as a result of from the  defendants' fraud scheme has no bearing on whether the defendants conspired to commit bank fraud, and testimony to this effect—expert or otherwise—should be excluded.  Indeed, earlier this year the Second Circuit upheld the district court's exclusion of similar expert testimony as irrelevant to providing or defending against a wire fraud scheme, and otherwise as confusing to the jury.  *See United States v. Gatto*, --F.3d--, 2021 WL 137250, at *8 (2d Cir. Jan. 15, 2021) (upholding district court's exclusion of expert testimony regarding whether victim universities profited from defendants' wire fraud scheme, which had resulted in victim universities obtaining top basketball recruits).

*E-commerce roles, rules, customs, and practices.*  Defendants seek to offer expert testimony pertaining to "e-commerce, payment gateways, processors, debit cards and credit cards," (Rankin Topic 4; *see* Mott Topic 4 ("non-secure e-commerce transactions" and "other [related]

16

topics")).  There is no further explanation as to what practices, customs, roles and rules the experts seek to discuss, although one can infer that it pertains to something *other* than testimony surrounding how the payment processing system functions, as that topic (which is relevant, but not properly the subject of expert testimony) is specifically addressed separately in each of these expert disclosures.  Aside from not being properly the subject of expert testimony, generalized testimony regarding e-commerce practices has no bearing on any matter of consequence in this action.

*Issuing Bank "Custom and Practice."*  MacGregor seeks to testify regarding the data that issuing banks look to "as a matter of custom and practice" in determining whether to approve or reject transactions.  As with the experts' proffered testimony on e-commerce practices, as discussed above, this testimony is not properly the subject of expert testimony.  In any event, this proposed testimony, like much of the testimony the defendants see to offer through their expert witnesses, concerns general industry practices.  Courts in this District—including this Court— have precluded, on relevancy grounds, proposed expert testimony about general industry practices especially where, as here, it is not helpful in assessing a defendant's conduct.  For example, in *United States v. Sanders*, No. 12 Cr. 574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. Mar. 27, 2013), Judge Kaplan precluded proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by the defendant was not material to the insurance carriers" and unhelpful to the jury "given the abundant evidence thus far offered by percipient witnesses"); *see also*, *e.g.*, *United States v. Newkirk*, No. 14 Cr. 534 (JSR), 2016 WL 1659149, at *1 (S.D.N.Y. Apr. 19, 2016).  In this case,

17

the "custom and practice" of issuing banks generally is not relevant to assessing the defendants' intent and conduct, and actual victim bank witnesses will testify as to what information they receive in connection with credit and debit transactions, as well as what is important to them in connection with continuing to authorizing transactions.

*Evolution of Rules.*  Defendants seek to offer expert testimony regarding the "evolution of Visa and MasterCard rules customs and practices as they relate to cannabis" (Rankin Topic 3), the "purpose, history, and evolution of MCCs," (Rankin Topic 8).  But the "evolution" of undefined customs, practices, and MCC codes is irrelevant.  What matters is what—*during the charged timeframe*—the procedures were for the assignment of MCC codes, the availability and nature of such codes, and the selection and assignment of those codes to a U.S.-based e-merchant.  The history and evolution of the card networks' marijuana "customs and practices as they relate to cannabis" and MCC code development, and their applicability (or not) outside of the charged timeframe and/or to non-U.S.-based merchants are irrelevant; they do not help in answering questions at issue in this prosecution.

*Merchant Bank Ability to Onboard Cannabis Client.*  Rankin seeks to opine that "within the Visa/MasterCard network, a merchant bank has discretion to onboard a cannabis client." (Rankin Topic 9).  Whether accurate or not, this misses the point.  The issues in this case are whether Visa and MasterCard allow their networks to be used for the credit or debit purchases of marijuana products—regardless of the type of merchant involved—and whether the use of a card for such a purchase is material to the issuing bank.  Notably, none of defendants' experts, while seeking to testify (albeit improperly) about Visa and MasterCard rules pertaining to marijuana,

18

intends to opine that the card networks permit such transactions.  Like thousands of merchants who sell more than one type of product or service, a merchant that sells marijuana may legally accept debit and credit payments for other goods and services it provides.  As such, beyond not being properly within the scope of expert testimony, whether Visa or MasterCard allowed acquiring banks to onboard marijuana merchants simply doesn't answer the relevant questions in this case.  Finally, the Government intends to call witnesses on behalf of Visa and MasterCard at this trial, who can offer direct testimony as to what they permit their partner acquiring banks to do.

  *Other Visa and MasterCard "Standards," "Protocols," and "Approach[es]."*
Weigand's expert Stephen Mott seeks to offer expert opinions regarding "standards and protocols" used by the card networks when "determining membership in the United States and abroad"; the card networks' "approach to international transactions"; and the ways in which the networks "oversee and manage the integrity of the global payments system," including "the jurisdictional constraints imposed on non-U.S. acquiring banks."  (Mott Topics 5, 6, 7).  Again, none of this is properly within the scope of expert testimony.  Even assuming that some narrow portion of this testimony might constitute relevant background information for the jury not otherwise admitted through percipient witness testimony, it is simply impossible to tell from this exceptionally broad and vague expert notice what Mott would say.

**B.  Testimony Offered by Vardaman**

  Vardaman's proposed testimony—which, in sum, amounts to his opinion that in light of DOJ policy, enforcement priorities, and FinCEN guidance, banks are free to bank cannabis notwithstanding that it remains illegal under federal criminal laws—has no relevance whatsoever

19

to whether the defendants agreed to commit bank fraud.  Rather, it is an overt and improper effort to hold mini-trials on DOJ enforcement priorities and prosecutorial discretion and invite jury nullification.

Vardman's testimony is fatally problematic for multiple reasons.  First, Vardaman—who, as explained in Section VI, below, recently accepted an offer of employment with the DOJ Frauds section—is seeking to put components of the Department of Justice on trial.  This is improper.  As the Supreme Court explained in *Wayte v. United States*, absent a violation of constitutional dimension, such as a deliberate decision to prosecute on the basis of a prohibited factor like race or religion, the Government's enforcement decisions and prosecutorial priorities are not subject to judicial review, and certainly are not within the proper purview of the jury:

> In our criminal justice system, the Government retains "broad discretion" as to whom to prosecute. *United States v. Goodwin,* 457 U.S. 368, 380, n. 11, 102 S.Ct. 2485, 2492, n. 11, 73 L.Ed.2d 74 (1982); accord, *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248, 100 S.Ct. 1610, 1616, 64 L.Ed.2d 182 (1980). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern.  Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor'**s** motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

470 U.S. 598, 608 (1985); *see also United States v. Sanchez*, 517 F.3d 651, 670 (2d Cir. 2008). "The decision as to whether to prosecute generally rests within the broad discretion of the prosecutor." *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (internal quotation marks and citation omitted).  Accordingly, evidence concerning the exercise of prosecutorial discretion as a policy matter is simply not an appropriate subject for this trial.

Second, the fact that some undefined banks (*see* Ex. A at 7) may rely on the Cole Memorandum and FinCEN guidance in determining whether to permit certain business involving marijuana transactions is irrelevant to whether the defendants' scheme to defraud is material in this case.  As explained in  motion in *limine* IV, whether it was "reasonable" for banks to process certain marijuana-related transactions in light of these documents  does not help answer the legally relevant question of whether it was important to them to know what they were processing.

Third, the FinCEN guidance is separately irrelevant because it applies *when merchants selling marijuana tell the truth and do not conceal their true identity and business*.  That is not what happened here.  In marked contrast, the defendants in this case orchestrated a sophisticated scheme to deceive virtually every participant in the payment processing system.  That scheme involved lies upon lies to disguise the U.S. based marijuana-related merchant as multiple innocuous UK companies, each with a fake website, fake customer service, and fake goods and services.  Indeed, the FinCEN guidance provides that a business that appears to be disguising its marijuana activities raises a red flag and may implicate one of the Cole Memorandum priorities, *i.e.* an area upon which that DOJ *should* focus its prosecutorial resources.

Indeed, the last paragraph of Vardman's expert disclosure is emblematic of the complete distraction that would occasion his testimony.  As he states, "[t]aking the Government's very own action through its words, and inaction through lack of enforcement, the alleged risk is, at best, theoretical and fictitious."  (Ex. A at 7). Setting aside the fact that Vardaman is presumably referring to the rate of enforcement of federal marijuana trafficking laws, as opposed to the rate of enforcement of frauds involving lies to U.S. financial institutions, properly assessing this testimony would require, at a minimum, testimony and evidence from other Government officials and from bank officials, as well as analyses of DOJ enforcement actions and the effect of that on bank risk taking and decision making processes.

Vardman conflates the ambiguous effects of one policy standard regarding marijuana sales and banking, with the actual facts and charges in this fraud case.  Having no probative value, the evidence should also be precluded under Rule 403.  Admission of evidence of the Department of Justice's marijuana enforcement priorities, purported lack of enforcement actions, and purported acquiescence to banks seeking to bank cannabis merchants would be unfairly prejudicial to the Government and would result in several mini-trials on the scope and appropriate interpretation of the Cole Memorandum and FinCEN guidance, the exercise of prosecutorial discretion, and banks consider these factors, and how those considerations inevitably change in light of fraud perpetrated by merchants that might otherwise be acceptable.

## IV.  The Court Should Preclude Certain Expert Testimony as Unreliable

Several of the defendants' experts' opinions should be precluded for the independent reason that the defendants have not demonstrated that the opinions are the "product of reliable principles and methods."  Fed. R. Evid. 702(c).  "The proponent of expert testimony bears the

burden of establishing its admissibility by a preponderance of the evidence." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003). The defendants have not met that burden here, particularly in light of the abstract and highly generalized nature of their experts' opinions. Of course, the fact that an expert may generally possess "specialized knowledge" to qualify as an expert witness does not automatically render her opinions in the case reliable. *SEC v. Lipson*, 46 F. Supp. 2d 758, 761 (N.D. Ill. 1998).

In particular, the Government asserts that the following expert opinions should be excluded as not reliably the product of any sort of principles or methods:

- The "various risk levels of consumer transactions and the indemnity, remedy, and risk allocation processes built into the credit card networks that favor issuing banks" (Rankin Topic 5);

- That "issuing bank policies regarding transaction monitoring for cannabis purchases are to a large extent policies in paper, not actionable in practice" because "there is no specific transactional typology to easily identify cannabis transactions"; (MacGregor Topic 2);

- That there is a "lack of consumer notice by the issuing banks regarding use of their branded cards to purchase cannabis as compared to other comparable goods and services" (MacGregor Topic 3);

- "Due to the lack of sufficient information provided by the credit card companies, other investigative methods and due diligence procedures would be required to reliably detect cannabis transactions" (MacGregor Topic 6);

- The "concerns and operating parameters of issuing banks" including their "consideration of customer creditworthiness and "the factors that are material or immaterial to them when determining whether to approve or decline credit and debit transactions" (Mott Topic 2);

- "Steps that issuing banks may take in order to detect and root out fraud and other suspicious activity" (Mott Topic 3);

23

- The ways by which Visa and MasterCard "oversee and manage the integrity of the global payments system," (Mott Topic 7);

- That the FinCEN guidance "has to be considered a qualified success" (Vardaman Topic 2);

- That "the recission of the Cole memorandum had no practical effect on DOJ enforcement policies with respect to cannabis banking," and that it "remains the de facto guidepost for federal prosecutors"; (Vardaman Topic 3);

- That the government has "in effect, encouraged banks to facilitate" the industry (Vardman Topic 4);

- That "banks can and do rely on the federal government's hands-off policies with respect to cannabis banking" (Vardamon Topic 5);  and

- Opinions, if any, based upon a USB drive in Weigand's possession that has been produced to the Government.  (*See* Exs. C, D).

The defendants have offered no "bases and reasons," Fed. R. Crim. P. 16(b)(1)(C), supporting such opinions outside of their "education, training, professional experience, other specialized knowledge," and review of guidebooks (mostly undefined) and certain broad categories of documents produced by the Government in discovery.  Indeed, for several of the categories above it is impossible to discern *what* opinions will even be expressed.  For example, what steps does Mott believe issuing banks can or should take to root out fraud?  How is Rankin measuring the "various risk levels" and "risk allocation processes" he proffers?  What are "[t]he ways" the card networks manage the integrity of the payment system, according to Mott?  What due diligence procedures does MacGregor believe would be sufficient to "reliably" identify marijuana transactions?  We don't know.  But most certainly, the experts' generalized "bases and reasons" do nothing to show *how* such "expert" testimony drawn from these sources meet *Daubert's* reliability requirement or how such opinions are "connected to existing data" by

24

anything other than the *ipse dixit* of the respective expert.  *Joiner*, 522 U.S. at 146.  We do not know, for example, why or how MacGregor believes that issuing bank policies are not actionable in practice, the basis for her conclusion that issuing bank notice to consumers regarding cannabis transactions is lacking as compared to "comparable" goods and services, or why she believes that algorithms based on MCCs are insufficient.  Indeed, some of this amounts merely to assertions of fact about which these experts have no personal knowledge, and all of it is prohibited expert *ipse dixit*.

Similarly it is impossible to assess the reliability of Vardman's opinions, and he otherwise appears to lack any basis for them.  He fails to explain how he measured the "success" of the FinCEN guidance, assessed the "practical effect" of the Cole Memorandum's recission, and fails to provide the basis for his opinions that banks "can and do rely on the federal government's hands-off policies with respect to cannabis banking," and that the Cole Memorandum "remains the de facto guidepost for federal prosecutors."  Indeed, Vardaman appears to have never worked at a bank—let alone any of the issuing banks that had policies prohibiting these activities—and has not worked in a federal prosecutor's office since 2016 (notably, the year that the charged conspiracy began).

Accordingly, the defendants have fallen far short of demonstrating the reliability of the "expert" testimony they seek to offer, and it should be precluded for this independent reason as well.

Relatedly, as noted above, Weigand provided the Government with "[a] USB drive [in Weigand's possession] that appears to be the source of [certain] materials" described in the

Government's preliminary exhibit list, "and which may be the source of other materials the Government located on Mr. Weigand's laptop."  Ex. C at 2.  While reiterating the information contained in Vilfer's expert notice, *i.e.* that the drive may supply *the basis* for testimony for the source of certain materials located on Mr. Weigand's laptop, Weigand's counsel have not informed the Government as to whether it intends to introduce the drive or the specifics of any opinions that will derive from it.  Weigand has also utterly failed to provide any "bases and reasons" for his conclusion that the USB drive "appears to be" the source of certain materials located on Weigand's laptop.  Accordingly, the Court should exclude any opinions based upon the Weigand USB Drive.

## V.   The Court Should Preclude Weigand's Expert From Offering Testimony That Invades the Jury's Function

Next, Weigand's expert witness, Stephen Mott, seeks to offer testimony about the "concerns and operating parameters of issuing banks" including their "consideration of customer creditworthiness" and "the factors that are material or immaterial to them when determining whether to approve or decline credit and debit transactions." (Mott Topic 2).  This testimony is clearly inadmissible, as the issue of materiality is for the jury to decide, not the expert.  *See United States v. Lesniewski*, No. 11 Cr. 1091 (VM), 2013 WL 3776235, at *9-*10 (S.D.N.Y. July 12, 2013) (precluding expert testimony as to materiality of representations in wire, mail, and healthcare fraud case); *United States v. Jacques Dessange, Inc.*, No. 99 Cr. 1182 (DLC), 2000 WL 294849, at *3 (S.D.N.Y. Mar. 21, 2000) (precluding expert in immigration fraud case from opining on whether certain information is ordinarily material to agency decision, as such testimony "usurps the jury's function by rendering an opinion on an ultimate legal conclusion").  Expert testimony that purports to tell the jury how to resolve this factual dispute does not "help the trier of fact to

understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, but instead usurps the jury's function by dictating a particular outcome.  *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

Accordingly, for this additional reason as well, this portion of Mott's testimony should be excluded.

## VI. The Court Should Preclude Akhavan's Expert, John Vardaman, From Testifying About His Prospective Employment With the DOJ Frauds Section as well as From Revealing Privileged Government Information

Finally, to the extent Vardaman is not entirely excluded (as he should be), the Government submits that he should be prohibited from testifying about his anticipated employment with the DOJ Frauds section as such testimony has no relevance and would be extraordinarily prejudicial to the Government.  By way of brief background, in or about mid-December, this Office and the defendants learned that Vardaman had accepted a position with the DOJ Frauds section in Washington, D.C.  At this time, trial in this matter had been set for January 25.  The Government understands that Vardaman anticipated that it would take some period of time for the background process to occur before he could begin work, and apparently intended to testify and then begin working at DOJ.  In the first week of January, however, the parties learned that the trial had been postponed due to the pandemic, and subsequently learned that it would be scheduled for May, unless the Court was able to fit the trial into a date in the first quarter of the year, in which case it would do so.  Shortly afterwards, on or about January 27, the parties were informed that the trial would likely be set for March 2 (now March 1).  In early February, DOJ informed Vardaman that his anticipated start date was March 1.  Vardaman is seeking to postpone his start date so that he could testify for the defense in this trial.

Introduction of any evidence that Vardaman intends to work for the Government following his defense testimony is wholly irrelevant.  In addition, introduction of such evidence would be unfairly prejudicial to the Government insofar as it would lend an unwarranted implication of endorsement by the Government of Vardaman's purported "expertise," and should be precluded.

In addition, to the extent Vardaman is permitted to testify at all, the Court should preclude any testimony or evidence that would reveal privileged Government information.  As described in Akhavan's disclosure, Vardaman was apparently involved in drafting the Cole Memorandum during his previous stint at DOJ, and further played a role in drafting FinCEN guidance during that time.  Again, assuming *arguendo* that he is permitted to testify about that Memorandum or guidance at all, his testimony should be strictly limited to the content appearing on the face of those documents.  Any and all testimony beyond what is contained on the face of those documents, *e.g.* concerning other rationales or thought processes behind the documents, other options considered and rejected, non-public communications within DOJ and between DOJ and FinCEN regarding the development or enforcement of those documents, and DOJ's and FinCEN's post-implementation discussions regarding the appropriate interpretation and application of those documents, are all privileged and should not be elicited.  *See Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (the deliberative process privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" (internal quotation marks and citations omitted)).

**Conclusion**

For the foregoing reasons, the Court should preclude the defendants' proposed expert testimony.[5]

Dated:  New York, New York
        February 16, 2021

                                      Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney for the
                                        Southern District of New York

                            By:
                                  _____/s/_____
                                  Tara M. La Morte
                                  Nicholas Folly
                                  Emily Deininger
                                  Assistant United States Attorneys
                                  Tel.: 212-637-1041/1060/2472

---

[5] In the event the Court does not preclude the defendants' experts in their entirety, they should be ordered to make additional expert disclosures in accordance with their obligations under Rule 16. Relatedly, the defendants should be ordered to make disclosures of any expert statements under Rule 26.2, as well as correspondence with defense counsel.  With the exception of materials produced several days ago by Akhavan for Mr. Rankin—materials that were largely created back in December and early January—the defendants have claimed that no such statements exist.