UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

Hamid Akhavan,
     a/k/a "Ray Akhavan,"

-and-

Ruben Weigand,

          Defendants.

**S3 20 Cr. 188 (JSR)**

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

AUDREY STRAUSS
United States Attorney
Southern District of New York

Nicholas Folly
Tara M. La Morte
Emily Deininger
Assistant United States Attorneys

- Of Counsel -

## TABLE OF CONTENTS

THE GOVERNMENT'S MOTIONS *IN LIMINE* ........................................................................ 1

BACKGROUND ............................................................................................................................. 2

ARGUMENT .................................................................................................................................. 5

I. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT THE
SCHEME DID NOT CAUSE PECUNIARY LOSS ....................................................... 5

II. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT
REGARDING FEDERAL ENFORCEMENT OF MARIJUANA LAWS,
LEGALIZATION OF MARIJUANA IN CERTAIN STATES AND/OR
COUNTRIES, AND EFFORTS TO LEGALIZE MARIJUANA FEDERALLY ....... 9

III. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT THE
VICTIM BANKS PURPORTEDLY FAILED TO ACT WITH SUFFICIENT
DILIGENCE OR ACTED NEGLIGENTLY IN ENFORCING POLICIES
PROHIBITING TRANSACTING BUSINESS INVOLVING MARIJUANA
TRANSACTIONS ........................................................................................................... 13

IV. THE DEFENSE SHOULD BE PRECLUDED FROM OFFERING ADDITIONAL
PORTIONS OF WEIGAND'S POST-ARREST STATEMENT ............................... 19

V. THE COURT SHOULD PRECLUDE THE DEFENDANTS FROM ASSERTING A
PRESENCE OF COUNSEL DEFENSE ...................................................................... 23

VI. THE COURT SHOULD PRECLUDE EVIDENCE THAT THE DEFENDANTS
FAILED TO ENGAGE IN FRAUD WITH RESPECT TO OTHER
MERCHANTS AND BANKS ....................................................................................... 27

VII. THE COURT SHOULD ADMIT CERTAIN CATEGORIES OF EVIDENCE AS
DIRECT EVIDENCE OF THE DEFENDANTS' BANK FRAUD
CONSPIRACY, OR IN THE ALTERNATIVE, PURSUANT TO RULE 404(B).... 29

VIII. MOTION TO PRECLUDE CROSS EXAMINATION OF COOPERATING
AND IMMUNIZED WITNESSES ............................................................................... 46

CONCLUSION ............................................................................................................................. 53

# TABLE OF AUTHORITIES

## Cases

*Carofino v. Forester*, 450 F. Supp. 2d 257 (S.D.N.Y. 2006) ...................................... 30

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) ................................................. 30

*Flythe v. District of Columbia*, 4 F. Supp. 3d 222 (D.D.C. 2014) .................................. 48, 49, 50

*In re United States*, 945 F.3d 616 (2d Cir. 2019) ................................................... 12

*Levine v. SEC,* 436 F.2d 88 (2d Cir. 1971) ........................................................ 26

*Loughrin v. United States*, 573 U.S. 35 (2014) ................................................... 7, 8

*Manzano v. United States*, No. 19-1447, 2020 WL 6385778 (U.S. Nov. 2, 2020) ..................... 12

*Neder* v. *United States*, 527 U.S. 1 (1999) ....................................................... 16

*Parker v. Randolph*, 442 U.S. 62 (1979) .......................................................... 32

*S.E.C.* v. *Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................... 22

*SEC v. Lek Securities Corp.*, 17 Civ. 1789 (DLC), 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019) 24

*SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. 2012) ........................................... 23

*Shaw v. United States*, 137 S. Ct. 462 (2016) ................................................... 6, 7, 8

*United States v. Allen*, No. 14 Cr. 272 (JSR), 2015 WL 5022524 (S.D.N.Y. Aug. 18, 2015) ..... 16

*United States* v. *Amato*, 540 F.3d 153 (2d Cir. 2008) ............................................ 48, 50

*United States* v. *Amico*, 486 F.3d 764 (2d Cir. 2007) ........................................... 18

*United States v. Araujo*, 79 F.3d 7 (2d Cir. 1996) ............................................... 30

*United States v. Benitez*, 920 F.2d 1080 (2d Cir. 1990) .......................................... 19

*United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016) .......................................... 7

*United States v. Boykoff*, 67 Fed. Appx. 15 (2d Cir. 2003) ....................................... 26

*United States v. Branch*, 91 F.3d 699 (5th Cir. 1996) ............................................ 18

*United States v. Brand*, 467 F.3d 179 (2d Cir. 2006) ............................................. 30

*United States v. Calderon-Urbina*, 756 F. Supp. 2d 566 (S.D.N.Y. 2010) .......................... 49

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ............................................ 36

*United States v. Chambers,* 800 Fed. Appx. 43 (2d Cir. 2020) ..................................... 26, 27

*United States* v. *Cherico*, No. 08 Cr. 786 (S.D.N.Y.) (CM), Oct. 31, 2011 Tr. .................... 15, 16

*United States v. Cirillo*, 468 F.2d 1233 (2d Cir. 1972) .......................................... 31

*United States v. Colasuonno*, 697 F.3d 164 (2d Cir. 2012) ........................................ 22

*United States v. Colon*, 880 F.2d 650 (2d Cir. 1989) ............................................. 30

*United States* v. *Colton*, 231 F.3d 890 (4th Cir. 2000) ......................................... 17

*United States* v. *Coonan*, 938 F.2d 1553 (2d Cir. 1991) ......................................... 28, 39

*United States v. Cooney*, 938 F.2d 1553 (2d Cir. 1991) ........................................... 28

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ............................................ 16

*United States v. Curley*, 639 F.3d 50 (2d Cir. 2011) ............................................. 29

*United States v. Downing*, 297 F.3d 52 (2d Cir. 2002) ............................................ 40

*United States v. Earls*, 157 F. App'x 421 (2d Cir. 2005) ......................................... 40

*United States v. Estrada*, 439 F.3d 606 ......................................................... 49

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) .......................................... 31

*United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) 26

*United States v. Frenkel*, 682 Fed. Appx. 20 (2d Cir. 2017) ...................................... 15

*United States v. Funches*, 135 F.3d 1405 (11th Cir. 1998)............................................................ 12

*United States v. Giovinco*, No. 18 Cr. 14 (JSR), 2020 WL 832920 (S.D.N.Y. Feb. 20, 2020).... 50

*United States v. Glover*, 101 F.3d 1183 (7th Cir. 1996) ............................................................. 20

*United States* v. *Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ............................................................. 29

*United States v. Gonzalez*, 399 F. App'x 641 (2d Cir. 2010) ...................................................... 19

*United States v. Hayes*, 553 F.2d 824 (2d Cir. 1977) .................................................................. 48

*United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012)...................................................... 28, 35, 39

*United States v. Inniss*, 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019) ..................................... 36

*United States* v. *Inserra*, 34 F.3d 83 (2d Cir. 1994) ............................................................. 29, 39

*United States* v. *Irvin*, 682 F.3d 1254 (10th Cir. 2012) ......................................................... 16, 17

*United States* v. *Isola*, 548 Fed. Appx. 723 (2d Cir. 2013) ...................................................... 15

*United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999), on reh'g, 196 F.3d 383 (1999) ......... 19, 20

*United States v. Johnson*, 507 F.3d 793 (2d Cir. 2007) ............................................................. 21

*United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010)................................................................. 35

*United States v. Kaufman*, 617 Fed. Appx. 50 (2d Cir. 2015)..................................................... 15

*United States v. Livoti*, 196 F.3d 322 (2d Cir. 1999) ............................................................. 31, 41

*United States v. Lumiere*, 249 F. Supp. 3d 748 (S.D.N.Y. 2017).................................................. 21

*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) .................................................................. 18

*United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009)............................................................. 28

*United States v. Moran-Toala*, 726 F.3d 334 (2d Cir. 2013)....................................................... 29

*United States v. Moye*, 793 F. App'x 19 (2d Cir. 2019) ............................................................. 41

*United States* v. *Neder*, 197 F.3d 1122 (11th Cir. 1999), *cert. denied*, 530 U.S. 1261 (2000)..... 17

*United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978)....................................................... 26, 30

*United States v. Paulino*, 445 F.3d 211 (2d Cir. 2006).............................................................. 30

*United States v. Peterson*, 808 F.2d 969 (2d Cir. 1987)............................................................. 30

*United States v. Petit*, No. 19 Cr. 850 (JSR)...................................................................... 23, 26

*United States* v. *Pitre*, 960 F.2d 1112 (2d Cir. 1992) ....................................................... 29, 30, 39

*United States* v. *Pizano*, 421 F.3d 707 (8th Cir. 2005)............................................................... 17

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) ............................................................ 28

*United States v. Rahim*, 339 F. App'x 19 (2d Cir. 2009)............................................................. 44

*United States v. Reed,* 639 F.2d 896 (2d Cir. 1981) ............................................................. 30, 40

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) .................................................................. 35

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012)............................................................... 35

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) .................................................... 36

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002)................................................................... 18

*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) .................................................................. 25

*United States v. Scott*, 677 F.3d 72 (2d Cir. 2012) ................................................................... 29

*United States v. Scully*, 877 F.3d 464 (2d Cir. 2017)................................................................. 22

*United States* v. *Singh*, 628 F.2d 758 (2d Cir. 1980)................................................................. 49

*United States v. Siraj*, No. 05 Cr. 104, 2006 WL 2738952 (E.D.N.Y. Sept. 25, 2006)............... 50

*United States v. Smith*, 794 F.2d 1333 (8th Cir. 1986) ............................................................. 18

*United States* v. *Thomas*, 377 F.3d 232 (2d Cir. 2004) ............................................................. 15

*United States v. Thompson*, 359 F.3d 470 (7th Cir. 2004).......................................................... 31

*United States v. Tussa*, 816 F.2d 58 (2d Cir. 1987) ................................................................... 32

*United States v. Walker*, 191 F.3d 326 (2d Cir. 1999)........................................................... 26, 27

*United States v. Weigand*, No. 20-CR-188 (JSR), 2020 WL 5105481 (S.D.N.Y. Aug. 31, 2020)

...................................................................................................................... 7,8

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000) ........................... 30, 44

*United States v. Williams*, 526 F. App'x 29 (2d Cir. 2013) ......................... 44

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993) ............................ 29

**Statutes**

18 U.S.C. § 1344(1) ................................................................................... 6

18 U.S.C. § 1344(2) ................................................................................... 7

N.Y.P.L. § 155.25 ...................................................................................... 48

**Rules**

Fed. R. Evid. 401 ....................................................................................... 28

Fed. R. Evid. 402 ....................................................................................... 28

Fed. R. Evid. 403 ........................................................................... 8, 9, 31, 48

Fed. R. Evid. 404(b) ................................................................................... 30

Fed. R. Evid. 608(b) ................................................................................... 47

Fed. R. Evid. 611 ....................................................................................... 47

Fed. R. Evid. 801(d)(2)(A) ......................................................................... 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     v.

Hamid Akhavan,
     a/k/a "Ray Akhavan,"

-and-

Ruben Weigand,

          Defendants.

**S3 20 Cr. 188 (JSR)**

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

The Government respectfully seeks rulings *in limine* on several issues prior to trial against defendants Hamid Akhavan, a/k/a "Ray Akhavan," and Ruben Weigand, which is scheduled to begin on March 1, 2021.

*First*, the Government seeks to preclude certain evidence or argument that is wholly irrelevant to the issues at trial, and/or for which any probative value is substantially outweighed by the risk of juror confusion, distraction from the evidence, unnecessary lengthening of the trial, and/or unfair prejudice to the Government. Specifically, the Government moves to preclude:

(1) Evidence or argument concerning how the victim banks faired economically, including that the banks did not suffer actual economic harm, or that victim banks made a profit from the fraudulent transactions;

(2) Evidence or argument concerning the federal enforcement of marijuana laws, legalization of marijuana in states or countries beyond those at issue in the charged scheme, and efforts to legalize marijuana federally;

(3) Evidence or argument concerning the victim banks' purported failure to act with sufficient due diligence or negligence in enforcing policies that prohibit transactions involving marijuana;

(4) Evidence or argument regarding whether it was "reasonable" for banks to process marijuana-related transactions;

(5) Additional portions of Weigand's post-arrest statement, beyond what the Government proposes to admit in its case-in-chief, that are not necessary to explain or provide context for those statements;

(6) Assertion of a "presence of counsel" defense, based on the presence of attorneys on certain communications or references to oral conversations that included counsel; and

(7) Evidence or argument regarding legitimate business activities of the defendants.

*Second*, the Government seeks to admit three categories of evidence as direct evidence of the charged offense or, in the alternative, under Federal Rule of Evidence 404(b). Those are:

(1) Evidence concerning the development of the relationship between a cooperating witness ("CW-1"), and the defendants;

(2) Evidence that, in 2016, Weigand, together with some of the same co-conspirators involved in the charged bank fraud scheme, utilized a specific software program to identify potential red flags for fake online merchants that the defendants continued to utilize for the same purpose in the charged scheme; and

(3) Evidence that, in 2018, Akhavan made certain threats to another cooperating witness ("CW-2"), in furtherance of the scheme.

*Finally*, the Government moves to preclude the Defendants from cross-examining two cooperating witnesses and two Company employees, whom the Government expects to call at trial, with respect to topics not relevant to their credibility.

## BACKGROUND

## I. THE CHARGED SCHEME

The defendants are charged in one count with participating in a conspiracy to commit bank fraud, from in or around 2016, through at least in or around 2019. As set forth in greater detail in the Indictment, Akhavan and Weigand, working with others, including principals from one of the leading on-demand marijuana delivery companies in the United States (the "Company") planned and executed a scheme to deceive United States banks and other financial institutions into processing over one hundred million dollars in credit and debit card payments for the purchase and

delivery of marijuana products (the "Scheme").

Contrary to the defendants' repeated claims in pretrial motions and other filings in this case that their scheme relied *solely* on miscoding of merchant category codes, or "MCCs" and fake descriptors, the Indictment describes, and the Government expects the evidence at trial to show, a sophisticated and wide-ranging scheme to deceive virtually all other participants in the payment processing scheme, including issuing banks in the United States (the "Issuing Banks") and thereby cause those banks to process marijuana transactions and issue payments that they would not have otherwise approved.

The Indictment details how the Scheme operated to deceive the Issuing Banks, and makes clear that the scheme involved deceptive conduct extending far beyond MCC miscoding and fake descriptors. As set forth in the Indictment, "the primary method used by Akhavan, Weigand, and other co-conspirators, involved the creation and use of the Phony Merchants. These fraudulent companies were used to open offshore bank accounts with merchant acquiring banks and to initiate credit card charges for marijuana purchases made through the Online Marijuana Marketplace Company." (*Id.* ¶ 12). Akhavan and Weigand "worked with other co-conspirators to create the Phony Merchants – including phony online merchants purportedly selling dog products, diving gear, carbonated drinks, green tea, and face creams – and established Visa and MasterCard merchant processing accounts with one or more offshore acquiring banks." (*Id.* ¶ 13). They then "arranged for more than a dozen Phony Merchants to be used by the Online Marijuana Marketplace Company." (*Id.*). The Indictment further alleges that many of the Phony Merchants purported to have the same physical address, and despite being based outside of the United States, claimed to maintain U.S.-based customer service numbers. (*Id.*).

To facilitate the Scheme, webpages were created and deployed to lend legitimacy to the

Phony Merchants. As the Indictment explains: "The Phony Merchants . . . typically had web pages suggesting that they were involved in selling legitimate goods, such as carbonated drinks, face cream, dog products, and diving gear. Yet . . . these companies were actually being used to facilitate the approval and processing of marijuana transactions." (*Id.*). The evidence at trial will show that the defendants' scheme even involved fake visits to those websites to make it appear as though the websites had real customers and were operating legitimate online businesses.

The defendants' scheme was highly sophisticated. The evidence at trial will show that the descriptors listed on Company customers' credit card statements often were the URLs for the Phony Merchant websites. As a result, Company customers were sometimes confused and did not recognize the transactions on their credit card statements. The defendants and their coconspirators were concerned that confused customers would call their Issuing Banks and inadvertently reveal the Scheme by indicating that they had purchased marijuana products and/or that they had made a purchase through the Company. To lessen the risk that customers would be confused, the defendants used a number of techniques, including online tracking "pixels" to track which users had visited the Company's website. If a Company customer had visited the Company's website and went to the URL listed on their credit card statement, they would automatically be re-routed to a webpage connected to the Company so that the customer would understand what the real purchase had been for (i.e., from the Company). However, in order to hide the Scheme, the defendants ensured that if a third-party such as a bank or credit card company investigator visited a URL for a Phony Merchant, they would not be re-routed, and would therefore be unable to discern any connection between the Phony Merchant website and the Company and/or the sale of marijuana products.

The Indictment alleges that over $100 million in marijuana credit and debit card

transactions were processed using the Phony Merchants. (*Id.* ¶ 14). "Some of the merchant websites listed for those transactions include: greenteacha.com, medical-stf.com, organikals.store, and soniclogistix.com." (*Id.*). Moreover, none of the Phony Merchant website names "listed for those transactions referred to the [Company] or to marijuana." (*Id.*). According to the Indictment, "AKHAVAN, and others, also worked with and directed others to apply incorrect MCCs to the Online Marijuana Marketplace Company marijuana transactions in order to disguise the nature of those transactions and create the false appearance that the transactions were completely unrelated to marijuana." (*Id.*). Indeed, as the Indictment details, "[s]ome of the MCCs/categories listed for the transactions . . . included stenographic services, music stores/pianos, and cosmetic stores." (*Id.*).

## ARGUMENT

### I. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT THE SCHEME DID NOT CAUSE PECUNIARY LOSS

In prior motions before this Court the defendants have repeatedly argued that this is a "no loss" bank fraud case, even going so far as to argue that the case should be dismissed as a result. (*See* April 24, 2020 Bail Arg. Tr. 4:11; 7:10-16 (asserting that "[t]he case is rife with serious question marks . . . . did any banks lose any money, much less have a loss caused by Mr. Weigand?"); *see also* Dkt. No. 62 (Weigand Mot. To Dismiss) (asserting that Indictment should be dismissed because "there is no allegation that the U.S. Issuing Banks suffered any loss from the [fraudulent] transactions, or faced any economic risk whatsoever. In fact, quite the opposite: they benefited from the transactions."); Dkt. No. 72 (Akhavan Mot. To Dismiss) (asserting that Indictment should be dismissed for failure to allege intent to harm). As this Court has already held in denying the defendants' motions to dismiss, the bank fraud statute requires neither a showing of ultimate financial loss nor a showing of intent to cause financial loss. (Dkt. No. 91 at 9) (citing

*Shaw v. United States*, 137 S. Ct. 462, 467 (2016); *Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014)). The defendants should accordingly be precluded from offering evidence of, and arguments relating to, how the victim banks fared economically, including that the banks did not suffer actual economic harm, or that victim banks made a profit from the fraudulent transactions.

## A. Relevant Facts

As set forth above, the evidence at trial will show that the defendants' Scheme caused Issuing Banks to process approximately $160 million in fraudulent marijuana credit and debit card transactions. The Government does not expect that the evidence at trial will show that the United States issuing banks suffered a financial loss on these transactions, but rather, that absent the defendants' deceptive scheme, the banks would not knowingly have approved these marijuana transactions. As described in the Indictment, "[i]ssuing banks in the United States generally will not extend credit (i.e., approve) transactions that involve unlawful activity under federal law, such as the sale of marijuana." (*Id.*). The Indictment also makes clear that that transfers of payment for credit card transactions are made from the Issuing Banks' own funds, as an extension of credit to the cardholder.

## B. Applicable Law

### 1. Bank Fraud Statute

The bank fraud statute, Title 18, United States Code, Section 1344, has two prongs under which a defendant may commit the crime of bank fraud. The first prong, Section 1344(1), makes it a crime to execute[ ], or attempt[ ] to execute, a scheme or artifice . . . to defraud a financial institution." 18 U.S.C. § 1344(1). Section 1344(1) requires the Government to prove that a defendant engaged in a deceptive course of conduct with "knowledge that [the defendant] would likely harm the bank's property interest," *Shaw v. United States*, 137 S. Ct. 462, 468 (2016), including deprivation of the bank's right to use the property, *Id.* at 467.

The second prong, Section 1344(2), makes it a crime to "execute[ ], or attempt[ ] to execute, a scheme or artifice . . . to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2). Section 1344(2) requires the Government to prove "that the defendant intend[ed] to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution" through false or fraudulent pretenses. U*nited States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016).

To prove a bank fraud scheme under 18 U.S.C. § 1344, "[t]he Government need not [prove] harm in the sense of pecuniary loss. *Shaw*, 137 S. Ct. at 467 (Subsection 1 'demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss.'); *Loughrin*, 573 U.S. at 366 n.9, 134 S. Ct. 2384 (Subsection 2 does not 'require[ ] the Government to prove that the defendant's scheme created a risk of financial loss to the bank' or that it, in fact, caused 'damage.')." *United States v. Weigand*, No. 20-CR-188 (JSR), 2020 WL 5105481, at *4 (S.D.N.Y. Aug. 31, 2020), as corrected (Sept. 2, 2020). Rather, the Government must only establish the existence of a scheme to "'deprive [the bank] of something of value,' *Shaw*, 137 S. Ct. at 469 (Subsection 1) or to 'obtain any of the moneys ... or other property owned by, or under the custody or control of, a financial institution,' *Loughrin*, 573 U.S. at 356, 134 S. Ct. 2384 (Subsection 2)." *Id.*

### 2. Rules 401 and 403

Evidence is relevant under Rule 401 if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

Evidence, including testimony sought to be elicited on cross-examination, must also satisfy Rule 403, which provides that a court may exclude evidence "if its probative value is substantially

outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### C. Discussion

Pecuniary loss is not an element of the charged bank fraud conspiracy, and lack of pecuniary loss by a bank is irrelevant to the question of the defendants' intent to defraud. *See Shaw*, 137 S. Ct. at 467. The Court should accordingly preclude: (1) evidence, including testimony elicited through cross-examination of bank witnesses, that victim banks did not suffer pecuniary loss as a result of the Scheme, or that victim banks may have earned revenue through processing marijuana transactions concealed from those banks as part of the Scheme; and (2) argument regarding the same. Given that financial loss or intent to cause financial loss is not an element of the charged crime, it is not relevant under Federal Rule of Evidence 401.

The same evidence and argumentation is also improper under Rule 403. The admission of such evidence inappropriately shifts the proper focus of the jury's inquiry, which should be on whether the Government has shown a scheme to deprive banks of something of value, or to obtain money that was under the control of the banks. Evidence that the banks did not suffer a pecuniary loss, or in fact earned money on the marijuana transactions, would only result in confusion of the issues, misleading the jury, and wasted time. *See* Fed. R. Evid. 403 (permitting court to exclude evidence "if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury . . . [and] wasting time . . . ."). In particular, the jury would be left with the impression that if the banks did not suffer any pecuniary loss, that would be relevant to whether the defendants are guilty. It is not.

## II. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT REGARDING FEDERAL ENFORCEMENT OF MARIJUANA LAWS, LEGALIZATION OF MARIJUANA IN CERTAIN STATES AND/OR COUNTRIES, AND EFFORTS TO LEGALIZE MARIJUANA FEDERALLY

The Court should preclude evidence regarding the federal enforcement of marijuana laws, legalization of marijuana in states beyond those at issue in the charged Scheme (i.e., California and Oregon) and/or countries outside the United States, and efforts to legalize or decriminalize marijuana federally. Such evidence or argument is not relevant, and its admission would be unfairly prejudicial, serving no other purpose but to inflame the jury, invoke sympathy, and suggest to the jury that because certain unrelated crimes are legal under some states' laws, or not being prosecuted by the federal government, the defendants should be found not guilty.

### A. Relevant Facts

As noted above, the Government expects the evidence at trial will show that during the time period of the Scheme, the sale and distribution of marijuana was unlawful under federal law. The evidence will also show that during the same time period, certain sales and personal use of marijuana were, to varying degrees, lawful under state law in the two states where the Company operated, i.e., California and Oregon. The evidence will show that the customers could only make purchases of marijuana through the Company's technology if they were physically located in California or Oregon.

Because marijuana is a Schedule I controlled substance under the Controlled Substances Act, and the possession, distribution, and use of marijuana is unlawful under federal statutes, including Title 21, United States Code Sections 841 and 844, federally chartered banks are generally unwilling to open accounts for marijuana businesses, or approve credit and debit card transactions for the purchase of marijuana products. The defendants' Scheme was aimed at tricking the victim banks into believing they were processing transactions for unambiguously lawful products, as opposed to marijuana.

Although the jury will hear that federal law proscribes the distribution of marijuana, the gravamen of the charges against these defendants is their lies to the U.S. banking system, not their decision to traffic in a controlled substance. As such, the Government does not intend to offer evidence regarding federal prosecutions of marijuana offenses (including the rate of such prosecutions); marijuana laws in states other than California and Oregon, or in countries outside of the United States; or efforts to legalize or decriminalize marijuana under federal law (or other similar legislation, such as proposed legislation to provide safe harbor to banks for processing of marijuana transactions).

**B. Discussion**

The Government is unaware of any lawful basis for the defendants to offer evidence or argument concerning: (1) the federal government's enforcement of federal laws prohibiting the possession, distribution, and use of marijuana; (2) laws permitting the sale or recreational use of marijuana in states other than California and Oregon and/or countries outside of the United States; and (3) efforts to legalize or decriminalize the sale of marijuana under federal law or create a safe harbor for banks and financial institutions doing business with state-legal marijuana businesses. They should be precluded from doing so, and from mentioning such subjects in their arguments to the jury, or eliciting such evidence through witnesses.

As noted above, the possession and sale of marijuana is unlawful under federal law. As a result, most United States banks have policies that prohibit, and are generally unwilling to approve, transactions that involve the sale of marijuana. These facts are directly relevant to the Government's case; they provide a clear explanation for why the defendants resorted to an elaborate scheme involving the use of Phony Merchants, fake websites, offshore bank accounts, and miscoded credit and debit card transactions.

On the other hand, evidence or argument about (1) the legality of marijuana in other states

or countries where the Company did not operate; (2) efforts to legalize or decriminalize certain aspects of the marijuana market at the federal level; and (3) proposed but unpassed federal legislation, such as the proposed SAFE Banking Act, to provide safe harbor to banks and financial institutions doing business with state-legal marijuana, are irrelevant to any issue at trial. The status of state law in other states where the Company did not operate has no bearing on the defendants' state of mind, or the potential motivations for their deceptive Scheme. For similar reasons, the defendants should also be precluded from offering further evidentiary detail or argument about California and Oregon's marijuana laws, including any policy rationales and/or enforcement considerations that led California and Oregon to legalize marijuana sales, beyond the mere fact that the Company did not operate in violation of the laws of those states (a fact that the Government intends to illicit on direct examination).

The possibility that federal marijuana laws might be changed in the future, including through legislation that would provide a safe harbor for banks who work with state-legal marijuana businesses, also has no bearing on the defendants' state of mind. [1] Such evidence would serve no purpose and would only invite the jury to nullify by suggesting that it would be unfair to convict the defendants in light of the fact that certain marijuana sales are legal or decriminalized in other states and might eventually be so under federal law, or that there might eventually be a safe harbor for banks who work with state-legal marijuana businesses. *See In re United States*, 945 F.3d 616,

---

[1] Notably, the SAFE Banking Act would provide protections for banks who work with state-legal marijuana businesses by prohibiting federal banking regulators from taking various actions against banks *solely* because of their provision of financial services to those state-legal marijuana business. It would *not* provide protections for individuals like the defendants who engage in a deceptive scheme to trick those banks, in violation of the bank fraud statute, or for banks that violated their Bank Secrecy Act, anti-money laundering, or other reporting obligations with respect to marijuana-related financial transactions. Evidence concerning this proposed legislation would create a sideshow at trial that has no bearing on the defendants' knowledge, intent, or any other issue properly before the jury.

630 (2d Cir. 2019) (noting that evidence cannot be admitted for the sole purpose of encouraging nullification), cert. denied sub nom. *Manzano v. United States*, No. 19-1447, 2020 WL 6385778 (U.S. Nov. 2, 2020); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("Because the jury enjoys no right to nullify criminal laws, and the defendant enjoys a right to neither a nullification instruction nor a nullification argument to the jury, the potential for nullification is no basis for admitting otherwise irrelevant evidence.").

Moreover, such evidence should be precluded under Rule 403. Introduction of evidence of other state laws will confuse the relevant issues and mislead the jury. It would suggest to the jury that the laws of other states are relevant to the lawfulness of the defendants' conduct in this case, which they are not. Further, introduction of evidence concerning proposed federal legislation about a bank safe harbor that did not exist at the time of the Scheme (and still does not) would be highly confusing and misleading to the jury. Proposed safe harbors, even had they existed at the time of the Scheme, would nevertheless not provide cover for individuals lying to affected banks to ensure the processing of payments, regardless of the nature of those transactions. Any suggestion that the proposed safe harbor provisions reflect the legality or harmlessness of lying to banks is simply a non sequitur designed to confuse the jury or encourage nullification. This evidence or argument should accordingly be precluded.

For similar reasons, the defendants should also be precluded from introducing evidence or argument concerning the federal Government's enforcement of marijuana trafficking laws.[2] The degree to which the Government enforces such laws has no bearing on the guilt or innocence of

---

[2] The defendants have indicated that they intend to offer such evidence at trial. For example, in an expert disclosure dated November 3, 2020, Akhavan indicated that one of his experts would testify that enforcement of federal marijuana laws has effectively been "suspended . . . in states where it has been legalized." This is further addressed in the Government's Motion *in Limine* to Preclude Defendants' Experts.

the defendants, who have been charged with bank fraud.  The evidence should accordingly be precluded.

**III.  THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT THE VICTIM BANKS PURPORTEDLY FAILED TO ACT WITH SUFFICIENT DILIGENCE OR ACTED NEGLIGENTLY IN ENFORCING POLICIES PROHIBITING TRANSACTING BUSINESS INVOLVING MARIJUANA TRANSACTIONS**

As the Government previously described to the Court (*see* Dkt. No. 148), based upon their pre-trial filings, including motion practice surrounding the enforcement of a subpoena directed to Circle, identification of exhibits involving Circle and Company purchases, and expert disclosures, it appears the defendants intend to argue that the victim banks have not and cannot diligently enforce policies prohibiting them from conducting business involving marijuana transactions.  Relatedly, the defendants may claim that the practices and procedures that the victim banks do employ in their efforts to enforce these policies are lacking and insufficient.  For example, the defendants intend to offer expert opinion that "issuing bank policies regarding transaction monitoring for cannabis purchases are to a large extent policies in paper, not actionable in practice"; that "due to lack of sufficient information provided by the credit card companies, other . . . due diligence procedures would be required to reliably detect cannabis transactions"; and expert opinion regarding the "steps issuing banks may take . . . to detect . . . fraud and other suspicious activity."[3]  Weigand has further argued that the "Issuing Bank were willfully blind to the fact that they have processed transactions related to Marijuana."  (Dkt. No. 153 at 6).  As a result, the argument goes, fraudulent misrepresentations and omissions to the victim banks intended to conceal the true nature of the transactions are simply immaterial.

The Court should preclude the defendants from offering any such evidence or argument.

---

[3] The Government's separately filed Motion *in Limine* to Preclude Defendants' experts describes and attaches the defendants' expert disclosures.  For the reasons explained therein, those disclosures are inadequate and suffer from a number of additional legal defects.

As described above, the defendants perpetrated a scheme to deceive all participants in the payment processing system, including the issuing banks, in order to ensure the continued processing of hundreds of millions of dollars' worth of marijuana transactions over a period of years. That the defendants exploited the fact that their scheme was difficult to detect by the victim issuing banks unless those banks conducted additional diligence has no bearing on whether the defendants' misrepresentations were material to the banks. The susceptibility of a fraud victim to the fraud—whether due to negligence, carelessness, insufficient (or even no) transaction monitoring systems, or some other factor—is wholly irrelevant to proving or defending against a bank fraud conspiracy charge; relatedly, any argument that the banks' failure to conduct what the defendants believe would constitute sufficient diligence means that the banks just "don't care," completely lacks any basis. Introduction of such evidence or argument has no purpose other than to confuse and mislead the jury.

## A. Applicable Law

It is black-letter law that negligence or lack of diligence or reasonableness on the part of a target of a fraudulent scheme is no defense to a federal fraud charge. *United States v. Frenkel*, 682 Fed. Appx. 20, 22 (2d Cir. 2017) (rejecting defendant's argument that district court erred in precluding him from arguing victim bank's negligence in failing to conduct sufficient diligence in connection with issuing loan because "a victim's negligence is not a defense under the federal fraud statutes" and argument is irreconcilable with Supreme Court's decision in *Neder*); *United States v. Kaufman*, 617 Fed. Appx. 50, 52 (2d Cir. 2015) (in bank fraud and bank fraud conspiracy case, upholding instruction that victim negligence, carelessness, or gullibility is no defense); *United States v. Isola*, 548 Fed. Appx. 723, 724-725 (2d Cir. 2013) (district court properly excluded allegedly habitual negligence of financial institutions that were victims of fraud; evidence of a particular lender's unreasonableness irrelevant to materiality of false

statements, which is an objective question); *see United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (adopting rule that victim's lack of reasonableness or negligence is no defense to fraud); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (confirming the same rule applies in prosecution for mail fraud).[4]

Negligence is no defense to bank fraud because (1) actual reliance by the target of the fraud is not an element of the fraud statutes, and, relatedly, (2) materiality under these statutes is an objective rather than a subjective standard. *Neder v. United States*, 527 U.S. 1, 16, 24-25 (1999). As to the first point, the Supreme Court has explained that "[t]he common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes," because, "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted." *Id.* at 24-25 (citations omitted).

The Court in *Neder* confirmed that materiality was an element of the federal fraud statutes, but, consistent with Congress's focus on the "scheme" to defraud rather than the completed fraud, adopted a test that did not have the effect of inserting reliance into the equation: "a false statement is material if it has a *natural tendency to influence*, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* at 16 (emphasis added; citation, alteration, and quotation marks omitted); *see United States* v. *Irvin*, 682 F.3d 1254, 1267-68 (10th Cir. 2012) ("This definition, in referring to natural tendencies and

---

[4] This principle is reflected in standard jury charges given in similar fraud cases. For example, in a mortgage fraud case, the jury was instructed: "[I]t does not matter whether any of the banks involved might have discovered the fraud had it probed further. If you find that a scheme or artifice existed, it is irrelevant whether you believe that any of the banks involved was careless, gullible, or even negligent." *United States v. Cherico*, No. 08 Cr. 786 (S.D.N.Y.) (CM), Oct. 31, 2011 Tr. at 1498:20-24.

capabilities, establishes materiality in the bank fraud context as an *objective* quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision.").  More recently, this Court has observed, "'a misrepresentation is material if it is capable of influencing the decisionmaker, *no matter what the victim decides to do.*'" *United States v. Allen*, No. 14 Cr. 272 (JSR), 2015 WL 5022524, at *2 (S.D.N.Y. Aug. 18, 2015) (emphasis added) (quoting *United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir. 2013)); *see also Cherico*, Oct. 31, 2011 Tr. at 1498:1-14 ("We use the word material to distinguish between kinds of statements that matter and those that are of no real importance.  A material fact is one that you would expect to be of concern to a reasonable and prudent person who was relying on the statements made to him and the accuracy of the information being provided to him in making a decision.  It does not matter whether the [target] actually relied on the misrepresentation or omission.  It had to be capable of influencing the [target], and intended by the defendant to influence the [target], whether it influenced the [target] or not.").[5]

A particular victim's susceptibility to fraud is irrelevant because *Neder* teaches that materiality is an objective, not subjective standard; for the same reason, a particular victim's willful blindness to a fraud, an inherently subjective inquiry, is also irrelevant.  *See, e.g.*, *United States v. Stadtmauer*, 620 F.3d 238, 255 (3d Cir. 2010) ("[W]illful blindness is a subjective state of mind that it deemed to satisfy a scienter requirement of knowledge.") (internal quotation

_____

[5] Indeed, under this objective test, "a false statement can be material even if the decision maker actually knew or should have known that the statement was false." *United States* v. *Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999), *cert. denied*, 530 U.S. 1261 (2000); *see United States* v. *Irvin*, 682 F.3d 1254, 1267-68 (10th Cir. 2012) (affirming conviction for bank fraud even though record was "clear" that fraudulent financial information submitted for a loan had no actual impact on target bank's decision whether to issue the loan); *United States* v. *Pizano*, 421 F.3d 707, 721-22 (8th Cir. 2005) (explaining that although evidence of reliance by banks on misrepresentations in loan applications is probative of materiality, absence of reliance does not prove lack of materiality); .

marks omitted); *United States v. Poole*, 640 F.3d 114, 121-22 (4th Cir. 2011) ("evidence establishing a defendant's 'willful blindness' constitutes proof of his subjective state of mind").

### B. Discussion

Applying these principles here, the Court should preclude defendants from adducing evidence (expert or otherwise), arguing, or cross-examining Government witnesses about purported lack of sufficient diligence or ability on the part of the victim issuing banks in detecting defendants' fraud, or a particular victim issuing bank's willful blindness to the nature of the transactions. These matters simply have no bearing on the question of materiality in a federal criminal fraud trial. *See United States* v. *Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis: 'If a scheme to defraud has been or is intended to be devised, it makes no difference whether the person the schemer intended to defraud was gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts.'" (citation omitted)).

## IV. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT REGARDING WHETHER IT WAS "REASONABLE" FOR BANKS TO PROCESS MARIJUANA-RELATED TRANSACTIONS

In prior submissions before this Court the defendants have indicated that they plan to present evidence and make arguments at trial that are wholly inconsistent with the black letter law on materiality. For example, the defendants have asserted that what "matters to materiality is whether it was reasonable for banks to process marijuana-related transactions." (Dkt. 152 at 6). This is completely inconsistent with the law. The materiality analysis is not aimed at determining whether conduct on behalf of the victim banks was reasonable; rather, it is aimed at whether the defendants' false or fraudulent pretenses, representations or promises were material, i.e., capable of influencing the decision-maker. The defendants should accordingly be precluded from introducing evidence or arguments concerning whether it was reasonable for the banks to process

marijuana-related transactions.

## A. Relevant Facts

The defendants have indicated that in order to prove a lack of materiality in this case, they intend to present evidence and argument concerning whether it was reasonable for banks to process marijuana-related transactions. For example, in a filing earlier today, counsel for Akhavan stated that:

- "The bottom line that matters to materiality is whether it was reasonable for banks to process marijuana-related transactions, and the Circle Subpoena will shine obvious and important light on that question by showing what a raft of banks are in fact doing as they continue to process marijuana-related transactions with eyes wide open." (Dkt. 152 at 6).

- "Defendants plan to prove at trial that the banks were objectively reasonable in processing marijuana-related transactions consistent with federal guidance, such as the Cole Memorandum, indicating that banks would not be prosecuted for doing so in states that specifically elected to legalize these transactions." (*Id.*).

- "The evidence sought by the Circle Subpoena is relevant to show the jury that an objectively reasonable bank might well (indeed, as a rule, does) choose to continue processing marijuana transactions, with full knowledge that the transactions are for marijuana." (*Id.* at 7).

## B. Discussion

The defendants seek to introduce evidence and argument pursuant to their own concocted standard of materiality that is wholly inconsistent with the law and improper for the jury to consider. Rather than focus on the materiality of the misrepresentations that the defendants made to banks, the defendants assert a novel theory of materiality that turns the law on its head and defines materiality based on whether it was reasonable for banks to process marijuana-related transactions. Defendants' attempt to make this argument further appears to be at least in part an attempt to find another avenue, in light of the black-letter law that bank fraud does not require a showing of actual financial loss or intent to cause loss discussed above, to introduce evidence regarding profits the victim bank's may have made as a result of the transactions. But

the reasonableness of the banks' decision to process such transactions is not at issue in this case, and is irrelevant to the jury's determination of guilty or innocence.

The question properly before the jury is whether the defendants' scheme, which was aimed at deceiving the victim banks, involved fraudulent representations that were material. "[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S. 16. "We use the word material to distinguish between kinds of statements that matter and those that are of no real importance. A material fact is one that you would expect to be of concern to a reasonable and prudent person who was relying on the statements made to him and the accuracy of the information being provided to him in making a decision." *Cherico*, Oct. 31, 2011 Tr. at 1498:1-14. Under the proper definition of materiality, which is aimed at evaluating the importance of the misstatements made to the banks, it is irrelevant whether the banks' decision to process marijuana transactions, if they did do so, was "reasonable," (Dkt. 152 and 6). Such argument and evidence should accordingly be precluded.

## V. THE DEFENSE SHOULD BE PRECLUDED FROM OFFERING ADDITIONAL PORTIONS OF WEIGAND'S POST-ARREST STATEMENT

### A. Relevant Facts

On or about March 9, 2020, Weigand was arrested at the Los Angeles International Airport in California. After his arrest, Weigand was interviewed by special agents with the FBI. The interview was audio recorded. The recording was subsequently transcribed and is attached hereto as Exhibit A. Weigand did not move to suppress any portion of his post-arrest statement in his pretrial motions.

At trial, the Government will seek to offer the yellow highlighted portions of the transcript

of Weigand's post-arrest audio interview set forth in Exhibit A (the "Statements").[6] Once admitted

into evidence, the Government plans to play these portions of the audio interview for the jury.

Weigand seeks to admit additional portions of Weigand's post-arrest statement which are

highlighted in green in Exhibit A.

### B. Applicable Law

The Government is permitted to introduce at trial statements made by the defendant as

party admissions, pursuant to Federal Rule of Evidence 801(d)(2)(A).  *See United States v. Russo*,

302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the

government in a criminal trial to prove the truth of the facts stated in them because they are

admissions of an adverse party." (citing Fed. R. Evid. 801(d)(2)(A))).  The defendant, however,

does not have a parallel ability to offer his statements into evidence.  "When the defendant seeks

to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not

admissible."  *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982).

Moreover, the Government is under no obligation to offer all portions of a statement when

it offers inculpatory admissions.  *See United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996)

(finding that a "self-serving [exculpatory] statement that does not contradict, explain, or qualify

the rest of the statement" did not need to be offered by Government under rule of completeness

when Government offered inculpatory statements); *United States v. Smith*, 794 F.2d 1333, 1335-

36 (8th Cir. 1986) (holding that district court did not err in precluding cross-examination on

portions of post-arrest statement describing relationship to co-defendant and implicating co-

defendant when Government offered admission that defendant had been present at the time of co-

---

[6]  At present, the Government intends to offer only the yellow highlighted portions identified in
Government Exhibit A.  If the Government identifies any additional portions to be offered, or
determines that it will not offer certain highlighted portions, it will immediately provide notice to
the defense.

defendant's arrest).

Nevertheless, there are certain instances when a defendant may require the admission of certain portions of a post-arrest statement when the Government offers excerpts of a post-arrest statement. Rule 106 of the Federal Rules of Evidence provides that: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time."

"Under this principle, an omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion. . . . The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999), on reh'g, 196 F.3d 383 (1999); *see United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2010) ("The completeness doctrine does not 'require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages.'") (quoting *Marin*, 669 F.2d at 84); *United States v. Benitez*, 920 F.2d 1080, 1086-87 (2d Cir. 1990) ("[The] 'rule of completeness' . . . is violated 'only where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the declarant.'" (quoting *United States v. Alvarado*, 882 F.2d 645, 651 (2d Cir. 1989)). As such, "the rule of completeness is not a mechanism to bypass hearsay rules for any self-serving testimony." *United States v. Gonzalez*, 399 Fed. App'x 641, 645 (2d Cir. 2010).

The burden rests with the defendant to demonstrate that the portions of the statement he seeks to offer are necessary to clarify or explain the portions the Government intends to offer. *See*

*United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent."). "The trial court's application of the rule of completeness is reviewed only for abuse of discretion." *Jackson*, 180 F.3d at 73.

### C. Discussion

There is no legitimate basis on which Weigand could offer those portions of his post-arrest statement not offered by the Government. The remaining portions, including the portions highlighted in green that the defense seeks to include, are all hearsay and are not necessary to explain the context of the Statements or to prevent the Statements from being misleading. The Statements fall into two general categories: (1) statements made by Weigand about his knowledge of and involvement with the Company; and (2) statements made by Weigand about his knowledge and use of a particular email address the evidence will show was used by Weigand in furtherance of the Scheme. The statements that the defense seeks to offer concern other distinct topics, including:

- Background questions posed to Weigand concerning his understanding of the fact that he was under arrest, his understanding of English, his waiver of his *Miranda* rights, and his willingness to answer questions;

- Statements about Weigand's current employment and employment history; and

- Statements made *after* the Statements in which Weigand invoked his right to counsel.

As noted above, the Statements offered by the Government pertain to two discrete topics and have nothing to do with the additional statements Weigand seeks to offer. The Statements stand on their own and they do not require other portions of Weigand's post-arrest statement for context or to prevent any misunderstanding. *See United States v. Lumiere*, 249 F. Supp. 3d 748,

758 (S.D.N.Y. 2017) (finding that rule of completeness did not require admission of portions of recorded conversation that were allegedly favorable to defendant); *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (holding that admission of defendant's redacted confession did not violate the rule of completeness and affirming conviction).  Accordingly, the remaining statements of Weigand should be precluded.

## VI.  THE COURT SHOULD PRECLUDE THE DEFENDANTS FROM ASSERTING A PRESENCE OF COUNSEL DEFENSE

In response to inquiries from the Government, both defendants have disclaimed any reliance on an advice of counsel defense.  However, the Government's production includes electronic communications containing Akhavan and attorneys for the Company, along with other co-conspirators and individuals, as well as references to oral conversations including counsel.  To the extent either defendant intends to assert—through documentary evidence, questioning, or argument—that the presence of such counsel constitutes evidence of his good faith with respect to the scheme charged in the Indictment (*i.e.*, a "presence of counsel" defense), such evidence should be rejected as an inappropriate and prejudicial end run around the obligations attending assertion of a true advice-of-counsel defense.

### A.  Applicable Law

Courts in this district—including this Court—have rightly approached a "presence of counsel" defense with caution, mindful that it risks injecting irrelevant or prejudicial information into criminal trials.  As to the potential prejudice, from a legal standpoint, the presence of counsel defense is not materially different from the advice of counsel defense, which "is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true," but is, instead, evidence that "if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an unlawful intent."  *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017).

Because an established body of law, developed under the rubric of the advice of counsel defense, governs when and how criminal defendants are entitled to rely on the involvement of lawyers to negate mens rea,[7] courts have been reluctant to endorse a presence of counsel defense that would allow a defendant to functionally mount an advice of counsel defense without meeting the required elements.

Thus, for example, in *S.E.C.* v. *Tourre*, 950 F. Supp. 2d 666, 683-84 (S.D.N.Y. 2013), Judge Forrest precluded the defendant from highlighting the fact that a lawyer participated in certain communications and transactions once it was clear that the defendant could not show a valid advice of counsel defense. In precluding the defendant from presenting anything short of a proper advice of counsel, Judge Forrest explained:

> A lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly "blessed" the legality of all aspects of a transaction. Likewise, the fact that lawyers saw and commented on disclosure language could be understood as "blessing" the sufficiency of that disclosure. This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense.

*Id.*

### B. Discussion

That is precisely the concern here. Beyond enabling the defendants to benefit from an incomplete advice of counsel defense, the presence of counsel defense risks injecting irrelevant or confusing evidence into this trial, because the involvement of counsel in a scheme is not probative of a defendant's state of mind unless it is established that the counsel was informed of

---

[7] As the Court is well aware, a true advice of counsel defense requires a defendant to show "that he (1) honestly and in good faith sought the advice of counsel; (2) fully and honestly la[id] all the facts before his counsel; and (3) in good faith and honestly follow[ed] counsel's advice, believing it to be correct and intending that his acts be lawful." *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) (internal quotations omitted).

all relevant facts regarding the scheme. This Court very recently recognized this in *United States v. Petit*, No. 19 Cr. 850 (JSR) (Tr. at 2092-2093) (noting that defense counsel "has been quite good in avoiding" raising presence of counsel and accountant issues, but that if they raise it in summation "I will probably interrupt right then and there and say 'There is no defense of counsel here, there is no auditor advice defense.'"); *see also* Tr. dated Oct. 23, 2020, at 8 ("I'm skeptical that [defense introduction of evidence of interactions with lawyers] can be done without a waiver of the attorney client privilege. . . ," but noting issue premature to rule upon). The Court also previously recognized these problems in *SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. 2012), where it took exception to defense counsel's effort to highlight, through questioning, that attorneys had reviewed certain offering materials that the SEC charged were materially misleading. Specifically, the Court recognized that "absent evidence that counsel knew either the information that Mr. Stoker allegedly kept secret, from outsiders, or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this [was] *totally irrelevant*." *Stoker*, Dkt. No. 100, July 23, 2012 Trial Tr. at 895-96 (emphasis added). The Court further recognized, despite the defendant's proffer of an alternative reason for the examination, that the defendant was effectively mounting a "disguised reliance argument," *id.* at 973, and that, even if the testimony were offered for some other purpose, questioning about the role of attorneys invited "all the danger of the jury misunderstanding the alleged purpose" of the testimony. *Id.* at 981. Ultimately the Court gave a supplemental limiting instruction to the jury that the attorneys' "signing off" on something may or may not be relevant, depending on whether counsel actually received the relevant information. *Id.* at 969; *see also SEC v. Lek Securities Corp.*, 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019) ("References to counsel's communications are not relevant in the absence of an advice-of-counsel defense and

should be excluded as well pursuant to Rule 403.").

Here, evidence and argument regarding the presence of counsel on documents and participation in communications would be irrelevant, prejudicial, and misleading. There is no admissible foundation to show that such counsel were apprised of all the material facts of the scheme, such that their presence would be probative of the defendants' state of mind. Nor is there adequate evidence of the nature and scope of counsel's advice, as would be the case if the defendants were asserting a true advice-of-counsel claim. Accordingly, any such evidence and argument should be excluded.

In the alternative, if either defendant wishes to assert a presence of counsel defense, he should be required to provide a detailed factual proffer that such evidence is relevant and not unfairly prejudicial or misleading, including describing what particular interactions and counsel communications they may introduce, when they occurred, what information was available to counsel, and why and how such interactions and communications are relevant.[8] Absent a sufficient foundation, the mere presence of lawyers would serve no purpose other than to mislead the jury into believing that a lawyer had "blessed" the defendants' conduct. The invocation of lawyers in that way would be highly prejudicial to the Government and should be excluded under both Rules 401 and 403.

---

[8] Importantly, insofar as defendants seek to introduce such evidence or argument, they should also be required to produce any evidence upon which they would rely in support thereof, regardless of whether a claim of privilege may attach to that evidence. *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (recognizing that a defense based on interactions and communications with lawyers may waive the attorney-client privilege with respect to those dealing).

**VII. THE COURT SHOULD PRECLUDE EVIDENCE THAT THE DEFENDANTS FAILED TO ENGAGE IN FRAUD WITH RESPECT TO OTHER MERCHANTS AND BANKS**

In the course of pretrial proceedings in this case, defendant Weigand in particular has highlighted his legitimate business activities.  For example, in the course of bail proceedings, Weigand's counsel has emphasized that his client is "deeply respected in Europe," a "very successful e-commerce merchant," working through "a legitimate company, it is a series of legitimate companies . . . ."  Moreover, counsel has represented that in the e-commerce industry, "these same types of accounts and same types of setups would be used whether they were selling marijuana or selling widgets or selling on eBay."  (Mar. 17, 2020 Tr. at 16; *see also id.* at 17, 18; *see also, e.g.*, Apr. 24, 2020 Tr. at 6).  While defendant Akhavan's counsel has not explicitly raised similar points, the Government's investigation has shown that he has had various dealings with multiple banks, foreign and domestic, as well as MasterCard, beyond the charged scheme.

To the extent that the defendants seek to introduce evidence regarding legitimate business activities pertaining to merchants other than the Company, or other legitimate business activities they have undertaken involving issuing banks, Visa, or MasterCard, in order to show that they did not have fraudulent intent with respect to the conduct at issue in this case, such evidence would plainly constitute impermissible "good acts" evidence that should be precluded.

**A.  Applicable Law**

"A defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Whether analyzed under the rubric of relevance, pursuant to Rule 401, or character propensity evidence, under Rule 404(b), courts—including this one—have uniformly held that evidence that a defendant engaged in legal, honest business conduct on some occasions may not be introduced to rebut an allegation that the defendant engaged in the charged criminal conduct on other

occasions. *See, e.g.*, *United States v. Chambers,* 800 Fed. Appx. 43, 46 (2d Cir. 2020) (summary order) ("Chambers's argument that his running of a legitimate law practice makes it less likely that he had corrupt intent to bribe Villanueva is precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit."); *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (affirming district court's exclusion of testimony that witnesses did not pay defendant any bribes "because such testimony would in effect be an attempt to demonstrate appellant's good character by proof of specific good acts"); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming the district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *see also United States v. Boykoff*, 67 Fed. Appx. 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.") (quoting *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978)); *Levine v. SEC,* 436 F.2d 88, 91 (2d Cir. 1971) (rejecting broker-dealer defendant's claim that he was entitled to offer testimony by certain of his clients that they had not been lied to, as such testimony would not negate the testimony of the customers who testified that false and misleading statements had been made to them , *United States v. Petit*, No. 19 Cr. 850 (JSR) (Tr. dated Oct. 23, 2020, at 11) (Dkt. No. 115)) (granting Government's motion *in limine* to preclude evidence that defendants did not engage in fraudulent activities with respect to certain customers); *see also, e.g.*, *United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) ("A defendant charged with robbing a bank in Manhattan on April 22 cannot offer as evidence to disprove the charged crime that he did not rob the bank's branches in Brooklyn or the Bronx on April 22 or that he did not rob the

Manhattan branch on April 20, 21, 23, and 24, because this evidence is irrelevant to the charge that he robbed the Manhattan bank on April 22.").

### B. Discussion

Although the Government has limited insight into the defendants' theories and expected evidence, as noted above, the defendants may seek to introduce evidence regarding one or both of their purportedly legitimate business activities with respect to merchants other than the Company and with respect to the issuing banks, Visa, or MasterCard, in order to demonstrate that they lacked fraudulent intent with respect to the conduct at issue in this case. As the above authorities demonstrate, however, the fact that the defendants may not have engaged in fraud with respect to other merchants and other activities involving the victim banks is not relevant to the issues in this case, or, in the alternative, the defendants' effort to offer this evidence would be an impermissible effort to prove their good character through specific instances of conduct in violation of Rule 404(b)(1). *See, e.g.*, *Walker*, 191 F.3d at 336; *Chambers*, 800 Fed. Appx. at 46. Here, the Indictment alleges, among other things, that the defendants conspired to commit bank fraud by fraudulently masking unlawful credit and debit marijuana sales facilitated by the Company—which would not have been approved by the Issuing Banks—as purportedly legitimate transactions involving innocuous goods and merchants. It is thus entirely improper for the defendants to introduce evidence related to other merchants and other non-fraudulent dealings with the victim banks in an effort to negate any inference about their state of mind as to the scheme at issue in the Indictment.

## VIII.  THE COURT SHOULD ADMIT CERTAIN CATEGORIES OF EVIDENCE AS DIRECT EVIDENCE OF THE DEFENDANTS' BANK FRAUD CONSPIRACY, OR IN THE ALTERNATIVE, PURSUANT TO RULE 404(B)

The Government seeks to introduce three categories of evidence as direct evidence of the charged offense: (1) evidence concerning the development of the relationship between CW-1, a

cooperating witness, and the defendants; (2) evidence concerning a particular deceptive act by Weigand that occurred in 2016; and (3) evidence that, in 2018, Akhavan made certain threats to CW-2, a cooperating witness, in furtherance of the scheme. In the alternative, the Government submits that such evidence is properly admissible pursuant to Federal Rule of Evidence Rule 404(b).

### A. Applicable Law
#### 1. Other Acts Evidence as Intrinsic or Direct Proof

If evidence is relevant to a charged offense, it is generally admissible at trial. Fed. R. Evid. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Uncharged acts are admissible in a conspiracy case where they are used to (i) explain the development of the illegal relationship between co-conspirators; (ii) explain the mutual criminal trust that existed between co-conspirators; and/or (iii) complete the story of the crime charged. *See United States v. Mercado*, 573 F.3d 138, 141–42 (2d Cir. 2009). In other words, evidence of uncharged criminal activity is admissible "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012) (citation and internal quotation marks omitted); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007). Even if the evidence does not directly establish an element of the offense charged, it can be admitted "in order to provide background for the events alleged in the indictment." *United States* v. *Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (citation omitted). "In particular, evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the

context of certain events relevant to the charged offense." *United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (citations omitted); *see also United States* v. *Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.").

### 2. Other Acts Evidence Pursuant to Rule 404(b)

Federal Rule of Evidence 404(b) provides, in relevant part, that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

It is well-settled that evidence of uncharged crimes, wrongs, or other acts is admissible under Rule 404(b) as long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect, and (4) if requested, is admitted with limiting instructions to the jury. *See United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992). The Second Circuit "follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (quoting *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996)); *see also United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013). Any "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States v. Roldan-Zapata*, 916 F.2d 795,

804 (2d Cir. 1990); *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *cf. Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

Prior conduct offered on the issue of the defendant's knowledge and intent is relevant and admissible when there is similarity between the prior conduct and the charged conduct. *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987) (holding that a prior act is probative of knowledge if it is sufficiently similar "to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence"). "Where only knowledge or intent is in issue, the similarity requirement is simply a rule of relevance." *United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996); *see also United States v. Brand*, 467 F.3d 179, 197 (2d Cir. 2006) (citing Federal Rule of Evidence 401 as test for similarity where other acts evidence is used to prove knowledge and intent). A defendant's knowledge and intent are at issue unless the defendant has expressed with sufficient clarity a decision not to dispute that element of the offense. *See United States v. Colon*, 880 F.2d 650, 656–57 (2d Cir. 1989); *Pitre*, 961 F.2d at 1119).

Finally, it is proper for a trial court to admit "other crimes, wrongs, or acts" evidence if it helps to prove the existence of a common scheme or plan. *See* Fed. R. Evid. 404(b) (establishing that "evidence of any other crime, wrong, or act . . . may be admissible" to prove a "plan"); *United States v. Reed,* 639 F.2d 896, 906 (2d Cir. 1981) ("[E]vidence of the [other] transactions was ... admissible to show a common scheme or plan."); *Carofino v. Forester*, 450 F. Supp. 2d 257, 272 (S.D.N.Y. 2006) (noting that "evidence demonstrative of pattern" or a common scheme or plan "is admissible under Rule 404(b)"); *see also United States v. O'Connor*, 580 F.2d 38, 41 (2d Cir. 1978) ("The rubric of scheme or plan has been used to cover a multitude

of particular situations, which do not fall into simple categories.").

### 3. Rule 403 and Evidence of Other Bad Acts

Regardless of whether the evidence is admitted as direct evidence or as other acts evidence under Rule 404(b), the evidence is, like all other evidence, admissible under Federal Rule of Evidence 403 only if its probative value is not substantially outweighed by the danger of unfair prejudice. Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Other crimes evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (Evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]."); *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("Evidence is unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." (citation and internal quotation marks omitted)). The fact that evidence may be damning does not render it inadmissible. See United States v. Cirillo, 468 F.2d 1233, 1240 (2d Cir. 1972).

To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendants are not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir.

1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule' – indeed, the premise upon which the system of jury trials functions under the American judicial system – is that juries can be trusted to follow the trial court's instructions.").

### B. The Government Should be Permitted to Introduce Evidence Regarding the Broader Business Relationship Between the Defendants, Other Co-Conspirators, and CW-1

#### 1. Relevant Facts

At trial, the Government expects to introduce evidence through CW-1 that explains the circumstances surrounding the development of his criminal relationship with the defendants. As explained below, this testimony will reflect that the Scheme originated with CW-1, an uncharged co-conspirator ("CC-1") and Akhavan working towards a payment processing solution involving the processing of transactions from Akhavan's online adult (*i.e.* online pornography) business and transactions from Akhavan's client, the Company. Accordingly, the testimony will include information about Akhavan's online adult business, in which Akhavan and CC-1 were engaged with prior to the scheme, and in which Akhavan, CC-1, and CW-1 were engaged with contemporaneously with the charged scheme involving the Company.

In particular, the Government expects CW-1 to testify, in substance and in part, that during the relevant time period he and CC-1 both worked at a particular payment processing company (the "Payment Processing Company"). Prior to that, CC-1 worked at an acquiring bank which was involved in processing online card transactions (*i.e.* "traffic") from Akhavan's online adult business. Through that work, CC-1 developed a relationship with Akhavan and an understanding of certain aspects of Akhavan's adult business. While working at the Payment Processing Company, CC-1 learned of an opportunity to process two types of traffic from Akhavan: traffic from Akhavan's adult business, and traffic from the Company, with was one of

Akhavan's clients. In light of CC-1's prior relationship with Akhavan and his understanding of Akhavan's adult business, CW-1 and CC-1 decided to solicit both the adult business and Company business from Akhavan. Among other things, CW-1 and CC-1 discussed with Akhavan a proposal that would involve processing both the adult business traffic and the Company traffic by integrating with a payment processor that Akhavan has already been using to process the Company traffic (and that was already a conspirator in the charged scheme), and relatedly, a plan that involved fraudulently minimizing the number of chargebacks pertaining to the adult business traffic.

In subsequent meetings with Akhavan and Weigand, at least one of which included a high-level representative of an acquiring bank involved in the charged scheme, CW-1 and CC-1 discussed these proposals with Akhavan and Weigand, and took a number of steps to implement them. Those steps included having explicit discussions with representatives of a foreign acquiring bank about the bank's willingness to engage in a transaction laundering scheme, *i.e.* a scheme to use a front company as the conduit to secretly process the Company's traffic. While the Payment Processing Company ultimately processed some portion of Akhavan's adult traffic, it was ultimately unable to process the Company traffic. As to the Company traffic, CW-1 and CC-1 then pivoted to working with the defendants to create fraudulent merchant processing account applications to submit to offshore acquiring banks, including to the acquiring bank whose representative was present at the aforementioned meeting. These merchant processing accounts were controlled by the defendants and used to disguise Company traffic and trick the Issuing Banks into processing it.

## 2. Discussion

This evidence of Akhavan's adult pornography business and the initial efforts to set up payment processing for that business, as well as for the Company, serves as direct evidence of

the charged bank fraud conspiracy. As noted above, uncharged acts and other wrongful conduct is admissible in a conspiracy case when the evidence is helpful to explain the development of the illegal relationship between co-conspirators, the level of trust that existed between co-conspirators, or to complete the story of the crime charged, including by providing context for certain events relevant to the charged offense. Here, the evidence sought to be introduced is necessary for all of these reasons. CW-1 is expected to testify that his understanding of CC-1's prior relationship with Akhavan and understanding of how Akhavan's adult business worked were factors in his and CC-1's decision to solicit and work with Akhavan—to process both Akhavan's adult traffic and the Company traffic, notwithstanding that both would require the perpetration of lies and omissions. CW-1 was able to meet with Akhavan (and subsequently both Akhavan and Weigand) to pitch a solution that accounted for both types of traffic and to freely discuss these opportunities precisely because of CC-1's prior relationship with Akhavan.

Moreover, certain aspects of the meetings described above are probative of Akhavan's and Weigand's intent and knowledge. The discussions between CW-1, Akhavan, and Weigand of reducing chargebacks, for example, is critical, as the Government intends to introduce evidence that the charged scheme involved features designed to reduce chargebacks specifically because the defendants understood that chargebacks could cause the scheme to be exposed by the issuing banks or the credit card companies. In addition, the involvement in one of these meetings of a conspiring representative of an acquiring bank, and the nature of the defendants' discussions with that representative, are also highly probative on these issues. For one thing, the Government asserts that Weigand bore primary responsibility for managing the relationships with the acquiring and settlement banks in the scheme, and the nature of his discussion with a conspiring bank representative shows that he in fact had these relationships, including an open

backchannel to discuss the fraudulent aspects of the scheme. The discussions also show the sophistication of the defendants' knowledge of the payment processing system and the ways in which it can be exploited. Finally, certain elements of Akhavan's adult business, including the use of deceptive bank-facing websites, were used as part of the charged scheme. Thus, notwithstanding that some of these discussions pertained largely to the conduct of Akhavan's adult entertainment business, rather than to the Company's U.S.-facing marijuana trafficking business, the relevant discussions reflect the defendants' fraudulent intent for the specifically charged Scheme.

The Second Circuit has repeatedly affirmed the admissibility of similar act evidence as direct proof of a charged offense, irrespective of whether it relates to conduct predating the charged crime. *See, e.g.*, *United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012) (following conviction after trial on campaign finance related charges, affirming district court's admission, as direct evidence, of testimony that defendant had engaged in a Ponzi scheme contemporaneously with, and arguably related to, the campaign finance violations); *United States v. Robinson*, 702 F.3d 22, 37-38 (2d Cir. 2012) (in child sex trafficking case, affirming admission as direct evidence and necessary to complete the story of the crimes on trial proof of defendant's calls, contemporaneous with the charged conduct, in which he discussed uncharged crimes related to prostitution and trafficking); *United States v. Kaiser*, 609 F.3d 556, 571 (2d Cir. 2010) (in securities fraud case, holding that bad acts predating the conspiracy were admissible as direct evidence, without regard to Rule 404(b), because they had carry-over effects during the conspiracy); *United States v. Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because

the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and

"'necessary to complete the story of the crime on trial'"); *United States v. Carboni*, 204 F.3d 39,

44 (2d Cir. 2000) (in case charging false statements to maintain a line of credit, affirming

admissibility of uncharged acts of falsification of business inventory, which occurred at or

around the same time as the charged crimes, as direct proof inextricably intertwined with

charged conduct); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence

of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to

aid jury's understanding of how transaction for which defendant was charged came about and his

role in it); *United States v. Inniss*, 2019 WL 6999912, at *5-*6 (E.D.N.Y. Dec. 20, 2019)

(admitting evidence of defendant's solicitation additional bribes as direct evidence of charged

bribes in connection with money laundering conspiracy charge; additional bribe was solicited

during time of the conspiracy and involved the same parties).

     In the alternative, this evidence is admissible pursuant to Rule 404(b) to show the

defendants' knowledge, intent, and lack of mistake regarding their participation in the charged

conspiracy, and to show the defendants' "common scheme or plan" to exploit the payment

processing network for their own benefit.  Notwithstanding the difference between Akhavan's

adult entertainment business and the Company's business, the history of Akhavan's participation

in each reflects his knowledge and development of the Scheme.  As discussed above, the

defendants' discussions with CW-1 and CC-1 concerning Akhavan's adult entertainment

business illustrate their intimate knowledge of the payment processing system and knowledge of

how aspects of that system can be exploited to fraudulently permit processing of traffic that

otherwise would not be permitted.  Some of these discussions occurred contemporaneously with

discussions of processing the Company's traffic, and the defendants' knowledge of ways to

exploit the payment processing system, revealed through discussions of the adult entertainment business, was used to design aspects of the charged scheme. This evidence therefore demonstrates that the defendants' had the knowledge, and opportunity, to design and implement the charged scheme in a manner that would deceive virtually every participant in the payment processing system, including the issuing banks.

Finally, none of this evidence is excludable under Rule 403 as unduly prejudicial. That Akhavan ran an online pornography business is not any more inflammatory as the conduct at issue with respect to the charged Company scheme, particularly where his operation of that scheme shared similar features to the scheme at issue here.

### C. The Government Should be Permitted to Introduce Evidence of Weigand's Involvement in Prior Deceptive Acts
#### 1. Relevant Facts

The Government expects the evidence at trial, including evidence introduced through CW-1, CW-2, and communications recovered from a laptop seized from Weigand at the time of his arrest in March 2020 (the "Weigand Laptop"), to show that Company employees began communicating with Akhavan and other uncharged co-conspirators, including CC-2, one of Akhavan's close associates and employees, regarding fraudulently processing credit and debit card transactions for the Company by at least in or about mid-2016, and that Weigand became involved in the fraudulent payment processing scheme by at least in or about 2017.

The Government further expects CW-1 to testify that, as part of the bank fraud scheme, the Defendants utilized a software program (the "Software Program") that had been developed by uncharged co-conspirator ("CC-3"). The Software Program was purportedly designed to protect the entities involved in processing credit and debit transactions from online merchants engaged in illegal or non-compliant activities by assessing information available on the internet,

such as addresses and phone numbers, for indicia of fraud and generating merchant risk reports. With the assistance of CC-3, however, the Software Program was also used by CW-1, the Defendants, and other uncharged co-conspirators to identify potential red flags for fake online merchants to be used in connection with the Scheme in order to address and obscure those red flags from inquisitive banks.

Included among the records found on the Weigand Laptop is an email dated March 7, 2016 ("the March 2016 Email"), attached hereto as Exhibit B, between Weigand and CC-2.[9]  In the email, Weigand explains that he has been "checking entities with [the Software Program] before boarding as our banks are using the tools as well and we need to know what they detect" and expresses concern that "[The Software Program]  is . . . detecting related entities for same phone numbers, support pages, etc.," which is "result[ing] in bad scores for the corp[orations]." Weigand suggests to CC-2 that they "sit with [CC-3] to figure out how we'll be able to avoid this," Because "[i]t would be better to make sure that crawlers won't roll up the structure . . . ," that is, connect and flag all of Weigand and CC-2's fake online merchants by identifying similar phone numbers and other information on the merchant websites.

Notwithstanding that the March 2016 Email predates Weigand's involvement in the scheme as charged, the Government is seeking to admit the March 2016 Email as direct evidence of the charged bank fraud conspiracy or, in the alternative, pursuant to Rule 404(b), to show Weigand's knowledge and intent to commit bank fraud, evidence of a common scheme or plan.

---

[9] The Government expects the testimony of CW-1 and other witnesses, and other evidence, will establish that that the email address Weigand corresponds with in the March 2016 Email was used by CC-2.

## 2. Discussion

The March 2016 Email is direct evidence of the charged bank fraud conspiracy.[10]  The exchange, which involves Weigand and CC-2 discussing their use of the Software Program to avoid banks' compliance programs, is crucial to "provide the jury with the complete story of the crimes charged."  *Inserra*, 34 F.3d at 89.  Indeed, the March 2016 Email goes to the heart of the conspiracy for several reasons.  *First*, the March 2016 Email makes manifest Weigand's direct involvement in the bank fraud scheme by displaying both his knowledge of the steps that needed to be taken to avoid detection by banks and his willingness to undertake those efforts.  *Second*, the March 2016 Email underscores how Weigand had a long history with Akhavan and CC-2—a history that includes attempts to process credit and debit card transactions in ways that won't be "detect[ed]" by banks—thereby "help[ing] explain to the jury how the illegal relationships between the participants in the crime developed."  *Pitre*, 960 F.2d at 1119.  *Finally*, the March 2016 Emails are "inextricably intertwined with the evidence regarding the charged offense," *Hsu*, 669 F.3d at 118, in that the conduct discussed therein, while it predates Weigand's involvement in the Scheme, follows precisely the same pattern as the charged bank fraud conspiracy, and thus "provide[s] background for the events alleged in the indictment," *Coonan*, 938 F.2d at 1561, namely the use of the Software Program as a tool to detect issues that would lead to fake online merchants, and fake merchant websites, being flagged by inquiring banks as fraudulent.

In the alternative, the March 2016 Email is admissible pursuant to Rule 404(b) to show Weigand's knowledge and intent regarding his participation in the charged conspiracy.  The Government expects Weigand may argue that he was uninvolved in processing Company

---

[10] The Government submits that Weigand's statements in the March 2016 Email are admissible as statements of a party opponent pursuant to Rule 801(d)(2)(A).

transactions[11] or that he was unaware that the online merchants being used to obtain accounts with the offshore acquiring banks weren't legitimate because other individuals handled the acquisition and management of the phony merchant websites. The March 2016 Email, in which Weigand acknowledges to CC-2, one of Akhavan's closest associates, that it is problematic that some online merchants they are using have the "same phone numbers, support pages, etc.," and that there is a need to "avoid" "detect[ion]," is highly probative evidence to rebut these defenses. *See United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("That [defendant] previously prepared false audit reports to facilitate a securities fraud scheme tends strongly to belie his assertion that he did not understand the nature of the [similar] scheme for which he was being prosecuted"); *United States v. Earls*, 157 F. App'x 421, 422 (2d Cir. 2005) (evidence regarding defendants participation in two prior investment scheme that "strongly resembled" the charged scheme as "highly probative of [the defendant's] motive and intent").

Moreover, the March 2016 Email is strong evidence of Weigand and Akhavan's "common scheme or plan" to abuse the transaction processing process for their own benefit. *Reed*, 639 F.2d at 906. Indeed, the discussed use of the Software Program is precisely the same as the manner in which it was used by the Defendants as part of the charged bank fraud conspiracy. Furthermore, while the March 2016 Email does not explicitly mention the Company, and the Government does not currently expect the evidence to show that Weigand began participating in the fraudulent processing of Company transactions until in or about 2017, it was sent within the time frame of the charged bank fraud conspiracy, at roughly the same time that Akhavan began working with Company employees to implement a credit card processing option utilizing miscoding and

---

[11] In a post-arrest interview, Weigand claimed to have had no involvement with the Company, and to have only had knowledge of the Company from billboards that he had observed while travelling and from visiting the Company's online website.

merchant descriptors that were purposely disassociated from the Company. "Given the similarity and temporal proximity between [the March 2016 Email and the charged offenses]," the jury could easily "infer the existence of a common scheme or plan for purposes of Rule 404(b)." *United States v. Moye*, 793 F. App'x 19, 22 (2d Cir. 2019).

Finally, the March 2016 Email is not excludable under Rule 403. For the reasons stated above, such evidence is highly probative of the Defendants' participation in the bank fraud conspiracy. Moreover, the March 2016 Email is not any more inflammatory than the bank fraud conspiracy charged in the Indictment, *see Livoti*, 196 F.3d at 326, and, if admitted, would be presented in a streamlined way as part of the testimony of an FBI agent summarizing certain evidence recovered from the Weigand Laptop.

### D. The Government Should be Permitted to Introduce Evidence that Akhavan Made Certain Threats to a Cooperating Witness in Furtherance of the Scheme

#### 1. Relevant Facts

At trial, the Government expects to present the testimony of CW-2, who was the Company's CEO for nearly the entire time period of the Scheme. CW-2 was one of the primary points of contact between the Company and Akhavan. At trial, the Government expects CW-2 to testify regarding, among other things, numerous conversations, including the one described below, that he had with Akhavan regarding the Scheme.

Notably, in or around March 2018, CW-2 received a series of threatening phone messages from Akhavan (the "Messages") concerning the Company's processing relationship with Akhavan. At the time the Messages were sent to CW-2, representatives from the Company were in the process of speaking with other processors about the possibility of processing the Company's marijuana transactions with them. The Messages stated: "I see your [sic] processing with others while I pay for your merchants[.] Get ready to get fucked[.]

You're in deep shit[.]"  When CW-2 received the Messages, he was fearful for his physical safety, went into a state of panic and called Akhavan on the phone to deescalate the situation.

After receiving the messages, CW-2 called Akhavan (the "Call").  During the Call, Akhavan was extremely upset with CW-2 and was yelling and cursing at him.  Akhavan stated during the call, in substance and in part, that: 1) CW-2 had gone behind his back by looking for other processors to work with; 2) the Company's prior CEO had promised Akhavan that the Company would only process with Akhavan; 3) Akhavan was losing money in the processing relationship and that the relationship would not end until Akhavan had earned his fair share; and 4) Akhavan owned the payment processing industry and CW-2 could not attempt to work with another processor without Akhavan finding out about it.  CW-2 will also testify, in sum and substance, that Akhavan made statements during that call indicating that CW-2 was personally responsible for the situation and that Akhavan would hold him responsible if he was not made whole financially.  CW-2's impression of Akhavan from the Messages and the Call was that Akhavan was conveying a threat to him.  CW-2 believed that Akhavan was very dangerous and was capable of following through on his threats with violence.  CW-2 will also testify in sum and substance that one of the main reasons that the Company continued to work with Akhavan was that CW-2 was afraid of Akhavan and did not want to terminate the relationship as a result.[12]

---

[12] CW-2 has previously explained in proffers with the Government that after the Call ended, he called one of his friends who was also a colleague at the Company and relayed the Call to him. Among other things, CW-2 stated to his friend, in sum and substance, that if CW-2 were to wind up dead, it was probably Akhavan who killed him.  CW-2 has also explained to the Government in proffers that one of the reasons that CW-2 was fearful when he received the Messages was that he believed that Akhavan was capable of violence and had the means to carry out violence. In particular, prior to receiving the Messages, CW-2 had learned through a conversation with another co-conspirator ("CC-4"), who had visited Akhavan's house, that Akhavan had a large walk-in safe that contained numerous automatic firearms.  The Government does not intend to

## 2. Discussion

Here, evidence of Akhavan's threats to CW-2 in the Messages and during the Call is admissible at trial because it is direct evidence of Akhavan's participation in the Scheme.

Akhavan's statements to CW-2 are direct evidence that he was a member of the charged conspiracy. The statements demonstrate his intentional participation in the Scheme and underscore one of Akhavan's motives for participating in the Scheme: financial gain. Specifically, Akhavan's attempt to strong-arm CW-2 into continuing to work with him, and his statements that he had thus far lost money during the Scheme and wanted to keep working with the Company until he was made whole, demonstrate that Akhavan was highly motivated to continue operating the Scheme. The statements made by Akhavan in the Messages and the Call are also evidence of steps that Akhavan took in furtherance of the conspiracy. Specifically, at a juncture when the Company was attempting to work with other processors, Akhavan took direct steps to keep the Scheme operating through his own criminal organization: first, Akhavan sent a series of threatening messages to CW-2; and second, Akhavan pressured CW-2 to keep working with him during the Call.

For similar reasons, Akhavan's threats to CW-2 are admissible under Rule 404(b). Consistent with Rule 404(b), Akhavan's threats to CW-2 demonstrate his significant motive to participate in the Scheme (i.e., financial gain). As noted above, Akhavan indicated to CW-2 during the Call that he wanted to be made whole financially. His statements also demonstrated that he was willing to threaten CW-2 in order to make that happen. Furthermore, his threats are admissible under 404(b) because his threats to CW-2 enabled

_____

illicit on direct examination CW-2's statement to his friend that if CW-2 were to wind up dead it was probably Akhavan who killed him. The Government also does not intend to elicit CW-2's conversation with CC-4 about Akhavan's possession of automatic firearms. However, if the defendants, through cross-examination or otherwise, seek to attack the genuineness or reasonableness of CW-2's fear of Akhavan, this evidence would become admissible notwithstanding its content in order to establish CW-2's state of mind.

Akhavan to maintain his processing relationship with the Company.

Finally, the probative value of this evidence is not substantially outweighed by a danger of unfair prejudice or confusion under Rule 403. The admission of this evidence would not unduly prejudice the defendant because the evidence is no more inflammatory, sensational, or disturbing than the charged offense—indeed, the proffered evidence is *direct* evidence of the charged crimes, as set forth above. *See United States v. Rahim*, 339 F. App'x 19, 23 (2d Cir. 2009) (introduction of 404(b) evidence not prejudicial because "the evidence was not more sensational than the evidence of the charged crime and did not consume a major portion of the trial time"); *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (introduction of 404(b) evidence not prejudicial because it "represented only a tiny fraction of the testimony heard by the jury, and did not involve conduct any more sensational or disturbing than the crimes with which Osario–Serna was charged").

To the extent there exists a risk that the jury may make an impermissible propensity inference from the proffered evidence, if admitted solely through 404(b), such risk is appropriately addressed through a limiting instruction. *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *see United States v. Williams*, 526 F. App'x 29, 35 (2d Cir. 2013) (approving district court's admission of Rule 404(b) evidence, and noting that "the court administered an appropriate limiting instruction, telling the jury that the evidence could only be considered with respect to the issue of knowledge or intent").

## IX. MOTION TO PRECLUDE CROSS EXAMINATION OF COOPERATING AND IMMUNIZED WITNESSES

The Government respectfully moves to preclude the Defendants from cross-examining two cooperating witnesses and two Company employees, whom the Government expects to call

at trial, with respect to topics not relevant to their credibility.[13]

## A. Relevant Facts

### 1. CW-1's Criminal History and Other Conduct

CW-1 was a participant in the bank fraud scheme who, among other things, prepared fraudulent application packages and supporting documentation for fake merchants, and submitted those fraudulent application packages to banks. CW-1 has no reported criminal history. However, from its conversations with CW-1, the Government understands that CW-1 engaged in the following criminal conduct for which he was not prosecuted, and the following other potential misconduct, which is unrelated to this matter:[14]

- CW-1 has engaged in personal use of controlled substances, including cocaine, ecstasy, and marijuana. CW-1 last used marijuana and ecstasy approximately more than ten years ago; prior to that, he used marijuana and ecstasy approximately every couple of months. CW-1 most recently used cocaine in or about 2019, and up until that time has generally used cocaine, on average, every couple of months.

- CW-1 has solicited prostitutes on approximately two occasions.

- CW-1 stole a pair of sunglasses and a pair of jeans when he was approximately 20 years old.

- CW-1 was arrested for drunk and disorderly conduct when he was approximately 17 years old.

### 2. CW-2's Criminal History and Other Conduct

CW-2 is a former Company executive. CW-2 has no reported criminal history. However, from its conversations with CW-2, the Government understands that CW-2 engaged in

---

[13] The criminal history and other potentially culpable conduct for these witnesses, along with their names, was produced to the defendants beginning on October 13, 2020, as part of the Government's early 3500 production.

[14] CW-1 has disclosed to the Government additional criminal conduct that the Government intends to illicit on direct examination and is not seeking to preclude here. That conduct has also been disclosed to the defense through the production of CW-1's 3500 material.

the following criminal conduct for which he was not prosecuted, and the following other

potential misconduct, which is unrelated to this matter:

- CW-2 has engaged in personal use of marijuana, MDMA, and cocaine on an infrequent basis.

- While still in college, CW-2 was arrested, but not charged, for failing to pay for a meal at a dining hall after a server was rude to him.

- During military service, CW-2 was placed on restricted duty for several days for logging into his personal email from his work computer.

### 3. Witness-1's Criminal History

Witness-1 is a current Company employee. Witness-1 has no reported criminal history.

However, from its conversations with Witness-1, the Government understands that Witness-1

engaged in the following criminal conduct for which he was not prosecuted, and the following

other potential misconduct, which was unrelated to this matter:

- Witness-1 has engaged in personal use of controlled substances, including (1) cocaine, which he used infrequently in college, then went several years without any use, and then infrequently afterwards, with the last use being over two years ago; (2) mushrooms, his use of which followed a similar patter as with cocaine; (3) marijuana, which he used occasionally while in college, and has used about once a week for the approximately the past year.

- More than ten years ago, Witness-1 illegally downloaded music using a file sharing program.

- While still in college, Witness-1 received an underage drinking ticket, for which he paid a fine.

- In or about 2018, Witness-1 engaged in a brief romantic relationship with another Company employee, his then-superior, while they both worked together at the Company.

### 4. Witness-2's Criminal History

Witness-2 is a current Company employee. Witness-2 has no reported criminal history.

However, from its conversations with Witness-2, the Government understands that Witness-2

engaged in the following criminal conduct for which he was not prosecuted, and the following

other potential misconduct, which was unrelated to this matter:

- Witness-2 has engaged in personal use of controlled substances, including (1) occasional use of cocaine, with the last use being approximately four or five years ago; (2) MDMA, which Witness-2 used on approximately two or three occasions, approximately ten years ago; (3) mushrooms, which Witness-3 used on one occasion approximately seven or eight years ago; and (4) marijuana, including approximately once every two weeks since in or about 2017, and occasionally prior to that.

- Witness-2 has solicited prostitutes on two or three occasions, approximately ten years ago.

## B. Applicable Law

### 1. Rule 608

Federal Rule of Evidence 608 sets forth the rubric for impeachment by evidence of specific instances of past conduct. The rule provides that such instances may be inquired into on cross-examination "if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about." Fed. R. Evid. 608(b). However, the rule precludes the admission of extrinsic evidence to prove specific instances of a witness's conduct in order to attack the witness's character for truthfulness. *Id.*

### 2. Rules 611 and 403

Federal Rule of Evidence 611 states that that a court should "protect witnesses from harassment or undue embarrassment," and that cross-examination "should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611.

Evidence, including testimony sought to be elicited on cross-examination, must also satisfy Rule 403, which provides that a court may exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." Fed. R. Evid. 403.

## C. Discussion

### 1. CW-1

The Court should preclude cross-examination concerning CW-1's prior criminal and other culpable conduct listed above, none of which is probative of CW-1's character for truthfulness or any other legitimate line of inquiry. There is no probative value that outweighs the prejudicial effect of cross-examination regarding CW-1's personal drug use, most of which occurred more than ten years ago; solicitation of prostitutes; or arrest for drunk and disorderly conduct, which occurred more than twenty years ago. Indeed, evidence as to drug use and solicitation of prostitutes is precisely the kind that risks inflaming and distracting the jury. *United States v. Amato*, 540 F.3d 153, 165 (2d Cir. 2008) (preclusion of questioning about witness's solicitation of prostitutes was "well within" district court's discretion); *Flythe v. District of Columbia*, 4 F. Supp. 3d 222, 229 (D.D.C. 2014) ("Courts have recognized that a witness's use of drugs is highly prejudicial and may be excluded when the witness' ability to perceive or recall facts is not legitimately at issue). The Defendants should accordingly be precluded from eliciting that information.

Similarly, the Defendants should be precluded from cross-examining on CW-1's uncharged conduct for stealing a pair of jeans and sunglasses. This prior uncharged conduct does not fall within Rule 608, because it did not involve acts of dishonesty or false statements. It would, if charged, have resulted in, at most, a misdemeanor petit larceny conviction. *See* N.Y.P.L. § 155.25 ("person is guilty of petit larceny when he steal property"). And the Second Circuit has recognized that the elements of petit larceny do not require proving a dishonest fact or false statement. *See United States v. Hayes*, 553 F.2d 824, 827 (2d Cir. 1977) (holding that petit larceny does not bear directly on truthfulness for purposes of Rule 609(a)(2)); *United States*

*v. Estrada*, 439 F.3d 606, 614 (no abuse of discretion in limiting scope of impeachment of witness on larceny convictions for shoplifting that did not "involve falsity or deceit"). Moreover, this one-off conduct occurred more than twenty years ago, and thus has no probative value to CW-1's propensity for truthfulness. *See United States v. Calderon-Urbina*, 756 F. Supp.2d 566, at *568 (S.D.N.Y. 2010) (petit larceny arrest that occurred twenty-one years ago was "too remote in time to be probative").

### 2. CW-2

The Defendants should be precluded from cross-examining CW-2 regarding his personal drug use and disciplinary history relating to use of a personal computer during his military service. That information has no bearing on CW-2's credibility. *See Flythe*, 4 F. Supp. 3d at 229.

The Court should likewise preclude cross-examination as to CW-2's arrest for failing to pay for a meal, prior uncharged conduct which occurred approximately twenty years ago and involved no dishonesty or deceit. *See Estrada*, 439 F.3d at 614. Even if evidence of that arrest had some probative value, which it does not, particularly in light of the ample other grounds available to the Defendants for cross-examination, including CW-2's participation in the charged bank fraud scheme and cooperation agreement with the Government, any such probative value is more than substantially outweighed by the risk of unfair prejudice and distraction. *See generally United States* v. *Singh*, 628 F.2d 758, 763 (2d Cir. 1980) (it is proper to constrain cross-examination where the jury is "already in possession of sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government").

### 3. Witness-1

Defendants should be precluded from cross-examining Witness-1 regarding his personal

drug use, illegal downloading of music, and underage drinking, none of which has bearing on Witness-1's property for truthfulness or any other legitimate line of inquiry. Inquiry as to Witness-1's drug use, in particular, would likely be highly prejudicial. *Flythe*, 4 F. Supp. 3d at 229.

Nor should Defendants be permitted to cross-examine Witness-1 regarding his brief romantic relationship with another Company employee. The Government is unaware of any proper basis for eliciting such a relationship, which has no bearing whatsoever on credibility, but would undoubtedly embarrass Witness-1, and testimony regarding their sexual relationship risks inflaming members of the jury. *United States v. Giovinco*, No. 18 Cr. 14 (JSR), 2020 WL 832920, at *3 (S.D.N.Y. Feb. 20, 2020) ("Evidence of an affair is not particularly probative of a witness's character for truthfulness, and is often unduly prejudicial, justifying exclusion under Rule 403); *United States v. Siraj*, No. 05 Cr. 104, 2006 WL 2738952, at *1 (E.D.N.Y. Sept. 25, 2006) (precluding cross-examination on divorce and affair) (citing cases).

### 4. Witness-2

The Court should preclude cross-examination concerning Witness-2's prior solicitation of prostitutes, which occurred approximately ten years ago, and personal drug use, none of which is probative of Witness-2's character for truthfulness or any other legitimate line of inquiry. As discussed above, evidence as to drug use and solicitation of prostitutes is precisely the kind that risks inflaming and distracting the jury. *Amato*, 540 F.3d at 165 (solicitation of prostitutes); *Flythe*, 4 F. Supp. 3d at 229 (illegal drug use). Defendants therefore should not be permitted to cross-examine Witness-3 on these subjects.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated: New York, New York
      February 16, 2021

                                 Respectfully submitted,

                                 AUDREY STRAUSS
                                 United States Attorney

                    By:   <u>s/ Nicholas Folly</u>
                                 Nicholas Folly
                                 Tara La Morte
                                 Emily Deininger
                                 Assistant United States Attorneys
                                 (212) 637-1060 / -1041 / -2472

# EXHIBIT A

# EXHIBIT B