# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

HAMID AKHAVAN and RUBEN WEIGAND,

        Defendants

Case No. 20-cr-188 (JSR)

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT RUBEN WEIGAND'S MOTIONS *IN LIMINE*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STANDARD FOR MOTIONS IN LIMINE................................................. 2

ARGUMENT ......................................................................................... 2

    I.     References To Unrelated Payment Processing Efforts In The Pornography And Online Gambling Industries Are Unfairly Prejudicial .................................. 2

    II.    The Government Should Be Precluded from Offering Documents And Communications Seized From Defendant Weigand's Laptop Without A Witness Who Can Testify To Their Substance ........................................................ 3

    III.   Documents Found on Defendant Weigand's Computer Where There Is No Evidence That He Had The Materials On His Laptop Or Otherwise In His Possession Until After the Conspiracy Ended Should Be Excluded ................... 11

    IV.   References to Defendant Weigand's Income, Wealth, And Lifestyle Are Unfairly Prejudicial............................................................................. 13

    V.    Documents Purporting To Be Telegram Chats And WhatsApp Chats Concerning The Defendants, And Emails Involving Euprocessing@protonmail.com Should Be Excluded For Lack Of Authenticity And Risk Of Confusing The Jury ................................................ 14

    VI.   If The Government Introduces Select Excerpts Of Defendant Weigand's Post-Arrest Statement, The Government Should Be Required To Play The Entire Statement ....................................................................................... 17

CONCLUSION..................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Records LLC v. Lime Grp. LLC,*
No. 06 CV 5936(KMW), 2011 WL 1542560 (S.D.N.Y. Apr. 21, 2011) ...............................13

*Beech Aircraft Corp. v. Rainey,*
488 U.S. 153 (1988)...............................................................................................................18

*Davis v. Washington,*
547 U.S. 813 (2006)...........................................................................................................4, 16

*Deptula v. Rosen,*
2020 WL 6135793 (S.D.N.Y. Oct. 16, 2020) ........................................................................15

*Federal Ins. Co. v. Mertz,*
No. 12-cv-1597, 2016 WL 1572995 (S.D.N.Y. Apr. 18, 2016) .............................................14

*Munoz v. United States,*
No. 07-CV-2080 ILG, 2008 WL 2942861 (E.D.N.Y. July 28, 2008) ..................................4, 5

*United States v. Akhavan,*
No. S3 20-CR-188(JSR), 2020 WL 2555333 (S.D.N.Y. May 20, 2020) ...............................13

*United States v. Calderon,*
944 F.3d 72 (2d Cir. 2019)....................................................................................................13

*United States v. Castro,*
813 F.2d 571 (2d Cir.1987)....................................................................................................17

*United States v. Graziano,*
558 F. Supp. 2d 304 (E.D.N.Y. 2008) .....................................................................................3

*United States v. Grinage,*
390 F.3d 746 (2d Cir. 2004)..................................................................................................4, 5

*United States v. Hatfield,*
685 F. Supp. 2d 320 (E.D.N.Y. 2010) ...................................................................................13

*United States v. Johnson,*
507 F.3d 793 (2d Cir. 2007)....................................................................................................17

*United States v. Koppers Co., Inc.,*
652 F.2d 290 (2d Cir. 1981)...................................................................................................12

*United States v. Miller*,
 549 F. Supp. 2d 1312 (D. Kan. 2008) ...................................................................13

*United States v. Stahl*,
 616 F.2d 30 (2d Cir. 1980)..................................................................................14

*United States v. Stein*,
 521 F. Supp. 2d 271 ...............................................................................................2

*United States v. Vargas*,
 No. 18 CR. 76 (PAC), 2018 WL 6061207 (S.D.N.Y. Nov. 20, 2018) ...................17

*United States v. Wilson*,
 493 F. Supp. 2d 460 (E.D.N.Y. 2006) ..................................................................12

**Rules**

Fed. R. Evid. 106 .........................................................................................................17

Fed. R. Evid. 401 ...........................................................................................................2

Fed. R. Evid. 402 ...........................................................................................................2

Fed. R. Evid. 403 .......................................................................................................1, 2

Defendant Ruben Weigand ("Weigand") respectfully submits this memorandum of law in support of his motions *in limine* to exclude categories of evidence as inadmissible, irrelevant, or because their probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, [and] misleading the jury." Fed. R. Evid. 403.

## PRELIMINARY STATEMENT

As the Court knows, the Indictment charges that, from in or about 2016 until mid-2019, the defendants and their coconspirators "engaged in a scheme to deceive United States banks and other financial institutions into processing in excess of one hundred million dollars in credit and debit card payments for the purchase and delivery of marijuana products." Indictment at ¶ 1. Specifically, the Indictment alleges that the defendants disguised money received from Eaze's customers as payments to non-marijuana businesses by assigning those transactions misleading merchant category codes and merchant descriptors, a practice referred to as "miscoding." *Id.* at ¶ 9.

Weigand moves to preclude the following categories of evidence: (i) references to the defendants' alleged involvement in payment processing in the pornography and online gambling industries; (ii) communications and documents found on defendant Weigand's laptop for which the Government has not designated a  witness with relevant knowledge who can provide context or explanation of materials that are not self-explanatory and could easily be the source of unsubstantiated speculation; (iii) documents downloaded onto Weigand's laptop *after* the termination of the alleged conspiracy, in the absence of any evidence that Weigand ever saw these materials during or in connection with the charged scheme; (iv) references at trial to Weigand's wealth, income, and lifestyle; and (v) unauthenticated Telegram and WhatsApp Chats, and email communications involving the email account Euprocessing@protonmail.com,

which the Government alleges, without proof, belonged to defendant Weigand. In addition, the Government has designated as an exhibit excerpts of a 17-minute recording (and an accompanying transcript) of Weigand's post-arrest statement. Weigand moves, under the doctrine of completeness, to ensure that his entire post-arrest statement is admitted into evidence and played for the jury.

## STANDARD FOR MOTIONS IN LIMINE

Evidence is admissible only if it is relevant and not barred by any other Federal Rule of Evidence. Fed. R. Evid. 401 and 402. To be relevant, the evidence must have a "tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. A court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## ARGUMENT

### I. References To Unrelated Payment Processing Efforts In The Pornography And Online Gambling Industries Are Unfairly Prejudicial

Any references at trial to unrelated payment processing efforts, by either defendant, in the pornography and online gambling industries is inadmissible under Federal Rule of Evidence 403 because any minimal probative value is substantially outweighed by the danger of unfair prejudice, given the taboo nature of those industries.

Any suggestion at trial that the defendants may have participated in payment processing efforts involving the pornography and online gambling industries is not necessary to understand the charged bank fraud conspiracy involving the processing of marijuana credit and debit card transactions. *See United States v. Stein*, 521 F. Supp. 2d at 271 (holding that uncharged tax

shelters were not necessary to understand the charged crimes of tax evasion and conspiracy to commit tax evasion). References to the defendants' purported involvement in payment processing for those specific industries will offer the jury no meaningful insight into the mechanics of payment processing for marijuana, in large part because marijuana is in a category of its own. Significantly, although there are merchant category codes ("MCCs") for adult entertainment and online gambling, there is no prescribed MCC for marijuana transactions in the United States. *See* Ex. 1 to the Appendix and Declaration of Michael Gilbert in Support of Weigand's Motions *In Limine*, Visa Merchant Data Standards Manual, GX 2207, at 73, 90. Additionally, marijuana is in the rare position of remaining illegal at the federal level as a Schedule I controlled substance under the Controlled Substances Act, even though legal in numerous states, including the states in which marijuana was purchased in this case. *See* Ex. 2, Cannabis and Hemp-Derived Products (August 2019), GX 2204, at USAO_00053795. This legal dichotomy makes marijuana unique in the payment processing context.

Pornography and gambling are likely to evoke strong reactions from some jurors, and the risk of unfair prejudice substantially outweighs any minimal probative value. *See United States v. Graziano*, 558 F. Supp. 2d 304, 324 (E.D.N.Y. 2008) (excluding evidence of illegal gambling at defendant's tavern as unduly prejudicial in arson prosecution). In the interest of avoiding unfair prejudice, the Court should exclude all references to purported payment processing efforts by the defendants in the pornography and gambling industries.

## II. The Government Should Be Precluded From Offering Documents And Communications Seized From Defendant Weigand's Laptop Without A Witness Who Can Testify To Their Substance

The Government should be precluded from offering documents and communications seized from defendant Weigand's laptop without a testifying witness to explain them and put them in context. Without a witness testifying for the Government to explain various documents

and communications—many of which also present a hearsay problem—and how they relate to the alleged scheme, if at all, the exhibits are not relevant and, even if the Government could establish relevance, their introduction at trial will almost certainly confuse and mislead the jury.[1]

As the Court will recall from Weigand's motion to suppress, the Government seized a laptop computer belonging to Weigand on the day of his arrest on March 9, 2020. The Government has included on its exhibit list over 700 "exhibits" from Weigand's laptop, which in reality consist of thousands of constituent files and sub-folders.

We anticipate that the Government will seek to offer what is essentially a data dump of exhibits into evidence through the testimony of an FBI agent. At most, the agent will be able to identify that a given document or file was found on defendant Weigand's laptop. The agent is not permitted, however, to use other information or knowledge that the agent has gathered in the course of the investigation to tell the jury "what [is] in the evidence" or "what inferences to draw from [the evidence]." *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (holding that agent's testimony interpreting certain ambiguous phrases in several recorded telephone conversations between the defendant and his alleged co-conspirators based on the "totality" of information gathered in the investigation should have been excluded). Where an agent testifies about the inferences the jurors should draw from the evidence, "rather than being helpful to the jury, [the agent's testimony] usurp[s] the jury's function." *Id.*; *see also Munoz v. United States*,

---

[1] Further, as this Court explained in its recent Order concerning the Government's letter-motion *in limine*, email communications are not self-authenticating business records and may raise Confrontation Clause concerns if the declarant's statements are "testimonial": in those instances, "the defendants must be permitted to cross-examine the declarant." ECF No. 151 at 6 (citing *Davis v. Washington*, 547 U.S. 813, 822 (2006)). For an overwhelming number of the email communications the Government is seeking to offer as evidence, the declarant has not been included on the Government's witness list and is not available for either direct or cross-examination.

No. 07-CV-2080 ILG, 2008 WL 2942861, at *21 (E.D.N.Y. July 28, 2008) ("The agent's testimony in this case similarly sought to usurp the role of the jury by dictating to it what inferences to draw from the ambiguous and facially innocent statements made by Mr. Munoz and the unidentified males in the recorded conversations.").

The risk that the testifying agent will improperly influence jurors is particularly severe where, although the agent is not formally recognized by the Court as an expert in the relevant subject matter, "it is conceivable, indeed probable, that the jury [will] afford[] unusual weight to the testimony of the agent[] on the basis of their perceived authority and access to information not available to the jury." *Id.* at 21; *see also United States v. Grinage*, 390 F.3d at 750−51 ("[T]he agent was presented to the jury with an aura of expertise and authority which increased the risk that the jury would be swayed by his testimony").

Specifically, defendant Weigand seeks to exclude three categories of documents seized from his laptop set forth in the following chart:

| CATEGORIES OF DOCUMENTS | ILLUSTRATIVE EXHIBITS[2] |
| --- | --- |
| Laptop documents and communications that on their face do not concern Eaze. | • GX 1689<br>• GX 1690<br>• GX 1691<br>• GX 1692<br>• GX 1705 |
| Laptop communications purportedly sent from non-testifying witnesses to defendant Weigand, which do not include a response from Weigand and for which the Government has no testifying witness. | • GX 1681<br>• GX 1682<br>• GX 1685<br>• GX 1687<br>• GX 1694<br>• GX 1698<br>• GX 1703 |
| Laptop documents that are not self-explanatory and for which the Government has no testifying witness to explain their contents. | • GX 1607<br>• GX 1608<br>• GX 1669<br>• GX 1670<br>• GX 1672<br>• GX 1712<br>• GX 1720 |

Documents in the first category do not reference Eaze by name and it is not clear from the face of the documents that they concern the alleged scheme, as opposed to matters entirely unrelated to Eaze, including Weigand's unrelated business activities in Europe. Even if some of these communications include statements from alleged co-conspirators not on the witness list, the Government still bears the burden of establishing that the substance of each communication relates to the charged scheme, which it cannot meet without a witness who can testify about the document.

---

[2] The proposed Government exhibits referenced in the chart are enclosed for the Court's review as Exhibits 3 through 21. They are a representative sample, but not an exhaustive set, of the Government exhibits that fall into these categories. Certain exhibits may fall into more than one category. We respectfully request that all documents and communications that fall into the above categories be excluded at trial.

For example, GX 1690 is what purports to be an email exchange between "█████" and "██████████" of ████████████, copying "Ruben Weigand" and "████████████"—none of whom are listed on the Government's witness list.



Ex. 4, GX 1690 (excerpted).

This is the type of exchange that presents a real danger of confusing and misleading the jury. It does not refer to Eaze and does not concern the charged scheme. Rather, it concerns a pre-existing business relationship with a European acquiring bank (*i.e.*, ██████) on matters unrelated to the charged scheme, including ways of boosting the bank's transaction volume through "new low risk" merchants.

Indeed, Defendant Weigand has been a longstanding and established figure in the European payments industry; he entered the industry in the early 2000s and founded one of his businesses, Payment Consultants, roughly a decade ago. *See* Ex. 22, GX 1901-T at 6:7−7:17, 9:15−17 (Weigand Post-Arrest Statement). As Weigand noted in his post-arrest statement, his businesses have, over time, provided technical payment consulting and merchant-onboarding services to European acquiring banks, and through his work Weigand has come to know "pretty much all of the European acquiring banks," including ████, the bank referenced in GX 1690. *Id.* at 11:9−13:10. Accordingly, documents such as GX 1690 have the false appearance of being relevant to the charged scheme, but are not. With no Government witness to provide necessary context, the distinction between documents that concern the charged scheme and those that concern unrelated business activities will almost certainly be lost on the jury.

The second category of documents consists of email communications purportedly sent to Weigand that do not elicit any response from him, and for which the Government has no witness to elucidate their substance. Without a witness to explain them, these one-sided communications are entirely devoid of context, technical, invariably unrelated to the charged scheme, and almost certain to mislead the jury. They also fail to show that Weigand took any steps in response to these communications or furthered the alleged conspiracy in any way.

In GX 1698, for example, "██████████," the ████████████████████t at European acquiring bank ████, *twice* sends an email to "Ruben Weigand," regarding some Excel spreadsheets—which are not attached to the exhibit—with no indication that Weigand ever responds. ████████ is not on the Government's witness list to testify otherwise.



Ex. 13, GX 1698 (excerpted).

So too for emails sent to Weigand by ███████████, who is not on the Government's witness list.  In GX 1681, for example, ███████████ sends an email to Weigand soliciting "feedback about the URLs."



Ex. 8, GX 1681-T (certified translation of GX 1681).  The email is devoid of context and, once again, there is no indication that Weigand responds.  Without ███████████ testimony, the jury will be left to speculate as to the meaning of this cryptic and one-sided email, including which

"URLs" ████████ is referring to, and how, if at all, the communication concerns the charged scheme.

The third and final category consists of certain standalone documents that are impossible to understand without relevant background knowledge, and there is no indication that they constitute business records. GX 1720, which we believe the Government intends to use to establish what Weigand gained from the alleged conspiracy, is a particularly egregious example.



Ex. 21, GX 1720 (excerpted); *see also* Ex. 19, GX 1672 (duplicate).

It is entirely unclear who created the document or for what purpose. The document refers to "Reuben [sic] commissions," but misspells defendant Weigand's name, provides no context as to the services rendered for those commissions, and how those services were related to the alleged scheme involving Eaze, if at all. There is, once again, no reference to Eaze in the document. It includes columns titled "actual," "expected," and "shortfall/upside," but it is entirely unclear, without further explanation, what is being referenced. This is, once again, a document that is far from self-explanatory and likely to mislead the jury by conflating the charged scheme with other endeavors by the defendants.

Without a witness with relevant background knowledge about the communications and documents at issue, these exhibits have no probative value and carry a substantial risk of confusing and misleading the jury. Accordingly, the Court should prohibit the Government from introducing such communications and documents absent a witness with relevant background knowledge.

### III. Documents Found On Defendant Weigand's Computer Where There Is No Evidence That He Had The Materials On His Laptop Or Otherwise In His Possession Until After The Charged Conspiracy Ended Should Be Excluded

The Government has designated as exhibits hundreds of files and sub-files that were allegedly found on defendant Weigand's laptop, after it was seized on March 9, 2020 pursuant to a search warrant.[3] The metadata associated with these documents proves that they were downloaded to defendant Weigand's laptop in August 2019, from a USB flash drive, after the Indictment alleges the charged conspiracy had ended. *See* Indictment at ¶¶ 1, 6 (describing the conspiracy as lasting "[f]rom at least in or about 2016, up to and including in or about 2019" and noting that Eaze "stopped accepting credit card payments in or around mid-2019."). Further, there is no evidence that these materials were sent to or shared with Weigand while the alleged conspiracy was ongoing.

The documents downloaded to defendant Weigand's laptop after the end of the charged conspiracy include merchant account applications that appear to be for the Offshore Merchants described in the Indictment, processing statements, wire confirmations, and settlement reports. *See, e.g.,* Ex. 24, GX 1516 (USAO_00045466); Ex. 25, GX 1195 (USAO_00044369). However, these documents only appeared on Weigand's laptop in August of 2019, after "Eaze stopped accepting credit card payments in or around mid-2019," Indictment at ¶ 6, and after the alleged

---

[3] This concern applies to the multitude of documents and constituent files identified under Government Exhibit series 1000 through 1800. An excerpt of the Government's Witness List showing Exhibits in series 1000 through 1800 is enclosed for reference as Exhibit 23.

conspiracy had ended. The belated appearance of these documents on Weigand's laptop is clear based on a review of a forensic image of Weigand's laptop. None of these documents was attached to any communication indicating that Weigand ever sent, received, created or worked with these materials.

These documents should not be admitted into evidence because of the substantial risk that the jury will infer incorrectly that Weigand received these documents while the alleged conspiracy was ongoing. The documents from the flash drive were all created and modified by individuals other than Weigand.

Post-conspiracy evidence is only admissible "if it is probative of the existence of the conspiracy." *United States v. Koppers Co.*, Inc., 652 F.2d 290, 298 (2d Cir. 1981) (admitting co-conspirator's post-conspiracy comment that "the deal we have had is over"). The documents recovered from Weigand's laptop are unlike other post-conspiracy evidence that courts have admitted because they do not make Weigand's knowledge of or involvement in the alleged conspiracy any more likely. The metadata associated with these documents will show that he did not create or modify these documents himself, or send them to others. There is also no evidence that he had ever seen these documents during the pendency of the alleged conspiracy. *Cf. United States v. Wilson*, 493 F. Supp. 2d 460 (E.D.N.Y. 2006) (admitting rap lyrics later found in defendant's possession which he had *created* and which contained references to the crime committed).

Even if the Court finds that these documents may be relevant, any probative value derived from this evidence is substantially outweighed by the risk of juror confusion about when and how Weigand acquired these documents, and what they reveal about his involvement. Defendant Weigand therefore respectfully requests that this Court exclude from evidence the

documents that were downloaded onto his laptop after the end of the conspiracy (*See* Ex. 23, Excerpt of Government Witness List showing GX 1001–1802).

## IV. References To Defendant Weigand's Income, Wealth, And Lifestyle Are Unfairly Prejudicial

References to defendant Weigand's income, wealth, and lifestyle are irrelevant to the alleged conspiracy to commit bank fraud and will serve only to inflame the jury. Defendant Weigand's wealth has no bearing on whether he conspired to make "material misrepresentations that deprived . . . banks of economically valuable information." *United States v. Calderon*, 944 F.3d 72, 78 (2d Cir. 2019). Where the defendant's wealth is not relevant to his liability, "courts have typically found that evidence of a defendant's net worth is too prejudicial to allow for its introduction during the liability phase of a trial." *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936(KMW), 2011 WL 1542560, at *2 (S.D.N.Y. Apr. 21, 2011).

As this Court has recognized, "compensation is not an element of the crime [of conspiracy to commit bank fraud] and is, at best, only tangentially probative of whether [a defendant] participated knowingly." *United States v. Akhavan*, No. S3 20-CR-188(JSR), 2020 WL 2555333, at *3 (S.D.N.Y. May 20, 2020). Especially where the defendant was an established and successful businessman prior to his alleged participation in a conspiracy, as defendant Weigand was, evidence of the defendant's wealth or lifestyle has minimal probative value, particularly as to the defendant's motive in joining the conspiracy. *See United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) (discounting motive allegations based on wealth because "it is entirely speculative whether [the defendant's] funding for his 'lavish' personal spending came from the alleged scheme or from his sizable pre-existing fortune"); *United States v. Miller*, 549 F. Supp. 2d 1312, 1326 (D. Kan. 2008) (holding that evidence of wealth acquired prior to the commencement of the alleged bank fraud conspiracy is irrelevant).

Long before Weigand's initial January 2018 meeting with defendant Akhavan, the Government's cooperating witness Oliver Hargreaves, and other alleged co-conspirators, Weigand was a successful and well-respected businessman who had founded businesses that had modernized and transformed the payments landscape in Europe. *See, e.g.*, Ex. 21, GX 1901-T, 7:4–12. There is no evidence that the alleged scheme funded defendant Weigand's lifestyle and, accordingly, any reference to his wealth is irrelevant.

Even assuming Weigand's wealth is of some limited relevance, that relevance is outweighed by the risk of unfair prejudice. Courts have consistently found that references to the wealth of the defendant can unduly prejudice a jury. *See Federal Ins. Co. v. Mertz*, No. 12-cv-1597, 2016 WL 1572995, at *3 (S.D.N.Y. Apr. 18, 2016) ("[T]he Second Circuit has held that evidence of wealth can unfairly prejudice a jury."); *see also United States v. Stahl*, 616 F.2d 30, 31-33 (2d Cir. 1980) (reversing criminal conviction because prosecutor's repeated references to defendant's wealth constituted "a persistent appeal to class prejudice" and "such appeals are improper and have no place in a court room"). Particularly now, during the midst of an ongoing global pandemic that has caused record unemployment rates and forced countless businesses to close, references to Weigand's wealth may evoke a strong emotional response from the jury. *See, e.g.*, Center on Budget and Policy Priorities, "Tracking the COVID-19 Recession's Effects on Food, Housing, and Employment Hardships," at https://www.cbpp.org/research/poverty-and-inequality/tracking-the-covid-19-recessions-effects-on-food-housing-and.

For the foregoing reasons, the Court should exclude all references to defendant Weigand's wealth and lifestyle as irrelevant to the charged crime of conspiracy to commit bank fraud and unduly prejudicial.

**V.** **Documents Purporting To Be Telegram Chats And Whatsapp Chats Concerning The Defendants, And Emails Involving Euprocessing@Protonmail.Com Should Be Excluded For Lack Of Authenticity And Risk Of Confusing The Jury**

Defendant Weigand joins defendant Akhavan's motion *in limine* # 7 to exclude various Telegram and WhatsApp chat logs because that they raise serious authenticity and Confrontation Clause concerns. *See* ECF No. 167 (Feb. 16, 2021). As defendant Akhavan points out, authenticating electronic communications requires "a *specific* attestation, by a person with personal knowledge of the communications, that they are authentic (*i.e.*, that they were actually sent to or received from the indicated person(s)) and that any printout or other version submitted to the court is a true copy of the **original** electronic messages." *Deptula v. Rosen*, 2020 WL 6135793, at *1 (S.D.N.Y. Oct. 16, 2020) (emphasis in original).

These chats were produced with no accompanying metadata that could be used to authenticate the chats' participants or their contents, and a number of the chats are so long—and appear to involve multiple participants entering and leaving the chat—that no witness could feasibly authenticate every message in each chat. For example, GX 302, a chat labeled "Easycompany," is purportedly a Telegram chat that is 89 pages long, but was produced with no accompanying metadata and in a format that looks like it was typed on Microsoft Word, raising concerns as to whether it is a "true copy of the **original** electronic messages." *Deptula* at *1 (emphasis added); Ex. 26, GX 302. Moreover, a majority of the Telegram chats contain "Deleted Account" placeholders in lieu of an actual account name for one (or multiple) participant(s), presenting a clear Confrontation Clause issue for the defendants. The "Deleted Account" placeholders—which, in some instances, refer to *more* than one chat participant with no distinction between them—make it unclear who is speaking, who they are speaking to, who else is involved in the chat, and who else may have read the conversation taking place. *See* Ex. 27, GX 308 (two of four apparent chat participants referred to only as "Deleted Account").

The anonymity in the chat messages not only invites juror speculation as to the identity of the chat participants, but also deprives the defendants of their right to confront—or even know—their accusers. The Government will undoubtedly attempt to use chat messages from these "Deleted Accounts" for the "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). As this Court has recognized, such evidence is testimonial in nature and runs afoul of the Confrontation Clause. ECF No. 151 at 6.

The Government has also designated as exhibits more than 200 email communications involving a Protonmail email address called Euprocessing@protonmail.com (the "EU Processing" email) that raise similar authenticity concerns. *See* Ex. 28 (chart of Government Exhibits involving email communications with the EU Processing account). EU Processing appears to be an email account that was used by multiple individuals. In the vast majority of emails involving the EU Processing account, the other email participants refer to EU Processing simply as "EUP" or "EU Processing" and some of the EU Processing emails were apparently drafted by an "Andreas." *See, e.g.,* Ex. 29, GX 443 (signing off "All my best, Andreas"); Ex. 30, GX 562 (signing off "Best, EUP"). There are only three exchanges that include some reference to "Ruben," although there is no admissible evidence that it was actually defendant Weigand participating in the exchange.

Despite this, in defendant Weigand's post-arrest statement the Government seeks to introduce at trial, Special Agent Matthew Mahaffey tells Weigand that "[e]verybody knows" the EU Processing email account belongs to him and repeatedly accuses Weigand of lying to the agents when Weigand denies that the email address belongs to him or that he used it. Ex. 21, GX1901-T (14:3−16:8).

The Government has not produced the accompanying metadata or IP Address information that would indicate who was using the EU Processing account at the time an email was sent or received. The admission of the over 200 EU Processing emails, without sufficient evidence that defendant Weigand used the account when a specific email was sent or received, is unfairly prejudicial and creates an enormous risk of misleading the jury into believing that Weigand authored or received emails from that account.

## VI. If The Government Introduces Select Excerpts Of Defendant Weigand's Post-Arrest Statement, The Government Should Be Required To Play The Entire Statement

The Government seeks to introduce at trial cherry-picked and misleading portions of defendant Weigand's post-arrest statement, recorded on March 9, 2020. *See* Ex. 21, GX 1901-T (Government designations in yellow). To provide necessary context for those excerpts, defendant Weigand respectfully requests that his entire post-arrest statement, spanning only approximately seventeen minutes, be played for the jury, as required by the doctrine of completeness. The Government opposes this request.

Rule 106 of the Federal Rules of Evidence, which codifies the common law doctrine of completeness, provides that "[i]f a party introduces all or part of a . . . recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time." Fed. R. Evid. 106. The purpose of Rule 106 is two-fold: *first*, to avoid "the misleading impression created by taking matters out of context," and *second*, to remedy "the inadequacy of repair work when delayed to a point later in the trial." Fed. R. Evid. 106 Advisory Committee Notes (1972 Proposed Rules). The Second Circuit has therefore interpreted Rule 106 to require that an omitted portion of a statement be admitted into evidence "if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted

portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (quoting *United States v. Castro*, 813 F.2d 571, 575–76 (2d Cir.1987)). *See, e.g., United States v. Vargas*, No. 18 CR. 76 (PAC), 2018 WL 6061207, at *2 (S.D.N.Y. Nov. 20, 2018) (admitting additional portions of defendant's post-arrest statements because otherwise the jury "may assume that no other statements were made" and that defendant's statements at trial were recent fabrications). This holds true regardless of whether the additional portion of the statement would constitute hearsay if independently offered by the defendant. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988) ("[T]he material required for completeness is *ipso facto* relevant and therefore admissible.").

The Government intends to introduce incomplete and misleading excerpts of defendant Weigand's post-arrest statement concerning Eaze, including Weigand's statements that he first learned of Eaze when he saw a billboard advertisement during a 2017 business trip to California and that he did not have any involvement with Eaze. Ex. 21, GX 1901-T (3:21−6:6). The Government's obvious purpose in admitting this excerpt is to imply that Weigand was intentionally misrepresenting his connection to Eaze. Defendant Weigand therefore seeks to introduce the remainder of his post-arrest statement, which is necessary to provide the jury with a "fair and impartial understanding" of Weigand's statement that he had "no involvement" with Eaze.

First and foremost, it is critical for the jury to hear the recording in its entirety to gain a full understanding of defendant Weigand's demeanor and the interrogation generally. The FBI arrested Weigand at the airport in Los Angeles as he was switching planes to catch a connecting flight for a vacation in Costa Rica. Immediately after stepping off his twelve-hour flight to Los Angeles, Weigand was interrogated. Under these circumstances, defendant Weigand, when

asked at the outset of the interrogation, raised concerns about his English being "okayish." Ex. 21, GX 1901-T (2:16−18) (Q: "You understand English and speak English, right?" A: "I'm okayish, I think."). Those stated concerns about his English proficiency do call into question what Weigand understood "involvement" with Eaze to mean.

The Government has also omitted vital portions of defendant Weigand's statement regarding his background in e-commerce and payment processing in Europe, and his statements that he exclusively directed his professional services to European clients. Tr. at 13:12–13 ("No. We [referring to his company, Payment Consultants] don't have any presence or any activities in the U.S."). The fact that defendant Weigand's business directed its services only to European clients ought in fairness to be considered alongside his statement that he had "no involvement" with Eaze, a California-based company.

The Government also seeks to introduce those portions of Weigand's post-arrest statement concerning the email address euprocessing@protonmail.com, which, in the Government's view, was used to effectuate the alleged scheme and transmit proxy merchant applications to acquiring banks in Europe. *Id.* (13:14−16:10). In the designated portion, Special Agent Matthew Mahaffey tells Weigand that the Government "ha[s] evidence that it's your email" and accuses him of lying to federal agents when Weigand truthfully insists that the EU Processing email account was not his. *Id.* (14:3−23).

When Weigand states that he has "heard of [the email address]," Special Agent Mahaffey quips: "Exactly, man, you've heard of it." *Id.* (16:4−10). The Government's excerpt ends there. Under the rule of completeness, the remaining portion of that discussion in which Weigand states that he does not believe he has "done anything that I shouldn't have done or that's illegal" should be played. *Id.* (16:11−25). The denial must be played to the jury to provide context for the

agent's accusation of guilt. To omit the denial implies that defendant Weigand conceded to, or ratified, the agent's accusation and would therefore be highly misleading. The jury should therefore be able to assess the statement in its entirety.

## **CONCLUSION**

For the foregoing reasons, defendant Weigand respectfully requests that this Court exclude the above categories of evidence and offer his complete post-arrest statement into evidence. Defendant Weigand hereby adopts by reference all applicable arguments in his co-defendant Akhavan's motions *in limine*.

Dated: New York, New York
       February 16, 2021

Respectfully submitted,

DECHERT LLP

By: */s/ Michael J. Gilbert*

Michael J. Gilbert
Shriram Harid
Steven Pellechi
Amy Lesperance
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Michael.gilbert@dechert.com
Shriram.harid@dechert.com
Steven.pellechi@dechert.com
Amy.Lesperance@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional
Corporation
1 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90071
Michaelartan@yahoo.com

*Attorneys for Defendant*
*Ruben Weigand*