**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL (213) 443-3000 | FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3170**

WRITER'S INTERNET ADDRESS
**christayback@quinnemanuel.com**

February 18, 2021

The Honorable Jed R. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *United States v. Weigand, et al.*, 20 cr. 188

Dear Judge Rakoff:

On behalf of Defendant Hamid "Ray" Akhavan, undersigned counsel respectfully opposes Visa's application to permit Martin Elliot to testify remotely.  While sympathizing with Mr. Elliott's desire to avoid traveling to testify in person during the COVID-19 pandemic (a desire no doubt shared by a good many counsel, experts, witnesses, jurors, and other essential contributors), we  note simply that his desire should not override the defendants' right to face-to-face confrontation.

### I.   FACE-TO-FACE CONFRONTATION IS A CORE CONSTITUTIONAL RIGHT

The Sixth Amendment guarantees that "the accused shall enjoy the right … to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Per the Supreme Court, the "'core' of the Confrontation Clause guarantee" is to "provide the accused an 'opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact.'"  *United States v. Carter*, 907 F.3d 1199, 1206 (9th Cir. 2018) (quoting *California v. Green*, 399 U.S. 149, 156 (1970)).[1]

There is good reason for demanding face-to-face confrontation.  "Not only does physical confrontation at trial serve as a symbol of fairness, but it also promotes reliability, for 'it is always more difficult to tell a lie about a person to his face than behind his back.'"  *Id.* at 1206–07 (quoting *Coy v. Iowa*, 487 U.S. 1012, 1019 (1988)).  "Compelling 'adverse witnesses at trial to testify in the accused's presence' thus 'enhances the accuracy of factfinding' at trial."  *Id.* at 1207 (quoting *Maryland v. Craig*, 497 U.S. 836, 846 (1990)).  "So too does 'compelling witnesses to stand face to face with the jury' as they tell their side of the story."  *Id.* (quoting *Green*, 399 U.S. at 158).

---

[1]     Unless otherwise noted, we have omitted internal citations, quotation marks, and alterations from this letter brief.

quinn emanuel urquhart & sullivan, llp

NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

"These important components of confrontation are lost when the witness is not testifying in court, regardless of the witness's … ability to see the defendant on a screen from a distant location." *Id.* (vacating conviction because a witness who was seven months pregnant and hospitalized due to complications was improperly permitted to testify remotely). Indeed, "[a]ny procedure that allows an adverse witness to testify remotely necessarily diminishes 'the profound [truth-inducing] effect upon a witness of *standing in the presence* of the person the witness accuses.'" *Id.* (quoting *Coy*, 487 U.S. at 1020) (alteration and emphasis in *Carter*). "[V]irtual 'confrontations' … fall short of the face-to-face standard because they do not provide the same truth-inducing effect." *United States v. Bordeaux*, 400 F.3d 548, 554–55 (8th Cir. 2005). "There are also important practical differences between face-to-face confrontation and virtual confrontation," such as "the angle and quality of the courtroom camera" which can "distort any effort to approximate in-person testimony." *Id.* Nor can the defense ensure that a remote "witness is not being coached or influenced during testimony, and that the witness is not improperly referring to documents." *Carter*, 907 F.3d at 1207. In sum, "[t]he simple truth is that confrontation through a video monitor is not the same as physical face-to-face confrontation." *United States v. Yates*, 438 F.3d 1307, 1315 (11th Cir. 2006) (en banc) (vacating conviction because witness was permitted to testify via two-way video).

## II. *CRAWFORD V. WASHINGTON* REQUIRES FACE-TO-FACE CONFRONTATION

The Supreme Court's decision in *Crawford v. Washington* requires face-to-face confrontation with a few narrow, historically-grounded exceptions that are not applicable here. 541 U.S. 36, 53–54 (2004) (abrogating *Ohio v. Roberts*, 448 U.S. 56 (1980) and holding that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination"). *Crawford* marked a "sea change" in Confrontation Clause jurisprudence, *United States v. James*, 712 F.3d 79, 89 (2d Cir. 2013) and made clear "that a face-to-face meeting between an accuser and the accused [is] an essential part of the confrontation right." *United States v. Cox*, 871 F.3d 479, 493 (6th Cir. 2017) (Sutton, J., concurring) (citing *Crawford*, 541 U.S. at 43–45). "*Crawford* looked to the original publicly understood meaning of confrontation to determine" that "the exception-free words of the [Sixth Amendment's] guarantee ('in all criminal prosecutions')" admits only of narrow, historically-grounded exceptions. *Id.* (citing *Crawford*, 541 U.S. at 42–50).

Although Mr. Elliott relies upon the Second Circuit's decision in *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999), that decision is irreconcilable with the Supreme Court's subsequent decision in *Crawford*. *Gigante* held that two-way video testimony does not violate a witness's Sixth Amendment rights "upon a finding of exceptional circumstances." *Id.* at 81. Under *Gigante*, two-way video testimony would be permissible "only when (1) the witness's testimony is material; (2) the movant has made good-faith and reasonable efforts to obtain the witness's presence and is unable to do so (that is, that the witness is 'unavailable' …); and (3) allowing testimony by such means furthers the interests of justice." *United States v. Buck*, 271 F. Supp. 3d 619, 622–23 (S.D.N.Y. 2017). But *Gigante* relied upon a policy-based reading of the Confrontation Clause, whereby "the central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant" as tested at trial. *Gigante*, 166 F.3d at 81 (quoting *Craig*, 497 U.S. at 845).

Of course, the Supreme Court's decision in *Crawford* fundamentally differs. The Court focused on history and text to conclude that "the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 541 U.S. at 69. In so holding, the Supreme Court expressly declined to "replac[e] categorical constitutional

guarantees with open-ended balancing tests." *Id.* at 67–68. Simply stated, *Gigante* exemplifies the sort of approach that the Supreme Court in *Crawford* rejected, quite pointedly.

Faced with such an irreconcilable conflict between earlier Second Circuit and later Supreme Court precedent, this Court should apply the later Supreme Court precedent. "Lower courts are bound by Second Circuit precedent *unless* it is expressly or implicitly overruled by the Supreme Court." *Ntsebeza v. Ford Motor Co. (In re S. African Apartheid Litig.)*, 15 F. Supp. 3d 454, 459–60 (S.D.N.Y. 2014) (emphasis added). This means "that a decision of the Second Circuit is binding unless it has been called into question by an intervening Supreme Court decision … or unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court." *Id.* (quoting *United States v. Agrawal*, 726 F.3d 235, 269 (2d Cir. 2013) (Pooler, J. dissenting), in turn quoting *United States v. Santiago*, 268 F.3d 151, 154 (2d Cir. 2001) and *In re Sokolowski*, 205 F.3d 532, 535 (2d Cir. 2000)).

Because *Gigante* is no longer good law post-*Crawford*, this Court may deny Mr. Elliott's request without analyzing that claimed exception. *Cf. Carter*, 907 F.3d at 1208 n.4 ("We agree with the Eighth and Eleventh Circuits that *Gigante* is an outlier."). As noted above, *Gigante* calls for the very sort of "open-ended balancing test" that *Crawford* condemns. 541 U.S. at 68. At a minimum, *Gigante* has been "called into question" by *Crawford*, *Santiago*, 768 F.3d at 154, such that grant of any exception pursuant to *Gigante* would call into question the constitutionality of the upcoming trial. After *Crawford*, the constitutional command is clear and dispositive: Face-to-face confrontation is required.[2]

### III.   EVEN UNDER *GIGANTE*, REMOTE TESTIMONY IS NOT WARRANTED

Even if this Court were to apply *Gigante*, this narrow exception to an otherwise ironclad guarantee of face-to-face confrontation should remain narrow—whereas grant of Mr. Elliott's request would risk broadening it into more of the rule than the exception amidst COVID-19. Notably, *Gigante* differed markedly in its facts. There, the witness "was in the final stages of inoperable cancer," making travel all but impossible. *Id.* at 79. Here, by contrast and as in

---

[2]   Nor has Visa satisfied the *Craig* standard, to the extent that intermediate standard might alternatively apply. *Craig* held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where" (1) the "denial of such confrontation is necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured." 497 U.S. at 850. In light of *Crawford*, however, *Craig* should be limited "to the specific facts [on which] it [was] decided: a child victim may testify against the accused by means of one-way video (or a similar *Craig*-type process) when the trial court finds, consistently with statutory authorization and through a case-specific showing of necessity, that the child needs special protection." *Michigan v. Jemison*, 952 N.W.2d 394, 400 (Mich. 2020). Even if *Craig* still applied beyond its facts, "[w]hat is 'necessary' is a high bar" and neither COVID-19 nor Mr. Elliott's health conditions (which are widely shared) make it "necessary" for him to testify remotely. *United States v. Casher*, 2020 U.S. Dist. LEXIS 106293, at *4–6 (D. Mont. June 17, 2020) (applying *Craig* to deny witness request to testify via two-way video conference); *United States v. Pangelinan*, 2020 U.S. Dist. LEXIS 157465, at *5–12 (D. Kan. Aug. 31, 2020) (same); *see also United States v. LaGuardia*, No. 19-CR-893 (LAK), ECF No. 78 (S.D.N.Y. Oct. 20, 2020).

3

*Pangelinan*, "although [the witness] has some health issues, there is no evidence that [he is] physically unable to travel like the witness[] in *Gigante*." 2020 U.S. Dist. LEXIS 157465, at *10. And even *Gigante* recognized that "[t]here may well be intangible elements of the ordeal of testifying in a courtroom that are reduced or even eliminated by remote testimony." 166 F.3d at 81.

The instant application calls for drastic *expansion* of what can qualify as an "exceptional circumstances" under *Gigante*, even while it is dubious that *Gigante* retains *any* vitality. Visa essentially asks the Court to adopt a blanket COVID-19 exception to the Sixth Amendment. But such an exception would swallow the rule. If COVID-19 constitutes an "exceptional circumstance," then *Gigante* would arguably permit every witness at this trial—all of whom have their own specific health and family worries, and wrestle with varying logistics for getting to and from court—to testify remotely. Certainly, appearing in person entails some risk for everyone. Indeed, two lawyers on Mr. Akhavan's defense team are unable to attend trial because of COVID-19. A malleable, forgiving approach to exceptions threatens to eviscerate the defendants' Confrontation Clause rights. Relatedly, Visa raises the general burdens associated with requiring Mr. Elliott to travel and quarantine during the pandemic. But those burdens cannot suffice to exempt a witness from testifying in person if there are to be any trials before vaccines are fully available.

Visa also discounts the protocols the Court has adopted to ensure the safety of all trial attendees, including witnesses, jurors, and court staff. The Court was well aware of the risks that would inevitably arise in holding a trial during the pandemic, and it has taken care to account for them. Visa has no more basis than anyone else does now to express dissatisfaction with the Court's considered judgment that its COVID-19 protocols are adequate to protect the safety of all trial participants. Indeed, granting the instant request would call into question the soundness of the protocols this Court has fashioned and relied upon to protect everyone other than Mr. Elliott.

Visa protests that it is concerned with the risk that Mr. Elliot might contract COVID-19 while traveling. But this does not distinguish Mr. Elliot from other trial participants. In New York City, it is virtually certain that some of those who are required to attend trial will travel to the court via public transit, and some may do so daily. If anything, the risks to jurors and anyone else who travels to the courthouse via public transit may be greater than the risks Mr. Elliott faces from traveling to New York City (notably, Mr. Elliott does not attempt to compare the risks of plane travel, which has proved to be quite safe, to any other form of travel). Over the course of the trial, it is possible (indeed, perhaps likely) that trial participants who travel to the courthouse via public transit will spend more hours traveling in the aggregate than Mr. Elliott will. That Mr. Elliott must travel to New York should not excuse him from the requirement that he testify in person.

Mr. Elliott asserts that he should not be required to testify in person because he and his wife are the "primary caregivers" for his elderly mother-in-law. Elliot Dec. ¶ 2. As in *Pangelinan*—in which a witness who resisted testifying in person proffered that she was responsible for caring for "her two young children and her elderly mother," 2020 U.S. Dist. LEXIS 157797, at *4—the Court should hold this is insufficient to override the defendants' right to face-to-face confrontation.

Mr. Elliott also asserts that he ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

4

██████████████████████████████████████████████ The Court should hold the same here.

Even assuming arguendo that Visa has satisfied *Gigante*'s "exceptional circumstances" requirement, the defense respectfully submits that Visa has not made a good-faith effort to produce a witness for trial. Counsel for Visa first raised this issue with counsel for Mr. Akhavan in early November 2020, apparently after being approached by the government. In the three-and-a-half months that have elapsed since then, Visa could have considered offering a different trial witness who lives in New York City. Instead, however, Visa elected to designate a San-Francisco-based witness as its trial witness and to wait until the eleventh hour before raising this issue with the Court. As noted above, the defense has reason to believe that the government has also been aware of this issue for some time. Yet the government also sat mum, even though it was preparing Mr. Elliott to testify at trial and producing Jencks Act material for him. The defendants should not be prejudiced in any way—let alone made to suffer a violation of their bedrock constitutional rights on the eve of trial—as a result of Visa's and the government's questionable choices.

Finally, Visa attempts to downplay the significance of Mr. Elliott's testimony by characterizing him as a "process witness." Whether he is a "process witness" is not a valid consideration under *Gigante*, which requires only that the proposed testimony be "material." Visa itself concedes that Mr. Elliott's testimony meets that operative standard. In any event, contrary to Visa's insinuations, questions about what Visa's policies did (or did not) require and how Visa did (or did not) enforce those policies are among the most critical questions in this case. The defense should not be denied the benefit of a vigorous cross examination on these important topics, which may make the difference between conviction and acquittal.[3]

Respectfully Submitted,

*Christopher Tayback* (signature)

Christopher Tayback

CC: AUSAs Emily Deininger, Nicholas S. Folly, and Tara LaMorte

09820-00002/12565803.1

---

[3] It is striking that the government has decided to take no position on Visa's request, after earlier expressing concern about minimizing any appellate exposure. Specifically, the government insisted on an in-person *Curcio* hearing to address a potential conflict of interest on the part of Mr. Akhavan's counsel. It did so purportedly to ensure that there was no ground on which Mr. Akhavan could seek an appeal based on the purported conflict if he is convicted. Yet Visa's request now presents a far more substantial risk of reversal, even as the government sits silent about it. Without speculating about the government's motivations, it is worth noting that Visa's application poses an obvious risk of gamesmanship on the part of prosecutors and witnesses who may wish to avoid having their testimony subjected to the crucible of in-person cross-examination.