UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

RUBEN WEIGAND and
HAMID "RAY" AKHAVAN,

Defendants.

20-CR-188-JSR

---

**OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE
DEFENDANT HAMID ("RAY") AKHAVAN'S EXPERTS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARGUMENT ..................................................................................................................1

I.      MS. MACGREGOR AND MR. RANKIN'S TESTIMONY IS DIRECTLY RELEVANT TO NEGATE THE REQUIRED ELEMENT OF MATERIALITY ........................1

      A.      Background ................................................................................................1

          1.      Monica MacGregor's Expected Testimony .................................1

          2.      Jeff Rankin's Expected Testimony .............................................2

      B.      Mr. Rankin and Ms. MacGregor's Testimony is Relevant to Whether Defendants' Alleged Misstatements Were Capable of Influencing an Objectively Reasonable Bank's Decision-Making ....................................3

II.     MR. AKHAVAN'S EXPERTS SHOULD BE PERMITTED TO REBUT OPINIONS OFFERED BY THE GOVERNMENT'S DISGUISED EXPERTS ...........................4

      A.      It is Premature to Preclude Defense Expert Testimony Prior to Hearing Testimony From the Government's Disguised Experts ............................4

      B.      Overlapping Testimony Between the Government's Disguised Expert Witnesses and Defense Experts is Not a Basis for Exclusion ................6

      C.      Ms. MacGregor's Testimony on Issuing Bank Custom and Practice Cannot Be Considered Duplicative or Cumulative of a Select Few Witnesses ..................................................................................................7

III.    OTHER TOPICS MR. RANKIN ADDRESSES ARE RELEVANT TO REBUT EVIDENCE INTRODUCED BY THE GOVERNMENT ............................................9

      A.      Mr. Rankin's Proposed Testimony About E-Commerce Roles, Rules, Customs, and Practices Is a Proper Subject of Expert Testimony ........10

      B.      Mr. Rankin's Proposed Testimony About the Evolution of Visa's and MasterCard's Rules Is a Proper Subject of Expert Testimony .............12

      C.      Mr. Rankin's Proposed Testimony Regarding Merchant Banks' Ability to Onboard Cannabis Clients Is Proper Expert Testimony ........................13

IV.     MR. VARADAMAN'S TESTIMONY IS DIRECTLY RELEVANT TO NEGATE THE REQUIRED ELEMENT OF MATERIALITY ....................................................14

V.      MR. VARDAMAN'S TESTIMONY IS RELEVANT TO REBUT EVIDENCE INTRODUCED BY THE GOVERNMENT ..........................................................15

VI.     MR. AKHAVAN'S EXPERT WITNESSES OFFER RELIABLE OPINIONS BASED ON EXTENSIVE AND SPECIALIZED EXPERIENCE ...............................................18

    A.     Mr. Rankin, Ms. MacGregor and Mr. Vardaman Have Extensive Professional Experience ...........................................................................................18

    B.     Each Expert Will Be Reliably Testifying Based on Their Backgrounds ...............19

CONCLUSION ................................................................................................................................22

# TABLE OF AUTHORITIES

**Page**

## Cases

*Baldonado v. Wyeth*,
   2012 WL 3234240 (N.D. Ill. Aug. 6, 2012) .................................................................... 21

*Cage v. City of Chicago*,
   979 F. Supp. 2d 787 (N.D. Ill. 2013) ............................................................................ 20

*FDIC v. W.R. Grace & Company*,
   877 F.2d 614 (7th Cir. 1989) .......................................................................................... 8

*Fed. Ins. Co. v. Arthur Andersen, LLP*,
   2006 WL 6555232 (N.D. Ill. Jan. 18, 2006) ................................................................... 9

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ...................................................................................................... 21

*Goldberg v. 401 North Wabash Venture LLC*,
   2013 WL 212912 (N.D. Ill. Jan. 18, 2013) ................................................................... 21

*Harms v. Lab. Corp. of Am.*,
   155 F. Supp. 2d 891 (N.D. Ill. 2001) ............................................................................ 22

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
   191 F.3d 813 (7th Cir. 1999) ........................................................................................ 14

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992) .......................................................................................... 18

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   643 F. Supp. 2d. 471 (S.D.N.Y. 2009) ........................................................................... 5

*Jordan v. City of Chi.*,
   2012 WL 254243 (N.D. Ill. Jan. 27, 2012) ................................................................... 20

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................................. 20, 21

*Lakeside Feeders, Inc. v. Producers Livestock Marketing Ass'n*,
   666 F.3d 1099 (8th Cir. 2012) ....................................................................................... 13

*Lippe v. Bairnco Corp.*,
   2002 WL 15630 (S.D.N.Y. Jan. 7, 2002) ........................................................................ 9

*Metavante Corp. v. Emigrant Sav. Bank*,
   619 F.3d 748 (7th Cir. 2010) .................................................................................... 20, 21

*Neder v. United States*,
   527 U.S. 1 (1999) ........................................................................................................ 3, 8

iii

*Nucor Corp. v. Neb. Pub. Power Dist.*,
    891 F.2d 1343 (8th Cir.1989) .................................................................................. 14

*Peoples State Bank v. Stifel, Nicolaus & Co., Inc.*,
    2013 WL 1024917 (S.D. Ind. Mar. 14, 2013) ............................................................. 21

*SEC v. Lipson*,
    46 F. Supp. 2d 758 (N.D. Ill. 1998) .......................................................................... 20

*United States v. Amuso*,
    21 F.3d 1251 (2d Cir. 1994) ................................................................................ 6, 14

*United States v. Banki*,
    2010 WL 1875690 (S.D.N.Y. May 10, 2010) ............................................................ 15

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) .................................................................................. 18

*United States v. Garcia*,
    413 F.3d 201 (2d Cir. 2005) ................................................................................ 4, 10

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015) ............................................................................ 3, 8, 13

*United States v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999) .................................................................................. 18

*United States v. Mendlowitz*,
    2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ......................................................... 5, 11

*United States v. Newkirk*,
    2016 WL 1659149 (S.D.N.Y. Apr. 19, 2016) ............................................................... 6

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007) ................................................................................... 3, 8

*United States v. Rodriguez*,
    140 F.3d 163 (2d Cir. 1998) ...................................................................................... 8

*United States v. Sanders*,
    2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) .............................................................. 3

*Van Straaten v. Shell Oil Prods. Co. LLC*,
    678 F. 3d 486 (7th Cir. 2012) ................................................................................. 14

*Walker v. Soo Line R.R. Co.*,
    208 F.3d 581 (7th Cir. 2000) .................................................................................. 20

*Wellogix, Inc. v. Accenture, L.L.P.*,
    716 F.3d 867 (5th Cir. 2013) .................................................................................. 14

*WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*,
    25 F.3d 422 (7th Cir. 1994) ...................................................................................... 9

iv

**<u>Rules</u>**

Fed. R. Evid. 702 ................................................................................................................... 18

Defendant Hamid ("Ray") Akhavan respectfully submits this memorandum of law in support of his opposition to the government's motion *in limine* to preclude, or otherwise limit, the testimony of defense experts Jeff Rankin, Monica MacGregor and John Vardaman from testifying at trial.  All three of Mr. Akhavan's experts offer relevant and reliable opinions that require specialized knowledge that will help the jury to understand the evidence and determine the issues.

## ARGUMENT

## I.     MS. MACGREGOR AND MR. RANKIN'S TESTIMONY IS DIRECTLY RELEVANT TO NEGATE THE REQUIRED ELEMENT OF MATERIALITY

In the Indictment, the government alleges that the defendants accomplished their scheme to deceive the banks into processing cannabis transactions through the use of false merchant category codes (MCCs) and phony merchants.  ECF No. 16.  In a bank fraud prosecution, the government must prove, among other elements, that a defendant's alleged misstatements—the alleged false MCCs and phony merchant names—were material.  Here, both Ms. MacGregor and Mr. Rankin's testimony is directly relevant to the issue of materiality.

### A.     Background

#### 1.     Monica MacGregor's Expected Testimony

As outlined in Mr. Akhavan's expert disclosures, Monica MacGregor's expected testimony includes the following:

- Issuing Banks receive limited information or metadata through the Visa and MasterCard networks.

- Visa and MasterCard have not created a system for Issuing Banks to make product level decisions on transactions (i.e., whether to approve or reject) , such as cannabis.

1

- The data Issuing Banks look to, as a matter of custom and practice, in determining whether to approve or reject transactions.

- While a MCC would be the most efficient way to set up an algorithm to detect cannabis transactions, because there was and is no MCC for cannabis or most other products, algorithms based on MCCs are not sufficient.

- During the relevant period there was no specific MCC for cannabis and even codes such as those for "pharmacy" or "medical miscellaneous" would still not allow an Issuing Bank to determine whether the purchase was for cannabis.

- Due to the lack of sufficient information provided by the credit card companies, other investigative methods and due diligence procedures would be required to reliably detect cannabis transactions by the Issuing Banks.

*See* ECF No. 168-1 at 3–5.

2.   Jeff Rankin's Expected Testimony

As outlined in Mr. Akhavan's expert disclosures, Jeff Rankin's expected testimony includes the following:

- The lack of specificity of rules and practices regarding what content should appear on a merchant website and what information must be included in a merchant name.

- The purpose of merchant names and websites is not for the benefit of the Issuing Banks. Rather, it is to reduce cardholder confusion so that when the transaction appears on the cardholder's statement, they are able to recognize the purchase, thereby reducing the number of disputes and chargebacks.

*See* ECF No. 168-1 at 1–3.

**B.      Mr. Rankin and Ms. MacGregor's Testimony is Relevant to Whether Defendants' Alleged Misstatements Were Capable of Influencing an Objectively Reasonable Bank's Decision-Making**

As the government argues in its third motion *in limine*, "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999).[1] But a "mere metaphysical possibility" of influence is insufficient. *United States v. Litvak*, 808 F.3d 160, 173 (2d Cir. 2015). Rather, a misrepresentation is material when it is "*reasonably likely* to influence the [decisionmaker] in making a determination required to be made." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (emphasis added).

Ms. MacGregor and Mr. Rankin's testimony will assist the jury in resolving a fact in issue—whether the defendants' alleged misstatements (*i.e.*, the MCCs and merchant names) had a natural tendency to influence an objectively reasonable bank in deciding whether the transaction was for cannabis, and as a result, whether to approve the transaction. Based on her extensive compliance background, Ms. MacGregor will opine that MCCs and merchant names are not capable of influencing a reasonable Issuing Bank in its decision-making because banks cannot rely on such information (accurate or not) to filter for, or detect, whether a purchase was for cannabis as part of its transaction monitoring capabilities.

In its motion *in limine* seeking to exclude this testimony, the government cited to *United States v. Sanders*, 2013 WL 1421487, at \*2 (S.D.N.Y. Mar. 27, 2013). But *Sanders* is inapposite because the court there concluded that the expert would *not* be testifying to the key question for the jury, "whether the accurate information would have been material to the insurance carriers." *Id.* Here, Ms. MacGregor intends to opine on the key issue the jury will consider as to

---

[1]    Unless otherwise noted, we have omitted internal citations, quotation marks, and alterations from citations in this brief.

materiality:  that even accurate information would not have (indeed, could not have) influenced an objectively reasonable Issuing Bank's decision.  As a result, her testimony must not be precluded.

## II.   MR. AKHAVAN'S EXPERTS SHOULD BE PERMITTED TO REBUT OPINIONS OFFERED BY THE GOVERNMENT'S DISGUISED EXPERTS

The government argues that because it will present testimony from Issuing Bank and card network employees as "percipient" witnesses, Mr. Akhavan's expert witnesses should be precluded from addressing the same concepts.  This argument is flawed for several reasons.

### A.   It is Premature to Preclude Defense Expert Testimony Prior to Hearing Testimony From the Government's Disguised Experts

The government's own bank and card network witnesses are not merely percipient witnesses, as explained in Mr. Akhavan's motion *in limine* #4 to preclude the government from eliciting disguised expert testimony.  These experts themselves seek to offer testimony that is certainly outside the realm of the lay juror's understanding.  Knowledge of Issuing Bank customer due diligence, enhanced due diligence, transaction monitoring, investigations and reporting is precisely the type of "technical[] or other specialized knowledge" the "admissibility [of which] must be determined by reference to Rule 702, not Rule 701."  *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005).  Likewise, knowledge of Visa and MasterCard requirements for merchant onboarding, risk monitoring and interpretation and application of card network rules and regulations that run hundreds of pages long requires an expert's specialized knowledge to help the trier of fact to understand the evidence.  The government is essentially offering expert testimony under the guise of percipient fact witnesses, then seeking to prevent the defense from rebutting such expert testimony through its' own witnesses.

Precisely because the government is taking the erroneous position that Issuing Bank and card network witnesses are not experts, they have not provided disclosures that would outline

these witnesses' expected testimony and the bases for such testimony.  Rather, the government has merely offered jotted down notes in the form of scant 3500 statements from some (but not all) of these witnesses, most of which run only a few pages long.[2]  However, because the government is taking the position that its disguised experts are merely fact witnesses and that the minimal 3500 statements provided are adequate, the defense has been left in the dark as to what the government's own disguised expert witnesses will testify to.  As a result, Mr. Akhavan cannot be expected to know exactly what these witnesses will say on direct and whether any of these witnesses will validate the opinions to be offered by defense experts.  As such, the Court should not prejudge the evidence and make a premature ruling barring the testimony of *all* of the defense experts simply because the government *may* elicit *some* of the same opinions from its witnesses.  *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d. 471, 476 (S.D.N.Y. 2009) ("[C]ourts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context.").

Indeed, in *United States v. Mendlowitz*, cited by the government in its motion *in limine*, the court did precisely that:  it specifically reserved decision on the government's motion *in limine* to preclude expert testimony because it was premature to make a ruling on the expert's testimony prior to hearing the fact witnesses' testimony on the issue.  2019 WL 6977120, at *3 (S.D.N.Y. Dec. 20, 2019).  Rather, the court waited until the tenth day of trial to rule.  *Id.*

The government is asking the Court to preclude defense experts because its own witnesses may discuss some of the same topics in its case in chief and that a cross of these

---

[2]    Notwithstanding the paucity of its own disclosures, the government criticizes the adequacy of Mr. Akhavan's expert disclosures, going so far as to say that for several categories it is "impossible to discern *what* opinions will even be expressed."  ECF No. 168 at 24.  Still, in the first four pages of its motion *in limine*, the government was able to precisely describe each of the topics about which Mr. Akhavan's experts will testify based on his disclosures.

witnesses on those topics is sufficient.  However, the Court cannot know at this stage whether testimony by defense experts would be duplicative or cumulative.  Thus, it would be improper to preclude their testimony at this stage.

### B.   Overlapping Testimony Between the Government's Disguised Expert Witnesses and Defense Experts is Not a Basis for Exclusion

Contrary to the government's arguments, potential overlap between testimony from government and defense witnesses does not call for the draconian measure of prohibiting Mr. Akhavan from calling his proffered expert witnesses.  Mr. Akhavan has the right to mount his materiality challenge in front of the jury.  The government asks the Court to rely on *United States v. Newkirk* to exclude Mr. Akhavan's experts.  2016 WL 1659149 (S.D.N.Y. Apr. 19, 2016), *aff'd*, 684 F. App'x 95 (2d Cir. 2017).  But as the Second Circuit noted in that case, "Newkirk's defense in the district court was *not* that his misrepresentations were immaterial.  Rather, he maintained that he was … not a knowing or intentional participant in the charged fraud."  684 F. App'x at 96 (emphasis added).  Here, all three of Mr. Akhavan's experts are essential to the pivotal and disputed issue of materiality.

In its motion *in limine*, the government cites *United States v. Amuso* for the proposition that trial courts should not admit "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses."  21 F.3d 1251, 1263 (2d Cir. 1994).  But *Amuso* undermines the government's argument.  There, the expert's testimony was *admitted*.  The Second Circuit held that although the testimonies of two fact witnesses "overlapped to a degree" with the expert's testimony, it did *not* preclude the expert from testifying on the same subject.  *Id.* at 1264.  Likewise, just because Ms. MacGregor and Mr. Rankin's testimony may overlap to a degree with select bank and card network witnesses, that does not call for a complete bar of their testimony.

**C.     Ms. MacGregor's Testimony on Issuing Bank Custom and Practice Cannot Be Considered Duplicative or Cumulative of a Select Few Witnesses**

Central to Mr. Akhavan's defense is a dispute over the materiality of the alleged misrepresentations.  Materiality in this context is evaluated by what would influence the decision of a "reasonable objective Issuing Bank" in permitting its credit and debit cards to be used for the purchase of marijuana.  *United States v. Cherico*, Oct. 31, 2011 Tr. at 1498:1-14.  The government seeks to offer the testimony from six bank witnesses, two of whom are listed only as records custodians and presumably will not be testifying to complex compliance-related policies and procedures.  In fact, from the 3500 statements provided thus far, only *three* witnesses the government intends to call will discuss these topics:  Richard Clow (Bank of America), Chuck Brown (Actors Federal Credit Union) and Michael Steinbach (Citibank).[3]  But on June 22, 2020, the government provided defense counsel with a *non-exhaustive* list of *1,095* U.S.-based Issuing Banks associated with individuals who made MasterCard and Visa credit card purchases from Eaze during the relevant period.  Indeed, the government intends to present at trial Visa and MasterCard transaction lists showing credit card purchases from *all* of these Issuing Banks.  *See* GX2201, 2301, 2302.

Ms. MacGregor's testimony is important because she will be providing an *overview* of Issuing Bank industry policies, procedures and practices when it comes to marijuana transactions.  The government is far short from having a percipient witness that represents each of the so-called "victim" banks it has identified.  Testimony from three or four bank witnesses out of 1,000 –plus is not close to sufficient to provide the jury with an overview of the industry.  Nor would crossing these few select government bank witnesses on their policies, procedures

---

[3]   The fourth non-records custodian listed bank witness is from Wells Fargo.  However, that witness remains unnamed and the defense has not received any 3500 statements from any Wells Fargo employee.

and practices *alone* prove sufficient.  The jury needs to understand the banks' policies *as a whole* to establish what an objective, reasonable Issuing Bank would do.

Although the government has charged a conspiracy to defraud "Issuing Banks" generally, many Issuing Banks do not have a policy or prohibition on the use of its credit cards to purchase cannabis, so a misrepresentation on that topic would not be material, as alleged in the Indictment. *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998) ("A misrepresentation is material *if it is capable of influencing a bank's actions*.") (emphasis added).   As a result, "whether a misrepresentation is material requires examination of the factors the decisionmaker would employ, and the degree to which a misrepresentation would be 'capable of influencing[] the decision of the decisionmaking body.'"  *Rigas*, 490 F.3d at 235 (quoting *Neder*, 527 U.S. at 16). "If a bank's discretion is limited by an agreement, we must look to the agreement to determine what factors are relevant, and when a misstatement becomes material."  *Id.*; *FDIC v. W.R. Grace & Company*, 877 F.2d 614, 620 (7th Cir. 1989).  Here, the banks' decisionmaking is limited, or informed by, their policies, so the jury must consider the policies of other banks besides those the government intends to call in determining when a misstatement becomes material.

Without Ms. MacGregor's testimony, Mr. Akhavan "would be left only with the 'victims' of his conduct as sources of potential testimony on this issue, an odd limitation where the jury is to evaluate materiality in an objective manner."  *Litvak*, 808 F.3d at 183–84.  In *Litvak*, the Second Circuit held that the district court "exceeded its allowable discretion" in excluding a defense expert whose testimony would have been probative of the materiality of the defendant's statements in connection with securities fraud charges.  *Id.* at 182.  The court held that without the expert witness's testimony, the defendant had few options to "put forth evidence to rebut the alleged victims' testimony that the defendant's misstatements were important to

them." *Id.* at 183.  Not only did the court find that the expert should have been permitted to testify, but also that the preclusion of the expert witness was not harmless error because the defendant was "left with little opportunity to present his non-materiality defense."  *Id*. at 184.

Accordingly, Ms. MacGregor's testimony cannot be classified as cumulative or duplicative of the government's few witnesses where, as here, her testimony will assist the jury in understanding Mr. Akhavan's materiality defense by testifying about Issuing Bank custom and practice related to cannabis transactions.  "An expert may properly testify as to 'the customs and standards of an industry, and [] opine as to how a party's conduct measured up against such standards." *Fed. Ins. Co. v. Arthur Andersen, LLP*, 2006 WL 6555232, at *3 (N.D. Ill. Jan. 18, 2006) (quoting *Lippe v. Bairnco Corp.*, 2002 WL 15630, at *2 (S.D.N.Y. Jan. 7, 2002)); *WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (affirming admission of expert testimony on customs in the commercial real estate industry).  As in *Litvak*, Ms. MacGregor's testimony is probative of the materiality of the defendants alleged misstatements and she should be allowed to testify on this critical issue.

## III.   OTHER TOPICS MR. RANKIN ADDRESSES ARE RELEVANT TO REBUT EVIDENCE INTRODUCED BY THE GOVERNMENT

The government seeks a blanket preclusion from allowing Mr. Akhavan to put on any sort of defense whatsoever by arguing each and every single topic about which defendants' experts seek to testify is irrelevant.  As described above, expert testimony related to the topics of (1) the Issuing Banks' policies regarding, and enforcement of, any marijuana prohibition; and (2) the Issuing Banks' customs and practices is relevant to the essential element of materiality.[4]

---

[4]   The government also seeks to exclude Mr. Mott's testimony related to other Visa and MasterCard standards, protocols and approaches and issuing bank profits.  Mr. Akhavan joins in the opposition to the government's motion *in limine* filed by defendant Ruben Weigand precluding Mr. Mott and Mr. Vilfer from testifying.

### A.    Mr. Rankin's Proposed Testimony About E-Commerce Roles, Rules, Customs, and Practices Is a Proper Subject of Expert Testimony

The government admits that testimony regarding how the payment processing system functions is relevant, but then claims it is not properly the subject of expert testimony.  Again, the government would like the Court to believe that its witnesses from Visa and MasterCard are merely percipient lay witnesses.  However, the 3500 statements for Martin Elliot (Visa) and John Verdeschi (MasterCard) reveal that they plan to testify about the global four-party payment system, including laying out the roles and responsibilities of the card network, the issuer, the acquirer and the agent.  As explained in Mr. Akhavan's motion *in limine* #4, knowledge of the payment processing system is precisely the type of "technical[] or other specialized knowledge" the "admissibility [of which] must be determined by reference to Rule 702, not Rule 701." *Garcia*, 413 F.3d at 215.

As outlined in Mr. Akhavan's expert disclosures, Jeff Rankin's expected testimony includes the following:

- The roles, processes and responsibilities of each of the players that make up the payment network – the merchant, the independent sales organization ("ISO"), payment service providers ("PSP"), the merchant/acquiring bank, the credit card network and the issuing bank.

- The privity, and lack of privity, between each player.  Specifically, there is no contract or agreement between the merchant and the card-issuing banks.  The merchant relies on the acquiring bank, including the terms of its agreement with the acquiring bank for rules, law and compliance.

*See* ECF No. 168-1 at 1–3.

10

As discussed above with respect to the testimony of Ms. MacGregor, the government's preclusion request is, at a minimum, premature. Until Mr. Elliot and Mr. Verdeschi take the stand, the Court does not know how each will testify and whether Mr. Rankin's testimony on these topics will be needed to rebut their testimony. *See Mendlowitz*, 2019 WL 6977120, at *3.

The government further claims that generalized testimony regarding e-commerce practices has "no bearing on any matter of consequence in this action." ECF 168 at 16–17. Specifically, the government seeks to exclude Mr. Rankin's testimony "as to the roles, rules, customs and practices related to e-commerce, payment gateways, processors, debit cards and credit cards." *See* ECF No. 168-1 at 1–3. Eaze, of course, is an e-commerce company, so testimony related to how e-commerce payment processing operates is certainly relevant to this case. Moreover, the government's own witnesses plan to testify about e-commerce practices, as reflected in the 3500 material. For example, the notes from Mr. Elliot's October 26, 2020 interview with the government includes the following paragraph:

> "E-commerce – consumer shops on e-commerce site; go to checkout, card info entered; merchant would have setup point of sale software that integrates with the shopping card and connects merchant to acq bank, can be done via payment gateway or direct connection; from website to acq bank, acq bank to visa, visa interprets tx and routes auth request to BOA for example, who make decision whether or not to approve tx, if approved the message flows back to visa, from visa to acq bank, then merchant; in nanoseconds; authorization shows up at merchant, sale done; true whether BOA US or BOA Japan for example, all travels the same network."

Likewise, the government includes on its own exhibit list documents it intends to introduce through the testimony of Mr. Elliot regarding Visa's rules for acquirers and their roles and responsibilities related to ecommerce merchants (like Eaze), as laid out in Visa's Global Brand Protection Program Guide for Acquirers (GX2203) and Global Acquirer Risk Standards (GX2206).

Accordingly, to prohibit Mr. Rankin from testifying about practices related to e-commerce would deny the defense the opportunity to rebut testimony on an issue which the government seeks to introduce.

### B.  Mr. Rankin's Proposed Testimony About the Evolution of Visa's and MasterCard's Rules Is a Proper Subject of Expert Testimony

The government seeks to exclude Mr. Rankin's testimony regarding the "evolution of Visa and MasterCard rules customs and practices as they relate to cannabis" and the "purpose, history, and evolution of MCCs" on the basis that such testimony may fall outside the charged timeframe.  ECF 168 at 18.  In the Indictment, the government alleges a time frame "[f]rom at least in or about 2016, up to and including in or about 2019."  ECF 16 at 1.  In the transaction lists from Visa and MasterCard that the government intends to introduce as exhibits at trial, the government lists Eaze-related cannabis transactions that span from January 2017 through March 2020.  Accordingly, the government alleges a scheme that runs up to four years.

Over those four years, there was indeed an evolution in both card network rules, customs and practices as they relate to cannabis and in MCCs, as reflected in exhibits the government intends to introduce at trial.  For instance, the government lists seven different versions of Visa Core Rules and Visa Product and Service Rules from October 2016 through October 2019 (GX2208–14), as well as the Visa Merchant Data Standards Manual from October 2019, which for the first time lists an MCC for cannabis (GX2207).  The government also intends to introduce Visa's internal memos regarding its stance on cannabis from May 2015 (which predates the charged timeframe) and May 2019.  To preclude a defense expert from testifying about these evolutions is an attempt by the government to have its cake and eat it, too.  The government wants to allow its disguised expert witnesses to testify to these topics while precluding rebuttal testimony from defense experts.

12

Moreover, with regard to Mr. Rankin's testimony explaining the purpose, history and evolution of MCCs, and whether and how Issuing Banks use MCCs, goes directly to the disputed question of materiality, as addressed above. The defense should not be precluded from presenting expert testimony on this topic. *See Litvak*, 808 F.3d at 184.

### C.     Mr. Rankin's Proposed Testimony Regarding Merchant Banks' Ability to Onboard Cannabis Clients Is Proper Expert Testimony

As outlined in Mr. Akhavan's expert disclosures, "Mr. Rankin will testify that under Visa and MasterCard rules, there is no specific written rule prohibiting merchant banks from onboarding cannabis merchants in a state where cannabis is legal, where the merchant will be conducting intrastate business. Rather, he will testify that within the Visa/MasterCard network, a merchant bank has discretion to onboard a cannabis client." *See* ECF No. 168-1 at 1–3.

The government seeks to preclude the second portion of that testimony while ignoring the first. The government itself acknowledges that one of the issues in this case is "whether Visa and MasterCard allow their networks to be used for the credit or debit purchases of marijuana products." ECF No. 168 at 18-19. Mr. Rankin intends to assist the trier of fact in answering that exact question based on the rules and guidelines the networks publish to their member banks, to define the phrases and terms in the card network rules. An expert witness may opine on the accepted meaning (or lack thereof) of a word or phrase within a particular industry based on his experience and training. *See Lakeside Feeders, Inc. v. Producers Livestock Marketing Ass'n*, 666 F.3d 1099, 1111 (8th Cir. 2012) ("Courts have frequently recognized the value of expert testimony defining terms of a technical nature and testifying as to whether such terms have acquired a well-recognized meaning in the business or industry.") (quoting *Nucor Corp. v. Neb. Pub. Power Dist.*, 891 F.2d 1343, 1350 (8th Cir.1989)); *see, e.g., Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013) (expert witness permitted to opine on the software

industry's understanding of certain terms based on his experience and training in the software industry); *Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F. 3d 486, 489 (7th Cir. 2012) (admitting expert testimony "that the payment-card industry understands 'account number' and the ISO's 'primary account number' to be the same thing"); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999) (noting that parties submitted "competing expert testimony regarding the industry definition of 'wax'").

Just because the government intends to call witnesses on behalf of Visa and MasterCard at this trial should not foreclose the defense from putting on a rebuttal expert. *See Amuso*, 21 F.3d at 1264.

## IV.   MR. VARADAMAN'S TESTIMONY IS DIRECTLY RELEVANT TO NEGATE THE REQUIRED ELEMENT OF MATERIALITY

As outlined in Mr. Akhavan's expert disclosures, Mr. Vardaman will testify, in part, that based on the issuance of federal guidance Issuing Banks may permissively service the cannabis industry and that numerous financial institutions are actively servicing the industry.  *See* ECF No. 168-1 at 6–7.  The way the federal government has applied, interpreted and enforced this guidance, in spite of the lingering federal prohibition on marijuana, and how such guidance has been understood by Issuing Banks is directly relevant to informing how Issuing Banks behave.

While some banks may have policy prohibitions on cannabis transactions, these policies are illusory because the banks are well aware there is no harm or threat of harm in processing cannabis transactions, so they do not actively enforce these policies.  An objectively reasonable bank knows there is no downside risk to processing cannabis transactions.  Because there will be no enforcement actions against them because of existing federal guidance, they can profit from processing these transactions.  That raises the obvious question:  Why would an objectively

14

reasonable bank care about these alleged misstatements if they could process the transactions anyway?

Mr. Vardaman's testimony will support the defense that any alleged misrepresentations by the defendants were incapable of influencing the Issuing Banks' decision to process cannabis transactions.  That is because an objectively reasonable bank can rely on federal guidance, as explained by Mr. Vardaman, in choosing to process these transactions.  The defendants expect to prove at trial that the Issuing Banks were objectively reasonable in allowing its credit and debit card holding customers to use those cards to purchase marijuana,  consistent with federal guidance, including the Cole Memorandum and the simultaneously issued Financial Crimes Enforcement Network ("FinCEN") Guidance on BSA Expectations Regarding Marijuana-Related Businesses, which indicate that banks can permissibly service the cannabis industry in states that elect to legalize such transactions.

This case is akin to *United States v. Banki*, 2010 WL 1875690 (S.D.N.Y. May 10, 2010). There, defendant was charged with making materially false statements to the Office of Foreign Assets Control ("OFAC").  *Id.* at *1.  The court held a defense expert witness, a former director of OFAC, was permitted testify regarding the materiality of the defendant's statements.  *Id.* at *1, 3-4.  In so holding, the court specifically concluded that "in light of OFAC's policy to under-enforce non-commercial family transfers," the expert witness could testify that the defendant's misstatements about  the "identity of the family member making such remittance" would be immaterial.  *Id*. at *4.  Likewise, here, Mr. Vardaman must be permitted to testify that in light of federal guidance and policy, an objectively reasonable bank could process cannabis card transactions, which supports the defense's position on the pivotal issue of materiality.

## V.  MR. VARDAMAN'S TESTIMONY IS RELEVANT TO REBUT EVIDENCE INTRODUCED BY THE GOVERNMENT

The government seeks to prevent any expert testimony regarding the federal government's position on cannabis even though that is the basis for which some of the Issuing Banks and card networks purport to have policies prohibiting cannabis transactions. Contrary to the government's assertions, Mr. Vardaman is not "putting the Department of Justice on trial," his testimony would simply introduce evidence that challenges and casts doubt on the legitimacy of the government's alleged basis that the alleged misstatements were material.  In fact, the government intends to introduce evidence that *specifically refers* to the federal guidance about which Mr. Vardaman would testify.  For instance, the government plans to publish to the jury an internal Issues Brief on Visa Acceptance at Marijuana Dispensaries, dated May 26, 2015, which includes the following summary:

> The banking industry has pushed government agencies to provide guidance on how to oversee bank accounts for businesses that sell marijuana legally under state law. Both Justice Department and the Financial Crimes Enforcement Network (FinCEN) issued guidelines for banks. FinCEN's guidelines stated that each financial institution must make the decision to open, close or refuse an account based on factors specific to each institution. FinCEN clarified how financial institutions can provide services to marijuana-related businesses consistent with their Bank Secrecy Act obligations. DOJ would expect a bank to make sure any marijuana business with an account did not sell pot to minors, is not involved in illegal activities and that the cash flow of that business is what would be reasonably expected. In addition to all the monitoring, the bank would have to file suspicious activity reports with the federal government anytime there was a cash transaction of $10,000 or more. Even so, few, if any, financial institutions have chosen to begin serving marijuana dispensaries even when such businesses are operating legally under state law.

GX2216.

Similarly, based on the 3500 statements the government has provided, several of the government's witnesses intend to testify that card networks prohibit, and Issuing Banks cannot accept, cannabis transactions by credit card *because* it is illegal under federal law.  How the federal government views cannabis banking in states where it is legal is directly relevant to

disputing that point.  There is a distinction between marijuana being a controlled substance under federal law, and the federal government's view when it comes to providing financial services for cannabis-related businesses in states where cannabis is legal.  The government wants the jury to believe because of the former, that is a catchall that the payment industry relies on in prohibiting cannabis transactions.  The defense intends to argue that simply isn't so.

Mr. Vardaman will assist the trier of fact in understanding the federal government's position regarding cannabis banking, the purpose behind guidelines that allow banks to permissibly service the industry, and the effect these guidelines have had on the banking industry.  In testifying about the purpose behind the guidelines, Mr. Vardaman can certainly testify about why these guidelines were put into effect and what they aimed to achieve—such information does not constitute privileged deliberations.  When testifying about the effect of these guidelines, Mr. Vardaman can also rely on publicly available data and statistics from FinCEN regarding the number of financial institutions that service the industry and the lack of enforcement actions against financial institutions for banking cannabis.

Mr. Vardaman is the *only* witness that can assist the jury in understanding and interpreting federal guidance that the government will introduce by reference.  Certainly, the bank and card network witnesses cannot do so.  However, what the government wants to do is strip the defense of any ability to address the federal law which forms the alleged basis of the Issuing Banks' policies by erroneously objecting that expert witness testimony on the topic is irrelevant, improper, privileged and calls for a legal conclusion.

The cases cited by the government in claiming Mr. Vardaman's testimony would usurp the role of the jury are factually distinguishable.  In *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999), the court ruled an expert on the reliability of eyewitness identifications would

have confused the jury's assessment of credibility and usurped their role of determining credibility. In *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992), the expert witness stated "conclusory condemnations" about the defendant's actions. Finally, in *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991), the court found the expert's testimony related directly to the ultimate legal conclusion as to whether the defendant's 13D disclosures complied with the relevant legal requirements. Here, Mr. Vardaman is not usurping the role of the jury. Rather, his testimony is helping the trier of fact to understand the evidence and to determine a fact in issue, materiality. Fed. R. Evid. 702. Thus, his testimony should not be precluded.

## VI. MR. AKHAVAN'S EXPERT WITNESSES OFFER RELIABLE OPINIONS BASED ON EXTENSIVE AND SPECIALIZED EXPERIENCE

### A. Mr. Rankin, Ms. MacGregor and Mr. Vardaman Have Extensive Professional Experience

As outlined in Mr. Akhavan's expert disclosures, all three experts have decades of relevant industry experience that form the bases for their opinions.

Mr. Rankin spent more than 25 years working at all levels of the payment network, from credit card companies (Visa), to merchant member banks and issuing member banks (U.S. Bank and Bank of America). While at Visa, Mr. Rankin's responsibility was managing member relationships for issuing, acquiring and processing members across the Midwest, which included interpreting Visa rules and regulations.

Ms. MacGregor is a senior compliance professional with over 20 years of experience specializing in fields including Global Risk Management. Most recently, Ms. MacGregor served as a senior in-house compliance officer for Oriental Bank in Puerto Rico during the period when cannabis was legalized. While there, she leveraged her past experience working with financial institutions to re-evaluate their risk profiles, integrate technology platforms and design tailored due diligence and reporting policies and procedures, including for high-risk transactions.

Mr. Vardaman has 15 years of senior federal government experience in the enforcement and application of federal laws and policies concerning the Bank Secrecy Act, money laundering, and other financial crimes.  He served with the U.S. Department of Justice ("DOJ") for ten years identifying and addressing threats related to the financial system.  In 2014, while serving as Assistant Deputy Chief for Policy in the DOJ Asset Forfeiture and Money Laundering Section, he drafted the DOJ policy for cannabis banking, known as the Cole Memorandum, and worked closely with FinCEN to draft the simultaneously issued FinCEN Guidance on BSA Expectations Regarding Marijuana-Related Businesses.

As Chief Compliance Officer and Executive Vice President of two different financial technology companies specializing in banking platforms for marijuana-related businesses, he frequently met with financial institutions interested in serving the industry to explain the legal and regulatory landscape surrounding cannabis banking.  He is currently on an advisory board where he gives legal advice regarding providing payment services in certain high-risk industries.  Additionally, as highlighted by the government, Mr. Vardaman will be rejoining the DOJ in the Fraud Section when this trial is completed.

Mr. Vardaman's past, present and near future employment are all relevant to his credentials and credibility.  Especially since the government seems primed to attack his reliability, having noted in their motion *in limine* that he "has not worked in a federal prosecutor's office since 2016 (notably, the year that the charged conspiracy began)."[5]  The government should not be permitted to raise inferences or questions about his credibility while precluding the defense from eliciting his reputable background, including his return to the DOJ.

B.      **Each Expert Will Be Reliably Testifying Based on Their Backgrounds**

---

[5]   The government neglects to mention that there was a change in federal government administration in 2016.

Despite a combined 60 years of experience across the three industries that form the basis for this prosecution—Issuing Banks, card networks and the federal government—the government curiously claims that the defendants have "fallen far short" of demonstrating the reliability of the expert testimony.  ECF No. 168 at 25.  Seeming to acknowledge that all three experts are industry professionals based on their years of experience, the government instead argues the fact that an expert may generally possess "specialized knowledge" to qualify as an expert witness does not automatically render their opinions reliable.  *SEC v. Lipson*, 46 F. Supp. 2d 758, 762 (N.D. Ill. 1998).

However, the government fails to recognize that courts have consistently held the opposite, that "[a]n expert may be qualified to render opinions based on experience alone." *Jordan v. City of Chi.*, 2012 WL 254243, at *3 (N.D. Ill. Jan. 27, 2012); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").  This is why Rule 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000); *accord Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).

Indeed, as discussed in *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 802–03 (N.D. Ill. 2013), the Advisory Committee Notes to Rule 702 provide:  "Some types of expert testimony will not rely on anything like a scientific method....  Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony.  To the contrary, the text of rule 702 expressly contemplates that an expert may be qualified on the basis of

experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Advisory Committee Notes to Fed. R. Evid. 702.

Since all three experts are well-rooted in their respective industry experience, the government instead argues their opinions must be "connected to existing data" to be admissible. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  However, contrary to the government's claims, "expert[] testimony is not unreliable simply because it is founded on his experience rather than on data."  *Metavante Corp.*, 619 F.3d at 761; *see, e.g.*, *Peoples State Bank v. Stifel, Nicolaus & Co., Inc.*, 2013 WL 1024917, at \*5 (S.D. Ind. Mar. 14, 2013) (finding the methodology and reliable-facts-and-data factors of the *Daubert* inquiry "not very helpful" where expert relied principally on twenty-five years of experience in the industry; in such cases, the "relevant reliability concerns ... focus upon personal knowledge or experience") (quoting *Kumho Tire,* 526 U.S. at 150); *Goldberg v. 401 North Wabash Venture LLC*, 2013 WL 212912, at \*5 (N.D. Ill. Jan. 18, 2013) (rejecting defendant's argument that expert's "methodology is unreliable because he applies personal experience and knowledge of industry customs and practices to actions taken by defendants," finding that the expert's opinion is "not inherently unsound if he draws upon his experience and industry knowledge rather than a proven formula, surveys, or established data.").

Here, the experts intend to offer opinion testimony regarding generally-accepted industry standards in the banking and card network industries.  For this kind of testimony, courts have consistently held that experts may rely on their professional experience.  *Baldonado v. Wyeth*, 2012 WL 3234240, at \*3–6 (N.D. Ill. Aug. 6, 2012) (denying *Daubert* challenge to expert who would opine on the standard of care in the pharmaceutical industry where expert "[brought] to bear her experience and training on the issue" and "repeatedly emphasized during her testimony

that her opinions are not subjective, but are instead based on training and experience and having done the same process"); *Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 903–04 (N.D. Ill. 2001) ("[T]estimony on the general standards of care in the industry would come from [the expert's] professional knowledge...  This is classic expert testimony.").

Accordingly, the reliability of each of Mr. Akhavan's experts is well-demonstrated by their background, training, and experience, which afforded them the opportunity to gain specialized knowledge in the industries upon which they will be opining.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the government's motion *in limine* to preclude Mr. Rankin, Ms. MacGregor and Mr. Vardaman from testifying.

Dated: February 23, 2021

ROTHKEN LAW FIRM
*/s/ Ira Rothken*
Ira Rothken
Jared Smith
3 Hamilton Landing
Suite 280
Novato, CA 94949
Telephone: (415) 924-0425
Email: ira@techfirm.net
Email: jared@techfirm.net

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*/s/ William A. Burck*
William A. Burck
Derek L. Shaffer
777 6th Street NW 11th floor
Washington, DC 20005
Telephone: (202) 538-8000
Fax: (202) 538-8100
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemauel.com

Christopher Tayback
Mari F. Henderson
865 S Figueroa Street 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
Email: christayback@quinnemanuel.com
Email: marihenderson@quinnemanuel.com

Sara C. Clark
711 Louisiana St., Ste. 500
Houston, Texas 77002
Telephone: (713) 221-7000
Fax: (713) 221-7100
Email: saraclark@quinnemanuel.com