**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 20-cr-188 (JSR) |
| v. | |
| RUBEN WEIGAND and HAMID AKHAVAN, | |
| Defendants | |

**DEFENDANT RUBEN WEIGAND'S MEMORANDUM OF LAW**
**IN OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE***

## **TABLE OF CONTENTS**

ARGUMENT .................................................................................................................. 1

I.      THE JURY SHOULD HEAR THE ENTIRE RECORDING OF
        DEFENDANT WEIGAND'S POST-ARREST STATEMENT ............................ 1

II.     THE GOVERNMENT IMPROPERLY CHARACTERIZES EVIDENCE
        OF DEFENDANTS' HISTORY IN THE CREDIT CARD PROCESSING
        INDUSTRY AS PROPENSITY EVIDENCE ........................................................ 4

III.    EVIDENCE REGARDING THE DEFENDANTS' "BROADER
        BUSINESS RELATIONSHIPS" ARE UNFAIRLY PREJUDICIAL AND
        LIKELY TO CONFUSE THE JURY AND LENGTHEN THE TRIAL .............. 6

IV.     THE ONLY PURPORTED EVIDENCE OF DEFENDANT WEIGAND'S
        ALLEGED PRIOR BAD ACTS IS IRRELEVANT AND
        INADMISSIBLE ................................................................................................. 10

V.      THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO
        EXCLUDE THE TESTIMONY OF DONALD VILFER AND STEPHEN
        MOTT ................................................................................................................. 14

        A.      Like The Government's Forensic Analyst, Donald Vilfer Is Not An
                Expert Witness And No Further Disclosure Is Required ......................... 14

                (1)     Background ................................................................................. 15

                (2)     Like The Government's Forensic Analyst Jessica Volchko,
                        Donald Vilfer Is Properly Characterized As A Fact Witness ...... 16

                (3)     Vilfer's Testimony Is Directly Relevant To Weigand's
                        Alleged Involvement In the Charged Scheme ............................ 17

        B.      Stephen Mott's Proposed Testimony Is Relevant And Admissible
                Expert Testimony .................................................................................... 18

                (1)     Background ................................................................................. 18

                (2)     Stephen Mott's Proposed Categories Of Testimony Are
                        Relevant And Proper Subjects Of Expert Testimony ................. 19

CONCLUSION ............................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of China, New York Branch v. NBM LLC*,
 359 F.3d 171 (2d Cir. 2004)........................................................................................21

*Beech Aircraft Corp. v. Rainey*,
 488 U.S. 153 (1988)....................................................................................................3

*Deptula v. Rosen*,
 No. 20-CV-2371(JPC)(BCM), 2020 WL 6135793 (S.D.N.Y. Oct. 16, 2020) ........................11

*Fed. Ins. Co. v. Arthur Andersen, LLP*,
 2006 WL 6555232 (N.D. Ill. Jan. 18, 2006) ...........................................................22

*Munoz v. United States*,
 No. 07-CV-2080 ILG, 2008 WL 2942861 (E.D.N.Y. July 28, 2008) ....................................12

*United States v. Amuso*,
 21 F.3d 1251 (2d Cir. 1994)........................................................................................20

*United States v. Garcia*,
 413 F.3d 201 (2d Cir. 2005).......................................................................................20

*United States v. Johnson*,
 507 F.3d 793 (2d Cir. 2007).........................................................................................2

*United States v. Litvak*,
 808 F.3d 160 (2d Cir. 2015)........................................................................................22

*United States v. Nejad*,
 No. 18-CR-224 (AJN), 2020 WL 883500 (S.D.N.Y. Feb. 24, 2020)..............................5, 23

*United States v. Rigas*,
 490 F.3d 208 (2d Cir. 2007)........................................................................................21

*United States v. Vargas*,
 No. 18 CR. 76 (PAC), 2018 WL 6061207 (S.D.N.Y. Nov. 20, 2018) ....................................4

*United States v. Weigand*,
 No. 20-CR-188 (JSR), 2020 WL 5105481 (S.D.N.Y. Aug. 31, 2020)..............................5, 23

**Rules**

Fed. R. Crim. P. 16 ........................................................................................................15

Fed. R. Evid. 106 ................................................................................................................2, 4

Fed. R. Evid. 403 ...................................................................................................................2

Fed. R. Evid. 701 .................................................................................................................20

Fed. R. Evid. 702 .....................................................................................................16, 17, 20

Fed. R. Evid. 901(a) .............................................................................................................11

Defendant Ruben Weigand ("Weigand") respectfully submits this memorandum of law in opposition to the Government's motions *in limine*: (1) to prevent the jury from hearing Weigand's complete, 17-minute post-arrest statement rather than the out-of-context snippets the Government seeks to play, *see* ECF No. 170 ("Gov't MIL"), Section V at 24−28; (2) to preclude evidence that the defendants failed to engage in fraud with respect to other merchants and banks, Gov't MIL, Section VII at 32−34; and (3) to admit certain categories of evidence as direct evidence of the defendants' bank fraud conspiracy, or in the alternative, pursuant to Rule 404(b), Gov't MIL, Section VIII(B)−(C) at 34−48.  Additionally, Weigand opposes the Government's motions *in limine* to exclude the testimony of Weigand's forensic witness, Donald Vilfer, and expert witness, Stephen Mott.  ECF No. 168 ("Gov't Expert MIL").

Defendant Weigand respectfully joins in his co-defendant Hamid Akhavan's ("Akhavan") objections to the Government's motions *in limine*: (1) to preclude evidence or argument that the victim banks purportedly failed to act with sufficient diligence or acted negligently in enforcing policies prohibiting transacting business involving marijuana, Gov't MIL, Section III at 18−22; (2) to preclude evidence or argument regarding whether it was "reasonable" for banks to process marijuana-related transactions, Gov't MIL, Section IV at 22−24; and (3) to preclude cross-examination of cooperating and immunized witnesses, Gov't MIL, Section IX at 51−57.

## **ARGUMENT**

## I.    **THE JURY SHOULD HEAR THE ENTIRE RECORDING OF DEFENDANT WEIGAND'S POST-ARREST STATEMENT**

In Section V of its Memorandum, the Government seeks to prevent the jury from hearing the complete, 17-minute recording of Weigand's post-arrest statement that would provide the jury necessary context for the Government's cherry-picked and misleading excerpts.  Gov't MIL

at 24–28.  For the reasons set forth below and in Weigand's motions *in limine*, ECF No. 172 ("Weigand MIL") at 17–20, Weigand's post-arrest statement should be played for the jury in its entirety.

Early in the interrogation, Special Agent Mahaffey says the following to Weigand:

> "I want to talk to you in, you know, kind of a back and forth and have a conversation about what happened."

Ex. 21 to Gov't MIL, GX 1901-T (2:1-3).  It seems now, the Government is not interested in having the jury hear the "back and forth," but only one side of the conversation, by picking and choosing excerpts of the discussion in a way that would mislead the jury and yield a skewed picture of what happened during the interrogation.

Federal Rule of Evidence 106 is plain and straightforward:  "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  The Second Circuit's interpretation is straightforward as well, requiring that omitted portions of a statement be admitted into evidence "if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (quoting *United States v. Castro*, 813 F.2d 571, 575–76 (2d Cir. 1987)).

In the simplest sense, the jury should be entitled to hear the *entire* recording to understand Weigand's demeanor throughout the interrogation.[1]   Weigand was arrested

---

[1] The entire recording—only about 17 minutes—is not a waste of time, nor an undue delay as contemplated by Rule 403 of the Federal Rules of Evidence.

unexpectedly at an airport *en route* to a vacation in Costa Rica.  He was in the custody of three government agents.  In the recording, the three agents introduce themselves, and Special Agent Mahaffey tells Weigand he is under arrest pursuant to a warrant issued from this Court.  Ex. 21 to Gov't MIL, GX 1901-T (1:1−23).  These are difficult and intimidating circumstances, yet the Government (understandably) does not want the jury to hear this portion of the recording.  The reading of constitutional rights that follows further adds pressure to the interrogative process—the jury should hear this.  *See id.* (2:6−14).

Against this backdrop, Agent Mahaffey's contention that he wants a "back and forth" is important to allow the jury to recognize how Weigand would have understood the ground rules of the interrogation.  The dialogue that follows constitutes this "back and forth."  That discussion was entirely responsive to Agent Mahaffey's questioning and did not constitute an attempt by Weigand to offer self-serving information.  Instead, the questioning was about Weigand's professional background and business activities, all of which provide necessary context to the succeeding portions of the transcript endorsed by the Government.[2]  *See* Ex. 21 to Gov't MIL, GX 1901-T (6:7−13:13).

Towards the end of the interrogation, the tone of the discussion changes from a simple "back and forth" to inculpatory and—in response to accusations by Agent Mahaffey about an email address—Weigand asks for a lawyer:

> SA MAHAFFEY: Like, where have you heard of it? Whose email address is it then? You're connected in that world, right? So whose email address is it if not yours?

---

[2] This is clearly not an end run around hearsay considerations as hearsay is admissible in the context of the completeness doctrine.  *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988).

MR. WEIGAND: I think I need to -- I don't know how to continue this without having (U/I).

SA MAHAFFEY: Without what?

MR. WEIGAND: Without having legal advice, I don't know how to continue it. I don't know what the implications. I've not done anything that -- at least, I don't think that I've done anything that I shouldn't have done or that's illegal, and the fact that. Now it seems that this is -- on this, I really don't know what I should do and -- without having any advice on it.

Ex. 21 to Gov't MIL, GX 1901-T (16:11-23).

Obviously, with continued frustration over being ignored and misunderstood, Weigand seeks counsel.  It is important the jury hears this dialogue, not just because it is part of the "back and forth," but also to avoid a situation where the jury "may assume that no other statements were made . . . " *United States v. Vargas*, No. 18 CR. 76 (PAC), 2018 WL 6061207, at *2 (S.D.N.Y. Nov. 20, 2018).

Federal Rule of Evidence 106 requires fairness when recordings are played for the jury, and, in light of the circumstances here, fairness warrants playing the entire post-arrest statement.[3] The entire recording is only 17-minutes long and thus playing the entire recording will add only a matter of minutes to the length of the trial.

## II.   THE GOVERNMENT IMPROPERLY CHARACTERIZES EVIDENCE OF DEFENDANTS' HISTORY IN THE CREDIT CARD PROCESSING INDUSTRY AS PROPENSITY EVIDENCE

In Section VII of their Memorandum, the Government seeks to exclude all discussion of the defendants' history in the payment processing industry, characterizing such evidence as irrelevant and improper propensity evidence.  Gov't MIL at 32−34.  Besides the inherent

---

[3] The recording can be provided to the Court for review.

dissonance in the Government's own efforts to introduce evidence of the defendants' prior lawful payment processing efforts as relevant to the "broader business relationship" between the defendants and their alleged co-conspirators, *see id.* at 39−40, this argument misses the point. In the cases cited at length by the Government on propensity evidence, *id.* at 33, the defendants sought to argue that because they did X on several other occasions, they did not do Y on this particular occasion. Defendants do not seek to argue that because they operated legitimate payment processing businesses and did not commit bank fraud on other occasions, they were less likely to be involved in an alleged criminal payment processing scheme.

Rather, defendant Weigand seeks to attack an essential element of the Government's case—whether he ***intended*** to: (1) "deceive [a federally insured] bank" and (2) "deprive [the bank] of something of value or to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution." *United States v. Weigand*, No. 20-CR-188 (JSR), 2020 WL 5105481, at *4−5 (S.D.N.Y. Aug. 31, 2020), *as corrected* (Sept. 2, 2020) (internal quotations and citations omitted). In other words, whether "the ***purpose*** of defendants' alleged misrepresentations . . . was so that those misrepresentations would be conveyed to the issuing banks to secure their approval for the transactions." *Id.* at *6 (emphasis added). To the extent defendant Weigand elicits testimony or seeks to introduce evidence regarding his legitimate payment processing efforts, it will be to rebut the Government's assertion that he contemplated the alleged misrepresentations as being capable of influencing decision making by Issuing Banks or causing tangible economic harm to them. *See United States v. Nejad*, No. 18-CR-224 (AJN), 2020 WL 883500, at *2 (S.D.N.Y. Feb. 24, 2020) ("The Government must prove that Sadr knew that it was likely that the alleged fraudulent scheme would cause the victim banks tangible economic harm under a right to control theory of bank fraud under § 1344(1). Sadr, in

turn, may offer evidence and argument to the contrary.").  Indeed, the alleged illegal practices the Government will point to at trial are perfectly legal practices in payment processing industry, including in Europe, where Weigand focuses his business.

Further, defendants' legitimate payment processing activities may serve as necessary impeachment material.  As noted in Weigand's Motions *In Limine*, the Government has designated over 700 "exhibits"—consisting of thousands of constituent files and sub-folders—that were allegedly recovered from Weigand's laptop without intending to call a witness who can testify as to the substance of those documents.  Weigand MIL at 4−8.  Most egregiously, several of the Government's exhibits do not reference Eaze by name and it is not clear from the face of the documents that they even concern the alleged scheme.  *Id.* at 6.  If the Government seeks to introduce such an exhibit and imply that the substance of the document or communication concerns the charged scheme, defendants have the right to rebut that assertion by arguing that the exhibit relates to their other legitimate payment processing activities, unrelated to the charged Eaze scheme.

The defendants should therefore be permitted to introduce evidence regarding their legitimate and lawful experience in the payment processing industry as it relates to their intent and knowledge (or lack thereof), and to the extent it serves as impeachment material to rebut the Government's mischaracterization of innocuous documents.

## III.   EVIDENCE REGARDING THE DEFENDANTS' "BROADER BUSINESS RELATIONSHIPS" ARE UNFAIRLY PREJUDICIAL AND LIKELY TO CONFUSE THE JURY AND LENGTHEN THE TRIAL

In Section VIII(B) of its Memorandum, the Government seeks to offer evidence of the "broader business relationship between defendants and other co-conspirators."  Gov't MIL at 39−44.  Setting aside the irony that, in the same submission, the Government seeks to exclude evidence of Weigand's completely legitimate work in the payment processing space, it is clear

that what the Government is, in fact, seeking to do is improperly tarnish Weigand in the eyes of the jury by seeking to connect him to payment processing for the pornography industry and a scandal-ridden German bank. *See id.* at 39−40. The Government's own recitation of the evidence it seeks to admit is so obtuse, *see id.* at 41−44, it makes clear that in addition to the unfair prejudice, this evidence will confuse the jury, lengthen the trial, and invite unwarranted speculation.

The Government's summary of the evidence at issue confirms that the charged scheme originated not with Weigand, but instead with the Government's principal cooperating witness, CW-1, and an uncharged co-conspirator, CC-1. *See* Gov't MIL at 39. The Government then describes a series of conversations that ostensibly took place in 2017 or earlier, in which Weigand was not involved. *Id.* at 39−40. In these discussions, CW-1 and CC-1, according to the Government, discussed both "adult business traffic" and Eaze-related "traffic." *Id.* at 40.

There is no evidence of Weigand doing anything at all in connection with payment processing for Eaze until after he attended a meeting in California on January 17, 2018. The Government fails to point to any evidence to support its contention that Weigand became involved with Eaze's processing "in or about 2017." *See* Gov't MIL at 44. Any evidence of discussions CW-1 claims to have had with CC-1 about processing for the porn industry during a period when Weigand had no involvement in the charged scheme offers no probative value as to Weigand and poses significant risk of unfair prejudice to him. Such evidence should be excluded. Further, for the reasons set forth in Weigand's Motions *In Limine*, at 2−3, all references to pornography or adult credit card payment processing should be excluded as against either defendant.

The Government also seeks to introduce evidence about a "high level representative" of a "foreign acquiring bank," ██████████████████████████████████████████████ ████████████████████████████████████████████. *See* Gov't MIL at 40.  This evidence, too, is highly prejudicial and, as to Weigand, offers no probative value.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ ███ █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ █████ ████ ████████████████████████████

████████████████████████████████

       ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████.

The Government's discussion of chargebacks is rife with speculation and risk of juror confusion. "A chargeback is a charge that is returned to a payment card after a customer successfully disputes an item on their account statement or transactions report." Troy Segal, *Chargeback*, INVESTOPEDIA (last updated Oct. 30, 2020). Customers dispute charges for many reasons, including that they never received the items they paid for, they were mistakenly charged twice, or they do not recognize a charge, among others. *Id.* Efforts to limit chargebacks are not only a legitimate practice in the payment processing industry, but a necessary one in order to comply with Visa and MasterCard's rules. *See* Dispute Management Guidelines for Visa Merchants, at 21 (last updated March 19, 2018) ("Once notified of a merchant with excessive disputes, acquirers are expected to take appropriate steps to reduce the merchant's dispute activity."); *see also* JPMorgan Chase, MasterCard Excessive Chargeback – Merchant Program Guide (last updated Dec. 2019) ("It is imperative that appropriate measures are taken to reduce chargebacks and prevent fine assessments.").

The Government's discussion about minimizing chargebacks with regard to the "adult traffic" should be excluded for the reasons set forth above and in Weigand's Motions *In Limine*. *See* Weigand MIL at 2−3. Marijuana is entirely unique, given its legal status, and discussion of complex, technical issues pertaining to chargebacks in the adult industry would lengthen the trial and sow confusion. To the extent there was discussion about reducing chargebacks in connection with the Eaze's traffic, there is no basis for the Government to portray any such efforts or discussions as nefarious. Furthermore, the issue of chargebacks is collateral to the

charged scheme in the Indictment, which alleges that the defendants helped establish offshore merchants to deceive Issuing Banks into believing these merchants were "involved in selling legitimate goods" instead of marijuana.  Indictment at ¶¶ 2, 13.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████  *See, e.g.,* Ex. A to the Declaration of Michael Gilbert in Support Weigand's Opposition to the Government's Motions *In Limine*, GX 4004-A Excerpt at 82−83.  The Government's reference to Weigand having an "open backchannel" to an acquiring bank is, thus, as inflammatory as it is puzzling.  *See* Gov't MIL at 41−42.

## IV.  THE ONLY PURPORTED EVIDENCE OF DEFENDANT WEIGAND'S ALLEGED PRIOR BAD ACTS IS IRRELEVANT AND INADMISSIBLE

In Section VIII(C) of its Memorandum, the Government points to a single email from March 2016, apparently between Weigand and CC-2, as evidence of the roots of the alleged conspiracy.  Gov't MIL at 44−48.  The March 2016 Email concerns a "Software Program" known as Web Shield, which the Government alleges the defendants and their co-conspirators used "in order to address and obscure . . . red flags from inquisitive banks."  *Id.* at 45.  It contends that the March 2016 Email "makes manifest Weigand's direct involvement in the bank fraud scheme by displaying both his knowledge of the steps that needed to be taken to avoid detection by banks and his willingness to undertake those efforts."  *Id.* at 46.

The March 2016 Email does no such thing.  To the contrary, the Government has taken a perfectly benign email—which predates Weigand's involvement in the charged scheme by nearly two years—out of context and attempted to draw entirely unsubstantiated inferences to suggest that the conduct described in the Email "follows precisely the same pattern as the

10

charged bank fraud conspiracy."  *Id.*  It does not, and the March 2016 Email is entirely irrelevant to Issuing Banks in the United States—the alleged victims of the charged scheme.

Moreover, the Government has no witness to interpret the email or place it context:  the only individuals on the Email are Weigand and CC-2, whom the Government has not listed as a witness.  For the reasons set forth in Weigand's motions *in limine*, most notably the absence of any witness capable of elucidating its substance, the Court should exclude the March 2016 Email, GX 1684, as irrelevant, unfairly prejudicial, and likely to confuse the jury.  *See* Weigand MIL at 6−8 (seeking to exclude "communications that on their face do not concern Eaze").

Even if the Government could authenticate the March 2016 Email, which it cannot,[4] there is nothing in the body of the Email that clearly connects it to the charged scheme.  There is no reference to Eaze, to phony merchants, or proxy merchants.

Regardless of whether the Government believes that the Email presaged the charged scheme, without the testimony of CC-2, the Government cannot connect the dots for the jury.  As defendant Weigand explained in his motions *in limine*, an FBI agent may at most testify that he found the March 2016 Email on defendant Weigand's laptop, but the agent cannot "usurp the role of the jury by dictating to it what inferences to draw from the ambiguous and facially

---

[4] The Government has not designated the purported recipient of the March 2016 Email—CC-2—as a witness at trial and will be unable to authenticate the Email through other means.  The Email was allegedly recovered from defendant Weigand's laptop following his arrest.  To admit a document at trial, "the proponent must produce evidence sufficient to support a finding that the item is what its proponent claims it is."  Fed. R. Evid. 901(a).  "With regard to emails . . . this is ordinarily not a difficult task, but it does require a specific attestation, by a person with *personal knowledge* of the communications, that they are authentic," meaning "that they were actually sent" by the purported author to the purported recipient and "that any printout or other version submitted to the court is a true copy of the original electronic messages."  *Deptula v. Rosen*, No. 20-CV-2371(JPC)(BCM), 2020 WL 6135793, at *1, n.1 (S.D.N.Y. Oct. 16, 2020) (emphasis added).  There does not appear to be any trial witness with *personal knowledge* capable of authenticating the Email.

innocent statements made by [defendant Weigand]." *Munoz v. United States*, No. 07-CV-2080

ILG, 2008 WL 2942861, at *21 (E.D.N.Y. July 28, 2008); *see* Weigand MIL at 4−5.

More importantly, in its moving papers, the Government has taken the March 2016 Email

entirely out of context in a way certain to mislead the jury, especially without the explanatory

testimony of CC-2 or some other witness with relevant knowledge.  It is far from "direct

evidence of the charged bank fraud conspiracy" and not the smoking gun the Government

contends it is.  *See* Gov't MIL at 46.  Rather, the Email describes the legitimate use of a standard

merchant underwriting tool that *acquiring* banks and other parties involved on the acquiring side

(ISOs, PSPs, Payment Facilitators)—not the alleged victim Issuing Banks—used to evaluate

merchants.  The Email describes the mechanics of Web Shield, including the information it

gathers (*i.e.*, including the "phone numbers" and "support pages" of merchants), without in any

way laying out a blueprint for the charged conspiracy.

Web Shield markets itself as a provider of "Merchant On-Boarding & Monitoring

Solutions."  It advertises itself as a tool to "help ***acquiring*** banks" with the merchant

underwriting process by aggregating information for them about the merchants they are

evaluating. Ex. B at 1 (Screenshots of Web Shield's Website) (emphasis added).  It gathers and

presents publicly available information on a given merchant, including whether that information

suggests that the merchant is out of step with certain standard protocols.  *Id.* at 3.  For example,

as indicated in the March 2016 Email, merchants with more than one phone number or support

page on the Internet may trigger additional steps in the underwriting process.  Although the Web

Shield program highlights these issues for acquiring banks, it is ultimately the acquiring bank's

decision whether to onboard a given merchant based on its own risk appetite and profile,

irrespective of recommendations by third parties, including third party software providers like

Web Shield.  *See id.* at 7.  Critically, contrary to the Government's suggestion, Web Shield is entirely a merchant acceptance tool and does not target *issuing* banks or their "compliance programs."  *See id.*; Gov't MIL at 46.

In the March 2016 Email, defendant Weigand appears to describe Web Shield, the information it gathers, and the merchant diligence process.  But there is no indication, contrary to the Government's assertions, of an intent "to abuse the transaction processing process" or deceive any bank, whether an acquiring bank or an issuing bank.  Gov't MIL at 47.

Weigand's apparent statements, when understood with relevant context, are benign and entirely descriptive of Web Shield and the merchant onboarding process.  He appears to note that he is using Web Shield to gain a better understanding of what information the tool shares with acquiring banks.  Ex. B to Gov't MIL (GX 1684) ("We're checking entities with Webshield [sic] before boarding as our banks are using the tools as well and we need to know what they detect.").  He then highlights some of the information shared with banks.  *Id.* ("Webshield [sic] is already detecting related entities for the same phone numbers, support pages, etc. . . . [which] results in bad scores for the corps.").

Without context, the Government assumes that Weigand is devising ways to deceive banks and implies that his statement regarding "related entities [with the] same phone numbers, support pages, etc." refers to phony merchants or proxy merchants.  Gov't MIL at 46.  There is no basis for that assumption.  More importantly, the Government has no witness who can explain the March 2016 Email or substantiate the Government's expedient but baseless interpretation of the Email.  For the reasons above, the March 2016 Email (GX 1684) is irrelevant to the charged conspiracy, unfairly prejudicial, and will only serve to confuse and mislead the jury.  Defendants respectfully request that GX 1684 be excluded at trial.

## V.     THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO EXCLUDE THE TESTIMONY OF DONALD VILFER AND STEPHEN MOTT

In the Government's Motion *in Limine* to Preclude Defendants' Experts, the Government seeks to exclude the testimony of defendant Weigand's forensic analyst, Donald Vilfer, and his expert witness, Stephen Mott.  ECF No. 168 ("Gov't Expert MIL").  For the reasons set forth below, the Court should deny the Government's Motion *in Limine* and permit the testimony of Donald Vilfer and Stephen Mott.

### A.     Like The Government's Forensic Analyst, Donald Vilfer Is Not An Expert Witness And No Further Disclosure Is Required

Defendant Weigand intends to call his forensics witness, Donald Vilfer ("Vilfer"), at trial to testify that, based on his own analysis, the metadata associated with hundreds of documents allegedly found on Weigand's laptop and designated as exhibits by the Government were downloaded to Weigand's laptop *after* the Indictment alleges that the charged conspiracy had ended.  The Government requests that the Court preclude Vilfer from testifying for defendant Weigand's purported failure to provide the Government with sufficient "bases and reasons" for Vilfer's testimony.[5]  Gov't Expert MIL at 25−26.  Although Weigand initially disclosed Vilfer as a potential expert witness, Weigand's counsel has since advised the Government on multiple occasions that it no longer considers Vilfer "an 'expert witness' for whom additional disclosures are required under the Federal Rules, beyond those already provided to the Government."  *See* Ex. D to Gov't Expert MIL at 2.  Weigand's disclosures regarding Vilfer's testimony go above

---

[5] The Government also contends that "Weigand's counsel has not committed as to whether or not they would seek to introduce the drive."  Gov't Expert MIL at 7.  This concern is moot:  Counsel for Weigand chose not to include the files on the USB on its defense exhibit list, produced to the Government on February 2, 2021, because the metadata associated with the "exhibits" identified as "Documents from Weigand Laptop" is sufficient to establish their source, and offering the drive into evidence would be cumulative.

and beyond those required for fact witnesses, including those provided by the Government for its own forensics witness, CART Analyst Jessica Volchko.

### (1) Background

On November 3, 2020, the Government provided the defendants with their preliminary exhibit list, which included more than 700 "exhibits" identified as "Documents from Weigand Laptop." It became apparent to the defense—based on a review of the exhibit list and the forensic image of his Laptop—that an external, USB drive shared with Weigand was "the source of the materials identified under the 1800 series on the Government's preliminary exhibit list . . . [and] may be the source of other materials the Government located on Mr. Weigand's Laptop (*i.e.*, 1000 Series–1700 Series)." Ex. C to Gov't Expert MIL at 2 (Weigand's Supplemental Disclosure of Potential Defense Expert); *see also* Weigand MIL at 11−12.

Out of an abundance of caution and mindful of the (then) upcoming January 25, 2021 trial date, on December 21, 2020, defendant Weigand issued a "Supplemental Disclosure of Potential Defense Expert" advising the Government "that he ***may*** call Donald E. Vilfer" to provide testimony concerning "the contents of three electronic devices seized from Mr. Weigand . . . along with Weigand's use of those devices[,]" based on a review of forensic images of those devices produced by the Government and a separate review of "[a] USB drive that appears to be the source of [certain] materials" located on Weigand's Laptop. *Id.* at 1−2 (emphasis added) (citing Fed. R. Crim. P. 16). Weigand's disclosure further set forth Vilfer's qualifications, bases for his testimony, and a preview of his expected testimony. *See generally id.*

Upon further reflection, it became clear to defendant Weigand that Vilfer was more appropriately characterized as a fact witness. In particular, the Government advised Weigand that it intends to call "an FBI analyst and/or Investigative Analyst with the United States Attorney's Office for the Southern District of New York," identified as CART Analyst Jessica

Volchko ("Volchko"), to testify about "forensic searches and analyses of electronic devices that were seized from the defendants and others."  Ex. C (Nov. 3, 2020 Gov't Expert Notice). Critically, the Government advised the defense that Volchko's "expected testimony would ***not*** constitute expert testimony under Federal Rules of Evidence 702, 703, or 705."  *Id.* (emphasis added).  Accordingly, based on the highly comparable nature of their expected testimony and the bases for their testimony (*i.e.*, a review of forensic images of Weigand's devices), Weigand's counsel notified the Government in a January 19, 2021 email that Vilfer "is likewise not an 'expert witness' for whom additional disclosures are required under the Federal Rules, beyond those already provided to the Government."  Ex. D to Gov't Expert MIL at 2.  Weigand's counsel reaffirmed its position on a February 12, 2021 phone call with the Government.  Gov't Expert MIL at 7.

Notwithstanding Weigand's repeated notice to the Government that he does not intend to call Vilfer as an expert witness, the Government now seeks to preclude Vilfer's testimony on the basis that it fails to comply with expert witness notice requirements.  *Id.* at 25−26.

### (2)  Like The Government's Forensic Analyst Jessica Volchko, Donald Vilfer Is Properly Characterized As A Fact Witness

Like Volchko, who will purportedly testify "regarding forensic searches and analyses of electronic devices that were seized from the defendants and others," the scope of Vilfer's testimony is limited to "the contents of the devices seized from Mr. Weigand based on his analysis of forensic images of those devices" and a USB drive that "appears to be the source of" hundreds of documents the Government allegedly located on Weigand's laptop and designated as exhibits.  Ex. D to Gov't Expert MIL at 2.

As the Government explained in its own expert notice, because "the focus of their testimony will be on what they found on the Devices, rather than any area of specialized

knowledge on which they relied in conducting their examinations," Vilfer's testimony, like Volchko's, does not constitute expert testimony.[6]  Ex. C (Nov. 3, 2020 Gov't Expert Notice) (citing *United States v. Berry*, 318 F. App'x 569, 569 (9th Cir. 2009) (agent's testimony not expert testimony where he "simply testified to what he found on the [defendant's] hard drive . . . , without expressing an opinion that required specialized knowledge or offering insight beyond common understanding"); *United States v. Scott-Emuakpor*, 2000 WL 288443, at *12 (W.D. Mich. 2000) ("The question before the Court at this time is not whether these witnesses have the expertise, for example, to develop sophisticated software programs. The question is whether they have the skill to find out what is on a hard drive or a zip drive. Apparently, they have this skill because they determined what was on the drives. By analogy, a person need not be an expert on English literature in order to know how to read.")).

Because Vilfer's testimony is confined to his own review of forensic images of Weigand's devices and the USB drive, he is a fact witness for whom additional "expert" disclosures are not required, contrary to the Government's position.  However, should the Court determine that Vilfer is an expert witness, Weigand is prepared to qualify him as such under Federal Rule of Evidence 702.

### (3) Vilfer's Testimony Is Directly Relevant To Weigand's Alleged Involvement In the Charged Scheme

To the extent the Government challenges the relevancy of Vilfer's testimony, his analysis of Weigand's devices and the USB drive is directly relevant to Weigand's alleged involvement in the charged scheme.  As set forth in Weigand's Motions *In Limine*, the metadata associated with hundreds of documents allegedly found on Weigand's laptop and designated as exhibits by the Government "proves that they were downloaded to defendant Weigand's laptop in August

---

[6] Vilfer previously supervised the FBI Computer Forensics Team (CART) where Volchko currently works.  *See* Donald E. Vilfer, JD, CFE, Ex. C to Gov't Expert MIL at 4.

2019, from a USB flash drive, after the Indictment alleges the charged conspiracy had ended." Weigand MIL at 11.  If the Government seeks to introduce any of those exhibits at trial, Vilfer's testimony will be critical in refuting any assertion by the Government that the existence of such documents on Weigand's laptop is probative of his involvement in the charged scheme.

### B.  Stephen Mott's Proposed Testimony Is Relevant And Admissible Expert Testimony

The Government seeks to preclude the proposed expert testimony of Stephen Mott ("Mott") as irrelevant, duplicative of the Government's anticipated lay witnesses, unreliable, and for usurping the jury's function.  *See* Gov't Expert MIL (ECF No. 168).  For the reasons set forth below, Mott's proposed expert testimony is relevant, reliably based on his impressive experience in the card payment processing industry, and a proper subject of expert testimony.[7]

#### (1) Background

On November 3, 2020, defendant Weigand provided notice to the Government that he intends to call Mott to provide expert testimony regarding certain aspects of credit card payment processing.  Ex. B to Gov't Expert MIL.  As set forth in Weigand's disclosure, Mott's expected testimony includes the following:

- the mechanics of credit and debit card transactions, including the roles of the various participants in those transactions;

- the concerns and operating parameters of Issuing Banks, including the factors that are material and immaterial to them when determining whether to approve or decline credit and debit card transactions;

---

[7] The Government also seeks to exclude the testimony of defendant Akhavan's card processing expert, Jeff Rankin.  Weigand joins in Akhavan's opposition to the Government's motion *in limine* to preclude defendant Akhavan's experts from testifying.

- non-secure e-commerce transactions, including the associated interchange fees paid to Issuing Banks [and] chargeback liability for online transactions; and

- the standards and protocols employed by Visa and MasterCard when determining their membership in the United States and abroad, Visa and MasterCard's approach to international transactions, and the ways in which they oversee and manage the integrity of the global payments system.

*Id.* at 3.

Mott's testimony regarding the above topics is based on his "more than three decades of experience in online and mobile transactions, debit and credit networks, authentication and security technologies, and emerging alternative payments." *Id.* at 1.  Of particular relevance to this case, Mott served as MasterCard's Senior Vice President of Electronic Commerce and New Ventures for three years from 1995 to 1998, where his responsibilities included "creating a new electronic security protocol and aiding member banks around the world to use the Internet as a safe new delivery channel for financial products." *Id.*  Since his tenure at MasterCard, Mott has worked as an industry consultant for a variety of actors in the payment processing industry and was elected to serve on the steering committee for the Federal Reserve's recent Secure Payments Task Force, among other prestigious posts. *Id.*

For the same reasons set forth in Defendant Akhavan's opposition to the Government's motion *in limine* to preclude expert testimony, Mott's extensive experience in the card payment processing space provides a reliable basis for admitting his expert testimony.

### (2) Stephen Mott's Proposed Categories Of Testimony Are Relevant And Proper Subjects Of Expert Testimony

The Government seeks to exclude Mott's testimony because it purportedly concerns "facts that are within the ken of the average juror's understanding, including based on the

anticipated testimony of lay witnesses with personal knowledge of the relevant facts."  Gov't Expert MIL at 10.  The Government asks the defendants to defer blindly to "[t]he Government's percipient witnesses [who] will address these concepts."  *Id.* at 11.  To ensure that its witnesses are the only witnesses who will testify on these subjects (and to disguise its own failure to properly designate certain of its witnesses as experts), the Government creates an illusory dichotomy between defendants' proposed expert testimony and the Government's purported lay witnesses.  For the reasons discussed below, to the extent that the testimony of the Government's banking and credit card industry witnesses overlaps with Mott's testimony, it is because the Government's "percipient" witnesses are expert witnesses masquerading as lay witnesses, not the other way around.[8]  *See generally* Defendant Akhavan's Motion *In Limine* #4 (ECF No. 161).

*First*, Mott's proposed testimony concerning the mechanics of credit and debit card transactions, including the roles of the various participants in those transactions, is precisely the type of "technical[] or other specialized knowledge" the "admissibility [of which] must be determined by reference to Rule 702, not Rule 701."  *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005).  The Government seeks to preclude Mott's testimony on this topic, arguing that such facts "are within the ken of the average juror's understanding" and will be covered by the Government's purported "lay witnesses with personal knowledge of the relevant facts."  Gov't Expert MIL at 10.  The Jencks Act material makes clear that the Government intends for its witnesses from Visa (Martin Elliot) and MasterCard (John Verdeschi) to testify about all facets of the global four-party payment system, including the roles and responsibilities of the card network, the issuer, the acquirer, and the merchant.  Such testimony from Elliot and Verdeschi

---

[8] Even assuming that the Government's witnesses are true lay witnesses, the fact that their testimony may overlap with Mott's testimony is not a ground for excluding Mott's expert testimony.  *See United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994) (admitting expert testimony where it "overlapped to a degree" with the testimony of two fact witnesses).

would go beyond the witness's own "perceptions" and is "not a product of his investigation, but rather reflect[s] specialized knowledge he has because of his extensive experience" in the industry, making him "an expert in lay witness clothing." *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181−82 (2d Cir. 2004).

      ***Second***, Mott's proposed testimony regarding the concerns and operating parameters of Issuing Banks—particularly the factors that are material and immaterial to them when determining whether to approve or decline credit and debit card transactions—is, by the Government's own logic, fertile ground for expert testimony. *See* Gov't Expert MIL at 17−18. A misrepresentation is material when it is "***reasonably likely*** to influence the [decisionmaker] in making a determination required to be made." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (emphasis added). *See also* Government's Memorandum of Law in Support of Circle Internet Financial LLC's Motion to Quash (ECF No. 147) at 9 ("A material fact is one that you would expect to be of concern to a ***reasonable and prudent person*** . . . It does not matter whether the [target] actually relied on the misrepresentation or omission." (emphasis added) (quoting *United States v. Cherico*, Oct. 31, 2011 Tr. at 1498:1-14)). Out of the more than one-thousand alleged victim banks,[9] the Government has handpicked only four bank witnesses (Actor's Federal Credit Union, Bank of America, Citibank, and Wells Fargo) to testify regarding their complex compliance-related policies and procedures.[10]

      If Weigand is not permitted to introduce Mott's expert testimony regarding the concerns and operating parameters of Issuing Banks, he "would be left only with the 'victims' of his

---

[9] On June 22, 2020, the Government provided defendants with a non-exhaustive list of 1,095 U.S. Issuing Banks associated with individuals who made MasterCard and Visa credit card purchases from Eaze during the relevant period.

[10] In total, the Government has designated six witnesses from financial institutions: four bank witnesses and two records custodians.

conduct as sources of potential testimony on this issue, an odd limitation where the jury is to evaluate materiality in an objective manner." *United States v. Litvak*, 808 F.3d 160, 183–84 (2d Cir. 2015).  Because it is not feasible to parade even a small fraction of the Issuing Banks before the jury, Mott, in his capacity as an expert witness, "may properly testify as to 'the customs and standards of an industry, and [] opine as to how a party's conduct measured up against such standards." *Fed. Ins. Co. v. Arthur Andersen, LLP*, 2006 WL 6555232, at *3 (N.D. Ill. Jan. 18, 2006) (quoting *Lippe v. Bairnco Corp.*, 2002 WL 15630, at *2 (S.D.N.Y. Jan. 7, 2002)).  Such testimony would not "usurp[] the jury's function by rendering an opinion on an ultimate legal conclusion."  Gov't Expert MIL at 26−27 (quotations omitted).  Mott's testimony is more nuanced than instructing the jury as to whether the defendants' alleged misrepresentations were material; his testimony would explain the factors that Issuing Banks consider when determining whether to approve or decline credit and debit card transactions, something the Government seeks to have its own lay witnesses do.

  ***Third***, Mott's proposed testimony concerning non-secure e-commerce transactions, including the associated interchange fees paid to Issuing Banks and chargeback liability for online transactions, is also a proper subject of expert testimony.  The Government argues that such testimony "has no bearing on whether the defendants conspired to commit bank fraud." Gov't Expert MIL at 16.  To the contrary, it bears directly on the issue of materiality.  As the Court explained in its recent order regarding the third party subpoena to Circle Internet Financial, Inc., the defendants' theory of materiality is "not that banks are lackadaisical in their enforcement [of their marijuana policies], but rather that banks *do not care* about whether their cardholders are purchasing marijuana (at least in states where that is legal)."  Mem. Order at 10 (Feb. 20, 2021) (emphasis in original).  As Mott's proposed testimony on this topic would show,

one of the reasons Issuing Banks do not care about the marijuana-related transactions processed through Eaze (which the jury is free to accept or reject) is that interchange fees—referring to the fee the acquiring bank pays the issuing bank for every card transaction—are higher for non-secure e-commerce transactions such as those processed on the Eaze platform.

*Finally*, Mott's proposed testimony concerning Visa and MasterCard's standards and protocols for determining their membership in the United States and abroad, their approach to international transactions, and the ways in which they oversee and manage the integrity of the global payments system all serve to inform the jury of defendants' alleged approach to card payment processing for Eaze. *See* Gov't Expert MIL at 19. As discussed above in Section II, the Government bears the burden of proving that Weigand intended to deceive Issuing Banks in the United States and deprive those banks of something of value. *United States v. Weigand*, 2020 WL 5105481, at *4−5. Weigand is therefore permitted to offer his own testimony rebutting the Government's assertion that his actions evince deception. *See United States v. Nejad*, 2020 WL 883500, at *2. Mott's proposed testimony, for example, could rebut the Government's assertion that the use of offshore merchants and proxy merchants in the alleged scheme is probative of the defendants' intent to deceive Issuing Banks in the United States. As Mott would be willing to testify, there are perfectly legal and acceptable reasons that someone involved in the payment processing industry in Europe, like defendant Weigand, would choose to utilize proxy merchants and offshore merchants—which are not "offshore" for Weigand himself.

For the reasons set forth above, the Court should permit Stephen Mott's expert testimony and preclude the Government's disguised expert witnesses from testifying to matters that go beyond their personal knowledge.

## <u>CONCLUSION</u>

For the foregoing reasons and those set forth in Defendant Akhavan's objections to the Government's Motions *In Limine* and Motion *in Limine* to Preclude Defendants' Experts, ECF Nos. 168 and 170, defendant Weigand respectfully requests that the Court deny the Government's Motions *In Limine* in their entirety.


Dated:  New York, New York
        February 23, 2021

Respectfully submitted,

DECHERT LLP

By: */s/ Michael J. Gilbert*

Michael J. Gilbert
Shriram Harid
Steven Pellechi
Amy Lesperance
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Michael.gilbert@dechert.com
Shriram.harid@dechert.com
Steven.pellechi@dechert.com
Amy.Lesperance@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional
Corporation
1 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90071
Michaelartan@yahoo.com

*Attorneys for Defendant*
*Ruben Weigand*

24