UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

Hamid Akhavan,
    a/k/a "Ray Akhavan,"

-and-

Ruben Weigand,

        Defendants.

S3 20 Cr. 188 (JSR)

# THE GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE*

AUDREY STRAUSS
United States Attorney
Southern District of New York

Nicholas Folly
Tara M. La Morte
Emily Deininger
Assistant United States Attorneys

- Of Counsel -

## TABLE OF CONTENTS

I. CERTAIN EVIDENCE CONCERNING PAYMENT PROCESSING OF
PORNOGRAPHY AND ONLINE GAMBLING TRANSACTIONS IS RELEVANT
AND NOT UNFAIRLY PREJUDICIAL ............................................................. 1

II. REFERENCES TO DEFENDANTS' WEALTH ARE RELEVANT AND NOT
UNFAIRLY PREJUDICIAL ............................................................................. 3

III. TELEGRAM CHATS AND WHATSAPP CHATS CONCERNING THE
DEFENDANTS, AND EMAILS INVOLVING EUPROCESSING.COM ARE
AUTHENTIC AND HIGHLY PROBATIVE ..................................................... 5

IV. AKHAVAN'S MOTION TO PRECLUDE THE USE OF SUPPOSEDLY
PREJUDICIAL TERMS SHOULD BE DENIED ............................................ 11

V. AKHVAN'S MOTION TO EXCLUDE QUANTUM SOLUTIONS AND
MASTERCARD DOCUMENTS SHOULD BE DENIED ............................... 15

VI. TESTIMONY CONCERNING POLICIES AND PAYMENT PROCESSING
OPERATIONS ARE APPROPRIATE SUBJECTS OF LAY WITNESS
TESTIMONY AND ACCORDINGLY THE COURT SHOULD REJECT
AKHAVAN'S MOTION *IN LIMINE* TO PRECLUDE "DISGUISED EXPERT
TESTIMONY" ............................................................................................... 19

VII. AKHAVAN'S MOTION TO REQUIRE THE GOVERNMENT TO PROVE THE
PREREQUISITES FOR ADMITTING COCONSPIRATOR STATEMENTS
OUTSIDE THE PRESENCE OF THE JURY SHOULD BE DENIED ........................... 21

VIII.   THE GOVERNMENT SHOULD NOT BE PRECLUDED FROM INTRODUCING

      EVIDENCE REGARDING THE AMOUNT OF CREDIT CARD

      TRANSACTIONS PROCESSED BY THE DEFENDANTS OR THE

      SETTLEMENT OF THOSE FUNDS ............................................................................ 27

IX.   AKHAVAN'S MOTION TO EXCLUDE EVIDENCE RELATING TO HIS PRIOR

      CRIMINAL CONVICTIONS IS PREMATURE ............................................................ 29

X.   WEIGAND'S MOTION TO EXCLUDE DOCUMENTS AND

      COMMUNICATIONS RECOVERED FROM HIS LAPTOP ABSENT A WITNESS

      TO TESTIFY TO THEIR SUBSTANCE SHOULD BE DENIED .................................. 31

XI.   WEIGAND'S MOTION TO EXCLUDE MATERIALS PURPORTEDLY

      DOWNLOADED TO THE WEIGAND LAPTOP AFTER THE CHARGED

      CONSPIRACY ENDED SHOULD BE DENIED ........................................................... 34

XII.   THERE IS NO BASIS TO INTRODUCE ADDITIONAL PORTIONS OF

      WEIGAND'S POST-ARREST STATEMENT ................................................................ 35

XIII.   CONCLUSION ............................................................................................................ 38

# TABLE OF AUTHORITIES

Cases

*Bourjaily v. United States*, 483 U.S. 171, 175 (1987) .................................................. 22

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) ...................................................... 28

*Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ............................................. 28

*Costantino v. Herzog*, 203 F.3d 164, 174-75 (2d Cir. 2000) .................................... 12, 28

*Crawford v. Washington*, 541 U.S. 36, 51 (2004) .......................................................... 9

*Cueva v. State*, 339 S.W.3d 839, 864 (Tex. App. 2011) ................................................ 14

*Elsevier B.V. v. UnitedHealth Group, Inc.*, 784 F. Supp. 2d 286, 292 (S.D.N.Y. 2011) ............... 6

*Haywood v. Portuando*, 288 F. Supp. 446, 472 (S.D.N.Y. 2003) ................................. 23

*In re Homestore.com, Inc.*, No. CV 01-11115 RSWL CWX, 2011 WL 291176, (C.D. Cal. Jan. 25, 2011) ........................................................................................................ 13

*Loughrin v. United States*, 573 U.S. 351, 363 (2014) .................................................. 15

*Tollefson v. Stephens*, No. SA:14-CV-144-DAE, 2014 WL 7339119, at *6 (W.D. Tex. Dec. 23, 2014) ........................................................................................................ 13

*United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) .......................................... 7

*United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ....................................... 26

*United States v. Beverly*, 5 F.3d 633, 639 (2d Cir. 1993) ............................................ 29

*United States v. Bourjaily*, 483 U.S. 171 (1987) .............................................. 9, 22, 25

*United States v. Browne*, 834 F.3d 403, 413-15 (3d Cir. 2016) ...................................... 7

*United States v. Cuti*, 720 F.3d 453, 457-61 (2d Cir. 2013) ........................................ 20

*United States v. Dawson*, 425 F.3d 389, 392-93 (7th Cir. 2005) .................................... 8

iii

*United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001) ................................................... 23, 24

*United States* v. *Diaz*, 176 F.3d 52, 87 (2d Cir. 1999).................................................................. 23

*United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) ........................................................ 26

*United States* v. *Farhane*, 634 F.3d 127, 161 n. 35 (2d Cir. 2011) ........................................... 23

*United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) ................................................ 28, 33

*United States* v. *Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002)............................................. 24

*United States v. Gasperini*, 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017), aff'd 729 F.

App'x 112 (2d Cir. 2018)........................................................................................................ 13

*United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969) (Friendly, J.) ...................................... 24

*United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) ......................................................... 22

*United States v. Green*, 887 F.2d 25, 27-28 (1st Cir. 1989) ...................................................... 23

*United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) .................................................... 22, 23

*United States v. Harvey*, 991 F.2d 981, 995 (2d Cir. 1993)......................................................... 2

*United States v. Heatley*, 994 F. Supp. 483, 490 (S.D.N.Y. 1998)......................................... 24, 25

*United States v. Huynh*, No. 4-CR-14-275, 2016 WL 7411529, at *7 (M.D. Pa. Dec. 22, 2016)....

13, 14

*United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000)................................................... 24

*United States v. Kerley*, 784 F.3d 327, 339-40 (6th Cir. 2015) ................................................ 20

*United States v. Koppers Co., Inc.*, 652 F.2d 290, 298 (2d Cir. 1981) ........................................ 35

*United States v. Lebowitz*, 676 F.3d 1000, 1019 (11th Cir. 2012)................................................ 7

*United States v. Lee*, 558 F.3d 638 (7th Cir. 2009) ..................................................................... 2

*United States v. Munoz-Franco*, 487 F.3d 25 (1st Cir. 2007)..................................................... 20

*United States v. Nosov*, 221 F. Supp. 2d 445 (S.D.N.Y. 2002), *aff'd*, 119 F. App'x 311 (2d Cir. 2004) ............................................................................................................................ 3

*United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1987) ....................................................... 26

*United States v. Petit*, 19 Cr. 850 (JSR), Tr. dated Oct. 23, 2020 ................................................ 4

*United States v. Petit*, No. 19 Cr. 850 (JSR) (Oct. 23, 2020 Tr. 3:12-21) ................................... 13

*United States v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y. Oct. 23, 2020) ...................................... 24

*United States* v. *Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) ................................................................. 6

*United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987) ............................................................ 24

*United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) ....................................................... 24

*United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) .................................................. 5

*United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006) ............................................... 9

*United States v. Saget*, 377 F.3d 223, 228-29 (2d Cir. 2004) ...................................................... 9

*United States v. Salemah*, 152 F.3d 88, 109 (2d Cir. 1998) ....................................................... 16

*United States v. Sasso*, 59 F.3d 341, 351 (2d Cir. 1995) ...................................................... 16, 18

*United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991) ................................................... 23

*United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988) ............................................ 23

*United States v. Thai*, 29 F.3d 795, 813 (2d Cir. 1994) ............................................................. 24

*United States v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004) .................................................... 6

*United States v. Triumph Capital Grp., Inc.*, 237 F. App'x 625, 629 (2d Cir. 2007) ................... 30

*United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir, 2003) ..................................................... 6

*United States v. Tropeano*, 252 F.3d at 661 (2d Cir, 2003) ......................................................... 6

*United States v. Vanwort*, 887 F.2d 375, 387 (2d Cir. 1989) ................................................ 16, 17

*United States v. Washburn*, 444 F.3d 1007, 1013 (8th Cir. 2006)................................................ 14

**Rules**

Fed. R. Evid. 104(a) ...................................................................................................... 28

The Government respectfully submits this omnibus filing in response to the defendants' motions *in limine*, which seek to preclude the Government from introducing relevant and admissible evidence.  Many of the defendants' motions are a transparent attempt to curtail significantly the Government's ability to introduce relevant evidence that is necessary to prove discrete elements of the crimes charged.  None of that evidence, which includes the defendants' own words in incriminating emails and chat messages discussing the scheme, as well as documents found on defendant Weigand's computer, is unfairly prejudicial. The defendants' motions should be denied.

## I.    CERTAIN EVIDENCE CONCERNING PAYMENT PROCESSING OF PORNOGRAPHY AND ONLINE GAMBLING TRANSACTIONS IS RELEVANT AND NOT UNFAIRLY PREJUDICIAL

Weigand first moves to exclude the admission of all evidence concerning "unrelated payment processing efforts, by either defendant, in the pornography and online gambling industries."  (Dkt. No. 172, at 2).  Weigand claims that such references are irrelevant because there are MCC codes for online gambling and pornography transactions (unlike marijuana transactions, which have no assigned MCC code), and further that such references raise a "risk of unfair prejudice" given the subject matter.  (*Id.* at 3).  Relatedly, Akhavan claims in his first motion *in limine* that all references to "other business ventures" are irrelevant as none of them were "intertwined with his work at Eaze."  (Dkt. No. 155 at Pt. VI.A, 12).

As explained fully in Government Motion *in limine* VIII (Dkt. No.170),[1] the Government

---

[1] The Government's Table of Contents inadvertently does not accurately reflect the numbering of the Government's motions.  References herein are to the numbering of motions as they appear in the memorandum portion of the Government's submission.

intends to introduce evidence concerning defendant Akhavan's payment processing activities pertaining to online pornography transactions insofar as they are part of the charged Transaction Laundering scheme.  As the Government described, CW-1's involvement in the scheme began when he and another co-conspirator engaged with Akhavan to discuss a proposed solution to process Akhavan's adult traffic and the traffic of his client, Eaze.  Discussions surrounding the proposed solution of both types of traffic are interwoven together, informed CW-1's decision to participate in the conspiracy, informed certain aspects of the charged scheme, and are an integral component of the development of CW-1's relationship with both defendants.  (*See* Dkt. 170 at Pt. VIII).  In addition, the Government also intends to elicit testimony that Akhavan cited his experience in processing adult traffic—an industry he characterized as "high risk"—in connection with pitching his payment process services to Eaze and marijuana dispensary personnel and explaining certain aspects of the charged scheme to them.  Such evidence is plainly material to the development of the charged conspiracy, and references to the fact that Akhavan has experience in processing adult traffic is not at all likely to inflame the passions of the jury so as to render the introduction of such evidence "unfair," in light of its probative value. *See, e.g.*, *United States v. Lee*, 558 F.3d 638 (7th Cir. 2009) (introduction of defendant's previous operations of spa business which included forced sex to show knowledge of defendant's prostitution business not unduly prejudicial); (*see generally* Dkt. No. 170 at pdf pages 39-44).

The cases cited by Akhavan are easily distinguishable.  Unlike in *United States v. Harvey*, 991 F.2d 981, 995 (2d Cir. 1993) (cited in Dkt. No. 155 at 13), the Government does not intend to elicit any evidence that describes the nature or content of the pornography involved. And unlike in *United States v. Nosov*, 221 F. Supp. 2d 445 (S.D.N.Y. 2002), *aff'd*, 119 F. App'x

311 (2d Cir. 2004) (cited in Dkt. No. 155 at 13), the evidence the Government intends to introduce here is evidence of the charged scheme, and is not being introduced for purposes of discrediting a witness's credibility on cross examination.[2]

As to online gambling, the Government does not intend to introduce evidence that either defendant facilitated the processing of online gambling transactions.  Rather, the Government will introduce evidence that CW-1's previous job involved facilitating such transactions, and that experience informed his understanding of payment processing and his decision to enter into a conspiracy with the defendants.

Accordingly, Weigand's first motion *in limine* and point VI of Akhavan's first motion *in limine* should be denied.

## II.     REFERENCES TO DEFENDANTS' WEALTH ARE RELEVANT AND NOT UNFAIRLY PREJUDICIAL

Both defendants move to preclude evidence concerning their wealth, income, and lifestyle as unfairly prejudicial.  (*See* Dkt. No. 172 at 13 (Weigand's fourth motion *in limine*); Dkt. No. 155 at Pt. VI, 11 (Akhavan's first motion *in limine*).  Weigand notes that compensation is not an element of the charged offense, and further that any wealth he accumulated prior to joining the conspiracy is not relevant. (Dkt. No. 172 at 13).  Akhavan claims that he did not profit from the charged scheme, and that his other business ventures are wholly untethered to it. (Dkt. No. 155 at 11).

Evidence of the defendants' wealth will not be a focus of the Government's case.

---

[2] The Government does not intend to introduce any evidence pertaining to Akhavan's arms business.

However, the Government does intend to introduce evidence that the defendants were motivated to participate in the conspiracy because they stood to profit from it, which is probative of their motivation and intent.  For example, the Government intends to introduce evidence of the processing fees that the defendants charged—and Eaze and marijuana dispensaries agreed to pay—in connection with their processing of credit and debit sales through Eaze.  Those rates were high, and the evidence will show that the high rates reflected the high risk that the defendants assumed by processing illegal transactions through phony merchants.  The Government also intends to introduce evidence from Weigand's laptop reflecting profits garnered from the charged scheme.  The jury may properly infer from this evidence that the defendants intended to commit the offense, and were motivated to do so, because they stood to profit from it.  *See United States v. Petit*, 19 Cr. 850 (JSR), Tr. dated Oct. 23, 2020, at 4 (granting in part and denying in part motion *in limine* to preclude references to the defendants' wealth; statements to the effect that the defendant is a "rich, rich man" are improper, but evidence of financial motive is proper).  This remains true whether or not the defendants in fact profited.

In addition, while there may be incidental suggestions of the defendants' wealth in testimony from Company employees regarding matters they observed during their participation in meetings with Akhavan, there will not be "repeated and inflammatory references to the defendant's wealth . . .  unrelated to the charged conduct."  (Dkt. No. 155 at 11 (citing *United States v. Stahl*, 616 F.2d 30, 33 (2d Cir. 1980)).  Any such limited references are not unfairly prejudicial under rule 403.

Accordingly, the defendants' motions *in limine* to preclude references to their income,

wealth, and lifestyle should be denied.

### III.   TELEGRAM CHATS AND WHATSAPP CHATS CONCERNING THE DEFENDANTS, AND EMAILS INVOLVING EUPROCESSING.COM ARE AUTHENTIC AND HIGHLY PROBATIVE[3]

Both defendants argue that certain categories of Telegram messages and WhatsApp chat logs should be excluded because they purportedly raise "serious" authenticity and Confrontation Clause concerns.  (*See* Dkt. No. 172 at 15-17 (Weigand motion *in limine* V); Dkt. No. 167 (Akhavan motion *in limine* 7).  Weigand also seeks to exclude emails involving the email account euprocessing@protonmail.com.  The defendants' arguments are misguided and without merit.

The Government will seek to introduce Telegram chats falling into three categories:  (1) Telegram chats obtained from CW-1's phone, all of which include CW-1 as a participant, as well as the defendants; (2) Telegram chats obtained from Eaze, which include as participants witnesses in this trial, as well as the defendants; and (3) Telegram chats obtained pursuant to a judicially authorized search of Weigand's laptop, which include the defendants and other co-conspirators.  The Government understands the defendants' respective motions to be challenging the authenticity of the first two categories of Telegram chats.

Rule 901(a) of the Federal Rules of Evidence "requires the proponent of any evidence to submit 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'"  *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) (quoting 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 901(a) [01], at 901–17 (1990)).  The threshold for the

---

[3] Although WhatsApp messages are referenced in the title of Weigand's argument, the argument itself contains no discussion concerning WhatsApp messages.

court's determination of authenticity under Rule 901 is not high.  "This requirement is satisfied 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'"  *Id.*  Authentication, a relatively minor threshold hurdle, can be established with circumstantial evidence.  *See, e.g., Elsevier B.V. v. UnitedHealth Group, Inc.*, 784 F. Supp. 2d 286, 292 (S.D.N.Y. 2011) ("'Rule 901 does not erect a particularly high hurdle, and that hurdle may be cleared by circumstantial evidence'" (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004) (internal quotation marks omitted)). The Government is not required to "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir, 2003) (quoting *United States* v. *Pluta*, 176 F.3d 43, 49 (2d Cir. 1999)).  Indeed, even though Rule 901 is clear that its enumeration of means of authentication consists of "examples only— not a complete list," the rule explicitly provides for authentication by a witness with knowledge, *see* Rule 901(b)(1), as well as by circumstantial evidence, including "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Rule 901(b)(4).

The Government intends to authenticate the first two categories of Telegram chats through witnesses who were participants in the chats, supplemented by the context and content of the messages themselves.[4]  This is all Rule 901 requires to establish that the messages are what the witnesses describe them to be.  *See, e.g.*, *United States v. Lebowitz*, 676 F.3d 1000,

---

[4] The Government intends to elicit testimony from an FBI forensic examiner to establish the authenticity of the third category of Telegram chats.

1019 (11th Cir. 2012) (internet chat authenticated by credible testimony of one participant);

*United States v. Browne*, 834 F.3d 403, 413-15 (3d Cir. 2016) (chat room transcript authenticated

by participant in the exchange); *see also United States v. Barnes*, 803 F.3d 209, 217 (5th Cir.

2015) (testimony by recipient of chat messages sufficient to authentic chat, notwithstanding that

recipient was not "certain" of chat's author).

      Pursuant to this authority, the defendants' arguments should be rejected. First, that the

Telegram messages were produced without metadata simply doesn't matter.[5] There is no

requirement in Rule 901—or anywhere else—that metadata must be used to authenticate any

kind of electronic communications.

      Relatedly, that "Deleted Account" icon monikers appear in some of the chat threads does

not change the analysis. To be clear, as the witnesses will testify, the content and substance of

those messages is still contained within the Telegram chat thread, and reflect the

communications the witnesses had with the chat participants.[6] The only difference—which is

_____

[5] As set forth above, the first category of Telegram messages is located on CW-1's phone. A forensic copy of all data extracted from the phone was provided to the defendants. The Government, however, was unable to forensically extract the Telegram messages from CW-1's phone. The Government therefore produced a video-scroll and pdf screenshots of the Telegram messages to the defendants, and intends to offer the pdf screenshots at trial. As to the second category of Telegram messages, the Government produced the messages as it received them from third parties. As described herein, the Government's witnesses will testify to the authenticity of the content of the messages contained within these chat messages, which is all the law requires to authenticate them.

[6] Citing a Telegram webpage accessed in 2021, Akhavan claims that in Telegram, "deleted messages do not leave a mark in the chat." (Dkt. No. 167 at 2). As an initial matter, "deleted messages" is not the same as "deleted account," *i.e.,* in the latter scenario, messages are not deleted. In any event, regardless of whether that feature was available at the time participants deleted their accounts, it is clear on the face of the Telegram messages produced in this case that mes-

apparent from the face of the chat thread—is the appearance of a different icon in place of the icon the author originally chose for his or her Telegram account.[7]  This does not, as a matter of law, undermine the witnesses' testimony that the Telegram chats fairly and accurately reflect the substance of the conversations, or the witnesses' firsthand knowledge of who the author was.  *Cf. United States v. Dawson*, 425 F.3d 389, 392-93 (7th Cir. 2005) (electronic surveillance tapes made by confidential informant during conversations with defendants not rendered unauthentic by gaps or erasures).  Nor does it undermine the probative value of the substance and content of those messages themselves, as corroborated by other forms of electronic communications that will be introduced in this case.  For example, some of the chat messages refer to the name of a relevant participant; others discuss information uniquely tied to the individuals in the chat; yet other messages refer to emails that contain the participant.  To the extent the author of a particular chat message is not identified, that implicates the weight of the evidence and can be examined on cross.

    More generally, the potential for manipulation is a feature of many forms of electronic communications, and can also be inquired about in cross-examination.  The fact that electronic evidence can be altered is not a basis to preclude the Government from relying on Federal Rule

_____

sage content associated with a deleted account remained in place.  The defendants should be precluded from cross-examining any witnesses on "deleted messages" absent evidence that the messages themselves were deleted, as such cross would be irrelevant, confusing, and misleading.

[7]  Contrary to Akhavan's representation, the name of the author of Telegram chats does not necessarily appear next to the messages he or she sent through Telegram, at the time those messages were sent.  Rather, it is up to the Telegram user to select what moniker or icon to use to represent him or her, including icons that do not reveal any identifying information.  Of course, this is true for many means of electronic communication, including emails and other chat applications.

of Evidence 901(b)(1) and (b)(4) to authenticate the Telegram chats.  *See United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006) (stating that the possibility of alteration "does not and cannot be the basis for excluding ESI as unauthenticated as a matter of course, any more that it can be the rationale for excluding paper documents").  Questions about what *could* have happened, *i.e.* that messages *could* have been deleted, is not a basis to impose upon the Government a burden that is greater than what is ordinarily required.[8]

Nor are there any "Confrontation Clause" issues.  (Dkt. No. 172 at 15; Dkt. No. 167 at 4).  The Telegram chats are not testimonial – they are similar to text messages and emails routinely admitted at trial.  They certainly were not created to aid in the defendants' prosecution.  *Crawford v. Washington*, 541 U.S. 36, 51 (2004).  The Government expects to show that the chats were largely created in the course of the charged offense and involve discussions by charged and uncharged co-conspirators in furtherance of the scheme.  Other chat messages will be offered as clearly identified statements of a party opponent, or for a non-hearsay purpose such as knowledge and intent.  Just as the non-testimonial statements of an unidentified co-conspirator may be admissible without raising Confrontation Clause concerns, so too are the non-testimonial statements of a co-conspirator in the Telegram chats, notwithstanding that his/her identity may not be readily knowable merely from the icon accompanying his/her messages.  *United States v. Bourjaily*, 483 U.S. 171 (1987); *United States v. Saget*, 377 F.3d 223, 228-29 (2d Cir. 2004).

Akhavan's effort to exclude screenshots of WhatsApp exchanges from CW-1's phone

---

[8] The single case that the defendants cite does not support their argument.  In *Deptula v. Rosen*, 2020 WL 6135793 (S.D.N.Y. Oct. 16, 2020), the court noted in a footnote that text messages were not sufficiently authenticated via an unspecific affidavit that did not reference the texts.

fails for the same reasons.  Contrary to Akhavan's argument, on or about April 29, 2020, the

Government produced a forensic copy of CW-1's phone, which included all WhatsApp

communications contained therein and the available metadata.  The Government selected

relevant portions of those WhatsApp messages to offer as exhibits at trial.  CW-1 will

authenticate the content of those exhibits as a true and accurate subset of WhatsApp

communications contained on his phone.  Akhavan is free to cross examine CW-1 to establish

that there are additional messages.  There is no evidence remotely suggesting that the content of

those messages was altered at any time.

Finally, Weigand's effort to exclude email communications involving the ProtonMail[9]

email address euprocessing@protonmail.com fares no better.  The Government expects CW-1 to

testify that he recognizes the email messages that include that email address and himself as

participants, and that Weigand used that email address.  CW-1's testimony will be corroborated

by the content of the email messages themselves as well as other (non-email) electronic

communications.  To the extent there is evidence that others also used that email address, the

Government expects the evidence will show that it may have been used by another member of

Weigand's team (*i.e.* an unidentified co-conspirator).  In any event, that others may have also

used that email address may be an appropriate topic for cross-examination, but it does not

implicate the authenticity of the messages.  Again, that the ProtonMail emails do not contain

metadata[10] is not of legal significance, as metadata is not necessary to authenticate the email

---

[9] ProtonMail is an email system that uses end-to-end encryption and zero access encryption to
secure emails for privacy and security purposes.

[10] The Government is not in possession of any metadata involving the ProtonMail messages.

exchanges.

### IV.   AKHAVAN'S MOTION TO PRECLUDE THE USE OF SUPPOSEDLY PREJUDICIAL TERMS SHOULD BE DENIED

Akhavan seeks to preclude the Government and its witnesses from using certain everyday terms that he claims are irrelevant and prejudicial to the defense.  (Dkt. 159).  In particular, Akhavan moves to preclude the use of the terms "shell company," "proxy company," and any variant of those terms, to refer to the phony merchant companies that the defendants used to open overseas bank accounts and process marijuana credit and debit card transactions on behalf of Eaze.  Akhavan also moves to preclude the use of the term "victim" to refer to the issuing banks that were defrauded by the defendants' Scheme.

Akhavan argues that these terms should not be used at trial because they are "pejorative description[s] [that have] no evidentiary value while creating a risk of unfair prejudice."  (Dkt. 159 at 5).  Akhavan is wrong.  These terms are accurate descriptions of the defendants' conduct that will assist the jury in understanding the Scheme.  For example, the use of the term "shell company" will assist the jury in understanding the distinction between the actual merchants (e.g., the marijuana dispensaries and Eaze) who were conducting business in the United States, and the fake merchants ("shell companies") that the defendants used to open bank accounts, process marijuana transactions, and hide the identity of the real merchants and the illegal nature of the transactions.  The defendant's motion should be denied.[11]

----

[11] The Government respectfully requests that the Court resolve this motion before trial, as it will affect the content of the Government's opening statement and may require the Government to provide instructions to some of its witnesses.

### A. The Government Should be Permitted to Use the Terms "Shell Company" and "Proxy Company"

As described in the Indictment, the defendants and their coconspirators used "Phony Merchants—including phony online merchants purportedly selling dog products, dive gear, carbonated drinks, green tea, and face creams—and establish[ed] Visa and MasterCard merchant processing accounts with one or more offshore acquiring banks."  (Indictment ¶ 13).  Some of the website names for the Phony Merchants included: absolutsoda.com; diverkingdom.com; fly2skyshop.com; goodegreenbazaar.com; greenteacha.com; happypuppybox.com; outdoormaxx.com; and soniclogistix.com.  The Phony Merchants also typically had web pages suggesting that they were involved in selling legitimate goods, such as carbonated drinks, face cream, dog products, and diving gear.  The evidence at trial will show that the Phony Merchants were merely paper companies being used by the defendants to facilitate the processing of marijuana transactions.

The terms shell company and proxy company are thus fair and accurate descriptions of the companies used by the defendants to commit the Scheme and the Government should be permitted to refer to them as such.  The terms are not unfairly prejudicial inasmuch as they fairly describe the nature and use of the Phony Merchants in the defendants' Scheme.[12]  *See Costantino v. Herzog*, 203 F.3d 164, 174-75 (2d Cir. 2000) ("[B]ecause virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair. The unfairness contemplated involves some adverse effect beyond tending to prove a fact or issue

---

[12] Notably, the defendants have never indicated that they intend to argue that the Phony Merchants were real businesses providing real goods or services.

that justifies admission." (citation omitted)); *United States v. Petit*, No. 19 Cr. 850 (JSR) (Oct. 23, 2020 Tr. 3:12-21) (denying motion to preclude use of certain terms including "shell company," and noting that "[t]hose are everyday terms familiar to most jurors. They are not inflammatory. They describe misconduct, which is what the government is charging, and if they can't be proven beyond a reasonable doubt, of course, that will inure to the benefit of the defendants.").[13]

### B.  The Government Should Be Permitted to Use the Term "Victim"

Use of the term "victim" at trial has been widely approved.  *See, e.g., United States v. Gasperini*, 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017), aff'd 729 F. App'x 112 (2d Cir. 2018) (Government's use of the term "victim" permitted and not unduly prejudicial in light of the issues being tried); *United States v. Huynh*, No. 4-CR-14-275, 2016 WL 7411529, at *7 (M.D. Pa. Dec. 22, 2016) (denying motion in limine seeking to preclude Government from referring to fraud victims as "victims"); *In re Homestore.com, Inc.*, No. CV 01-11115 RSWL CWX, 2011 WL 291176, at *12 (C.D. Cal. Jan. 25, 2011) (denying defendant's motion to prevent references to plaintiffs as "victims"); *see also Tollefson v. Stephens*, No. SA:14-CV-144-DAE, 2014 WL 7339119, at *6 (W.D. Tex. Dec. 23, 2014) (noting that the term "victim" is "commonly used at trial in a neutral manner to describe the events in question").

---

[13] Akhavan's reliance on *United States v. Watts*, 934 F. Supp. 2d 451 (E.D.N.Y. 2013) is misplaced.  In *Watts*, the Court concluded that the facts did not support the use of the term "shell company" because the defendant's company was actually a holding company with a portfolio of investment companies and the Government had not demonstrated that the company at issue was created to engage in fraud.  Here, by contrast, the Phony Merchants are consistent with the everyday meaning of shell or proxy company, as well as the description of a shell company set forth in *Watts*, namely a corporation created to commit fraud.

Indeed, referring to issuing banks as victims is permissible, even in the context of the Court's jury instructions. This is because "use of the term 'victim' in jury instructions is not prejudicial to a defendant's rights when, as is the case here, the instructions taken as a whole clarify the government's burden of proving all elements of the crime." *United States v. Washburn*, 444 F.3d 1007, 1013 (8th Cir. 2006) (collecting cases).

Akhavan nonetheless argues that the Court should preclude the Government from referring to the victims in this case as "victims" in front of the jury. The Indictment charges that the defendants engaged in a conspiracy to commit bank fraud. The Government is entitled to prove this allegation at trial and, in so doing, to use the term "victim" to refer to the Issuing Banks who were tricked into processing over one hundred million dollars in marijuana transactions based on the defendants' misrepresentations and falsehoods. *See Gasperini*, 2017 WL 3140366 at *7; *Huynh*, 2016 WL 7411529, at *7. The term "victim" is an appropriate and neutral way to identify for the jury the collection of Issuing Banks—both those who will testify at trial and those who will not—in the context of a case involving numerous financial institutions. *See Tollefson*, 2014 WL 7339119, at *6.

Nor is the use of the term "victim" unfairly prejudicial to the defendants. *See Cueva v. State*, 339 S.W.3d 839, 864 (Tex. App. 2011) (victim is "relatively mild and non-prejudicial" term) (citations omitted). There is no risk that the jury will be confused or misled, or that the defendants will be prejudiced by this non-pejorative and commonly used term, especially in the context of the Court's instructions articulating the Government's burden of proof of all elements of the crime charged in the Indictment. *See Washburn*, 444 F.3d at 1013.

Finally, Akhavan's assertion that the Government should be precluded from introducing

14

argument or evidence about other victims in this case, such as credit card companies and acquiring banks, is meritless. First, this evidence is directly relevant to how the Scheme worked. The evidence will show that in order for the defendants to successfully process credit card transactions, they had to trick not only the issuing banks, but also the credit card companies, as well as certain employees at acquiring banks.[14]  *Second*, the defendants' efforts to trick these additional financial institutions for the purpose of obtaining funds from the issuing banks is direct evidence of their guilt.  *See Loughrin v. United States*, 573 U.S. 351, 363 (2014) (holding that under Section 1344(2) the false or fraudulent pretenses, representations, or promises need not be made to the bank itself, so long as they are the mechanism naturally inducing the bank (or custodian of bank property) to part with money in its control).

For the above-described reasons, the defendant's motion *in limine* to preclude use of the terms shell and proxy company (and similar terms), and victim, at trial should be denied.

## V.   AKHVAN'S MOTION TO EXCLUDE QUANTUM SOLUTIONS AND MASTERCARD DOCUMENTS SHOULD BE DENIED

Akhavan moves to exclude certain evidence obtained from Quantum Solutions, Inc. and Mastercard on the grounds that (1) it was improperly obtained utilizing grand jury subpoenas, and (2) the Quantum Solutions records are not business records.  Because the grand jury subpoenas were issued pursuant to a valid, ongoing investigation, and the Government does not currently anticipate that it will seek to admit any Quantum Solutions documents as business records, Akhavan's motion should be denied.

---

[14] The evidence will show that some principals at certain acquiring banks were in on the Scheme, but other employees at acquiring banks were not, and therefore were a threat to detect and expose the Scheme.

### A. Applicable Law

It is unquestionably "improper for the government to use a grand jury subpoena 'for the sole or dominant purpose of preparing for trial under a pending indictment.'" *United States v. Sasso*, 59 F.3d 341, 351 (2d Cir. 1995) (quoting *United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994)). Nevertheless, "[w]here there was some proper dominant purpose for the post-indictment subpoena, … the government is not barred from introducing evidence obtained thereby." *Sasso*, 59 F.3d at 351; *Leung*, 40 F.3d at 581. Post-indictment action is permitted to identify or investigate other individuals involved in criminal schemes, *see Sasso*, 59 F.3d at 352, or to prepare superseding indictments against persons already charged, *see, e.g.*, *United States v. Vanwort*, 887 F.2d 375, 387 (2d Cir. 1989).

Moreover, "[b]ecause a presumption of regularity attaches to grand jury proceedings, a defendant seeking to exclude evidence obtained by a post-indictment grand jury subpoena has the burden of showing that the Government's use of the grand jury was improperly motivated." *Leung*, 40 F.3d at 581 (citations omitted); *see also Sasso*, 59 F.3d at 352 ("There is a presumption that [a post-indictment] subpoena had a proper purpose."). Because "[a] grand jury subpoena is presumed to have a proper purpose, ... the defendant bears the burden of showing that the grand jury has exceeded its legal powers." *United States v. Salemah*, 152 F.3d 88, 109 (2d Cir. 1998). Thus, "[a] defendant must present *particularized proof* of an improper purpose to overcome the presumption of propriety of the grand jury subpoena." *Id.* (emphasis added) (citing *United States v. Mechanik*, 475 U.S. 66, 75 (1986)).

16

B. **Discussion**

1. **Quantum Solutions Documents**

There was no improper use of a grand jury subpoena in the instant case. Indeed, Akhavan has failed to identify even a purported impropriety with regard to the March 11, 2020 grand jury subpoena to Quantum Solutions (the "Quantum Subpoena"). As Akhavan acknowledges, the Government directed the issuance of the Quantum Subpoena *before* the grand jury returned the superseding indictment against Akhavan and Weigand on March 31, 2020. (*See* Dkt. 157 at 1). Its original return date of March 25, 2020, likewise predated the grand jury's return of the S3 indictment. There is thus no conceivable argument that the Quantum Subpoena was primarily used to prepare for trial under an already pending indictment. *See Vanwort*, 887 F.2d at 387 ("no justification" for argument that grand jury subpoena authorized prior to return of last superseding indictment was improper).

Akhavan's argument that Quantum Solutions documents, which consist primarily of emails maintained by Quantum Solutions, should be excluded because the Government will not be able to establish that they are business records is similarly meritless. As noted above, the Government does not anticipate seeking to admit these documents as business records pursuant to Federal Rule of Evidence 803(6). Rather, the Government believes that these documents are admissible as statements of co-conspirators in furtherance of the conspiracy, pursuant to Rule 801(d)(2)(E); statements of Akhavan's agents or employees on matters within the scope of that relationship, and made while it existed, pursuant to Rule 801(d)(2)(D);[15] or will be offered for

---

[15] The Government expects the evidence to show that Akhavan served as a Director of Quantum Solutions, and as its President and Secretary, from the company's inception in or about 2013

17

purposes unrelated to the truth of the matters asserted therein, such as establishing the circumstances surrounding and motivation for, certain decisions and actions.  Moreover, Akhavan and Weigand, through their counsel, have agreed to a foundational stipulation regarding the authenticity of the relevant exhibits, GX 901-927, as documents that were maintained by Quantum Solutions.

### 2.  Mastercard

The April 1, 2020 grand jury subpoena to Mastercard (the "Mastercard Subpoena"), was also properly issued, in connection with a broader, ongoing criminal investigation into other individuals and conduct related to, but not encompassed by, the charged Scheme.[16]  The information sought by the Mastercard Subpoena—information pertaining to a number of fake merchants and merchant descriptors used by the defendants and Eaze in the charged Scheme—was directly relevant to, among other things, the superseding information filed on Friday, February 19, 2021, charging Jim Patterson, a former CEO of Eaze, with one count of conspiracy to commit bank fraud.  Because the grand jury subpoena was issued to pursue a valid, ongoing investigation into other individuals, including Patterson, and Akhavan has not presented any particularized proof otherwise, his motion must be denied.  *See Sasso*, 59 F.3d at 352 (rejecting argument where "government explained that after the indictment of [the defendant], it continued . . . to investigate other individuals"); *Leung*, 40 F.3d at 581-82 ("sequence of events" where

_____

through at least in or about August 2019.

[16] Should the Court require further information regarding the subject matter and scope of the Government's ongoing investigation, the Government respectfully requests permission to provide that information under seal in an *ex-parte* submission.

grand jury subpoena was issued "after the indictment, before a trial date had been set . . . does not undermine the presumption that the grand jury was in fact investigating possible [other] charges that were not included in the original indictment").

## VI. TESTIMONY CONCERNING POLICIES AND PAYMENT PROCESSING OPERATIONS ARE APPROPRIATE SUBJECTS OF LAY WITNESS TESTIMONY AND ACCORDINGLY THE COURT SHOULD REJECT AKHAVAN'S MOTION *IN LIMINE* TO PRECLUDE "DISGUISED EXPERT TESTIMONY"

As the Government set forth in its Motion *in Limine* to Preclude Defendants' Experts, testimony surrounding principles of payment processing, as well as bank policies and procedures pertaining thereto, are appropriate subjects of lay witness testimony, based upon those witnesses' personal experience working in that industry. (Dkt. No.168 at 7-14). Unlike Akhavan's fourth motion *in limine* (*see* Dkt. Nos 160, 161), the Government's motion provided ample authorities that specifically support the application of Federal Rules of Evidence 602 and 701 in this context, including authorities concerning the payment processing system in particular. Those authorities firmly establish that fact testimony, even when offered by a person with specialized knowledge, is admissible so long as it is relevant, within the personal knowledge of the witness, and helpful. (Dkt. No. 168 at 8). None of the Government's bank and credit card witnesses will provide testify "from a process of reasoning which can be mastered only by specialists in the field." (*Id.* (quoting *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005)). Indeed, as the Government further described, many of these concepts are discussed amongst the co-conspirators in this case, including those that had *not* been employed in the payment processing industry. (*Id.* at 11-12). The jury is capable of understanding these concepts without expert assistance, and it is for this reason (among many others) that the Government has moved to preclude the

19

defendants' experts in this case.[17]  *Id.*

Akhavan notes that the Government's bank and credit card witnesses will offer their view on "how marijuana transactions *should* have been accounted for under" the relevant policies. (Dkt. No. 161 at 4).  Of course, the witnesses are capable from their personal experience to provide this testimony, such testimony does not require the assistance of an expert to understand, and such questions are undoubtedly proper for a lay witness with experience applying these policies to relay to the jury in the context of materiality.  As evident from the plain language of Rule 701 itself, the rule is not so wooden as to permit no more testimony than what appears on the text of the policy.  *See, e.g.*, *United States v. Munoz-Franco*, 487 F.3d 25 (1st Cir. 2007) (in bank fraud prosecution, bank officers did not testify beyond the scope of their personal knowledge where they expressed lay opinions based upon their knowledge of the bank's business operations and banking practices that they acquired during their employment there); *United States v. Cuti*, 720 F.3d 453, 457-61 (2d Cir. 2013) (in accounting fraud case involving "what if you had known" questions posed to accountants, explaining that "[w]hen the issue for the fact-finder's determination is reduced to impact—whether a witness would have acted differently in he had been aware of additional information—the witness so testifying is engaged in a process of reasoning familiar in everyday life" within the meaning of Rule 701); *United States v. Kerley*, 784 F.3d 327, 339-40 (6th Cir. 2015) ("Moreover, we concur with the Eleventh

---

[17] Akhavan repeatedly states that the Government provided no expert notice in this case.  As the Government explained in its Motion *in Limine* to Preclude Defendants' Experts, it does not believe that the testimony at issue is properly the subject of expert testimony, but provided notice "in an abundance of caution."  As the defendants' notices are no more detailed than the Government's, in the event the Court rules that expert testimony would be required on these topics, the defendants should be ordered to make additional disclosures as well.

Circuit's view that it does not take any specialized or technical knowledge to realize that lending institutions would be reluctant to approve a loan application if they knew that it contained false statements about material facts." (internal quotation marks and citations omitted)).

With respect to the Government's witnesses from Eaze, their understanding of payment processing concepts is critical to issues of knowledge and intent among the Scheme participants in this case—regardless of whether their understanding is right or wrong. For example, if Eaze's former CEO testifies that "banks would do business with only a select number of cannabis-related customers because such business impose [sic] a heavier compliance burden" (Dkt. No. 161 at 3), or if an Eaze employee (another co-conspirator) testifies that he "believed that Visa and MasterCard might shop on descriptor websites and attempt to call customer service numbers to verify that they are genuine" (*id.*), such testimony is not only on its face non-expert, but is highly probative of the conspirators' knowledge, intent, and motivation in defrauding issuing banks. Their understanding of what would and would not be prohibited under bank and credit-card rules is highly relevant regardless of whether their understanding is accurate or not. This is neither difficult to understand, nor is it "disguised" expert testimony. Accordingly, Akhavan's fourth motion *in limine* should be denied.

### VII.   AKHAVAN'S MOTION TO REQUIRE THE GOVERNMENT TO PROVE THE PREREQUISITES FOR ADMITTING COCONSPIRATOR STATEMENTS OUTSIDE THE PRESENCE OF THE JURY SHOULD BE DENIED

Akhavan moves to require the Government "to prove the prerequisites for admission of certain alleged coconspirator statements outside the presence of the jury and prior to admitting them into evidence." (Dkt. 165 at 1). As discussed below, Akhavan's motion is meritless and should be denied.

21

### A. Applicable Law

Federal Rule of Evidence Rule 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's coconspirator during and in furtherance of the conspiracy."  To admit a statement under this rule, a court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).  "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself."  *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014).

When determining whether the predicate conspiracy has been established, a court is not bound by the Federal Rules of Evidence, *see* Fed. R. Evid. 104(a), and the "may consider the hearsay statement itself" as evidence of "the existence of a conspiracy."  *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181).  Moreover, under this exception to the hearsay rule, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial.  *Gigante*, 166 F.3d at 82; *see also Maldonado-Rivera*, 922 F.2d at 962 ("Though . . . Fed. R. Evid. 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment.").  The defendant does not have to have been a member of the conspiracy at the time the statement was made.  *United States* v. *Farhane*,

22

634 F.3d 127, 161 n. 35 (2d Cir. 2011); *Haywood v. Portuando*, 288 F. Supp. 446, 472

(S.D.N.Y. 2003).  And, notably, Rule 801(d)(2)(E) does not require that a statement be made to

another co-conspirator in order to be in furtherance of a conspiracy.  *United States v. Green*, 887

F.2d 25, 27-28 (1st Cir. 1989) (co-conspirator's statement to shooting victim admissible against

co-defendant under Rule 801(d)(2)(E)); *see United States v. Gupta*, 747 F.3d 111, 125 (2d Cir.

2014) (a statement need not be made to a member of the conspiracy to be admissible under Rule

801(d)(2)(E)) because "[s]tatements designed to induce the listener's assistance with respect to

the conspiracy's goals satisfy the Rule's in-furtherance requirement").

       To be in furtherance of a conspiracy, the statement must in some way have been designed

to promote or facilitate achievement of a goal of the conspiracy.  Under this standard, a co-

conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-

conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other

person's usefulness to the conspiracy."  *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C.

Cir. 1988).  Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide

an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d

150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or

facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958; (3) "seek

to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted);

(4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *United States* v.

*Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial

activities, *United States* v. *Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of

"the identity and activities of his coconspirators," *United States v. Rastelli*, 870 F.2d 822, 837

(2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).  A narrative description

of a past event is admissible as long as it serves "some current purpose in the conspiracy."

*United States v. Thai*, 29 F.3d 795, 813 (2d Cir. 1994); *see also Desena*, 260 F.3d at 159;

*Maldonado-Rivera*, 922 F.2d at 958; *United States* v. *Flaharty*, 295 F.3d 182, 199-200 (2d Cir.

2002). Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they

are made . . . simply to keep coconspirators abreast of current developments and problems facing

the group." *United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotation

marks omitted).

**B. Discussion**

Akhavan's motion is unsupported by any legal authority and is contrary to the typical

practice in this district.  In fact, under controlling Second Circuit precedent, "statements

proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject

to the later submission of the necessary evidence of "the requirements of Rule 801(d)(2)(E)."

*United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969) (Friendly, J.); *see also, e.g.*, *United States

v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y. Oct. 23, 2020) (Tr. at 7 (denying motion to preclude

Government from introducing statements made by unindicted co-conspirators until the Court

finds prerequisites met because that "hasn't been law for about 30 years" and such statements

"can come into evidence subject to connection").

The principal case on which Akhavan relies is *United States v. Heatley*, 994 F. Supp. 483,

490 (S.D.N.Y. 1998).  But *Heatley* directly undermines Akhavan's motion and in fact

demonstrates that the relief he seeks is meritless.  In that case, then-Judge Sotomayor denied the

defendant's request, observing that "the Second Circuit has expressly approved the practice of

admitting such statements at trial subject to the government's introduction of evidence which will support the required finding under *Bourjaily*." *Heatley*, 994 F. Supp. at 490 (internal citation omitted). The court concluded that it "will make this determination during trial and accordingly denies [the defendant's] motion for a hearing on this issue." *Id.* Although the Government in *Heatley* stated that it would seek from the court an advance hearing "on any potentially doubtful evidence under the *Bourjaily* standard," Judge Sotomayor did not require the Government to do so. *Id.*

Akhavan argues that "there is no reason to believe that there will be evidence establishing that the 100+ entities and individuals identified as co-conspirators" in the Government's bill of particulars were engaged in a conspiracy. He is wrong. The Government anticipates that the co-conspirators' statements, corroborated by the testimony of cooperating witnesses, Eaze employees, and other documentary evidence, will plainly show how all of the relevant individuals and entities—including people who worked for Akhavan and Weigand, insiders at offshore acquiring banks, Eaze employees, and marijuana dispensaries and their personnel—all knowingly worked together towards the common criminal goal of fraudulently processing credit and debit card marijuana transactions that were prohibited by Visa and Mastercard and would not have been knowingly approved by the issuing banks. Tellingly, Akhavan fails to identify a single specific individual or entity, or even a category of individuals or entities, for which it believes the Government's evidence will be insufficient based on its review the Government exhibits and the witness's Jencks Act materials.

Moreover, Akhavan overlooks that statements made by those co-conspirators may be admissible without reference to Rule 801(d)(2)(E). For example, the Government may offer

certain statements of the defendant's employees and agents for the truth of the matters asserted therein under Rule 801(d)(2)(D) because such statements concerned matters within the scope of the agency or employment and were made during the existence of the relationship.  In addition, many statements of co-conspirators will be offered for purposes unrelated to the truth of any matters asserted therein, and will thus be admissible without regard to Rule 801.  For example, certain such statements are directives or instructions, and others provide context for, or evidence of the motivation and intent for, certain decisions, actions, or other admissible statements of the defendants and co-conspirators.  *See United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."); *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1987) ("When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed."); *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) (email messages properly admitted not for truth of matters asserted, but rather "to provide context for defendant's messages sent in response to them").

In any event, the relief Akhavan seeks is impracticable and a waste of the Court's and the jury's time. There is a significant risk that adopting Akhavan's proposal, which presumably would require frequent sidebars and conferences outside the presence of the jury, will keep the jury waiting and prolong the trial.  There is no reason to adopt such a proposal here, particularly given this Court's ability to provide an appropriate limiting instruction to the jury should there be—and the Government does not expect there will be—any statements admitted subject to

connection where the connection is not ultimately made.

**VIII.  THE GOVERNMENT SHOULD NOT BE PRECLUDED FROM INTRODUCING EVIDENCE REGARDING THE AMOUNT OF CREDIT CARD TRANSACTIONS PROCESSED BY THE DEFENDANTS OR THE SETTLEMENT OF THOSE FUNDS**

Akhavan moves to preclude the Government from introducing evidence regarding the amount of money that he and his co-conspirators successfully processed during their years-long Scheme and evidence of how the defendants transferred that money back to United States bank accounts on behalf of the marijuana dispensaries.  Akhavan inexplicably claims that this direct evidence of the charged bank fraud scheme "would mislead and confuse the issues for the jury" and "is more prejudicial than probative."  (Dkt. 163 at 1, 2).  For the reasons set forth below, Akhavan's motion is meritless.

The Government expects the evidence at trial to show that between 2016 and 2019, approximately $160 million in credit and debit card transactions were processed through Phony Merchant offshore bank accounts that were being used by the defendants and their coconspirators to process marijuana purchases through Eaze.  Furthermore, the Government expects the evidence to show that one of the defendants' primary responsibilities in the Scheme was to ensure that the marijuana dispensaries received the funds from the overseas bank accounts in the names of the Phony Merchants.  Absent this final step, the Scheme would fail; the marijuana dispensaries would be left empty-handed and would not receive the funds for the marijuana products that they had sold through Eaze.  For the Scheme to work, it was critical that the defendants not only successfully obtained the Issuing Banks' funds, but also that they successfully got those funds back to the marijuana dispensaries' bank accounts.

The above-described evidence is plainly relevant under Rule 401—it is direct evidence of

27

the charged Scheme.  For the defendant's motion to succeed, he must therefore show that this

evidence is *unfairly* prejudicial.  *See Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000)

("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under

Rule 403 the prejudice must be unfair.").  Bank records, emails, witness testimony, and other

similar innocuous evidence showing the amount of money the defendants processed during their

Scheme, and the manner in which that money was sent back to the marijuana dispensary bank

accounts in the United States, is in no way unfairly prejudicial.  *See, e.g.*, *United States v.

Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (noting that evidence is unfairly prejudicial "only

when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or

issue that justified its admission into evidence.").  This evidence is therefore admissible at trial.[18]

Finally, Akhavan's argument that the Government should be precluded from: 1) offering

evidence regarding the profit earned by the defendants from the Scheme; 2) referring to the size

of the fraud in this case; and 3) presenting evidence or argument concerning loss, harm, or other

negative economic effect of any financial institution in this case, Dkt. 163 at 3, is meritless.  All

of this is direct evidence and does not present any risk of unfair prejudice.  Akhavan's motion

should therefore be denied.

---

[18] Evidence concerning the settlement transactions is also probative because it provides another
example of the defendants' deliberate attempts to hide any link between the Phony Merchants
and the true nature of the transactions being processed by those merchants (i.e., marijuana pur-
chases through Eaze from the dispensaries).  The evidence shows that the defendants and their
coconspirators hid the true nature of the transactions by requiring that the bank accounts receiv-
ing the settlements be in names other than the dispensary names.  For example, in GX 639, an
email was sent from EU Processing stating that a dispensary's bank account could not be used
for settlement because public source information revealed that the company name was for a can-
nabis distribution business.

### IX.    AKHAVAN'S MOTION TO EXCLUDE EVIDENCE RELATING TO HIS PRIOR CRIMINAL CONVICTIONS IS PREMATURE

In his first motion *in limine*, Akhavan argues that his prior convictions in January 2020 for criminal threats and weapons possession should be precluded under Federal Rule of Evidence 609(A)(1).  The Government does not intend to offer these convictions in its case-in-chief. Further, insofar as the defendant does not open the door to this evidence during his testimony on direct examination or cross examination, the Government does not intend to offer these convictions under Rule 609(A)(1).  However, if during his testimony on direct (or cross) examination Akhavan were to open the door to these convictions, by, for example, testifying that he had not previously been convicted, the Government should be able to impeach the defendant on cross-examination regarding his convictions.  *See United States v. Beverly*, 5 F.3d 633, 639 (2d Cir. 1993) (noting that "[o]nce a defendant has put certain activity in issue by offering innocent explanations for or denying wrongdoing, the government is entitled to rebut by showing that the defendant has lied.  The same holds true for defendant's false statements on cross-examination.").  Akhavan's motion is therefore premature.

Akhavan also argues that evidence pertaining to his 2020 arrest is inadmissible.  The facts pertaining to that arrest are as follows.  On October 24, 2020, an officer with the Los Angeles Police Department ("LAPD") responded to an overdose radio call and found Akhavan being treated by the Los Angeles fire department for a drug overdose.  Akhavan lied to the LAPD officer and told him that he was not on probation, even though he was then serving his term of probation in connection with his state convictions and was on pre-trial supervision in connection with this matter.  *See* Nov. 5, 2020 Arrest Report, attached to U.S. Pretrial Services Officer Moscato's Violation Memorandum dated Nov. 10, 2020.

On November 5, 2020, LAPD officers conducted a probation compliance check at Akhavan's residence.  During a search of his bedroom, they found two firearms—one of which was a loaded semi-automatic pistol, with a high-capacity magazine containing 12 rounds—and a prescription bottle that appeared to contain crack cocaine.  *Id.*  The guns were hidden inside of boxing gloves in a gym bag.  The prescription bottle was also found inside of the gym bag.  The defendant claimed that the guns were not his—notwithstanding that they were found in his bedroom—yet admitted that law enforcement would likely find his DNA on the weapons.  *Id.*  Specifically, Akhavan claimed that the guns belonged to his roommate, and that his roommate would hide the firearms in Akhavan's room when he had escorts over to party.  *Id.*  Akhavan also denied that the crack belonged to him.  Akhavan was arrested and detained on state charges for being a felon in possession of a firearm.

Like the defendant's prior convictions, the Government does not intend to introduce any of the above-described evidence concerning Akhavan's November 2020 arrest in its case-in-chief.  However, if Akhavan were to testify, the Government is entitled to challenge his credibility on cross-examination and confront him with the false statements he made to the LAPD regarding his probation status and his ownership of firearms and cocaine.  *See, e.g.*, *United States v. Triumph Capital Grp., Inc.*, 237 F. App'x 625, 629 (2d Cir. 2007) (finding no abuse of discretion in allowing defendant to be cross examined about specific instances in which he had previously made false statements and noting that such statements can be appropriately introduced under Rule 608(b)(1)).  The evidence at issue here is particularly probative of Akhavan's character for untruthfulness given that it involves his false statements to law enforcement officers.  Akhavan's motion to preclude the Government from cross-examining him

about his November 2020 arrest should therefore be denied.

X.  **WEIGAND'S MOTION TO EXCLUDE DOCUMENTS AND COMMUNICATIONS RECOVERED FROM HIS LAPTOP ABSENT A WITNESS TO TESTIFY TO THEIR SUBSTANCE SHOULD BE DENIED**

In his second motion *in limine*, Weigand argues that broad tranches of the evidence recovered from the laptop that was seized from him at the time of his arrest (the "Weigand Laptop") should be precluded under Rule 403 because admitting them without a witness who can specifically testify to their content and relevance would be confusing and unfairly prejudicial. Weigand's motion is unsupported by any authority and ignores the jury's ability to draw plain and common-sense inferences from these documents.[19]  Weigand's arguments with regard to these materials may be arguments that may be made to a jury with respect to the weight that should be given to particular exhibits, but they are not grounds for preclusion.

Weigand's first claim is that documents and communications should be excluded if they "do not reference Eaze by name."  (Dkt. 171 at 6.)  Other documents and testimony, however, will provide the necessary context for the jury to understand the relevance to the charged bank fraud scheme.  With respect to GX 1690, for example, witness testimony and other evidence will establish that the individuals[20] writing the emails, which Weigand was included on, were

---

[19] The Government anticipates that testimony from an FBI forensic examiner will establish that the documents and communications the Government intends to seek to admit into evidence are true and correct copies of materials recovered from the Laptop.  The Government further submits that those documents and communications are admissible as statements as a party opponent pursuant to Rule 802(d)(2)(A), statements of co-conspirators pursuant to Rule 802(d)(2)(E), statements of agents or employees pursuant to Rule 801(d)(2)(D), or for purposes unrelated to the truth of the matters asserted therein.

[20] While the Government does not intend to call these individuals as witnesses, Weigand is, of course, free to call them for purpose of eliciting admissible testimony.

employed by Akhavan and involved in the Scheme, including being present at a key meeting

with Eaze employees and representatives from the marijuana dispensaries, and that the

referenced banks were two of the acquiring banks that were sent fraudulent merchant bank

account application packages and used to process Eaze transactions.  A jury could therefore

reasonably infer that the discussed "accounts" that were "turned live yesterday" were fraudulent

merchant accounts opened in furtherance of the scheme.[21]

　　　Weigand's second claim is that any communications which do not include a response

from him must be excluded.  (Dkt. 171 at 6, 8.)  But many of these communications are plainly

relevant, particularly when considered together with other anticipated evidence.  In GX 1688-

TR, for example, CC-3 sends Weigand three attachments.  The attached documents, which were

also recovered from the Weigand Laptop, are reports, prepared using the Software Program

described in the Government's motions *in limine*, *see* Dkt. 170 at 44-45, regarding three websites

for fake merchants used in the Scheme.  Moreover, testimony from CW-1 and other

communications will establish how the Software Program was used by the participants in the

Scheme to identify potential red flags for fake online merchants.

　　　Weigand next claims that certain standalone documents should be excluded because they

are "impossible to understand without relevant background knowledge."  (Dkt. 171 at 6, 10).

The example provided by Weigand, however, disproves his point.  GX 1720 is a relatively

---

[21] Another example of relevant and admissible evidence that would appear to fall into the category of documents that "do not reference Eaze by name" that Weigand seeks to exclude is the March 2016 Email discussed in the Government's motions *in limine*, *see* Dkt. 170 at 44-48.

straightforward table laying out "actual" and "expected" volumes, profits, and margins, along with information on other expenses, including EUR 760,000 in commissions to "Reuben," for the period between April 2018 and August 2019, during the time the charged Scheme was operating.  Moreover, witness testimony and other evidence will show that several of the acquiring banks and other entities identified in GX 1720 were involved in or received funds from processing the Eaze transactions.  In light of that evidence, and the fact that GX 1720 was recovered from Weigand's own laptop, GX 1720 is relevant apart from the truth of any matters asserted therein because a jury can draw the reasonable inference from GX 1720 that Weigand had a financial motivation—in the form of some anticipated amount of "commissions"—to participate in the charged Scheme.

The above-described evidence is plainly relevant under Rule 401 as direct evidence of the Scheme, Weigand's knowledge of and involvement in steps taken in furtherance of the Scheme, and his motivation for participating in the Scheme.  For the defendant's motion to succeed, he must therefore show that the evidence is unfairly prejudicial, and he has not done so.  *See, e.g.*, *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (noting that evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.").

Finally, while the Government does anticipate that an FBI Special Agent will testify regarding the contents of documents and communications recovered from the Weigand Laptop, and his knowledge, based on his background and experience, of certain features of the messaging applications used by Weigand, the Government does not intend to elicit any testimony from the agent as to the proper interpretation of those materials or inferences that should be drawn.

33

Weigand's motion should therefore be denied.

### XI. WEIGAND'S MOTION TO EXCLUDE MATERIALS PURPORTEDLY DOWNLOADED TO THE WEIGAND LAPTOP AFTER THE CHARGED CONSPIRACY ENDED SHOULD BE DENIED

Weigand also argues that *all* of the material recovered from the Weigand Laptop (the "Laptop Materials") should be excluded because the metadata associated with the documents purportedly proves that they were downloaded to the Weigand Laptop from a USB flash drive in August 2019.  (Dkt. 171 at 11).  Weigand may seek to offer admissible evidence supporting this theory at trial, but the Government is not currently aware of any.[22]  To the contrary, the Government anticipates that an FBI forensic examiner will testify that many of the relevant files were added to the Weigand Laptop in 2018—during the pendency of the charged Scheme—and that some of those documents were downloaded from a Protonmail account.

In addition, among the Laptop Materials are communications involving Weigand, and reflecting Weigand's involvement in the conspiracy, from well before the purported August 2019 USB download.  For example, in GX 1706, a September 21, 2017 email exchange recovered from the Weigand Laptop, Akhavan writes that a data set needs to "explain [the Eaze history] properly to new processors without naming the current banks," and adds that "Ruben is submitting it and is ccd [sic]."  Weigand then responds to Akhavan, asking about "the split" "between VI and MC," i.e. Visa and Mastercard.  Such communications are not "post-

---

[22] As discussed in the Government's Motion *in Limine* to Preclude Defendants' Experts, Weigand notified the Government that it may call Donald Vilfer to testify regarding a USB drive that it claims is the source of materials the Government located on the Weigand Laptop.  The Government has moved to exclude any opinions based upon the USB drive because Weigand has filed to provide any "basis or reasons" for Vilfer's conclusion that the USB drive "appears to be" the source of the materials on the Weigand Laptop.  *See* Dkt. 168 at 6-7, 25-26.

conspiracy" evidence, regardless of when they were downloaded onto the Weigand Laptop.

Moreover, even assuming other Laptop Materials—which include fraudulent merchant bank account packages and numerous statements for payment processing services provided to dispensaries involved in the Scheme—were downloaded onto the Weigand Laptop in August 2019, shortly after the fraudulent credit card processing was shut down—and the Government is not aware of any evidence suggesting that is the case—those documents are still "probative of the existence of the conspiracy." *United States v. Koppers Co., Inc.*, 652 F.2d 290, 298 (2d Cir. 1981). Notably, the Government is aware of no evidence that Weigand received the USB drive from someone else, as opposed to Weigand himself merely moving them from one device in his possession to another. Regardless, the mere fact that Weigand possessed these documents as the conspiracy was dissolving is indicative of his membership in it, as is a Telegram exchange, also recovered from the Weigand Laptop, showing that Weigand sent Akhavan many of these documents, in August 2019, in a zip folder titled "E," i.e. Eaze. *Koppers*, 652 F.2d at 298 (jury was entitled to hear testimony regarding end of conspiracy that "went directly to the question of whether or not a conspiracy ever existed"). Weigand's motion should therefore be denied.

## XII.    THERE IS NO BASIS TO INTRODUCE ADDITIONAL PORTIONS OF WEIGAND'S POST-ARREST STATEMENT

Weigand has failed to carry his burden to demonstrate that the portions of his post-arrest statement that he seeks to offer are necessary to clarify or explain the portions the Government intends to offer (the "Statements"). For the reasons set forth in the Government's motions *in limine*, *see* Dkt. 170 at 17-21, and below, Weigand's motion to introduce additional portions of his post-arrest statement should be denied.

Weigand's first claim is that certain background statements he made regarding his

35

English proficiency "call into question what Weigand understood 'involvement' with Eaze to mean." (Dkt. 172 at 23).  Weigand's full statements regarding his involvement with Eaze are not ambiguous and do not require any additional context for the jury to understand them.  Weigand stated that he had learned about Eaze on a billboard; had no involvement with Eaze; and learned what he knew about Eaze through the company's website.  (*See* GX 1901-T at 3-5).  The evidence at trial will show that these statements by Weigand were completely false.  Contrary to his statements in his post-arrest interview, Weigand worked with other co-conspirators to process over a hundred million dollars in Eaze's credit and debit card transactions through an elaborate scheme designed to hide the true nature of the transactions from financial institutions.  Furthermore, Weigand traveled to the United States in 2018 and attended a meeting with employees from Eaze and principals from the marijuana dispensaries.  Background statements by Weigand earlier in the interview are not necessary to understand the clear meaning of his statements regarding Eaze later in the interview.

Weigand next claims that his self-serving statements about his background in e-commerce and payment processing in Europe are somehow necessary to understand his statements about Eaze and his denial that he used a particular email address.  Weigand's purported employment history has no bearing on those topics.  Further, Weigand's false exculpatory statements in the post-arrest interview that his company did not conduct any business activities in the United States are also not necessary to provide context or prevent any misunderstanding.

Finally, Weigand's false exculpatory statements that he did not do anything illegal and his invocation of his right to counsel are not necessary to understand the Statements.  In the

portion the Government seeks to offer, Weigand denies that he has ever used a particular email address to communicate with anyone.  At the end, there is the following exchange:

> SA MAHAFFEY: Whose is it? You've never heard of it? Have you ever heard of it?
>
> MR. WEIGAND: I might have heard of it but --
>
> SA MAHAFFEY: Yeah. Exactly, man, you've heard of it.
>
> MR. WEIGAND: -- it's obviously not my email address.

After this exchange, Special Agent Mahaffey asks Weigand where he's heard of the email address and Weigand begins to indicate that he wants legal advice before continuing, and then makes a false exculpatory statement that he doesn't think he's done anything illegal.  The defense seeks to admit his false exculpatory under the guise that it's necessary to "provide context for the agent's accusation of guilt."  (Dkt. 172 at 20).  Weigand's false exculpatory is irrelevant and unnecessary for the jury to understand his unequivocal statement that he had not used the email address.  Weigand's motion should accordingly be denied.

37

**XIII.   CONCLUSION**

For the foregoing reasons, the Defendants' motions *in limine* should be denied.

Dated:  New York, New York
February 23, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:     s/ Nicholas Folly
Nicholas Folly
Tara La Morte
Emily Deininger
Assistant United States Attorneys
(212) 637-1060 / -1041 / -2472