UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA            :
                                    :
                                    :    20-cr-188 (JSR)
        -v-                         :
                                    :    OPINION & ORDER
HAMID AKHAVAN & RUBEN WEIGAND,      :
                                    :
    Defendants.                     :
                                    :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

   This case began less than one year ago, on March 9, 2020, when a grand jury returned indictments against Ruben Weigand and Hamid ("Ray") Akhavan for conspiracy to commit bank fraud. Today, the Court will empanel a jury to try the case.

   The intervening year has been challenging. Just two days after the indictments were returned, the World Health Organization declared a global pandemic.[1] Two days later, President Trump announced that "[t]o unleash the full power of the federal government, in this effort today I am officially declaring a national emergency. Two very big words."[2] Since then, the total

---

[1] James Keaton, et al., WHO Declares Coronavirus a Pandemic, Urges Aggressive Action, Reuters (Mar. 12, 2020), https://apnews.com/article/52e12ca90c55b6e0c398d134a2cc286e.

[2] The New York Times, Two Very Big Words: Trump Announces National Emergency for Coronavirus (Mar. 13, 2020), https://www.nytimes.com/video/us/politics/100000007032704/trump-coronavirus-live.html.

number of confirmed COVID-19 cases has surpassed 113 million worldwide, and more than 2.5 million people have died.[3]  In the United States alone, there have been more than 28 million confirmed cases, and more than half a million people have died.[4]

Recognizing the importance of the defendants' and the public's right to a speedy trial, and despite the complexity of this case and the many difficulties generated by the pandemic, the Court has expended considerable effort to bring the case swiftly and safely to trial.  So have many others: support personnel at the courthouse; Pretrial Services Officers; U.S. Marshals; witnesses who have been subpoenaed and who will travel to the courthouse, some from great distances; counsel for both sides, including some who have flown across the country to defend their clients; and now, dozens of jurors who, despite the risk, will board buses and subways to answer the call to discharge one of their most sacred civic duties.

Now before the Court are two motions relating to the pandemic and the Court's response to it.  First, Weigand moves to dismiss the indictment under the Speedy Trial Act and the constitutional

---

[3] Henrik Petterson, et al., Tracking COVID-19's Global Spread, CNN, https://www.cnn.com/interactive/2020/health/coronavirus-maps-and-cases/ (last accessed Feb. 28, 2021).

[4] Centers for Disease Control & Prevention ("CDC"), COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last accessed Feb. 28, 2021).

Speedy Trial Clause, arguing that the COVID-19 pandemic did not offer a valid basis for adjourning this trial from its originally scheduled date, December 1, 2020, until today.  This motion borders on the frivolous and is denied for reasons set forth below.

Second, Martin Elliott and his employer, Visa, Inc., third parties, have been subpoenaed to give trial testimony in this case.  However, Elliott resides in California and contends that, because of his personal medical situation and that of his family, he is unable to travel to New York and back during the pandemic without seriously jeopardizing his and their health.  He moves for leave to testify by two-way videoconference.  The defendants oppose the motion, arguing that permitting such testimony would violate their Sixth Amendment right to confront witnesses against them.  The Court granted Elliott's motion orally on February 19, 2021, see Tr., and this Opinion sets forth the basis for that ruling.

I. WEIGAND'S MOTION TO DISMISS THE INDICTMENT ON SPEEDY TRIAL GROUNDS

Anyone who has appeared before the undersigned knows that this Court moves its cases swiftly.  This is especially true in criminal cases, where

> [i]nordinate delay between public charge and trial, wholly aside from possible prejudice to a defense on the merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

United States v. Taylor, 487 U.S. 326, 340 (alterations omitted).
Even so, moving a document-heavy white-collar case like this from
indictment to trial in less than one year would be an
accomplishment under even normal circumstances, let alone the
delays brought on by the pandemic.  The argument that the delay in
this action violated Weigand's rights under the Speedy Trial Act
is specious at best, and the claim that it violated his
constitutional rights is frivolous.  The Court takes up Weigand's
statutory and constitutional arguments, in turn.

A. Speedy Trial Act

1. Legal Standard

The Speedy Trial Act sets guardrails on federal courts' powers
to delay criminal trials.  It provides that trial "shall commence
within seventy days from the filing date (and making public) of
the information or indictment, or from the date the defendant has
appeared before a judicial officer of the court in which such
charge is pending, whichever date last occurs."  18 U.S.C.
§ 3161(c)(1).  However, the 70-day clock is not always running.
Certain "periods of delay shall be excluded . . . in computing the
time within which the trial of any such offense must commence."
Id. § 3161(h).  Some exclusions operate automatically, including,
as relevant here, "[a]ny period of delay resulting from other
proceedings concerning the defendant, including but not limited to
. . . delay resulting from any pretrial motion, from the filing of

4

the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" and "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court."  Id. § 3161(h)(1)(D), (H).  In addition to these automatic exclusions, the Court may exclude periods of time in the interests of justice.  Specifically, the 70-day clock does not run

> if the judge granted [a] continuance on the basis of his
> findings that the ends of justice served by taking such
> action outweigh the best interest of the public and the
> defendant in a speedy trial.  No such period of delay
> resulting from a continuance granted by the court in
> accordance with this paragraph shall be excludable under
> this subsection unless the court sets forth, in the
> record of the case, either orally or in writing, its
> reasons for finding that the ends of justice served by
> the granting of such continuance outweigh the best
> interests of the public and the defendant in a speedy
> trial.

Id. § 3161(h)(7)(A).  "[I]n determining whether to grant [such] a continuance," the Court "shall consider" certain enumerated factors, "among other[]" non-enumerated factors; enumerated factors include "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice."  Id. §3161(h)(7)(B)(i).

2. Analysis

Weigand's initial appearance before this Court took place remotely, with Weigand's consent, on April 28, 2020. Thus, the 70-day clock would have begun ticking on that day. However, on that day the Court set the case for trial on December 1, 2020 and, without objection, granted an exclusion of time until December 1, 2020 under 18 U.S.C. § 3161(h)(7)(A), finding the exclusion "necessary for the completion of discovery, the making and deciding of motions, the accommodation of counsel's complicated schedules, [and] the special delays put in place by the coronavirus crisis," among other reasons. Tr., ECF No. 30, at 12:18-21. Weigand concedes that time was properly excluded through December 1, 2020.

The case progressed swiftly. On May 11, 2020, the defendants moved for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f), and the Court granted that motion on May 20, 2020. ECF Nos. 35-38. On June 26, 2020, the defendants moved to dismiss the indictment, to compel certain discovery, and to suppress certain evidence seized from Weigand incident to his arrest. ECF Nos. 61-74. The parties briefed and argued the motions, and the Court issued an Opinion and Order granting them in part and denying them in part on August 31, 2020. ECF No. 91. Discovery continued in earnest through summer and fall 2020. Throughout this time, the Court granted Weigand's requests to remain in custody in California, rather than requiring that he be

6

brought to the Southern District of New York; this permitted his California-based counsel to meet with him more easily.  Moreover, on October 6, 2020, the Court granted Weigand's renewed motion for bail, permitting him to be released into the custody of private security guards and further facilitating his access to counsel. ECF No. 112.

The parties and the Court were on track to proceed with trial on December 1, 2020, but the trial did not proceed for one reason: the COVID-19 pandemic.  On November 30, 2020, Chief Judge McMahon issued a standing order announcing a "temporary curtailment of operations [that] is required to preserve public health and safety in light of the recent spike in coronavirus cases, both nationally and within the Southern District of New York."  Standing Order M-10-468, at 1, In re: Coronavirus/COVID 19 Pandemic, Dkt. No. 20-mc-622-CM (Nov. 30, 2020).  The Standing Order provided that "[a]ll jury trials scheduled for the period beginning December 1, 2020 and ending January 15, 2021 are adjourned."  Id. at 2.

On December 1, 2020, the Government filed a letter that stated in part, "For the reasons set forth in the Chief Judge's Standing Order, as well as those previously stated by the Court when it excluded time through today, the Government respectfully requests the exclusion of time under the Speedy Trial Act from today through January 15, 2021."  Ltr, ECF No. 123.  The Court endorsed the

letter by writing, "So ordered," that same day.  ECF No. 124.  The Court adjourned the trial to January 25, 2021.

The Chief Judge issued a First Amended Standing Order on January 5, 2021, extending the suspension of jury trials in the District through February 12, 2021 because of a continuing surge in COVID-19 cases.  First Amended Standing Order M-10-468, In re: Coronavirus/COVID 19 Pandemic, Dkt. No. 20-mc-622-CM (Jan. 5, 2021).  On January 7, 2020, the Court conducted a teleconference regarding the need to further adjourn this trial.  The Court explained that it was still hopeful that the trial could proceed in March, or perhaps even in late February, but warned counsel that, due to limitations in the number of courtrooms that have been outfitted with equipment to permit safe trials during the pandemic and given previously scheduled cases, a trial in February or March might not be possible.  Because counsel were unavailable for a trial in April or early May, the Court

> set the trial down for May 17th.  And pursuant to the Speedy Trial rules, [the Court] exclude[d] all time between [January 7] and [May 17], finding that because of the pandemic the best interests of justice in excluding such time substantially outweighs the interests of the public and the defendants in a speedy trial.

Tr., ECF No. 130, at 9:11-16.

Weigand's counsel objected, arguing that Weigand is a German citizen with no criminal history; that this was a "no-loss" fraud in which no banks had been harmed; and that discovery had been

8

completed, pretrial motions had been decided, and "there's nothing remaining to do." Id. at 15:5-13. The Court asked, "So you think those grounds override the risk of someone dying from COVID-19 if we went forward with a trial, say, tomorrow?" Id. at 15:16-18. Weigand's counsel responded, "Certainly not, Your Honor." Id. at 15:19-20. The Court adhered to its ruling, excluding time through May 17, 2021.

### 1. The Court's Exclusions Were Proper

The Court's exclusions of time based on the pandemic were proper. Due to specific surges in COVID-19 cases around the holidays, the Chief Judge adjourned all jury trials, ultimately for a period of 11 weeks. During that time, many of the most vulnerable members of the public, and many courthouse employees, were vaccinated. While the courthouse cannot entirely eliminate the possibility of COVID-19 transmission during a trial -- let alone the possibility of transmission during travel to and from the courthouse -- now that many of the most vulnerable members of our population have been vaccinated, and given the downward trend in cases, the "risk of someone dying from COVID-19" because of the trial is markedly lower now than it was in December. As Weigand himself conceded, his interests in a slightly speedier trial do

not override this risk, which would have been markedly more significant during the winter COVID-19 spike.[5]

> 2. Even Without the Court's Exclusion of Time, 70 Days of Non-Excludable Time Have Not Passed

Even setting aside this Court's pandemic-induced exclusions of time, 70 days of non-excludable time have not yet passed.

The Speedy Trial Act automatically excludes "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to . . . delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" and "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court."  18 U.S.C. § 3161(h)(1)(D), (H).  Other courts have found that motions in limine are pretrial motions for purposes of this provision.  E.g.,

---

[5] Weigand also argues that the Court's "so ordered" exclusion on December 1 was inadequate because it did not explicitly state the basis for the Court's exclusion of time.  The Supreme Court has explained on this issue that "the findings must be made, if only in the judge's mind, before granting the continuance," Zedner v. United States, 547 U.S. 489 (2006), and "must be put on the record by the time a district court rules on a defendant's motion to dismiss," id. at 506-07.  Before granting the exclusion of time, this Court found, in its own mind, that the exclusion was warranted because of the pandemic.  And the Court unambiguously explained its reasoning during the teleconference on January 7.  Tr., ECF No. 130, at 15:21-23 ("The whole reason for these adjournments is the pandemic, nothing else.  The government is ready to go.  I'm ready to go.").  Thus, there is no merit to the argument that the Court failed to articulate the basis for its ruling.

United States v. Jones, No. 15-CR-133S, 2017 WL 2957818, at *6 (W.D.N.Y. July 11, 2017).  This Court agrees.

The Government filed a motion in limine on February 5, 2021, which the Court granted in part and denied in part on February 14. All parties filed additional motions in limine on February 16, 2021, which remain pending and on which the Court will rule before opening arguments today.

The February 5 motion was, and the February 16 motions will be, promptly resolved less than 30 days after they were taken under advisement.  Thus, time is excluded "from the filing of [each] motion through the . . . prompt disposition" of the motion, i.e., from February 5 through February 14 for the earlier motion and from February 16 through today for the subsequent motions.

Therefore, even assuming contrary to fact that there was a defect in the Court's exclusions of time in the interests of justice under the Speedy Trial Act, no more than 66 non-excludable days have passed since December 1, 2020: 65 days from December 2 through February 4, plus February 15 (the day between the Court's ruling on the initial motion in limine and the filing of the remaining motions).[6]

---

[6] February 15 might also be properly excluded because a third-party motion to quash was pending.  The Court need not resolve that question because, either way, 70 non-excludable days have not passed.

11

B. Speedy Trial Clause

The Court need not dwell on Weigand's claim that the delay in this case violates his constitutional right to a speedy trial.

When conducting a constitutional speedy trial inquiry, courts look, as a threshold matter, to the length of the delay; a court "will only consider the other . . . factors when the defendant makes a showing 'that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay.'" United States v. Ghailani, 733 F.3d 29, 43 (2d Cir. 2013) (quoting Doggett v. United States, 505 U.S. 647, 652 (1992)) (further quotation marks omitted). A delay that "approaches one year" triggers further inquiry. Doggett, 505 U.S. at 652 n.1. Trial in this case will commence eight days shy of one year after indictment, so the Court assumes without deciding that further inquiry is necessary.

To assess whether a speedy trial violation has occurred, the Court considers four factors: "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." United States v. Moreno, 789 F.3d 72, 78 (2d Cir. 2015) (quoting Barker v. Wingo, 407 U.S. 514, 530 (1972)) (brackets omitted). Balancing these factors, Weigand's claim easily fails. First, the less-than-one-year delay, while perhaps sufficient to trigger further inquiry, is unremarkable in a case of such complexity. Second, the delay through December 1, 2020 is equally

12

attributable to the Government and to the defendants, and the three-month delay thereafter is not attributable to the Government but rather to the pandemic, a neutral reason outside of the Government's control.  Third, while Weigand properly and timely asserted his speedy trial rights for delays after December 1, he explicitly waived any argument that prior delays were improper. Finally, Weigand argues that he has suffered various forms of prejudice: needing to undergo medical treatment in prison, a year away from his family, costs, loss of livelihood, and psychological trauma associated with incarceration during the pandemic. However, most of these had nothing to do with the three-month delay from December 1 to March 1, the only cognizable delay for present purposes.  The only prejudice he has demonstrated that is attributable to that delay is, almost circularly, the additional time he has spent away from his family and the associated costs and continued harms to his livelihood.

In sum, the three-month delay attributable to the pandemic comes nowhere close to violating Weigand's constitutional right to a speedy trial.

II.  MARTIN ELLIOTT'S MOTION TO TESTIFY BY VIDEO

The Court next turns to another coronavirus-related motion, the motion by third parties Visa, Inc., and Martin Elliott to offer trial testimony from California by two-way video technology.  The defendants oppose the motion, arguing that permitting videophonic

13

testimony would violate their rights under the Confrontation Clause of the Sixth Amendment.  The Government takes no position. Following expedited briefing and oral argument, the Court granted the motion on February 19, 2021.  This Opinion explains the basis for that ruling.

A. Background

The Government has subpoenaed Elliott, commanding that he testify at this trial.  Akhavan has also subpoenaed Visa for trial testimony, and Visa intends to offer Elliott as its witness to discharge that obligation.  Elliott was Visa's Global Head of Franchise Risk Management during the relevant period.  Although he represents that he "has no firsthand knowledge of the specific transactions at issue in this case," he is expected to provide, in his counsel's words, "process-type testimony about the workings of the Visa payment network."  Elliott Ltr. Motion, ECF No. 174, at 1.  The defendants do not contest this description, although they maintain that "questions about what Visa's policies did (or did not) require and how Visa did (or did not) enforce those policies are among the most critical questions in this case."  Ltr. Opp., ECF No. 175, at 5.

Elliott is 57 years old and has been diagnosed with hypertension and atrial fibrillation (a heart condition).  His wife is 55 and has been diagnosed with hypertension.  To his knowledge, no one in his household has contracted COVID-19, and no

one has received the coronavirus vaccine.  He and his wife are also the primary caretakers of his 83-year-old mother-in-law, who has received the first dose of the COVID-19 vaccine.  Elliott lives in the San Francisco Bay area and would need to travel by commercial flight to testify in this trial.  He avers that he and his wife have diligently complied with Centers for Disease Control and Prevention ("CDC") guidance during the pandemic.  They have not left California since early 2020 and have not flown on an airplane since the early summer.

Elliott's age and preexisting conditions place him at increased risk of serious illness or death if he were to contract COVID-19.  The CDC has found that people aged 50-64 are 400 times more likely to die and 25 times more likely to be hospitalized from COVID-19 than children aged 5-17 years, and are more than 25 times more likely to die and 3 times more likely to be hospitalized than young adults aged 18-29.[7]  On top of that, "adults of any age" with "heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies" "are at increased risk of severe illness" from COVID-19, and "adults of any age" with hypertension "might be at an increased risk for severe illness."[8]

---

[7]    CDC, Older Adults and COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed Feb. 28, 2021).

[8] CDC, Certain Medical Conditions and Risk for Severe COVID-19 Illness,   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

Although COVID-19 cases are trending downward, they remain high, and the "CDC recommends that [people] do not travel at this time."[9]  Under present courthouse policy, those who do travel from outside New York and its adjacent states must quarantine for four days and then obtain a negative COVID-19 test on the fifth day before they may enter the courthouse.  Elliott points out that if he testified in person, then, due to the heightened risks faced by his wife and mother-in-law, he would also need to quarantine apart from his family after returning to California.

B. Legal Standard

None dispute that the Court has the inherent authority to permit testimony by videophonic means, unless doing so would be contrary to federal law.  Defendants argue that such testimony is impermissible here for one reason, the Confrontation Clause of the Sixth Amendment, which provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.

"The primary object of" this clause is "to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil

---

precautions/people-with-medical-conditions.html  (last  accessed Feb. 28, 2021).

[9]      CDC,        Travel        During        COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (last accessed Feb. 28, 2021).

cases, being used against the prisoner." Maryland v. Craig, 497

U.S. 836, 845 (1990).  Instead, courts generally must permit

> a personal examination and cross-examination of the
> witness in which the accused has an opportunity, not
> only of testing the recollection and sifting the
> conscience of the witness, but of compelling him to stand
> face to face with the jury in order that they may look
> at him, and judge by his demeanor upon the stand and the
> manner in which he gives his testimony whether he is
> worthy of belief.

Id. (internal quotation marks and citation omitted).

C. Analysis

A "confrontation" encompasses several elements -- "physical

presence, oath, cross-examination, and observation of demeanor by

the trier of fact" -- that together "serve[] the purposes of the

Confrontation Clause by ensuring that evidence admitted against an

accused is reliable and subject to . . . rigorous adversarial

testing[.]"  Id. at 846.  Despite the values of confrontation,

however, the Supreme Court "ha[s] never held . . . that the

Confrontation Clause guarantees criminal defendants the absolute

right to a face-to-face meeting with [all] witnesses against them

at trial."  Id. at 844.  For example, "a literal reading of the

Confrontation Clause would abrogate virtually every hearsay

exception," a result the Court has long rejected.  Id. at 848

(internal quotation marks and citation omitted).

Confrontation Clause analysis comprises two distinct

questions.  First, a court must ascertain whether the evidence in

17

question even implicates the accused's right to confront "witnesses against him."  The Supreme Court identifies such evidence as "testimonial."  This question is not difficult in this case.  If Elliott were offering evidence by means of an affidavit, then some aspects of his testimony might bear on matters, like Visa's policies, that are sufficiently ministerial that his statement might qualify as non-testimonial.  See, e.g., Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009) ("[H]aving been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial[,] [certain records would] not [be] testimonial."); United States v. Boyd, 686 F. Supp. 2d 382, 386 (S.D.N.Y. 2010), aff'd, 401 F. App'x 565 (2d Cir. 2010) ("[W]here the defendant had ample opportunity to confront the Government witness who undertook the final, critical stage of the DNA analysis, and where that witness was personally familiar with each of the prior steps, testified that the analysis included safeguards to verify that errors would not result in a false positive, and demonstrated that the prior steps were essentially mechanical in nature, the Confrontation Clause is satisfied.").  But Elliott will be testifying live, so there is no doubt that his statements will be testimonial.  See Melendez-Diaz, 557 U.S. at 310 ("[T]estimonial statements" include "ex parte in-court testimony or its functional equivalent" and "statements that were made under circumstances which would lead an objective witness

18

reasonably to believe that the statement would be available for use at a later trial[.]") (internal quotation marks and citations omitted). After all, the purpose of the "testimonial" inquiry is to assess whether, in the words of the Sixth Amendment, the declarant is a "witness," and Elliott will obviously be one. Put simply, testimony is always "testimonial."

Ordinarily, this ends the Confrontation Clause inquiry because a defendant has a right to confront witnesses against him. But in some cases, courts also face a second question: whether the "confrontation" requirement may be satisfied by something short of traditional, live, in-court testimony.

In Maryland v. Craig, for example, the Supreme Court found that live testimony through a one-way videoconferencing system satisfied the Confrontation Clause. The state court permitted such technology so that a child witness could testify regarding alleged abuse without facing the accused. The Court "f[ou]nd it significant" that, other than requiring the witness to face the defendant, the procedure "preserves all of the other elements of the confrontation right," including oath, cross-examination, and the ability of the judge, jury, and defendant to view the witness's demeanor. Craig, 497 U.S. at 851. The Court recognized "the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding," but it nevertheless found that the one-way videoconference procedure "adequately ensures that the testimony

is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." Id. The Court concluded "that use of the one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause." Id. at 852. And the Court held that Maryland's "interest in the physical and psychological well-being of [the] child abuse victim[]" was an important state interest furthered by the one-way video procedure used in the state court. Id. Therefore, the Court found no Confrontation Clause violation. Id. at 857.

The Second Circuit likewise approved the use of video testimony in United States v. Gigante, 166 F.3d 75 (2d Cir. 1999). Gigante held that, "upon a finding of exceptional circumstances, . . . a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." Id. The Second Circuit reviews a district court's "exceptional circumstances" determinations for "abuse [of] discretion." Id. at 82.

The Gigante panel reasoned that Federal Rule of Criminal Procedure 15 permits deposition of pretrial witnesses in exceptional circumstances and that courts permit such deposition testimony to be used at trial if the witness is unavailable. The panel explained that

20

two-way closed-circuit presentation of [the witness's] testimony afforded greater protection of Gigante's confrontation rights than would have been provided by a Rule 15 deposition [that was later introduced at trial]. It forced [the witness] to testify before the jury, and allowed them to judge his credibility through his demeanor and comportment; under Rule 15 practice, the bare transcript of [the witness's] deposition could have been admitted, which would have precluded any visual assessment of his demeanor. Closed-circuit testimony also allowed Gigante's attorney to weigh the impact of [the witness's] direct testimony on the jury as he crafted a cross-examination.

Id. The panel concluded that if Gigante could have been deposed under Rule 15, then a fortiori he could be examined by two-way videoconference. Because the witness "was in the final stages of an inoperable, fatal cancer," id. at 79, and was "participat[ing] in the Federal Witness Protection Program," id. at 81-82, the Second Circuit held that the use of two-way videoconference technology was consistent with the Confrontation Clause. Gigante has never been overturned by the Second Circuit.

The defendants argue that Gigante is no longer good law because it conflicts with the Supreme Court's 2004 opinion in Crawford v. Washington, 541 U.S. 36 (2004). In Crawford, the Supreme Court ruled that certain out-of-court statements could not be admitted, consistent with the Confrontation Clause, unless the defendant was allowed to cross-examine the declarant. Drawing from historical evidence, the Court explained that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of

21

ex parte examinations as evidence against the accused." Id. at 50. Thus, the Court held that testimonial out-of-court statements are only admissible when the witness is "unavailab[le]" and where there was "a prior opportunity for cross-examination." Id. at 68.

The error in defendants' reasoning is that Crawford and Gigante answered different questions. Crawford addressed whether confrontation was required for certain out-of-court statements. Gigante addressed whether, when the defendant undeniably has a Confrontation Clause right, that right can be vindicated in exceptional circumstances by video testimony. The answer to that question is yes. By arguing otherwise, defendants would have this Court believe that the Crawford Court overruled Maryland v. Craig. But the majority opinion in Crawford did not even mention Craig. This Court declines to find that the Supreme Court overruled Craig sub silentio, just fourteen years after issuing that opinion, with nary a word about stare decisis.

Because Crawford answered a different question than the question presented here, and because Gigante is consistent with Craig, the Court applies Gigante, asking whether Elliott is "unavailable" and whether "exceptional circumstances" warrant the use of two-way video testimony.[10] Here, these two inquiries largely

---

[10] The witness and the defendants suggest that Elliott's testimony must also be "material" to warrant the use of two-way video testimony, citing Judge Forrest's opinion in United States v. Mostafa, 14 F. Supp. 3d 515, 519 (S.D.N.Y. 2014). The Court need

overlap.    Elliott cannot travel across the country without subjecting himself to a substantial risk of contracting COVID-19. Given his age and comorbidities (as well as, to a lesser extent, the risks his family would face), contracting COVID-19 could well result in serious illness or death.  Therefore, the Court finds that Elliott is "unavailable" to testify in person within the meaning of Gigante.  Likewise, the need to prevent Elliott's serious illness or death (and to protect his family) offers exceptional circumstances warranting the use of two-way video testimony.

The defendants point out that many trial participants (e.g., counsel, witnesses, jurors, courthouse staff) must travel to the courthouse in the presence of others using public transit. However, this does not show that Elliott's circumstances are not exceptional.  If other trial participants present similarly severe risks of severe illness or death, the Court will similarly endeavor to limit such risks.  To that end, the Court has agreed to permit two defense attorneys to view the proceedings by video and, with reasonable advance notice, to argue non-jury motions.  Moreover, the Clerk of Court's procedure for summoning jurors has considered, and the Court's procedure for selecting jurors will consider,

---

not consider whether such a requirement exists, because the witness and the defendants agree that Elliott's testimony satisfies any such materiality requirement.

prospective jurors' risks of contracting severe COVID-19.  Elliott merely asks that the Court similarly consider his individualized circumstances, which are exceptional.[11]

Because Elliott has demonstrated that he is unavailable to testify, and because exceptional circumstances support his request to testify by two-way video, his motion is granted.[12]

The Court has made clear, and here reiterates, that Elliott, Visa, and their counsel are responsible for making all necessary technological arrangements for Elliott's testimony.  The Court has been assured that this technology will permit the defendants, defense counsel, the questioner, the judge, and the jurors all to

---

[11] Judge Preska reached a similar conclusion in United States v. Donziger, No. 11-CV-691 (LAK), 2020 WL 5152162, at *2 (S.D.N.Y. Aug. 31, 2020), reconsideration denied, No. 11-CV-691 (LAK), 2020 WL 8465435 (S.D.N.Y. Oct. 23, 2020).  Judge Preska reasoned that a witness "was at heightened risk of serious health complications if he were to contract COVID-19, that the Government had proposed adequate procedures to ensure the reliability of his testimony by video, and that the video testimony would comport with the requirements of the Sixth Amendment as construed in Maryland v. Craig, 497 U.S. 836 (1990), United States v. Gigante, 166 F.3d 75 (2d Cir. 1999), and related decisions."  Id. at *1.  This Court agrees, and the same rationale applies here.

[12] The standard articulated in Craig is satisfied, as well.  See Craig, 497 U.S. at 850 ("[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.").  Preventing the serious illness or death of a third-party witness whose testimony is compelled by subpoena is an important public policy.  And the procedures applied here, even more than the one-way video testimony in Craig, will preserve every adversarial element of confrontation other than physical presence itself.

see and be seen by the witness.  Cf. United States v. Mostafa, 14 F. Supp. 3d 515, 525 (S.D.N.Y. 2014) (adopting similar approach). The Court has also been informed that Elliott will testify from his attorneys' offices in the San Francisco area and that counsel for the defendants have been invited to send representatives, who can be present in the same room as Elliott throughout the entirety of his testimony.  The Court need not address whether such procedures are constitutionally necessary in this case, but the Court agrees that they are prudent.  This approach, even more than the approaches approved in Craig and Gigante, will preserve almost all "the intangible elements of the ordeal of testifying in a courtroom."  See Gigante, 166 F.3d at 81.

For the foregoing reasons, Weigand's motion to dismiss the indictment on speedy trial grounds, ECF No. 183, is denied, and Visa and Elliott's motion to testify by video, ECF No. 174, is granted.

SO ORDERED.

Dated:    New York, NY
          March 1, 2021
Time:     12:02 a.m.

_____
United States District Judge

25