

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 14, 2021

**BY ECF**

Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
New York, New York 10007

   Re: *United States v. Hamid Akhavan et al.*, S3 20 Cr. 188 (JSR)

Dear Judge Rakoff:

  The Government writes respectfully in response to defendants' letters regarding the expected testimony to be elicited by their respective experts. As discussed below, the Government submits that the proffered opinions and/or testimony are largely irrelevant, prejudicial, and cumulative. In addition, defendant Weigand's expert disclosures remain inadequate.

**Defendant Weigand**

  *Stephen Mott*. The opinions and testimony Weigand seeks to offer through Stephen Mott should be excluded because (1) they were never disclosed to the Government; and (2) they are irrelevant and otherwise substantially misleading.

  *First*, Weigand states that "consistent with prior disclosures," Mott will testify about the "influence that the credit card networks and the issuing banks have over the International Organization for Standardization with respect to the creation of Merchant Category Codes." (Weigand Ltr. dated Mar. 13, 2021, at 5 point 2). Remarkably, in contrast to Weigand's representation (in which he provides a general citation to his previous expert notice), this proffered testimony appears nowhere in his expert disclosure to the Government, even under the broadest reading. For this reason alone, Mott should be precluded from offering this testimony.

  Moreover, the Government is still left in the dark as to Mott's opinion on this subject, *i.e.*, there is no information regarding the level of influence Mott contends that credit card companies and issuing banks have over an independent organization responsible for creating MCCs. Nor, aside from his experience—involving work at MasterCard decades ago—is the Government aware of the basis supporting any such opinions. In this vein, Weigand has represented to the Government yesterday that there is literally no 3500 materials for this expert. In light of Weigand's continued failure to disclose his expert's opinion on this topic to the Government (let alone the basis for it), it should be excluded.

*Second*, Weigand seeks to have Mott testify that "in order to comply with Visa and MasterCard's "Area of Use" rules for acquiring banks, it is common practice for companies to locate subsidiaries or related entities in the same jurisdiction as their acquiring bank to facilitate payment processing." (Weigand Ltr. at 5 point 1). Again, this opinion has never been disclosed to the Government, nor has the basis for it. Continued general reliance on Mott's "experience" is insufficient.

More problematically, however, the opinion is not relevant and unduly confusing and misleading, and should be excluded on those grounds. Contrary to companies that "locate subsidiaries or related entities" in the same jurisdiction as the "acquiring bank" to legitimately facilitate payment processing, there is not a shred of evidence that Eaze established "subsidiaries" or "related entities" for this purpose. To the contrary, witness testimony has established that the shell companies used in the charged scheme have no relation to Eaze whatsoever. For example, Michael Tassone, who remains an Eaze employee, testified that he did not recognize the names of the shell companies and associated descriptors. (Tr. dated Mar. 2, 2021, at 243-244). Oliver Hargreaves also testified that the purpose of the shell companies was simply to fraudulently disguise Eaze transactions, and otherwise lacked a relationship to Eaze. (*See, e.g.*, Tr. dated Mar. 8, 2021, at 682-684, 757, 758-762, 776, 825-826, 828-829). In addition, while those shell companies were all incorporated in the United Kingdom, two of the major acquiring banks used in the scheme were not based in the United Kingdom, but rather Germany (Wirecard), and Vienna (Kalixa). (Tr. dated Mar. 8, 2021, at 804, 829). Absent proof that Eaze established "subsidiaries" or "related companies" in the relevant foreign jurisdictions to facilitate processing, Mott's opinion is irrelevant, confusing, and misleading, and should therefore be excluded.

*Finally*, Weigand seeks to have Mott testify that financial liability for ecommerce transactions is borne by the acquiring banks, not the issuing banks. (Weigand Ltr. at 5 point 3). This is not properly the subject of expert testimony, and is otherwise irrelevant. While the Court has permitted evidence that issuing banks profit from processing credit and debit transactions as relevant to materiality only, the proffered opinion regarding chargeback liability for ecommerce transactions generally is of minimal probative value. In any event, witnesses from Visa, MasterCard, and banks—which, notably, appear on the defense's witness lists as well—can easily address this topic; "expert" testimony is unnecessary.

<u>Donald Vilfer.</u>  The testimony Weigand seeks to offer through Donald Vilfer should be excluded to the extent it extends beyond conclusions reached from his personal review of Weigand's laptop because such opinions and testimony (1) were never disclosed to the Government; (2) are irrelevant and otherwise substantially misleading; (3) would be impermissibly using an expert as a conduit for introducing hearsay, and (4) are not the product of reliable principles and methods.

*First*, Weigand's discussion of the relevance and need for Vilfer's testimony is misleading in several respects. He contends that Vilfer will show that contents of the USB drive were copied onto the laptop after the close of the conspiracy, but August 2019, the date that Vilfer will apparently testify to, is squarely within the time frame that the Government has alleged the conspiracy was operating. (*See* Indictment at ¶¶ 1, 6). In addition, Weigand's contention that there have been "serious limitations" as to the testimony regarding documents obtained from the

laptop ignores Volchko's testimony, in which she testified to the meaning of the metadata that she reviewed, including explaining that "date added" metadata "is the date that a file was added to a specific location on the Mac" and that it meant "that a file had to have been on the computer as of its date-added metadata date." (Trial Tr. at 631; *see also* Trial Tr. at 635). Weigand's counsel did not pose any questions to Volchko regarding that date added metadata during her cross-examination.

*Second*, Weigand still has failed to disclose what Vilfer's opinions are on many of the relevant subjects. For example, Weigand proffers that Vilfer will testify to "who authored the contents of the E.zip folder," but has failed to disclose who Vilfer believes that is, or the basis for that conclusion. (Weigand Ltr dated Mar. 13, 2021 at 2-3 point 1). Weigand has yet to produce any 3500 materials for this witness, or work product that he may seek to use as an exhibit with this witness, that would provide specifics on those opinions.[1] Vilfer's proffered testimony regarding "the lawful and common privacy-protection uses of the encrypted messaging applications" similarly fails to provide any specifics as to what he believes those privacy-protection uses are (*id.* at 3 point 5), and is wholly outside the scope of his expert disclosure.

*Third*, testimony regarding the USB drive should be precluded as irrelevant and confusing. Although Weigand does not proffer any specifics as to what Vilfer will say as to how he obtained the USB drive, the Government believes that he will testify that he received it from Weigand's counsel. Vilfer accordingly cannot authenticate the USB drive as having been in the possession of Weigand, or any other relevant individual. Testimony regarding the USB drive will, accordingly, be highly confusing and will merely invite the jury to speculate, based on no evidence, as to the USB drive's origins. The proposed testimony that the documents came from a USB drive, moreover, has minimal probative value, as Vilfer can testify, based on metadata from the laptop, as to when the relevant files were added to the laptop without any reference to the USB drive.

Vilfer should also be precluded from testifying as to any narrative recounted to him by Weigand or Weigand's counsel as to where the USB drive came from or the purposes for which it was used. (*See* Trial Tr. 1518-19 (defense counsel proffer that "drive has information that Mr. Weigand was given as part of his efforts to mediate a dispute between unrelated entities")). Such testimony would be impermissibly "repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the [defendant] to circumvent the rules prohibiting hearsay." *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003); *United States v. Meija*, 545 F.3d 179, 197 (2d Cir. 2008) ("The expert may not . . . simply transmit . . . hearsay to the jury."); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony"). Any narratives recounted to Vilfer regarding the origins of the USB drive have no basis in Vilfer's knowledge and experience as a computer crimes and mobile device forensic investigator, are unreliable as made by an interested party who is not subject to cross-examination, and would likely be improperly relied on by the jury for their truth. *See United States v. Rodriguez*, 651 F. App'x 44, 46-47 (2d Cir. 2016) (affirming preclusion of statements defendant made to expert in preparation for trial).

---

[1] In response to the Government's inquiry yesterday, Weigand represented that they would produce 3500 materials for Vilfer today, but that they have no 3500 materials for Mott.

3

*Fourth*, and relatedly, testimony "confirming" that Weigand did or did not undertake any particular actions should be precluded because it goes far beyond the limited reliable conclusions Vilfer can properly reach from his personal review of the forensic image of Weigand's laptop. (*See* Weigand Ltr. dated Mar. 13, 2021 at 3 points 2-5). Vilfer may be able to testify to the evidence or lack of evidence as to Weigand's actions based on data available from the laptop. He should be precluded, however, from testifying to opinions that would, to be reliable, have required a review of every electronic device Weigand used and every email that Weigand sent or received during the relevant time period—which Vilfer has not, and does not purport to have, done—such as testifying that "Weigand never used, changed, or sent these allegedly 'fraudulent' merchant applications to anyone else" and that "Weigand did not create on his electronic devices any websites or merchant applications packages that are the subject of trial testimony." (*Id.* at 3 points 2 and 4).

**Defendant Akhavan**

*Jeffrey Rankin.* Defendant Akhavan seeks to offer expert testimony through Mr. Rankin concerning various topics relating to the role of the acquiring bank, including the privity, or lack thereof, between the participants in the payment processing system, the responsibilities of the acquiring bank to onboard merchants, including KYB/KYC responsibilities, and the selection of MCC codes and descriptors. He further seeks to testify as to the information known to the acquiring bank about a merchant versus what is passed to the card networks and issuing banks in connection with a transaction. (Akhavan Ltr. dated Mar. 13, 2021, at 1).

As the Government previously asserted, this is not properly the subject of expert testimony and has already been addressed by several witnesses. (*See, e.g.*, Tr. dated Mar. 3, 2021, at 433 (role of acquiring bank includes managing merchant account and KYC on merchant), 434-435 (information transmitted to issuing banks), 437 (same), 438-439 (acquirer responsible for assigning MCC codes), 453 (relationship between MasterCard and acquiring bank), 457-458 (merchant onboarding by acquiring bank, including MCC), 461 (MasterCard does not have a direct relationship with the merchant); Tr. dated March 11, 2021, at 1159-61 (information received by issuing bank from acquirer), 1162 (acquiring bank assigns MCC code), 1191-92 (issuing bank has no kind of contractual relationship with acquiring bank or with merchant).

In addition, portions of the proffered testimony should be excluded as irrelevant and confusing. As the Court and the parties repeatedly discussed, the pertinent issues in this case concern what information an issuing bank received in connection with its decision to authorize a transaction during the relevant timeframe, and whether the bank deliberately refused to consult the information received, because in reality it didn't care about what it was authorizing. Testimony surrounding the details received by the *acquiring bank* about a merchant do not bear on these issues, and is otherwise confusing. In other words, it does not matter that the acquiring bank, pursuant to its KYC and KYB duties, may be privy to additional information about its customer merchant—what matters is what information is transmitted to Visa, MasterCard, and the issuing bank and whether that information was false and material to those entities. Again, absent a showing that these entities deliberately chose not to use the transactional information they received

because they didn't care what they were processing, the fact that the acquiring bank may have more detailed information about the merchant is irrelevant and misleading.

In addition, testimony concerning "the process for challenging the accuracy of an MCC or descriptor" appears particularly irrelevant and confusing. This is not a case involving an assessment of what MCC and descriptor should apply to a known, identified merchant; it is a case about the application of falsified MCCs and descriptors stemming from the fraudulent use of a seemingly innocuous shell company designed to conceal the identity and business of the real merchant, *i.e.*, Eaze. For this additional reason, this testimony should be excluded.

    Very truly yours,

    AUDREY STRAUSS
    United States Attorney

by: s/ _____
    Nicholas Folly
    Tara LaMorte
    Emily Deininger
    Assistant United States Attorneys
    (212) 637-1060 / 1041 / 2472

cc: all counsel of record (by ECF)