**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

RUBEN WEIGAND and HAMID AKHAVAN,

        Defendants

Case No. 20-cr-188 (JSR)

**DEFENDANT RUBEN WEIGAND'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTIONS FOR A JUDGMENT OF ACQUITTAL**
**OR, IN THE ALTERNATIVE, A NEW TRIAL**

# TABLE OF CONTENTS

## TABLE OF AUTHORITIES

Defendant Ruben Weigand ("Weigand") respectfully submits this memorandum of law in support of his motion for a judgment of acquittal under Rule 29 or, in the alternative, for a new trial under Rule 33.

## PRELIMINARY STATEMENT

Weigand is entitled to a judgment of acquittal because no rational juror could have found that the Government established, beyond a reasonable doubt, two of the fundamental elements of the bank fraud conspiracy charge: (1) that the misrepresentations at issue would have been material to a reasonable bank, and (2) that Weigand had specific intent to defraud U.S. credit card issuing banks. With respect to materiality, there was no evidence at trial that any U.S. issuing bank had *ever rejected or failed to authorize a credit card transaction because it was for the purchase of marijuana.* Instead, the evidence demonstrated that U.S. issuing banks are well aware that their cardholders use their credit and debit cards to purchase marijuana. Instead of blocking the transactions or penalizing their cardholders, the banks simply collect their fees. With respect to intent to defraud, there was no evidence whatsoever that Weigand intended to deceive a U.S. issuing bank or obtain money/property from a U.S. issuing bank by means of fraudulent misrepresentations. Indeed, the Government introduced no evidence, be it testimonial or documentary, that Weigand ever so much as discussed U.S. issuing banks or their policies, let alone conspired to deceive them or obtain their property.

If the Court denies Weigand's motion for judgment of acquittal, Weigand moves for a new trial under Federal Rule of Criminal Procedure 33 based on six evidentiary rulings the Court made during trial: (1) the Court admitted vague and misleading documents and communications seized from Weigand's laptop that the Government offered without a witness who could explain them or put them into context, leaving the jury with no option other than to speculate or guess

about the content of these materials; (2) the Court admitted other documents that were copied onto Weigand's laptop well after the conspiracy had ended and without any evidence that Weigand had possession of the documents while the conspiracy was ongoing; (3) the Court admitted evidence concerning Wirecard, the German financial institution at the center of a $2 billion fraud scheme, and its former Chief Operating Officer, Jan Marsalek, who is currently an international fugitive, despite the fact that not a single transaction at issue in the case was processed by Wirecard and that there was nothing other than the Government's wild and inappropriate speculation to connect Weigand to Wirecard in any meaningful respect; (4) the Court excluded evidence or argument regarding pecuniary loss (or lack thereof) to U.S. issuing banks as it relates to intent to defraud, preventing Weigand from presenting a perfectly appropriate defense: he acted in good faith toward U.S. banks because there was no reason for him to believe that U.S. banks would lose money on the transactions at issue and there was no reason for him to believe U.S. banks were not content to process the transactions; (5) the Court excluded all testimony from Weigand's payment processing expert, Stephen Mott, which deprived Weigand of a defense expert who could buttress his non-materiality defense; and (6) the Court excluded portions of Weigand's post-arrest statement that provided necessary context for the cherry-picked and misleading excerpts the Government played for the jury.

## LEGAL STANDARDS

Under Rule 29 of the Federal Rules of Criminal Procedure, the Court must set aside a guilty verdict and enter a judgment of acquittal with respect to any offense for which the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a), (c)(2). Where a "rational trier of fact could [not] have found the essential elements of [a] crime beyond a reasonable doubt," a Rule 29 motion must be granted. *United States v. Rodriguez*, 392 F.3d 539, 544 (2d

Cir. 2009) (citation and quotation marks omitted).  Each element necessary for conviction must be proven beyond a reasonable doubt, and in assessing the sufficiency of evidence offered with respect to a particular essential element, the Court "must . . . be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element . . . is established beyond a reasonable doubt."  *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (citation and quotation marks omitted).  A reasonable jury must "necessarily entertain a reasonable doubt" where "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence."  *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (citation and quotation marks omitted).

Under Rule 33 of the Federal Rules of Criminal Procedure, the Court may "set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (citation and quotation marks omitted).  The Second Circuit has stated that "the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29 . . . ."  *Id.* at 134 (citation and quotation marks omitted).  A trial court must exercise its own discretion to "strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury."  *Id.* at 133 (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)).  In exercising that discretion, a court "is not required to view the evidence in the light most favorable to the government."  *United States v. Lopac*, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006) (citations omitted).  Accordingly, the district court must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation."  *Id.* (citation and quotation marks omitted).  In particular, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict."  *Ferguson*, 246 F.3d at 133 (citation

omitted).  Where evidence has been admitted at trial in error, a new trial must be granted unless it is "'highly probable' that the error did not affect the verdict."  *United States v. Dukagjini*, 326 F.3d 45, 61 (2d Cir. 2003) (citation omitted).   In other words, a new trial is warranted if improperly admitted evidence had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 62 (citation and quotation marks omitted).

## ARGUMENT

### I.   MR. WEIGAND IS ENTITLED TO A JUDGMENT OF ACQUITTAL UNDER RULE 29

The Government was required to prove that the alleged misrepresentations would have been material to a reasonable bank, and that a federally insured bank (or credit union) was "induced to authorize the transactions by means of the misrepresentations."  *See* Dkt. No. 246 at 17 ("Jury Instructions").  The Government was also required to prove that Weigand joined the conspiracy "knowingly, intentionally, and with the specific intent to defraud." *Id*. at 18. Pursuant to the Court's jury instructions, "even if a defendant himself caused a misrepresentation to be made but did so in good faith and without an intent to defraud, he would not be guilty of this conspiracy." *Id*. at 19.

For the reasons described below, the Government fell woefully short of proving both the materiality of the alleged misrepresentations and that Weigand joined the conspiracy with a specific intent to defraud.  Accordingly, no rational juror could have found that the Government met their burden with respect to these fundamental elements, and a judgment of acquittal is, therefore, required.

### A.  No Rational Juror Could Have Found That The Alleged Misrepresentations Were Material To An Objectively Reasonable Bank

Weigand hereby adopts all arguments set forth in Akhavan's post-trial motions for the reasons outlined in the motions and pursuant to the authorities cited therein.  *See* Dkt. No. 258 ("Akhavan Motion").

Specifically, Weigand joins Akhavan in arguing that: (1) there was no evidence that a reasonable bank would have declined to authorize Eaze transactions even absent the alleged misrepresentations (and, in fact, the proof at trial established that the testifying banks, even after learning about specific transactions for marijuana they had authorized, took no steps to prevent the cardholders from continuing to use their cards to buy marijuana and kept the fees and interest payments associated with those transactions), (2) self-serving testimony from *three* U.S. issuing banks—out of the more than 1,300 U.S. issuing banks that processed Eaze transactions in the relevant period, *see* HAX 10069—that those banks would not have "knowingly" processed marijuana transactions is insufficient to prove the misrepresentations were material to a reasonable bank, (3) the evidence showed that U.S. issuing banks made a conscious decision to permit marijuana transactions, and (4) evidence that the defendants conspired to submit false information to European banks is irrelevant.

Indeed, the Government's March 17, 2021 letter to the Court (the "Letter"), in which the Government defends the practices of Circle Financial ("Circle"), a payment processing company that currently processes Visa and MasterCard marijuana-related transactions on behalf of Eaze, confirms that the alleged misrepresentations were not material.  Dkt. No. 239.  The Government acknowledges that these transactions utilize descriptors that explicitly refer to "Eaze."  *Id*. at 2. Yet, in the same Letter, and at trial, the Government claimed the U.S. issuing banks would not have knowingly processed the Eaze transactions.  *Id*. at 2-3; (Tr. 2440:1-7; 2461:11-24; 2488:21-

2489:1.)  The evidence at trial demonstrated that, within an eight month period, over a thousand U.S. issuing banks authorized a combined total of roughly $50 million dollars in marijuana transactions using Visa/MasterCard, processed by Circle on behalf of Eaze, with the word "Eaze" explicitly in the descriptor.  (Tr. 2378:9-16.)  It is a matter of common sense that a misrepresentation cannot be said to have "induced" an issuing bank to authorize a transaction, when, absent the misrepresentation (when the descriptor explicitly refers to "Eaze") the issuing banks processed these transactions regardless in just a few months.  The idea that the Circle transactions were somehow "different" than the transactions that occurred during the charged conspiracy because they involved the meaningless purchase of a "cryptocurrency" is, on its face, an absurd and, frankly, surprising, position for the Government to take, as the substance of the transactions: using Visa/MasterCard to buy marijuana, is identical to the transactions that occurred during the charged conspiracy.

Indeed, Circle uses a non-marijuana related MCC, offshore banks, and foreign merchant accounts.  (Tr. at 2365:22-24; 2366:16-25; 2367:13-22; 2638:3-2639:3.)  Incredibly, one of the merchant banks that Circle processes Eaze's transactions through Circle was identified as a coconspirator by the Government.  (*Compare* HAX 14003 *with* GX 1622.)

### B.  No Rational Juror Could Have Found That Mr. Weigand Had A Specific Intent To Defraud U.S. Issuing Banks[1]

The Government's case was devoid of any evidence that Weigand intended to either: (1) defraud a U.S. issuing bank, or (2) obtain money or property from a U.S. issuing bank by means of false representations.  No rational jury could have found, under either subsection of the bank

---

[1] In addition to the arguments set forth in this section, Weigand joins the arguments made by Akhavan regarding the insufficiency of evidence of the defendants' intent to defraud the "victim" issuing banks.  *See* Akhavan Motion at 15-23.  Specifically, Weigand joins Akhavan in arguing that no rational juror could have found that the defendants: (1) intended to harm a U.S. issuing bank, or (2) intended to deceive a U.S. issuing bank.  *Id*.

fraud statute, that Mr. Weigand joined a conspiracy to commit bank fraud "knowingly, willingly, and with specific intent to defraud."  Jury Instructions at 14.

For a conviction under §1344(1), the Government is required to prove that the "defendant intended to defraud the financial institution itself."  *United States v. Bouchard*, 828 F.3d 116, 125 (2d Cir. 2016) (citations omitted) (finding evidence of intent insufficient for a conviction under either bank fraud subsection).  Under §1344(2), the Government is required to prove "that the defendant intend[ed] 'to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution' . . . [and] that the envisioned result—i.e., the obtaining of bank property—occur 'by means of false or fraudulent pretenses, representations, or promises.'"  *Loughrin v. U.S.*, 573 U.S. 351, 355-356 (2014).  "[§]1344(2)'s 'by means of' language is satisfied when . . . the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control."  *Id*. at 363. Moreover, pursuant to the Court's jury instructions, "even if a defendant himself caused a misrepresentation to be made but did so in good faith and without an intent to defraud, he would not be guilty of [a conspiracy to commit bank fraud]."  Jury Instructions at 19.

At trial, there was not a shred of evidence that Weigand engaged in any discussion about U.S. issuing banks or their policies, let alone any conversation about deceiving those banks. Instead, the evidence demonstrated that Weigand had a tangential role that consisted of introducing Oliver Hargreaves ("Hargreaves"), the Government's main cooperating witness, to an individual named Andreas who was tasked with submitting application packs to foreign acquiring banks.  (Tr. 739:17-740:1.)   The evidence also showed that Weigand had been

involved in some communications (primarily a couple of group chats), acting as a liaison[2] between Hargreaves and Andreas at certain points and also offering bits of technical advice. With respect to the misrepresentations Mr. Weigand is alleged to have been aware of (i.e., the "fraudulent" application packs), the evidence showed, at best, that these misrepresentations were transmitted to the foreign merchant banks and had nothing to do with deceiving U.S. banks or inducing them to authorize credit card transactions.

Of the Government's fourteen witnesses, only two testified to having had any direct communications with Weigand during the course of the charged scheme: Oliver Hargreaves, the Government's main cooperating witness, and John Wang ("Wang"), the "Lead Product Manager" at Eaze. At no point did the Government elicit testimony from either of these witnesses that would demonstrate that Weigand intended to defraud U.S. issuing banks or that it was Weigand's belief that, as a result of the application packs submitted to foreign acquiring banks, misrepresentations would be sent to U.S. issuing banks that would induce the issuing banks to authorize transactions they were not content to process and collect fees. Indeed, the evidence at trial demonstrated, overwhelmingly, that it simply would not have mattered if the information transmitted to the U.S. issuing banks was accurate, because issuing banks would have authorized the transactions regardless (and continue to do so to this day). Akhavan Motion at 3-15. This explains why, out of all the communications and documents the Government had

---

[2] Communications involving Hargreaves and Weigand indicated that Weigand told Hargreaves to send merchant applications, which Hargreaves and his team were responsible for filling out, to the email address: Euprocessing@protonmail.com. (Tr. 794:21-795:5.) Testimony from Darcy Cozzetto, the former Senior Vice President of Operations at Eaze, who communicated frequently with that email address, testified, definitively, that it was always her understanding that Euprocessing@protonmail.com was operated by Andreas, (Tr. 2076:24-2077:13), who, by Hargreaves' own admission, was the individual who was tasked with submitting the applications to the foreign acquiring banks. (Tr. 739:17-740:1.) Numerous exhibits consisting of emails between Cozzetto and Euprocessing@protonmail.com corroborated her testimony. (Tr. 2052:1-2059:12.)

access to, there is not a single conversation that suggests that Weigand intended for any alleged misrepresentations to deceive the U.S. issuing banks, or that he thought that the misrepresentations were necessary to induce those banks to process the transactions; the focus of Mr. Weigand's communications was entirely on the foreign merchant banks.

Hargreaves' testimony primarily concerned communications he had with Weigand during the time Hargreaves was putting together applications for the proxy merchants that were to be submitted to the foreign merchant banks. (Tr. 785:21-789:9; 791:5-797:20; 803:3-804:5; 811:11-814:7.) It was clear from Hargreaves's testimony that the purpose of submitting the application packs using proxy companies, instead of Eaze or the dispensaries, was to satisfy the requirements of the foreign merchant banks, who were well aware the transactions were for marijuana but did not want the accounts to be explicitly linked to marijuana because that could trigger fines by the card networks. *See, e.g.*, Tr. 1115:1-23 (Hargreaves) (conceding that the defendants worked with "insiders" at European acquiring banks), 814:14-19 (Hargreaves) (Mr. Akhavan received "input" from acquiring banks on merchant applications), 931:3-6 (Hargreaves) ("99 percent of the [acquiring] bank" believed that the defendants' actions were "legal"); 1886:1-11 (Elliot) (explaining that Visa will impose fines on acquiring banks if the banks' merchants are non-compliant with Visa rules); 578:16-19 (Verdeschi) (same for MasterCard.)

On redirect, Hargreaves was asked, in no uncertain terms, why he created the "fraudulent" application packs:

> Q. Mr. Hargreaves, you testified that you -- one of your -- your job was to create fraudulent application packs; is that correct?
> A. It -- yes, it mutated into that.
> Q. And why did you do that?
> A. It was a requirement in order to obtain merchant accounts for the true merchant in question, in this case Eaze.
> Q. And to your understanding, why was that necessary to proceed that way?

A. Because they would not have been able to obtain a merchant account certainly through us.

(Tr. 1107:20-1108:5.)   Hargreaves makes no mention of deceiving U.S. issuing banks or inducing them to authorize transactions.

Further, on cross examination, Hargreaves was asked why the descriptors for the proxy merchants did not reference Eaze or marijuana.  Hargreaves testified that the foreign merchant banks "were not particularly interested in having things that remotely sounded like – that referenced marijuana."  (Tr. 1058:15-17.)  The difficulty, Hargreaves explained, was trying to come up with a descriptor that "met the requirements of the [foreign] acquiring bank" (i.e., matched the name/website of the proxy company) but also "jogged the memory of the customers of Eaze" as to what they purchased.  (Tr. 1056:20-21.)  In other words, according to the Government's own cooperating witness, the reason for the misrepresentation was to satisfy the requirements of the *foreign banks*, not to deceive U.S. issuing banks.

John Wang's testimony likewise provided no evidence of Weigand's intent to defraud U.S. issuing banks.  Wang's testimony primarily concerned messages that Weigand sent in a Telegram group chat (titled "Easycompany") and a single phone call between Wang and Mr. Weigand on July 31, 2018.  According to Wang, the messages sent by Mr. Weigand in the Easycompany chat, and the subsequent July 31st phone call between Wang and Mr. Weigand, concerned the "volume limits" of the European merchant accounts and how the merchant accounts should be linked with Eaze's partner dispensaries.  (Tr. 2263:8-2265:18.)  Wang explained that the purpose of the discussion was "[t]o make sure that the transaction volume of the dispensary did not go over the transaction limits of the merchant accounts."  (Tr. 2265:16-18.)  On cross examination, Wang admitted that the merchant accounts, which were subject to

the volume limits, were at foreign merchant banks. Wang was not able to articulate any conceivable connection that the volume limits had to U.S. issuing banks. (Tr. 2288:3-13.)

Two other witnesses called by the Government, Darcy Cozzetto ("Cozzetto") and James Patterson ("Patterson"), claimed to have heard of Weigand, but did not recall ever meeting Weigand or having any direct communications with him. (Tr. 2064:15-20; 1687:13-18.) In addition to witness testimony, the Government's documentary evidence also demonstrated that Weigand's involvement concerned, exclusively, the foreign merchant banks, and did nothing to establish that Weigand had a specific intent to defraud U.S. issuing banks.

Despite the lack of evidence of Weigand's intent to defraud, the Government exaggerated Weigand's role in both its opening statement and summation. For example, the Government argued in summation that Weigand "orchestrated a sophisticated scheme, a massive scheme that they perpetrated for three years to the tune of over $150 million worth of concealed and illicit transactions." (Tr. 2442:5-8.) However, the evidence at trial showed that Weigand had no role, whatsoever, with Eaze' credit card processing for the first two years it was in operation (i.e., 2016-2017), which accounts for a considerable portion of the $150 million that was allegedly processed. (Tr. 1685:2-12.) The evidence also showed that it was the Government's own cooperating witness, Hargreaves, who "orchestrated" the dynamics of Eaze's second credit card processing setup. (Tr. 964:5-9.) Indeed, in the fall of 2017, months before Weigand was alleged to have joined the conspiracy, there were communications involving Hargreaves where Hargreaves is outlining, in detail, how Eaze's credit card processing would be set up. (Tr. 964:5-9) (Hargreaves) (Agreeing that he had sent a "turnkey" plan for "going forward with [Eaze's] payment processing"); (Tr. 702:17-22.) Further, Hargreaves admitted that he became involved with Eaze because he and his boss, Koen Vanpraet, understood that Eaze needed to update their

credit card processing, and they felt that they had a "solution."[3] (Tr. 959:15-22; 699:16-700:6.) There was no evidence that Weigand was involved in, or even aware of, any of these meetings or communications.

## II.   IN THE ALTERNATIVE, MR. WEIGAND IS ENTITLED TO A NEW TRIAL UNDER RULE 33

The admission of improper and prejudicial evidence is a valid basis on which a motion for a new trial may be granted under Criminal Rule 33.  *See United States v. Bell*, 584 F.3d 478, 486 (2d Cir. 2009).  Whether improperly admitted evidence has prejudiced a defendant is determined with reference to a review of "the record as a whole."  *Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir. 1997).  In other words, if upon such a review of the record as a whole, the Court determines that a verdict is not supported by "competent, satisfactory and sufficient evidence," such that there is "a real concern that an innocent person may have been convicted," *Bell*, 584 F.3d at 482–83, the Court may grant a new trial.

Here, six of the Court's evidentiary rulings, whether considered individually or in the aggregate, improperly created a high risk that the jury erroneously convicted Weigand of conspiracy to commit bank fraud based on improperly admitted evidence:  (1) the Court admitted vague and misleading documents and communications seized from Weigand's laptop without a testifying witness who could explain them or put them into context; (2) the Court admitted other documents the evidence demonstrated only came in to Weigand's possession well after the conspiracy had ended; (3)  the Court admitted evidence concerning Wirecard, the German financial institution at the center of a $2 billion fraud scheme, and its former Chief Operating Officer, Jan Marsalek, who is currently an international fugitive, despite the lack of any evidence that Wirecard processed a single transaction in connection with the charged scheme and without

---

[3] Hargreaves also admitted that he and Vanpraet had met with Akhavan in September 2017 to discuss, *inter alia*, the Eaze payment processing. (Tr. 705:12-707:11.)

any evidence to establish Weigand had any remotely meaningful connection to Wirecard; (4) the Court excluded evidence or argument regarding pecuniary loss (or lack thereof) to U.S. issuing banks as it relates to intent to defraud, depriving Weigand of a critical defense that he acted in good faith toward U.S. banks which Weigand had no reason to believe were not content to process the transactions and collect the fees for doing so; (5) the Court entirely excluded Weigand's credit card payment expert, Stephen Mott, which deprived Weigand of having a defense expert who could buttress his non-materiality defense; and (6) the Court excluded portions of Weigand's post-arrest statement that provided necessary context for the cherry-picked and misleading excerpts the Government played for the jury.

### A. The Court's Admission Of Various Misleading Documents Without Any Witness To Provide Context Was Erroneous And Prejudicial

Weigand objected to the admission of documents and communications seized from his laptop on the day of his arrest without a testifying witness who could explain them and put them in context.  (Tr. at 33:16-22; 492:8-498:3; 628:4-9; 1135:19-1137:14.)  Specifically, Weigand moved to exclude three categories of documents under Federal Rule of Evidence 403 as unfairly prejudicial and likely to mislead the jury:  (1) laptop documents and communications that, on their face, do not concern Eaze or the charged scheme;[4] (2) laptop communications purportedly sent from non-testifying witnesses to Weigand, which do not include a response from Weigand and for which the Government did not call a testifying witness;[5] and (3) laptop documents that are not self-explanatory and for which the Government did not call a witness who could explain their contents.[6]  (Dkt. No. 172 at 3-11 ("Weigand MIL"))  The Court generally denied the motion but noted that "there may be specific items where it's a closer call and it will be taken up at the

---

[4] GX 1684, GX 1690, GX 1695, GX 1709, GX 1722.
[5] GX 1682, GX 1686, GX 1688, GX 1696.
[6] GX 1518, GX 1613, GX 1654, GX 1678, GX 1716, GX 1719, GX 1720.

time."  (Tr. at 33:16-22.)   Following the Court's preliminary ruling, Weigand renewed his objections to the three categories of documents at various points throughout the trial.  (Tr. at 492:8-498:3; 628:4-9; 1135:19-1137:14.)  In denying Weigand's renewed objections, the Court held that the documents were admissible through a summary witness because any concerns of unfair prejudice could be remedied by Weigand calling his own witness to testify about the substance of the documents, while noting that the defendant calling his own witness to put the documents in context "would be somewhat unusual."  (Tr. at 1136:1-17.)

During trial, the Government introduced these categories of documents from Weigand's laptop through two FBI agents:  computer analyst Jessica Volchko, who forensically examined Weigand's laptop (Tr. at 619:5-620:13), and Special Agent Robert Hupcher, whose only role was to ensure the accuracy of summary charts prepared by the Government.  (Tr. at 1288:9-1289:6; 1381:6-14.)   Volchko and Hupcher's testimony was limited to reading the documents into evidence and describing the associated metadata.

As Weigand noted during trial in objecting to the admission of the first category of documents, Government Exhibits 1684, 1690, 1695, 1709, and 1722, these documents created "a real risk of juror confusion [and] juror speculation" because they "concern Mr. Weigand's pre-existing business relationships in Europe and his preexisting relationships that have nothing to do with Eaze at all."  (Tr. 494:6-12; 582:21-583:13; 637:19-638:4; 1137:4-8.)  Most importantly, the Government offered no evidence to suggest that the matters discussed in these emails and WhatsApp messages concerned Eaze or any aspect of the charged scheme.  As Agent Hupcher conceded on cross-examination, Government Exhibits 1684, 1690, and 1695—emails involving alleged co-conspirators with whom Weigand had pre-existing business relationships—do not reference Eaze, the proxy merchants, or descriptors.   (Tr. at 1397:7-20; 1400:1-1401:16.)

Despite the utter lack of evidence tying these documents and others to the charged scheme, when asked whether the Government would be "introducing any of the documents that relate to [Weigand's] prior business," the Government affirmatively represented to the Court "that all of these documents relate to the scheme." (Tr. at 494:13-17.) That was not the case.

Further, Weigand sought to exclude Government Exhibit 1684 because testimony from multiple Government witnesses conclusively established that the email predates the conspiracy. (Tr. at 150:1-7, 150:18-20, 1141:14-24; 1352:15-22; 1687:2-9.) Before trial, the Government moved for the admission of Exhibit 1684 as "evidence of Weigand's involvement in prior deceptive acts"—namely, as evidence that Weigand had used a Software program called Webshield, which the Government argued the defendants and their co-conspirators used "in order to address and obscure . . . red flags from inquisitive banks." (Dkt. No. 170 at 44-45 ("Government MIL")) The Government contended that the March 2016 Email "makes manifest Weigand's direct involvement in the bank fraud scheme by displaying both his knowledge of the steps that needed to be taken to avoid detection by banks and his willingness to undertake those efforts." (*Id.* at 46; *see also* Tr. at 2471:19-24) In overruling Weigand's objection, the Court held that Exhibit 1684 was admissible regardless of whether it was "preparatory to the conspiracy" because the email appeared to be from Weigand. (Tr. at 1141:25-1142:3.) Contrary to the Government's misleading interpretation of GX 1684, the Email describes the legitimate use of a standard merchant underwriting tool that *acquiring* banks and other parties involved on the acquiring side (ISOs, PSPs, Payment Facilitators)—not the alleged victim Issuing Banks— used to evaluate merchants. The Government's cooperating witness, Oliver Hargreaves, even admitted on cross-examination that Web Shield is simply "a tool that can be used to assess" risk factors for merchant banks "to help in that decision making." (Tr. at 1084:1-10.)

In the absence of any corroborating evidence to connect Government Exhibits 1684, 1690, 1695, and 1709 to the charged conspiracy, the jury may have reached a very different conclusion about Weigand's role in the charged scheme.

Turning to the second category of documents, Weigand moved to exclude Government Exhibits 1682, 1686, 1688, and 1696 on the basis that there is "no evidence to suggest that Mr. Weigand ever responded" to these emails from alleged co-conspirators and the Government did not call any witness who could testify otherwise.  (Tr. at 627:23-628:9; 1143:7-1144:3.)  The Court admitted Exhibits 1682, 1686, 1688, and 1696 over Weigand's renewed objections during trial.  (Tr. at 628:6-9.)  As Weigand explained in his motions *in limine*, "these one-sided communications are entirely devoid of context, technical, invariably unrelated to the charged scheme, and almost certain to mislead the jury."  (Weigand MIL at 8.)

 Weigand also objected to the admission of the third category of documents, Government Exhibits 1518, 1613, 1654, 1678, 1716, 1719, and 1720, on the ground that these documents "are not, on their face, self-explanatory and . . . there needs to be a witness who can put them in context."  (Tr. at 493:18-494:1; 1372:11-14.)  As Weigand noted in his objections, these exhibits "are nuanced documents that would lead to jury confusion and speculation" without a witness who can speak to the substance of the documents or connect them to Weigand.  (Tr. at 1136:8-12.)  The most egregious of these was Government Exhibit 1720, a spreadsheet with no reference to Eaze or the proxy merchants that the Government used to argue Weigand was compensated in connection with the charged scheme.  (Tr. at 1373:12-14.)  Agent Hupcher was unable to testify as to who created Exhibit 1720 or for what purpose, and acknowledged that, to the extent Exhibit 1720 refers to Ruben Weigand, it misspells his name.  (Tr. at 1405:14-1406:5.)  The admission of Exhibit 1720 was highly prejudicial to Weigand because it was the sole piece of evidence

offered by the Government to prove that Weigand received *any* money at all from the charged scheme, let alone the "millions of dollars" argued by the Government.  (Tr. at 61:3-5; 2452:10-17.)  Without Government Exhibit 1720, the argument the Government made in its summation that "this is a very ordinary fraud case" in which "the defendants perpetrated [lies] to get money" would have been dead in the water.  (Tr. at 2440:8-15.)

### B. The Court's Admission Of Certain Documents From Weigand's Laptop, Where There Was No Evidence That Weigand Had Those Materials Until After The Conspiracy Ended, Was Erroneous And Prejudicial

The Court also erred by admitting various Government Exhibits that were recovered from Weigand's laptop where there was no evidence that Weigand had possession of those documents until after the charged scheme ended in June 2019, at which point Eaze stopped working with EU Processing.  (Tr. at 1687:2-9.)  Specifically, Weigand sought to exclude Government Exhibits 1518 (added Jan. 19, 2020), 1720 (added Jan. 18, 2020), and 1801 (added Jan. 19, 2020), which contained several folders and sub-folders of documents including Government Exhibits 1037, 1043, and 1506.  (Tr. at 631:7-12; 632:1-21 1382:3-11; 1386:2-9; 1388:17-22; 1424:16-19; *see also* Weigand MIL at 15-17; GX 1806.)  At the outset, the Court "generally . . . denied" Weigand's motion to exclude documents acquired after the charged scheme had ended, but noted that "there may be specific items where it's a closer call and it will be taken up at the time."  (Tr. at 33:16-22.)  During trial, Weigand renewed his objections under Federal Rule of Evidence 403 on the basis of unfair prejudice and misleading the jury.  (492:14-495:3.)  In denying Weigand's renewed objections, the Court noted that the jury could "reasonably infer" that these documents were "either sent by [Weigand] or received by him" and are indicative of his "involvement."  (Tr. at 497:21-498:1.)

As Weigand explained in his opposition to the Government's Motions *In Limine*, documents that appeared on his laptop after the conspiracy had ended—with no explanation of

how or why they got there—are not indicative of his involvement in the conspiracy while it was

ongoing.  (Dkt. No. 185, at 11-13, Weigand Opposition to Government's Motions *In Limine*

("Weigand Opp.")).  Post-conspiracy evidence is only admissible "if it is probative of the

existence of the conspiracy."  *United States v. Koppers Co., Inc.*, 652 F.2d 290, 298 (2d Cir.

1981) (admitting co-conspirator's post-conspiracy comment that "the deal we have had is over").

In light of the complete absence of evidence to show that Weigand created, sent or received, or

modified these documents while the scheme was ongoing, these documents are of minimal

probative value to show Weigand's involvement in the scheme.  *Cf. United States v. Wilson*, 493

F. Supp. 2d 460 (E.D.N.Y. 2006) (admitting rap lyrics later found in defendant's possession

which he had created and which contained references to the crime committed).

The prejudicial effect of admitting after-acquired documents was especially pronounced

with Government Exhibit 1801, the "E-zip folder" which consisted of several folders and sub-

folders containing account applications that appear to be for the Offshore Merchants described in

the Indictment, processing statements, wire confirmations, and settlement reports.  (Tr. at

1313:13-1333:4; *see also* GX 1802, GX 3703, GX 3704, GX 3705.)  The Government used the

E-zip folder to argue that Weigand had knowledge of the charged conspiracy while it was

ongoing, remarking in closing that "much of the evidence of this scheme is . . . located on

Ruben's computer," including documents associated with the European merchant banks and

proxy merchants.  (Tr. at 2470:6-14; 2471:16-18.)  As Weigand noted during trial, there is a

serious risk that the jury was misled into believing that Weigand possessed those documents

during the pendency of the conspiracy because the Government emphasized during Agent

Hupcher's direct testimony and through the use of summary exhibits that the documents

contained within the E-zip folder were all created prior to June 2019.  (Tr. at 1319:17-19;

1321:5-10; 1322:14-16; 1323:19-21; 1325:8-9; 1325:20-21; 1326:24-25; 1331:12-13; 1333:10-14; 1416:19-25; *see also* GX 3703, GX 3704, GX 3705.)  But as Agent Volchko explained, a zip folder "is basically just a compressed folder" that "makes files easier to send," and the "date added" is "associated with that zip folder, but not necessarily the documents inside, because the zip folder was added on the date, and the documents weren't."  (Tr. at 632:5-21.)  As Agent Hupcher conceded on cross-examination, the "date added" for the E-zip folder was January 19, 2020, more than six months after the end of the charged conspiracy.  (Tr. at 1382:3-11; 1386:2-9; 1388:17-22; 1424:16-19.)  The earlier dates associated with the underlying documents are not probative of whether Weigand was in possession of those documents while the conspiracy was ongoing.  Further, the Government failed to put forth any evidence to show that the documents contained within the E-zip folder were sent to or shared with Weigand while the alleged conspiracy was ongoing, or that these documents were attached to any communication indicating that Weigand ever sent, received, created or worked with these materials.

The admission of Exhibit 1801 and the other documents that appeared on Weigand's computer after the charged scheme had ended was erroneous because it gave the jury an inflated sense of Weigand's connection to the charged scheme.  In closing, the Government painted Weigand as "the banker and the money mover" and "the one who introduce the lies into the payment processing system."  (Tr. at 2457:2-12; 2464:11-21.)  Based on documents that Weigand did not even possess while the scheme was ongoing, the Government contended:

> **Ruben** reviewed the fraudulent application packs prepared by Hargreaves and his team. **Ruben** chose the banks that those fake applications were going to. **Ruben** submitted those applications with the lies to those banks. **Ruben** corresponded with those banks. **Ruben** got the money, money sent by those U.S.-issuing banks, and sent it back to the dispensaries in the United States. And **Ruben**, **Ruben**, worked directly with Eaze.

(Tr. at 2464:15-21 (emphasis added)).   Whatever probative value these documents had, it was substantially outweighed by the prejudice arising from the Government's misleading use of the documents at trial with no witness who could testify otherwise.

### C.  The Court's Admission of Evidence Concerning Embattled German Financial Institution Wirecard Was Erroneous and Prejudicial

In an attempt to improperly taint Weigand by association, the Government filed a motion *in limine* seeking the admission of evidence involving Wirecard (Government MIL at 40), a German financial services company at the center of a widely publicized scandal since it was revealed last year that Wirecard had missing account balances amounting to $2.1 billion.  *See* Liz Alderman & Christopher F. Schuetze, *In a German Tech Giant's Fall, Charges of Lies, Spies and Missing Billions*, NY TIMES (June 26, 2020).   The Government also sought to introduce evidence related to Wirecard's former Chief Operating Officer, Jan Marsalek, who is the subject of an international manhunt after German authorities charged him with securities violations and fraud in connection with the Wirecard scandal.   *See* Ruth Bender, *Hunt for Ex-Wirecard Executive Jan Marsalek Goes Public in Germany*, THE WALL STREET JOURNAL (Aug. 13, 2020). To avoid the substantial prejudice arising from being tied to a bank involved in a billion-dollar fraud scheme and an international fugitive, Weigand vigorously opposed the admission of Wirecard-related evidence under Federal Rule of Evidence 403.  Weigand Opp. at 8-10.  Before opening arguments, the Court admitted the evidence without further argument.  (Tr. at 31:13-16.) Respectfully, the admission of this evidence was erroneous and highly prejudicial.

The probative value of the Wirecard evidence was minimal at best and substantially outweighed by the unfair prejudice.  The evidence at trial showed that out of the more than 1.5 million Eaze-related transactions processed over the Visa and MasterCard networks, not a ***single*** transaction involving a U.S. issuing bank was processed through Wirecard.  (GX 2201, GX

2202, GX 2301, GX 2301, GX 2302.)  Despite the Government devoting substantial time during the testimony of Oliver Hargreaves to applications packs prepared for Wirecard, at the end of the day, Wirecard had, in fact, rejected the applications.  *See* GX 4004 at 71 (explaining that the applications "didn't pass muster at wc"); *see also* 2527:11-16 (arguing that the Government did not show that a single transaction had been processed through Wirecard).  In sum, Wirecard had no meaningful connection to the case and Weigand plainly had no special access to, or connection with, Wirecard.  Hargreaves testified about a single "meeting" in a London hotel room involving Marsalek but admitted on cross-examination that Eaze was not even discussed at that meeting.  (Tr. at 733:11-735:17, 1046:19-1047:3.)

Despite all this, in closing arguments, the Government contended that Weigand had "dirty inside help at these foreign banks [including Wirecard] to help get these fraudulent merchant applications approved" and that Weigand had a "relationship with high-level people at Wirecard."  (Tr. at 2445:5-11.)   The expansive role of Wirecard that the Government presented at trial was unsupported by the evidence and likely tarred the jury's opinion of Weigand, just as it was given unwarranted attention in the press coverage of the trial.  *See* Rebecca Davis O'Brien, *Wirecard Aided Online Marijuana Sales, Prosecutors Allege*, The Wall Street Journal (Mar. 23, 2021) ("The now-bankrupt fintech firm and its fugitive former No. 2 executive engineered fraudulent accounts to trick banks, according to testimony").

### D.  The Court's Exclusion of Evidence or Argument Regarding Pecuniary Loss to U.S. Issuing Banks As It Relates to Intent and Good Faith Was Erroneous and Prejudicial

Before trial, the Government moved to preclude evidence or argument that the charged scheme did not cause pecuniary loss, arguing that because "[p]ecuniary loss is not an element of the charged bank fraud conspiracy" it is therefore "irrelevant to the question of defendants' intent to defraud."  (Government MIL at 13.)   The Court agreed, limiting evidence and argument on

pecuniary loss to the issue of materiality and accepting the Government's illusory distinction between what is *required* to prove the elements of bank fraud and what may be *relevant* to proving (or rebutting) those elements.  (Tr. at 42:16-43:1; 43:13-44:1.)  In both the preliminary jury instruction and the final charge, the Court instructed the jury that "the government does not need to prove that a bank suffered any financial loss."  (Tr. 319:21-22; 2637:11-13.)

To establish the charged "scheme to defraud," the Government was required to prove that Weigand "contemplated some actual harm or injury to [his] victims."  *United States v. Calderon*, 944 F.3d 72, 88 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 953 (2020) (citation and quotation marks omitted); *United States v. Weigand*, No. 20-cr-188, 2020 WL 5105481, at *8 (S.D.N.Y. Aug. 31, 2020), as corrected (Sept. 2, 2020) (citations and quotation marks omitted) ("[T]he government cannot escape the burden of showing that some actual harm or injury to the victim's money or property was contemplated by the schemer.").  In *Calderon*, the Second Circuit affirmed a district court's jury instruction that "[a] genuine belief that the scheme never exposed the victim to loss or risk of loss in the first place would demonstrate a lack of fraudulent intent."  944 F.3d at 91.  Likewise, in the mail and wire fraud context—which this Court has analogized to bank fraud, *see Weigand*, 2020 WL 5105481, at *4—courts in the Second Circuit have been reluctant to find a "scheme to defraud" where "the purported victim received the full economic benefit of its bargain."  *United States v. Davis*, 2017 WL 3328240, at *9 (S.D.N.Y. Aug. 3, 2017) (citing *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)).

As Weigand argued at trial, the utter lack of pecuniary harm to U.S. Issuing Banks is "certainly relevant" to his good faith and demonstrates "that he had no intention to harm any

bank in this country." (Tr. at 42:6-15.)[7]  If Weigand was permitted to make this argument, the jury would have come to a very different conclusion about whether the Government met its burden of proving intent.

### E. The Court's Exclusion of Weigand's Payments Expert, Stephen Mott, Was Reversible Error

The Court erred when it excluded the testimony of Weigand's payment expert, Stephen Mott ("Mott"), whose proposed testimony was adequately disclosed to the Government, non-cumulative, and relevant to both the issue of materiality and Weigand's intent to defraud.   The Court's exclusion of Mott's testimony inhibited Weigand's ability to put forth a comprehensive defense, resulting in severe prejudice.[8]

#### 1. Background

On November 3, 2020, Weigand provided notice to the Government that he intended to call Mott to provide expert testimony regarding certain aspects of credit card payment processing. [Dkt. No. 168] Ex. B to Gov't Expert MIL.  As set forth in Weigand's disclosure to the Government, Mott's expected testimony included the following:

- the mechanics of credit and debit card transactions, including the roles of the various participants in those transactions[;]

- the concerns and operating parameters of Issuing Banks, including . . . the factors that are material and immaterial to them when determining whether to approve or decline credit and debit card transactions[;]

- non-secure e-commerce transactions, including the associated interchange fees paid to issuing banks [and] chargeback liability for online transactions[; and]

- the standards and protocols employed by Visa and MasterCard when determining their membership in the United States and abroad, Visa and MasterCard's approach to

---

[7] *See also* Weigand Opp. at 1 (incorporating by reference defendant Hamid Akhavan's arguments on pecuniary loss, Dkt. No. 181 at 11-14 ("Akhavan Opp.")).

[8] This prejudice was compounded by the fact that Weigand's co-defendant's proposed payment expert, who the Court did not exclude, did not end up testifying.

international transactions, and the ways in which they oversee and manage the integrity of the global payments system.

*Id*. at 2-3.

On March 12, 2021, the Court held oral argument on the defendants' proposed experts. The Court instructed Weigand's counsel to submit a letter to the Court that stated, with more particularity, Mott's proposed testimony.  (Tr. at 1534:25-1535:3.)  On March 13, 2021, pursuant to the Court's directive, Weigand filed a letter regarding the expected testimony of Mott.  Dkt. No. 227 ("Weigand Expert Letter").  As set forth in Weigand's letter, Mott was being offered to testify on the following topics:

- [T]he jurisdictional constraints [that are] imposed on non-U.S. acquiring banks by Visa and MasterCard.  Specifically, . . . that, in order to comply with Visa and MasterCard's 'Area of Use' rules for acquiring banks, it is common practice for companies to locate subsidiaries or related entities in the same jurisdiction as their acquiring bank to facilitate payment processing.

- [T]he influence that the credit card networks and the issuing banks have over the International Organization for Standardization (ISO) with respect to the creation of Merchant Category Codes.

- [T]hat for non-secure e-commerce transactions, the transaction type at issue in this case, all financial liability for those transactions is borne by acquiring banks, not issuing banks. This fact bears on the incentives of issuing banks: for such transactions, issuing banks are always fully compensated, even in the event of chargebacks.

*Id*. at 5 (citations omitted).

On March 15, 2021, the Court notified Weigand that Mott would be excluding Mott's proposed testimony in its entirety and, on March 22, 2021, the Court put on record its reasons for barring Mott from testifying.  (Tr. at 1722:17-20; 2541:8-2452:6.)  With respect to the first topic of Mott's proposed testimony—jurisdictional constraints on non-U.S. acquiring banks and the use of proxy merchants—the Court found that such testimony was irrelevant, or, "even if marginally relevant, confusing."  (Tr. at 2541:20-24.)  With respect to the second topic—the influence that credit card networks and issuing banks have over ISO with respect to the creation

24

of Merchant Category Codes—the Court stated that Weigand's disclosures with respect to this topic were inadequate.  (Tr. at 2541:11-19.)  With respect to topic three—the financial liability of issuing banks for non-secure e-commerce transactions—the Court excluded the testimony on cumulative grounds.  (Tr. at 2541:1-2542:6.)

### 2.   Mott's Proposed Testimony Was Adequately Disclosed, Highly Probative of Key Issues in the Case, and Non-Cumulative

All three topics of Mott's proposed testimony were relevant to the materiality of the alleged misrepresentations and/or Weigand's intent to defraud and were not unduly cumulative as to warrant exclusion.  Moreover, all proposed topics were adequately disclosed, both in Weigand's original letter to the Government and Weigand's letter to Court.

**First**, Mott's proposed testimony regarding Visa and MasterCard's "Area of Use" rules would have rebutted the Government's assertion that the use of offshore merchants and proxy merchants in the alleged scheme is probative of the defendants' intent to deceive U.S. issuing banks. (Tr. 2463:9-18.)  As Mott would have testified, there are perfectly legal and acceptable reasons that someone involved in the payment processing industry in Europe, like Weigand, would choose to utilize proxy merchants and offshore merchants.  This includes proxy merchants that don't have the same name, or other identifying information, as the company actually accepting payments.  Based on this testimony, the jury could have found that, given the common practice of using proxy merchants in the credit card industry: (1) the use of proxy merchants in the charged scheme did not evince a specific intent to defraud, and/or, (2) that a reasonable bank would not have found information such as the merchant name, or merchant descriptor, to be material.

**Second**, Mott's proposed testimony regarding the influence that the credit card companies and issuing banks have on ISO to create new merchant category codes would have

rebutted testimony from the Government's bank witnesses that, had the U.S. issuing banks been able to identify marijuana transactions (e.g., through the use of a marijuana specific MCC), that they would have categorically blocked those transactions. (Tr. 1819:16-1820:5).  Specifically, Mott's testimony could have demonstrated that the credit card companies and U.S. issuing banks have the ability to urge ISO to create new MCCs, which they have done in the past with respect to high risk industries such as gambling.[9]  Based on this testimony, the jury could have found that the decision of the issuing banks *not* to take such an approach when it comes to marijuana, when considered along with evidence that the issuing banks were aware that marijuana transactions were being processed on their credit and debit cards, demonstrates that the U.S. issuing banks *did not care* that they were authorizing marijuana transactions.

**Third**, Mott's proposed testimony that it is the acquiring banks, not the issuing banks, who bear the financial risk of chargebacks with respect to non-secure e-commerce transactions (i.e., the type of transactions at issue in this case) would have supported Weigand's non-materiality defense.  This proposed testimony, when coupled with other evidence elicited at trial (e.g., that the issuing banks earn fees for every transaction and also that the federal government does not typically enforce marijuana laws) could have led the jury to find that the financial benefit of processing marijuana transactions outweighed the risks and, because of that, a reasonable bank would have processed marijuana transactions.

---

[9] This point was explored partially during the cross examination of Martin Elliot, the Government's Visa witness. (Tr. 1974:12-1975:4.)  However, due to the prejudicial time constraints discussed in Akhavan's brief, the defense was not able to fully explore this point. Akhavan Motion at 28-33.  Moreover, even though a Government witness was, briefly, cross examined on the point, Weigand still should have been afforded the opportunity to call Mott, a non-adverserial expert witness, to more fully explore the topic.

Further, this category of evidence would have not been unduly cumulative.  No witness at trial had testified that issuing banks were not liable for chargebacks that occur in relation to non-secure e-commerce transactions.

### F.  The Court's Exclusion of Additional Portions of Weigand's Post-Arrest Interview Statement Was Erroneous and Prejudicial

As its final piece of evidence before resting its case, the Government played for the jury cherry-picked and misleading excerpts of Weigand's post-arrest interview statement, recorded on March 9, 2020.  (Tr. at 2295:11-2296:18; GX 1904; GX 1901-A; GX 1901-B; GX 1901-C; GX 1901-T.)  Prior to trial, Weigand moved for the admission of additional portions of his post-arrest statement, which spanned only 17 minutes in its entirety, under Federal Rule of Evidence 106 and the doctrine of completeness.  (Weigand MIL at 17-20)  The Government opposed Weigand's motion, arguing that the additional portions Weigand sought to admit were not necessary to understand the portions designated by the Government.  (Government MIL at 24-28; Government Omnibus Opposition to Motions *In Limine* No. 12 at 35-37.)  The Court admitted one additional portion of the post-arrest statement in which FBI Agent Mahaffey asked Weigand "You understand English and speak English, right?" to which Weigand responded "I'm okay-ish, I think."  (Tr. at 857:5-13.)  In declining to admit the other requested portions, the Court noted that Weigand "misconstrued the scope of the completeness rule" and sought to admit "broader" portions of his post-arrest statement than the rule allowed.  (Tr. at 34:23-35:3; 856:19-857:25; 1921:22-1922:21; 2046:2-2047:3; 2119:23-2126:9.)  For the reasons set forth below, we respectfully argue that the exclusion of those additional portions was erroneous and prejudicial.

Rule 106 of the Federal Rules of Evidence, which codifies the common law doctrine of completeness, provides that "[i]f a party introduces all or part of a . . . recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness

ought to be considered at the same time." Fed. R. Evid. 106.  The purpose of Rule 106 is two-fold: first, to avoid "the misleading impression created by taking matters out of context," and second, to remedy "the inadequacy of repair work when delayed to a point later in the trial." Fed. R. Evid. 106 Advisory Committee Notes (1972 Proposed Rules).  The Second Circuit has therefore interpreted Rule 106 to require that an omitted portion of a statement be admitted into evidence "if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (quoting *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir.1987)).

During trial, the Government first played for the jury the misleading excerpt of Weigand's statement that he first learned of Eaze when he saw a billboard advertisement during a 2017 business trip to California and that he did not have any involvement with Eaze.  (GX 1901-B.)  In opening and closing arguments, the Government repeatedly emphasized that Weigand "made up [lies] when he was caught," "lied and claimed he had never been involved with Eaze," and "pretended that he had learned about Eaze from seeing it on a billboard"—all "because he knows he's guilty."  (Tr. at 67:8-12; 2483:2-17.)  Standing alone, Weigand's statement to law enforcement that he had "no involvement" with Eaze appears disingenuous. However, when read in context alongside Weigand's other statements regarding his professional background and business activities, all of which are focused on Europe, the jury gets "a full and impartial understanding" of Weigand's statement that he had "no involvement" with Eaze, an American company; that is, he was not an owner, officer or agent of Eaze, all of which was undeniably correct.

In closing out Weigand's post-arrest statement, the Government played for the jury Agent Mahaffey's accusation that Weigand lied about owning the EU Processing e-mail address—a fact which, by the end of trial, even the Government was forced to concede that "maybe Ruben did not own that EU Processing address."  (GX 1901-C; Tr. at 2484:4-8.)  The Government's excerpt ends with Weigand stating that he has "heard of [the email address]," to which Special Agent Mahaffey quips: "Exactly, man, you've heard of it."  (GX 1901-C.)  Under the rule of completeness, Weigand sought, unsuccessfully, to admit the remaining portion of that discussion in which he rebuffs Agent Mahaffey's accusation:

> SA MAHAFFEY: Like, where have you heard of it? Whose email address is it then? You're connected in that world, right? So whose email address is it if not yours?
>
> MR. WEIGAND: I think I need to -- I don't know how to continue this without having (U/I).
>
> SA MAHAFFEY: Without what?
>
> MR. WEIGAND: Without having legal advice, I don't know how to continue it. I don't know what the implications. I've not done anything that – at least, I don't think that I've done anything that I shouldn't have done or that's illegal, and the fact that. Now it seems that this is – on this, I really don't know what I should do and – without having any advice on it.

(GX 1901-T, Tr. at 16:11-23.)  Without Weigand's statement that he does not believe he has "done anything that I shouldn't have done or that's illegal," the jury likely (and reasonably) assumed that Weigand failed to deny the accusation like any reasonable person would do.  For this reason alone, the jury was entitled to hear the full discussion regarding the EU Processing e-mail address.  *See, e.g., United States v. Vargas*, No. 18 CR. 76 (PAC), 2018 WL 6061207, at *2 (S.D.N.Y. Nov. 20, 2018) (admitting additional portions of defendant's post-arrest statements because otherwise the jury "may assume [that] no other statements were made" and that

defendant's statements at trial were recent fabrications); *United States v. Peeples*, No. 01 CR 496, 2003 WL 57030, at *3 (N.D. Ill. Jan. 7, 2003) (admitting the defendant's statement denying pointing his gun at the agent because to "diminish the possibility that a juror hearing only that portion of the statement being offered by the prosecution will conclude that the defendant failed to deny turning and aiming his gun at the special agent"); *Com. v. Crayton*, 470 Mass. 228, 247 (Mass. Sup. Ct. 2014) ("By excluding the defendant's denial, the judge might have left the jury with the false impression that the defendant had not denied viewing the child pornography where an innocent person would have denied it, and therefore, there was a significant risk that a reasonable jury might have understood the other statements the defendant made to the detectives as an implied admission to having viewed the child pornography.").

## <u>CONCLUSION</u>

For the foregoing reasons, Weigand is entitled to entry of a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. To the extent the Court denies Weigand's Criminal Rule 29 motion, the Court should order a new trial pursuant to Criminal Rule 33 due to the admission of unfairly prejudicial evidence for the reasons stated above.

Dated:  New York, New York
      April 21, 2021

Respectfully submitted,

DECHERT LLP

By: */s/ Michael J. Gilbert*

Michael J. Gilbert
Shriram Harid
Steven Pellechi
Amy Lesperance
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Michael.gilbert@dechert.com
Shriram.harid@dechert.com
Steven.pellechi@dechert.com
Amy.Lesperance@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional
Corporation
1 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90071
Michaelartan@yahoo.com

*Attorneys for Defendant*
*Ruben Weigand*