UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>Hamid Akhavan,<br>a/k/a "Ray Akhavan,"<br><br>-and-<br><br>Ruben Weigand,<br><br>Defendants. | S3 20 Cr. 188 (JSR) |

**GOVERNMENT'S OMNIBUS MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION
FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL**

AUDREY STRAUSS
United States Attorney
Southern District of New York

Nicholas Folly
Tara M. La Morte
Emily Deininger
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

BACKGROUND ................................................................................................ 1

I.      THE GOVERNMENT'S CASE AT TRIAL .................................................. 1

        A.  Background on Eaze ........................................................................... 2

        B.  Details of the Scheme ......................................................................... 3

        C.  Defendants' Roles in the Scheme ....................................................... 7

ARGUMENT .................................................................................................... 7

I.      APPLICABLE LAW ................................................................................... 7

        A.  Motion for a Judgement of Acquittal under Rule 29 ........................... 7

        B.  Motion for a New Trial under Rule 33 ................................................ 8

II.     A RATIONAL TRIER OF FACT COULD HAVE EASILY FOUND THAT THE
        DEFENDANTS' MISREPRESENTATIONS WERE MATERIAL ........................... 9

        A.  Applicable Law ................................................................................. 9

        B.  Discussion ....................................................................................... 10

III.    THE DEFENDANTS' ARGUMENT THAT NO RATIONAL JURY COULD
        HAVE CONCLUDED THAT THEY INTENDED TO DEFRAUD THE VICTIM
        ISSUING BANKS IS BASELESS ................................................................ 18

        A.  Applicable Law ............................................................................... 19

        B.  Discussion ....................................................................................... 22

IV.     THE EVIDENCE OVERWHELMINGLY SUPPORTED THE VERDICT ........... 25

V.      EXCEPTIONAL CIRCUMSTANCES WARRANTED MARTIN ELLIOTT'S
        TESTIMONY BY TWO-WAY VIDEOCONFERENCE .................................... 25

        A.  Background ...................................................................................... 25

        B.  Applicable Law ............................................................................... 27

        C.  The Court Correctly Concluded That the Exceptional Circumstances Standard Was
            Satisfied ......................................................................................... 28

        D.  Akhavan Suffered No Undue Prejudice from Elliott's Remote Testimony ............... 30

VI.     THE COURT'S CURATIVE INSTRUCTION REGARDING MATERIALITY
        WAS PROPER ......................................................................................... 32

VII.    WEIGAND'S ARGUMENT THAT CERTAIN DOCUMENTS FROM THE
        WEIGAND LAPTOP SHOULD HAVE BEEN EXCLUDED IS MERITLESS ...... 34

VIII.   WEIGAND'S ARGUMENT THAT DOCUMENTS ADDED TO THE
        WEIGAND LAPTOP IN JANUARY 2020 SHOULD HAVE BEEN EXCLUDED
        IS MERITLESS ........................................................................................ 37

IX.     WEIGAND'S    ARGUMENT    THAT    ADMISSION    OF    EVIDENCE

**CONCERNING WIRECARD WAS UNFAIRLY PREJUDICIAL IS BASELESS** ....................................................................................................... **39**

**X.    THE COURT ACTED WELL WITHIN ITS DISCRETION IN EXCLUDING WEIGAND'S EXPERT, STEPHEN MOTT** ................................................. **40**

**XI.   THE COURT PROPERLY EXCLUDED ADDITIONAL PORTIONS OF WEIGAND'S POST-ARREST** ................................................................. **44**

**XII.  THE COURT PROPERLY PRECLUDED IRRELEVANT AND MISLEADING EVIDENCE AND ARGUMENT REGARDING PECUNIARY LOSS** ..................... **45**

CONCLUSION ................................................................................................. 47

# TABLE OF AUTHORITIES

<u>Cases</u>

166 F.3d 75, 80-81 (2d Cir. 1998) ............................................................. 28

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) ........... 41

*Crawford v. Washington*, 541 U.S. 36 (2004) ............................................... 29

*Crawford*, 541 U.S. at 50, 59 .............................................................. 30

*Daubert*, 509 U.S. at 597 ................................................................... 41

*Donziger*, 2020 WL 5152162, at *3 ........................................................ 29

*Ferguson*, 246 F.3d at 134 .................................................................. 9

*Horn v. Quarterman*, 508 F.3d 306, 319 (5th Cir. 2007) ................................... 29

*Jackson v. Virginia*, 443 U.S. 307 (1979) .................................................. 8

*Loughrin v. United States*, 573 U.S. 351, 355-56 (2014) .................................. 19

*Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014) ................................. 45

*Maryland v. Craig*, 497 U.S. 836, 844 (1960) ............................................. 27

*Neder v. United States*, 527 U.S. 1, 4 (1999) ............................................ 32

*United States v. Babichenko*, No. 18 Cr. 258 (BLW), 2021 WL 1759851, at *2 (D. Idaho May 4, 2021) ....................................................................................... 29

*United States v. Batista*, No. 06 Cr. 265 (DLI), 2010 WL 1193314, at *13 (E.D.N.Y. Mar. 24, 2010) ....................................................................................... 31

*United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016) ............................. 46

*United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) ............................... 42

*United States v. Carter*, 907 F.3d 1199, 1206 n.3 (9th Cir. 2018) ........................ 29

*United States v. Chavez*, 549 F.3d 119 (2d Cir. 2008).................................................................. 8

*United States v. Davis*, No. 19 Cr. 101 (LPS), 2020 WL 6196741, at *4 (D. Del. Oct. 22, 2020)

................................................................................................................................. 29

*United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008)........................................................... 37

*United States v. Felder*, 993 F.3d 57, 81 (2d Cir. 2021)............................................................. 36

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) ......................................................... 8, 9

*United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) .................................................. 36

*United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002) ................................................. 37

*United States v. Flaherty*, 295 F.3d 182, 190-91 (2d Cir. 2002) ............................................ 30

*United States v. Frenkel*, 682 Fed. Appx. 20, 22 (2d Cir. 2017) ............................................. 15

*United States v. Gambino*, 59 F.3d 353 (2d Cir. 1995) ........................................................... 8

*United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir.1981) ......................................................... 31

*United States v. Harris*, 842 F. App'x 28 (9th Cir. Dec. 29, 2020)......................................... 32

*United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) ............................................................. 20

*United States v. Mendlowitz*, No. 17 CR. 248 (VSB), 2019 WL 6977120, at *13–14 (S.D.N.Y.

Dec. 20, 2019)........................................................................................................... 31

*United States v. Mora*, 152 F.3d 921 (2d Cir. 1998) ............................................................... 31

*United States v. Nathan*, 476 F.2d 456, 459–60 (2d Cir. 1973)............................................... 38

*United States v. Pennick*, 17 Cr. 15, 2020 WL 4692475, at *6 (W.D.N.Y. Aug. 13, 2020) ........ 32

*United States v. Ragosta*, 970 F.2d 1085 (2d Cir. 1992) ......................................................... 8

*United States v. Rea*, 958 F.2d 1206, 1221-22 (2d Cr. 1991)................................................. 36

*United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) ....................................................... 32

*United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) ............................................. 34

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ................................................................. 8

*United States v. Schwartz*, 924 F.2d 410, 420-21 (2d Cir. 1991) ................................................. 24

*United States v. Seabrook*, 467 F. Supp. 3d 171, 178–79 (S.D.N.Y. 2020) ................................. 31

*United States v. Torres*, 604 F.3d 58, 68 (2d Cir. 2010)................................................................ 36

*United States v. Van Putten*, No. 04 Cr. 803 (PKL), 2005 WL 612723, at *5 (S.D.N.Y. Mar. 15, 2005) ................................................................................................................................... 38

*United States v. Walker*, 974 F.3d 193, 208–09 (2d Cir. 2020).................................................... 31

*United States v. Wandahsega*, 924 F.3d 868, 879 (6th Cir. 2019)................................................ 29

*United States v. Weigand*, 482 F. Supp. 3d 224, 236 (S.D.N.Y. 2020) ........................................ 46

*United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) ....................................................... 41

*United States v. Yannai*, 791 F.3d 226 (2d Cir. 2015) ................................................................... 9

*United States v. Young*, 470 U.S. 1, 13-14 (1985) ........................................................................ 33

*United States v. Zongo*, 15 Cr. 319, 2017 WL 2297010, at *1 (S.D.N.Y. May 24, 2017) (KMW) 8

*United States v. Zongo*, 2017 WL 2297010 (S.D.N.Y. 2017) ....................................................... 8

*Williams*, 506 F.3d at 160 ............................................................................................................. 42

Rules

Fed. R. Crim. P. 16(b)(1)(C) ........................................................................................................... 42

Fed. R. Crim. P. 16(d)(2) ................................................................................................................ 42

Fed. R. Evid. 702 ............................................................................................................................ 41

## **BACKGROUND**

The defendants were charged and convicted in one count with participating in a conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349, from in or around 2016, through in or around 2019.   Akhavan and Weigand, working with others, including principals from one of the leading on-demand marijuana delivery companies in the United States, Eaze, planned and executed a scheme to deceive United States banks and other financial institutions into processing over one hundred and fifty million dollars in credit and debit card payments for the purchase and delivery of marijuana products (the "Scheme").  (Tr. 1430: 21-1431: 21).  Because many United States banks, as well as Visa and MasterCard, are unwilling to process payments involving marijuana products, Akhavan, Weigand, and other co-conspirators utilized the Scheme in order to avoid these restrictions and facilitate Eaze's credit and debit card processing. (Tr. 1430: 4-20).  The defendants' Scheme involved the unlawful processing of more than $150 million in debit and credit card transactions.  The specific details of the defendant's offense conduct and the evidence presented at trial are set forth below.

## I.        The Government's Case at Trial

The Government's evidence at trial against the defendants was overwhelming.   The evidence included the testimony of fourteen witnesses, including but not limited to: the former CEO of Eaze, James Patterson; one of Akhavan's and Weigand's key coconspirators, Oliver Hargreaves; several additional co-conspirator Eaze employees, namely Darcy Cozzetto, John Wang, and Michael Tassone; witnesses from issuing banks and credit unions in the United States, who were victims of the defendants' Scheme; witnesses from Visa and MasterCard; and several law enforcement witnesses, including witnesses involved in the search of Weigand's laptop and

the review of evidence seized from the laptop pursuant to a search warrant.  The Government's evidence also included numerous encrypted chat messages and emails, including chat messages and emails between the two defendants and other key-conspirators.  In addition, the Government's evidence included bank records which showed the defendants' elaborate network of shell companies and offshore bank accounts that were used to unlawfully process over $150 million in credit and debit card transactions for the sale of marijuana products.

### A.  Background on Eaze

Eaze is a California-based company that arranged for on-demand sale and delivery of marijuana products to customers located primarily in California. (Tr. 138: 1-7).  Through Eaze's mobile application and website (collectively, the "Applications"), customers could order marijuana from different dispensaries.  (Tr. 146: 3-7).  Specifically, customers used the Applications to select the marijuana product(s) of their choice, and to receive delivery of their selection shortly thereafter.  (Tr. 147: 4-14).  Although Eaze operated the technology platform through which users purchased marijuana (i.e., the Applications), it was not the actual retailer of the marijuana.  The actual retailers were the dispensaries, which contracted with Eaze to fulfill orders placed by customers through the Applications.  (Tr. 138: 8-10).

To request and receive a delivery of marijuana through the Applications, a user created an Eaze account through the company's website or mobile application.  (Tr. 146: 24-147: 3).  Once the customer selected his or her product(s) for purchase, the Application generated a check-out screen for the order where the customer could select a payment option. (Tr. 147: 5-9).  At various points from in or around 2016, through in or around 2019, Eaze offered credit cards and debit cards as payment options. (Tr. 1441: 2-4).  For purchases with credit cards or debit cards, the Applications allowed customers to enter their card information and then complete the payment

2

using that information.  (Tr. 147: 4-9).

Once a customer placed an order, a delivery driver would deliver the order to the customer

shortly thereafter. (Tr. 147: 10-14).  Once the delivery was complete, Eaze generated and

transmitted via email a receipt for the purchase.  (Tr. 147: 19-21).  When customers made

purchases by credit cards or debit cards, those purchases would appear on the customers' card

statements.  The information regarding the merchant name and location on the customer's card

statement, however, would indicate that the purchase was made from a merchant other than Eaze

(e.g., a merchant from whom the customer had not in fact purchased the marijuana).  (Tr. 159: 21-

160:6).

### B.  Details of the Scheme

The Scheme involved the deception of virtually all of the participants in the payment

processing network, including issuing banks and credit unions in the United States (the "Issuing

Banks") and Visa and MasterCard, through the use of fake merchant names, fake merchant

locations, fake descriptions of the merchant activities, and fake merchant descriptors.  (Tr. 1430:

7-17).  There were at least ten Issuing Banks that were victims of the defendants' Scheme.  (GX

2201, 2202, 2301.2302).

The primary method used by Akhavan, Weigand, and other coconspirators to deceive the

Issuing Banks involved the purchase and use of shell companies that were used to disguise the

marijuana transactions through the use of phony merchants (the "Phony Merchants"). (Tr. 1442:

3-10).  The shell companies were used to open offshore bank accounts with merchant acquiring

banks and to disguise credit and debit card charges for marijuana purchases made through Eaze.

(Tr. 1443: 3-6).  In particular, Akhavan and Weigand worked with other co-conspirators to apply

for and obtain the phony merchant accounts– including for phony online merchants purportedly

selling dog products, diving gear, carbonated drinks, green tea, and face creams – and established Visa and MasterCard merchant processing accounts with one or more offshore acquiring banks. (Tr. 878: 17-879: 3).  Many of the Phony Merchants purported to be based in the United Kingdom, but, despite being based outside of the United States, claimed to maintain U.S.-based customer service numbers.  (Tr. 1364: 20-24; Tr. 827: 2-4).  Akhavan and Weigand had insiders at some of these acquiring banks who were aware that the Phony Merchants were being used to process marijuana transactions and provided feedback on the merchant bank account applications for the Phony Merchants in order to ensure that the accounts were opened successfully.  (Tr. 729: 17-24).

Akhavan and Weigand then arranged for more than a dozen of the Phony Merchants, with their corresponding merchant bank accounts, to be used by Eaze to process debit and credit card purchases of marijuana products.  (Tr. 1443: 18-21).

To assist in obtaining the phony merchant bank accounts, Akhavan and Weigand were provided access to a software program referred to as Webshield that was misused by the defendants in order to circumvent the merchant banks' compliance protocols.  (Tr. 869: 3-7).  Webshield is a company that provides legitimate merchant risk services that are designed to help acquiring banks assess the risks associated with merchants in their portfolio.  (Tr. 868: 17-24).  Webshield is often used during the onboarding process for new merchants who are applying for merchant bank accounts.  (Tr. 868: 17-24).  The defendants were provided with access to the Webshield tool by a co-conspirator named Christian Chmiel, who allowed them to misuse the tool in order to get around the risk assessment checks that were in place at acquiring banks.  (Tr. 870: 1-10).

To facilitate the Scheme, webpages were created and deployed to lend legitimacy to the Phony Merchants, and to avoid detection of the Scheme.  (Tr. 889: 1-11).  The Phony Merchants typically had web pages suggesting that they were involved in selling legitimate goods, such as

carbonated drinks, face cream, dog products, and diving gear.  (Tr. 266: 10-22).  Yet these companies were actually used by the defendants to facilitate the approval and processing of marijuana transactions.  (Tr. 1100: 16-19).  Some of the merchant websites listed for those transactions included: diverkingdom.com, desirescent.com, outdoormaxx.com, and happypuppybox.com.  (Tr. 470: 8-22).  Moreover, none of the Phony Merchant website names listed for those transactions referred to Eaze or to marijuana.  The defendants' scheme even involved fake visits to those websites to make it appear as though the websites had real customers and were operating legitimate online businesses.  (Tr. 890: 7-11).

The defendants' scheme also involved the use of online tracking pixels.  (Tr. 2254: 7-11).  Because the descriptors listed on Eaze's customers' credit card statements often were the URLs for the Phony Merchant websites, Eaze's customers were sometimes confused and did not recognize the transactions on their credit card statements.  (Tr. 1442: 14-24).  The defendants and their coconspirators were concerned that confused customers would call their Issuing Banks and inadvertently reveal the Scheme by indicating that they had purchased marijuana products and/or that they had made a purchase through Eaze.  (Tr. 1465: 6-13).  To lessen the risk that customers would be confused, the defendants used a number of techniques, including employing online tracking pixels to track which users had visited Eaze's website. (Tr. 2254: 7-11).  If an Eaze customer who had visited Eaze's website then went to the URL listed on their credit card statement (i.e. the URL of a Phony Merchant), the tracking pixels would automatically re-route the customer to a webpage connected to Eaze so that the customer would understand what the real purchase had been for (i.e., from Eaze).  (Tr. 1486: 22-1487:6).  To hide the Scheme, the defendants ensured that third-parties who were not Eaze customers, such as bank or credit card company investigators, would not be re-routed, and would therefore be unable to discern any connection between the

Phony Merchant website and Eaze and/or the sale of marijuana products. (Tr. 1486: 22-1487: 6).

Akhavan, Weigand, and others also worked with and directed others to apply incorrect merchant category codes ("MCCs") to the marijuana transactions in order to disguise the nature of those transactions and create the false appearance that the transactions were completely unrelated to marijuana. (Tr. 1577: 8-19). Some of the MCCs/categories listed for the transactions included freight carrier trucking, clock jewelry watch and silverware, stenographic services, department stores, music stores/pianos, and cosmetic stores. (Tr. 471: 18-22).

Over $150 million in marijuana credit and debit card transactions were processed using the Phony Merchants. (Tr. 280: 7).

There were two phases of the Scheme. The first phase of the Scheme operated from 2016 through in or around early 2018. This phase of the Scheme was generally referred to by the name "Clearsettle." (Tr. 1443: 7-11). The second phase of the Scheme, generally referred to by the name "EU Processing," became operational in or around April 2018, although plans for the second phase were underway earlier. (Tr. 1443: 16-17). For example, in or around January 2018, Weigand, Akhavan, and other co-conspirators met at Akhavan's office in Calabasas, California ("Akhavan's Office") for a meeting in which they discussed and planned the second phase of the Scheme. (Tr. 710: 5-11). In addition, Akhavan, Weigand, principals at Eaze and from the marijuana dispensaries, all met at Akhavan's Office in California in March 2018 to discuss and plan the second phase of the Scheme. (Tr. 1690: 15-20). Akhavan participated in both phases of the Scheme. Weigand participated in the second phase of the Scheme. During the second phase of the Scheme, the Issuing Banks remitted approximately $108,320,268.20 as a result of the fraudulent misrepresentations conveyed to the Issuing Banks in furtherance of the Scheme. (GX 687).

During the first phase of the Scheme, Akhavan and his co-conspirators charged Eaze and the dispensaries a fee of approximately 8.75%. (GX 425). During the second phase of the Scheme, Akhavan and his co-conspirators charged the defendants a fee of approximately 12%. (Tr. 1327: 16-18).

### C. Defendants' Roles in the Scheme

Akhavan was the leader of the Scheme and oversaw the entire operation. (Tr. 1445: 12-14). Weigand was responsible for the relationship with the overseas acquiring banks during the EU Processing phase of the scheme, including facilitating the applications for merchant bank accounts on behalf of the Phony Merchants, reviewing fraudulent applications prepared by coconspirators (Tr. 729:8-24; GX 3968; GX 4004 at 3; GX 4002 at 3-5; GX 3940 & 3707), interfacing with the acquiring banks regarding the merchant bank accounts once they were established (Tr. 729:8-24; Tr. 1115:8-23; GX 302, at 10:52; GX 1802; GX 3935; GX 3923; GX 4004 at 4-7, 19-20, 83-87; GX 1722), and providing statements to the dispensaries regarding the flow of proceeds from the marijuana transactions back to bank accounts in the United States (Tr. 2254: 21-23; GX 4004 at 65; GX 485, 1709, & 1801). Weigand also worked on forwarding customer service phone numbers connected to the Phony Merchants to Eaze. (GX 4004 at 39-40, 62-64). And Weigand directed other members of the Scheme, such as Oliver Hargreaves, to prepare application packages for particular banks, such as Kalixa, Wirecard, and E-Comprocessing. (Tr. 802:16-18).

### ARGUMENT

**I.      Applicable Law**

### A. Motion for a Judgement of Acquittal under Rule 29

After the jury has returned a guilty verdict, the court may set aside the verdict and enter an

acquittal pursuant to Federal Rule of Criminal Procedure 29(c). "The Rule permits a district court to enter a judgment of acquittal on a count of conviction only if it finds that the evidence on that count is 'insufficient to sustain a conviction.'" *United States v. Zongo*, 15 Cr. 319, 2017 WL 2297010, at *1 (S.D.N.Y. May 24, 2017) (KMW) (quoting Rule 29). "It is a fundamental general principle that [defendants] challenging the sufficiency of the evidence underlying a conviction bear a very heavy burden." *United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir. 1992) "In considering such a challenge, [the court] must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility, and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (citations, quotation marks, and brackets omitted). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### B. Motion for a New Trial under Rule 33

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[M]otions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most extraordinary circumstances," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). In order for such a motion to have merit, the district court must conclude, taking into account all of the facts and circumstances of the case, that there is "a real concern that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."

*Ferguson*, 246 F.3d at 134; *see also United States v. Yannai*, 791 F.3d 226, 242 (2d Cir. 2015) ("A defendant's motion for a mistrial may be granted where something has occurred to interfere with the defendant's right to a fair trial.").  A new trial should not be granted when the court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134.

## II.      A Rational Trier of Fact Could Have Easily Found that the Defendants' Misrepresentations Were Material

At trial, the Government showed that the defendants' engaged in a years-long Scheme that involved a multitude of lies and misrepresentations, many of which were communicated directly to the Issuing Banks.  Those lies were designed to hide the true nature of the transactions (i.e., the illegal purchase of marijuana) from Visa, MasterCard, and the Issuing Banks, in order to get thousands of marijuana transactions approved over the course of several years.  Despite the overwhelming evidence presented at trial, the defendants' have asserted, among other things, that "there was *no* evidence [presented at trial] that a reasonable bank would have declined to authorize Eaze transactions even absent the defendants' alleged misrepresentations."  (Akhavan Br. 4) (emphasis added).  The defendants' arguments should be rejected in their entirety.

### A.  Applicable Law

At the outset, the jury was properly charged regarding the elements of conspiracy to commit bank fraud, including materiality.  The Court properly instructed the jury regarding the two basic elements of the charged conspiracy: "First, the existence of a conspiracy to commit federal bank fraud at any time during the charged time period of 2016 through 2019; and Second, that the defendant you are considering knowingly, willfully, and with specific intent to defraud joined and participated in this conspiracy."  (Tr. 2635:12-17).  The Court also properly instructed the jury regarding the three elements of the bank fraud object of the charged conspiracy: "First,

that a person devised a scheme to defraud a federally insured bank or credit union by means of misrepresentations. Second, that one or more of the misrepresentations was material. Third, that the perpetrator devised the scheme knowingly, willfully, and with a specific intent to defraud." (Tr. 2636:10-16). Finally, as to the element of materiality, the Court properly instructed the jury that:

> As to the second element, a material fact, as applicable here, is a fact that a reasonable banker would be reasonably likely to consider in making a decision authorizing a bank transaction involving the transfer of money or property. For example, if a perpetrator made misrepresentations designed to make marijuana purchases look like the purchases of other goods, the misrepresentations would be material if, had the banker known that the purchases – that the purchases [sic] were disguised and really were for marijuana, such knowledge would be reasonably likely to influence a reasonable banker in deciding whether to authorize the purchases. Keep in mind that the test of materiality is what a reasonable banker would think and do. The Government does not need to prove that any bank actually relied on a misrepresentation.

(Tr. 2638:5-18).

The defendants have raised no argument challenging the Court's instructions to the jury as to any of these elements. Instead, they assert that the evidence was so insufficient that even when viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found that the element of materiality was satisfied. As described below, a reasonable juror could have easily concluded that the Scheme involved material misrepresentations.

### B. Discussion

The Government introduced overwhelming evidence at trial establishing that the Scheme involved material misrepresentations. Specifically, the Government introduced the following categories of evidence, among others, that demonstrated the Scheme involved material misrepresentations:

- <u>First</u>, at trial it was undisputed that the sale of marijuana was illegal under federal

law during the period of the Scheme.  The jury received a legal instruction on this issue early in the trial.  (*See* Tr. 525:20-22);

- <u>Second</u>, the Government introduced testimony from representatives from three Issuing Banks who all stated, in substance and in part, that those banks would not have knowingly processed credit and debit card transactions that involved the purchase of marijuana.  (Tr. 1130:11-14, Tr. 1769:15-17, Tr. 2083:20-22);

- <u>Third</u>, testimony and bank records from the same three Issuing Banks showed that the rules for those banks prohibited illegal transactions.  (Tr. 1201: 2-18, Tr. 1768:1-2, Tr. 2090:6-18);

- <u>Fourth</u>, the Government introduced testimony and policy documents from Visa and MasterCard that established that both companies prohibited marijuana transactions on their card networks and that issuing banks could be kicked off of the card networks for violating the card companies' rules.  (GX 2312, Tr. 446:16-447:10, GX 2217, Tr. 1880:9-15);

- <u>Fifth</u>, the Government introduced testimony and documentary evidence showing that when Visa and MasterCard had uncovered  the Scheme (i.e., that Eaze transactions were being processed on their networks through Phony Merchants), both companies took steps to terminate those merchants (the evidence also showed that those merchants were in fact terminated).  (GX 2309, GX 2313, GX 2228, GX 2230, Tr. 463:8-21, Tr. 1927:3-6);

- <u>Sixth</u>, the Government introduced testimony from several Issuing Banks that established that if those banks were to lose access to the Visa and/or MasterCard network, it would be devastating to the banks' business (Tr. 1769:11-14, Tr.

2082:12-15);

- <u>Seventh</u>, the Government introduced testimony from witnesses from several Issuing Banks that established that those banks rely on truthful merchant information in order to calculate the risk associated with processing each card transaction. (Tr. 1151:24-1152:10, Tr. 1762:2-13, Tr. 2088:18-25);

- <u>Eighth</u>, the Government introduced testimony from a number of Issuing Banks, such as Bank of America and Wells Fargo, showing that those banks had discovered marijuana merchants who were processing through those banks, and in response, the banks took steps to investigate, and in some cases terminate, those merchants. (GX 2427, GX 2633, GX 2634, GX 2635);

- <u>Ninth</u>, in the case of Wells Fargo bank, when Wells Fargo discovered that there were Eaze-affiliated bank accounts at Wells Fargo, the bank closed those accounts out of a concern that they were connected to a marijuana company (i.e., Eaze). (GX 2633, GX 2635);

- <u>Tenth</u>, the Government introduced evidence showing that the defendants and their co-conspirators understood that U.S. Issuing Banks were unwilling to process marijuana transactions and would take steps to stop those transactions if they discovered them (GX 422); and

- <u>Eleventh</u>, the Government presented overwhelming evidence at trial that showed that the defendants engaged in extensive efforts to conceal the true nature of the marijuana transactions.

Based on the totality of this evidence, a reasonable juror could have easily found that the Scheme involved material misrepresentations. Indeed, the basic fact that these transactions were

illegal, and that their illegality was concealed, is itself sufficient for a reasonable juror to conclude that the Scheme involved material misrepresentations. In other words, had a reasonable banker known that the Eaze purchases were not legal purchases of innocuous goods, but actually were disguised illegal purchases of marijuana in the United States, such knowledge would be reasonably likely to influence a reasonable banker in deciding whether to authorize the purchases. Furthermore, the evidence described above shows that Issuing Banks have an enormous incentive not to process marijuana transactions, but instead to report those transactions to Visa and MasterCard; and more generally, Issuing Banks care about being provided with accurate information when they are processing card transactions. The evidence also demonstrated that the defendants' use of fake MCCs, merchant names, merchant locations, and descriptors, was designed to hide (and did hide) the true nature of the transactions from Visa and MasterCard and the Issuing Banks.

The defendants largely ignore all of this evidence. The defendants rely on four main arguments, claiming that: 1) the evidence showed that the Issuing Banks made a conscious decision to authorize marijuana transactions; 2) there was no evidence that a reasonable bank would have declined to authorize Eaze transactions absent the defendants' alleged misrepresentations; 3) testimony that some banks would not have knowingly processed marijuana transactions is insufficient to prove materiality; and 4) evidence that the defendants submitted false information to European banks and of the Issuing Banks' policies related to marijuana-related businesses is irrelevant. The defendants' arguments strain credibility, are unsupported by the record, and were properly rejected by the jury.

The defendants' first argument is supported by no evidence in the record. Specifically, there was no evidence presented at trial that a *single* Issuing Bank made a conscious decision to

authorize marijuana transactions during the course of the Scheme. As a substitute for such evidence, the defendants primarily rely on evidence from after the conspiracy connected to purchases of marijuana products through a payment platform called Circle. Eaze-Circle transactions worked as follows: (1) first, the customer purchased a stable cryptocurrency that was pegged to the dollar (so called "USD Coin," or "USDC") and added to the customer's Circle wallet; and (2) second, the USDC was then used to fund the purchase of marijuana products that were sold through the Eaze platform. (Tr. 2395: 18-2396: 11, HAX 14001 at 4). In other words, when customers used Circle to make purchases on Eaze, the marijuana products were purchased through the payment of USDC, not the payment of U.S. dollars from the issuing bank, in a second-stage transaction that did not involve the issuing bank. (Tr. 2395: 22-2396: 13, HAX 14001 at 4). The evidence regarding Eaze-Circle transactions had no bearing on the issue of materiality to Scheme transactions. Given the substantial differences between the transactions at issue in the Scheme, that is, the direct use of cards issued by the Issuing Banks to fund illegal transactions, and the transactions at issue through Circle, which involved the purchase of cryptocurrency, a reasonable juror would rightly have given minimal or no weight to the Circle evidence in determining how a reasonable banker would view the defendants' misrepresentations.

Furthermore, the only evidence presented at trial that any Issuing Bank was aware of the Circle-Eaze transactions directly undercut the defendants' argument. Specifically, a bank witness from Bank of America testified that when the bank had learned about the Circle-Eaze transactions, it had reported them to Visa and MasterCard. (Tr. 1275:24-1276:2). Based on the totality of this evidence, and all of the evidence described above, a reasonable juror could have concluded that the Issuing Banks had not made a "conscious decision" to process marijuana transactions, and

14

more importantly, that the defendants' misrepresentations were material.[1]

The defendants' second argument is that the Government presented no evidence that a reasonable bank would have declined to authorize the Eaze transactions absent the defendants' misrepresentations. At bottom, the defendants' argument is that if the defendants had transmitted truthful information to the Issuing Banks, the Issuing Banks would not have detected that they were processing marijuana transactions, and/or would have continued processing such transactions even if they had detected them. At the outset, the defendants have misconstrued the relevant test for materiality. The relevant question is not whether the banks would have decided to conduct these transactions if they'd known the truth, but rather, whether the illegal nature of these transactions was a fact that a reasonable banker would be reasonably likely to *consider* in making a decision whether to authorize the transactions. (*See* Tr. 2638:5-18). The answer to that question

---

[1] None of the additional points cited by the defense in support of this argument are persuasive. (*See* Ak. Br. 10-12). For example, the defendants blame the banks for not doing more and assert that the banks never warned customers about making marijuana purchases and that "the banks did not push for a specific MCC for marijuana, even though they could have." (*Id.* at 12). At the outset, the defendants completely ignore that the Issuing Banks' policies prohibited illegal transactions, which included all of the marijuana transactions at issue in the Scheme. Further, that the Issuing Banks theoretically could have done more to prevent marijuana transactions from being processed is of minimal probative value on the issue of materiality, and certainly does not so greatly undermine all of the Government's evidence that no rational juror could have found the defendants' misrepresentations to be material. *See, e.g.*, *United States v. Frenkel*, 682 Fed. Appx. 20, 22 (2d Cir. 2017) (rejecting defendant's argument that district court erred in precluding him from arguing victim bank's negligence in failing to conduct sufficient diligence in connection with issuing loan because "a victim's negligence is not a defense under the federal fraud statutes" and argument is irreconcilable with Supreme Court's decision in *Neder*). Finally, the defendants' argument that the banks faced no "meaningful" risk of enforcement action by the federal government was inconsistent with the evidence and properly rejected by the jury. Among other things, witnesses from Issuing Banks made it clear that the risk of knowingly facilitating illegal transactions was not a risk the banks were willing to take. (Tr. 1146: 15-1147: 4, Tr. 1169: 25-1170: 13, Tr. 2088: 9-17). The jury was entitled to credit that testimony. Further, the risk faced by Issuing Banks that processed marijuana transactions was not limited to just enforcement actions, but also extended to the risk of being kicked off of the Visa and MasterCard networks.

is obvious: of course the fact that these transactions were illegal is a fact that a reasonable banker would be reasonably likely to consider in deciding whether to authorize the transactions.

Nonetheless, even if the Government had been required to show definitively that the bankers would not have authorized these transactions, the evidence clearly shows that as well. At the outset, the evidence was clear that the defendants and their co-conspirators believed, rightfully, that absent their elaborate and expensive Scheme, the Issuing Banks would not have authorized the marijuana transactions. That is why the defendants went through considerable time and effort to purchase shell companies, set up offshore merchant bank accounts, and design fake websites for the Phony Merchants. That is also why the defendants were able to charge the marijuana dispensaries outsized fees for setting up the Scheme and processing the marijuana transactions.

Furthermore, the evidence at trial showed that Issuing Banks have controls in place to monitor and detect marijuana transactions. For example, a witness from Bank of America testified at trial that the bank has a compliance team that monitors marijuana transactions (as well as other types of high-risk transactions). (Tr. 1166:11-13). If that team discovers marijuana merchants are present on the network, they take steps to investigate the merchant, and refer the merchant to Visa and/or MasterCard as appropriate. (Tr. 1167:7-18). If the credit card networks were to determine that a particular merchant was in fact accepting credit and debit cards for marijuana transactions, the merchant would be terminated. (Tr. 1168:9-14). Notably, even despite the defendants' elaborate scheme, various financial institutions, including Visa and MasterCard, discovered the Scheme, and took prompt steps to shut down the card processing (i.e., to stop all subsequent transactions), defeating the defendants' efforts to move funds through affected Issuing Banks. (GX 2309, GX 2313, GX 2228, GX 2230, Tr. 463: 8-21, Tr. 1927: 3-6). It is inconsistent with this record to suggest that absent the defendants' extensive misrepresentations, the Issuing Banks and

16

credit card companies would not have discovered the Scheme.

In addition, all of the evidence described above, *see supra* at 10-12, demonstrates that if the Issuing Banks had discovered the Scheme, they would have done exactly what Akhavan predicted they would do: "reach[] out to [V]isa and [MasterCard] saying this bank in the U.K. [i]s doing processing for weed."  (GX 422).  In other words, the totality of the evidence demonstrates that the defendants' misrepresentations were essential in order to get the Issuing Banks to authorize the Eaze transactions, and had the Issuing Banks discovered the truth, they would not have allowed subsequent Eaze transactions to be authorized.

The defendants next argue that testimony that some banks would not have knowingly processed marijuana transactions is "insufficient to prove materiality."  (Ak. Br. 8).  Specifically, the defendants assert that whether the banks would have knowingly processed the marijuana transactions is "irrelevant to materiality unless the government can show that an objectively reasonable bank would 'know' it was processing marijuana transactions based on the Transaction Information."  (*Id.*).  This argument is a repackaged version of the argument described above, and fails for the same reasons.  As described above, there was ample evidence at trial from which a reasonable juror could have concluded that the Issuing Banks (directly, or through Visa and MasterCard)[2] would have discovered that the defendants were processing marijuana transactions absent the defendants' misrepresentations, and would have taken steps in response to that discovery to stop the authorization of further transactions.  In other words, absent the defendants'

---

[2] As the Court correctly instructed the jury, it was not necessary for the Government to prove that the misrepresentations were made directly to a federally insured bank or credit union, but only that the federally insured bank or credit union was induced to authorize the transactions by means of the misrepresentations.  (Tr. 2637:13-17).

misrepresentations, Eaze would not have been able to successfully process over $150 million in marijuana transactions through the Issuing Banks of their customers.

Lastly, the defense argues that two pieces of evidence were irrelevant on the issue of materiality: 1) Issuing Bank policies related to marijuana-related businesses; and 2) false information submitted to European banks. The first category of evidence is plainly relevant to materiality. Evidence showing that an Issuing Bank had policies in place regarding marijuana-related businesses, and in some cases prohibited such businesses, is relevant to a juror's assessment of whether a reasonable banker's knowledge that the Eaze purchases were disguised and really were for marijuana, would be reasonably likely to influence the banker in deciding whether to authorize the purchases. Such evidence shows, among other things, that objectively reasonable banks, including banks that functioned both as Issuing Banks and acquiring banks, had particular concerns about being involved with marijuana transactions, and makes it more likely that the misrepresentations were capable of influencing the decisions of whether to authorize such transactions. In addition, while the European banks in this case were not covered by the bank fraud statute (and the Government never argued to the jury that they were), the lies told to those banks were still relevant because many of those lies were passed on to the Issuing Banks as part of the overarching scheme to facilitate the illegal flow of funds through the Issuing Banks.

III.     **The Defendants' Argument that No Rational Jury Could Have Concluded That They Intended to Defraud the Victim Issuing Banks Is Baseless**

Relying upon a misapprehension of the governing caselaw and this Court's jury instructions, the defendants claim that to convict them of bank fraud conspiracy, the Government was required to prove that they "intended to cause actual harm" (Akhavan Br. 15), through effecting misrepresentations that "affected an essential element of the banks' bargain with their cardholders," and that the Government failed to do so (*id*. at 16, 20). The defendants further argue

that no rational juror could have found that they intended to deceive a federally-insured financial institution.  (*Id.* at 21).  These arguments are meritless.  With respect to proving a bank fraud scheme under Section 1344(2), Supreme Court and Second Circuit precedent do not require the Government to prove that misrepresentations affected an essential element of the transaction, and the Court's jury instructions accurately reflected this precedent.  But even if they did, the evidence established that the legality of the goods that U.S. banks were asked to authorize for purchase was, in fact, essential to them.  Moreover, ample evidence established that both defendants intended to obtain funds from federally-insured U.S. institutions through their Scheme.

### A.  Applicable Law

This Court previously described the essential elements of a Section 1344(2) charge in denying the defendants' motion to dismiss the Indictment.  Pointing to the Supreme Court's decision in *Loughrin v. United States*, 573 U.S. 351, 355-56 (2014), which directly addressed the elements of Section 1344(2), this Court explained that a violation of that provision requires that a defendant (1) knowingly execute (or attempt to execute) a scheme through which the defendant "intend[ed] to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution"; (2) the defendant made misrepresentations; (3) the misrepresentations were material; and (4) the misrepresentations were the "means" by which the defendant "intended to obtain bank property."  (Op. & Order dated Aug. 31, 2020, at 7-8 (quoting *Loughrin*, 573 U.S. at 355-56)).

At that time, the Court rejected arguments that the defendants repeat now, albeit couched in terms of sufficiency of the evidence.  In particular, the defendants argued then that the Indictment failed to allege that they intended to impose actual harm or injury on the U.S. Issuing Banks (or indeed, on anyone), within the meaning required by precedent.  They argue now that no

rational jury could find that they possessed such intent, as the evidence adduced at trial failed to show that their scheme depended upon a misrepresentation of an essential element of the bargain. (Akhavan Br. 15-16). However, these arguments—then and now—turn on a fundamental misapprehension of the governing caselaw, and the Court should reject them again. As this Court previously explained, the "harm" contemplated under Section 1344(2) is a scheme to obtain money or property under the custody or control of a financial institution. (*Id.* at 9-10 (citing *Loughrin*)). The scheme as charged squarely met that requirement, as the defendants "sought to injure those interests by causing the banks to relinquish . . . funds through deception." (*Id.* at 11-12). Put another way, the object of the defendants' scheme was to cause the Issuing Banks to relinquish *money*, and that purpose satisfied the statutory provision. (*Id.* at 11). As a result, contrary to the defendants' assertion—pressed again in their current motions (*see* Akhavan Br. 17-18)—the Court explained that "whether the banks also had a 'right to accurate information,' 'ethereal' or otherwise," was "beside the point." (Aug. 31, 2020 Order at 11-12).

Notably, the Court's analysis of Section 1344(2), including the provision's object and intent elements, is fully supported by the Second Circuit's decision in *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) – which is on all fours with his case. (*See* Akhavan Br. 19 n.13).[3] Similar to this case, the defendants in *Lebedev* concealed from issuing banks and credit card

---

[3] Notably, none of the Circuit cases relied upon by the defendants, including *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), *United States v. Binday*, 804 F.3d 558 (2015), *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), and *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), concern bank fraud under Section 1344(2), but rather concern the "scheme to defraud" element under Sections 1341 and/or 1343. And the Second Circuit's decision in *United States v. Chandler*, 98 F.3d 711 (2d Cir. 1996) concerns the "scheme to defraud" element under Section 1344(1), not bank fraud under Section 1344(2).

companies that the transactions involved the purchase and sale of Bitcoin, and to do so, they used a false merchant purportedly in the business of collecting and exchanging memorabilia.  932 F.3d at 46. On appeal, Lebedev argued that the Government failed to prove that he intended to defraud either the banks or their customers, as the customers willingly purchased Bitcoin and the banks were not deprived of any property interest in those accounts.  Applying *Loughrin*, the Second Circuit held that sufficient evidence showed (1) that the defendant caused false information to be sent to financial institutions to conceal the fact that their customers were transacting business with an unregistered Bitcoin exchange, and (2) that the defendant did so "with the intent to obtain funds under those institutions' custody and control; namely, funds in the customers' accounts."  *Id.* at 49.  In addition, the Court noted that in the course of authorizing the credit transactions, the banks advanced their own funds.  *Id.*  On this basis, the Second Circuit held that there was sufficient evidence to sustain Lebedev's Section 1344(2) conviction.  *Id.*

Applying these principles, the Court properly instructed the jury in this case that it must find that the defendants possessed a "specific intent to defraud," meaning an "intent to use misrepresentations to obtain money or property from a federally insured bank, directly or indirectly." [4]  As such, under the body of caselaw that actually governs in this case, and consistent with the Court's jury instructions, the Government need not have proven that the defendants' scheme depended upon a "misrepresentation of an essential element of the bargain" (Akhavan Br.

---

[4] Although the Court's jury instructions used the term "scheme to defraud" the Court explicitly defined that term to mean "a scheme to use one or more misrepresentations to obtain money or property from a bank or credit union," *i.e.* in the language of Section 1344(2), and its instructions otherwise instructed the jury as to the elements of this particular provision of the bank fraud statute.

16) to sustain a Section 1344(2) conviction.  Accordingly, the Court once again should reject the defendants' arguments otherwise.

### B.  Discussion

Turning to the sufficiency of the evidence at trial, the evidence overwhelmingly established that the defendants intended to cause misrepresentations to pass through the credit card networks to U.S. Issuing Banks in order to trick those banks into authorizing illegal transactions and releasing funds.  The evidence established the following, among other things:

- That the defendants knowingly and intentionally engaged in a transaction laundering scheme on behalf of Eaze, which they were well aware was based in California and sold its products to customers based in California, and were therefor likely to have (and did have) bank accounts at U.S. Issuing Banks.  (*See, e.g.*, Tr. 138, 176-77, 1108-1110, 1560-63, 2253-54, GX 104, 105, 302, 411, 423, 566, 4002, 4004, S2).

- To carry out the scheme, both defendants directed misrepresentations to be submitted to foreign acquiring banks for purposes of opening card processing accounts in the names of phony merchants; indeed, Weigand was directly involved in submitting those misrepresentations.  (*See supra,* Background; *see also, e.g.*, Tr. 878:17-879:3; 729:8-24; 802:16-18; GX 3968; GX 4004 at 3; GX 4002 at 3-5; GX 4008; GX 3919; GX 3940 & 3707).

- Akhavan and Weigand knew that the misrepresentations were being passed to the credit card companies and U.S. Issuing banks, as evidenced by, among other things, discussions at the Calabasas meetings (*See, e.g.* Tr. 710, 716, 726-731, 1553-63; GX 105); internal Telegram communications in which the defendants discussed

avoiding detection by banks and credit card companies (GX 4002, 4004); electronic communications between and among the defendants and Eaze employees about avoiding chargebacks, which they explained could lead to detection by banks and credit card companies, about banking issues, and about miscoding (*See, e.g.*, Tr. 1463-65, 1562 2267-2268; GX 302, 418, 422, 615, 4002, 4004); complaints sent by confused Eaze customers in the United States to the defendants, in which the customers complained that they did not recognize the charges of their statements and threatening to contact their banks and/or credit card companies (GX 3949, 3950, 3957); and documents found on Weigand's computer showing Mastercard's detection and shutdown of the scheme, documents containing misrepresentations, and communications concerning the Eaze scheme (GX 2309; GX 678; GX 1449, GX 1722, 1733).[5]

- Weigand was responsible for receiving the proceeds of these transactions—which came from the U.S. Issuing Banks—sending them to U.S. bank accounts of the dispensaries, and instructing the dispensaries to ensure that their bank accounts could not be traced to cannabis.  (Tr. 2254, 2265, 1762; GX 4004 at 65; GX 302, 479, 485, 523, 649, 650, 1506, 1709, & 1801).

From all of this evidence, a jury could easily conclude that the defendants intended to obtain money from the Issuing Banks through false or fraudulent pretenses.

---

[5] While some of these communications involved the EUP email address, many of them did not, and, in any event, as reflected in the evidence cited herein, a jury could reasonably infer that Weigand controlled use of that email address and was aware of its contents.  (*See, e.g.*, Tr. 763; GX 3919, 3949).

23

However, even assuming the Government was also required to prove that the defendants' misrepresentations affected an essential element of the bargain with the U.S. Issuing Banks, a reasonable jury could easily conclude that the Government met its burden. The concealment of information regarding the illegal nature of the transactions and the completely fraudulent nature of the transactions presented to the U.S. Issuing Banks surely implicated an "essential element of the bargain" with the Issuing Banks. In *United States v. Schwartz*, 924 F.2d 410, 420-21 (2d Cir. 1991)[6] the Second Circuit held that a wire/mail fraud indictment alleged "misrepresentations that went to an essential element of the bargain" where the indictment asserted that as part of a consummated contract of sale with a counterparty, the defendant falsely promised the counterparty that it would not distribute the night vision goggles to restricted nations, which would have been illegal under the export laws. Here, the bank and credit union witnesses all testified that their respective institutions would not knowingly authorize illegal transactions, as that would subject them to legal risk, reputational risk, and for the banks, potentially being barred from participating in the Visa and Mastercard networks. (*See, e.g.*, Tr. 1129-31, 1241, 1769-1770, 2082-2083, 2086-2087; GX 2208, 2312, 2410, 2502, 2704). While the defendants argue that the defendants "innocently intended to further a transaction that would in the end benefit the bank" (Akhavan Br. 21 (quoting *United States v. Nkansah*, 699 F.3d 748, 757 n.2 (2d Cir. 2012), *overruled by United States v. Shaw*, 137 S.Ct. 462 (2016) and *Loughrin*, 573 U.S. at 366 n.9)), there was no evidence that this was the defendants' intent. Indeed, it borders on the absurd to argue that lies going to the nature and legality of transactions the U.S. Issuing Banks were being asked to approve do not satisfy the essential element requirement.

---

[6] Notably, the defendants fail to cite *Schwartz* at any point in their briefs.

24

Finally, the evidence at trial firmly established a "'real connection'" between the defendants' misrepresentations and a federally insured bank, *i.e.* that "a false statement will naturally reach the bank.'" (Aug. 31, 2020 Order at 13 (quoting *Loughrin*, 573 U.S. at 365 n.8)). Specifically, as discussed above, the evidence showed that the purpose of passing misrepresentations to the acquiring banks in the form of phony merchants, phony websites, false MCC codes, and false location information was to cause those misrepresentations to pass to the credit card companies and ultimately to the U.S. Issuing Banks to ensure authorization for the concealed marijuana transactions. *See supra*. This evidence was more than sufficient for a rational juror to conclude that the defendants intended to deceive federally insured financial institutions..

## IV.      The Evidence Overwhelmingly Supported the Verdict

Defendant Akhavan raises a vague three-sentence argument that the "evidence preponderated heavily against the verdict" and the Court should therefore grant him a new trial under Rule 33. (Ak. Br. 24). Specifically, Akhavan repeats his argument that the "government failed to produce evidence that any bank has ever declined to authorize an Eaze transaction or any other marijuana transactions." (*Id.*). No such evidence was required. As set forth above, the Government adduced ample evidence as to each of the elements of the charged bank fraud conspiracy. The Court should accordingly reject Akhavan's general assertion that the evidence weighed against the verdict, as well as Akhavan's more specific arguments, as set forth below.

## V.      Exceptional Circumstances Warranted Martin Elliott's Testimony by Two-Way Videoconference

### A.  Background

Martin Elliott, the Head of Visa's Franchise Risk Management Group, moved to testify at

trial by two-way video conference after being subpoenaed by the Government.[7] (Dkt. 174). Elliott, who resides in California, is 57 years old, and suffers from ███████████████████████ ███████████████. (*Id.* at 1). His wife is 55 years old and suffers from █████████, and his mother-in-law, with whom he resides and is a primary caretaker, is 83. (*Id.*). In these circumstances, given the ongoing COVID-19 pandemic, the Court found that Elliott was unavailable to testify in person, and that "the need to prevent Elliott's serious illness or death (and to protect his family) offer[ed] exceptional circumstances warranting the use of two-way video testimony." (Dkt. 208 at 23-24).

At trial, Elliott testified, among other things, regarding the general roles of the different players in Visa's payment processing network (Tr. 1845-1852); the information provided to Visa and U.S. issuing banks when processing card transactions (Tr. 1852-1857); Visa's policies, rules, and positions regarding illegal transactions, including marijuana transactions (Tr. 1858-1885); Visa's processes for enforcing those policies, rules, and positions (Tr. 1885-1892); and Visa's termination of merchants conducting marijuana transactions, including several fake merchants used by the Defendants in the Scheme (Tr. 1989-1907).

Elliott testified via two-way video conference from the office of his counsel in San Francisco, California. At all times during his testimony, Elliott was able to see the defendants, the jurors, the examiner, and the judge. (*See* Tr. 1843). Counsel for both defendants had a representative present in the room with Elliott during his testimony (Tr. 1841), and were invited to make exhibits available for cross-examination in whatever format—hard copy or electronic—

---

[7] Visa had also been subpoenaed by Akhavan and had indicated that it intended to offer Elliott as a witness in satisfaction of that subpoena. *See* Dkt. 208 at 14.

and at whatever time—in advance of or during questioning—they wished.

### B. Applicable Law

The Sixth Amendment grants defendants the right "to be confronted with the witnesses against [them]." U.S. Const. amend VI. It does not, however, "grant defendants the *absolute* right to a face-to-face meeting" with those witnesses at trial, *Maryland v. Craig*, 497 U.S. 836, 844 (1960) (emphasis in original). Rather, "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial, a preference that must occasionally give way to consideration of public policy and the necessities of the case." *Id.* at 849 (internal citation and quotes omitted).

As the Supreme Court has explained, "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." In *Maryland v. Craig*, the Supreme Court recognized that this central concern could be addressed short of live, in-court testimony. In that case, the Supreme Court approved the use of one-way video testimony for a child witness because "denial of such confrontation is necessary to further an important public interest and . . . the reliability of the testimony is otherwise assured." *Id.* at 850. In so holding, the Supreme Court recognized that the one-way videoconference "adequately ensure[d] that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony," because it preserved all elements of the confrontation right—"oath, cross-examination, and observation of the witness' demeanor"—other than the witness's ability to see the defendant as he or she testified. *Id.* at 851.

In *United States v. Gigante*, the Second Circuit drew upon the standard applicable for Rule 15 depositions to approve the use of two-way video testimony, which "preserve[s]" "all of the salutary effects of face-to-face" confrontation, "[u]pon a finding of exceptional circumstances . . .

when this furthers the interests of justice."  166 F.3d 75, 80-81 (2d Cir. 1998).

### C. The Court Correctly Concluded That the Exceptional Circumstances Standard Was Satisfied

Elliott was properly allowed to testify by two-way videoconference because his "age and preexisting conditions placed him at risk of serious illness or death if he were to contract COVID-19" (Dkt. 208 at 15), and, at the time of the trial, Elliott "[could not] travel across the country without subjecting himself to a substantial risk of contracting COVID-19" (*id.* at 23).

Akhavan contends that Elliott suffered only "minor health conditions," and was therefore not "physically unable to travel like the witness[] in *Gigante*."[8]  (Akhavan Br. 27).  A court, however, is not limited to considering a witness's mobility in determining whether exceptional circumstances are present.  In light of the specific and severe health risks to Elliott if he were to contract COVID-19—as this Court noted, the CDC had recognized that (a) adults over age 50 were significantly more likely to die, and (b) adults with the conditions Elliot has had an "increased risk of severe illness" if they contracted COVID-19 (Dkt. 208 at 15)—*Gigante*'s exceptional

_____

[8] Akhavan does not dispute that Elliott's testimony was material, or that it was in the interest of justice to have Elliott testify.  (*See* Akhavan Br.. at 28 (characterizing Elliott as "one of the most important witnesses")); *United States v. Mostafa*, 14 F. Supp. 3d 515, 524 (S.D.N.Y. 2014) (interests of justice furthered by video testimony for unavailable witness because "it is important that the Government be able to present the material and relevant evidence in its search for truth"); *United States v. Donziger*, No. 19 Cr. 561 (LAP), 2020 WL 5152162, at *3 (S.D.N.Y. Aug. 31, 2020) (interests of justice furthered where witness had first-hand knowledge of relevant conduct).

circumstances standard was satisfied here.[9]  *See, e.g.*, *Donziger*, 2020 WL 5152162, at *3 (finding standard met based on witness's age, health conditions, and health risk posed by COVID-19); *United States v. Davis*, No. 19 Cr. 101 (LPS), 2020 WL 6196741, at *4 (D. Del. Oct. 22, 2020) (similar); *United States v. Babichenko*, No. 18 Cr. 258 (BLW), 2021 WL 1759851, at *2 (D. Idaho May 4, 2021) ("ongoing pandemic constitutes exceptional circumstances").

Akhavan further contends that the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), implicitly overruled *Gigante*.  For the reasons set forth by this Court in its March 1, 2021 Memorandum and Order, Akhavan is wrong.  (Dkt. 208 at 21-22).  *Crawford* did not overrule *Gigante*—or *Craig*—because the cases address fundamentally different questions. *See United States v. Carter*, 907 F.3d 1199, 1206 n.3 (9th Cir. 2018) (noting that "*Crawford* did not overturn *Craig*"); *United States v. Wandahsega*, 924 F.3d 868, 879 (6th Cir. 2019) (same); *Horn v. Quarterman*, 508 F.3d 306, 319 (5th Cir. 2007) ("we are not at liberty to presume that *Craig* has been overruled *sub silentio*").  *Crawford* addressed the admissibility of prior out-of-court statements not subject to cross-examination, while *Gigante* and *Craig* considered the use of video testimony through which witnesses *would* be subject to cross-examination.  The "categorical guarantee" affirmed by *Crawford* was a defendant's right not to be subjected to the "principal evil at which the Confrontation Clause was directed"—the use of *ex parte*, testimonial statements that

---

[9] Although the Government believes that *Gigante* proscribes the correct standard for the use of two-way video, the standard set out in *Craig* for one-way video testimony is satisfied here as well. As this Court previously held, "preventing the serious illness or death of a third-party witness whose testimony is compelled by subpoena is an important public policy," and the reliability of Elliott's testimony was assured through the two-way videoconference process, which permitted testimony under oath, with cross-examination, jury observation of the witness's demeanor, and face-to-face visibility of the witness and defendants.  (*See* Dkt. 208 at 24 n. 12); *Craig*, 497 U.S. at 850.

had not been subjected to cross-examination as evidence.  *Crawford*, 541 U.S. at 50, 59.  That guarantee was protected here: Elliott was subjected to the truth-finding functions of confrontation and cross-examination at trial.

### D.  Akhavan Suffered No Undue Prejudice from Elliott's Remote Testimony

Akhavan further contends that he encountered certain "practical difficulties" in cross-examining Elliott that amounted to a miscarriage of justice requiring a new trial.  Akhavan, however, has not shown, and cannot show, that he suffered any undue prejudice.

Akhavan first suggests that his cross-examination of Elliott was hampered by unfair time constraints and certain brief delays experienced when Elliott sought to identify the exhibits being referenced.  (Akhavan Br. 29-30).  As the record reflects, however, any delays or defects in the video transmission were brief and promptly addressed.  (*See, e.g.*, Tr. 1932, 1939, 1969).

The Court was also well within its "wide discretion" when it chose to manage cross-examination by imposing reasonable time constraints.  *United States v. Flaherty*, 295 F.3d 182, 190-91 (2d Cir. 2002).  Akhavan received all of the time—and more—that he requested for Elliott's cross-examination.  (*See* Tr. 1893-94 (requesting 45 minutes); Tr. 1962 (Court granting Akhavan's request for "a few more minutes"); Tr. 1967 (granting Akhavan an additional two minutes for "wrap up questions")).  Notably, Akhavan has failed to identify any particular exhibit, topic, or question that he was unable to present or pose to Elliott because of insufficient time.

In addition, Akhavan contends that he is entitled to a new trial because he believes that Elliott gave "evasive answers."  (Akhavan Br. 30-31).  But Akhavan's assertion that he would have had better "control" over Elliott if Elliott had testified in person is no more than rank speculation.  "Ordering a new trial based on [such] speculation would be inconsistent with the 'great caution' courts must exercise when deciding Rule 33 motions."  *United States v. Seabrook*,

467 F. Supp. 3d 171, 178–79 (S.D.N.Y. 2020); *United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir.1981) (affirming denial of Rule 33 motion where claim of Government misconduct was based on "unsupported speculation"); *United States v. Walker*, 974 F.3d 193, 208–09 (2d Cir. 2020) (similar). That is particularly true here, where Akhavan has not identified any 3500 materials or other evidence indicating that Elliott might have given different answers if he was present in the courtroom (and the Government is not aware of any). *See United States v. Mendlowitz*, No. 17 CR. 248 (VSB), 2019 WL 6977120, at *13–14 (S.D.N.Y. Dec. 20, 2019) ("[defendant] has not identified any evidence that would lead one to believe that additional questioning of [the witness] would have elicited testimony helpful to [the defendant]").

With regard to HAX-5014, Akhavan suggests that his inability to cross-examine Elliott regarding a presentation slide showing historical and projected sales of marijuana prevented him from establishing that Visa and U.S. Issuing Banks did not care about marijuana transactions because they could profit from them. (Akhavan Br. 39). But Akhavan made exactly this point in his closing argument, based on the undisputed testimony of multiple witnesses, including Elliott, that U.S. banks and credit card companies obtain fees and profits when they process card transactions. (*See* Tr. 2563, 2571-72, 2575-76). Akhavan's assertion that he could have gained further concessions towards this point, for which there was already extensive, cumulative evidence, by cross-examining Elliott regarding this marginally relevant slide is, again, mere speculation. And to the extent that there was some critical point to be made, Akhavan could have sought to recall Elliott during his defense case. His failure to do so "reinforces [the] conclusion that [a] new trial[ is] not warranted, and belies defendants' claims regarding the importance of this evidence." *United States v. Mora*, 152 F.3d 921 (2d Cir. 1998); *see also United States v. Batista*, No. 06 Cr. 265 (DLI), 2010 WL 1193314, at *13 (E.D.N.Y. Mar. 24, 2010) (new trial not

warranted based on disclosure delays where defense did not seek to recall relevant witness); *United States v. Pennick*, 17 Cr. 15, 2020 WL 4692475, at *6 (W.D.N.Y. Aug. 13, 2020) (similar).

Moreover, as discussed above, *supra* Section II.B, the evidence as to the materiality of the defendants' misrepresentations to U.S. issuing banks was overwhelming, and Elliott's testimony was largely cumulative of and consistent with that of John Verdeschi, a similar witness from Mastercard.[10]  *See, e.g., United States v. Harris*, 842 F. App'x 28 (9th Cir. Dec. 29, 2020) (testimony by video was "harmless beyond a reasonable doubt" where other witnesses "gave similar testimony").  For all of these reasons, a new trial is not warranted.

## VI.        The Court's Curative Instruction Regarding Materiality Was Proper

Akhavan argues that the Court's curative instruction was unnecessary, and prejudicial because it undercut his counsel's credibility. (Akhavan Br. 33-34). Defense counsel's statement that "*the question for bank fraud isn't what the banks do after the fact*; remember, it's what they do to authorize a transaction" (Tr. 2581) (emphasis added), however, misstated the law and risked confusing the jury.  It wrongly implied that (a) misrepresentations could only be material in relation to the particular transaction they were submitted in connection with, rather than potentially being material because they influenced authorization decisions for later transactions in an ongoing deceptive course of conduct, *see Neder v. United States*, 527 U.S. 1, 4 (1999) ("the Government must prove that the defendant in question engaged in a deceptive course of conduct by making material misrepresentations"); *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (same);

---

[10] Much like Elliott, Verdeschi testified as to the roles different players in the card payment processing network, the information provided to the credit card companies and U.S.-issuing banks when processing card transactions; Mastercard's policies prohibiting illegal transactions, including marijuana transactions; processes for enforcing those policies; and the termination of certain marijuana merchants, including several fake merchants used by the defendants in the Scheme.

and (b) Issuing Banks couldn't be defrauded unless they checked for and discovered the misrepresentations at the time of a given transaction, rather than after the fact (*see* Tr. 2620-21).

In these circumstances, it was appropriate for the Court to issue a curative instruction to clarify the law and the issues properly before the jury. *See United States v. Young*, 470 U.S. 1, 13-14 (1985) (noting that the proper remedy for improper arguments by counsel is to request a curative instruction). The Court did so in a limited and appropriate fashion, clarifying that "it is not necessary that a misrepresentation made in connection with a particular transaction be reasonably likely to affect the decision to authorize that particular transaction at that particular time [because] what is charged here is an ongoing scheme to defraud, including a course of misrepresentations over a period of time through a pattern or a course of deceptive conduct. So you need to look at the whole picture." (Tr. 2673-38). Because that instruction was necessary to cure defense counsel's misstatement, and because the Court did nothing more than to correctly state the law regarding materiality in the context of bank fraud conspiracy, Akhavan's request for a new trial should be rejected.[11]

Moreover, to the extent that Akhavan argues that the curative instruction was unduly highlighted because it was given in the midst of the final jury instructions, without being included on the printed version of those instructions, the responsibility for that sequence of events falls squarely on Akhavan. Akhavan made the strategic decision to have the curative instruction read

---

[11] The curative instruction, moreover, did not unduly emphasize any errors made in summation so as to undermine defense counsel's credibility, or otherwise improperly vouch for any parties' characterization of the evidence. *See United States v. Weiss*, 914 F.2d 1514, 1523-24 (2d Cir. 1990). Indeed, the Court gave the curative instruction only after having given curative instruction that similarly clarified an issue raised in Government's summation, in which the Court told the jury that the Government's counsel "inadvertently suggested at one or two places that defense counsel may have attempted to mislead you." (Tr. 2500).

at that time (Tr. 2621-22), and cannot now be heard to complain that he suffered the consequences

of that decision when there is no dispute that this Court correctly charged the jury on the law.

## VII.      Weigand's Argument that Certain Documents from the Weigand Laptop Should Have Been Excluded Is Meritless

Repeating arguments made repeatedly in Weigand's motions *in limine* and at trial, and

which the Court properly rejected, Weigand claims that several categories of records recovered

from the laptop that was seized from him at the time of his arrest (the "Weigand Laptop") should

have been precluded under Rule 403 absent a witness who could provide first-hand testimony

regarding their content and relevance.[12]  There was nothing unduly prejudicial, however, about the

admission of any of these records.  None included any inflammatory, sensational, or disturbing

content.  *See United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (introduction of

evidence not prejudicial where it did not involve conduct any more sensational or disturbing than

the charged crimes).  Rather, these exhibits were communications between Weigand and co-

conspirators, and records relating to entities involved in the Scheme, from which a jury could draw

plain and common sense inferences as to Weigand's relationship with those co-conspirators and

his involvement in the review and submission of fraudulent application packs to acquiring banks,

particularly when the documents were considered alongside other testimony and admitted

evidence.  (*See, e.g.*, GX 1684 (Weigand email describing use of Webshield to "know what [the

banks] detect") *with* Tr. 869-876 (Hargreaves) (Webshield used to improve fake merchant

application packages to avoid rejection by acquiring banks) *and* GX 1688 (March 2018 co-

---

[12] Weigand does not dispute that the exhibits were properly authenticated by Jessica Volchko, an FBI Forensic Examiner, as having been recovered from the Weigand Laptop, (*see* Tr. 626-627), and were admissible as non-hearsay or under a valid hearsay exception.

conspirator email sending Weigand three Webshield reports for fake merchants used in the Scheme); GX 1709 (WhatsApp chat between Weigand and co-conspirators referencing fake merchants used in the Scheme, including Knutled and Conetild, and describing Weigand's role as "channeling communications with submerchant payees and [] providing statements and client support") *with* GX 1686 (August 2017 co-conspirator email to Weigand identifying issues to be addressed in fake merchant application packages, including application packages for Knutled and Conetild); GX 1720 (spreadsheet of volumes and profits made in connection with Esepa, among others, and related "Reuben commissions") *with* Tr. 776-777, 731-32, 841 (Hargreaves describing involvement of Esepa in the Scheme).[13]

Because these exhibits were far more probative than prejudicial, their admission was

---

[13] *See also* GX 1690 (February 2018 emails involving Weigand and co-conspirators regarding new accounts at acquiring banks Wirecard and Kalixa) *with* Tr. 802 (Hargreaves testimony regarding preparation of fraudulent application packs for Wirecard and Kalixa); GX 1695 (July 2018 co-conspirator email to Weigand identifying email addresses to be used for submission of new applications) *with* GX 1696 (July 2018 co-conspirator email to Weigand regarding issues in application for greenedenvale.com, which had been submitted to those same email addresses) *with* GX 3970 (April 2019 email to EU Processing listing greenedenvale.com as website used in the Scheme); GX 1654 (invoice from 1A Commerce for renewal of fake merchants used in Scheme) *with* Tr. 709 (Hargreaves testimony that he conducted work in furtherance of the Scheme through 1A Commerce); GX 1678 (document containing bank information for From the Earth) *with* Tr. 508 (From the Earth was an Eaze dispensary); GX 1719 (June 2018 Visa letter to Kalixa regarding early warning for fake merchant Hot Robots' chargeback levels); GX 1518 (spreadsheet listing 2018 and 2019 "team" "shares" made in connection with acquiring banks and fake merchants used in the Scheme); GX 1613 (account set-up form for fake merchant and related fake website used in Scheme).

proper.[14]  *See, e.g.*, *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."); *United States v. Felder*, 993 F.3d 57, 81 (2d Cir. 2021) (evidence of defendant's relationship with co-conspirators properly admitted as more probative than prejudicial).

It makes no difference that Weigand may not have responded to certain of these communications because his mere receipt and possession of them is indicative of his involvement in the conspiracy.  *See, e.g.*, *United States v. Torres*, 604 F.3d 58, 68 (2d Cir. 2010) (circumstantial evidence of knowledge and specific intent can include, among other things, "possession of or mention in documents important to the conspiracy") (internal quotations marks omitted); (*see also* Tr. 497-498).  To the extent Weigand contends these documents relate to other, legitimate business operations, he was entitled to call witnesses who could offer admissible testimony regarding those matters; he chose not to do so.  He was also entitled to make—and indeed did make—arguments to the jury with respect to the inferences that could be drawn from and the weight that should be given to these exhibits.  (Tr. 2524-2528).  That the jury rejected those arguments does not make the admission of the exhibits unduly prejudicial.  *See United States v. Rea*, 958 F.2d 1206, 1221-22 (2d Cr. 1991) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury . . . .").  Weigand's

---

[14] Volchko testified that Government Exhibits 1716 (April 2018 transaction records for fake merchant Hot Robots) and 1682 (March 2018 email from co-conspirator Christian Chmiel to Weigand regarding fake merchant New Opal) were recovered from the Weigand Laptop (Tr. 626-627), but no witness ever read from or referred to materials drawn from those exhibits and the Government did not rely upon these exhibits during summations.  Weigand therefore cannot have suffered any prejudice, much less undue prejudice requiring a new trial, from their receipt into evidence.

request for a new trial should accordingly be denied because he has put forth no valid reason that these exhibits, which easily surpassed the low bar for admission under Rule 401, should have been excluded under Rule 403.

**VIII.    Weigand's Argument that Documents Added to the Weigand Laptop in January 2020 Should Have Been Excluded Is Meritless**

Weigand also contends that he was unduly prejudiced by the admission of six exhibits for which he contends there is metadata indicating that they were added to the Weigand Laptop in January 2020.  (Weigand Br. 17-20).  Weigand's argument relies on his assertion that the conspiracy concluded in mid-2019, when Weigand and his co-conspirators stopped processing Eaze transactions through the network of fake merchants established during the EU Processing phase of the Scheme.  (*See id.* at 17).  That argument is unavailing.

There was no evidence that this multi-stage conspiracy conclusively terminated, or that Weigand withdrew from the conspiracy, in June 2019.[15]  *See, e.g.*, *United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002) ("it is well established that where the government has shown that a conspiracy existed and that a given defendant was a member of it, his membership is presumed to continue until the last overt act by any of the coconspirators, unless the defendant proves that the conspiracy was terminated or that he took affirmative steps to withdraw").  To the contrary, the evidence established that Weigand and his co-conspirators were moving Eaze-related funds and "closing . . . old merchant companies" through at least December 2019.  (GX 1733); *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008) ("To show that the conspiracy was terminated, the defendants needs to present evidence from which the jury could find that the goals of the

---

[15] The Indictment charged a bank fraud conspiracy that operated from in or about 2016 through in or about 2019.  (Dkt. 16).

conspiracy were accomplished *in some final matter*.") (emphasis in the original) (internal edits and quotations omitted)..

Even assuming that the conspiracy concluded in mid-2019 and Weigand did not receive these documents until January 2020,[16] the mere fact that Weigand received and possessed them is indicative of his membership in the conspiracy.  They were thus properly admitted as evidence that was "probative of the existence of the conspiracy [and] the participation of the alleged conspirator."  *United States v. Nathan*, 476 F.2d 456, 459–60 (2d Cir. 1973) (evidence of a conspirator's post-conspiracy activity is admissible if probative of the existence of a conspiracy or the participation of the alleged conspirator"); *see also United States v. Van Putten*, No. 04 Cr. 803 (PKL), 2005 WL 612723, at *5 (S.D.N.Y. Mar. 15, 2005) ("it seems clear that evidence tending to show that a conspiracy existed after . . . the charged crime also tends to show that a conspiracy existed when the charged crime occurred").

Regardless, there is no reason to be believe that the outcome of the trial would have been different if these six exhibits had been excluded (which they should not have been).  Weigand's involvement and role in the conspiracy was overwhelmingly established by the testimony of cooperating and immunized witnesses (Tr. 655 (Hargreaves); Tr. 1567-68, 1578 (Patterson); Tr.

---

[16] A reasonably jury could also easily have inferred that Weigand had the relevant records, possibly on a different electronic device, in or about 2018 and early 2019.  First, Weigand sent a version of GX 1801, referred to as the "E.zip folder," to Akhavan via Telegram in August 2019.  (*See* GX 1730; Tr. 1312-1313, 1417).  Second, the relevant files, including numerous statements intended for acquiring bank and corresponding dispensaries, were created during, and related to, time periods in 2018 and the first half of 2019.  (*See, e.g.,* GX 3703, 3704, 3705).  Finally, those statements, many of which were contained within the E.zip folder, directly related to Weigand's role in the Scheme as the individual responsible for "channeling communications with submerchant payees and [] providing statements and client support" (GX 1709), and the jury could therefore reasonably have inferred that Weigand would have possessed those statements, and provided them to the relevant acquiring banks and dispensaries, during the course of the Scheme.

2254 (Wang); emails, Telegram communications, and WhatsApp chats from late 2017 through 2019 (*see* GX 4004, GX 1686, GX 1706, GX 1709, GX 1724, and GX 1728), and numerous records, including fraudulent application packages, recovered from the Weigand Laptop that had been added to the Weigand Laptop by at least mid-2018 (*see* GX 3707).  For all of these reasons, a new trial is not warranted.

## IX.   Weigand's Argument that Admission of Evidence Concerning Wirecard Was Unfairly Prejudicial Is Baseless

The evidence at trial regarding Wirecard was narrow in scope, probative, and was not unduly prejudicial.  Specifically, the evidence showed that the defendants and co-conspirators: (1) created fraudulent application packages using the Phony Merchants and submitted them to Wirecard as part of the charged Scheme, (Tr. 734, 772-781, 788-89, 802, 804; GX 4004, 4008, 3918, 3919, 3925, 3926, 3927, 3928, 3938); (2) relied on assistance from Jan Marsalek, a then-high ranking Wirecard official, for advice regarding several important aspects of the transaction laundering scheme, such as the selection of fraudulent MCC codes, development and features of fraudulent websites, and other aspects of the fraudulent applications, (Tr. 733-735, 793-794; GX 4004 at 30-31, 45, 71, 85, 92-93, 101); and (3) met with Marsalek in February 2018 to discuss, among other things, a so-called chargeback reduction scheme.  (Tr. 733:11-735:17).  During the meeting, Hargreaves provided Akhavan with an update on the progress of the fraudulent application packages.  (Tr. 733:11-18).[17]

---

[17]Weigand misleadingly represents that Hargreaves "admitted" on cross-examination that Eaze was not discussed at the meeting (Weigand Br. 21).  This is incorrect.  Consistent with his testimony on direct, Hargreaves testified that he had updated Akhavan during the meeting about the Eaze fraudulent application packs, but did not speak to Marsalek directly about it.

Weigand's argument that "[t]he expansive role of Wirecard that the Government presented at trial was unsupported by the evidence and likely tarred the jury's opinion of Weigand, just as it was given unwarranted attention in the press coverage at trial" is inconsistent with the record and has no merit.  (Weigand Br. 21). Evidence concerning the involvement of Marsalek and Wirecard in effectuating the defendants' transaction laundering scheme was direct evidence of the charged bank fraud conspiracy, and fully supported the Government's closing argument that the defendants had dirty insider help at the foreign acquiring banks to effectuate the scheme and that they had relationships with high-level people at Wirecard, one of the foreign acquiring banks to which they submitted fraudulent applications.   The presence of Marsalek at the February 2018 meeting demonstrated the nature of the relationship between the defendants and Marsalek, which provided context for his involvement in the charged scheme, and their demonstrated knowledge of the key topic discussed—reducing chargebacks—was important evidence with respect to the charged scheme, as the charged scheme was intentionally designed to reduce chargebacks precisely because the defendants understood that chargebacks could cause their scheme to be exposed by the U.S. Issuing Banks or credit card companies.

Weigand has shown nothing prejudicial—let alone unfairly so—about the introduction of this evidence.  His reliance on press articles, the contents of which were not introduced at trial, provides no basis for a showing of prejudice.  Accordingly, the Court's admission of this evidence was entirely appropriate and Weigand's argument should be rejected.

## X.      The Court Acted Well Within Its Discretion in Excluding Weigand's Expert, Stephen Mott

The Court was well within its discretion in excluding the testimony of Weigand's expert, Stephen Mott.  Even following an opportunity provided by the Court to cure defective expert disclosures associated with Mott, Weigand continued to supply expert notice that was deficient

and otherwise proffered testimony that was irrelevant, unreliable, not properly the subject of expert testimony, and cumulative.

Under Federal Rule of Evidence 702, where "specialized knowledge will help the trier of fact," an expert witness may give opinion testimony if "[1] the testimony is based on sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The party proffering expert testimony bears the burden of demonstrating, by a preponderance of the evidence, that the expert testimony is admissible. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); Fed. R. Evid. 702 advisory committee notes (2000). The trial court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). "Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597.

To determine whether the expert testimony is reliable, "the district court should consider the indicia of reliability identified in Rule 702." *Amorgianos*, 303 F.3d at 265. Specifically, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached," and "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* at 266. To assess whether expert testimony is relevant, the district court must consider whether the evidence has "any tendency to make the evidence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 265.

41

When a criminal defendant intends to introduce an expert witness at trial, the defense is required under Federal Rule of Criminal Procedure 16(b)(1)(C) to, "at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rule[ ] 702." Fed. R. Crim. P. 16(b)(1)(C).   The disclosure must include a summary that "describe[s] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C).   The purpose of this rule is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee notes (1993).  A party who fails to comply with its discovery obligations may be precluded from introducing evidence not disclosed.  Fed. R. Crim. P. 16(d)(2).

In applying Rule 702, it is well established that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous."  *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985).

This Court properly excluded the proposed expert testimony of Mott because Weigand fell far short of satisfying his burden to show the testimony's admissibility under Rule 702.  *See Williams*, 506 F.3d at 160.

First, the Court was well within its discretion in excluding as irrelevant and confusing Mott's proffered testimony that it is "common practice for companies to locate subsidiaries or related entities" in the same jurisdiction as the acquiring bank in order to "comply with Visa and MasterCard's 'Area of Use' rules."  (*See* Dkt. No. 227).  Contrary to companies that "locate subsidiaries or related entities" in the same jurisdiction as the "acquiring bank" to legitimately facilitate payment processing, there was not a shred of evidence introduced at trial that Eaze

established "subsidiaries" or "related entities" for this purpose.  Instead, witness testimony at trial indisputably established that the foreign shell companies used in the charged scheme were not subsidiaries of Eaze or otherwise related to the company whatsoever.  (*See, e.g.* Tr. 243-244, 682-684, 757, 758-762, 776, 825-826, 828-829).  In addition, while those shell companies were all incorporated in the United Kingdom, two of the major acquiring banks used in the scheme were not based in the United Kingdom, but rather Germany (Wirecard), and Vienna (Kalixa), in other words, not in the acquiring bank's jurisdiction.  (Tr. 804, 829).  Absent proof that Eaze established "subsidiaries" or "related companies" in the relevant foreign jurisdictions to facilitate processing, the Court correctly excluded Mott's opinion as irrelevant, misleading, and confusing.

Second, the Court properly concluded that Weigand's disclosure that Mott would testify to "the influence that credit card networks and the issuing banks have over the . . . (ISO) with respect to the creation of Merchant Category Codes"—which, notably, was the entirety of the disclosure—was wholly inadequate.  As an initial matter, this opinion was disclosed to the Government for the first time on March 13, *i.e.*, two weeks into trial.  In any event, the Court correctly observed that the disclosure was woefully inadequate, as, for example, it provided no information regarding the level of influence Mott contends that credit card companies and issuing banks have over an independent organization responsible for creating MCCs.  Nor, aside from his experience—involving work at MasterCard decades ago—did the disclosure provide any basis for Mott's testimony on this subject.  The Court also thus correctly questioned the reliability of the proffered testimony.

Weigand admits that this point was explored in the cross examination of the Government's Visa witness, but claims that the "defense was not able to fully explore this point" due to "prejudicial time constraints" imposed on cross.  (Weigand Br. 26).  As discussed above, the

43

Government disputes that the 1.5 hour combined cross time allotted to the defendants was "prejudicial" in any way.  In any event, this claim is particularly puzzling and specious since Weigand did not nearly use the entirety of the cross-examination time allotted to him, asked some questions on this topic, and then made the strategic choice not to ask more, notwithstanding having the time to do so.  (Tr. 1970-1984).

Finally, the Court was also well within its discretion to exclude as cumulative and not properly the subject of expert testimony Mott's proffered testimony that acquiring banks bear the financial risk of chargebacks with respect to non-secure e-commerce transactions.  As the Court correctly observed, there was a plethora of evidence introduced by the defendants at trial, through cross-examination and introduction of documents through bank and credit card witnesses, concerning the financial benefits to issuing banks of processing credit and debit transactions. Moreover, the nature of chargebacks, what they mean, and how they work was explained several times at trial—by fact witnesses, bank witnesses, and credit card witnesses—including that monies expended by customers who successfully charge back purchases is returned.  The Court thus correctly determined that the proposed testimony was not properly the subject of expert testimony and otherwise cumulative of substantial evidence already introduced by lay witnesses on this point.

Accordingly, the Court's exclusion of Mott's proffered testimony was an entirely proper exercise of the Court's discretion.

## XI.        The Court Properly Excluded Additional Portions of Weigand's Post-Arrest

In his motion, Weigand seeks to re-litigate the admissibility of certain portions of his post-arrest statement.  These issues were briefed and argued by the parties before and during trial, and the Court correctly denied Weigand's motion to offer additional portions of his post-arrest statement under the guise of the rule of completeness.  Notably, in denying Weigand's motion the

Court stated:

> the defense really exaggerates the scope of the rule of completeness. This is designed to deal with things like someone introduces half a sentence and not the other half of a sentence. It doesn't open the door to pages and pages of what is otherwise clearly hearsay just because the government is offering something.  (Tr. 856:24-857:1-4).

The Court went on to explain why the specific portions of the interview that Weigand sought to offer were not admissible under the rule of completeness.  (Tr. 2120-2125).  In his motion for a new trial, Weigand repeats arguments he already made and articulates no basis for why the Court should reconsider its decision.  For the all of the reasons set forth in the Government's prior briefing, and in the Court's decision denying Weigand's underlying motion, the Court should deny his current Rule 33 motion on this issue.

## XII.     The Court Properly Precluded Irrelevant and Misleading Evidence and Argument Regarding Pecuniary Loss

As this Court previously held in denying the defendants' motions to dismiss, the bank fraud statute requires neither a showing of ultimate financial loss nor a showing of intent to cause financial loss.  (Dkt. No. 91 at 9) (citing *Shaw v. United States*, 137 S. Ct. 462, 467 (2016); *Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014)).  Consistent with this law, the Court properly found prior to trial that evidence and argument regarding pecuniary loss would only be admissible as to the issue of materiality.  (Tr. 43:-45).  The Court also properly instructed the jury in both the preliminary jury instruction and the final charge, that the Government did "not need to prove that a bank suffered any financial loss."  (Tr. 319:21-22, 2637:11-13).  Despite this clear law, Weigand argues that the Court erred in precluding him from arguing that a lack of pecuniary harm to Issuing Banks demonstrated his good faith and lack of intent to harm the Issuing Banks. (Weigand Br. 22-23).  Weigand is wrong.

45

To prove a bank fraud scheme under Subsection 2 of 18 U.S.C. § 1344, the statute requires the Government to prove "that the defendant intend[ed] to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution" through false or fraudulent pretenses. *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016). Here, as the Court noted in denying the defendants' motions to dismiss, "the object of the alleged scheme was money. The banks had concrete property interests in these funds, and defendants allegedly sought to injure those interests by causing the banks to relinquish those funds through deception." *United States v. Weigand*, 482 F. Supp. 3d 224, 236 (S.D.N.Y. 2020), as corrected (Sept. 2, 2020). The law requires nothing more.

Given that pecuniary loss was not an element of the charged bank fraud conspiracy, the Court properly precluded the defendants from arguing that lack of pecuniary loss by Issuing Banks was relevant to the question of the defendants' intent to defraud. That argument would have been inconsistent with the law. Further, such argument would have inappropriately left the jury with the misimpression that if Weigand did not intend for the banks to suffer any pecuniary loss, that was somehow a defense to the bank fraud conspiracy charge. As noted above, that is not the law. The Court properly precluded such argument.[18]

---

[18] As noted above, the Court allowed the defense to introduce evidence that the Issuing Banks made money on card transactions during the Scheme in support of the defendants' materiality defense.

## **CONCLUSION**

For the foregoing reasons, the defendants' Motions should be denied in their entirety.

Dated:  New York, New York
        May 12, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:    s/_____
        Nicholas Folly
        Tara La Morte
        Emily Deininger
        Assistant United States Attorneys
        (212) 637-1060 / -1041 / -2472