UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>RUBEN WEIGAND and HAMID AKHAVAN,<br><br>　　　　　　Defendants | Case No. 20-cr-188 (JSR) |

**RUBEN WEIGAND'S REPLY IN SUPPORT OF HIS
MOTION FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL**

**TABLE OF CONTENTS**

ARGUMENT ........................................................................................................................... 1

    I.    WEIGAND IS ENTITLED TO A JUDGMENT OF ACQUITTAL UNDER RULE 29 ................................................................................................ 1

        A.    The Government Substantially Overstates The Strength Of Its Case At Trial ............................................................................................. 1

        B.    The Evidence Offered By The Government Is Insufficient To Prove That Weigand Had A Specific Intent To Defraud .......................... 7

    II.    IN THE ALTERNATIVE, WEIGAND IS ENTITLED TO A NEW TRIAL UNDER RULE 33 ................................................................................ 8

CONCLUSION ...................................................................................................................... 11

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Calderon*,
   944 F.3d 72 (2d Cir. 2019)..................................................................................................10, 11

*United States v. Weigand*,
   2020 WL 5105481 (S.D.N.Y. Aug. 31, 2020).........................................................................11

**Other Authorities**

Rule 29 ......................................................................................................................................1, 11

Rule 33 ......................................................................................................................................8, 11

Rule 403 .........................................................................................................................................9

Defendant Ruben Weigand ("Weigand") respectfully submits this reply in support of his motion for a judgment of acquittal or, in the alternative, for a new trial.

## ARGUMENT

**I.   WEIGAND IS ENTITLED TO A JUDGMENT OF ACQUITTAL UNDER RULE 29**

**A.   The Government Substantially Overstates The Strength Of Its Case At Trial**

In its opposition, the Government (1) asserts it adduced evidence of Weigand's role in the charged scheme that in fact was not supported by the trial record, (2) distorts beyond recognition what the evidence did show about the materiality of marijuana transactions to U.S. issuing banks ("Issuing Banks"), and (3) in particular, blatantly ignores that the defense evidence demonstrating conclusively that, even after the indictment in this case, Eaze processed roughly $50 million dollars of marijuana transactions through Circle Financial ("Circle"), evidence that was devastating to the Government's theory of materiality.  The evidence as it was presented at trial, without these mischaracterizations, was not sufficient to permit a rational jury to find that the Government established the requisite elements of materiality and intent to defraud beyond a reasonable doubt.  In addition to the arguments set forth in this section, Weigand joins the arguments made by Akhavan regarding the insufficiency of the evidence as to: (i) the materiality of the misrepresentations, and (ii) the defendants' intent to defraud.  *See* Dkt. No. 304, at 2-10 ("Akhavan Opposition").

> i.   Weigand's Role in the Charged Scheme

- The Government claims that the trial record established that "Akhavan, Weigand, principals at Eaze and from the marijuana dispensaries, all met at Akhavan's Office in California in March 2018 to discuss and plan the second phase of the Scheme."  Opp. at 6.  In fact, there was *no evidence* presented at trial that

- Weigand attended the March 2018 meeting. James Patterson and Darcy Cozetto, Eaze employees who attended that meeting (and the only meeting participants who testified at trial), testified that they *never* met or spoke with Weigand and did not recall Weigand attending the March 2018 meeting. (Tr. 1562:18-19; 1696:12-20; 2035:25-2036:3; 2048:2-2049:18.) Moreover, Weigand traveled to Los Angeles a full week before the meeting, which calls into serious doubt the Government's conjecture that the purpose of Weigand's March 2018 trip was "to map out this operation." (Tr. 1564:2-7; 2464:4-6; GX 441.)

- The Government argues that Weigand's role included "receiving the proceeds of these [Eaze-related] transactions[,] . . . sending them to U.S. bank accounts of the dispensaries, and instructing the dispensaries to ensure that their bank accounts could not be traced to cannabis." *See* Opp. at 7, 23. However, there is not a shred of evidence in the trial record to support this assertion. The evidence showed that the proceeds of the transactions came into the U.S. through Spinwild Ltd., an entity associated with the Government's cooperating witness, Oliver Hargreaves, and his associate, Michele Furlan. (Tr. 979:19-980:1; GX 485.)

- The Government also claims to have demonstrated at trial that Weigand "engaged in a years-long Scheme that involved a multitude of lies and misrepresentations, many of which were communicated directly to the Issuing Banks," and that "[t]hose lies were designed to hide the true nature of the transactions [] from . . . the Issuing Banks." Opp. at 9. Yet, the Government offers no proof in its opposition (and none was presented at trial) that Weigand ever so much as discussed Issuing Banks or their policies, let alone communicated

with the Issuing Banks. The only evidence the Government cites to show that the Defendants "understood" that the Issuing Banks "would take steps to stop [marijuana] transactions if they discovered them" is an email from September 2016—that was sent long before Weigand's alleged involvement in the charged scheme began and in which he was not a participant—that concerned chargebacks for EazeMD, a separate service that allowed Eaze customers to obtain virtually through a mobile platform a medical marijuana prescription before recreational marijuana was legalized in California in late 2016. *See* Opp. at 12 (citing GX 422); (Tr. 1611:25-1612:13; 2274:20-2275:7.)

ii.   Materiality

- The Government claims to have introduced testimony from "a number of Issuing Banks, such as Bank of America and Wells Fargo, showing that those banks had discovered marijuana merchants" and, in some cases, "took steps to. . . terminate" those merchants. *See* Opp. at 12. But there was *no evidence* that any Issuing Bank ever "terminate[d]" any merchants they discovered were processing marijuana transactions. Instead, the evidence demonstrated that: (1) the Issuing Banks *cannot* terminate merchants, (Tr. 1228:3-6), and (2) in instances where the Issuing Banks did identify possible marijuana merchants, the banks simply relayed the merchants' information to Visa and MasterCard, and made no recommendation as to whether or not the merchant should be terminated.[1] (Tr. 1228:7-11.) The only evidence that an Issuing Bank even so much as blocked

---

[1] The evidence also showed that the overwhelming majority of merchants that Bank of America identified to Visa and MasterCard (as being possible marijuana related businesses) were never terminated and remained on the Visa and MasterCard network. (GX 2423; GX 2425; Tr. 1222:6-1228:2.)

transactions involving marijuana dispensaries came from Actors Federal Credit Union, whose witness testified that it blocked transactions involving the dispensaries identified in the Government's subpoena only a week before he took the stand and more than a year after Actors received the Government's subpoena. (Tr. at 1780:4-11; 1814:13-25; Tr. 2186:7-21.)

- The Government, relying on the Issuing Banks' general policies against "illegal" transactions, contends that the Issuing Banks' policies prohibited the marijuana transactions at issue in this case. *See* Opp. at 15, n.1.  However, multiple bank witnesses admitted that their banks never communicated to their cardholders that these boilerplate provisions, which only generally prohibit "illegal" transactions, prohibit the purchase of marijuana in states where marijuana is legal for medical/recreational use. (Tr. 1258:18-23; 1813:14-23.)  Moreover, despite evidence that the banks were aware that their cardholders were using their cards to purchase marijuana, none of the bank witnesses were able to identify a single instance in which their bank terminated a relationship with a cardholder, penalized a cardholder, or even informed a cardholder that they had violated the bank's cardholder agreement.  (Tr. 1258:24-1259:2; 1797:16-17.)  In fact, the witness from Bank of America admitted that, in the limited instances where it had reason to believe that certain transactions it had processed were for marijuana, the bank never sought to reverse the transactions and kept the interest it collected on those transactions.  (Tr. 1263:20-1265:25; 1267:2-25.)

- The Government claims that "policy documents from Visa and MasterCard [] established that both companies prohibited marijuana transactions on their card

4

networks and that issuing banks could be kicked off of the card networks for violating the card companies' rules." Opp. at 11. Although there was evidence that the *acquiring bank*s could be subject to penalties if their merchants violated Visa/MasterCard rules,[2] there was no evidence that an *Issuing Bank* had ever been "kicked off" either network because a cardholder used a Visa/MasterCard-branded card to purchase marijuana.[3] Indeed, it is clear from text of the Visa and MasterCard rules that they held acquiring banks responsible for ensuring that merchants complied with their rules, not Issuing Banks. *See* GX 2217 at 1 ("Visa operates the Global Brand Protection Program (GBPP) to ensure *acquirers* do not submit illegal or brand damaging transactions into the payment system." (emphasis added)); *see also* GX 2312 at 73.

iii.  Circle Transactions

- The Government claims that there are "substantial differences" between the roughly $50 million dollars of marijuana transactions processed by Eaze through Circle and the transactions at issue in this case due to Circle's inclusion of cryptocurrency in the transaction. *See* Opp. at 14. In reality, the substance of the Circle transactions and the transactions underlying the charged scheme are

---

[2] Even the risk to acquiring banks, which is irrelevant in this case, is at best, theoretical. The witnesses from the credit card networks did not believe that the acquiring banks in this case were ever penalized, let alone kicked off the network, even though their merchants were found to be processing marijuana transactions. (Tr. 556:12-19).

[3] If the Issuing Banks were genuinely concerned with processing only properly coded transactions, one would expect that at least some portion of an Issuing Bank's anti-fraud budget would be dedicated to identifying improperly coded transactions such as marijuana purchases. (Tr. 2161:6-12) (Citibank witness testifying that "***none***" of its more than $270 million anti-fraud budget "is dedicated to ferreting out or identifying marijuana sales" (emphasis added)). Further, the witness for Bank of America testified that it continues to process transactions involving suspected marijuana dispensaries until Visa or MasterCard has investigated the merchant and issued a formal decision. (Tr. 1189:8-24; 1228:3-11; GX 2427.)

identical from the customer's perspective: the customer enters their Visa/Mastercard information into Eaze's website and their Visa/Mastercard card is used to purchase the marijuana. (Tr. 2403:7-18; 2342:12-23.) Circle's Vice President described the 'second-stage' of the cryptocurrency transaction, during which the Circle credits are instantaneously transferred to Eaze, as merely "an internal transfer" and "essentially . . . a ledger update." (Tr. 2395:24-2396:11.)

- The Government also argues that evidence that Bank of America reported the Eaze-Circle transactions to Visa and Mastercard undercuts the defendants' materiality argument. *See* Opp. at 14. However, there was no evidence that Bank of America blocked the Circle-Eaze transactions, penalized their cardholders who used their cards to purchase marijuana through Eaze, or even informed their cardholders that the Circle-Eaze transactions were against policy.

- Ultimately, the Government continues in its opposition to sidestep the most fundamentally important point which is that the descriptors for the Eaze-Circle transactions explicitly state "Eaze," and the Issuing Banks processed roughly $50 million in Eaze-Circle transactions in an eight month period. (Tr. 2378:9-16.) This demonstrates, overwhelmingly, that the alleged misrepresentations (*i.e.*, the "phony" descriptors) were not material and that the Issuing Banks would have processed the transactions anyway.

Given these evidentiary shortcomings, a rational jury could not have concluded that the Government established the requisite elements of materiality and intent to defraud beyond a reasonable doubt.

**B.     The Evidence Offered By The Government Is Insufficient To Prove That Weigand Had A Specific Intent To Defraud**

As Weigand argued in his opening papers, the trial record is devoid of any evidence from which a rational jury could have found that Weigand intended to defraud Issuing Banks, or that he thought the alleged misrepresentations (i.e., descriptors, merchant name) would be the mechanism that induced the Issuing Banks to part ways with their property; the Government's opposition fails entirely to rebut this. Indeed, Weigand highlighted several pieces of testimony, from the only two witnesses who spoke to Weigand during the timeframe of the alleged scheme, Oliver Hargreaves and John Wang, that demonstrated that the fraudulent application packs, and Weigand's involvement more generally, were directed entirely at the foreign acquiring banks, and had nothing to do with inducing Issuing Banks to process transactions. That evidence included, *inter alia*:

- Hargreaves testifying that the purpose of submitting fraudulent application packs was because "[i]t was a requirement in order to obtain merchant accounts for the true merchant in question, in this case Eaze," and making no mention of Issuing Banks or inducing those banks to process transactions. (Tr. 1107:20-1108:5.)

- Hargreaves testifying the descriptors did not reference Eaze or marijuana because the foreign acquiring banks "were not particularly interested in having things that remotely sounded like – that referenced marijuana," (Tr. 1058:15-17), and that the descriptors needed to "m[e]et the requirements of the [foreign] acquiring bank." (Tr. 1056:19-21.)

- John Wang testifying that the purpose of his discussion with Weigand was to ensure that the dispensary accounts did not go over their volume limits at the foreign acquiring banks. (Tr. 2288:3-13.)

7

- John Wang being unable to identify any conceivable connection that the volume limits would have had to Issuing Banks. (*Id.*)

The Government fails entirely in its opposition to rebut, or even acknowledge, this damaging testimony by its own witnesses.

Instead, the Government resorts to attributing the conduct and communication of others to Weigand. For example, the Government, in arguing that the "defendants" had a specific intent to defraud, cites numerous chat logs and communications that did not include Weigand. *See, e.g.,* Opp. at 23 (citing GX 4002, a Telegram chat in which Weigand was not a participant, to argue that the "defendants discussed avoiding detection by banks and credit card companies."); *Id*. (citing Tr. 1463-65, GX 418, GX 422, which consists of communications that Weigand was not included on, to argue that the "defendants" had conversations with Eaze employees "about avoiding chargebacks, which they explained could lead to detection by banks and credit card companies, about banking issues, and about miscoding.")

The fact remains that the Government was unable to produce a single conversation involving Weigand in which he discusses deceiving Issuing Banks or inducing banks in the United States to process transactions they would have failed to authorize. *See* Mot. at 8-9.

## II. IN THE ALTERNATIVE, WEIGAND IS ENTITLED TO A NEW TRIAL UNDER RULE 33

As Weigand argued at trial and in his opening brief, six of the Court's evidentiary rulings, whether considered individually or in the aggregate, improperly created a high risk that the jury erroneously convicted Weigand of conspiracy to commit bank fraud based on improperly admitted evidence. The Government's arguments to the contrary are unavailing.[4]

---

[4] The Government does not put forth any new arguments regarding the exclusion of additional portions of Weigand's post-arrest interview and relies on its prior papers. *See* Opp. at 44-45.

8

***First***, the Government argues that the Court properly admitted documents recovered from Weigand's laptop through a computer forensics analyst and summary witness because "a jury could draw plain and common sense inferences" from the documents. Opp. at 34-37. Without a witness who could testify as to the substance of these exhibits[5]—many of which pre-dated Weigand's involvement in the charged conspiracy or concerned his pre-existing, legitimate business relationships in Europe—the jury was left with no choice other than to speculate. *See* Mot. at 14-17.

***Second***, the Government's argument that the Court properly admitted documents that were copied to Weigand's laptop more than six months *after* the conspiracy had ended because they are "indicative of his membership in the conspiracy" sidesteps the issue of unfair prejudice. *See* Opp. at 37-39. To the extent that these documents are probative of Weigand's involvement in the charged conspiracy as the Government contends, that probative value is substantially outweighed by the risk of unfair prejudice given the complete absence of evidence regarding how or why Weigand came into possession of these documents. To preempt the Rule 403 issue altogether, the Government argues that "there was no evidence" the charged conspiracy had terminated in June 2019, Opp. at 37, despite testimony ***from their own witness*** that Eaze stopped working with EU Processing, the entity Weigand was allegedly involved with, in June 2019. (Tr. 1687:2-9.)

***Third***, the Government overstates the strength of the evidence presented at trial in arguing that the admission of evidence concerning the embattled German financial institution

---

[5] The Government's list of co-conspirators contained nearly 150 individuals and more than 50 entities, many of which had preexisting business relationships with Weigand. (Tr. 124:16-125:5.) It is unreasonable to expect an alleged co-conspirator to voluntarily testify on behalf of a defendant, especially since, unlike the Government, Weigand cannot offer immunity. Opp. at 36 (arguing that Weigand could have called witnesses to testify that the "documents relate to other, legitimate business operations.")

9

Wirecard and its former Chief Operating Officer, Jan Marsalek, was not unfairly prejudicial. Opp. at 39-40. The evidence conclusively established that *none* of the Eaze-related transactions involving Issuing Banks were processed through Wirecard, GX 2201, GX 2202, GX 2301, GX 2301, GX 2302; the application packs that were allegedly submitted to Wirecard were all rejected, GX 4004 at 71; and there was no testimony that Weigand or anyone else discussed the charged scheme with Marsalek at the February 2018 meeting in London, *see* Tr. 733:11-25 (Hargreaves testifying that he "provided ***Ray***" a "very brief update" on the application packs but reducing chargebacks for Akhavan's "adult-content websites" was the "[p]redominat[]" topic.)

***Fourth***, the three categories of Mott's proposed testimony were sufficiently disclosed to the Court. *See* Mot. at 23-25. Further, Mott's proffered testimony that the acquiring banks, rather than the Issuing Banks, bear the *financial risk* of chargebacks for the type of transactions at issue here was not cumulative of the lay witness testimony, which concerned the fees Issuing Banks earn for transactions and reimbursements to cardholders. *See* Opp. at 44.

***Finally***, the Government misses the point that although pecuniary loss may not be required to establish a bank fraud scheme, it is nonetheless relevant to whether the defendant "contemplated some actual harm or injury to their victims." *United States v. Calderon*, 944 F.3d 72, 88 (2d Cir. 2019). As this Court has recognized, "[i]n describing the sorts of harm that qualify … the Supreme Court's bank fraud precedents cast a wide net," which indisputably includes pecuniary loss. *United States v. Weigand*, 2020 WL 5105481, at *4 (S.D.N.Y. Aug. 31, 2020), as corrected (Sept. 2, 2020). The Government claims to have introduced evidence that Issuing Banks could face pecuniary loss in the form of testimony from Visa and MasterCard that issuing banks could be kicked off their networks for failing to comply with their written policies. *See* Opp. at 11. Setting aside whether those policies were actually enforced, Weigand was

entitled to put forth evidence that he did not contemplate any financial risk to the Issuing Banks. But regardless of whether the Government puts forth evidence of pecuniary loss, "[a] genuine belief that the scheme never exposed the victim to loss or risk of loss in the first place would demonstrate a lack of fraudulent intent." *Calderon*, 944 F.3d at 91; *see* Mot. at 21-23. With the Head of Citibank's Consumer Fraud Prevention unit unable to determine how he would even calculate "the losses to Citi caused by marijuana sales over a credit card system," (Tr. 2168:2-6), the jury would not have found that Weigand, a European businessman involved with *acquiring* banks, contemplated some harm.

## CONCLUSION

For the foregoing reasons, Weigand is entitled to entry of a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. To the extent the Court denies Weigand's Rule 29 motion, the Court should order a new trial pursuant to Rule 33 due to the admission of unfairly prejudicial evidence for the reasons stated above.

Dated: New York, New York
May 19, 2021

Respectfully submitted,

DECHERT LLP

By: */s/ Michael J. Gilbert*

Michael J. Gilbert
Shriram Harid
Steven Pellechi
Amy Lesperance
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Michael.gilbert@dechert.com
Shriram.harid@dechert.com
Steven.pellechi@dechert.com
Amy.Lesperance@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional Corporation

11

1 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90071
Michaelartan@yahoo.com

*Attorneys for Defendant
Ruben Weigand*