

Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
+1  212  698  3500  Main
+1  212  698  3599  Fax
www.dechert.com

---

**MICHAEL J. GILBERT**

michael.gilbert@dechert.com
+1 212 698 3886  Direct
+1 212 698 0426  Fax

June 12, 2021

**VIA ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  *United States v. Hamid Akhavan et al.*, S3 20 Cr. 188 (JSR)

Dear Judge Rakoff:

We represent Ruben Weigand ("Mr. Weigand"), a defendant in the above-captioned case.  Mr. Weigand is scheduled to be sentenced on June 18, 2021 at 3:00 p.m., having been found guilty on a single count of conspiracy to commit federal bank fraud in violation of 18 U.S.C. § 1349 on March 24, 2021, following a jury trial.  For the reasons set forth below, we respectfully submit that a sentence of time served would be sufficient, but not greater than necessary, to achieve the aims of sentencing set forth in 18 U.S.C. § 3553(a).  A sentence of time served would also fall within the Guidelines range when correctly calculated.

Between 2016 and 2019, $150 million in Eaze credit and debit card transactions for marijuana were processed by U.S. banks to the benefit of many:  Eaze's customers received the products they paid for;  Eaze and its dispensaries were paid for the legal marijuana they sold;  Visa and Mastercard collected a fee with every transaction; and, most importantly, so did the alleged victims in this case, U.S. banks that issued credit and debit cards (the "issuing banks") to account holders.  The issuing banks collected millions of dollars in interest and fees.  The Presentence Investigation Report ("PSR") acknowledges that the issuing banks did not lose a penny and that no restitution is appropriate or required, which the Government concedes.  *See* PSR ¶ 104, 24, 34.  The Government has also in effect acknowledged, through a consent preliminary order of forfeiture, that *the most* Mr. Weigand received in connection with the charged scheme was $384,000 in commission payments from an unindicted co-conspirator.  This is entirely consistent with the limited role Mr. Weigand played as an introducer who was involved for less than half of the time period of the charged conspiracy.

Mr. Weigand, who until the instant offense had a spotless record, has already been punished severely.  He has been separated from his family and loved ones, all of whom live in Europe, for over 15 months.  He was incarcerated in a city jail in California for over seven months during the



The Honorable Jed S. Rakoff
June 12, 2021
Page 2

height of the COVID-19 pandemic, during which he faced the daily stress and anxiety of knowing that, with an underlying health condition, he was at risk of contracting the COVID-19 virus with potentially life-threatening consequences. He also underwent emergency surgery while incarcerated.

Before his arrest, Mr. Weigand had built several businesses from the ground up, relying on his own entrepreneurial acumen and immense work ethic. Those business—focused on matters entirely unrelated to the offense conduct—have been devastated: their corporate assets have been frozen by European regulators; they no longer generate revenue; and they have a fair market value of zero. Mr. Weigand's financial life is in ruin, as the costs of mounting a defense and paying for 24/7 armed security for over eight months of house arrest have rendered him functionally bankrupt. His well-earned reputation as an upstanding entrepreneur has been destroyed, exacerbated by inaccurate and sensational press coverage incorrectly associating him with the Wirecard scandal. His future professional prospects are grim.

We respectfully submit that the various sentencing factors under 18 U.S.C. § 3553, to which this Court has carefully adhered, especially when "the calculations under the guidelines have so run amok that they are patently absurd on their face," *Adelson*, 441 F.Supp.2d at 515, justify a sentence of time served. These factors include Mr. Weigand's fundamentally decent character and history of good deeds, corroborated by various letters of support; the nature of the offense, which caused no pecuniary harm and was not intended to do so; Mr. Weigand's temporally and substantively limited role in the charged scheme; and the immense personal and professional toll already inflicted on Mr. Weigand. There is no doubt that the punishment for Mr. Weigand's involvement in this case will continue for the rest of his life. Additional jail time is not justified nor is it required to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

The Guidelines calculation of 235 to 293 months' imprisonment set forth in the PSR—for which the Government advocates—is entirely without support in the Guidelines or case law. To base a sentence on a "loss" of over $100 million when the Government has conceded the issuing banks made money as a result of the offense conduct would obliterate any notion of common sense and fairness from the Sentencing Guidelines, a concern this Court has raised extensively and eloquently in the past. *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (decrying "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guidelines calculations can visit on human beings if not cabined by common sense").

In any event, the Government and PSR misapply the Guidelines by applying a 24-level enhancement for "loss" where no financial institution or person suffered any pecuniary harm and no such harm was intended. Indeed, the PSR makes clear that "[r]estitution is not an issue in this case," PSR ¶ 104, and the Government has no objection to that assertion, a remarkable concession



The Honorable Jed S. Rakoff
June 12, 2021
Page 3

entirely at odds with the Government's position that the alleged victim banks incurred over $100 million in "loss." A correct application of the Guidelines and examination of the trial record results in an offense level of 7 and a Guidelines range of 0 to 6 months' imprisonment.

The Probation Department recognizes that the Guidelines calculation "may substantially overstate the seriousness of the offense" because "the issuing banks did not incur a monetary loss in the offense." PSR ¶ 110. Probation further acknowledges that this is a fundamentally atypical fraud case, and recommends a substantial downward departure and variance on that basis: "We believe that this case should be viewed differently than another fraud case in which the victims have been swindled of their money, and there is a need to make the victim whole again. However, the guidelines do not capture this differentiation, and therefore, a departure and variance from the guidelines seems to be appropriate in this case." PSR at 31.

A sentence of time served—reflecting the seven months Mr. Weigand has been incarcerated and the over eight months he has been under house arrest—would fall squarely within the heartland of sentences this Court has imposed in other fraud cases. *See, e.g.*, *United States v. Kaitz, et al.*, 14-cr-845 (S.D.N.Y. 2015) (sentence for Z. Kaitz of 4 months and Guidelines range of 51 to 63 months); *United States v. Petit*, 19-cr-850 (S.D.N.Y. 2021) (sentence of one year in prison and no supervised release; Guidelines range of 30 years); *United States v. Taylor*, 19-cr-850 (S.D.N.Y. 2021) (sentence of one year in prison and no supervised release; Guidelines range of 262 to 327 months); *United States v. Conti, et al.*, 14-cr-272 (S.D.N.Y. 2016) (sentence for A. Allen of one year and one day, no supervised release, and no fine; Guidelines range of 87 to 108 months).

Mr. Weigand is a kind-hearted, immensely talented, fundamentally decent person who never intended to harm anyone. No one was harmed. He poses no risk to anyone. Mr. Weigand has been harshly punished already. The reality is he will continue to be punished for his involvement in this case for the rest of his life. We respectfully request that he now be permitted to return home, where he will undoubtedly do his very best to put this case behind him and find a way to re-build a positive, productive life amongst the friends and family he cares so deeply about.

I.      **Background**

        A.      **Mr. Weigand's Personal and Family History**

Mr. Weigand was born in Dernbach, Germany in 1982 to Franz and Hella Weigand. PSR ¶ 56. His father, now retired, worked as a schoolteacher. His mother was a homemaker. *Id.* Mr. Weigand has four siblings: Philipp, Annabel, Natalie, and Quintus, who are forty-four, forty, thirty-six and twenty-six years old, respectively. *Id.* His parents and his siblings all reside in Germany. *Id.*



The Honorable Jed S. Rakoff
June 12, 2021
Page 4

Mr. Weigand grew up in a rural area of Germany and enjoyed a good childhood in a close-knit family. PSR ¶¶ 57, 64. He excelled in his studies. *Id.* ¶ 57; Ex. A at 1. Mr. Weigand attended Gymnasium, "the most difficult and longest path" to university in Germany, and then received the equivalent of a bachelor's degree from the University of Cooperative Education in Karlsruhe, Germany. PSR ¶¶ 77–78; Ex. A at 1.

Mr. Weigand is engaged to Hannah Fiedler, who calls him her "soul mate" and "the love of [her] life." PSR ¶ 66; Ex. B at 2. Mr. Weigand first began dating Ms. Fiedler in 2008. Prior to his arrest, they lived together in Luxembourg, where Ms. Fiedler works as a human resources business manager. PSR ¶ 59. She was with Mr. Weigand when he was taken into custody at Los Angeles International Airport on March 10, 2020. *Id.* They were waiting to board a connecting flight to Costa Rica for a vacation, having chosen a detour through Los Angeles so that Mr. Weigand could check on the "well-being of a friend." *Id.*; Ex. G. Following Mr. Weigand's arrest, Ms. Fiedler remained in the United States, first Los Angeles and later Rhode Island, for approximately 10 weeks—as long as she could before her tourist visa expired—before returning to Luxembourg. PSR ¶ 59.

After he was taken into custody, Mr. Weigand was incarcerated for seven months—from March 9 through October 9, 2020—in the Santa Ana City Jail in Santa Ana, California, during the height of the COVID-19 pandemic. PSR ¶ 61. Over the course of the COVID-19 pandemic, Orange County, in which the jail is located, experienced more than 250,000 cases of coronavirus resulting in more than 5,000 deaths.[1] Several inmates in close proximity to Mr. Weigand contracted the virus.[2] In 2018, Mr. Weigand was diagnosed with obstructive sleep apnea, a respiratory condition his doctor described as a "hypoventilation syndrome with corresponding oxygen depletion," and "recurring sinusitis and mouth breathing," which his doctor identified as a sign of having a compromised immune system. PSR ¶ 70. As a result, Mr. Weigand faced a significant risk of becoming severely ill if he were infected, as substantiated in letters from Mr. Weigand's physicians submitted in connection with bail applications. *See* ECF No. 25, 98.

While in custody, Mr. Weigand was hospitalized after he reported experiencing abdominal pain, dizziness, chills, itchiness throughout his body, and discoloration of his urine. PSR ¶ 68. Mr.

---

[1] OC Health Care Agency, "COVID-19 Case Counts and Testing Figures," (last updated June 4, 2021), https://occovid19.ochealthinfo.com/coronavirus-in-oc.

[2] Tony Saavedra, "Full quarantine imposed at Orange County central jail after 4 more inmates contract virus," THE ORANGE COUNTY REGISTER (April 7, 2020), at https://www.ocregister.com/2020/04/07/full-quarantine-imposed-at-orange-county-central-jail-after-4-more-inmates-contract-coronavirus/.



The Honorable Jed S. Rakoff
June 12, 2021
Page 5

Weigand was diagnosed with "obstructive jaundice and choledocholithiasis" (i.e., the formation of gallstones). *Id.* He underwent surgery to remove his gallbladder, including the gallstones, and had a stent inserted in his bile duct. *Id.*

Since Mr. Weigand was released on bail on October 9, 2020, he has remained under house arrest in Manhattan with armed guard supervision at all times, paid for at his own expense. PSR ¶¶ 60–61. Mr. Weigand has fully complied with all conditions of his bail. Ex. L.

> **B.    Mr. Weigand's Character and Positive Impact on His Family, Peers, and Community (Letters of Support)**

The letters submitted on Mr. Weigand's behalf speak to his selfless devotion to others. As Mr. Weigand's four siblings observed, "[h]e likes to see others happy and has always had a genuine interest in supporting and helping those close to him." Ex. C.

Bobby Thekkekara, one of Mr. Weigand's oldest friends, describes how as a teenager, Mr. Weigand devoted every Sunday for many years to attending to and accompanying his great-uncle Paul, who was "physically challenged and fragile." Ex. H. Mr. Thekkekara, now a registered nurse, was touched by Mr. Weigand's level of devotion, recalling that Mr. Weigand always went home early on Saturday evenings because he wanted to be "fit for his great-uncle Paul," with whom he shared a "special friendship." *Id.*

Another childhood friend, Moritz Lamp, recalled that when he needed money to pay for his driver's license, Mr. Weigand helped get him a summer job shoveling clay at a nearby clay mine, the only remaining industry in their rural region of Germany. Ex. I. And when Mr. Lamp complained of the "extremely dirty, hot and tough" conditions, he says Mr. Weigand started shoveling clay alongside him. *Id.* Despite the "incredibly tough" working conditions, Mr. Lamp looks back on that summer fondly, calling it "the best summer of my life." *Id.*

Mr. Weigand's other friends echo Mr. Thekkekara and Mr. Lamp's praises. Julia Reimers, a friend of Mr. Weigand's since they were teenagers, describes how Mr. Weigand has "a strong commitment for [] friendship and a deep appreciation for old fashioned values such as loyalty, friendship, honesty, reliability, and generosity." Ex. G. Dan Steven Kuhlmann, a friend of Mr. Weigand's for more than twenty-two years, remarks of Mr. Weigand that "you only get such a friend once in your life." Ex. J.

Mr. Weigand's family also describe the positive impact he has had on them. His parents note that he "has always played a central role in [their] family, from his early childhood on up until today." Ex. A. They describe how they "often rely on [Mr. Weigand's] vast and profound knowledge and



The Honorable Jed S. Rakoff
June 12, 2021
Page 6

ask for his opinion," noting that "[t]hese days, [they] postpone quite a few plans and decisions because [they] both agree, 'Let's wait until Ruben is back.'"  *Id.* at 2.

Mr. Weigand's siblings note that they "all have a very good relationship with him."  Ex. C at 1. His older brother, Philipp, describes Mr. Weigand as "genuinely helpful and very reliable" and notes that Mr. Weigand is usually the one to drive him to and from family events since he does not have a car.  *Id.* at 2.  His sisters Annabel and Natalie describe how he has been "a strong shoulder for [them] to lean and rely on" and his sister Natalie hopes that he will be the same for her daughter, who is due to be born soon.  *Id.*  His younger brother, Quintus, calls Mr. Weigand "one of [his] greatest role models" and notes that Mr. Weigand "has had the biggest impact on [his] development as a human being, both personally and professionally."  *Id.*  Quintus describes how Mr. Weigand encouraged him to pursue an apprenticeship and then attend university, which he says he "really did not like [] at the time, but looking back at it now, it was one of the best decisions [he has] ever made."  *Id.* at 3.

Ms. Fiedler, his fiancée, describes Mr. Weigand as "probably the most selfless and non-judgmental person" she knows and remarks that he "has a very strong desire to change the world for the better and help people to get the best out of life/business for themselves."  Ex. B.  She notes that "[w]ith this attitude in business and life, Ruben – in a very short time – has built a strong network based on trust, made a name for himself as a reliable and competent consultant and has thus been very successful in driving his business forward."  *Id.*

Ms. Fiedler's cousin, Max Ortseifen, credits Mr. Weigand with inspiring him to "follow [an] innovative and future-oriented path" in the online retail business "through intense conversations, very helpful advice, and many of his experiences as an entrepreneur."  Ex. E; *see also* Ex. F (Letter from Mr. Ortseifen's Parents).  Mr. Ortseifen noted that Mr. Weigand is "not the kind of person who just listens and is present, but a person who has taken on each family member's personal situation from the heart."  Ex. E.

One of Mr. Weigand's peers, Renaud Kieffer, describes how Mr. Weigand "has supported [him] throughout the ups and downs of entrepreneurship" in developing Mr. Keiffer's young start-up company.  Ex. K.  Mr. Keiffer recalls that when his partner had to spend time away taking care of her mother after her father died unexpectedly, Mr. Weigand "always came over to help [him] as long as he was not traveling himself" and "never asked for anything in return."  *Id.*

During his house arrest in Manhattan, Mr. Weigand has maintained his close relationships with his family and friends despite the distance.

True to his character, Mr. Weigand has also developed a special bond with the current and former law enforcement officials who have served as his private security guards.  Thomas Buda, whose



security company is responsible for enforcing the Court's home confinement order, noted that "Mr. Weigand has been professional, kind, humble and respectful to [his] team."  Ex. L.  Several of Mr. Weigand's security guards also submitted letters of support.  Damien Fils-Aimé, one of those guards, observed that Mr. Weigand "values the relationships he has with his parents, siblings, fiancée, and friends more than anything."  Ex. M.  Tammy Weisberg, another security guard for Mr. Weigand, notes that "[t]here are daily zoom calls, where he prepares dinner and eats with his family" – called "cooking with Ruben" – "and they have movie or family gatherings so he doesn't miss out."  Ex. N.

Ms. Weisberg also notes that Mr. Weigand "has shown nothing but respect and gratitude to his security detail" and "knows each and every one of us and asks how we are and how our families are and if we need anything."  Ex. N.  Mr. Fils-Aimé considers Mr. Weigand to be a friend and says "it was natural to strike up a bond with Mr. Weigand."  Ex. M.

## II.      The Offense Conduct and Evidence at Trial

On March 24, 2021, after a 15-day trial, Mr. Weigand was found guilty of a single count of conspiracy to commit bank fraud.  The PSR, which is based on the Superseding Indictment and information the Government provided the Probation Office, purports to summarize the offense conduct.  PSR at ¶¶ 9–33.  However, the PSR significantly misstates what the evidence at trial established with respect to the offense conduct and Mr. Weigand's involvement.

### A.      Ruben Did Not "Plan" and "Execute" a Three-Year $150 Million Scheme.

The PSR asserts that from 2016 through 2019, Mr. Weigand "planned and executed a scheme to deceive United States banks and other financial institutions into processing over one hundred and fifty million dollars in credit and debit card payments for the purchase and delivery of marijuana products."  PSR at ¶ 10.  It is irrefutable, however, based on the evidence at trial, that Mr. Weigand was not involved in the charged scheme prior to 2018.

Instead, the trial evidence showed that, from early 2016 to January 2018, Eaze executives and employees worked to develop Eaze's first credit card processing setup through a foreign payment processor called Clearsettle, and subsequently processed approximately fifty million dollars in credit card transactions for the purchase of marijuana.  Tr. 164:7–165:22, Tr. 279:1–3; GX 713.  These earlier Eaze transactions involved merchant websites, foreign banks, and merchant descriptors that did not identify, explicitly, that the transactions were for marijuana.  Tr. 197:7–12, 347:12–15; GX 428.  James Patterson, Eaze's former CEO, testified that, to the best of his knowledge, Mr. Weigand had no involvement in Eaze's Clearsettle processing, and no evidence at trial suggested otherwise.  Tr. 1685:2–17.



The Honorable Jed S. Rakoff
June 12, 2021
Page 8

Even with respect to the second phase of Eaze's credit card processing, the mechanics and details were developed and implemented by Oliver Hargreaves, the Government's main cooperating witness, months before Mr. Weigand became involved. Tr. 1075:6–1076:13, 1076:7–1077:5. In late 2017, when Eaze needed to update its credit card processing (apparently due to issues with Clearsettle), Hargreaves, along with Hargreaves' then-colleague Koen Vanpraet, approached Mr. Akhavan with what they believed to be a comprehensive solution for Eaze's payment processing. Tr. 699:11–700:6, 959:15–22.

From approximately September 2017 to January 2018, there were meetings and communications during which Hargreaves and others, aside from Mr. Weigand, discussed and planned the operational aspects of the revised payment processing solution. Tr. 702:17–22. In a November 22, 2017 email, Hargreaves shared with Mr. Akhavan's company a detailed "turnkey" plan as to how Eaze's payment processing would operate. Tr. 964:5–9. Hargreaves' plan included proxy companies and proxy websites that were fully operational, met the card scheme audit standards, and had 24-7 customer support, among other features. Exhibit IWX 22. There was no evidence that Ruben was involved in, or even aware of, any of these meetings or communications.

Therefore, the notion that Mr. Weigand "planned and executed" a three-year, $150 million dollar scheme—as the Government contended in its opening and closing statements (Tr. 61:3–13, 2442:4–8) and as the PSR now asserts—is unequivocally false.

### B.      Mr. Weigand Was Not a "Manager" of the Scheme.

The PSR asserts that Mr. Weigand was a "manager" of the scheme, and that he "directed other members of the Scheme, such as Oliver Hargreaves." PSR at ¶ 29. In reality, however, Mr. Weigand's role consisted of acting as a liaison or introducer between Hargreaves and an individual named Andreas, participating intermittently in certain group chats, and offering limited technical advice. *See* GX 4004; Tr. 739:17–740:1, 836:25–837:3.

The evidence at trial demonstrated that Mr. Weigand certainly did not "manage" or "direct" any other participants. Hargreaves testified that Mr. Weigand was the "operations manager" and that he and Mr. Weigand communicated on a "daily basis." Tr. 655:10–22. However, the primary forum in which Hargreaves and Mr. Weigand communicated was a group chat titled "Olliebaba," which involved a number of other participants and spanned the period from April 23, 2018 through June 20, 2018. GX 40004. Over the nearly two months the chat was active, Mr. Weigand participated on only eight days; on certain days, he sent only a single message. *Id.* Indeed, on most days the Olliebaba chat was active, Mr. Weigand did not participate at all. *Id.* Critically, none of the messages Mr. Weigand sent indicated that he was managing or directing anyone, especially not Hargreaves. When examined, the chat belies Hargreaves's unsubstantiated testimony that he and Mr. Weigand communicated "daily" and that Mr. Weigand had a managerial role.



The Honorable Jed S. Rakoff
June 12, 2021
Page 9

Hargreaves also testified that Mr. Weigand's role was to submit application packs to the foreign acquiring banks (hardly a managerial role), Tr. 729:17–24, and even that testimony was contradicted by other testimony from Hargreaves, and the trial evidence as a whole.  Indeed, the application packs clearly showed who submitted them, and that none were submitted by Mr. Weigand or an entity associated with him.  *See, e.g.*, Tr. 1036:7–20; GX 1622 at 7; GX 3917. Hargreaves testified that, in February 2018, Mr. Weigand introduced Hargreaves to a gentleman named Andreas, who, by Hargreaves' own admission, was supposed to be the person who "submit[ed] the application packs . . . to the acquiring banks."[3] Tr. 739:17–740:1, 728:7–22, 974:2– 6.  Hargreaves also admitted that, at certain times, Hargreaves' team submitted applications to the banks directly, and did not even involve Euprocessing@protonmail.com, through which Mr. Weigand allegedly received e-mail.  Tr. 651:14–18, 729:22–23, 802:19–23, 974:16–18.  Indeed, the Government ultimately was forced to concede the lack of evidence connecting Mr. Weigand and the Euprocessing account.  Tr. 2609:24–2610:2 ("There's no requirement that Ruben Weigand sent every single email from Euprocessing. What you have in this case is so much other evidence, put the email address completely to the side.").  Hargreaves was also unable to recall any specific instance of an application pack being submitted to a bank, Tr. 1040:5–7, and there was not a single email admitted into evidence that involved Mr. Weigand submitting an application to a bank.

What the evidence at trial did establish was that it was Hargreaves who was managing the European side.  GX 4002 at 1.  Hargreaves testified that he oversaw "a team" consisting of Kate Farmer, Michelle Furlan, and others, each of whom had critical and distinct roles in the creation and submission of the application packs.  Tr. 740:12–743:14.  Farmer, who was Hargreaves' Operations Manager, was responsible for the various "moving parts" needed to prepare the applications for submission, including getting documents signed, ensuring the application packs complied with bank and other requirements, and updating them as needed.  Tr. 740:21–741:14.  Furlan was responsible for actually creating the application packs, which involved purchasing shell companies and building websites.[4] Tr. 741:15–21.  Through his entity Spinwild Limited, Furlan also processed

---

[3] Other evidence at trial also indicated that it was Andreas who submitted the application packs to the foreign acquiring banks.  On May 10, 2018, in a Telegram group chat, Hargreaves informed Mr. Akhavan and Mr. Weigand that Hargreaves would be advising his team to send all future merchant applications to the email address Euprocessing@protonmail.com.  GX 4004 at 48.  Darcy Cozzetto, the former Senior Vice President of Operations at Eaze, who communicated frequently with that email address, testified definitively that it was always her understanding that Euprocessing@protonmail.com was operated by Andreas.  Tr. 2076:24– 2077:13.

[4] In addition to Hargreaves' immediate team, Hargreaves also sought advice from third parties such as Stanley Skoglund, a former Visa employee, who Hargreaves used as a consultant to learn about "Visa fraud rules relating to cross-border and domestic transactions and how fraud is monitored," among other things.  Tr.



payments throughout the period following Hargreaves' first involvement.  Tr. 741:15–742:2, 911:1–9, 1331:4–9, 1392:16–20.

Indeed, nothing illustrates the difference between Mr. Weigand's limited role and Hargreaves's leadership role more clearly than comparing how each of them was introduced to Eaze's employees by Mr. Akhavan.  On May 10, 2018, in a group chat titled "Eaze cs," Mr. Akhavan introduced Hargreaves as "the man in charge in Europe," who was "handling all the [customer service] numbers."  GX 4002 at 1.  Over two months later, on July 31, 2018, Mr. Akhavan introduced Mr. Weigand along with an individual named "Martin" and described both of them as people who were "helping . . . out."  GX 302 at 50.  In other words, Mr. Weigand was introduced over half a year into the second phase of the charged scheme and received the same introduction as "Martin," an individual so unimportant to the charged scheme that the Government made virtually no effort to explain to the jury who he was or what he did.

### C.  Mr. Weigand Did Not Intend to Harm any U.S. Bank, and No U.S. Banks Were Harmed.

In addition to having a limited role in the charged scheme, Mr. Weigand did not intend to cause any pecuniary harm to U.S. issuing banks, and the evidence failed to show that any U.S. issuing bank or anyone suffered any pecuniary harm at any point.  Indeed, with the acquiring banks underwriting all the U.S. bank transactions, there is also no indication anywhere in the record that anyone involved intended any U.S. bank to suffer any loss or pecuniary harm.

Only two of the Government's fourteen witnesses at trial testified to having any conversation with Mr. Weigand during the charged scheme: Hargreaves and John Wang, Eaze's Lead Product Manager.  Their testimony made clear that it was their understanding that Mr. Weigand interfaced solely with foreign acquiring banks.  Tr. 655:10–25, 1043:15–1044:10, 2254:21–23, 2287:2–2288:13.  Wang's testimony, in particular, was based on only a single, short phone call with Mr. Weigand, Tr. 2267:3–7, and a chat exchange in which Mr. Weigand was clearly filling in for an individual named "Marty."  Tr. at 2264:16–17.  There was not a single piece of evidence at trial that showed Mr. Weigand discussing U.S. issuing banks or their policies.  Further, there was no testimony or evidence to suggest that Mr. Weigand thought any of the alleged means of deception (*e.g.*, MCCs, descriptors, and location) would "induce" U.S. issuing banks to process transactions they would not have otherwise.

---

743:8–745:9.  These overtures to third parties were made without any input or involvement by Mr. Weigand.



The Honorable Jed S. Rakoff
June 12, 2021
Page 11

Indeed, the evidence established that the alleged misrepresentations had no such impact. The evidence showed that the issuing banks did not block transactions based on MCC, location or descriptor, even when the descriptors were either nonsensical or clearly indicated that Eaze was involved in the transaction. Tr. 1799:25–1800:7, 2117:16–2118:1, 2378:9–14. Rather, the issuing banks' only concerns were: (1) whether the actual cardholder was making the purchase, and (2) whether the cardholder had enough credit to cover the transaction. Tr. 2117:25–2118:1. As Michael Steinbach, the Government's witness for Citibank, testified: "[i]f it's Mike Steinbach, if I'm within the credit limit, I can do whatever I want." Tr. 2117:25–2118:1. The evidence showed that where the banks did become aware that their cardholders were using their Visa and Mastercard-branded cards to purchase marijuana, the banks did not penalize their cardholders or even notify them that they had breached bank policy. Tr. 1822:8–17. Instead, the issuing banks profited from the marijuana purchases their customers made, and did nothing to stop customers from making those purchases. Tr. 1659:14–1659:24. Indeed, the Government failed to identify even a single instance in which a bank declined one of its cardholders' transactions for marijuana. Nor was there any evidence that the issuing banks had blocked merchants in connection with the marijuana purchases.

Remarkably, even after Eaze's former CEO was arrested and the defendants were charged in this case, up until trial, Eaze continued to process card purchases for marijuana through a company called Circle Internet Financial ("Circle"). Tr. 2378:9–16; HAX 14004; HAX 14008. The Circle transactions utilized merchant descriptors that explicitly said "Eaze," which means that the information transmitted to the issuing banks made clear that the transactions were linked to Eaze, which openly advertised as an online cannabis delivery service. Tr. 2385:22–2389:24; HAX 11024–HAX 11027. Yet, within an eight-month period, starting in July 2020, months after this case became public and a year after both Visa and Mastercard became aware that Eaze was an online marijuana marketplace that accepted credit and debit cards, Tr. 465:10–467:4, 1901:11–1905:6, the U.S. issuing banks processed approximately $50 million in Eaze-Circle marijuana transactions. Tr. 2378:9–16.

And, again, the evidence at trial failed to establish that any issuing bank incurred any pecuniary harm. Tr. at 1660:19–24 (Patterson Cross) ("Q. You never intended to cause anyone to lose any money, Correct? A. That's right. Q. And to your knowledge, no one did lose any money on the credit card purchases. Correct? A. Correct, to my knowledge."); Tr. at 2168:2–6 (Steinbach Cross) (Q. Have you ever estimated the losses to Citi caused by marijuana sales over a credit card system? A. I don't know how I would do that. Q. So the answer is no. A. The answer is no.").

To the contrary, the evidence established that the acquiring banks, the U.S. issuing banks, Visa and Mastercard all collected a portion of the transaction fees on each transaction. Tr. 2098:20–22, 2164:22–2165:21, 1202:18–1203:16, 1783:22–1784:24. Eaze and the individual dispensaries also received payment for the products they provided and delivered. And the individual customers all received the products they each ordered through Eaze. In other words, the evidence unquestionably



The Honorable Jed S. Rakoff
June 12, 2021
Page 12

showed that all participants in the transaction were compensated or received what they paid for. *Id.*

Significantly, the evidence failed to demonstrate that Mr. Weigand received any compensation for his role in the charged scheme. The Government failed to connect to Mr. Weigand the only two documents purportedly concerning commission payments. *See* GX 1518 (no mention of Mr. Weigand); GX 1720 (no proven connection to charged scheme). Nor did the Government present any witness testimony to elucidate those documents or otherwise explain how Mr. Weigand profited from his involvement in the charged scheme.

The PSR makes clear that "[r]estitution is not an issue in this case," PSR ¶ 104, highlighting that issuing banks did not actually incur pecuniary harm. Further, the Government and counsel for Mr. Weigand have agreed to a $300,000, which will be paid by the time of sentencing, in full satisfaction of a $384,000 money judgment against Mr. Weigand. In other words, the Government does not dispute that *the most* Mr. Weigand personally received in connection with the scheme was $384,000 in commission payments from an unindicted co-conspirator. This amount is entirely consistent with the role of an introducer, certainly not that of someone who conceived and managed a $100 million fraud, as the Government inexplicably asserts.

### III.   The Sentencing Guidelines:  The Correct Guidelines Range is 0 to 6 Months' Imprisonment.

This Court has repeatedly and eloquently described "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guidelines calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("Imposing a sentence on a fellow human being is a formidable responsibility. . . . The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.").

This is precisely such a case, where the Guidelines—as applied by the Government and the PSR— would result in a "travesty of justice" and demand a sentence entirely out of step with the history and characteristics of the defendant, the seriousness of the offense, and the other sentencing factors this Court must consider. Nevertheless, this Court has a statutory obligation to calculate the Guidelines range, even though, as this Court has "expressed many times in cases like this, this is an exercise in irrationality." *United States v. Taylor*, 19 cr 850, Sentencing Tr. at 2.

The Government and the PSR have failed at this task and calculated a total offense level of 38 and a Guidelines range of 235 to 293 months, which the Government considers accurate. PSR ¶ 94,



The Honorable Jed S. Rakoff
June 12, 2021
Page 13

24.  For the reasons that follow, the Government and PSR's Guideline range calculation is incorrect. Based on a base offense level under § 2B1.1 of 7 and no further enhancements, the correct range is instead 0 to 6 months' imprisonment.

> A.    **The Government and PSR's 24-Level Loss Enhancement is Entirely Unsupported by the Record, the Law, and the Guidelines.**

This Court has repeatedly criticized "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss.  As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."  *Adelson*, 441 F. Supp. 2d at 509; *see also Gupta*, 904 F.Supp.2d at 351 ("[T]he Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.").

Setting aside this Court's justified criticism of the Guidelines' approach to loss in fraud cases, the PSR's 24-level loss enhancement is entirely unsupported by the record, the Guidelines, and the law.  Rather, the record established that no issuing banks suffered pecuniary harm, there was no "loss" under the Guidelines, and that no offense-level enhancement is appropriate under § 2B1.1(b)(1).

The Guidelines define "loss" in terms of "pecuniary harm."  *See* Note 3(A)(i)-(iii) to § 2B1.1 (defining "actual loss" as "reasonably foreseeable pecuniary harm;" "intended loss as "pecuniary harm that the defendant purposely sought to inflict;" and "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money.").

Both before trial and at trial, the Government repeatedly conceded that the issuing banks did not incur any "loss" or pecuniary harm.  ECF No. 169 at 11 ("**The Government does not expect that the evidence at trial will show that the United States issuing banks suffered financial loss on these transactions**, but rather, that absent the defendants' deceptive scheme, the banks would not knowingly have approved these marijuana transactions.") (emphasis added); Tr. at 43:9–12 ("The government's argument, fundamentally, is that pecuniary loss is simply not an element of this case. It's also not a theory that the government is advancing at trial here."); Tr. 44:5–7 ("the government is not alleging here that the banks lost money on these transactions, it's not part of the theory.").



The Honorable Jed S. Rakoff
June 12, 2021
Page 14

Further, as predicted by the Government, the evidence at trial also did not establish that any issuing bank incurred any pecuniary harm.  Tr. at 1660:19–24 (Patterson Cross) ("Q. You never intended to cause anyone to lose any money, Correct?  A. That's right.  Q. And to your knowledge, no one did lose any money on the credit card purchases. Correct?  A. Correct, to my knowledge."); Tr. at 2168:2–6 (Steinbach Cross) (Q. Have you ever estimated the losses to Citi caused by marijuana sales over a credit card system? A. I don't know how I would do that. Q. So the answer is no. A. The answer is no.").

Now, for purposes of sentencing, the Government has done an about-face, incorrectly equating the volume of transactions processed by issuing banks with the pecuniary harm they incurred.  In response to Weigand's objections to the PSR, the Government asserts that "loss was more than $65,000,000 but less than $150,000,000" and that the 24-level loss enhancement applies.  Gov't Response at 4.  The Government asserts that "the loss amount under Section 2B1.1 is properly keyed to the "scheme's goal" of "obtaining bank property."  *Id.*  This assertion is entirely unsupported by the case law the Government cites—*United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016) and *United States v. Loughrin*, 134 S. Ct. 2384, 2389 (2014)—and by the Guidelines.

In *Loughrin*, the Supreme Court examined the requirements of 18 U.S.C. § 1344(2) and held, in relevant part, that the statute did not require "the Government to prove that the defendant's scheme created a risk of financial loss to [a] bank."  573 U.S. 351, 366 n. 9 (2014).  Such a reading of the statute would risk "entangling courts in technical issues of banking law about whether the financial institution or, alternatively, a depositor would suffer the loss from a successful fraud."  *Id.*  The Court was entirely silent on the Guidelines and limited its inquiry to the elements of the bank fraud statute.  So too in *Bouchard*.  There, the Second Circuit examined the two prongs of the bank fraud statute without opining on the Guidelines, *see* 828 F.3d 116, 124–127 (2d Cir. 2016), let alone suggesting that the loss Guideline is "keyed to the scheme's goal of obtaining bank property." Gov't Response at 4.

To the contrary, the applicable case law on the issue makes clear that the amount of a loan or extension of credit is not the equivalent of loss under the Guidelines.  In *United States v. Markert*, the Eighth Circuit held that, for purposes of loss under the Guidelines, "the principal amount of . . . nominee loans was not a proper initial estimate of actual loss."  774 F. 3d 922, 927–928 (8th Cir. 2014).  Defendant Markert, a bank officer, had been convicted of willfully misapplying bank funds by wrongfully approving loans in the amount of $1.9 million.  The Eighth Circuit held that the district court had erred by equating actual loss with the total amount of the loans and applying a 16-level enhancement on that basis.  *Id.* at 923.  The Court held that the Government had failed to meet its burden of proving actual loss by a preponderance of the evidence and held that "no §



2B1.1(b)(1) enhancement [would] be imposed in any further sentencing proceeding."  *Id.* at 923, 928.

Similarly, in *United States v. Abbey*, the Second Circuit also declined to equate the principal amount of a loan with "loss" for purposes of the Guidelines.  288 F.3d 515, 518 (2d Cir. 2002).  Rather, reviewing and embracing Note 8(b) to Guideline Section 2F1.1, which was deleted by consolidation with § 2B1.1 in 2001, the Second Circuit noted that "where, as here, 'a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.'"  *Id.* at 518 (quoting U.S.S.G. § 2F1.1, cmt. 8(b)).  In other words, "actual loss" under the Guidelines is appropriately keyed to any amount that a bank fails to recover after extending credit or a loan, not to the principal amount of the loan.

Indeed, the Second Circuit's holding in *Abbey* is entirely aligned with the Guidelines' definition of "actual loss" and "intended loss" in terms of "pecuniary harm."  Note 3(A)(i)–(iii).  Here, the trial record was devoid of any evidence that issuing banks were not repaid for any of the credit they extended to Eaze's customers, who knowingly and willingly purchased legal marijuana, or that the banks were harmed economically in any other way.  To the contrary, the evidence at trial showed that U.S. issuing banks, along with the credit card companies, collected a portion of the transaction fees on each transaction.  Tr. 2098:20–22, 2164:22–2165:21, 1202:18–1203:16, 1783:22–1784:24.  Eaze and the individual dispensaries also received payment for the products they provided and delivered.  And the individual customers all received the products they ordered through Eaze.  In other words, the evidence showed that every bank and financial intermediary in the chain was compensated:  none incurred any pecuniary harm.

For the reasons above, a 24-level enhancement for "loss" is entirely unsupported by the record, the law, and the Guidelines.  For the reasons discussed later in this memorandum, as the single largest driver of the PSR's proposed Guidelines range, it is also an entirely improper measure of the appropriate sentence.

### B.  The 2-Level "10 or More Victims" Enhancement Does Not Apply.

The enhancement under § 2B1.1(b)(2)(A)(i) for "10 or more victims" is inapplicable because there was no evidence that anyone, let alone an issuing bank, suffered pecuniary harm as a result of the charged scheme.  Note 1 to § 2B1.1 defines a "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)."  The "number of victims" enhancement applies only where the government can prove loss and identify those who were harmed. *See, e.g.*, *United States v. Skys*, 637 F.3d 146, 154–55 (2d Cir. 2011); *United States v. Abiodun*, 536 F.3d 162, 168–



69 (2d Cir. 2008). The Government's failure to establish actual or intended pecuniary harm, and therefore the existence of a "victim" under the Guidelines, precludes an enhancement under §2B1.1(b)(2)(A)(i). To the contrary, these so-called victims each made their full fees on the transactions at hand. To suggest that banks that profit are victims would be unprecedented.

### C.     The "Sophisticated Means" Enhancement Does Not Apply.

The PSR asserts that the 2-level enhancement under § 2B1.1(b)(10)(B) and (C) applies because "[a] substantial part of a fraudulent scheme was committed from outside the United States, and the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." PSR ¶ 41.

With respect to § 2B1.1(b)(10)(B), the locus of the charged fraud was in the United States. The underlying marijuana sales took place in the United States in California and Oregon. Eaze, the company at the heart of the charged scheme, is based in California. Eaze's management and employees are based in California. Eaze's payment gateway Inovio is based in California. Eaze's customers are based in Oregon and California. And the alleged victim-issuing banks were based in the United States.

As for § 2B1.1(b)(10)(C), the evidence at trial failed to establish that Weigand "intentionally engaged in or caused the conduct constituting sophisticated means," including the use of "shell companies . . . to open offshore bank accounts with merchant acquiring banks." PSR ¶ 41. Rather, those efforts, including the creation of fraudulent application packs, were orchestrated by the Government's cooperating witness Oliver Hargreaves. *See supra* at 8–10; Tr. at 699:16–700:6, 702:17–22, 959:15–24, 964:5–9, 1107:20–1108:5. The only individuals involved in the intentional creation and use of shell companies were Hargreaves, Koen VanPraet, and members of Hargreaves' immediate team, including Kate Farmer and Michele Furlan. *See supra* at 8–10; Tr. 740:21–741:21. No evidence at trial ever established that Mr. Weigand was involved in the creation or acquisition of shell companies or the submission of application packs. *See supra* at 9–10.

There was also no evidence that Mr. Weigand was involved in developing or implementing the technical aspects of Eaze's card processing solution, including the use of tracking pixels or "cookies," which are used to track online consumer behavior, and related Eaze customer service features. John Wang, Eaze's Lead Product Manager, who had substantial involvement in developing those technical aspects of Eaze's processing, admitted on cross-examination that he could not recall Mr. Weigand being involved in any discussions regarding tracking pixels or cookies. Tr. 2290:13–25. James Patterson (Eaze's former CEO), who was also involved in those discussions admitted at trial he never met or communicated with Mr. Weigand during his tenure as



The Honorable Jed S. Rakoff
June 12, 2021
Page 17

CEO and for the entirety of the second phase—the EU Processing phase—of the charged scheme. Tr. 1687:13–23.

Further, in the "Eaze cs" group chat spanning May 10, 2018 to July 11, 2018, Eaze employees and others discussed all things customer service-related in the context of Eaze's card processing and use of proxy merchants. GX 4002. Mr. Weigand is not a participant in the chat, nor is he mentioned in any of the hundreds of messages sent in the 29-page chat log. *Id.* Instead, at the beginning of the chat, Mr. Akhavan introduces Hargreaves as "the man in charge in Europe," who is "handling all the [customer service] numbers." *Id.* at 1.

Accordingly, no enhancement under § 2B1.1(b)(10)(B) or (C) applies.

### D.    The 3-Level Manager or Supervisor Enhancement Does Not Apply.

The PSR asserts that the 3-level enhancement under § 3B1.1 applies because Weigand "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  PSR ¶ 43.

In fact, the evidence at trial failed to show that Mr. Weigand played a managerial or supervisory role in the charged scheme and failed to substantiate the various assertions in the PSR, including that he "was responsible for the relationship with the overseas acquiring banks during the EU Processing phase of the scheme," that he "facilitate[ed] the applications for merchant bank accounts on behalf of the Phony Merchants," that he "review[ed] fraudulent applications prepared by coconspirators," that he "interface[d] with the acquiring banks regarding the merchant bank accounts once they were established," or that he "provid[ed] statements to the dispensaries regarding the flow of proceeds from the marijuana transactions back to bank accounts in the United States."

To the contrary, the evidence at trial did not establish that Weigand directed, managed, or supervised others in the charged scheme.  *See supra* at 8–10.  Rather, the evidence showed that it was Hargreaves and Koen Vanpraet who conceived of the second phase of the charged scheme, before Mr. Weigand's involvement in January of 2018.  Hargreaves then proceeded to direct the operational aspects of the second phase along with his lieutenants Kate Farmer and Michele Furlan.  *See supra* at 9–10.  Mr. Weigand's role at most consisted of acting as a liaison between Hargreaves and an individual named Andreas, participating intermittently in certain group chats, and offering limited technical advice.  *See supra* at 8–9; GX 4004; Tr. 739:17–740:1, 836:25–837:3.

Moreover, the Guidelines' "concerns about relative responsibility" were not implicated by the evidence at trial, which failed to show that Weigand gained anything at all from the charged



The Honorable Jed S. Rakoff
June 12, 2021
Page 18

scheme. *See* Note 4 to § 3B1.1 ("[I]t is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate.").

The Government has agreed to a preliminary forfeiture order and judgment that recognizes that Mr. Weigand received $384,000 in commission payments from an unindicted co-conspirator during the time period of the charged scheme, and has agreed to $300,000 in full satisfaction of the judgment. In effect, the Government recognizes that that *the most* Mr. Weigand received in connection with the offense conduct was $384,000. This is entirely consistent with the role of an introducer, not of a manager or supervisor of a $100 million scheme.

## IV.  A Time-Served Sentence is Appropriate Under 18 U.S.C. § 3553.

Where "the calculations under the guidelines have so run amok that they are patently absurd on their face," this Court has been "forced to place a greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *Adelson*, 441 F.Supp.2d at 515.

Such is the case here, where the Government and PSR's proposed Guideline range is both incorrect and patently incompatible with the history and characteristics of Mr. Weigand, the nature of the offense, and the aims of sentencing under 18 U.S.C. § 3553.

Probation recommends a substantial downward departure and variance, "[g]iven the defendant's personal attributes and that the guideline calculations over-represent[ ] the seriousness of the offense." PSR at 31. Even so, we respectfully submit that the sentencing factors under 18 U.S.C. § 3553 call for an even greater variance and a time-served sentence because, as Probation recognizes, "this case should be viewed differently than another fraud case in which victims have been swindled out of money, and there is a need to make the victim whole again." PSR at 31.

In numerous fraud cases, this Court has imposed a sentence comparable to time served in this case (*i.e.*, seven months of incarceration and over eight months of house arrest) after careful consideration of the sentencing factors under 18 U.S.C. § 3553. *See, e.g.*, *United States v. Kaitz, et al.*, 14-cr-845 (S.D.N.Y. 2015) (sentence for Z. Kaitz of 4 months and Guidelines range of 51 to 63 months); *United States v. Petit*, 19-cr-850 (S.D.N.Y. 2021) (sentence of one year in prison and no period of supervised release; Guidelines range of 30 years); *United States v. Taylor*, 19-cr-850 (S.D.N.Y. 2021) (sentence of one year in prison and no period of supervised release; Guidelines range of 262 to 327 months); *United States v. Conti, et al.*, 14-cr-272 (S.D.N.Y. 2016) (sentence for A. Allen of one year and one day, no supervised release, and no fine; Guidelines range of 87 to 108 months).



The Honorable Jed S. Rakoff
June 12, 2021
Page 19

The sentencing factors warrant a sentence of time served for the reasons that follow.

> **A.      § 3553(a)(1): "The Nature and Circumstances of the Offense and the History and Characteristics" of Defendant Weigand Call for a Time-Served Sentence.**

Mr. Weigand's character, history of good deeds, and "extraordinary devotion . . . to individual human beings in their times of need," *see Gupta*, 904 F. Supp. 2d at 354, are captured in the enclosed letters of support.  *See supra* at 5–7.  From taking care of his infirm great-uncle in his youth to working alongside a close friend in a clay mine simply out of solidarity to aiding friends at times of loss and personal hardship, *see* Ex. H, I, K, Mr. Weigand's "good deeds were not performed to gain status or enhance his image." *Adelson*, 441 F.Supp. 2d at 513.  Rather, his good deeds for those in need have been motivated by "a deep appreciation for old fashioned values such as loyalty, friendship, honesty, reliability, and generosity."  Ex. G.  Those personal qualities have elicited deep and heartfelt gratitude from friends and those who have known him, who recognize that "you only get such a friend once in your life."  Ex. J.

Mr. Weigand has been an anchor and source of inspiration for his friends and family.  His siblings describe him as "a strong shoulder for [them] to lean and rely on," one of their "greatest role models," and the individual who "has had the biggest impact on [their] development as a human being, both personally and professionally."  Ex. C.

They also speak to his interest in social uplift and "to humanity writ large."  *Gupta*, 904 F. Supp. 2d at 354.  Ms. Fiedler, Mr. Weigand's longtime partner, describes him as "probably the most selfless and non-judgmental person" she knows, someone with "a very strong desire to change the world for the better and help people to get the best out of life/business for themselves."  Ex. B.  Indeed, as the PSR acknowledges, Mr. Weigand's desire to modernize the payments landscape and "improv[e] how people electronically paid for commerce goods" motivated his entrepreneurial zeal and business ventures.  PSR ¶ 85.  He has since served as mentor to fellow entrepreneurs, assisting them with fledgling start-ups, and "throughout the ups and downs of entrepreneurship" without "ask[ing] for anything in return."  Ex. K.  Even in the context of his military service in Germany, Mr. Weigand chose to serve voluntarily for six months longer than the mandated requirement, receiving a promotion during his service.  PSR ¶ 80.

These accounts have been confirmed by those who have come to know him only recently.  The security guards supervising Mr. Weigand have developed a deeply personal bond with Mr. Weigand.  Ex. N, M.  Mr. Weigand has been deeply invested in their lives and the lives of their



The Honorable Jed S. Rakoff
June 12, 2021
Page 20

families, "ask[ing] how we are and how our families are and if we need anything." Ex. N. Strangers to him until the present ordeal, the guards now describe Mr. Weigand as their "friend." Ex. M.

Until the instant offense, Mr. Weigand had a spotless history with no prior issues with the law. PSR ¶ 50. As the PSR acknowledges, his family describe him as "a 'law-abiding person' and one who would never agree to commit an act if he knew that the behavior was against the law." PSR ¶ 65. Given his history of compliance with the law, his involvement in the instant offense was an aberration. *See Gupta*, 904 F. Supp. 2d at 354 (defining "aberrant" as "atypical" and noting that the "aberrant nature of [the defendant's] conduct by itself would warrant a non-guideline sentence, even aside from the other factors favoring leniency.")

Mr. Weigand's participation in the instant conspiracy was limited in scope and duration. By all accounts, Mr. Weigand was not involved in the initial Clearsettle phase of the charged scheme, from early 2016 to January 2018, during which approximately $50 million in Eaze transactions were processed. *See supra* at 7; Tr. 1685:2–17. From September 2017 until January 2018, before Mr. Weigand's involvement, Oliver Hargreaves and Koen VanPraet devised and set in motion the second phase of the charged scheme, which entailed the use of proxy merchants and websites. *See* supra at 9–10; Tr. 699:11–700:6, 959:15–22, 964:5–9; Exhibit IWX 22. Oliver Hargreaves and his immediate team—principally Michele Furlan and Kate Farmer—drove the operational aspects of the preparation and submission of application packs to acquiring banks. *See supra* at 8; Tr. 740:12–743:14. As shown by his participation in the two-month-long Olliebaba group chat, which included numerous other participants, Mr. Weigand's contribution to the execution of the second phase was intermittent, at best, and limited to discrete technical guidance. *See supra* at 8–9; GX 40004. The evidence did not establish that Mr. Weigand ever created a single proxy merchant, or submitted an application pack to any acquiring bank. No documents or testimony at trial showed that Mr. Weigand personally ever contemplated the deception of financial institutions in the United States.

The evidence at trial failed to show how, or the extent to which, Mr. Weigand profited from his limited role in the charged scheme. Defense counsel for Mr. Weigand and the Government have agreed to a negotiated forfeiture amount of $300,000 in satisfaction of a money judgment in the amount of $384,000. The PSR acknowledges that "[r]estitution is not an issue in this case." PSR ¶ 104.

The calculus under § 3553(a)(1)—including Mr. Weigand's character, personal qualities, and limited role in the offense conduct—supports a time-served sentence.



The Honorable Jed S. Rakoff
June 12, 2021
Page 21

**B.      § 3553(a)(2):  A Sentence of Time-Served Will Achieve the Aims of Sentencing.**

In addition to "the nature and circumstances of the offense and the history and characteristics of the defendant," a court fashioning a sentence must consider "the need for the sentence imposed to serve the four overarching aims of sentencing," set forth in 18 U.S.C. § 3553(a)(2), specifically "just punishment, deterrence, protection of the public, and rehabilitation."  *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017).  In this case, all four of those sentencing aims support a time-served sentence.

**B.1.    <u>The Seriousness of the Offense and Just Punishment (§ 3553(a)(2)(A))</u>**

An assessment of the seriousness of the offense, and the punishment it requires, also demands a probing assessment of the impact on the alleged victims in this case, along with their own role in the charged scheme.

The evidence established that the alleged victim issuing banks were, at worst, knowingly complicit in the processing of marijuana credit and debit card transactions and, best, willfully blind.  Despite evidence that the banks were aware that their cardholders were using their cards to purchase marijuana, none of the bank witnesses were able to identify a single instance in which their bank terminated a relationship with a cardholder, penalized a cardholder, or even informed a cardholder that they had violated the bank's cardholder agreement.  Tr. 1258:24–1259:2; 1797:16-17.  The Government's Bank of America witness admitted that, in the limited instances where it had reason to believe that certain processed transactions were for marijuana, the bank never sought to reverse the transactions and kept the interest it collected on those transactions.  Tr. 1263:20–1265:25; 1267:2-25.  The Government's Citibank witness testified that "none" of its more than $270 million anti-fraud budget "[was] dedicated to ferreting out or identifying marijuana sales."  Tr. 2161:6–12.

The reason for the banks' inaction:  they stood to profit from the marijuana transactions.  Indeed, the evidence at trial showed that the alleged victim issuing banks processed approximately $50 million in clearly marked Eaze-Circle transactions *after* the defendants were charged in this case.  Tr. 2378:9–16.

Eaze's and the banks' approach to the charged scheme, including their post-indictment conduct, bears on the seriousness of the offense and the punishment it warrants.  Absent evidence of pecuniary harm to any financial institution or person, this sentencing factor supports a time-served sentence.



The Honorable Jed S. Rakoff
June 12, 2021
Page 22

### B.2.   Deterrence (§ 3553(a)(2)(B))

As a result of the charge, trial, and conviction in this case, Mr. Weigand has already endured severe personal, professional, medical, and financial hardship.  In light of the litany of horrors he has already experienced, no additional incarceration is needed to achieve the aims of deterrence.

As documented in multiple bail applications to this Court, Mr. Weigand was detained at the Santa Ana City Jail in California during the height of the COVID-19 pandemic, from March 9, 2020 through October 9, 2020.  PSR ¶ 5.  Mr. Weigand shared a windowless room with 14 other inmates at the Santa Ana City Jail, *see* ECF No. 25 at 6, at a time when the risk of contagion was real, and the rate of infection and death in the prison community was rapidly escalating.  *Id.* at 4–5.  With a diagnosed respiratory condition (obstructive sleep apnea), Mr. Weigand was particularly susceptible to COVID-19 and accompanying health risks, as documented in letters submitted to the Court.  *See* ECF No. 98-1 at 5.

Compounding the health risks he already faced in jail, Mr. Weigand was forced to endure unexpected emergency surgery while detained in California.  After experiencing a range of severe symptoms—including abdominal pain and severe exhaustion—Mr. Weigand was diagnosed with obstructive jaundice and choledocholithiasis (*i.e.*, gallstone formation).  He underwent emergency surgery to remove his gallbladder, including the gallstones, and had a stent inserted into his bile duct.  ECF No. 98-1 at 5.  According to letters from Mr. Weigand's physicians, the combination of his underlying health concerns, the surgery, the post-operative healing required, and the risk of COVID-19 posed potentially "life-threatening" risks to Mr. Weigand.  *Id.*

Since his release on bail on October 9, 2020, Mr. Weigand has been subject to stringent bail conditions with which he has studiously complied, *see* PSR at 35, including detention in an apartment "secured at all times by on-premises armed security guards, paid for by Weigand" and authorized to use force to thwart any attempt to flee; and strict supervision and electronic monitoring at the direction of Pre-Trial Services.  ECF No. 112 at 7.

As described in the enclosed letters of support and the PSR, Mr. Weigand has played a pivotal role in the lives of friends and family.  Since his arrest on March 9, 2020, he has been stripped of direct contact with his family, friends, and long-time partner and fiancée, all of whom are outside the United States and unable to visit him due to pandemic-related travel restrictions.  *See* PSR ¶¶ 64–67.  This separation has inflicted a profound and ongoing emotional and psychic toll on Mr. Weigand and his family.  *See* PSR ¶¶ 65–66, 30.

The indictment and conviction in this case have devastated Mr. Weigand's businesses and professional life.  Before the indictment in this case, Mr. Weigand's four European e-commerce



The Honorable Jed S. Rakoff
June 12, 2021
Page 23

businesses were operational and successful.  *See* PSR ¶ 81.  Since then, regulators in Luxembourg have frozen all of his corporate assets; all four of the businesses have a present market value of $0.  *See* PSR ¶ 87.  Further, as a result of the indictment, Mr. Weigand's corporate acquisitions in Europe have been stymied, forcing him to litigate for the substantial amounts owed and unpaid.  *See* PSR ¶ 89.

As documented in the PSR, Mr. Weigand's financial life is in shambles, and his liabilities vastly exceed his assets.  PSR ¶ 86.

His hard-earned reputation has been destroyed.  The global press coverage of the instant case has been extensive, inaccurately linked with the Wirecard scandal, and scathing.  As a result of the trial and conviction, Mr. Weigand has been erroneously linked with the insolvent and embattled German payment processor and the company's former Chief Operating Officer, Jan Marsalek, who is the subject of an international manhunt over securities and fraud charges.  *See, e.g.*, Marta Orosz, "German found guilty of bank fraud in the USA - Whatsapp chats with ex-Wirecard manager Jan Marsalek provided decisive evidence," BUSINESS INSIDER, March 26, 2021, available at https://www.businessinsider.de/wirtschaft/wirecard-spur-deutscher-in-den-usa-wegen-bankenbetrugs-verurteilt-b/.  The coverage has been misleading and has strayed from the evidence at trial.  *See id.* ("Jurors at the Southern District Court in New York on Wednesday found Ruben Weigand and Hamid Ray Akhavan guilty of gang-related bank fraud. . . . Wirecard is also alleged to have played a central role in the fraud. The witnesses and evidence show how closely Akhavan and his posse worked with former Wirecard executive Jan Marsalek.").  In fact, the evidence at trial showed that out of the more than 1.5 million Eaze-related transactions processed over the Visa and MasterCard networks, not a *single* transaction was processed through Wirecard.  GX 2201, GX 2202, GX 2301, GX 2301, GX 2302.  Mr. Weigand has been wrongly tainted by association.  His professional prospects in Europe are now bleak and uncertain.

The serious price Mr. Weigand has already paid—and will continue to pay—renders further incarceration unnecessary to achieve deterrence.

### B.3.    Protecting the Public (§ 3553(a)(2)(C)) and Rehabilitation (§ 3553(a)(2)(D))

Mr. Weigand poses no threat to the public.  Prior to the instant case, Mr. Weigand had no arrests, convictions, or criminal record of any kind.  *See* PSR ¶ 50.  He enjoyed a sterling personal and professional reputation in Europe.  He has been entirely compliant with his conditions of supervision:  Pretrial Services has reported that Mr. Weigand "always ha[s] a great attitude towards supervision."  PSR ¶ 6; Ex. N.  Emblematic of his mindset and approach to public service, Mr.



The Honorable Jed S. Rakoff
June 12, 2021
Page 24

Weigand not only completed mandatory military service in Germany, but chose to serve for an additional 6-month voluntary period, over and above the mandated requirement. PSR ¶ 80.

Mr. Weigand's involvement in the instant case was, in the context of his blemish-free past, an aberration. In light of the significant toll already inflicted on him, the likelihood that he will reoffend is extremely remote. For the same reasons, Mr. Weigand's rehabilitation is not a live concern.

## V.   Alternatives to Incarceration and Voluntary Surrender

If the Court determines that a sentence beyond time served is appropriate, a sentence of home confinement, with a significant community service component, would be sufficient but not greater than necessary to punish Mr. Weigand. As the Administrative Office of the United States Courts has observed, community service is "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair – a 'win-win' proposition for everyone involved." *Community Service*, Court & Community: An Information Series About U.S. Probation & Pretrial Services (2007).[5]

The Court has an opportunity to put Mr. Weigand's industry, technical acumen, and ability to good use by imposing a probationary sentence with a substantial community service component, enabling society to benefit from this sentence and Mr. Weigand's abilities. Mr. Weigand has a demonstrated passion for entrepreneurship and e-commerce, *see* PSR ¶ 85, and has spent considerable time and energy helping others through the "ups and downs of entrepreneurship" without asking for "anything in return." Ex. K. Mr. Weigand would be eager to use his energy and talents to help at-risk youth and others with an interest in technology, e-commerce, and entrepreneurship. He is willing to engage in any community service program that this Court or any supervising officer identifies or approves.

Separately, as Probation acknowledges, Mr. Weigand "is viewed as a good candidate for voluntary surrender. He has kept all court appearances and has been in compliance with all terms and conditions of his pretrial release. He is not viewed as a flight risk or a danger to the community." PSR at 35. In light of Mr. Weigand's history of compliance, we respectfully request that, should the Court impose a further term of imprisonment, Mr. Weigand be permitted to surrender voluntarily to his designated BOP facility. The documented and inhumane conditions at the MCC and the MDC in New York, where Mr. Weigand would most likely be incarcerated until he is assigned a designated BOP facility, also counsel in favor of voluntary surrender.[6]

---

[5] Available at https://www.nhp.uscourts.gov/sites/default/files/pdf/ccservice.pdf (last visited Feb. 16, 2021).
[6] During a recent sentencing hearing, former Chief Judge McMahon described conditions at the MCC and MDC as "as disgusting, inhuman as anything I've ever heard about any Colombian prison" and lamented her



The Honorable Jed S. Rakoff
June 12, 2021
Page 25

## VI.     Conclusion

For the foregoing reasons, Defendant Weigand respectfully submits that a sentence of time served and no term of supervised release would be sufficient, but not greater than necessary, to achieve the aims of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Michael J. Gilbert*

Michael J. Gilbert
Shriram Harid
Steven Pellechi
Amy Lesperance
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Michael.gilbert@dechert.com
Shriram.harid@dechert.com
Steven.pellechi@dechert.com
Amy.Lesperance@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional Corporation
1 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90071
Michaelartan@yahoo.com
*Attorneys for Defendant Ruben Weigand*

cc:     Assistant United States Attorneys Emily Deininger, Nicholas Folly, and Tara LaMorte

---

"utter inability to do anything meaningful about the conditions at the MCC, especially at the MCC and the MDC."  *United States v. Days*, 19 Cr. 0619 (CM), ECF No. 35 at 18–19, (S.D.N.Y. 2019); *see also* Noah Goldberg and Stephen Rex Brown, "Judge, inmate slam conditions at NYC federal jails in pandemic's 13th month," NEW YORK DAILY NEWS (April 26, 2021), at https://www.nydailynews.com/new-york/ny-federal-jails-covid-conditions-20210426-s3fsstsktbcrpj7xdtj3s7snoq-story.html.