

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**MICHAEL J. GILBERT**

michael.gilbert@dechert.com
+1 212 698 3886 Direct
+1 212 698 0426 Fax

June 15, 2021

**VIA ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v. Hamid Akhavan et al.*, S3 20 Cr. 188 (JSR)

Dear Judge Rakoff:

We represent Ruben Weigand ("Mr. Weigand"), a defendant in the above-captioned case who is scheduled to be sentenced on June 18, 2021 at 3:00 p.m. We respectfully submit this letter in response to the Government's letter dated June 12, 2021, ECF No. 309 ("Gov't Ltr."), in connection with Mr. Weigand's sentencing.

The Government's sentencing submission makes a number of important concessions. The Government concedes, in effect, that its Guidelines calculation is not tied to pecuniary harm, as the Guidelines require. The Government admits that "the defendants' Scheme did not result in direct financial loss to the U.S. Issuing Banks," Gov't Ltr. at 7, and that "the victims here did not suffer any unrecouped financial loss." Gov't Ltr. at 8. The Government also concedes that, even if the Court adopted its Guidelines analysis, a sentence within the range is not appropriate. The Probation Department has reached the same conclusion, recommending a sentence well below the low end of the Guidelines range.

The Government asserts that "Weigand's involvement in the Scheme had cascading indirect effects" by requiring banks to make a "significant investment in compliance and fraud detection programs." Gov't Ltr. at 7. Although it cites Citibank's $276 million anti-fraud budget, the Government expediently neglects to mention the number of programs at the bank "designed to identify a marijuana transaction" and the amount of money the bank spends on "ferreting out or identifying marijuana sales": zero. Tr. 2161:2–12 (testimony by Citibank's Head of Fraud Prevention Michael Steinbach). That number, zero, reflects the actual and intended pecuniary harm in this case, and the basis for the Guidelines range of 0 to 6 months' imprisonment set forth in Mr. Weigand's sentencing submission. ECF No. 310 at 13–15.





Indeed, far from losing money, the alleged victim issuing banks profited handsomely from the offense conduct. With every Eaze transaction, the issuing banks automatically received interchange fees from the credit card networks, *see* Tr. 2098:20–22 ("Citi, like all issuing banks, earns an interchange fee somewhere in the neighborhood . . . [of] about 1.8 percent of the transaction."), and also collected fees imposed on the cardholder, including foreign transaction fees, interest, and penalties. Tr. 2164:19–2165:21. The banks also did not incur any incremental economic risk from the transactions, because their cardholders had already been vetted and assigned a credit limit based on their financial capacity. *See* Tr. 1203:10–17. Indeed, these financial incentives underpinned the banks' permissive approach to the Eaze transactions and their cardholders. Tr. 2117:25–2118:1 ("If it's Mike Steinbach, if I'm within the credit limit, I can do whatever I want."). Finally, Eaze's customers were knowing and willing purchasers of marijuana, and no bank witness at trial testified that the banks were unable to collect on the Eaze transactions.

This Court has directed the parties to clarify whether the Court should apply Application Note 3(B) to § 2B1.1 of the Guidelines, which states that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss *only if* there is a loss but it reasonably cannot be determined." (emphasis added). The prerequisites for the application of Note 3(B) are not satisfied in this case, as indicated in prior submissions to the Court. *See, e.g.*, ECF No. 98-1 at 4. *First*, there was no loss to the issuing banks, as the evidence established at trial, *see* Tr. at 1660:19–24 (Patterson Cross) ("Q. You never intended to cause anyone to lose any money, Correct? A. That's right. Q. And to your knowledge, no one did lose any money on the credit card purchases. Correct? A. Correct, to my knowledge."), and as the Government conceded repeatedly both before and at trial. ECF No. 169 at 11 ("**The Government does not expect that the evidence at trial will show that the United States issuing banks suffered financial loss on these transactions** . . . ."); Tr. 44:5–7 ("the government is not alleging here that the banks lost money on these transactions, it's not part of the theory."). *Second*, because the loss amount is zero, it is not indeterminate. For those reasons, Application Note 3(B) is inapplicable and gain to each defendant should not be used as an "alternative measure of loss." *See, e.g.*, *United States v. Marcus*, 82 F.3d 606, 608 (4th Cir. 1996) ("We have recognized, though, that in some instances gain may prove to be an appropriate alternative measure of loss. **It is not, however, a proxy for loss if there is none**. Thus, gain . . . does not support a loss enhancement . . . if there was no actual, probable, or intended loss to the victims.") (internal citations omitted and emphasis added); *United States v. Haddock*, 12 F.3d 950, 960 (10th Cir. 1993) ("The defendant's gain may be used only as an 'alternative estimate' of that loss; **it may not support an enhancement on its own if there is no actual or intended loss to the victims.**") (emphasis added).

As the Government acknowledges, Mr. Weigand and the Government have agreed to a Consent Preliminary Order of Forfeiture and Money Judgment in the amount of $384,000, which "represent[s] the Government's estimate of the value of the Forfeitable Property that [Mr. Weigand]





personally obtained." ECF No. 309-1 ("Ex. A") at 2. That sum reflects the approximately $384,000 in commission payments Mr. Weigand received from ESEPA, an unindicted co-conspirator, between September 2018 and July 2019, part of the time period of the charged conspiracy. Ex. A at 1; Gov't Ltr. at 6. The Government has accepted $300,000 in full satisfaction of the Money Judgment. Ex. A at 2; Gov't Ltr. at 6.

The terms of the Consent Preliminary Order of Forfeiture and the negotiated amount of $300,000 are commensurate with Mr. Weigand's true role and status as introducer, Tr. 739:17–740:1, 836:25–837:3, and late entrant to the charged conspiracy, not manager or "critical, senior participant." Gov't Ltr. at 1. *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (distinguishing "a belated entrant" to a conspiracy from "an active leader").

Indeed, throughout its sentencing submission, the Government vastly inflates Mr. Weigand's role in the charged conspiracy, describing him at various points as "a critical, senior participant," *see* Gov't Ltr. at 1, as a "manager and senior member of the extensive conspiracy," *id.* at 8, and as "one of the most culpable members of a sprawling conspiracy," and "substantially more culpable than" Oliver Hargreaves, who the Government incorrectly asserts "worked at the direction of" Mr. Weigand. *Id.*

Further, contrary to the Government's contention that "it is unlikely that the Scheme would have been anywhere near as successful as it was" without Mr. Weigand's involvement, Gov't Ltr. at 6, the evidence established that Eaze had a viable and successful card payment solution *before* Mr. Weigand's involvement: From early 2016 to January 2018, the Clearsettle phase, approximately $50 million in Eaze transactions were processed. Tr. 1685:2–17. Even *after* the conclusion of the charged conspiracy and the indictment of the defendants, Eaze made every effort and managed to set up another card payment solution, processing approximately $50 million in marijuana transactions through Circle over an eight-month period. Tr. 2378:9–16.

The Government's description of Mr. Weigand's role is contradicted not only by the evidence at trial, as outlined below, but also by the terms of the Consent Preliminary Order of Forfeiture:

- **Hargreaves and his associate Koen Vanpraet set up and launched the second phase of the charged conspiracy *before* Mr. Weigand's involvement, and without his knowledge or participation. Mr. Weigand was a late entrant to the charged conspiracy.** There is no dispute that Mr. Weigand was not involved in the first Clearsettle phase of the charged conspiracy. Tr. 1685:2–17. With respect to the second phase, the payment processing solution and details were conceived by Hargreaves—in concert with his associate Koen Vanpraet and multiple other well-known payments experts, including former Visa executive Stanley Skoglund, who served in various capacities for Hargreaves





and Vanpraet's employer, *see* Tr. 743:8–745:9—in late 2017, several months before Mr. Weigand's involvement. Together, Hargreaves and Vanpraet pitched Mr. Akhavan their proposed solution. Tr. 699:11–700:6, 959:15–22.

By November of 2017, months before Weigand's involvement, Hargreaves already had a "turnkey" plan in place, complete with the various features the Government describes, including already-acquired "shell companies," already-developed "fake websites," and "fake customer call centers, and the deliberate use of jurisdictions outside of the United States." Gov't Ltr. at 9; Tr. 964:5–9; IWX 22. The months of planning leading up to that solution—which included fully operational websites, proxy merchants, and 24/7 customer support—took place without Mr. Weigand's knowledge or participation. Tr. 1075:6–1076:13, 1076:7–1077:5; IWX 22.

In short, Mr. Weigand was a late "entrant" to the charged conspiracy, *see Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (distinguishing "a belated entrant" to a conspiracy from "an active leader"), a factor this Court should consider in assessing Mr. Weigand's culpability.

- **Mr. Weigand did not "regularly direct[ ] and manage[ ] other members of the Scheme," let alone direct Hargreaves. Gov't Ltr. at 8–9.** Various aspects of the trial record undermine the Government's contention that Mr. Weigand directed and managed other members of the charged conspiracy. In May 2018, in a group chat ("Eaze cs"), Mr. Akhavan described Hargreaves as "[t]he man in charge of Europe." GX 4002 at 1. At the end of July of 2018—over 11 months after Hargreaves and Vanpraet set in motion the second phase of the conspiracy— Mr. Akhavan introduced Mr. Weigand along with an individual named "Martin" as having "agreed to be actively involved with helping us out." GX 302 at 50.

  Mr. Weigand's infrequent and limited participation in group chats undercuts the Government's view of his role as "operations manager" and the "main point of contact for Hargreaves and his team." Gov't Ltr. at 8. For the over two months the "Olliebaba" group chat—central to the Government's case—was active, Weigand participated on only eight days; on certain of those days, he sent only a single message. GX 4004.

  Mr. Weigand's limited communications with Hargreaves belie the notion that Weigand directed Hargreaves. A call log between February and June of 2018 reveals only a few short and sporadic phone calls between Hargreaves and Mr. Weigand during those months. GX 4010. Further, for close to a year—between June 2018 and May 2019—the call log shows no contact at all between Hargreaves and Mr. Weigand, until Hargreaves asks for





"a catch up" in May 2019 to update Mr. Weigand on developments at his end. GX 4010 at 7.

A recorded conversation between Mr. Weigand and Hargreaves in May of 2019 further undermines Hargreaves' contention that he was in "daily" contact with Mr. Weigand, *see* Tr. 655:10–22, and that he was directed by Mr. Weigand. *See* IWX 28-T. The conversation highlights just how disconnected and out of sync Hargreaves and Mr. Weigand were. In part, Hargreaves says to Mr. Weigand: "[W]hoever we're communicating with – honest, whoever's been dealing with it, they're fully aware of all of this, **but I'm just letting you know.**" *Id.* at 6. Hargreaves' repeated references to "whoever we're communicating with" and "whoever we were speaking with," *id.* at 5–6, also highlight that Hargreaves' testimony—including his claim that Mr. Weigand controlled EU Processing—was flatly contradicted by other, more credible evidence. *See* Tr. 763:16–22; *see supra* at 4.

- **The Government's description of Mr. Weigand's role is premised, in part, on the incorrect conflation of Mr. Weigand and the Euprocessing email account.** The Government asserts, in part, that Mr. Weigand "[r]eviewed and provided feedback on fraudulent bank account applications" and "on the fraudulent webpages," and that Hargreaves' "team received feedback from Weigand regarding the fraudulent application packages on an almost daily basis." Gov't Ltr. at 3, 4. But those descriptions are based in substantial part on emails sent and received from the account euprocessing@protonmail.com. *See* GX 3956, 3959. Evidence at trial undercut Hargreaves' false identification of Mr. Weigand as EU Processing, which was not confirmed by any other witness. Indeed, Darcy Cozzetto, the former Senior Vice President of Operations at Eaze, who communicated frequently with Euprocessing@protonmail.com, testified definitively that it was always her understanding that the email address was operated by the individual named "Andreas." Tr. 2076:14–2077:13. Ms. Cozzetto's testimony was corroborated by numerous exhibits consisting of emails between EU Processing and Ms. Cozzetto, in which EU Processing signed off as, or was otherwise addressed as, "Andreas." GX 443; WX 102; WX 103; WX 107; WX 111; WX 119. The Government later acknowledged the lack of evidence establishing that Mr. Weigand was EU Processing. Tr. 2609:24–2610:2 ("There's no requirement that Ruben Weigand sent every single email from Euprocessing. What you have in this case is so much other evidence, **put the email address completely to the side**."). It follows that Mr. Weigand did not direct Hargreaves.

- **Weigand had no "direct involvement in the creation of false businesses using shell companies, fake websites, [or] fake customer call centers." Gov't Ltr. at 8–9.** To the contrary, Hargreaves' own trial testimony made clear that Michele Furlan, a member of his





core team, was "contracted to manage the whole process of actually creating the application packs, [t]o purchasing the shelf companies to building the websites," all without Mr. Weigand's involvement. Tr. 741:15–21. Through his entity Spinwild Limited, Furlan was also responsible for wiring funds to the Eaze dispensaries in the United States. Tr. 741:15–742:2, 911:1–9, 1331:4–9, 1392:16–20. This fact also belies the Government's assertion that Hargreaves and his core team "had no knowledge of the extent of the Scheme's financial impact" and were less culpable than Mr. Weigand. Gov't Ltr. at 8.

Mr. Weigand also had no role in the technical aspects of Eaze's card processing solution, including the use of online tracking pixels or call centers. John Wang, Eaze's Lead Product Manager, who had substantial involvement in developing those aspects of Eaze's processing, admitted on cross-examination that he did not recall discussing the contents of any website or the use of tracking pixels with Mr. Weigand. Tr. 2290:13–25. Similarly, Mr. Weigand was not even a participant in the "Eaze cs" group chat concerning the customer service aspects of the processing solution. GX 4002.

- **The Government's contention that Weigand "interfaced with the acquiring banks" was unsupported by direct evidence. Gov't Ltr. at 3.** The only two Government witnesses who had any contact with Mr. Weigand during the charged scheme, Hargreaves and Wang, testified that it was their *understanding* that Mr. Weigand "interfaced with the acquiring banks," but that contention was unsupported by any documentary evidence. Tr. 655:10–25, 1043:15–1044:10, 2254:21–23, 2287:2–2288:13. Wang's testimony, in particular, was based on only a single, short phone call with Mr. Weigand, Tr. 2267:3–7, and a chat exchange in which Mr. Weigand was clearly filling in for an individual named "Marty." Tr. at 2264:16–17. Further, the only email the Government cites for this proposition, GX 1696, shows ESEPA submitting a merchant application to an acquiring bank executive, but does not show Mr. Weigand personally engaging with that executive.

- **There was no direct evidence of Mr. Weigand sending "wire proofs" or "statements" to Eaze dispensaries. Gov't Ltr. at 4.** Not a single email or document admitted into evidence, including those seized from Mr. Weigand's laptop, showed Mr. Weigand sending wire proofs or statements to Eaze dispensaries concerning "the flow of proceeds from the marijuana transactions." *Id.* Rather, the group chat the Government cites for this proposition, GX 1709 (describing Weigand's role as "channeling communications with the submerchant payees and [] providing statements and client support") was not connected to the charged Eaze scheme in any way and no witness with relevant knowledge testified that it was.





- **Weigand did not submit application packs to the acquiring banks, as the Government contends.** ***See*** **Gov't Ltr. at 3.** Indeed, every application pack sent to an acquiring bank was clearly signed by an executive at the entity ESEPA Finance GmbH, *see* GX 1622 at 7, and submitted by an ESEPA executive. *See also* GX 1696, Tr. 1036:7–20. This is the same entity the Government now belatedly acknowledges, for purposes of forfeiture, "was involved in processing the Eaze-related transactions." Gov't Ltr. at 6. The evidence the Government cites, including the Olliebaba chat, *see* GX 4004 at 51, 87, shows that the application packs were submitted, but does not show that Mr. Weigand submitted them.

For the foregoing reasons and those set forth in Mr. Weigand's sentencing submission dated June 12, 2021, ECF No. 310, the Government dramatically overstates Mr. Weigand's role in the charged conspiracy. For the same reasons, the "manager or supervisor" enhancement under § 3B1.1 of the Guidelines does not apply. ECF No. 310 at 17–18. Nor do the enhancements for "loss," "10 or more victims," or "sophisticated means" under § 2B1.1 apply for the reasons enumerated in Mr. Weigand's sentencing submission. *Id.* at 13–17.

Defendant Weigand respectfully submits that a sentence of time served and no period of supervised release would be sufficient, but not greater than necessary, to achieve the aims of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Michael J. Gilbert*

Michael J. Gilbert
Shriram Harid
Steven Pellechi
Amy Lesperance
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Michael.gilbert@dechert.com
Shriram.harid@dechert.com
Steven.pellechi@dechert.com
Amy.Lesperance@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional Corporation
1 Wilshire Boulevard, Suite 2200





Los Angeles, CA 90071
Michaelartan@yahoo.com
*Attorneys for Defendant Ruben Weigand*

cc: Assistant United States Attorneys Emily Deininger, Nicholas Folly, and Tara LaMorte