

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 15, 2021

**BY ECF AND HAND DELIVERY**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl St.
New York, New York 10007

    Re:    *United States v. Ruben Weigand*, S3 20 Cr. 188 (JSR)

Dear Judge Rakoff:

    The Government respectfully submits this letter in response to defendant Ruben Weigand's sentencing submission, dated June 12, 2021 (hereinafter, "Weigand Ltr."). For the reasons set forth below, the Government submits that Weigand's objections to the Probation Report's Guidelines' calculation should be rejected, as should his further arguments that a sentence of time served is sufficient because, among other things, he was merely an "introducer" with a minimal role in the bank fraud scheme (the "Scheme"), the U.S. Issuing Banks knowingly processed marijuana transactions, or because of the collateral consequences to his family, businesses, reputation, and finances as a result of the conviction. These arguments largely amount to an attempt to minimize the severity of his crime and redirect the blame onto others, utterly failing to take any responsibility for his serious criminal conduct. A substantial term of imprisonment, below the Guidelines, remains appropriate for Weigand.

    **I.**    **The Presentence Report Correctly Calculated the Guidelines Range**

    Weigand objects to the U.S. Probation Office's determination that the total offense level for the offense is 38, arguing that there are no applicable enhancements and that the correct Guidelines range is 0 to 6 months' imprisonment. Weigand, however, ignores the plain text of the Guidelines and the weight of the evidence introduced at trial.

    A.    **The Twenty-Four Level Loss Enhancement Is Properly Applied Because Weigand Deceived U.S. Issuing Banks into Authorizing More Than $108 Million in Hidden Marijuana Transactions**

    At trial, the Government proved "that the defendant intend[ed] 'to obtain . . moneys . . . owned by, or under the custody or control of, a financial institution'—that is, 'intend[ed] to obtain bank property.'" *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016) (quoting *United States v. Loughrin*, 134 S. Ct. 2384, 2389 (2014)). As such, the loss amount under Section 2B1.1 is properly keyed to the "scheme's goal" of "obtaining bank property." *Id.* This harm to the

banks' property interests was real regardless of whether they ultimately were recouped for their financial loss by the cardholders. And because that harm "otherwise is readily measurable in money"—i.e., the amount of money the U.S. Issuing Banks were deceived into processing—it constitutes a "reasonably foreseeable pecuniary harm that resulted from the offense" warranting the 24-level enhancement under the Guidelines. U.S.S.G. § 2B1.1 app. note 3(A)(i) & (iii).

Weigand's argument to the contrary should be rejected because it would lead to an absurd calculation of the Guidelines. Under Weigand's theory, Weigand and his co-conspirators purposefully tricked thousands of financial institutions into parting with over one hundred million dollars in transactions, and collected tens of millions of dollars for themselves, would be considered no culpable than a fraudster who submitted a single fraudulent bank application seeking a $5 loan. That is completely inconsistent with the Sentencing Commission's determination that "sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes." U.S.S.G. § 2B1.1, background; *see also United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 102 (2d Cir. 2014) (noting that loss under the fraud Guidelines "seeks [] to measure the seriousness of [the defendant's conduct]").

*United States v. Markert*, 774 F.3d 922 (8th Cir. 2014), which Weigand relies upon in support of his position, is completely consistent with the Government's interpretation of the Guidelines. In that case a bank officer wrongfully approved nominee loans, the proceeds of which were redirected to other overdrawn accounts at the bank. *Id.* at 924. In concluding that the total amount of the loans was not the best measure of loss, the Eighth Circuit stressed that the issue, unlike in this case, was that "*the money never left the Bank*." *Id.* at 926 (emphasis in original). As *Markert* explained, however, "[f]or many, perhaps most fraud offenses, actual loss is properly and readily measured by the fair market value of property 'taken' from the victim"—here, the more than $108 million in fraudulently authorized transactions. *Id.*

*United States v. Abbey*, 288 F.3d 515 (2d Cir. 2002), also cited by Weigand, is also easily distinguishable. In *Abbey*, which involved a defendant who fraudulently obtained a loan by misrepresenting the value of his assets, the Second Circuit held that the relevant Guidelines application note required the loss amount to be reduced by the bank's recovery of assets pledged by the defendant to secure the loan. *Id.* at 518. Notably, that application note applied only where a *defendant* pledged assets to secure a loan—in other words, where there were assets controlled by the defendant, not a third party, that offset the intended or actual loss amount. This is consistent with the Sentencing Guidelines overall "net loss" approach, which "'recognizes that the offender who transfers something of value to the victim[] generally is committing a less serious offense than an offender who does not.'" *Markert*, 774 F.3d at 925 (quoting U.S.S.G.App. C., Vol. II, Amend. 617, at 183). The current application notes to Section 2B1.1 recognize this same distinction, providing for a credit against loss in cases where (a) the *defendant or co-conspirators* returned money or property to the victim before the offense was detected, or where (b) collateral had been "pledged or otherwise provided *by the defendant*." U.S.S.G. § 2B1.1 app note 3(E)(i) & (ii) (emphasis added). In contrast, here, the defendant pledged no collateral and made no repayments to the victims, and therefore should not be credited as having "commit[ed] a less serious offense." Whether U.S. cardholders would make timely payments on their credit card bills was outside of Weigand's control, and beyond his intent, which was merely to get the transactions authorized so that he and his co-conspirators could collect their fees and commissions.

Because the amount of funds that the U.S. Issuing Banks were tricked into releasing is a reasonably determinable loss amount, that amount—for the EU Processing phase of the Scheme, more than $108 million—should be used rather than relying upon gain as an alternative measure of loss. *See* U.S.S.G. § 2B1.1, app note 3(B).

That being said, the Government accepts that using gain as an alternative measure of loss would more accurately reflect the seriousness of the offense than Weigand's proposition that the less amount is zero. Accordingly, to the extent the Court determines that the actual loss amount is not readily determinable here, the Government respectfully submits that it should use gain as an alternative measure of loss, and further submits that the gain to Weigand and his co-conspirators during the EU Processing phase of the Scheme is the amount processed during that phase multiplied by the rate charged by the co-conspirators for processing the transactions, or $108,320,268.20 times 8.75% (PSR ¶ 26-27), for a total gain of $12,998,432.20. *See* U.S.S.G. § 2B1.1, app note 3(B) (permitting Court to use "gain that resulted from the offense" as alternative measure of loss); *United States v. Tzolov*, 435 F. App'x 15, 16-17 (2d Cir. 2011) (affirming district court's use of commissions earned on fraudulent sales as an alternative measure of loss); *see also* U.S.S.G. § 1B1.3(a)(1)(B) (each co-conspirators is liable for all reasonably foreseeable acts of other co-conspirators taken in furtherance of the conspiracy).

### B. **The Two-Level "10 or more Victims" Enhancement is Properly Applied**

Weigand does not dispute that there were more than ten banks that authorized transactions and released funds as a result of the scheme; rather, he claims that none of them were victims because there was no financial loss. Again, this absurdly minimizes the seriousness of this sprawling, complex offense which in actuality impacted thousands of banks in the United States alone. As the Government previously noted, the costs to the U.S. Issuing Banks went beyond the loss of their property. It also included necessary investment in enhanced compliance programs and risk assessment procedures in an attempt to identify these types of schemes and enforce their own rules and policies. Govt. Ltr. at 7. Regardless, for the reasons described above, each of the U.S. Issuing Banks that was tricked into parting with its money suffered "actual loss" for purposes of the Guidelines, and this enhancement should be applied.[1]

### C. **The Two-Level "Sophisticated Means" Enhancement is Properly Applied**

Weigand's objections to this enhancement are meritless. It is undisputed that the shell companies used to form the Phony Merchants were located in offshore jurisdictions, and the co-conspirators used offshore acquiring banks to obtain bank accounts for the Phony Merchants. In addition, Weigand himself was based outside the United States for the entirety of his involvement in the scheme, as were other co-conspirators. "A substantial part of [the] fraudulent scheme was [thus] committed from outside the United States." U.S.S.G. § 2B1.1(b)(10). Moreover, as described in the Government's prior submission, the evidence at trial overwhelmingly established that Weigand was directly involved in the use of those shell companies to prepare fraudulent bank

---

[1] This two-level enhancement should be applied even if the Court believes that gain should be used as an alternative measure of loss. *United States v. Romano*, 794 F.3d 317, 338-39 (2d Cir. 2015).

account applications and obtain merchant bank accounts with the offshore acquiring banks,[2] in addition to providing input on other complex and sophisticated aspects of the Scheme such as the use of fake webpages and forwarded customer service call numbers for the Phony Merchants. Govt. Ltr. at 3-4. Weigand's contention that he was not involved with the fraudulent bank account applications is contradicted not only by witness testimony (*see, e.g.*, Tr. 729, 1740), but also the extensive evidence recovered from Weigand's laptop, which included a number of those fraudulent bank account application packages and correspondence regarding the same (*see, e.g.*, Tr. 1365-1367; GX 1265, GX 3707).

### D. **The Three-Level "Manager/Supervisor" Enhancement is Properly Applied**

Weigand contends that he was not a "manager" of the Scheme, arguing that he was merely an "introducer" and was not involved in the Scheme's planning. (Weigand Ltr at 7-10, 17). The evidence at trial plainly established otherwise.

*First*, the evidence showed that Weigand was involved in the planning of the EU Processing phase of the Scheme. As an initial matter, Weigand was clearly involved in the EU Processing by September 2017, when Weigand agreed with Akhavan to submit Eaze's processing history "properly to new processors without naming the current banks" (GX 1706), more than two months before Hargreaves submitted his supposed "turnkey" plan to Akhavan in November 2017 (IWX 22). Weigand was also present at both of the critical planning meetings at Akhavan's office in Calabasas, California in January 2018 (Tr. 710-716), and March 2018 (*see* Tr. 1562-63, 1997; GX S2; GX 302 at 50). Indeed, other than Akhavan, Weigand was *only* person present for both of these planning meetings.

*Second*, as the Government has already described, once the Scheme was operating, Weigand was intimately involved in its core elements, and specifically was responsible for providing guidance to both Eaze employees and Hargreaves and his team to make sure that the Scheme was successfully executed. (*See* Govt Ltr at 3-4). Contemporaneous communications established that these instructions went out from Weigand not just regularly, but "daily." (GX 302 at 46 (Hargreaves writing that "Kf is my project manager she is communicating with [R]uben daily")). Other contemporaneous communications further contradict Weigand's characterization of himself as having limited involvement. For example, Weigand was a critical participant in the "Olliebaba" chat, which is a 108-page running narrative of the planning and implementation of the Scheme, covering virtually every facet of it (GX 4004), and is also a participant in other extensive chat exchanges regarding the Scheme (*see* GX 302 (messages between Akahvan, Weigand, and

---

[2] Weigand's contention that the "application packs clear showed who submitted them" appears to be reference to the fact that many of the completed application packs were signed by Michael Kindle, who was affiliated with the ISO ESEPA. (*See, e.g.*, GX 1622 at 7). But the presence of Kindle's name fails to establish that Weigand was *not* involved in submitting the application packs, particularly in light of the overwhelming evidence otherwise, including witness testimony, email correspondence showing fraudulent applications being sent by Hargreaves' team to Weigand's email address, euprocessing@protonmail.com, and the many versions of fraudulent applications and related paperwork recovered from Weigand's laptop (*see, e.g.*, GX 3707).

Eaze employees, among others); GX 4008 (messages between Weigand, Hargreaves, and other members of Hargreaves' team).

*Third*, Weigand's attempts to shift the blame to Hargreaves are unavailing. Far from being the leader who "direct[ed] the operational aspects of the second phase" (Weigand Ltr. at 17), the evidence showed that Hargreaves was essentially hired labor: he contracted with Akhavan to purchase shell companies, prepare application packages (for which he received extensive guidance and feedback from Weigand), and devise websites; indeed, he went to Weigand to collect on his invoices for that work. (*See, e.g.*, Tr. 654-55, 905-08; GX 3904; GX 3905; GX 3968; GX 3962; GX 3963, GX 3963; GX 3967; GX 3970).

## II.  A Substantial Sentence of Imprisonment is Warranted under 18 U.S.C. § 3553

The Government has already set forth the basis for its position that a substantial sentence, but below the Guidelines range of 235 to 293 months' imprisonment, is appropriate under Section 3553, and will not repeat those arguments here. The Government disagrees with Weigand that a sentence of time served is sufficient in this case.

Among the mitigating factors raised by Weigand are the support of his family, history of good deeds and entrepreneurship, and lack of prior criminal history. (Weigand Ltr. at 20-21). These, of course, are factors the Court should consider in determining an appropriate sentence. On the other hand, these attributes make it even more disappointing that Weigand chose to engage in a course of criminal conduct, over a lengthy period of time, when so many other options were available to him. The defendant was quite successful—he had started and was operating several businesses as detailed in the PSR—but that simply was not enough for him. Nor was the offense an "aberration," as Weigand contends; rather, it was a concerted and extensive course of conduct carried out over the course of more than a year. This was no one-off, one-time mistake. Weigand wanted more money, and he chose to break the law to get it.

Weigand also argues that the collateral consequences of the conviction to his businesses, finances, and reputation weigh against a term of further imprisonment. While the Government acknowledges that the conviction may cause Weigand financial and professional hardship, the Government respectfully notes that this is true with respect to almost every defendant sentenced by Your Honor, and therefore merits little special consideration here. Indeed, these were the natural consequences of Weigand's knowing decision to get involved in a cross-border payment processing fraud scheme, if he were to get caught. In other words, any financial, professional, or personal harm Weigand is suffering was foreseeable, and yet was insufficient to deter him from commencing the instant offense conduct, presumably because he believed that his actions would not, in fact, be detected or traced back to him.

The Government also disagrees with the defendant's argument that the offense was not serious because the U.S. Issuing Banks were complicit or willfully blind. (Weigand Ltr. at 21). That argument was made to and rejected by the jury and should be given no weight by this Court when considering the appropriate sentence.[3] The testimony from representatives of U.S. issuing

---

[3] Likewise, the Court should give no weight to Weigand's argument that he did not intend to cause any harm to U.S. issuing banks, another argument that was presented to and rejected by the jury.

5

banks consistently established that those banks would not have knowingly authorized marijuana transactions, and that the accuracy of the information they received regarding transactions, including the accuracy of merchant category codes ("MCCs"), was something they relied upon when deciding whether to authorize or block transactions.[4]  (Tr. 1161-1162, 1170 (Clow); Tr. 1760-62, 1769 (Brown); Tr. 2083, 2096-2098 (Steinbach) (explaining that inaccurate transaction information results in (a) "financial loss through fraud"; (b) "impact [to] legitimate customers when they're trying to do purchases"; and (c) instead [in] operation expenses").  If anything, Weigand's continued victim-blaming, and insistence that this is a victimless crime that caused no harm, demonstrates that he has not accepted responsibility and will not be deterred from engaging in similar, future conduct unless the risk of a substantial term of imprisonment is made real.

For all of these reasons, and for the reasons set forth in the Government's initial sentencing submission, the Government believes that a substantial term of imprisonment, but below the Guidelines range of 235 to 293 months' imprisonment, would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____/s/_____
Emily Deininger
Nicholas Folly
Tara LaMorte
Assistant United States Attorneys
(212) 637-2472 / 1060 / 1041

Cc:   Defense counsel (by ECF)

---

(Tr. 2510-2511).  As explained in the Government's opposition to Weigand's Rule 29 and Rule 33 motions, the evidence firmly established that Weigand knew that the transaction laundering scheme was being conducted on behalf of Eaze, a California company that sold its products to California customers, who were likely to have cards from U.S. Issuing Banks.  Dkt. No. 303 at 22-23.

[4] The Circle transactions, which occurred *after* the charged conspiracy, do not otherwise show that the banks were complicit in knowingly processing marijuana transaction in circumvention of their own rules.  Those transactions were (1) conducted using a two-stage transaction process in which the issuing banks processed a transaction for a stable cryptocurrency, not marijuana (Tr. 2395-96; HAX 14001 at 4), and (2) were not clearly marked as marijuana transactions or as transactions involving the California-based marijuana delivery company Eaze.  Rather, the descriptor for those transactions, which referred to "Circle Wallet *Eaze London, UK" (HAX 11001), could have referred to any company associated with the word Eaze and appeared to refer to a merchant based outside of the United States.